**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN BROADCASTING COMPANIES, INC., THE WALT DISNEY COMPANY, KABC TELEVISION, LLC, KFSN TELEVISION, LLC, KGO TELEVISION, INC., KTRK TELEVISION, INC., WABC TELEVISION (NEW YORK), LLC, WLS TELEVISION, INC., WPVI TELEVISION (PHILADELPHIA), LLC, and WTVD TELEVISION, LLC,<br><br>*Plaintiffs*,<br><br>v.<br><br>FEDERAL COMMUNICATIONS COMMISSION, and, in their official capacities, BRENDAN CARR, ANNA M. GOMEZ, OLIVIA TRUSTY, and JOHN DOES 1–2,<br><br>*Defendants*. | Civil Case No. 1:26-cv-2902 |

**MEMORANDUM IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER**
**AND PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS


TABLE OF AUTHORITIES .......... iii

INTRODUCTION .......... 1

BACKGROUND .......... 5

I. Statutory Framework .......... 5

II. Factual Background .......... 7

A. ABC's Stations Have Served The Public Interest With Distinction For Decades .......... 7

B. The Administration Has Waged A Multi-Front Campaign Against ABC In Retaliation For Its Expression And Editorial Judgments. .......... 8

C. The Commission Orders Plaintiffs To File Early Broadcast License Renewal Applications For All Eight ABC Owned Stations. .......... 15

D. The Commission's Playbook Has Been To Use Regulatory Power To Extract Concessions From Media Companies. .......... 19

E. The Commission's Next Step Will Inflict Further Irreparable Injury On Plaintiffs. .......... 20

ARGUMENT .......... 21

I. Plaintiffs Are Likely To Succeed On The Merits Of Their Claim That The Early License Renewal Process Is Unconstitutional First Amendment Retaliation. .......... 21

A. Disney, ABC, And ABC Owned Stations Have Engaged In Protected Speech. .......... 23

B. The Commission's Unprecedented Threat to Plaintiffs' Broadcast Licenses Are Adverse Actions. .......... 24

C. The Unprecedented Context Of These Proceedings Demonstrates That The Commission's Actions Are Motivated By Retaliatory Animus. .......... 26

II. Defendants' Actions Are Inflicting Irreparable Harm On Plaintiffs. .......... 34

III. The Balance Of Equities And Public Interest Strongly Favor An Injunction. .......... 38

IV. This Court Has Jurisdiction To Review Plaintiffs' Claims. .......... 39

V. This Court Should Waive FRCP 65(c)'s Security Requirement. .......... 43

CONCLUSION .......... 43

APPENDIX A: KEY STATEMENTS CHRONOLOGY .......... A1

# TABLE OF AUTHORITIES

**Cases**

598 U.S. 175 (2023) ..... 41, 42, 44

*Am. First Legal Found. v. Becerra*,
2024 WL 3741402 n.11 (D.D.C. Aug. 9, 2024) ..... 45

*Aref v. Lynch*,
833 F.3d 242 (D.C. Cir. 2016) ..... 24

*Ark. Educ. Television Comm'n v. Forbes*,
523 U.S. 666 (1998) ..... 25

*Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963) ..... 27

*Cate v. Oldham*,
707 F.2d 1176 (11th Cir. 1983) ..... 36

*City of Angels Broad. v. FCC*,
745 F.2d 656 (D.C. Cir. 1984) ..... 21

*Dep't of Com. v. New York*,
588 U.S. 752 (2019) ..... 28

*Doran v. Salem Inn, Inc.*,
422 U.S. 922 (1975) ..... 35

*Egbert v. Boule*,
596 U.S. 482 (2022) ..... 38

*Elgin v. Dep't of Treasury*,
567 U.S. 1 (2012) ..... 41

*Endocrine Soc'y v. FTC*,
2026 WL 1257289 (D.D.C. 2026) ..... passim

*FCC v. Nat'l Citizens Comm'n for Broad.*,
436 U.S. 775 (1978) ..... 5

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021) ..... 5

*FDIC v. Meyer*,
510 U.S. 471 (1994) ..... 38

*First Choice Women's Res. Centers, Inc. v. Davenport*,
146 S. Ct. 1114 (2026) .......... 43

*Fox Television Stations, LLC*,
40 FCC Rcd. 438 (MB 2025) .......... 6

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
561 U.S. 477 (2010) .......... 41

*FTC v. Standard Oil Co. of California*,
449 U.S. 232 (1980) .......... 42

*Galloway v. FCC*,
778 F.2d 16 (D.C. Cir. 1985) .......... 29

*Garrison v. Louisiana*,
379 U.S. 64 (1964) .......... 3

*Glob. Health Council v. Trump*,
153 F.4th 1 (D.C. Cir. 2025) .......... 22

*Green v. U.S. Dep't of Just.*,
54 F.4th 738 (D.C. Cir. 2022) .......... 22

*Hartman v. Moore*,
547 U.S. 250 (2006) .......... 24, 28

*Hous. Cmty. Coll. Sys. v. Wilson*,
595 U.S. 468 (2022) .......... 26

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
515 U.S. 557 (1995) .......... 25, 37

*In re NTE Conn., LLC*,
26 F.4th 980 (D.C. Cir. 2022) .......... 38

*Infinity Broadcasting Operations Inc.*,
18 FCC Rcd. 18603 (2003) .......... 14

*Jenner & Block LLP v. U.S. Dep't of Just.*,
784 F. Supp. 3d 76 (D.D.C. 2025) .......... 39

*League of Women Voters v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) .......... 35, 38, 40

*Mata v. Lynch*,
576 U.S. 143 (2015) .......... 41

*Media Matters for Am. v. Bailey*,
2024 WL 3924573 (D.D.C. 2024) .................................................................. 23, 32

*Media Matters for Am. v. FTC*,
805 F. Supp. 3d 105 (D.D.C. 2025) ............................................................. passim

*Media Matters for Am. v. FTC*,
2025 WL 2988966 (D.C. Cir. 2026) ............................................................. passim

*Media Matters for Am. v. FTC*,
2026 WL 1354245 (D.C. Cir. 2026) ..................................................................... 23

*Media Matters for Am. v. Paxton*,
732 F. Supp. 3d 1 (D.D.C. 2024) .................................................................. 23, 26

*Media Matters for America v. Paxton*,
138 F.4th 563 (D.C. Cir. 2025) ........................................................... 24, 36, 37, 40

*Mills v. Alabama*,
384 U.S. 214 (1966) .............................................................................................. 37

*Morse v. Frederick*,
551 U.S. 393 (2007) .............................................................................................. 25

*Motion Picture Ass'n of Am. v. FCC*,
309 F.3d 796 (D.C. Cir. 2002) ............................................................................ 6, 7

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*,
429 U.S. 274 (1977) .............................................................................................. 28

*N.Y. Times Co. v. Sullivan*,
376 U.S. 254 (1964) ................................................................................................ 4

*Nat'l Rifle Ass'n of Am. v. Vullo*,
602 U.S. 175 (2024) ...................................................................................... 3, 26, 27

*Nieves v. Bartlett*,
587 U.S. 391 (2019) .............................................................................................. 31

*Ozburn-Hessey Logistics, LLC v. Nat'l Lab. Rels. Bd.*,
833 F.3d 210 (D.C. Cir. 2016) .............................................................................. 33

*Patriot, Inc. v. U.S. Dep't of Hous. & Urb. Dev.*,
963 F. Supp. 1 (D.D.C. 1997) ............................................................................... 39

*Perkins Coie LLP v. U.S. Dep't of Just.*,
783 F. Supp. 3d 105 (D.D.C. 2025) ..................................................................... 27

*Pursuing Am.'s Greatness v. Fed. Election Comm'n*,
831 F.3d 500 (D.C. Cir. 2016) .......... 36

*Roth v. United States*,
354 U.S. 476 (1957) .......... 40

*Sagittarius Broad. Corp.*,
18 FCC Rcd. 22551 (2003) .......... 6, 34

*SEC v. Jarkesy*,
603 U.S. 109 (2024) .......... 22

*Sherley v. Sebelius*,
644 F.3d 388 (D.C. Cir. 2011) .......... 22

*Singh v. Carter*,
168 F. Supp. 3d 216 (D.D.C. 2016) .......... 22

*Snyder v. Phelps*,
562 U.S. 443 (2011) .......... 25

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014) .......... 26

*Syracuse Peace Council v. FCC*,
867 F.2d 654 (D.C. Cir. 1989) .......... 7

*Syracuse Peace Council*,
2 FCC Rcd. 5043 (1987) .......... 7, 29, 34, 44

*Thunder Basin Coal Co. v. Reich*,
510 U.S. 200 (1994) .......... 42, 43

*Trudeau v. FTC*,
456 F.3d 178 (D.C. Cir. 2006) .......... 40

*Trump v. Cook*,
146 S. Ct. 2234 (2026) .......... 40

*UAW-Lab. Emp. & Training Corp. v. Chao*,
325 F.3d 360 (D.C. Cir. 2003) .......... 37

*United States v. P.H.E., Inc.*,
965 F.2d 848 (10th Cir. 1992) .......... 44

*United States v. Stanchich*,
550 F.2d 1294 (2d Cir. 1977) .......... 28

*Virginia v. Am. Booksellers Ass'n, Inc.*,
484 U.S. 383 (1988) ... 37

*Vt. Right to Life Comm'n, Inc. v. Sorrell*,
221 F.3d 376 (2d Cir. 2000) ... 26

*W. Va. Bd. of Educ. v. Barnette*,
319 U.S. 624 (1943) ... 4

*Webster v. Doe*,
486 U.S. 592 (1988) ... 41

*White v. Lee*,
227 F.3d 1214 (9th Cir. 2000) ... 31, 35

*Whitman v. Dep't of Transp.*,
547 U.S. 512 (2006) ... 41

*Winter v. Natural Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ... 22

*Xiaomi Corp. v. Dep't of Def.*,
2021 WL 950144 (D.D.C. Mar. 12, 2021) ... 39

**Statutes**

5 U.S.C. § 702 ... 40

5 U.S.C. § 706 ... 43

18 U.S.C. § 1464 ... 7

28 U.S.C. § 1331 ... 41

47 U.S.C. Ch. 5 ... 33

47 U.S.C. § 303 ... 5

47 U.S.C. § 307(c) ... 5

47 U.S.C. § 307(d) ... 6, 32, 40

47 U.S.C. § 309 ... 5

47 U.S.C. § 309(k) ... 17

47 U.S.C. § 309(k)(1) ... 6, 34

47 U.S.C. § 315 ... 7, 13

47 U.S.C. § 315(a)(2) ........ 13

47 U.S.C. § 326 ........ 6, 44

47 U.S.C. § 503(b)(4) ........ 33

**Rules**

FRCP 65(c) ........ 45

**Regulations**

47 C.F.R. § 73.1020 ........ 5, 17

47 C.F.R. § 73.1943 ........ 13

47 C.F.R. § 73.3539 ........ 17, 18

47 C.F.R. § 73.3539(c) ........ 17, 32, 33

# INTRODUCTION

This case boils down to a simple question: can the Administration use its control over the federal regulatory apparatus to punish a media organization for editorial decisions and news coverage it dislikes? Because the First Amendment provides a clear answer—of course not—this Court's intervention is necessary to stop the Federal Communications Commission's extraordinary assault on free speech.

In April, the Commission took the unprecedented step of ordering the eight television stations ("the Stations") owned by ABC and its parent, The Walt Disney Company, to submit renewal applications for their broadcast licenses years ahead of schedule. That order was both abrupt and irregular. Until the day before, the Commission had not called for an early license renewal in over fifty years, much less one for stations with decades-long records of serving the public interest. And the Commission has *never* demanded simultaneous renewal applications from a group of stations commonly owned with a broadcast network.

It is no mystery why the Commission has singled out the Stations: the Administration and the Commission's Chairman have openly and repeatedly denounced ABC's editorial decisions and the views expressed on ABC programs. For years, the President has called on the Commission to "take away [ABC's] license" because it was "corrupt,"[1] asserting that ABC "should lose their Licenses for their unfair coverage of Republicans and/or Conservatives."[2] The day before the Commission's unprecedented order, the President had publicly objected to on-air comments made

[1] Exhibit 6 to Declaration of Beth A. Wilkinson ("Wilkinson Ex.") (*Interview: Donald Trump Calls Into Fox and Friends for an Interview After the Debate*, Roll Call Factbase (Sept. 11, 2024), https://perma.cc/GEL9-ZGAU).
[2] *See* Wilkinson Ex. 23 (Donald J. Trump (@realDonaldTrump), Truth Social (Aug. 24, 2025, at 10:58 PM ET), https://perma.cc/C48H-XQEP).

by ABC's late-night host Jimmy Kimmel and called for his firing.[3] And in an interview explaining the Commission's decision shortly thereafter, the Commission's Chairman warned: "If you didn't take us seriously, now you should."[4]

The Commission has since reinforced that it will aim its attention at ABC's content and editorial choices in its review of the Stations' licenses. Just two weeks ago, the President again called to revoke the Stations' licenses (as well as those of NBC) in response to the editorial choice not to broadcast his primetime address: "NBC and ABC fake news have both said that they would not cover this speech . . . . [T]his should mean a revocation of their licenses."[5] In what has become a familiar pattern, the Chairman quickly picked up the President's call to action, publicly promising that the Commission would weigh ABC's decision not to broadcast the address in the renewal process because the address was (in the Chairman's view) "something that broadcasters should be carrying."[6]

The Commission thus has ABC caught in a vise. With the public comment period on the early renewal applications now closed, at any moment the Commission could order an administrative hearing forcing the Stations to defend their right to exist. Indeed, public reporting suggests that it intends to issue that order "before the Labor Day holiday."[7] In the meantime, Plaintiffs can only guess whether future editorial choices might lead the Commission to retaliate

---

[3] Wilkinson Ex. 39 (Donald J. Trump (@realDonaldTrump), Truth Social (Apr. 27, 2026, at 1:26 PM ET), https://perma.cc/6QGQ-C4NH).

[4] Wilkinson Ex. 44 (Anna Nicolaou, *'The US Needed A Shock To The System': Brendan Carr, Media Watchdog*, Financial Times (May 15, 2026), https://perma.cc/YN3E-MGQ6).

[5] Wilkinson Ex. 49 (*Speech: Donald Trump Delivers a Primetime Address to the Nation - July 16, 2026*, Roll Call Factbase (July 16, 2026), https://perma.cc/227P-G5R7).

[6] Federal Communications Commission, July 2026 Open Commission Meeting, at 1:22:28 (YouTube, July 22, 2026), https://perma.cc/RM6E-EWFA (transcript of statements).

[7] Wilkinson Ex. 46 (Kelcee Griffis, *FCC Near Rulings Against Disney Over 'The View,' TV Licenses*, Bloomberg (July 15, 2026), https://perma.cc/MWK2-XS7T).

further. Each time an ABC journalist publishes a story or an ABC host interviews a political guest, they must wonder whether that speech might lead the Administration to follow through on its threat of license revocation or to impose some other sanction. In this intolerable situation, Plaintiffs have no choice but to seek judicial protection against the Commission's ongoing assault on their right to speak.

The First Amendment demands an immediate end to the Commission's retaliatory campaign. The President and Chairman's own statements, the unprecedented nature of the early license renewals, and the timing of Defendants' actions all make abundantly clear that the Commission is using its regulatory power to retaliate against Plaintiffs for programming and editorial decisions the Administration dislikes. But the Executive cannot "use the power of the State to punish or suppress disfavored expression" or "attempt to coerce private parties" to silence their speech. *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 180, 188 (2024). The Commission's attack is particularly dangerous because it strikes at the First Amendment's core protection—the freedom of the press to cover and comment on the most important issues of the day. *See, e.g.*, *Garrison v. Louisiana*, 379 U.S. 64, 74–75 (1964) ("[S]peech concerning public affairs is more than self-expression; it is the essence of self-government."). Plaintiffs are thus likely to succeed on the merits of their claim.

Plaintiffs also easily satisfy the remaining requirements for preliminary relief. Plaintiffs are already suffering and will continue to suffer multiple independent irreparable harms from the FCC's retaliation: specifically, the here-and-now loss of First Amendment rights and the devastating potential consequences (both economic and reputational) of license revocation that loom over every editorial decision that Plaintiffs and their employees make. The equities and public interest also decisively favor preliminary relief. While Plaintiffs suffer these ongoing

injuries, Defendants will not be harmed by the delay of regulatory proceedings they initiated far ahead of schedule—especially where the law does not even permit the Commission to grant renewal of the Stations' licenses for years. Moreover, Defendants' retaliatory campaign is a threat not only to Plaintiffs; it jeopardizes all broadcasters, the public's interest in a media industry free to report fairly without fear of retribution—and, indeed, the very notion that ours is "a government of laws, not of men."[8] While the Commission believes it should get to dictate the content of network television, "[i]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion. . . ." *W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943); *see also N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964) (noting that the First Amendment "presupposes that right conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection") (citations omitted).

Faced with indistinguishable claims, multiple courts in this District have recently enjoined the government's First Amendment retaliation. When presented with credible allegations that the Federal Trade Commission was using pretextual allegations of wrongdoing and sprawling investigative demands to retaliate against organizations for expressing views with which the President disagreed, those courts stepped in to prevent the agency from "run[ning] roughshod over [the] party's First Amendment rights." *Endocrine Soc'y v. FTC*, 2026 WL 1257289 (D.D.C. 2026); *Media Matters for Am. v. FTC*, 805 F. Supp. 3d 105 (D.D.C. 2025); *see also Media Matters for Am. v. FTC*, 2025 WL 2988966 (D.C. Cir. 2026) (denying stay pending appeal).

[8] Adams, John. "Novanglus Papers, No. 7." 1775. *The Works of John Adams*, edited by Charles Francis Adams, vol. 4, Little, Brown and Co., 1851, p. 106.

The same course is required here. The Court should issue a temporary restraining order preventing the Commission from taking further action with respect to the Stations' early license renewal applications. The Court should further enter a preliminary injunction that halts the early license renewal proceedings and bars any further acts of coercion or threatened sanctions aimed at altering Plaintiffs' protected speech pending the resolution of this case. Only that remedy can prevent the Commission's ongoing assault on Plaintiffs' First Amendment rights.

## BACKGROUND

### I. Statutory Framework

The Communications Act of 1934 ("the Act") gives the FCC the authority to regulate broadcast media "as public convenience, interest, or necessity requires." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 418 (2021) (quoting 47 U.S.C. § 303). Pursuant to that authority, the FCC is responsible for granting and renewing broadcast licenses. *See* 47 U.S.C. § 309. Television broadcasting licenses "ordinarily" run for eight-year terms, with terms staggered geographically by state. 47 C.F.R. § 73.1020; *see also* 47 U.S.C. § 307(c).

When granting and renewing licenses, the Commission has "consistently" determined "that preserving continuity of meritorious service furthers the public interest." *FCC v. Nat'l Citizens Comm'n for Broad.*, 436 U.S. 775, 805 (1978) (internal citation omitted). Thus, "both the Commission and the courts have recognized that a licensee who has given meritorious service has a legitimate renewal expectancy that is implicit in the structure of the Act and should not be destroyed absent good cause." *Id.* Congress codified that presumption in the Act's 1996 amendments, requiring the Commission to review a station's record during its preceding license term, and mandating that the Commission "shall grant" an application for license renewal if the Commission finds that, during that preceding term, "the station has served the public interest, convenience, and necessity"; "there have been no serious violations by the licensee of . . . the rules

and regulations of the Commission"; and "there have been no other violations . . . [,] which, taken together, would constitute a pattern of abuse." 47 U.S.C. § 309(k)(1).

By law, renewal proceedings are supposed to be scheduled and streamlined. The Act—consistent with its requirement that the Commission review the station's service during its preceding license term—prohibits the Commission from granting license renewals "more than thirty days prior to . . . expiration." 47 U.S.C. § 307(d). And to streamline the process, the Act prohibits the Commission from requiring applicants "to file any information which previously has been furnished to the Commission." *Id.* § 307(c)(2). Instead, the Commission may only "require any new or additional facts it deems necessary to make its findings." *Id.* The Act also expressly "limit[s] the scope of the license renewal inquiry to matters occurring *at the particular station* for which license renewal is sought." *Sagittarius Broad. Corp.*, 18 FCC Rcd. 22551, 22555 (2003) (emphasis added); *accord Fox Television Stations, LLC*, 40 FCC Rcd. 438, 442 (MB 2025).

Critically, the Act bars the Commission from using its powers to censor or otherwise "interfere with the right of free speech." 47 U.S.C. § 326. Accordingly, the Commission has repeatedly emphasized that it "has limited legal authority to act on complaints relating to the content of television or radio programming."[9] For example, while the Act requires the Commission to consider whether the "public interest" supports granting a broadcast license, courts have "avoid[ed] potential First Amendment issues" by construing that general requirement not "to go so far as to authorize the FCC to regulate program content." *Motion Picture Ass'n of Am. v. FCC*, 309 F.3d 796, 805 (D.C. Cir. 2002).[10] Likewise, while the "fairness doctrine" once required

---

[9] *FCC, Consumer Guides, The FCC and Speech,* The Federal Communications Commission (last updated Aug. 31, 2022), https://perma.cc/7D3U-F7NU.

[10] By contrast, "Congress has been scrupulously clear when it intends to delegate authority to the FCC to address areas significantly implicating program content." *Id.*; *see also, e.g.*, 18 U.S.C. § 1464 ("Whoever utters any obscene, indecent, or profane language by means of radio

stations to present contrasting viewpoints, the Commission abolished that doctrine long ago after concluding that it "is unconstitutional on its face." *See Syracuse Peace Council*, 2 FCC Rcd. 5043, 5047 (1987), *aff'd Syracuse Peace Council v. FCC*, 867 F.2d 654 (D.C. Cir. 1989); *see also* Declaration of Mark S. Fowler ("Fowler Decl.") ¶ 5.

## II. Factual Background

### A. ABC's Stations Have Served The Public Interest With Distinction For Decades.

The Stations have held broadcast licenses without interruption for decades, based on the Commission's consistent recognition that they serve the "public interest." *See* Declaration of Eric Lieberman ("Lieberman Decl.") ¶¶ 5, 9. Altogether, the Stations produce over 390 hours per week of regularly scheduled news, offering in-depth coverage of local news stories, investigative and consumer reporting, weather, and sports. *See* Lieberman Decl. ¶ 7. The Stations provide critical services for their local communities, including live coverage of emergencies; coverage of local government and school systems; and programming highlighting community events, sports teams, and charities. *See* Compl. ¶¶ 43–44.

As a testament to the quality of their programming—and their service in the public interest—the Stations' local news broadcasts consistently earn market-best ratings. *See* Lieberman Decl. ¶ 7.[11] During their current license terms, the Stations and their staff have already received over 200 national, regional, and local awards and honors, including over 85 local Emmy Awards; since 2020, the Stations have collectively received 63 Edward R. Murrow Awards for outstanding achievement in broadcast journalism. *See* Lieberman Decl. ¶ 8.

---

communication shall be fined under this title or imprisoned not more than two years, or both."); 47 U.S.C. § 315 (governing provision of broadcast time to legally qualified candidates for public office in certain circumstances).

[11] In seven out of the eight markets, the Stations' local news broadcasts are ranked number one for viewership in every single daypart, and the eighth station is ranked first for morning news and second in all other dayparts. *See* Lieberman Decl. ¶ 7.

Since ABC's first Owned Station, WABC-TV, began broadcasting in New York City in 1948, the FCC has renewed each of its Stations' broadcast licenses without fail, reflecting the agency's repeated determination that the Stations have served the public interest and committed no violations that could justify non-renewal. *See* Lieberman Decl. ¶¶ 5–6, 9, 36.

### B. The Administration Has Waged A Multi-Front Campaign Against ABC In Retaliation For Its Expression And Editorial Judgments.

The Commission has waged a retaliatory campaign against ABC for one reason: the Administration disapproves of ABC's programming and editorial choices. The Commission has pursued ABC on several related fronts that all seek to punish Plaintiffs for protected speech. It began with a pretextual investigation of Plaintiffs' employment practices. It then turned up the pressure by issuing an unprecedented order directing ABC to justify the longstanding exemption from the equal opportunities requirement in Section 315 of the Act for its popular daytime talk program, *The View*, in direct response to complaints by the Administration about the program's coverage of the President, his Administration, and Republicans. The Commission has now raised the stakes yet again by directing the Stations to apply for license renewals years ahead of schedule, with the apparent intent of initiating an agency hearing at which the Commission can deny renewal or even revoke the licenses. This latest escalation is the Commission's answer to the Administration's repeated demands that the Commission take action against Plaintiffs for speech it dislikes.

#### *1. The Administration Criticizes ABC's Political Coverage*

The President has long called on the FCC to revoke ABC's licenses, but those calls have steadily escalated from the 2024 presidential campaign through recent months. *See* Appendix A.

During the 2024 campaign, ABC News hosted the sole debate between then-candidate Trump and then-Vice President Kamala Harris. The day after the debate, Trump accused ABC

News's moderators of fact-checking his statements more strenuously than Harris's: "It was three to one. It was a rigged deal, as I assumed it would be."[12] He argued that the FCC "ought to take away [ABC's] license."[13] He subsequently repeated this threat during a campaign rally, stating: "ABC should lose its license . . . because of what they've done."[14]

Two weeks later, the Center for American Rights ("CAR") filed an FCC complaint against ABC's Owned Station in Philadelphia, WPVI, echoing Trump's criticisms about the debate and requesting a formal reprimand based on ABC News's alleged "broadcaster favoritism" toward Harris.[15] While CAR's complaint was pending, then-Commissioner Carr publicly wrote to ABC's parent company, accusing the company of contributing to the "erosion in public trust" in media.[16]

On January 16, 2025, the FCC's Enforcement Bureau squarely rejected the complaint against WPVI. The Enforcement Bureau explained that CAR's request for a reprimand was "contrary" to the mandates of the First Amendment, and that CAR's "editorial" allegations and "conclusory statements" failed to meet the "very high bar for the Commission to commence an enforcement action," particularly given the agency's unwillingness to "act as a self-appointed, free-roving arbiter of truth in journalism."[17]

---

[12] Wilkinson Ex. 8 (Laura Barrón-López & Winston Wilde, *Key Takeaways And Highlights From The Contentious Presidential Debate*, PBS NewsHour (Sept. 11, 2024, 6:55 PM ET), https://perma.cc/8GD8-MMLH).
[13] *Id*.
[14] Wilkinson Ex. 15 (Donald J. Trump, *Donald Trump Holds a Campaign Rally in Henderson, Nevada*, Roll Call Factbase (Oct. 31, 2024), https://perma.cc/F3JC-2M2H); *see also* Wilkinson Ex. 54 (Greg Sargent, *Transcript: Trump Blurted Out Vile Plot to Censor ABC—and It Backfired*, The New Republic (July 31, 2026), https://perma.cc/EC2Z-JEM7).
[15] *See In re Complaint Against WPVI-TV*, FCC (Sept. 25, 2024), https://perma.cc/23FR-8XRJ.
[16] *See* Letter from Brendan Carr, Comm'r, FCC, to Robert A. Iger, CEO, Walt Disney Co. (Dec. 21, 2024), https://perma.cc/XN49-6MU4.
[17] Letter from Peter S. Hyun, Acting Chief, Enforcement Bureau, FCC, to Daniel R. Suhr, Ctr. for Am. Rights, GN Docket No. 25-11, at 1–3 (Jan. 16, 2025), https://perma.cc/3N83-6S7K.

The day he was inaugurated, the President appointed then-Commissioner Carr as FCC Chairman. One of the new Chairman's first acts was to reinstate the just-dismissed CAR complaint against WPVI, asserting that its previous dismissal "was issued prematurely based on an insufficient investigatory record."[18] Commissioner Anna Gomez disagreed with the reinstatement decision. As she put it, because the complaint "failed to even assert a set of facts that, if true, would violate FCC rules," the Chairman's decision had "nothing to do with the merits and everything to do with politics."[19] She concluded, "[t]here will be no end in sight for that investigation because the process is the punishment and keeping it open serves that goal."[20] Indeed, the complaint against WPVI remains pending to this day.

Throughout his second term, the President has continued to escalate his threats to revoke ABC's licenses whenever ABC's coverage displeases him. In an August 2025 Truth Social post, he called ABC "the absolute worst" and "most biased network anywhere in the World" and proclaimed that ABC "should lose their Licenses for their unfair coverage of Republicans and/or Conservatives."[21] The next month, he posted: "This is just one of many reasons that the [FCC] should look into the license of . . . ABC Fake News . . . 97 percent negative to Republicans!"[22] A month later, responding to an ABC reporter at a press conference, the President stated: "I think the

---

[18] *News Distortion Complaint Involving WPVI Television (Philadelphia), LLC*, Order, DA 25-84, ¶ 1 (EB rel. Jan. 22, 2025), https://perma.cc/Q2JX-JJ2U.

[19] Wilkinson Ex. 43 (Letter from Anna M. Gomez, Comm'r, FCC, to Josh D'Amaro, CEO, The Walt Disney Company, at 1 (May 11, 2026) ("Commissioner Gomez Letter"), https://perma.cc/3VWL-TB6E). Notably, the Commission chose not to reinstate a petition challenging renewal of the license of the Fox Owned Philadelphia TV station that had been previously dismissed the same day as CAR's complaint against WPVI. *See* Letter from Rep. Yvette D. Clarke et al. to Brendan Carr, Chairman, FCC, at 3 (Mar. 31, 2025), https://perma.cc/CX6J-PW5A.

[20] Wilkinson Ex. 43 (Commissioner Gomez Letter).

[21] *See* Wilkinson Ex. 23.

[22] *See* Wilkinson Ex. 27 (Donald J. Trump (@realDonaldTrump), Truth Social (Oct. 5, 2025, at 7:19 PM ET), https://perma.cc/J7SP-32CY).

license [should be] taken away from ABC because your news is so fake and it's so wrong, and we have a great [FCC] Chairman who should look at that."[23] Meanwhile, the White House began cataloguing supposed "offenses" by ABC reporters on a public "Media Offenders" webpage.[24]

#### *2. The Commission Opens A Pretextual Investigation Into Plaintiffs' Employment Practices*

On March 27, 2025, Chairman Carr wrote to Plaintiffs to say that he had asked the FCC's Enforcement Bureau to open an investigation to "ensure that Disney and ABC have not been violating FCC equal employment opportunity [("EEO")] regulations by promoting invidious forms of DEI discrimination."[25] In June 2025, the Enforcement Bureau issued the first Letter of Inquiry ("LOI") on this subject, confirming that the FCC was initiating an investigation into Plaintiffs for potential violations of the Communications Act and FCC rules prohibiting discrimination in employment. Lieberman Decl. ¶ 15. The LOI ordered Plaintiffs to produce information and documents concerning hiring and employment practices over the previous eight years. *Id.* Those demands concerned not only employment practices at the Stations subject to FCC regulation but also at the parent company and its entire family of companies, including some that have nothing to do with broadcasting.

Though they objected to the scope of these demands, Plaintiffs nonetheless timely and thoroughly responded, providing written responses and producing approximately 6,000 pages of documents between July and September 2025. *Id.* In response, the Enforcement Bureau issued another LOI in February 2026, with more than 80 additional requests for documents and

---

[23] *See* Wilkinson Ex. 29 (Transcript, *President Trump Holds a Bilat with Mohammed bin Salman of Saudi Arabia*, Senate Democratic Caucus (Nov. 18, 2025), https://perma.cc/2CTN-A58E).
[24] Wilkinson Ex. 35 (*Media Offender: ABC News*, The White House, https://perma.cc/B449-B9U3).
[25] Letter from Brendan Carr, Comm'r, FCC, to Robert A. Iger, CEO, Walt Disney Co., at 1 (Mar. 27, 2025), https://perma.cc/C3ST-8J4N.

information—many duplicative of the Bureau's prior requests. Plaintiffs completed their responses to the additional LOI in April 2026, producing more than 4,000 pages of additional documents. *Id*.

Plaintiffs' cooperation simply begat further, more aggressive demands. The Bureau sent follow-up requests with aggressive deadlines and issued extensive new LOIs while Plaintiffs were preparing their other responses, *id*., requests with an unusual volume and sweeping scope relative to typical practice, *see* Fowler Decl. ¶¶ 7–8. Plaintiffs continued to comply with the FCC's investigation—responding most recently on August 14, 2026—and have to date responded to over 600 separate requests and produced more than 12,900 pages of documents. *See* Compl. ¶ 68; Lieberman Decl. ¶ 15. As explained in those responses, Plaintiffs' employment practices have been lawful and consistent with those adopted across the industry and *encouraged* by FCC regulations.[26]

#### 3. *The Administration Targets* **The View***'s Longstanding Exemption From The Equal Opportunities Requirement*

The Administration next took aim at ABC Network's popular daytime talk program, *The View*. According to the White House's "Media Offenders" webpage, *The View*'s supposed "offenses" include criticism of government officials for "visiting the Alligator Alcatraz ICE detention facility in Florida" and "claiming President Trump was overstepping his authority by constructing a White House ballroom."[27]

---

[26] *See* Opposition of The Walt Disney Co. et al. to Petitions to Deny Renewals of Licenses, MB Dkt. No. 26-131, at § II.C (July 29, 2026), https://perma.cc/SH7V-BNMZ. The Commission has also approved recent mergers only after extracting concessions on DEI. *See FCC Approves Verizon-Frontier Merger, Off. of Chairman Brendan Carr* (May 16, 2025), https://perma.cc/UJQ9-3Z7Z; Wilkinson Ex. 19 (Brendan Carr (@BrendanCarrFCC), X (May 16, 2025), https://perma.cc/9FFV-64WC). By contrast, the Commission has given Plaintiffs no similar opportunity to settle the issues alleged in its ongoing DEI investigation, demonstrating that this investigation is really a pretext for the Commission's efforts to punish Plaintiffs' speech.

[27] Wilkinson Ex. 35.

On February 11, 2026, the FCC's Media Bureau sent an LOI to KTRK, the ABC Owned Station in Houston, in connection with a potential violation of the "equal opportunities" rule relating to *The View*'s interview of Texas Democratic U.S. senatorial candidate James Talarico. That rule requires broadcast stations to provide, upon request, equal opportunity to all legally qualified candidates for an office if they permit any one candidate for the same office to use their facilities, *see* 47 U.S.C. § 315, and, if running for office in the station's service area, to include a record of the time used by that candidate in the station's political file, *see* 47 C.F.R. § 73.1943. But Congress has exempted "bona fide news interview" programs from these requirements. 47 U.S.C. § 315(a)(2). In 2002, the FCC ruled that *The View* qualifies for that exemption, a ruling which remains in effect today.[28]

The next month, the Commission issued an unprecedented order directing ABC to file a new petition for a declaratory ruling on *The View*'s exempt status and to confirm in less than 24 hours its intention to do so. *See* Lieberman Decl. ¶ 17.[29] The Commission does not appear to have ever required a licensee to initiate such a proceeding. Moreover, the order contradicted—without explanation or justification—prior Commission statements that licensees "need not seek formal declaration from the Commission" to claim a bona fide news exemption.[30]

Moreover, the Chairman has treated radio stations—a medium that traditionally favors conservative voices—quite differently, even though the "equal opportunities" rule applies equally

---

[28] *See* Wilkinson Ex. 1 (Letter from Robert Baker, Chief, Office of Political Programming, Policy and Rules Division, Mass Media Bureau, FCC, to ABC, Inc. (Mar. 1, 2002)).

[29] The Commission's order also contended, citing certain ABC affiliates' placement of the Talarico appearance in their political files, that KTRK's position that *The View* qualified for the exemption was not uniformly held. But the LOI failed to mention that those ABC affiliates apparently made those filings at the Commission's request and two weeks after Mr. Talarico's appearance, rather than the next business day as the rule requires. *See* Compl. ¶ 84, n.67.

[30] *See Infinity Broadcasting Operations Inc.*, 18 FCC Rcd. 18603, 18604 (2003), https://perma.cc/52U5-LW4A.

to radio.[31] At a news conference, the Chairman indicated that the Commission did not see the same need for radio programs, but with respect to television programs, he said: "If you're fake news, you're not going to qualify as the bona fide news exception."[32]

As a result of these cumulative pressures from the investigation into *The View* as well as the early license renewal process where some Petitions to Deny have called for non-renewal based on the political affiliations of guests on ABC's programming, the process for evaluating potential guests for *The View* has changed. Lieberman Decl. ¶ 32. Historically, decisions about which candidates or public figures to invite as guests were made based on newsworthiness, audience interest, and scheduling alone. Since the Bureau's inquiry began, Plaintiffs must now evaluate any invitation to a political candidate for its potential consequences, including whether it might later be cited by the Commission as a basis for non-renewal in the Stations' impending license renewal process. *Id*. ¶¶ 31–32.

Perhaps unsurprisingly, no political candidate has appeared on *The View* since the Bureau opened its inquiry regarding Mr. Talarico's appearance. *Id*. ¶ 33. Although the program has not changed its editorial standards regarding the newsworthiness of any candidate who might otherwise have been invited during this period, the FCC's pressure campaign has led Plaintiffs to be more circumspect in booking political candidates, and has resulted in passing on further consideration of booking several political candidates. *Id*. Those pressures have also required Plaintiffs to reconsider the video clips to include on the program that could constitute an "appearance" on *The View* under the FCC equal opportunities regulation: Plaintiffs have chosen

---

[31] *See* Wilkinson Ex. 36 (John Hendel, *Talk Radio Isn't a Target of FCC's 'Equal Time' Notice, Brendan Carr Says*, Politico (Jan. 29, 2026, 6:02 PM EST), https://perma.cc/UU87-5L9N).
[32] *See id.*

not to air clips that they otherwise would have aired during the Hot Topics segment of *The View* and also in the cold open of the program. *Id*.

#### *4. The Administration Objects To Comments By Late Night Host Jimmy Kimmel*

The Administration has also threatened to take action against ABC in response to comments by its late-night host, Jimmy Kimmel. After Kimmel made on-air comments in September 2025, following the death of Charlie Kirk, the Chairman issued an ultimatum to Plaintiffs: "We can do this the easy way or the hard way. These companies can find ways to take action on Kimmel, or there is going to be additional work for the FCC ahead."[33] The President echoed those threats, calling Kimmel "yet another arm of the DNC," and saying: "[W]e're going to test ABC out on this."[34]

The Administration's threats did not go unnoticed. In a concurring opinion issued a few months later, Supreme Court Justice Neil Gorsuch cited this episode as a cautionary tale of what might be done to "[a] business out of favor with the party in control of the White House."[35] Senator Ted Cruz put it more bluntly, saying the Commission's attempted censorship of ABC is "dangerous as hell."[36]

### C. The Commission Orders Plaintiffs To File Early Broadcast License Renewal Applications For All Eight ABC Owned Stations.

On April 23, 2026, Kimmel made a joke about the President and First Lady that again drew the President's ire. In another Truth Social post four days later, the President said that "Jimmy

---

[33] Benny Johnson, *Kash Patel Testifying LIVE Now on Charlie Kirk Assassin*, at 1:31:36–54, 1:31:55–32:05, 1:32:59–1:33:18, 1:35:54–1:36:13 (YouTube, Sept. 17, 2025), https://perma.cc/68CA-XGSP.
[34] Wilkinson Ex. 26 (Donald J. Trump (@realDonaldTrump), Truth Social (Sept. 23, 2025, at 10:35 PM ET), https://perma.cc/3P4S-PP8N).
[35] *Trump v. Slaughter*, No. 25-332, slip op. at 8–9, 11–12 (June 29, 2026) (Gorsuch, J., concurring).
[36] Verdict with Ted Cruz, *Jimmy Kimmel Fired—Was It Right & Should the FCC Have Gotten Involved plus Trump Designates ANTIFA...* (YouTube, Sept. 19, 2025), https://perma.cc/9FE7-CRRU.

Kimmel should be immediately fired by Disney and ABC."[37] The very next day, the FCC's Media Bureau abruptly ordered ABC to file broadcast license renewal applications for all eight of its Owned Stations.[38]

The Order is unprecedented in many ways. Under the ordinary regulatory schedule, the Stations' licenses are not due for renewal for years—with the earliest expiring not until 2028 (WTVD), and the latest not until 2031 (both WABC and WPVI).[39] Although FCC regulations permit the Commission to call for license applications ahead of schedule, *see* 47 C.F.R. § 73.3539(c), it had not done so in more than half a century.[40] And the Commission has never demanded simultaneous renewal applications from a group of stations commonly owned with a broadcast network. Although licensees typically have months to prepare their renewal applications, the Order demanded that the Stations file within 30 days, and the Media Bureau denied, without explanation, Plaintiffs' request for a 60-day extension.[41]

As the basis for its unprecedented action, the Order noted the Commission's "ongoing investigation" into Plaintiffs' employment practices, and asserted that "calling in Disney's ABC

---

[37] Wilkinson Ex. 39; Wilkinson Ex. 40 (Shawn McCreesh, *President and First Lady Demand ABC Fire Jimmy Kimmel Over 'Widow' Joke*, N.Y. Times (Apr. 27, 2026), https://perma.cc/BUQ9-4PS4).
[38] *See* Wilkinson Ex. 41 (*The Walt Disney Company, American Broadcasting Company et al.*, Order, DA 26-416, ¶ 2 (MB Apr. 28, 2026), https://perma.cc/NMV3-C3NE) ("the Order").
[39] *See* 47 C.F.R. § 73.1020; Broadcast Television License Renewals by STATE, FCC (archived July 23, 2026), https://perma.cc/57R4-FFMM.
[40] *See* Wilkinson Ex. 44. The day before the FCC issued its order mandating early license renewals for ABC, the FCC entered a similar order to Bridge News, LLC. *See Bridge News, LLC*, Order, DA 26-413 (MB rel. Apr. 27, 2026), https://perma.cc/H6LB-9AYU. The timing led "many to suggest that this action the day before may have been taken to deprive ABC of the argument that calling for accelerated license renewal applications is unprecedented at the FCC." Scott R. Flick & Betsy Craig, *FCC Enforcement Monitor*, Pillsbury Law (May 28, 2026), https://perma.cc/YR33-GE6J. The last time the Commission called for early renewal under this provision was *before* Congress amended the Communications Act in 1996 to require the Commission to conduct the backwards-looking review of the station's service in its preceding term. *See* 47 U.S.C. § 309(k).
[41] *See* Wilkinson Ex. 41.

licenses for early renewal, at this time, under the Communications Act's public interest standard is essential within the meaning of agency regulations," which permit early renewal where it is "essential to the proper conduct of an investigation." Order at 2 (citing 47 C.F.R. § 73.3539). The Order went on to explain that "[d]oing so both allows the FCC to conduct its ongoing investigation *and* enables the FCC to ensure that the broadcaster has been meeting its *public interest obligations more broadly*." *Id*. (emphasis added). In other words, the Commission invoked the ongoing EEO investigation as the hook for initiating the early renewal process under 47 C.F.R. § 73.3539, but made clear that it intended for its inquiry to sweep "more broadly" to encompass whatever the agency deemed in the "public interest."

The Stations timely filed the renewal applications under protest, arguing (among other things) that the Order violated the First Amendment.[42] The day after the Stations filed their early renewal applications, Chairman Carr wrote to Congress that the Commission had "formally notified Disney that responses to the agency's lawful [EEO-related] inquiries have been deficient, nonresponsive, and disingenuous."[43] Given Plaintiffs' consistent history of compliance with the agency's investigatory demands, the Chairman's accusation was plainly intended to manufacture a pretext that it was "essential to the investigation" to call for early renewal applications.

A few weeks after the Stations submitted their early renewal applications, the Administration called yet again for ABC's licenses to be revoked—this time in direct response to ABC's decision not to broadcast the President's July 16, 2026, primetime address.[44] ABC made

---

[42] *See generally id.*

[43] *See* Letter from Brendan Carr, Chairman, FCC, to Yvette Clarke, Ranking Member, House Subcommittee on Oversight and Investigations, at 4 (May 29, 2026), https://perma.cc/FCK2-T7VA.

[44] Wilkinson Ex. 48 (Brian Stelter, *Here's How The TV Networks Handled Trump's Highly Unusual Prime-Time Address*, CNN (July 16, 2026), https://perma.cc/FDB4-VLCY).

the editorial judgment not to broadcast the address live. Lieberman Decl. ¶ 23. ABC considered the fact that the Administration wanted the speech to be broadcast live and might take some adverse action against ABC if it did not. *Id.* In the end, ABC decided to livestream the speech on ABC News LIVE, which it ordinarily would not have done. *Id.* In direct response to ABC's decision—and during the address itself—the President called for revocation of the Stations' broadcast licenses (as well as those of NBC, which had similarly chosen not to broadcast the address): "NBC and ABC fake news have both said that they would not cover this speech . . . . Fraud like this should mean a revocation of their licenses."[45] The following week, the Chairman commented at a press conference that the President's address was "something that broadcasters should be carrying," and explicitly promised that the Commission would consider ABC's decision during the license renewal proceedings.[46]

The FCC's actions against Plaintiffs have produced a public outcry from across the political spectrum. To name but a few examples: A coalition of conservative and free-market organizations has warned against the "politicization" of the process and urged the FCC to "preserve the well-established, routine, predictable, and presumptive nature of broadcast license renewal."[47] During a recent Senate Judiciary Committee hearing, Senator John Kennedy stated, "[s]ometimes the FCC scares me right now," and asked current FCC general counsel, "I don't like some of the stuff that

[45] Wilkinson Ex. 47 (Aaron Pellish, *Trump Calls For Revocation Of ABC, NBC Licenses Over Speech Snub*, Politico (July 16, 2026), https://perma.cc/L3G5-E72K); *see also id.* at 2 (noting numerous prior instances of networks declining to broadcast presidential speeches).

[46] Wilkinson Ex. 51 (Todd Spangler, *FCC Chair Says ABC's Decision to Not Broadcast Trump Speech Live Will Be Part of Agency's Review of Station Licenses*, Variety (July 22, 2026, 11:24 AM PT), https://perma.cc/6ZF2-G7E3).

[47] Wilkinson Ex. 50 (Letter from Center for Individual Freedom et al., to Brendan Carr, Chairman, FCC, at 1 (July 22, 2026), https://perma.cc/X5HC-SK9J).

is said on television, but what business is it of the FCC?"[48] And in a filing related to the Stations' license renewal proceeding, a bipartisan group of former FCC officials implored the Commission to "terminate these early renewal proceedings," "lift the pall of state censorship" the proceedings have "cast over American broadcasting," and "reaffirm [the FCC's] foundational and long-held commitment to free speech."[49]

### D. The Commission's Playbook Has Been To Use Regulatory Power To Extract Concessions From Media Companies.

The Commission's attacks on Plaintiffs have been unique in force, but not in kind. The Commission has repeatedly used its regulatory authority to coerce speech-related concessions from other media companies. As just one example, after the FCC opened an investigation into AM radio station KCBS, due to its reporting about immigration agents in the Bay Area, the station "demoted a well-liked anchor and dialed back on political programming."[50]

As a result of those coercive efforts, the Chairman has openly claimed credit for changes at other media companies that are favorable to the Administration:

> President Trump took on the fake news media and President Trump is winning. Look at the results so far. PBS defunded. NPR defunded. Joy Reid, gone from MSNBC. Sleepy-Eyed Chuck Todd, gone. Jim Acosta, gone. John Dickerson, gone. Colbert is leaving. CBS is under new ownership, and soon enough CNN is going to have new ownership as well.[51]

---

[48] Wilkinson Ex. 56 (John Hendel, *Sen. Kennedy: 'Sometimes The FCC Scares Me Right Now'*, Politico (Aug. 5, 2026, at 3:45 PM ET), https://perma.cc/RR5W-9RVK); *see also Nomination Hearing*, U.S. Senate Committee on the Judiciary, at 01:39:13–01:41:52 (Aug. 5, 2026), https://perma.cc/8Z4K-V6E9 (video recording of statements).

[49] Wilkinson Ex. 52 (Opposition of Former FCC Chairs, Comm'rs, Chiefs of Staff, Gen. Counsels, and Bureau Chiefs to Petitions to Deny of CAR & MRC, MB Docket No. 26-131, at i (July 28, 2026) ("Former FCC Officials Letter"), https://perma.cc/KXZ8-5CAH).

[50] Wilkinson Ex. 32 (Byron Tau, *How an AM Radio Station in California Weathered the Trump Administration's Assault on Media*, Associated Press (Dec. 15, 2025), https://perma.cc/QHY7-VXBR).

[51] Wilkinson Ex. 38 (Ryan Mancini, *FCC's Brendan Carr: Trump Is 'Winning' Against 'Fake News Media'*, The Hill (Mar. 28, 2026), https://perma.cc/2PYM-7RA4).

**E. The Commission's Next Step Will Inflict Further Irreparable Injury On Plaintiffs.**

The Commission-ordered comment cycle on the Stations' early license renewal applications closed on August 5, 2026.[52] At any time and without warning, the Commission could take the next step—most likely setting an administrative hearing on whether the licenses should be renewed (or even revoked).[53] Any hearing would be a charade, because the Commission cannot lawfully grant renewal this early in the license terms. So the only outcomes on the table would be adverse to Plaintiffs—non-renewal or immediate revocation of the licenses. And the Commission may intentionally prolong the adjudicative process, miring ABC in years of costly litigation, with the threat of adverse action ever present and with the risk of provoking the Administration into further retaliation lurking behind each and every editorial decision ABC makes. Nor does the Commission lose its leverage once the hearing ends; it could delay its ultimate ruling, continuing to hang the threat of punishment over Plaintiffs' heads.

But even if a hearing designation order is not forthcoming, Plaintiffs are still suffering irreparable injuries. The looming threat of a potential hearing alone is coercive. And the Commission may well strategically choose to drag its feet—by doing so, the Commission can both prevent Plaintiffs from appealing any adverse decision to a neutral Article III court and maintain the threat of further proceedings as a tool to coerce Plaintiffs to conform their programming to the Administration's preferences.[54]

---

[52] Wilkinson Ex. 45 (FCC's Media Bureau Establishes Pleading Cycle and Ex Parte Procedures for the Early Renewal Applications of the Walt Disney Company's ABC Licenses, Public Notice, FCC, DA 26-541, at 3 (May 29, 2026), https://perma.cc/WCQ8-QFNX).

[53] *Id*.

[54] The prospect of drawn-out proceedings here is not speculative. The Commission's proceedings often raise "the spectre of unending delay." *See City of Angels Broad. v. FCC*, 745 F.2d 656, 675 (D.C. Cir. 1984) (Wilkey, J., dissenting); *see also id.* at 676 (noting that "given the FCC's past inability to resolve the issues in this case in a timely fashion . . . this case will linger on for another two decades"); *cf. SEC v. Jarkesy*, 603 U.S. 109, 145 (2024) (Gorsuch, J., concurring) ("The

Whichever path the Commission takes, therefore—a rushed, performative hearing or an intentionally protracted process—the immediate harms to Plaintiffs are acute. Either way, the process is itself the punishment.

## ARGUMENT

The blatant First Amendment retaliation in this case merits immediate relief. A preliminary injunction[55] is warranted when a plaintiff shows "'[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest.'" *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). "In First Amendment cases, the likelihood of success will often be the determinative factor." *Green v. U.S. Dep't of Just.*, 54 F.4th 738, 745 (D.C. Cir. 2022) (citation omitted). "[I]f the government is the opposing party," the balance of the equities and public-interest factors "merge." *Glob. Health Council v. Trump*, 153 F.4th 1, 12 (D.C. Cir. 2025). Each factor justifies immediate relief here. The Commission's unprecedented threat to the Stations' licenses is a clear instance of First Amendment retaliation; it is designed to, and does, inflict immediate and irreparable injury; and the equities overwhelmingly favor preserving the status quo and the right of Plaintiffs to speak freely without threat of retribution.

### I. Plaintiffs Are Likely To Succeed On The Merits Of Their Claim That The Early License Renewal Process Is Unconstitutional First Amendment Retaliation.

There is no doubt that the Commission is subjecting Plaintiffs to an early license renewal process to punish them for airing views and content the Administration dislikes. It is part of this

---

Commission agreed to review the ALJ's decision. It then afforded itself the better part of six years to issue an opinion. And, after all that, it largely agreed with the ALJ.").

[55] "The standard for a temporary restraining order is the same as that for [a] preliminary injunction." *Singh v. Carter*, 168 F. Supp. 3d 216, 223 (D.D.C. 2016).

Administration's playbook. Indeed, in two recent cases involving strikingly similar facts, courts in this District have enjoined efforts by the FTC to use pretextual investigations and sprawling investigative demands to retaliate against organizations that espoused views that displeased the Administration. *See Media Matters for Am. v. FTC*, 805 F. Supp. 3d 105 (D.D.C. 2025); *Endocrine Soc'y*, 2026 WL 1257289 (D.D.C. 2026); *see also Media Matters for Am. v. FTC*, 2025 WL 2988966 (D.C. Cir. 2026) (denying stay pending appeal).[56] In *Media Matters*, the court found that a media organization was likely to succeed on the merits of its First Amendment retaliation claim where the FTC "issued a sweeping and burdensome [civil investigative demand ("CID")]" to retaliate against the plaintiff media organization for its critical reporting about X (formerly Twitter), which led to an advertiser boycott of the platform. 805 F. Supp. 3d at 111–12.[57] Likewise, in *Endocrine Society*, the court found that a non-profit organization was likely to succeed on its First Amendment retaliation claim where, after the President and high-level staff expressed "vehement disagreement" with and "vitriol toward" the plaintiff's views, the FTC issued a broad investigative demand with the "true aim to suppress the [plaintiff]'s speech." 2026 WL 1257289, at *1, *13.

As in those cases, the Commission's actions here are antithetical to the First Amendment. Because "[t]he principle that public issues should be debated freely has long been woven into the very fabric of who we are as a Nation," "[s]peech on matters of public concern is at the heartland

---

[56] A court in this District also preliminarily enjoined the Texas and Missouri Attorneys General from enforcing separate CIDs against Media Matters in retaliation for its comments on Elon Musk's post. *See Media Matters for Am. v. Paxton*, 732 F. Supp. 3d 1, 8 (D.D.C. 2024), *aff'd* 138 F.4th 563, 585 (D.C. Cir. 2025); *Media Matters for Am. v. Bailey*, 2024 WL 3924573 (D.D.C. 2024).

[57] The parties ultimately stipulated to dismissal after the D.C. Circuit denied the Government's motion for a stay pending appeal. *See Media Matters for Am. v. FTC*, 2026 WL 1354245 (D.C. Cir. 2026).

of the First Amendment." *Media Matters*, 805 F. Supp. 3d at 111. And "the law is settled that . . . the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006).

To prevail on a First Amendment retaliation claim, a plaintiff must show: "(1) he engaged in conduct protected under the First Amendment; (2) the defendants took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again; and (3) a causal link between the exercise of a constitutional right and the adverse action taken against him." *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016) (modified). Plaintiffs are likely to succeed in establishing each of these elements. The President and the Chairman's own statements confirming the retaliatory intent of the Commission's actions, the timing of those actions, and the unprecedented nature of the early license renewal process all make clear that the Commission called for early license renewal applications to retaliate against Plaintiffs for content, views, and editorial judgments the Administration dislikes.

**A. Plaintiffs Have Engaged In Protected Speech.**

As "media organization[s]," Plaintiffs "are obviously engaged in conduct protected under the First Amendment." *Media Matters for America v. Paxton*, 138 F.4th 563, 585 (D.C. Cir. 2025). And it is equally obvious that the incidents that precipitated the Administration's calls to revoke Plaintiffs' licenses and the Commission's order requiring the Stations to file early renewal applications constituted speech: ABC News's hosting of the 2024 presidential debate; *The View*'s editorial decisions about which guests to invite on the program, including an interview of a Democratic political candidate; on-air comments about political figures by ABC late-night host Jimmy Kimmel; ABC News's general coverage of political events; and ABC News's decision not to broadcast the President's July 16th address. Such "speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Snyder v.*

*Phelps*, 562 U.S. 443, 452 (2011) (citation omitted). And such "[p]olitical speech, of course, is at the core of what the First Amendment is designed to protect." *Morse v. Frederick*, 551 U.S. 393, 403 (2007) (citation omitted).

Consider, for example, the Chairman's promise to weigh ABC's decision not to broadcast the President's July 16 address as a factor in the Stations' early license renewal proceedings.[58] ABC's decision not to broadcast the address is protected speech: "When a public broadcaster exercises editorial discretion in the selection and presentation of its programming, it engages in speech activity." *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 674 (1998). That is equally true when the editorial choice is *not* to broadcast something: "one important manifestation of the principle of free speech is that one who chooses to speak may also decide what not to say." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995) (citation omitted).

### B. The Commission's Unprecedented Threats to Plaintiffs' Broadcast Licenses Are Adverse Actions.

The Commission's demand for early license renewal applications and its pretextual investigations "constitute[] a sufficiently adverse action" against Plaintiffs "to give rise to an actionable First Amendment claim." *Hous. Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 477 (2022).

Both the investigations and the early license renewal process threaten drastic sanctions, including elimination of the Stations' broadcast licenses—a threat to the Stations' very existence. *See* Lieberman Decl. ¶¶ 27, 31, 34–36. These licenses generate substantial advertising and retransmission-consent revenue, all of which would be lost if the Commission decides not to renew (or even to revoke) the licenses. *Id.* ¶ 37. Faced with such existential threats, any broadcaster would question whether its speech is worth the cost. *See Media Matters for America v. Paxton*,

[58] *See* Wilkinson Ex. 51.

732 F. Supp. 3d 1, 28 (D.D.C. 2024), *aff'd* 138 F.4th 563, 585 (D.C. Cir. 2025) (finding "the threat of invoking legal sanctions," including "civil penalties of up to $10,000 per violation," "sufficient to deter protected speech." (citation modified)); *see also Vt. Right to Life Comm'n, Inc. v. Sorrell*, 221 F.3d 376, 382 (2d Cir. 2000) ("The fear of civil penalties can be as inhibiting of speech as can trepidation in the face of threatened criminal prosecution."); *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 165 (2014) ("[A]dministrative action, like arrest or prosecution, may give rise to harm sufficient to justify pre-enforcement review.").

To determine whether an action qualifies as adverse, a court must make an "objective inquiry" into whether the action would deter a reasonable person from speaking. *Vullo*, 602 U.S. at 191. Key considerations, among others, are whether the official's words "can be reasonably understood as a threat," whether the official "singled out" his or her target, and the extent of "[t]he power that [the] government official wields." *See id.* at 191–94. Under that test, the Administration's repeated statements that ABC's broadcast licenses should be revoked can be "'reasonably understood'" *only* as threats of "adverse action." *Id.* at 189 (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 66–68 (1963)). Those threats, and the Commission's Order, single out Plaintiffs: until the day before ordering Plaintiffs to apply to renew their licenses, the Commission had not called for early license renewal applications for more than half a century. Nor has the Commission *ever* demanded simultaneous early license renewal applications from a group of stations commonly owned by a single broadcast network. Finally, there could hardly be a "greater and more direct" threat than one made by the Chairman of the agency with "direct regulatory and enforcement authority over" ABC, its Owned Stations, and their broadcast licenses. *Vullo*, 602 U.S. at 191–92. Any ordinary person in Plaintiffs' position would feel deterred from

speaking in ways that might displease the Administration where doing so might cause the loss of the right to speak altogether.

Indeed, other companies' responses to similar pressures demonstrate the deterrent power of the Commission's retaliatory campaign. Even short of existential threats to their licenses, many companies have given in to the FCC's unlawful, speech-related demands. *See also Perkins Coie LLP v. U.S. Dep't of Just.*, 783 F. Supp. 3d 105, 157 (D.D.C. 2025) ("[E]ach additional deal provides further evidence to satisfy the second element of plaintiff's retaliation claim, given that each of these firms, presumably possessing 'ordinary firmness,' sought successfully to avoid being targeted by similar Executive branch actions, with each law firm committing the equivalent of $100 million or more as part of the price to do so.").

**C. The Unprecedented Context Of These Proceedings Demonstrates That The Commission's Actions Are Motivated By Retaliatory Animus.**

To show the required causal link between the Commission's actions and Plaintiffs' protected speech, Plaintiffs need only make a "prima facie showing of retaliatory harm," after which "the burden shifts to the defendant official to demonstrate that even without the impetus to retaliate he would have taken the action complained of." *Hartman*, 547 U.S. at 260; *accord Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977) (noting that a plaintiff satisfies his initial burden by showing that his protected conduct was a "motivating factor" of the government's challenged action).

Courts need not "exhibit a naiveté from which ordinary citizens are free." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019) (quoting *United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir. 1977) (Friendly, J.)). This Court thus need only look at the President and the Chairman's own words to see that Plaintiffs are likely to show a causal link between Plaintiffs' protected speech and the early renewal proceedings. As with the government officials' statements in both

*Media Matters* and *Endocrine Society*, the President's and the Chairman's own statements expressly tie the Commission's retaliatory actions to Plaintiffs' protected speech. The retaliatory purpose of these statements is further underscored by the timing of Defendants' actions; the Order's unprecedented nature; the Order's obviously pretextual explanation; and Defendants' pattern of using their authorities to extract speech-related concessions from other broadcasters. Each fact confirms that the "causal element is met" here. *See Media Matters*, 805 F. Supp. 3d at 134 (citation omitted).

***Statements By The Administration.*** Both the President and the Chairman have repeatedly said the quiet part out loud: the Commission's actions are a direct response to ABC's speech.

The President has made no secret of his opposition to Plaintiffs' speech: he has consistently called on the Commission to revoke ABC's broadcast licenses and justified those calls by pointing to examples of Plaintiffs' speech he views as unfairly critical of him, his administration, and his party. The President has thus made the "causal link" plain.

The "highest echelons of the [Commission] have affirmed the Administration's view." *Endocrine Soc'y*, 2026 WL 1257289, at *11. Again and again, the Chairman has himself issued threats against ABC for speech that the Administration dislikes. When Mr. Kimmel made comments that the Chairman found offensive, he threatened ABC with consequences if it did not "take action on Kimmel."[59] After the President complained on Truth Social about news coverage of the Iran war, the Chairman reposted the message and threatened to revoke the licenses of broadcasters who run "fake news."[60] In the wake of the President's call to revoke ABC's licenses

[59] Johnson, *supra* note 33 at 1:31:36–54, 1:31:55–32:05, 1:32:59–1:33:18, 1:35:54–1:36:13.
[60] Wilkinson Ex. 37 (Brendan Carr (@BrendanCarrFCC), X (Mar. 14, 2026, 12:24 PM ET), https://perma.cc/VFL3-QNA9). Chairman Carr made this threat even though the Commission's "news distortion" policy has an "extremely limited scope" and applies only where a complainant identifies "extrinsic evidence" beyond "the broadcast itself" that "the distortion or staging [was]

in response to the network's decision not to broadcast his July 16th address, the Chairman explicitly promised to consider that programming decision during the license renewal proceedings.[61] And he has repeatedly stated that the FCC will bring enforcement actions against broadcasters (like ABC) that he views as overly "partisan."[62] Yet the Chairman's "partisanship" concerns only go one way—he has assured conservative talk radio that it need not worry about content-related Commission scrutiny[63] and has personally appeared at meetings hosted by organizations dedicated to "combat[ting] liberal media bias."[64]

The "breadth and vigor" of these statements, *Endocrine Soc'y*, 2026 WL 1257289, at *11, as well as their consistent, frequent, and "ideological" nature, reinforce that Defendants' motive is to punish Plaintiffs for their coverage and programming, *Media Matters*, 805 F. Supp. 3d at 134.

***Unprecedented Nature of the Commission's Actions***. The scope and unprecedented nature of Defendants' actions confirm the "causal link" between Plaintiffs' protected speech and the Commission's retaliation.

The Commission has repeatedly broken from its own precedent, practices, and even regulations in its ongoing effort to punish Plaintiffs for speech the Administration dislikes. The Commission has singled ABC out for harassment—reversing its own prior statements to order

---

deliberately intended to slant or mislead." *Galloway v. FCC*, 778 F.2d 16, 20–21 (D.C. Cir. 1985). No such evidence was apparent with respect to broadcasters' Iran war coverage.

[61] *See* Wilkinson Ex. 51.

[62] *See, e.g.*, Wilkinson Ex. 55 (Brendan Carr (@BrendanCarrFCC), X (Aug. 3, 2026, at 2:53 PM ET), https://perma.cc/A3VD-E5MQ). That promise wholly fails to acknowledge the FCC's longstanding conclusion that it is contrary to both the First Amendment and the Commission's public interest mandate for the Commission to enforce its view of proper partisan balance. *See* *Syracuse Peace Council*, 2 FCC Rcd. at 5047 (repealing the Fairness Doctrine).

[63] *See* Wilkinson Ex. 36.

[64] Wilkinson Ex. 18 (*RSC and FCC Chairman Carr Join Forces to Combat Liberal Media Bias and Expanding Regulatory Reforms*, Republican Study Committee (Feb. 27, 2025), https://perma.cc/5M4S-KG5E).

ABC to file a petition for declaratory ruling on *The View*'s exempt status, *see* Lieberman Decl. ¶ 17, something the agency has never done before. It also opened an investigation into Plaintiffs' employment practices, ignoring that the practices it was scrutinizing are generally consistent with the rest of the industry and were in many instances *encouraged* by longstanding FCC guidance. Many aspects of that investigation went well beyond the FCC's regulatory authority, targeting ABC's parent company and its broader family of companies (including some that have nothing to do with broadcasting). *See id.* ¶ 15. The Commission has wielded both *The View* and EEO investigations to pummel Plaintiffs with discovery demands of a volume and scope unheard-of in modern FCC practice. Fowler Decl. ¶¶ 7–8; Compl. § II.C. In its latest salvo, the Commission broke with more than fifty years of practice by ordering the Stations to apply to renew their licenses years ahead of schedule—the first such demand ever directed at a group of stations commonly owned with a single broadcast network.

The unprecedented nature and extensive scope of the Commission's multi-pronged actions targeting Plaintiffs demonstrate the Commission's retaliatory motive. *See Media Matters*, 2025 WL 2988966, at *6–8 (crediting a "pattern of litigation and information demands" targeted at a disfavored speaker over the course of months and the "broad scope" of the investigative demand to be "relevant evidence" that the Commission's purpose was pretextual); s*ee also White v. Lee*, 227 F.3d 1214, 1228–29 (9th Cir. 2000) (finding retaliation even in the absence of an enforcement action in part because of the breadth of the government investigation).

***Timing of the Commission's Actions.*** The timing of the Commission's actions also betrays their retaliatory intent. "Chairman [Carr] wasted no time after taking office to" reinstate the CAR complaint against ABC Owned Station, WPVI, showing that he was "chomping at the

bit" to target Plaintiffs. *Media Matters*, 805 F. Supp. 3d at 136.[65] The Commission abruptly made the unprecedented demand that Plaintiffs file early broadcast renewal applications *the day after* the President complained about Kimmel's speech. And the Commission ordered Plaintiffs to do so years before the applications would be due in the ordinary course—and, indeed, years before the Commission is even authorized by statute to grant them, *see* 47 U.S.C. § 307(d). For all but two of the Stations, this early review comes before their current license terms have even reached the halfway point. The only plausible explanations for Defendants' premature Order are either that Defendants have already decided not to grant the Stations' applications (or worse, revoke the Stations' licenses), or that they intend to hold the license renewal proceedings—and threat of denial—over Plaintiffs for years. Either way, Defendants' retaliatory motive is clear.

***The Commission's Pretextual Explanations.*** Defendants' failure to provide a valid justification for their extraordinary action further confirms their retaliatory motive. *See Bailey*, 2024 WL 3924573, at *15 (weighing pretextual reasons for investigation in favor of retaliation finding). Under FCC regulations, the only basis for the agency to call for early license renewal applications is if the agency determines that early applications are "essential to the proper conduct of a hearing or investigation." *See* 47 C.F.R. § 73.3539(c). None of the Commission's justifications for early renewal hold water against that standard.

[65] The Commission's *inaction* against broadcasters it views as favorable to the Trump Administration further shows its retaliatory objective in targeting Plaintiffs. *See, e.g.*, *Nieves v. Bartlett*, 587 U.S. 391, 407 (2019) (evidence that similarly situated persons were treated differently can sustain a retaliatory arrest claim even where probable cause is present). As explained above, while the Chairman reinstated the CAR complaint against ABC Owned Station WPVI, he did not renew an investigation against a Fox-owned television station. *See supra* note 19. And while enforcing the equal opportunities requirement against *The View*, even despite *The View*'s longstanding exemption, the Commission has declined to enforce the same requirement against conservative talk radio. *See* Wilkinson Ex. 36.

*First*, although the Commission nominally invokes the standard by concluding that the early renewal process is "essential within the meaning of agency regulations," Order at 2, it does not explain why it is essential to the only "hearing or investigation" identified in the Order—the EEO investigation. And there is no such explanation because nothing about the license renewal application (which is a standard form—FCC Form 2100, Schedule 303-S)[66] would advance the EEO investigation. Indeed, the FCC has continued to issue LOIs related to the EEO investigation well after the Commission called for early renewal, Lieberman Decl. ¶ 15, which undermines the Commission's claim that early renewal was "essential" to the conduct of that investigation.

While the Chairman has subsequently suggested that Plaintiffs' investigatory responses have been deficient, *see supra* note 43, that suggestion is belied by Plaintiffs' consistent record of thorough responses to the agency's more than 600 separate requests across the two investigations, resulting in the production of more than 13,000 pages of material. Compl. ¶ 68; *see also* Lieberman Decl. ¶¶ 15, 17. Moreover, in situations where the agency perceives that a party has failed to comply with an investigatory request, the ordinary tool for responding is a Notice of Apparent Liability, *see* 47 U.S.C. § 503(b)(4), not a call for early license renewal. And even if a Communications Act violation were ultimately established, the Commission has a graduated set of well-established remedies that fall far short of the corporate death sentence that is license non-renewal (or revocation). *See generally* 47 U.S.C. Ch. 5, Subch. V (penal provisions and forfeitures). That the agency reached first for the most extreme sanction in its arsenal reveals that its true objective is not to advance its EEO investigation, but to penalize Plaintiffs for speech the Administration dislikes. *Cf. Ozburn-Hessey Logistics, LLC v. Nat'l Lab. Rels. Bd.*, 833 F.3d 210,

[66] *License Renewal Applications for Television Broadcast Stations*, FCC, https://perma.cc/B8YB-DHZC (archived Aug. 14, 2026).

224 (D.C. Cir. 2016) (choosing "immediately to impose the harshest form of discipline," as opposed to "starting out with the least severe penalty that might accomplish the disciplinary objective," supports a finding of pretext).

*Second*, the Commission asserts that the early renewal process is needed to "ensure that [ABC] has been meeting its public interest obligations more broadly." Order at 2. But the FCC's own regulations authorize early renewal proceedings only where "essential to the proper conduct of a hearing or investigation," 47 C.F.R. § 73.3539(c)—not in service of an undefined public interest mandate. There is no basis in the FCC's own regulations, let alone the Act, for what the Commission has done—calling up all of ABC's licenses for a years-early renewal proceeding and granting itself free rein to scrutinize every decision (including editorial decisions) made by Plaintiffs against the public interest standard "more broadly" with no limit and no end date. That reinforces that the purpose of this early licensing renewal process is to give the Administration unbounded leverage against Plaintiffs.

The Commission's expansive reading of its authority is all the more troubling, given that the Chairman has publicly declared his belief that the public interest standard should account for the "political ideology" of a broadcaster's programming.[67] This belief is wrong; it invokes the long-abandoned "fairness doctrine," which once required stations to present contrasting viewpoints before the Commission itself abolished it as "unconstitutional on its face." *See Syracuse Peace Council*, 2 FCC Rcd. at 5047; Fowler Decl. ¶ 5.

*Third*, recall that the Act expressly "limit[s] the scope of the license renewal inquiry to matters occurring *at the particular station* for which license renewal is sought." *Sagittarius*

[67] Wilkinson Ex. 24 (Jasmine Baehr, *FCC Chair Brendan Carr Defends ABC Affiliates Pulling Jimmy Kimmel Show After Monologue About Charlie Kirk*, Fox News (Sept. 17, 2025), https://perma.cc/6A9J-65WZ).

*Broad.*, 18 FCC Rcd. at 22555 (citing 47 U.S.C. § 309(k)(1)) (emphasis added). As a general matter, inquiry into the conduct of the Stations' parent company, and divisions of the parent company unrelated to broadcasting, exceeds the scope of the license renewal process. Yet that is precisely what the Chairman proposes to do with his roving public-interest mandate—further demonstrating that the Commission's invocation of the public interest is merely a pretext for its campaign of censorship.

In sum, the early renewal process is being used not for legitimate investigative ends, but instead to retaliate against Plaintiffs for their free speech.

***The Commission's Pattern of Demands for Speech-Related Concessions.*** Finally, the Commission's pattern of using its authority to coerce other broadcasters' speech provides further evidence of retaliatory motive. As explained, the Commission has repeatedly demanded speech-related concessions from other companies as a condition of approving their pending media deals or of releasing them from pending investigations. And the Chairman has celebrated those political victories.[68] The Order is merely the latest example of the Commission's use of coercion to alter or silence speech the Administration dislikes. *See Endocrine Soc'y*, 2026 WL 1257289, at *14 (finding that "the same systemic targeting" of groups like plaintiffs, among other things, "confirm[ed] the conclusion that the CID was likely issued for a retaliatory purpose"); *see also White*, 227 F.3d at 1228–29 (affirming retaliation finding in part because a government official "conveyed a conciliation proposal requiring the plaintiffs to cease all litigation and publications" regarding a government project).

[68] *See* Wilkinson Ex. 38.

## II. Defendants' Actions Are Inflicting Irreparable Harm On Plaintiffs.

Plaintiffs can also readily establish that they are suffering, and will continue to suffer, multiple independent irreparable harms unless this Court halts the Commission proceedings. *See League of Women Voters v. Newby*, 838 F.3d 1, 7–8 (D.C. Cir. 2016). To show irreparable injury, Plaintiffs need only point to imminent or ongoing harm that is beyond the power of courts to remedy after the fact, such that "a favorable final judgment might well be useless." *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (1975). Multiple such harms are present here.

***Subjection to Unconstitutional Enforcement Action.*** The D.C. Circuit has recognized that where plaintiffs are "suffering from a campaign of retaliation against them in response to their exercise of their First Amendment rights," that alone constitutes "an irreparable injury." *Paxton*, 138 F.4th at 580; *see also id.* ("Appellees' allegations that they are targets of a retaliatory government investigation is a claim regarding concrete harm. And this harm is distinct from any resulting chilling effects."). And the case that the D.C. Circuit in *Paxton* cited for this proposition—*Cate v. Oldham*, 707 F.2d 1176 (11th Cir. 1983)—makes this even more explicit:

> This does not mean . . . that only if a plaintiff can prove actual, current chill can he prove irreparable injury. On the contrary, **direct retaliation by the state for having exercised First Amendment freedoms in the past is particularly proscribed by the First Amendment.**

707 F.2d at 1189 (emphasis added). Accordingly, if the Court agrees that Plaintiffs are likely to succeed in proving First Amendment retaliation, that suffices to establish irreparable harm.

***First Amendment Injuries.*** In addition, "ongoing adverse effects to [a plaintiff's] First Amendment rights" constitute irreparable injury. *See Paxton*, 138 F.4th at 585; *see also Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." (citation modified)).

Plaintiffs have suffered multiple First Amendment injuries, including concrete impacts to their programming. For example, the cumulative pressures from the FCC's investigation into *The View* and the early license renewal process have led Plaintiffs to be more circumspect in inviting political guests on *The View*. Lieberman Decl. ¶¶ 31–33. Since the Commission's inquiries began, any invitation to a political candidate is now evaluated not solely for newsworthiness or audience engagement, but also for whether it would provide further pretextual justification for sanctions. *Id.* ¶¶ 31–32. And even if Plaintiffs could withstand lesser sanctions to vindicate their belief that the equal time rule cannot be enforced against *The View*, the risk of losing their broadcasting licenses shifts that calculus. *Id.* ¶ 31. As a result of these cumulative pressures, *The View* has not hosted a candidate for public office since the Commission opened its investigation, has passed on further consideration of booking several political candidates, and has chosen not to air clips that otherwise would have aired during the "Hot Topics" or cold open segments of the show. *Id.* ¶ 33. This curtailed speech qualifies as a concrete First Amendment injury. *See Paxton*, 138 F.4th at 585; *accord Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988) ("[T]he alleged danger of this statute is, in large measure, one of self-censorship; a harm that can be realized even without an actual prosecution.").

Plaintiffs' First Amendment injuries are not limited to *The View*. Take, for instance, the President's July 16, 2026, address concerning election interference. In making the decision to livestream the address, Plaintiffs considered the fact that the Administration might take some adverse action against ABC if it did not, and indeed ordinarily would not have livestreamed the address. Lieberman Decl. ¶ 23. Because "the First Amendment includes not only the right to speak, but also the right not to speak," this, too, is a First Amendment injury. *UAW-Lab. Emp. & Training Corp. v. Chao*, 325 F.3d 360, 365 (D.C. Cir. 2003); *accord Hurley*, 515 U.S. at 573.

The electoral calendar makes Defendants' intimidation all the more consequential. The Commission's threat hangs over Plaintiffs as the country heads into a midterm election, precisely when "the free discussion of governmental affairs" and the "discussion[] of candidates" that fill Plaintiffs' programming command the Constitution's fullest protection. *See Mills v. Alabama*, 384 U.S. 214, 218 (1966). Indeed, a Commission intent on influencing coverage could hardly have chosen a more opportune moment. Plaintiffs must make editorial judgments about how to cover the election in the shadow of a threatened corporate death sentence, and the Commission has every incentive to let that threat loom as long as possible. Nor can that harm be undone after the fact. *Cf. League of Women Voters*, 838 F.3d at 9 (finding irreparable harm because, after the election passes, "there can be no do over and no redress").

***Economic Injuries.*** Plaintiffs further face irreparable economic injuries. Economic injury is irreparable where damages will be unavailable to the plaintiff at the conclusion of litigation. *See In re NTE Conn., LLC*, 26 F.4th 980, 990–91 (D.C. Cir. 2022). That is the case here.

The Commission's retaliatory campaign has already imposed significant costs on Plaintiffs, who have spent considerable time, money, and resources responding to Defendants' pretextual investigative demands and preparing the license renewal applications that Defendants required to be submitted early and prepared in an expedited thirty-day window. Plaintiffs have to date been subjected to over 600 separate requests for information and/or documents and have produced more than 13,000 pages of material across the Commission's overlapping investigations, and have expended countless resources and man-hours defending themselves from the Commission's retaliatory campaign. *See, e.g.*, Lieberman Decl. ¶¶ 15, 17.

If allowed to proceed, the agency adjudication would require Plaintiffs to expend considerable time, money, and resources defending the Stations' licenses. And at the end of those

proceedings, Plaintiffs may lose those licenses, which are worth considerable sums in retransmission consent fees and advertising dollars. *See* Lieberman Decl. ¶ 37.

Despite those economic harms, damages are unavailable to Plaintiffs for their First Amendment retaliation claim. *See FDIC v. Meyer*, 510 U.S. 471, 477 (1994) (holding that constitutional tort claims are not cognizable under the Federal Tort Claims Act); *Egbert v. Boule*, 596 U.S. 482, 491 (2022) ("[T]here is no *Bivens* cause of action for [a] First Amendment retaliation claim."). In similar circumstances, courts have found that the costs of responding to a retaliatory government action for which damages would never be available constitute irreparable harm. *See, e.g.*, *Jenner & Block LLP v. U.S. Dep't of Just.*, 784 F. Supp. 3d 76, 114 (D.D.C. 2025) (finding plaintiff's significant economic loss irreparable where sovereign immunity would bar collection).

***Reputational Injuries.*** Reputational harms, which are "not easily measurable in monetary terms," generally constitute irreparable harm. *Xiaomi Corp. v. Dep't of Def.*, 2021 WL 950144, at *9 (D.D.C. Mar. 12, 2021); *see, e.g., Patriot, Inc. v. U.S. Dep't of Hous. & Urb. Dev.*, 963 F. Supp. 1, 5 (D.D.C. 1997) (determining that "plaintiffs have demonstrated irreparable harm in damage to their business reputation" where government letter portrayed them as engaging in unsavory business practices). By repeatedly attacking Plaintiffs for their speech, falsely accusing them of failing to comply with the FCC investigation in order to manufacture a pretext for agency action, and ordering them to defend their licenses out of the ordinary course, Defendants are tarnishing Plaintiffs' reputation and will continue doing so unless enjoined. Lieberman Decl. ¶ 35.

***Cumulative Effect.*** Each of these injuries standing alone is an irreparable harm, but their cumulative effect is staggering. Plaintiffs face simultaneous, mutually reinforcing harms to their constitutional rights, their finances, and their Stations' very existence—harm that is certain because it is already occurring, great because it strikes at the core of Plaintiffs' broadcasting

business and editorial independence, and irreparable because no damages remedy will ever be available against Defendants.

### III. The Balance Of Equities And Public Interest Strongly Favor An Injunction.

On the balance of equities, "[t]here is no contest." *Endocrine Soc'y*, 2026 WL 1257289, at *14. Plaintiffs' interest in obtaining an injunction "mirrors that of every person subject to government power: vindicating the right to be free of retaliation for . . . protected speech." *Id.* "And 'there is always a strong public interest in the exercise of free speech rights otherwise abridged by an unconstitutional' government action." *Paxton*, 138 F.4th at 585 (internal citation omitted). That is especially so where, as here, the Administration has threatened the public's interest in a free and open media industry. *See Roth v. United States*, 354 U.S. 476, 484 (1957) ("The protection given speech and press was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people."); *Media Matters*, 805 F. Supp. 3d at 111 (explaining that it should be particularly alarming "when the Government retaliates against those engaged in newsgathering and reporting").

By contrast, "[t]he Government is in no way harmed by issuance of a preliminary injunction which prevents [it] from [continuing proceedings] likely to be found unconstitutional." *Media Matters*, 805 F. Supp. 3d at 138 (internal citation omitted); *see also League of Women Voters*, 838 F.3d at 12 ("There is generally no public interest in the perpetuation of unlawful agency action."). And any possible harm to the Commission from enjoining a process it initiated years early—indeed, years ahead even of its lawful authority to renew Plaintiffs' licenses, *see* 47 U.S.C. § 307(d)—"pales in comparison to the benefit [Plaintiffs and the public] will receive once the chilling weight of the [proceedings] is lifted." *Endocrine Soc'y*, 2026 WL 1257289, at *14.

**IV. This Court Has Jurisdiction To Review Plaintiffs' Claims.**

This Court has jurisdiction to review Plaintiffs' claims now. Under 5 U.S.C. § 702, Congress has expressly waived sovereign immunity in "*all* equitable actions . . . against a Federal agency or officer acting in an official capacity." *Trudeau v. FTC*, 456 F.3d 178, 186 (D.C. Cir. 2006). Accordingly, "plaintiffs may sue 'in equity' without a congressionally-provided cause of action 'to prevent an injurious act by a public officer.'" *Trump v. Cook*, 146 S. Ct. 2234, 2251 n.2 (2026).

Congress has assigned federal district courts original jurisdiction to hear "all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. "[U]nless Congress explicitly directs otherwise," *Elgin v. Dep't of Treasury*, 567 U.S. 1, 9 (2012), district courts thus have a "virtually unflagging obligation" to exercise that jurisdiction, *see Mata v. Lynch*, 576 U.S. 143, 150 (2015). When a district court is asked to enjoin unconstitutional government action, "[t]he question, then, is not whether [some statute] confers jurisdiction," but whether a specific statute "removes the jurisdiction given to the federal courts" under Section 1331. *Whitman v. Dep't of Transp.*, 547 U.S. 512, 514 (2006) (per curiam).

Courts apply a strong presumption in favor of judicial review. *See, e.g.*, *Webster v. Doe*, 486 U.S. 592, 603 (1988) (requiring a "heightened showing" of congressional intent "to avoid the 'serious constitutional question' that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim"). Indeed, even when Congress seeks to delay or channel judicial review, rather than preclude it altogether, courts are reluctant to "restrict judicial review unless the 'statutory scheme' displays a 'fairly discernible' intent to limit jurisdiction, and the claims at issue 'are of the type Congress intended to be reviewed within the statutory structure.'" *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 489 (2010).

Although the Communications Act channels judicial review of certain kinds of FCC action, nothing in the Act precludes immediate judicial review of the kind of claims raised here. As the Supreme Court recognized in *Axon Enterprise, Inc. v. Federal Trade Commission*, even where Congress otherwise channels agency review through a special process, litigants may proceed straight to federal district court for claims falling outside that statutory scheme. 598 U.S. 175, 186–87 (2023). Whether a claim qualifies turns on three questions: (1) "could precluding district court jurisdiction 'foreclose all meaningful judicial review' of the claim?"; (2) "is the claim 'wholly collateral' to the statute's review provisions?"; and (3) "is the claim 'outside the agency's expertise?'" *Id.* at 186 (citing *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212–13 (1994)). First Amendment retaliation claims like Plaintiffs' here, which challenge the lawfulness of the very proceedings themselves (rather than the underlying merits of the issues raised in those proceedings), "sail[] through the three considerations." *Endocrine Soc'y*, 2026 WL 1257289, at *7 (citation modified); *see Media Matters*, 2025 WL 2988966, at *5.

*First*, denying Plaintiffs a chance to seek relief would "foreclose all meaningful judicial review." *Thunder Basin*, 510 U.S. at 212–13. In *Axon*, the Court framed the question this way: "If an appellate court had ruled in favor of the [plaintiff] on review of an agency decision," could the court "have remedied the party's injury?" 598 U.S. at 191. There, the answer was no. The alleged harm was "'being subjected' to 'unconstitutional agency authority,'" specifically, a "proceeding conducted by an unconstitutionally appointed [Administrative Law Judge ("ALJ")]." *Id*. Even if the court of appeals had later agreed that the ALJ-led proceeding was unconstitutional, that injury would have been "impossible to remedy once the proceeding [was] over." *Id.*

The same is true here. Plaintiffs challenge "an illegitimate proceeding"—an early license renewal process initiated for retaliatory purposes in violation of the First Amendment. "And as to

that grievance, the court of appeals can do nothing: A proceeding that has already happened cannot be undone." *Id.* Judicial review under the Communications Act would "come too late to be meaningful," destroying Plaintiffs' "right[] not to undergo the complained-of agency proceedings" in the first place. *Id.* at 191–92.

Moreover, even if review in the court of appeals could eventually provide some relief, a court would likely require a "final" order by the Commission before entertaining judicial review under the Hobbs Act. *Cf. FTC v. Standard Oil Co. of California*, 449 U.S. 232, 239–43 (1980) (holding that an agency's issuance of an investigative complaint is not final agency action). And here, the Commission may well drag out these retaliatory proceedings for years to continue exerting pressure while preventing Plaintiffs from reaching an Article III court. *See, e.g.*, *Media Matters*, 2025 WL 2988966, at *4 (recognizing that if the agency chose "not to take additional enforcement steps," it could "clos[e] the courthouse doors to relief," which counseled in favor of district court review). Indeed, the patent illegality of the Commission's conduct gives the Commission exactly that incentive. While the Commission's effort to strip the Stations of their licenses is likely to be overturned on appeal, keeping the proceedings open allows the Commission to continue pressuring Plaintiffs to accede to its unconstitutional demands. As Commissioner Gomez aptly observed, "[t]he value of a sword of Damocles is that it hangs, not that it drops."[69]

This Court thus has jurisdiction to prevent the agency from "run[ning] roughshod over a party's First Amendment rights while simultaneously closing the courthouse doors to relief as long as the agency chooses not to take additional enforcement steps." *Endocrine Soc'y*, 2026 WL

---

[69] *See* Wilkinson Ex. 43 (Commissioner Gomez Letter) (quoting *First Choice Women's Res. Centers, Inc. v. Davenport*, 146 S. Ct. 1114, 1127 (2026)).

1257289, at *7. Holding otherwise would "foreclose all meaningful judicial review" of the First Amendment violations that Plaintiffs allege. *Thunder Basin*, 510 U.S. at 212–13.

*Second*, Plaintiffs' claims are also "wholly collateral" to the statute's review provisions because they challenge the FCC's ability to initiate retaliatory proceedings, as opposed to the merits of the early license renewal proceedings themselves. *Id.* at 212. Plaintiffs' claims turn not on whether the Commission engaged in reasoned decisionmaking or reached conclusions supported by substantial evidence (the familiar inquiries under 5 U.S.C. § 706), but instead on the Commission's retaliatory use of the early license renewal process as punishment for Plaintiffs' speech. Whatever judicial review is available after the fact, "a prosecution motivated by a desire to discourage expression protected by the First Amendment is barred and must be enjoined or dismissed, irrespective of whether the challenged action could possibly be found to be unlawful." *United States v. P.H.E., Inc.*, 965 F.2d 848, 853 (10th Cir. 1992). Accordingly, as in *Axon*, Plaintiffs "are challenging the [Commission's] power to proceed *at all*, rather than actions taken in the agency proceedings." 598 U.S. at 192 (emphasis added).

*Third*, the FCC "has no 'expertise' in adjudicating First Amendment retaliation claims that parties bring against the Commission itself." *Endocrine Soc'y*, 2026 WL 1257289, at *7 (quoting *Axon*, 598 U.S. at 186). To the contrary, the Communications Act expressly precludes the Commission from using any of its authorities to censor or otherwise "interfere with the right of free speech." 47 U.S.C. § 326. Although the Commission's regulatory authority permits it to consider the substance of broadcaster speech in narrow circumstances such as broadcast indecency, the Commission generally lacks any authority to engage in content- and viewpoint-based review. *See, e.g.*, *Syracuse Peace Council*, 2 FCC Rcd. at 5047 (abolishing the FCC's former fairness doctrine as contrary to the public interest and unconstitutional on its face); Fowler Decl. ¶ 5. And

the Commission's expertise certainly does not extend to adjudicating First Amendment retaliation cases, especially those that concern the agency's "purported abuse of its *own* authority in order to suppress Plaintiff's speech." *Endocrine Soc'y*, 2026 WL 1257289, at *7 (emphasis added). Because "[s]uch self-policing is far outside the Commission's expert[ise]," *id.*, there is no "benefit to waiting" to proceed with judicial review. *Media Matters*, 2025 WL 2988966, at *5. All three factors thus justify this Court's review of Plaintiffs' claims.

## V. This Court Should Waive FRCP 65(c)'s Security Requirement.

Lastly, Plaintiffs respectfully request that the Court waive the security requirement in Federal Rule of Civil Procedure 65(c), pursuant to its "broad discretion . . . to determine the appropriate amount of an injunction bond," *Am. First Legal Found. v. Becerra*, 2024 WL 3741402, at *16 n.11 (D.D.C. Aug. 9, 2024) (internal citation omitted), "including the discretion to require no bond at all," *id.* (internal citation omitted). It is appropriate here to dispense with the security requirement because "the restraint will do the defendant no material damage" and "there has been no proof of likelihood of harm." *Id.* (internal citation omitted).

## CONCLUSION

"It should alarm all Americans when the Government retaliates against individuals or organizations for engaging in constitutionally protected public debate. And that alarm should ring even louder when the Government retaliates against those engaged in newsgathering and reporting." *Media Matters*, 805 F. Supp. 3d at 111. The Commission has done just that here.

For the foregoing reasons, this Court should grant Plaintiffs' request for a temporary restraining order preventing the Commission from taking any further action with respect to its retaliatory early renewal application order and enter a preliminary injunction that halts the early renewals proceedings—and associated threats of revocation in response to ABC's protected editorial discretion—pending the resolution of this case.

Dated: August 18, 2026

By: */s/ Beth A. Wilkinson*
Beth A. Wilkinson (D.C. Bar No. 462561)
Jenna P. Swarbrick (D.C. Bar No. 1614398)
Daniel Epps (*pro hac vice pending*, D.C. Bar No. 1002523)
Luke Churchill (*pending admission*, D.C. Bar No. 90020985)
**WILKINSON STEKLOFF LLP**
2001 M St. NW, 10th Floor
Washington, DC 20036
Telephone: (202) 847-4000
Facsimile: (202) 847-4005
bwilkinson@wilkinsonstekloff.com
jpswarbrick@wilkinsonstekloff.com
depps@wilkinsonstekloff.com
lchurchill@wilkinsonstekloff.com

Caroline Li (*pending admission*, D.C. Bar No.1779285)
**WILKINSON STEKLOFF LLP**
130 W 42nd St., 24th Floor
New York, NY 10036
Telephone: (212) 294-8910
Facsimile: (202) 847-4005
cli@wilkinsonstekloff.com

By: */s/ Paul D. Clement*
Paul D. Clement (D.C. Bar No. 433215)
Jeffrey C. Thalhofer (D.C. Bar No. 1658324)
**CLEMENT & MURPHY, PLLC**
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com
jeff.thalhofer@clementmurphy.com

*Counsel for Plaintiffs American Broadcasting Companies, Inc.; The Walt Disney Company; KABC Television, LLC; KFSN Television, LLC; KGO Television, Inc.; KTRK Television, Inc.; WABC Television (New York), LLC; WLS Television, Inc.; WPVI Television (Philadelphia), LLC; and WTVD Television, LLC.*

# APPENDIX A: KEY STATEMENTS CHRONOLOGY

*Blue rows indicate explicit calls to punish ABC or revoke its licenses.*

| Date | Statement / Action |
|---|---|
| **Sept. 18, 2020** | President Trump stated at a campaign rally in Bemidji, Minnesota: "You know, in the old days, when you used public airwaves free, you had to get a license. **I keep saying if they're reporting fake news, how come they can keep getting a license**? Whether it's ABC, whether it's NBC, CBS, or of course CNN . . . ."[70] |
| **Jan. 16, 2024** | President Trump stated at a campaign rally in Atkinson, New Hampshire: "Last night, NBC and CNN refused to air my victory speech. Think of it, because they are crooked, they're dishonest, and frankly, they should have their licenses or whatever they have taken away."[71] |
| **July 4, 2024** | President Trump posted on Truth Social: "The meanest and most vicious Interviewer out there is George Slopadopoulos of FAKE NEWS ABC, one of the worst and most vile Broadcasters in the business — In fact, the home of disgraced 'reporter' Brian Ross whose reporting on the Russia, Russia, Russia Hoax was so outlandish that ABC, after defending him at levels not seen before, was forced to put him, and their reputation, out to pasture. Now ABC, and Liddle' George, a tiny, angry man, can make up for their past indiscretions and journalistic failures by doing a real interview with Crooked Joe, not a cut up promotion with only his few coherent answers released to the public. Let the World know why Joe directed, and allowed his Department of Injustice, and others, to illegally attack his Political Opponent, ME. Nothing like this has ever happened in our Country before. Also, ask why he used all Soros Prosecutors and, in particular, a loser like Deranged Jack Smith? The proof is irrefutable - Crooked Joe is a COWARD!!! MAGA2024"[72] |

[70] Wilkinson Ex. 2 (*Donald Trump Campaign Rally Speech Bemidji, Minnesota*, Rev (Sept. 18, 2020), https://perma.cc/QX2E-L5K4); *see also* Bloomberg News, *Trump Holds Campaign Rally in Bemidji, Minnesota* (YouTube, Sept. 18, 2020), https://perma.cc/H4KY-78LZ (video).

[71] Wilkinson Ex. 3 (*Speech: Donald Trump Holds a Political Rally in Atkinson, New Hampshire*, Roll Call Factbase (Jan. 16, 2024), https://perma.cc/M3JD-AC2S); *see also* Right Side Broadcasting Network, *FULL SPEECH: Trump to Deliver Remarks in Atkinson, New Hampshire - 1/16/24* (YouTube, Jan. 16, 2024), https://perma.cc/VP84-VE6W (video).

[72] Wilkinson Ex. 4 (Donald J. Trump (@realDonaldTrump), Truth Social (July 4, 2024, at 5:20 PM ET), https://perma.cc/WK45-QUTC).

| Date | Statement / Action |
|---|---|
| **Sept. 5, 2024** | President Trump stated at a *Fox News* town hall: "ABC is the worst network in terms of fairness. . . . They are the most dishonest network, the meanest, the nastiest, but that is what I was presented with. I was presented with ABC, George Slopadopoulos. You know who he is. And he's a nasty guy."[73] |
| **Sept. 11, 2024** | Following ABC's hosting of the only 2024 presidential debate between President Trump and former Vice President Kamala Harris, President Trump called into a live interview on *Fox & Friends* and stated: "It was three to one. It was a rigged deal as -- as I assumed it would be . . . A lot of people are very angry about it. You know, you have corrupt news organizations. You have a lot of bad people, it's amazing . . . I think ABC took a big hit last night. I mean, to be honest, they're a news organization. They have to be licensed to do it. **They ought to take away their license for the way they did that.**"[74] |
| **Sept. 11, 2024** | Following the ABC-hosted 2024 presidential debate, President Trump posted on Truth Social: "People are just starting to give me credit for having a GREAT DEBATE. The Voters and Voter Polls showed it, but the Fake News Media wasn't giving the credit that was due. Now they are seeing the results with independent Voters, Evangelicals, and more - and saying, WOW! Remember, I wasn't debating one person, I was debating three. They should fire everybody at ABC Fake News, whose two lightweight 'anchors' have brought disgrace onto the company!"[75] |
| **Sept. 12, 2024** | President Trump stated at a rally in Tucson, Arizona that "stupid ABC [] did this horrible debate" and that ABC anchors David Muir and Linsey Davis were "low lives" who "should be fired as an anchor."[76] |

[73] Wilkinson Ex. 5 (*Interview: Sean Hannity Hosts a Town Hall with Donald Trump in Harrisburg, Pennsylvania*, Roll Call Factbase (Sept. 4, 2024), https://perma.cc/FL7L-WEQ2).
[74] Wilkinson Ex. 6.
[75] Wilkinson Ex. 7 (Donald J. Trump (@realDonaldTrump), Truth Social (Sept. 11, 2024, at 11:17 PM ET), https://perma.cc/M8A2-S8MN).
[76] Wilkinson Ex. 9 (*Speech: Donald Trump Holds a Campaign Event in Tucson*, Arizona, Roll Call Factbase (Sept. 12, 2024), https://perma.cc/97XN-44GP); *see also* News 4 Tucson KVOA-TV, *Trump Delivering Remarks in Tucson* (YouTube, Sept. 12, 2024), https://perma.cc/GNS5-22SV.

| Date | Statement / Action |
|---|---|
| **Sept. 12, 2024** | President Trump posted on Truth Social: "People are saying that Comrade Kamala Harris had the questions from Fake News ABC. I would say it is very likely. The two so-called 'Anchors' were a disgrace to Modern Day Journalism. David Muir should be ashamed of himself, as should Linsey Davis, who I never heard of, but both were nasty and rude when they were making statements that they knew were false. As an example, the FBI said they didn't give all the information when coming up with Crime stats, making me RIGHT. Despite having to debate three people, Polls firmly state that I won, and EASILY. I felt that also, but no Politician should ever do a Debate with ABC News. They have proven NOT WORTHY, and hopefully an investigation will be done as to whether or not they gave the Debate questions to Comrade Kamala, whose best friend is a top ABC Executive. If she did give the questions to Kamala, **ABC's license should be TERMINATED.** Remember, Donna Brazile works for ABC, and she gave the questions to Hillary Clinton!"[77] |
| **Oct. 9, 2024** | At a campaign rally in Scranton, Pennsylvania, President Trump stated about *The View* co-host, Sunny Hostin: "That is one dumb woman. Sorry. I'm sorry, women, she's a dummy."[78] |
| **Oct. 9, 2024** | At a campaign rally in Reading, Pennsylvania, President Trump stated about *The View* moderator, Whoopi Goldberg: "She was so filthy dirty, disgusting. . . . Every word was filthy, dirty. . . . [W]hat a loser she is."[79] |
| **Oct. 10, 2024** | President Trump posted on Truth Social: "60 Minutes is a major part of the News Organization of CBS, which has just created the Greatest Fraud in Broadcast History. CBS should lose its license, and it should be bid out to the Highest Bidder, as should all other Broadcast Licenses, because they are just as corrupt as CBS — and maybe even WORSE!"[80] |

[77] Wilkinson Ex. 10 (Donald J. Trump (@realDonaldTrump), Truth Social (Sept. 12, 2024, at 7:40 PM ET), https://perma.cc/M7Q6-8C2E).

[78] PBS NewsHour, *WATCH LIVE: Trump holds rally in Biden's hometown of Scranton, Pa.* (YouTube, Oct. 9, 2024), https://perma.cc/VK66-8W78 (video); Wilkinson Ex. 11 (Michelle L. Price, Jill Colvin, & Will Weissert, *Trump lashes out at Harris, 'The View' co-hosts in Pa. rally as Hurricane Milton makes landfall*, Fox29 Philadelphia (Oct. 10, 2024), https://perma.cc/WQ5J-ZGUC).

[79] WFAA, *Donald Trump full speech at rally in Reading, PA (Oct. 9, 2024)* (YouTube, Oct. 9, 2024), https://perma.cc/FVK3-ULY2; Wilkinson Ex. 11.

[80] Wilkinson Ex. 12 (Donald J. Trump (@realDonaldTrump), Truth Social (Oct. 10, 2024, at 10:04 AM ET), https://perma.cc/A8YY-KARP).

| Date | Statement / Action |
|---|---|
| **Oct. 11, 2024** | President Trump stated at a campaign rally in Reno, Nevada: "*60 Minutes* should be taken off the air for what they've done. . . . And you know what else []? They should lose their license because that's not just a little bad stuff. You know, they have licenses, these networks. They're worth billions of dollars, but the one thing is it says you have to be honest. That's election interference. They're interfering with the election. Am I right? They should lose their license, and *60 Minutes* should be taken off the air."[81] |
| **Oct. 25, 2024** | President Trump stated at a campaign rally in Traverse City, Michigan: "CBS should lose its license. You know, the government, the government gives us license to NBC fake news, ABC fake news, and CBS fake news. They have to pay. If they had to pay, they'd pay billions of dollars. They get them for nothing. They pay nothing. They're public airways, they pay nothing. . . . The one thing is you have to be honest, and they were very dishonest."[82] |
| **Oct. 31, 2024** | President Trump stated at a campaign rally in Henderson, Nevada: "I think CBS should lose its license, but **I think ABC should lose its license also because of what they've done**."[83] |
| **Nov. 17, 2024** | Then-Commissioner Carr told Fox News: "We need to keep every single remedy on the table. . . . One of the remedies the FCC has, ultimately, would be license revocation, if we find that it's egregious. And we'll see what they have to say about this. But it needs to deter this kind of conduct. The whole purpose of this rule is to give people a fair shot."[84] |
| **Nov. 25, 2024** | Commissioner Carr stated on Fox Business program *Mornings with Maria*: "Step one for me is to make sure I continue to work with President Trump and his team over the coming weeks as the transition is complete. I want to make sure I understand 100% President Trump's agenda."[85] |

[81] Wilkinson Ex. 13 (*Donald Trump Speech: Campaign Rally in Reno, Nevada*, Roll Call Factbase (Oct. 11, 2024), https://perma.cc/54RM-FH2T).
[82] Wilkinson Ex. 14 (*Donald Trump Holds a Campaign Rally in Traverse City, Michigan*, Roll Call Factbase (Oct. 25, 2024), https://perma.cc/WD4Z-EUQ2).
[83] Wilkinson Ex. 15.
[84] Wilkinson Ex. 16 (David Folkenflik, *Trump taps FCC's Brendan Carr to lead the agency*, NPR (Nov. 17, 2024), https://perma.cc/6WEU-K9HV).
[85] Wilkinson Ex. 17 (*Americans Have Lived Under An Unprecedented Surge Of Censorship, Says FCC Chair Nominee*, Fox Business (Nov. 25, 2024), https://perma.cc/FUM3-Y299).

| Date | Statement / Action |
|---|---|
| **Dec. 21, 2024** | Commissioner Carr sent a public letter to Disney, accusing the company of contributing to the "erosion of public trust" in mass media.[86] |
| **July 23, 2025** | In a statement to *Fox News Digital*, White House spokesperson Taylor Rogers stated, "Joy Behar is an irrelevant loser suffering from a severe case of Trump Derangement Syndrome. It's no surprise that '*The View*'s ratings hit an all-time low last year. She should self-reflect on her own jealousy of President Trump's historic popularity before her show is the next to be pulled off-air."[87] |
| **July 24, 2025** | In an appearance on Fox News' *America's Newsroom*, Chairman Carr stated about *The View*: "It's entirely possible that there's issues over there. Stepping back, this broader dynamic, once President Trump has exposed these media gatekeepers and smashed this facade, there's a lot of consequences. I think the consequences of that aren't quite finished."[88] |
| **Aug. 24, 2025** | President Trump posted on Truth Social: "Despite a very high popularity and, according to many, among the greatest 8 months in Presidential History, ABC & NBC FAKE NEWS, two of the worst and most biased networks in history, give me 97% BAD STORIES. IF THAT IS THE CASE, THEY ARE SIMPLY AN ARM OF THE DEMOCRAT PARTY AND **SHOULD, ACCORDING TO MANY, HAVE THEIR LICENSES REVOKED BY THE FCC**. **I would be totally in favor of that** because they are so biased and untruthful, an actual threat to our Democracy!!! MAGA"[89] |

[86] *See* Letter from Brendan Carr, Comm'r, FCC, to Robert A. Iger, CEO, Walt Disney Co. (Dec. 21, 2024), https://perma.cc/85B3-NLES.
[87] Wilkinson Ex. 20 (Lindsay Kornick, *White House Warns 'The View' Could Be Canceled Next After Joy Behar's Anti-Trump Rant*, Fox News (July 23, 2025, at 7:00 PM ET), https://perma.cc/X2DN-5X6E).
[88] Wilkinson Ex. 21 (Rachel del Guidice, *FCC Chairman Sounds Clarion Call To Return To 'Unbiased, Trustworthy Journalism',* Fox News (July 24, 2025, 4:00 PM EDT), https://perma.cc/6EKS-Y3QS).
[89] Wilkinson Ex. 22 (Donald J. Trump (@realDonaldTrump), Truth Social (Aug. 24, 2025, at 9:59 PM ET), https://perma.cc/4DMG-KKG8).

| Date | Statement / Action |
|---|---|
| **Aug. 24, 2025** | President Trump posted on Truth Social: "Why is it that ABC and NBC FAKE NEWS, two of the absolute worst and most biased networks anywhere in the World, aren't paying Millions of Dollars a year in LICENSE FEES. **They should lose their Licenses** for their unfair coverage of Republicans and/or Conservatives, but at a minimum, they should pay up BIG for having the privilege of using the most valuable airwaves anywhere at anytime!!! Crooked 'journalism' should not be rewarded, it should be terminated!!!"[90] |
| **Sept. 17, 2025** | Chairman Carr appeared on Sean Hannity's Fox News show and stated about Jimmy Kimmel: "Something's gone seriously awry [with late night shows] . . . They went from being court jesters that would make fun of everybody in power to becoming court clerics and enforcing a very narrow political ideology."[91] |
| **Sept. 17, 2025** | Chairman Carr appeared on the podcast *The Benny Show* and discussed Mr. Kimmel's comments about Charlie Kirk's murder, stating that there was a "strong case" for action against ABC and Disney. He further stated: "We can do this the easy way or the hard way. These companies can find ways to take action on Kimmel, or there is going to be additional work for the FCC ahead."[92] |
| **Sept. 17, 2025** | President Trump posted on Truth Social: "Great News for America: The ratings challenged Jimmy Kimmel Show is CANCELLED. Congratulations to ABC for finally having the courage to do what had to be done. Kimmel has ZERO talent, and worse ratings than even Colbert, if that's possible. That leaves Jimmy and Seth, two total losers, on Fake News NBC. Their ratings are also horrible. Do it NBC!!! President DJT"[93] |

[90] Wilkinson Ex. 23.
[91] Wilkinson Ex. 24.
[92] Johnson, *supra* note 33 at 1:31:36–54, 1:31:55–32:05, 1:32:59–1:33:18, 1:35:54–1:36:13.
[93] Wilkinson Ex. 25 (Donald J. Trump (@realDonaldTrump), Truth Social (Sept. 17, 2025, at 8:04 PM ET), https://perma.cc/GT3P-LZD3).

| Date | Statement / Action |
|---|---|
| **Sept. 23, 2025** | President Trump posted on Truth Social: "I can't believe ABC Fake News gave Jimmy Kimmel his job back. The White House was told by ABC that his Show was cancelled! Something happened between then and now because his audience is GONE, and his 'talent' was never there. Why would they want someone back who does so poorly, who's not funny, and who puts the Network in jeopardy by playing 99% positive Democrat GARBAGE. He is yet another arm of the DNC and, to the best of my knowledge, that would be a major Illegal Campaign Contribution. **I think we're going to test ABC out on this.** Let's see how we do. Last time I went after them, they gave me $16 Million Dollars. This one sounds even more lucrative. A true bunch of losers! Let Jimmy Kimmel rot in his bad Ratings."[94] |
| **Oct. 5, 2025** | President Trump posted on Truth Social: "I knew Al Sharpton for many years, not that it matters, but he was a major 'TRUMP' fan. He'd ask me to go to his fake Rallies all the time, because I brought BIG Crowds, and he couldn't get anybody to come without me. Then he did the Tawana Brawley Hoax, one of the worst Low Level Scams in History, and that set him back, BIG TIME! Then he got to know Brian Roberts, Chairman of Fake News NBC, who gave him what would become one of the Lowest Rated Shows in Television History. Roberts is afraid to take him off because it wouldn't be 'Politically Correct.' **This is just one of the many reasons that the Federal Communications Commission should look into the license of NBC,** which shows almost exclusively positive Democrat content. **Likewise, ABC Fake News** — About the same thing, 97% negative to Republicans!"[95] |
| **Nov. 15, 2025** | Brendan Carr reposted on his official X account the following Truth Social post by President Trump: "NBC's Seth Meyers is suffering from an incurable case of Trump Derangement Syndrome (TDS). He was viewed last night in an uncontrollable rage, likely due to the fact that his 'show' is a Ratings DISASTER. Aside from everything else, Meyers has no talent, and NBC should fire him, IMMEDIATELY!"[96] |

[94] Wilkinson Ex. 26.
[95] Wilkinson Ex. 27.
[96] Wilkinson Ex. 28 (Brendan Carr (@BrendanCarrFCC), X (Nov. 15, 2025, at 7:28 PM ET), https://perma.cc/BW6P-5QN9).

| Date | Statement / Action |
|---|---|
| **Nov. 18, 2025** | President Trump responded to a question about the Epstein files from ABC News Chief White House Correspondent, Mary Bruce: "It's not the question on my mind, it's your attitude. I think you are a terrible reporter . . . . You're a terrible person, and a terrible reporter . . . . **I think the license should be taken away from ABC because your news is so fake, and it's so wrong, and we have a great Commissioner, a Chairman, who should look at that.** Because I think when you come in and when you're 97% negative to Trump, and then Trump wins the election by a landslide, that means obviously your news is not credible, and you're not credible as a reporter."[97] |
| **Nov. 19, 2025** | The White House published a press release titled "ABC 'News' Is Fake News," claiming: "ABC 'News' has a long, rich tradition of peddling lies, conspiracies, and outright opinion thinly veiled as fact."[98] |
| **Nov. 23, 2025** | President Trump posted a *Newsmax* article on Truth Social, stating: "If this would also allow the Radical Left Networks to 'enlarge,' I would not be happy. ABC & NBC, in particular, are a disaster – A VIRTUAL ARM OF THE DEMOCRAT PARTY. They should be viewed as an illegal campaign to the Radical Left. NO EXPANSION OF THE FAKE NEWS NETWORKS. If anything, make them SMALLER! President DJT"[99] |
| **Nov. 28, 2025** | The White House launched a public webpage titled "Media Offenders," cataloguing perceived "offenses" of various networks, reporters, and television hosts, including many from ABC.[100] The website condemned *The View* for criticizing government officials for visiting "Alligator Alcatraz ICE detention facility" and denouncing Trump's ballroom construction.[101] |
| **Dec. 24, 2025** | President Trump posted on Truth Social: "Who has the worst Late Night host, CBS, ABC, or NBC??? They all have three things in common: High Salaries, No Talent, REALLY LOW RATINGS!"[102] |

[97] Wilkinson Ex. 29.
[98] Wilkinson Ex. 30 (*ABC "News" Is Fake News,* White House (Nov. 19, 2025), https://perma.cc/HN72-CB22).
[99] Wilkinson Ex. 31 (Donald J. Trump (@realDonaldTrump), Truth Social (Nov. 23, 2025, at 4:58 PM ET), https://perma.cc/KFS6-DJ8V).
[100] Wilkinson Ex. 35.
[101] *Id.*
[102] Wilkinson Ex. 33 (Donald J. Trump (@realDonaldTrump), Truth Social (Dec. 24, 2025, at 12:23 AM ET), https://perma.cc/G6HT-4H2Y).

| Date | Statement / Action |
|---|---|
| **Dec. 24, 2025** | President Trump posted on Truth Social: "If Network NEWSCASTS, and their Late Night Shows, are almost 100% Negative to President Donald J. Trump, MAGA, and the Republican Party, **shouldn't their very valuable Broadcast Licenses be terminated?** I say, YES!"[103] |
| **Mar. 14, 2026** | In response to a Truth Social post by President Trump, Chairman Carr posted on X: "Broadcasters that are running hoaxes and news distortions - also known as the fake news - have a chance now to correct course before their license renewals come up. The law is clear. Broadcasters must operate in the public interest, and they will lose their licenses if they do not. And frankly, changing course is in their own business interest since trust in legacy media has now fallen to an all time low of just 9% and are ratings disasters. The American people have subsidized broadcasters to the tune of billions of dollars by providing free access to the nation's airwaves. It is very important to bring trust back into media, which has earned itself the label of fake news. When a political candidate is able to win a landslide election victory after [sic] in the face of hoaxes and distortions, there is something very wrong. It means the public has lost faith and confidence in the media. And we can't allow that to happen. Time for change!"[104] |
| **Mar. 27, 2026** | Chairman Carr stated in a speech at the Conservative Political Action Conference: "President Trump took on the fake news media and President Trump is winning. Look at the results so far. PBS defunded. NPR defunded. Joy Reid, gone from MSNBC. Sleepy-Eyed Chuck Todd, gone. Jim Acosta, gone. John Dickerson, gone. Colbert is leaving. CBS is under new ownership, and soon enough CNN is going to have new ownership as well."[105] |

[103] Wilkinson Ex. 34 (Donald J. Trump (@realDonaldTrump), Truth Social (Dec. 24, 2025, at 12:36 AM ET), https://perma.cc/6MJX-Y4R8).
[104] Wilkinson Ex. 37.
[105] Wilkinson Ex. 38.

| Date | Statement / Action |
|---|---|
| **Apr. 27, 2026** | President Trump posted on Truth Social: "Wow, Jimmy Kimmel, who is in no way funny as attested to by his terrible Television Ratings, made a statement on his Show that is really shocking. He showed a fake video of the First Lady, Melania, and our son, Barron, like they were actually sitting in his studio, listening to him speak, which they weren't, and never would be. He then stated, 'Our First Lady, Melania, is here. Look at Melania, so beautiful. Mrs. Trump, you have a glow like an expectant widow.' A day later a lunatic tried entering the ballroom of the White House Correspondents Dinner, loaded up with a shotgun, handgun, and many knives. He was there for a very obvious and sinister reason. I appreciate that so many people are incensed by Kimmel's despicable call to violence, and normally would not be responsive to anything that he said but, this is something far beyond the pale. **Jimmy Kimmel should be immediately fired by Disney and ABC.** Thank you for your attention to this matter! President DONALD J. TRUMP"[106] |
| **Apr. 30, 2026** | President Trump posted on Truth Social: "**When is ABC Fake News Network firing seriously unfunny Jimmy Kimmel**, who incompetently presides over one of the Lowest Rated shows on Television? People are angry. It better be soon!!! President DJT"[107] |
| **Apr. 30, 2026** | President Trump appeared on Newsmax's *The Record with Greta Van Susteren* and stated about Mr. Kimmel: "I haven't heard him apologize but he's a lowlife whether he apologized or not. He shouldn't be on television. **I think ABC is putting themselves in great jeopardy, actually**. You know, they already paid me $16 million. George Slopadopolous said things that were untrue. This is very serious what's going on there."[108] |
| **May 15, 2026** | Chairman Carr was interviewed by *The Financial Times* and stated about ABC's early renewal proceedings: "**It's probably been 50, 60 years or longer since the FCC has used this tool**," and that: "**If you didn't take us seriously, now you should**."[109] |

[106] Wilkinson Ex. 39.
[107] Wilkinson Ex. 42 (Donald J. Trump (@realDonaldTrump), Truth Social (Apr. 30, 2026, at 9:25 AM ET), https://perma.cc/DGU6-JR5C).
[108] Newsmax, *Trump Speaks Out on 'Lowlife' Kimmel, Iran, and Poll Numbers in Talk with Greta Van Susteren*, (YouTube, Apr. 30, 2026), https://perma.cc/Q4B9-DBUZ (video).
[109] Wilkinson Ex. 44.

| Date | Statement / Action |
|---|---|
| **July 16, 2026** | During a speech that ABC decided to not broadcast, President Trump stated: "In a rare move, NBC and ABC fake news have both said that they would not cover this speech. They knew what it was about. Because of the fact that they don't like the topic . . . **Fraud like this should mean a revocation of their licenses**."[110] |
| **July 22, 2026** | Chairman Carr commented during an FCC press conference that the President's July 16, 2026 speech was "something that broadcasters should be carrying," and stated that "[w]ith respect to Disney/ABC in particular, we have an open proceeding right now on whether they've been operating in the public interest, and I'm sure that there are going to be points raised in that proceeding that relate to Disney's decision there."[111] |
| **July 31, 2026** | Chairman Carr stated in an interview with *Politico*: "Well, what we said is that the decision by broadcasters to carry or not carry the speech is something that is likely to be raised by petitioners that are seeking to have the FCC not renew the license for the Disney ABC stations that are before us. So that pleading has been filed. Uh, **we'll take a look at it**. We have also ourselves. **We are looking into this question itself about the decision to air programming or not**."[112] |

[110] Wilkinson Ex. 51; The White House, *President Trump Delivers an Address to the Nation, July 16, 2026* (YouTube, streamed July 16, 2026), https://perma.cc/HLP6-5SUW (video).
[111] Federal Communications Commission, *July 2026 Open Commission Meeting*, at 1:22:28 (YouTube, July 22, 2026), https://perma.cc/RM6E-EWFA (video).
[112] Wilkinson Ex. 53 (Alisa Vasquez, *Full Transcript: Chairman of the Federal Communications Commission Brendan Carr*, Politico (July 31, 2026), https://perma.cc/3RKM-2L3S).