**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| American Broadcasting Companies, Inc., *et al.*,<br>*Plaintiffs*,<br>v.<br>Federal Communications Commission, *et al.*,<br>*Defendants*. | Civil Case No. 1:26-cv-2902 |

**DECLARATION OF MARK S. FOWLER IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

I, Mark S. Fowler, declare as follows:

1. I am over the age of eighteen and fully competent to make this declaration. I am currently retired. I submit this declaration of my own accord and without compensation. If called upon to testify as to the facts set forth herein, I could and would testify competently thereto.

2. In 1981, I was appointed by President Ronald Reagan to serve as Chairman of the Federal Communications Commission ("FCC"). I assumed office on May 18, 1981, and served as FCC Chairman for almost 6 years, until April 17, 1987. Defined by long-held conservative principles, my chairmanship pursued market-oriented deregulation, strong protections for editorial independence and the belief that competition generally serves the public better than government regulation. After leaving the FCC in 1987, I built a career as a telecommunications lawyer, entrepreneur, investor, and corporate director. Throughout, I

have spoken and written extensively on First Amendment issues and communications regulation, filed amicus briefs and participated in legal and academic discussions opposing and eliminating government regulation of broadcast speech. I continue to advocate for market-based communications policies that respect First Amendment rights of communications companies and the public.

3. Just in the past 9 months, I have participated in two proceedings at the FCC. In the first, I joined a Petition for Special Relief with other former FCC Chairs, Commissioners and high level staff asking the FCC to repeal the News Distortion Policy, which the current FCC Chairman, Brendan Carr, has weaponized to chill broadcasters' speech. In the second proceeding, I joined former FCC Chairs, Commissioners and high level staff opposing two of the Petitions to Deny renewal of ABC Stations' broadcast licenses. Our opposition is bipartisan, comprising both Democratic and Republican presidential appointees.

4. During my time leading the FCC and thereafter, I have consistently argued that the FCC must respect First Amendment limits by avoiding interference with broadcasters' editorial judgment. The Commission's historic role has been to protect free expression—not to influence or police news coverage or programming decisions. The FCC should regulate technical and marketplace issues while leaving editorial choices to journalists and broadcasters, recognizing that government involvement in content decisions poses a threat to First Amendment freedom.

5. From 1949 until 1987, the FCC enforced the Fairness Doctrine, which required each broadcaster to include differing viewpoints on controversial matters of public importance in its overall programming. Under my chairmanship, the FCC concluded that the Fairness

Doctrine no longer served the public interest, discouraged speech rather than promoted it and that government oversight of editorial decisions raised serious First Amendment concerns. Under that legal and policy foundation, my successor, Chairman Dennis Patrick, officially repealed the Fairness Doctrine in the *Syracuse Peace Council* decision later in 1987.[1]

6. Throughout my tenure as Chairman, I advocated that the Commission eliminate the artificial distinction between broadcast and print media. The First Amendment's plain wording suggests that the press that uses air and electrons should be as free as the press that uses paper and ink. In my view, broadcasters are entitled to the full protections of the First Amendment and government regulation should not intrude upon broadcasters' editorial judgment. This proceeding underscores the critical importance of applying the same First Amendment protections afforded to print media equally to broadcast radio and television networks, including ABC.

7. The FCC's proceedings against ABC are a gross denial of procedural and substantive due process for ABC. The FCC's investigative demands of Disney/ABC are more intrusive, burdensome and extreme than anything I observed as a chairman; indeed, the early license renewal process has not been invoked in more than 50 years. The blatant interplay between presidential complaints respecting ABC's *broadcast content* and subsequent FCC Chairman Carr's punitive actions regarding broadcast content (described in Plaintiffs' Complaint) define the Chairman as a biased political operative with a personal stake and bias in this case's outcome. Never in its history has the agency ever acted so corruptly and unlawfully to intrude on broadcasters' First Amendment rights.

---

[1] *See Syracuse Peace Council*, 2 FCC Rcd. 5043 (1987).

8. The FCC's broad investigatory requests directed at Disney—the parent company of licensed ABC television stations—depart from longstanding FCC practices and raise serious questions about the scope of the Commission's statutory authority, particularly because the requests extend beyond the operations of the licensed stations themselves.

9. The FCC's order requiring every one of ABC's owned stations to file early renewal applications is highly unusual. ABC and numerous former FCC officials contend the proceeding is retaliatory and unconstitutional. Until the Commission resolves its investigations, the proceeding continues to impose significant and burdensome regulatory burdens on ABC that would not exist absent the early-renewal order.

10. License renewal is a systematic administrative process in which broadcast licensees normally file an application for renewal every eight years. The Supreme Court has long recognized that a licensee that "has given meritorious service has a 'legitimate renewal expectanc[y]' that is 'implicit in the structure of the Act' and should not be destroyed absent good cause." *FCC v. National Citizens Committee for Broadcasting*, 436 U.S. 775, 805 (1978). In 1996, Congress added Section 309(k) to the Communications Act of 1934, which is the law that governs the FCC, to codify the presumption of renewal that the Supreme Court recognized. Under Section 309(k), the Commission is mandated to grant a license renewal application if it finds that the station, in the preceding term, has "served the public interest, convenience, and necessity"; there have been no "serious violations by the licensee of . . . the rules and regulations of the Commission"; and there have been no other violations "which, taken together, would constitute a pattern of abuse." 47 U.S.C. § 309(k)(1),

11. The Center for American Rights, in its Petition to Deny ABC's Broadcast TV License Renewals filed at the FCC, cites the 54-year-old FCC decision in *In re Leflore Broadcasting Co.*, 36 F.C.C. 2d 101 (1972) for the proposition that both early license renewal and designation of the license renewals for a hearing are warranted here. But *Leflore* does not support either action here. In *Leflore*, the Commission called for early renewal proceedings of a license where there were possible intentional misrepresentations in the licensee's prior renewal application. Leflore's renewal application pledged to meet certain programming needs of the community, but eight months later, Leflore notified the Commission that it would not meet those programming needs. The Commission then ordered Leflore to file its renewal application early so, in part, the Commission could determine whether Leflore had made misrepresentations to the Commission in its 1970 application or in subsequent statements. The *Leflore* early renewal proceeding has no bearing here, where there is no allegation of misrepresentation in ABC's prior applications and the focus of the inquiry appears to be ABC's First Amendment-protected editorial discretion. The purpose of a renewal proceeding is to assess whether a licensee has complied with the Commission's rules—not whether the licensee has achieved what the agency considers the right balance of speech.

12. The FCC's early renewal order directed ABC to file license renewals for all eight of its licensed stations within thirty days. Stations typically know when an application for renewal will be due years in advance, which provides adequate time to compile a complete record demonstrating the stations' service in the public interest over the prior license term.

The early renewal order denied the stations that opportunity and is highly prejudicial to their renewal efforts.

13. There is no modern precedent for a president publicly calling, during a national address, as President Trump did in July 2026, for broadcast stations to lose their FCC licenses because a broadcaster declined to air that address. Nor is there a known modern precedent for an FCC chairman stating that a broadcaster's editorial decision on whether to carry a presidential address would be considered in a pending license renewal proceeding.

14. When editors and producers decide what's news, they are exercising constitutionally protected editorial discretion. When Chairman Carr judges the merits of those editorial decisions, he is acting as a censor. This case poses a grave threat to the discretion long guaranteed under the First Amendment.

15. I declare under the penalty of perjury that the foregoing is true and correct. *See* 28 U.S.C. § 1746.

Executed on this 7th day of August, 2026, in Blowing Rock, North Carolina.

By:

Mark S. Fowler

Mark S. Fowler