# Exhibit 2

# PUBLIC NOTICE

Federal Communications Commission
45 L Street NE
Washington, DC 20554

News Media Information 202-418-0500
Internet: www.fcc.gov

**DA 26-530**
**Released: May 28, 2026**

## FCC REMINDS BROADCASTERS OF THEIR PUBLIC INTEREST OBLIGATIONS

*Encourages Broadcasters to Review and Modify Their Operations to Ensure Compliance*

Federal law requires broadcasters to comply with a basic and fundamental obligation—they must operate in the public interest. Congress first enshrined this concept in the law nearly 100 years ago,[1] and it charged the FCC with the responsibility of ensuring that broadcasters only obtain and maintain a license to the extent they are operating in a manner that serves the "public interest, convenience, and necessity."[2]

From those early days, as the courts have long recognized, "[t]he clear intent of the Act was that the award of a broadcasting license should be a 'public trust,'"[3] with broadcasters serving the role "of a 'public trustee' charged with the duty of fairly and impartially informing the public audience."[4] As the D.C. Circuit has stated, "broadcasters are temporary permittees—fiduciaries—of a great public resource and they must meet the highest standards which are embraced in the public interest concept."[5] It is this service as a public trustee[6]—and the corresponding obligation to offer programming responsive to the needs and interests of the local communities they are licensed to serve—that makes broadcasters unique and distinguishes them from other programmers. It is an obligation that broadcasters take on voluntarily, in exchange for the privilege of holding a license to operate using the public airwaves.[7] Throughout the decades, the law and the obligation it places on broadcasters have not departed from this

---

[1] *See* Radio Act of 1927, Pub. L. No. 69-632, 44 Stat. 1162 (1927); Communications Act of 1934, as amended (Act), 47 U.S.C. § 151 *et seq*.

[2] *See, e.g.*, 47 U.S.C. §§ 303, 307(a), 309(a), 310(d); *see also Fed. Commc'ns Comm'n v. Pottsville Broad. Co.*, 309 U.S. 134, 137-8 (1940) (*Pottsville*).

[3] *Office of Communication of United Church of Christ v. FCC*, 707 F.2d 1413, 1427 (D.C. Cir. 1983) (*UCC 1983*).

[4] *Columbia Broadcasting System, Inc. v. Democratic National Committee*, 412 U.S. 94, 117 (1973).

[5] *Office of Communication of United Church of Christ v. FCC*, 425 F.2d 543, 548 (D.C. Cir. 1969) (*UCC 1969*).

[6] *See Complaint by Alf Pratte, Honolulu, Hawaii Concerning Political Broadcast Re Station KGMB-TV*, 67 F.C.C.2d 72, 73 (1977) ("Licensees are trustees, granted the privilege of using a scarce natural resource, the airwaves, and they are required to operate in the public interest.").

[7] *See FCC v. National Citizens Committee for Broadcasting*, 436 U.S. 775, 795 (1978) (*NCCB*) (stating that "the physical scarcity of broadcast frequencies, as well as problems of interference between broadcast signals, led Congress to delegate broad authority to the Commission to allocate broadcast licenses in the 'public interest'"); *UCC 1983*, 707 F.2d at 1427 (observing that "in return for the 'free and exclusive use of a limited and valuable part of the public domain,' broadcasters were to be 'burdened by enforceable public obligations'") (internal quotations omitted).

fundamental public interest obligation. This Public Notice serves to remind broadcasters of their longstanding public interest obligations and further ensure that broadcasters are continuing to comply with the public interest obligations that underpin their licenses.

Spectrum is a finite public resource bound by the limits of physics.[8] There are inherently more would-be broadcasters than available broadcast spectrum licenses.[9] And the technical realities of operating on limited spectrum frequencies means that the government has to allocate a channel in the TV band to one licensee in a geographic area. This necessarily places the government in the position of picking a winner and a loser among the many people that might want a broadcast license. The government is effectively giving one person a monopoly on a particular spectrum band and allowing them to exclude all other speakers.

As a result, spectrum is extremely valuable. Spectrum auctions routinely bring in billions of dollars for the same spectrum broadcasters use for free.[10] In exchange, broadcasters are required to operate in the public interest of the communities they serve. This sets them apart from distributors that use other technologies, including the Internet or cable channels, that have no FCC obligation to identify and serve the needs of a particular community. Unlike broadcast, those distribution technologies do not involve the government picking and excluding speakers. As a result of the government picking them, excluding others, and giving them free access to a valuable public resource, Congress charged the FCC with ensuring that broadcasters uphold their obligation as public trustees while using the public airways.[11]

Congress could have chosen a regulatory approach that is far different from the public trustee model. Congress could have decided that once the government selects a winner by giving them free access to broadcast spectrum coupled with the right to exclude all others, that broadcasters have no obligation to account for or serve the needs of their local community. Under that alternative model, broadcasters could operate the same as the owner of any newspaper or any one of today's online streamers—meaning, without any regard for the public interest. But unlike newspapers, streamers, and essentially all other forms of distribution, no one can broadcast without a license from the federal government due to the unique technical aspects

[8] *See Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 376 (1969) (*Red Lion*) ("It quickly became apparent that broadcast frequencies constituted a scarce resource whose use could be regulated and rationalized only by the Government. Without government control, the medium would be of little use because of the cacophony of competing voices, none of which could be clearly and predictably heard.").

[9] *See NCCB*, 436 U.S. at 799 ("Because of problems of interference between broadcast signals, a finite number of frequencies can be used productively; this number is far exceeded by the number of persons wishing to broadcast to the public."). This is particularly the case today in the context of broadcast TV. There are far fewer broadcast TV stations available to potential speakers than broadcast radio stations. Broadcast TV stations generally have different barriers to entry than broadcast radio stations. And licensees of broadcast TV stations benefit from federal statutory protections that do not apply to broadcast radio stations. For instance, broadcast TV stations benefit from the statutory and regulatory retransmission consent / must carry framework. *See, e.g.*, 47 U.S.C. § 325(b).

[10] *See, e.g.*, *Incentive Auction Closing and Channel Reassignment Public Notice*, AU Docket No. 14-252 et al., Public Notice, 32 FCC Rcd 2786 (2017) (Proceeds from the auction for broadcast television spectrum that was reallocated for wireless broadband use yielded $19.8 billion in revenue, including $10.05 billion for winning broadcast bidders and more than $7 billion to be deposited to the U.S. Treasury for deficit reduction).

[11] *See Red Lion*, 395 U.S. at 390 *(*"[It is the right of the viewers and listeners, not the right of the broadcasters, which is paramount."); *UCC 1983*, 707 F.2d at 1427-8 ("The clear intent of the Act was that the award of a broadcasting license should be a 'public trust.'").

of the public resource that they operate on. In exchange for broadcasters obtaining free access to that valuable public resource, Congress has provided the American people and their local communities with something in exchange—broadcasters' commitment to operate in the public interest.

Congress expressly granted the Commission authority to regulate broadcasting and hold them accountable to the public interest standard.[12] The Act articulates the clear principle that the Commission must allocate spectrum to serve the public interest.[13] While the Commission's authority has its limits,[14] it remains broad enough to provide a "supple instrument" by which this finite resource can be managed to benefit everyone.[15] Congress recognized the "rapidly fluctuating factors characteristic of the evolution of broadcasting" and granted authority sufficiently flexible to meet the moment.[16]

It is the Commission's statutory duty to determine if broadcasters are meeting their public interest obligation.[17] Although broadcasters have "broad discretion in giving specific content to these duties,"[18] the courts and Congress have clearly articulated that the Commission's "power to license in the public interest [has been] held necessarily to entail the power to license on the basis of program service."[19] Programming decisions by broadcasters must be made in service of the public and be responsive to the needs of the local community they are licensed to serve, not

[12] *National Broadcasting Co. v. United States*, 319 U.S. 190, 216 (1943) (*NBC*) ("The Commission was, however, not left at large in performing this duty. The touchstone provided by Congress was the 'public interest, convenience, or necessity,' a criterion which 'is as concrete as the complicated factors for judgment in such a field of delegated authority permit.'").

[13] 47 U.S.C. § 303. Section 307(b) requires that the Commission to "make such distribution of licenses, frequencies, hours of operation, and of power among the several States and communities as to provide a fair, efficient, and equitable distribution of radio service to each of the same." 47 U.S.C. § 307(b). It is from this and the public interest standard that the concept of "localism," a cornerstone of broadcast regulation, is derived. *Broadcast Localism*, MB Docket No. 04-233, Report and Notice of Proposed Rulemaking, 23 FCC Rcd 1324, 1327, para. 5 (2007) (*Broadcast Localism Report*). As the Commission has observed, "[its] broadcast regulatory framework is designed to foster a system of local stations that respond to the unique concerns and interests of the audiences within the stations' respective service areas." *Id.* at 1327, para. 6.

[14] *See, e.g.*, 47 U.S.C. § 326.

[15] *Pottsville*, 309 U.S. at 138.

[16] *Id. See Red Lion*, 395 U.S. at 380 ("This mandate to the FCC to assure that broadcasters operate in the public interest is a broad one[.]").

[17] *Red Lion*, 395 U.S. at 379-80 ("The Commission is specifically directed to consider the demands of the public interest in the course of granting licenses; renewing them; and modifying them.) (internal citations omitted); 47 U.S.C. §§ 307(a), 309(a), (k).

[18] *Banzhof v. FCC*, 405 F.2d 1082, 1095 (D.C. Cir. 1968) (*Banzhof*). *See FCC v. Sanders Radio Station*, 309 U.S. 470, 475 (1940) ("An important element of public interest and convenience affecting the issue of a license is the ability of the licensee to render the best practicable service to the community reached by his broadcasts.").

[19] *UCC 1983*, 707 F.2d at 1428. *See NBC*, 319 U.S. at 215-217;*UCC 1983*, 707 F.2d at 1428 ("Since the Commission has the power to make license determinations on the basis of programming, then it perforce has the power—and in fact the responsibility—to define the licensees' public interest obligations with respect to programming."); *Banzhof*, 405 F.2d at 1095 (acknowledging the Commission's "long-established authority to consider program content"); *Broadcast Localism Report*, 23 FCC Rcd at 1327, para. 6 ("The Commission has consistently held that, as temporary trustees of the public's airwaves, broadcasters are obligated to operate their stations to serve the public interest—specifically, to air programming responsive to the needs and issues of the people in their communities of license.").

the private interests of national networks.[20] Additionally, the Commission promotes its "traditional public interest goals of promoting competition, localism, and viewpoint diversity" when reviewing broadcast ownership structures.[21] The Commission will continue to analyze ownership structures to ensure that they are responsive to the needs of their local communities and are providing them with diverse viewpoints reflective of the information needs of those communities.

Even as the Commission has eased the regulatory burden on broadcasters by eliminating some of the more formal processes broadcasters must use in satisfying their public interest obligation—such as ascertainment,[22] the main studio rule,[23] and the program origination rule[24]—their role as public trustees of the airwaves has not been diminished.[25] Similarly, the role of the Commission in determining whether broadcasters have met their public interest obligation has not faded.[26] Many requirements remain intact to help broadcasters and the Commission fulfill their statutory duties. For example, broadcasters are required to prepare and maintain in a station's online public inspection file issues/programs lists describing what issues were given

[20] *See Empowering Local Broadcast TV Stations to Meet Their Public Interest Obligations: Exploring Market Dynamics Between National Programmers and Their Affiliates*, *M*B Docket No. 25-322*,* Public Notice, DA 25-961 (MB Nov. 19, 2025) (*Network Affiliates Public Notice*); *NCCB*, 436 U.S. at 808 ("[Local] owners' knowledge of their local communities and concern for local affairs, built over a period of years, would be lost if they were replaced with outside interests.").

[21] FCC v. Prometheus Radio Project, 592 U.S. 414, 419 (2021).

[22] *Deregulation of Radio*, BC Docket No. 79-219, Report and Order, 84 F.C.C.2d 968 (1981) (eliminating ascertainment for broadcast radio licensees); *Revision of Programming and Commercialization Policies, Ascertainment Requirements, and Program Log Requirements for Commercial Television Stations*, MM Docket No. 83-670, Report and Order, 98 F.C.C.2d 1086 (1984) (eliminating ascertainment for broadcast television licensees).

[23] *Amend. of Sections 73.1125 & 73.1130 of the Commission's Rules, the Main Studio & Program Origination Rules for Radio & Television Broadcast Stations*, MM Docket No. 86-406, Report and Order, 2 FCC Rcd 3215 (1987) (*Main Studio and Program Origination Order*); *Elimination of Main Studio Rule*, MB Docket No. 17-106, Report and Order, 32 FCC Rcd 8158 (2017). The main studio rule was intended to ensure service obligations were met by placing a station's production center within the community it served. This promoted the use of "local talent and ideas" and encouraged interaction and engagement between stations and the community they were licensed to serve. *Main Studio and Program Origination Order*, 32 FCC Rcd at 3217-8, para. 29.

[24] *Main Studio and Program Origination Order*, 32 FCC Rcd. at 3218-9, paras. 39-47. The program origination rule, a companion rule to the main studio rule, required stations to originate a minimum percentage of its non-network programming from its main studio or elsewhere within its community of license. The purpose of the rule was to encourage locally-oriented programming in furtherance of the Commission's public interest standard and localism mandate.

[25] *See Network Affiliates Public Notice* (examining barriers preventing local broadcast television stations from meeting their public interest obligation based on dynamics governing the relationships between local stations and national networks); *Broadcast Localism*, MB Docket No. 04-233, Notice of Inquiry, 19 FCC Rcd 12425, 12425, para. 1 (2004) ("Even as the Commission deregulated many behavioral rules for broadcasters in the 1980s, it did not deviate from the notion that they must serve their local communities.").

[26] *NCCB*, 436 U.S. at 793 ("[I]t is now well established that this general rule-making authority supplies a statutory basis for the Commission to issue regulations codifying its view of the public-interest licensing standard, so long as that view is based on consideration of permissible factors and is otherwise reasonable."). *See also FCC v. WNCN Listeners Guild*, 450 U.S. 582, 595 (1981); *Springfield Television of Utah, Inc. v. FCC*, 710 F.2d 620, 623 (10th Cir. 1983); *Gray Television, Inc. v. FCC*, 130 F.4th 1201, 1219 (11th Cir. 2025); *Tribune Co. v. FCC*, 133 F.3d 61, 69 (D.C. Cir. 1998).

significant treatment and the programming that provided this treatment.[27] The Commission has called these issues/programs lists "a significant and representative indication that a licensee is providing substantial service to meet the needs and interests of its community."[28] Broadcasters are also prohibited from engaging in news distortion,[29] must provide equal opportunity to political candidates,[30] and are prohibited from airing obscene, indecent, and profane content,[31] or broadcast hoaxes.[32] The requirement that broadcasters operate in the public interest is a longstanding, congressionally established,[33] and judicially affirmed[34] statutory obligation that is central to their license. In meeting that obligation, not only must broadcasters air programming that is responsive to the needs of their local community, but they must avoid conduct that undermines the public trust in the broadcast service.[35]

It is against this historical and legal backdrop that the Commission views licensees as public trustees of the radio spectrum and not permanent owners.[36] No broadcaster has a "right" to use the public spectrum.[37] Indeed, the U.S. Supreme Court has recognized that certain FCC

---

[27] 47 CFR §§ 73.3526(e)(11), (12), 73.3527(e)(8).

[28] *Formulation of Policies and Rules Relating to Broadcast Renewal Applicants, Competing Applicants, and Other Participants to the Comparative Renewal Process and to the Prevention of Abuses of the Renewal Process*, BC Docket No. 81-742, Third Further Notice of Inquiry and Notice of Proposed Rulemaking, 4 FCC Rcd 6363, 6365, para. 17 (1989). For issues/programs lists to serve this essential purpose, however, we remind broadcasters that they must include a "*brief description*," not merely a single word identification, of the issues treated, and that the required description of programs "shall include, but *shall not be limited to*, the time, date, duration, and title of each program in which the issue was treated." 47 CFR §§ 73.3526(e)(11), (12), 73.3527(e)(8) (emphasis added).

[29] *See Serafyn v. FCC*, 149 F.3d 1213, 1216 (D.C. Cir. 1998) (referencing the FCC's policy of evaluating and penalizing news distortion emanating from the licensee or its management); *FCC Establishes MB Docket No. 25-273 and Comment Cycle for News Distortion Complaint Involving CBS Broadcasting Inc.*, *Licensee of WCBS, New York, NY*, Public Notice, 40 FCC Rcd 1132 (MB 2025).

[30] 47 U.S.C. § 315; 47 CFR § 73.1941.

[31] *FCC v. Pacifica Found.*, 438 U.S. 726, 737-38 (1978) (*Pacifica*); 18 U.S.C. §§ 1464, 1468(a); 47 CFR § 73.3999.

[32] 47 CFR § 73.1217.

[33] Radio Act of 1927, Pub. L. No. 69-632, 44 Stat. 1162 (1927); Communications Act of 1934, as amended (Act), 47 U.S.C. § 151 *et seq*.

[34] *See, e.g. NBC*, 319 U.S. at 225-6 finding an "intelligible principle" in the FCC's power to regulate airwaves in the "public interest."); *UCC 1983*, 707 F.2d at 1428 ("Since the Commission has the power to make license determinations on the basis of programming, then it perforce has the power—and in fact the responsibility—to define the licensees' public interest obligations with respect to programming."); *Banzhof*, 405 F.2d at 1095 (acknowledging the Commission's "long-established authority to consider program content").

[35] *See, e.g., Legend Commc'ns of Wyoming*, LLC, KZMQ(AM), Greybull, WY, Memorandum Opinion & Order, FCC 26-12, para. 12 (Mar. 5, 2026) ("The character of an applicant is among the important public interest factors that the Commission considers in determining whether an applicant has the requisite qualifications to become and/or remain a Commission licensee."). *See also Policy Regarding Character Qualifications In Broadcast Licensing*, Report, Order, & Policy Statement, 102 F.C.C.2d 1179 (1986), *recon. dismissed/denied*, 1 FCC Rcd 421 (1986); *Policy Regarding Character Qualifications in Broadcast Licensing*, Policy Statement and Order, 5 FCC Rcd 3252 (1990), modified, Memorandum Opinion and Order, 6 FCC Rcd 3448 (1991), *further modified*, Memorandum Opinion and Order, 7 FCC Rcd 6564 (1992).

[36] *Red Lion*, 395 U.S. at 394 ("Licenses to broadcast do not confer ownership of designated frequencies, but only the temporary privilege of using them.").

[37] *Id.* at 389 ("No one has a First Amendment right to a license or to monopolize a radio frequency…."); 47 U.S.C. § 301.

regulatory efforts in furtherance of its statutory mandate "enhance rather than abridge the freedoms of speech and press protected by the First Amendment."[38] Further, the courts have recognized that there are limits on broadcasters' First Amendment rights.[39] The mere denial of a license "because 'the public interest' requires it 'is not a denial of free speech.'"[40]

Where the Commission finds that a broadcaster has failed to serve the public interest, the Commission may take appropriate action, including enforcement action,[41] grant of a renewal application with conditions and/or on a short term basis,[42] requiring a licensee to file an early license renewal application,[43] or designating an application for hearing.[44]

The Commission will continue to engage in a robust review of applications to ensure compliance with our rules and determine whether broadcasters have met their obligation to operate in the public interest. Broadcasters are reminded that consideration of their public interest obligation is not just limited to license renewal applications,[45] but also other applications, including assignments and transfers.[46] We encourage broadcasters to review their current practices and confirm that they fully align with their statutory public interest obligation.[47] The

[38] *Red Lion* at 375.

[39] *See Pacifica*, 438 U.S. at 727 ("Of all forms of communication, broadcasting has the most limited First Amendment protection. Among the reasons for specially treating indecent broadcasting is the uniquely pervasive presence that medium of expression occupies in the lives of our people.").

[40] *Red Lion*, 395 U.S. at 389.

[41] 47 U.S.C. § 503 (establishing forfeiture processes for violations of the Act or Commission rules).

[42] 47 USC § 309(k)(2) ("If any licensee of a broadcast station fails to meet the requirements of this subsection, the Commission may…grant such application on terms and conditions as are appropriate, including renewal for a term less than the maximum otherwise permitted."). *See also* 47 U.S.C. § 316 (permitting modification of station licenses).

[43] 47 CFR 73.3539(c) ("Whenever the FCC regards an application for a renewal of license as essential to the proper conduct of a hearing or investigation, and specifically directs that it be filed by a date certain, such application shall be filed within the time thus specified."); *Bridge News, LLC*, Order, DA 26-413 (MB Apr. 27, 2026); *The Walt Disney Company, American Broadcasting Company et al.*, Order, DA 26-416 (MB Apr. 28, 2026) (calling for the filing of all station licenses for early renewal).

[44] 47 U.S.C. § 309(e). *See, e.g.*, *Entercom License, LLC*, Hearing Designation Order and Notice of Opportunity for Hearing, 31 FCC Rcd 12196 (2016) (designating license renewal application for hearing to determine whether licensee's operation of a radio station was in the public interest after station hosted a dangerous contest that resulted in the death of a contestant); *Vandalia Media Partners 2, LLC*, Hearing Designation Order and Notice of Opportunity for Hearing, 36 FCC Rcd 7012 (MB 2021) (designating license renewal application for hearing to determine whether licensee's operation of a radio station was in the public interest where station had extensive periods of silence and operations at reduced power).

[45] 47 U.S.C. § 309(k)(1).

[46] 47 U.S.C. § 310(d).

[47] For example, the Commission's decision when considering a renewal application is governed by section 309(k) of the Act. 47 U.S.C. § 309(k). That section provides that the application shall be granted if, among other requirements, it finds that during the prior license term "the station has served the public interest, convenience, and necessity." 47 U.S.C. § 309(k)(1). Similarly, section 310(d) of the Act, provides that no station license shall be transferred or assigned except upon application and a finding by the Commission "that the public interest, convenience, and necessity will be served thereby." 47 U.S.C. § 310(d). The relevant applications will be reviewed and amended as necessary to ensure the Commission is able to make its statutorily required public interest determination.

Commission will not hesitate to exercise its statutory authority[48] to ensure that broadcasters either fulfill their public interest obligation or provide the privilege of being a broadcast licensee to someone that will fulfill that duty.

**-FCC-**

[48] *See NBC*, 319 U.S. at 219 (stating that the Commission's mandate to assure that broadcasters operate in the public interest is "expansive"); *see also* 47 U.S.C. § 303(r) (the Commission may adopt "such rules and regulations and prescribe such restrictions and conditions, not inconsistent with law, as may be necessary to carry out the provisions of this Act").