# Exhibit 4

FEDERAL COMMUNICATIONS COMMISSION
WASHINGTON, DC 20554

Brendan Carr
Chairman

May 29, 2026

The Honorable Yvette D. Clarke
Ranking Member
Subcommittee on Oversight and Investigations
Committee on Energy and Commerce
U.S. House of Representatives
2322 Rayburn House Office Building
Washington, DC 20515

Dear Ranking Member Clarke,

Thank you for your April 30, 2026, letter to the Federal Communications Commission ("FCC"). It provides an opportunity for me to correct the record on several misconceptions regarding the FCC's work.

Throughout the previous Administration, communications laws and FCC processes were repeatedly weaponized for political purposes. For instance, Democrats ran a campaign to pressure cable companies into dropping what Democrats described as "Right-wing media outlets," like Fox News, Newsmax, and OANN.[1] And that campaign worked, resulting in several providers dropping one or more of those channels. During the Biden years, Democrats successfully pressured the FCC to block the sale of a Spanish-language radio station for overtly political reasons.[2] During the Biden years, the FCC refused to renew hundreds of routine broadcast licenses following political pressure from Democrats in Congress.[3] And the Biden FCC teed up for action a petition seeking to take away a Fox broadcast license based on content that allegedly ran on a Fox News cable channel.[4] The list goes on and on, as I have detailed.

In contrast to the Biden years, I am focused as Chairman of the FCC on restoring the agency's commitment to basic fairness and faithful adherence to the Congressionally enacted Communications Act.

Through the diligent work of the FCC's talented staff, the agency has been delivering great results for the American people. Internet speeds are up. Prices are down. Competition is

---

[1] *See* Letter from Chairman Brendan Carr, Federal Communications Commission to Sen. Richard Blumenthal, Ranking Member, Permanent Subcommittee on Investigations (Mar. 26, 2025) (*Blumenthal Letter 2025*), https://docs.fcc.gov/public/attachments/DOC-410581A2.pdf.

[2] *Id.*

[3] *Id*.

[4] *Id.*

stronger than before. And the FCC has taken bold steps to promote our national security interests. There is much more work ahead. But the U.S. is now leading the world again in next-gen technologies—including ones that will connect families that had been stuck on the wrong side of the digital divide for far too long. The FCC is also freeing up spectrum after years of inaction. And we are cutting through the red tape that has slowed down Internet builds across the country.

With respect to the FCC's work on media issues, in particular, the reporting to date has left the public with one false impression after another. So, your letter provides me with a chance to address a lot of that misinformation.

On media policy, the FCC is administering the unique regulatory framework that Congress decided to apply to broadcasters many years ago. In doing so, the agency is working to empower local broadcast TV stations that serve diverse communities across the nation. It is important to me that local broadcast TV stations have the chance to succeed and thrive into the future. They provide the trusted sources of local news and information that so many find so important today. In many communities, they are the only sources of real reporting because misguided federal policies contributed to the hollowing out and closure of local newspapers. I want to ensure that America's local broadcasters do not go the way of defunct local newspapers.

As noted above, the reporting on the FCC's media policies have consistently misled the American public. For instance, the media and many in public life recently fell for a hoax apparently concocted by a former late night TV host and a Democrat candidate for Senate in Texas. Specifically, the candidate, in an apparent effort to get attention and political donations, falsely indicated that the FCC or the Administration censored or otherwise prevented one of his interviews from airing on broadcast TV. That claim was and is obviously false.[5] The government did not prevent any such interview from airing. Yet too many people ran with the story anyways.

Your letter asks about several additional instances of public reporting regarding the FCC's media policy. For example, your letter asks specifically about the FCC's decision to invoke the agency's longstanding authority to call in broadcast licenses for early renewal. As I have stated on several occasions, the FCC ordered the early renewal of Disney's ABC TV stations based on the agency's ongoing investigation into allegations that the relevant corporate entities discriminated on the basis of race, gender, and/or other protected characteristics in violation of federal law.[6] These are serious allegations, and this is an FCC enforcement matter that remains under consideration at the agency.

As you may know, the Communications Act and longstanding Commission rules prohibit FCC-regulated entities from engaging in discrimination on the basis of race, color, religion, national

---

[5] *See* Letter from Chairman Brendan Carr, Federal Communications Commission to Sen. Richard Blumenthal, Ranking Member, Permanent Subcommittee on Investigations (Mar. 06, 2026), https://docs.fcc.gov/public/attachments/DOC-420011A2.pdf.

[6] *See The Walt Disney Co.*, Order, DA 26-416 (MB rel. Apr. 28, 2026) (*Early Renewal Order*), https://docs.fcc.gov/public/attachments/DA-26-416A1.pdf.

origin, age, or sex.[7] The FCC's Equal Employment Opportunity ("EEO") rules impose specific obligations on regulated entities, including broadcast licensees such as Disney's ABC TV stations. The FCC has both the authority and the responsibility to ensure compliance with those obligations.[8]

Last year, following a series of public reports and allegations, on March 27, 2025, I asked the FCC's Enforcement Bureau to open an investigation into whether Disney was complying with the Commission's EEO requirements. Those reports, including ones based on whistleblower accounts and publicly available corporate initiatives, described practices that appeared to raise serious concerns under the FCC's nondiscrimination rules.

For example, public reporting indicated that Disney may have relied on race, gender, or other protected characteristics in making hiring and promotion decisions, made compensation decisions based on race, gender, or other protected characteristics, limited workplace opportunities to employees based on race, gender, or other protected characteristic, and/or made other decisions based on impermissibly discriminatory considerations.[9] Other reports described affinity groups and programs that appeared to segregate employees on the basis of race or identity characteristics.[10]

These allegations and reports, though concerning, do not represent FCC conclusions or determinations. Disney is submitting evidence, and the FCC is reserving judgment on the issues. But given the nature of the reports implicating the kind of race-based discrimination whose prohibition has been an essential part of the federal legal system for decades, the FCC had a responsibility to determine if any of Disney's practices implicated the Commission's EEO rules or other applicable federal nondiscrimination requirements.

The FCC's Enforcement Bureau advanced its investigation in June of 2025 by issuing a letter of inquiry ("LOI") to Disney. As you may know, LOIs are a standard investigative tool used by the Commission to obtain information relevant to potential violations of law or FCC rules. As the Bureau made clear in its June 5, 2025 letter of inquiry ("Initial LOI"), the action constituted an order of the FCC to produce the documents and information requested therein. Failure to fully respond to the LOI constitutes a violation of the Communications Act and FCC rules.[11] FCC

---

[7] *See, e.g.*, 47 U.S.C. § 151.

[8] *See, e.g.*, 47 CFR §§ 25.601, 90.168, 73.2080(a), 76.73.

[9] *See* Letter from Chairman Brendan Carr, Federal Communications Commission to Robert A. Iger, Chief Executive Officer, The Walt Disney Company (Mar. 27, 2025), https://www.fcc.gov/sites/default/files/Carr-Letter-to-Disney-DEI-03252027.pdf.

[10] *Id.*

[11] *See* 47 U.S.C. § 503(b)(1)(B); *see also Aura Holdings of Wisconsin, Inc.*, Notice of Apparent Liability for Forfeiture, 33 FCC Rcd 3688, 3696, para. 21 (2018), *forfeiture order issued*, 34 FCC Rcd 2540 (2019) (imposing a $19,693 penalty for failure to respond to LOI); *ABC Fulfillment Services LLC d/b/a HobbyKing USA LLC and HobbyKing.com, and Indubitably, Inc. d/b/a/ HobbyKing Corp., HobbyKing USA LLC, HobbyKing and HobbyKing.com*, Notice of Apparent Liability for Forfeiture, 33 FCC Rcd 5530 (2018), *aff'd*, Forfeiture Order, 35 FCC Rcd 7441 (2020) (imposing a $39,278 forfeiture for failure to respond to LOI); *Net One Int'l, Net One, LLC, Farrahtel Int'l, LLC*, Forfeiture Order, 29 FCC Rcd 264, 267, para. 9 (EB 2014), *recon. denied*, Memorandum Opinion and Order, 30 FCC Rcd 1021 (EB 2015) (imposing a $25,000 penalty for failure to respond to LOI);

staff reviewed Disney's response to the Initial LOI and a subsequent request for additional information. FCC staff continued to have concerns about Disney's compliance with federal antidiscrimination law following their review that took place over the course of months.

Accordingly, in February 2026, the FCC's Enforcement Bureau issued a supplemental LOI seeking additional materials, including documents that Disney apparently omitted from its initial production. Disney subsequently requested, and received, additional time to respond. Following FCC staff review of those supplemental materials, concerns were again raised regarding the adequacy of Disney's production, the adequacy of its response, and whether it complied with the agency's lawful enforcement requests. Indeed, the FCC has formally notified Disney that responses to the agency's lawful inquiries have been deficient, nonresponsive, and disingenuous.

Accordingly, after more than a year of investigative activity, multiple rounds of document requests, and ongoing engagement between FCC staff and Disney representatives, the FCC's Media Bureau issued an early renewal order pursuant to the Commission's longstanding rules and procedures.[12] FCC leadership signaled for months that an early renewal order was a distinct possibility in this and other cases. Indeed, under my leadership the FCC has been more transparent about the scope of our investigative work than prior leadership.

Consistent with the FCC's Early Renewal Order, Disney filed its renewal application with the FCC's Media Bureau on May 28, 2026. This triggers a process where interested parties will have the opportunity to file, both in support and in opposition to the application. The FCC will consider the whole record and evaluate whether to grant renewal or whether more process is called for to determine if the licensee is qualified to continue to hold its license.

Throughout, the FCC has not singled out any one company for special treatment. We have been considering early license renewal as a potential investigative or enforcement step involving broadcasters more generally.[13] Nor is early renewal limited to Disney's ABC stations. For example, the FCC has been investigating Bridge News, LLC, for repeated violations of the FCC's rules. After issuing two LOIs, the FCC determined in April that the appropriate next investigative step would be to call in its licenses early for renewal.[14] Additionally, the FCC's Media Bureau concluded that a short-term license renewal made sense as an appropriate step for SPB LLC, an AM Radio license holder, following continued violations of the FCC's online

---

*Conexions, LLC d/b/a Conexion Wireless*, Notice of Apparent Liability for Forfeiture and Order, 28 FCC Rcd 15318, 15325, para. 22 (2013) (proposing a $300,000 forfeiture for failure to provide timely and complete responses to an LOI); *Technical Commc'n Network, LLC*, Notice of Apparent Liability for Forfeiture and Order, 28 FCC Rcd 1018, 1020, para. 8 (EB 2013) (proposing a $25,000 forfeiture for failure to provide a complete response to an LOI); *SBC Commc'ns, Inc.*, Forfeiture Order, 17 FCC Rcd 7589, 7600, para. 28 (2002) (imposing $100,000 penalty for failing to submit a sworn written response); *Quadrant Holdings LLC, Q Link Wireless LLC, & Hello Mobile LLC*, Notice of Apparent Liability for Forfeiture, 37 FCC Rcd 9304, 9307, para. 9 (EB 2022).

[12] *See The Walt Disney Co.*, Order, DA 26-416 (MB rel. Apr. 28, 2026).

[13] *US FCC could speed up broadcast license reviews, says agency head Carr*, Reuters (Mar. 16, 2026), https://www.reuters.com/business/media-telecom/fcc-could-speed-up-broadcast-license-reviews-says-agency-head-carr-2026-03-16/.

[14] *See* Bridge News, LLC, Order, DA 26-413 (rel. Apr. 27, 2026).

public file rule, which called into question whether the station was meetings its public interest obligations.[15]

Reporting has also included a lot of misinformation about the FCC's enforcement of longstanding political equal opportunity regulations. Decades ago, Congress made the decision to prevent covered broadcast television programs from being used to advance certain partisan purposes. Specifically, through section 315 of the Communications Act of 1934, as amended,[16] Congress put protections in place to ensure equal access to broadcast station facilities for legally qualified candidates for office, regardless of political affiliation. A person is a legally qualified candidate for purposes of the FCC's equal opportunities or equal time rule if they meet certain requirements, including having publicly announced their intention to run for office and qualifying under applicable state or federal law to hold the office being sought.[17] Under section 315, if a broadcast station permits any legally qualified candidate for public office to use its facilities, it shall provide an equal opportunity to all other legally qualified candidates for that office.[18] This statutory requirement and the corresponding FCC rules[19] seek to ensure that no legally qualified candidate for office is unfairly given less access to the public airwaves than their opponent.

Furthermore, the FCC's political file rules require that, when "free time is provided for use by or on behalf of candidates, a record of the free time provided shall be placed in the political file."[20] Any such free use of broadcast airtime by a legally qualified candidate would require the broadcaster to place a record in its online political file "as soon as possible."[21] Other legally qualified candidates can then submit an equal opportunities request. As the FCC has determined, equal opportunities generally mean that a broadcaster must provide comparable time and placement to opposing legally qualified candidates.[22] Adherence to these requirements is central to a broadcast licensee's obligation to operate in the public interest.[23]

---

[15] *See* SPB LLC, Order on Reconsideration, DA 26-434 (rel. May 1, 2026).

[16] See 47 U.S.C. § 315(a). Although section 315(a) is also commonly referred to as the "equal time" rule, it requires the provision of comparable time and placement, rather than the provision of identical airtime to opposing candidates.

[17] The criteria for legally qualified candidates are specified in the FCC's rule at 47 CFR § 73.1940.

[18] 47 U.S.C. § 315(a).

[19] 47 CFR §§ 73.1212 (Sponsorship identification); 73.1940 (Legally qualified candidates for public office); 73.1941 (Equal opportunities); 73.1942 (Candidate rates); 73.1943 (Political file); 73.1944 (Reasonable access).

[20] 47 CFR § 73.1943(c).

[21] *Id*. § 73.1943(d).

[22] *See, e.g.*, Equal Opportunities Complaint Filed by Nicole Parra Against Pappas Telecasting Companies, 19 FCC Rcd 21994, para. 3 (MB 2004) ("The Commission has ruled that when a candidate is furnished time at no cost, competing candidates are entitled to receive the same amount of free time in comparable time periods."); Carter/Mondale Reelection Committee, Memorandum Opinion and Order, 81 FCC 2d 409, n.13 (1980) ("the time that is made available under 315(a) must have a comparable audience potential to that of the initial 'use.'"); *see also* Primer on Political Broadcasting & Cablecasting, Public Notice, 69 FCC 2d 2209, 2219 (1978) ("The station must, however, make periods that normally have comparable audiences available to competing candidates upon request.").

[23] 47 USC 312(a)(7).

The FCC did not create these statutory obligations and cannot simply disregard them. The FCC's role in these matters involves applying the framework established by Congress and longstanding FCC precedent.

Your letter also objects to the FCC's review of broadcaster conduct under the public interest standard. However, the FCC cannot selectively ignore that statutory obligation simply because certain regulated parties or commentators disagree with scrutiny applied in a particular case. The Communications Act expressly requires the FCC to determine whether broadcasters are operating in the public interest.

As the FCC has made clear, federal law requires broadcasters to comply with a basic and fundamental obligation—they must operate in the public interest. Congress first enshrined this concept in the law nearly 100 years ago,[24] and it charged the FCC with the responsibility of ensuring that broadcasters only obtain and maintain a license to the extent they are operating in a manner that serves the public interest.[25]

From those early days, as the courts have long recognized, "[t]he clear intent of the Act was that the award of a broadcasting license should be a 'public trust,'"[26] with broadcasters serving the role "of a 'public trustee' charged with the duty of fairly and impartially informing the public audience."[27] As the D.C. Circuit has stated, "broadcasters are temporary permittees—fiduciaries—of a great public resource and they must meet the highest standards which are embraced in the public interest concept."[28] It is this service as a public trustee[29]—and the corresponding obligation to offer programming responsive to the needs and interests of the local communities they are licensed to serve—that makes broadcasters unique and distinguishes them from other programmers. It is an obligation that broadcasters take on voluntarily, in exchange for the privilege of holding a license to operate using the public airwaves.[30] Throughout the decades, the law and the obligation it places on broadcasters have not departed from this fundamental public interest obligation.

---

[24] *See* Radio Act of 1927, Pub. L. No. 69-632, 44 Stat. 1162 (1927); Communications Act of 1934, as amended (Act), 47 U.S.C. § 151 *et seq*.

[25] *See, e.g.*, 47 U.S.C. §§ 303, 307(a), 309(a), 310(d); *see also Fed. Commc'ns Comm'n v. Pottsville Broad. Co.*, 309 U.S. 134, 137-8 (1940) (*Pottsville*).

[26] *Office of Communication of United Church of Christ v. FCC*, 707 F.2d 1413, 1427 (D.C. Cir. 1983) (*UCC 1983*).

[27] *Columbia Broadcasting System, Inc. v. Democratic National Committee*, 412 U.S. 94, 117 (1973).

[28] *Office of Communication of United Church of Christ v. FCC*, 425 F.2d 543, 548 (D.C. Cir. 1969) (*UCC 1969*).

[29] *See Complaint by Alf Pratte, Honolulu, Hawaii Concerning Political Broadcast Re Station KGMB-TV*, 67 F.C.C.2d 72, 73 (1977) ("Licensees are trustees, granted the privilege of using a scarce natural resource, the airwaves, and they are required to operate in the public interest.").

[30] *See FCC v. National Citizens Committee for Broadcasting*, 436 U.S. 775, 795 (1978) (stating that "the physical scarcity of broadcast frequencies, as well as problems of interference between broadcast signals, led Congress to delegate broad authority to the Commission to allocate broadcast licenses in the 'public interest'"); *UCC 1983*, 707 F.2d at 1427 (observing that "in return for the 'free and exclusive use of a limited and valuable part of the public domain,' broadcasters were to be 'burdened by enforceable public obligations'") (internal quotations omitted).

Accordingly, the FCC not only has authority, but the duty, to examine whether regulated entities are operating consistent with the public interest standard established by Congress. Any suggestion that the FCC must ignore credible allegations of misconduct or refuse to conduct oversight of regulated broadcasters would amount to an abdication of the FCC's statutorily obligations.

I appreciate the opportunity to respond to your letter and to clarify recent FCC actions. Under my leadership, the FCC will continue working to ensure fair and even-handed treatment for all parties appearing before the agency while faithfully carrying out the FCC's statutory obligations.

Additionally, I have renewed my April 29, 2025, response to your previous correspondence. It is attached to this letter.

Sincerely,

Brendan Carr,
Chairman

FEDERAL COMMUNICATIONS COMMISSION
WASHINGTON, DC 20554

Brendan Carr
Chairman

April 29, 2025

The Honorable Yvette D. Clarke
Ranking Member
Subcommittee on Oversight and Investigations
Committee on Energy and Commerce
U.S. House of Representatives
2322 Rayburn House Office Building
Washington, DC 20515

**RE: March 31, 2025 Letter to FCC**

Dear Ranking Member Clarke,

Thank you for your March 31, 2025, letter to the Federal Communications Commission (FCC). Throughout the previous Administration, communications laws and FCC processes were repeatedly weaponized for political purposes. As Chairman, I am focused on restoring the FCC's commitment to basic fairness and even-handed treatment for all. In particular, I am working to ensure that everyone appearing before the agency gets a fair shake from their government, regardless of political affiliation.

My commitment on this front represents a departure from the years when peoples' politics often determined the answers they received from the FCC. If they were aligned with the previous Administration, then they would receive favorable and special treatment on a streamlined basis. If they were not, then they got the opposite treatment, including having previous FCC awards revoked for political reasons.

Your letter provides me with a welcome opportunity to correct some misconceptions regarding the FCC's work. Specifically, your letter suggests the FCC is treating a petition involving a CBS TV station differently than one involving a Fox TV station.[1] But that is not the case at all. Under my leadership, the FCC has merely followed agency precedent. We are putting the relevant complaint on the same procedural footing that the previous FCC found appropriate.

As you may recall, in 2023, a group filed a petition with the FCC asking the agency to take the broadcast license away from a Fox broadcast TV station in Philadelphia because the

[1] *See* Center for American Rights, Petition to Condition Grant by the Center for American Rights, MB Docket No. 25-73 (filed Dec. 16, 2024); The Media and Democracy Project, Milo Vassallo, John McGinty, Peter Lems, Chenjerai Kumanyika, and Bill Hartman, Petition to Deny, LMS File No. 0000213362 (filed July 3, 2023).

petitioners did not agree with the content that they argued was carried on a separate cable channel.[2] Despite the Fox petition failing to satisfy basic pleading requirements, the FCC chose to move forward. The previous FCC determined that it was in the public interest to entertain the filing and issued a public notice seeking comment on the Fox petition.[3]

The previous FCC then left the Fox proceeding open for more than a year, and it received about 200 comments from the public. The FCC did not dismiss or deny the Fox petition when the public comment cycle ended either. Instead, it waited through the entire 2024 election cycle to dismiss the petition against the Fox broadcast TV station.

However, the previous FCC took a different approach entirely when it came to the CBS petition.[4] Unlike the Fox petition, the Biden FCC just summarily dismissed the CBS one. Unlike the Fox petition, the Biden FCC did not seek public comment on the CBS petition. And unlike the Fox petition, the Biden FCC did not establish a record on the CBS one before issuing its decision. Instead, at the eleventh hour, the Biden FCC simply dismissed the CBS petition. It is not clear why previous FCC leadership dismissed the CBS complaint without nearly the same level of process that it applied to the Fox petition. Under my leadership, the FCC is seeking comment on the CBS petition, just as the prior FCC did on the Fox petition. In other words, the FCC is treating like cases alike and following the precedent set by the agency. That is the very definition of even-handed treatment.

Again, this is a marked contrast from the weaponization that prevailed during the Biden years. During the previous Administration, Democrats regularly weaponized their authority against their perceived political opponents, including running a campaign to pressure cable companies into dropping what they described as "Right-wing media outlets,"[5] pressuring the FCC to block the sale of a Spanish-language radio station in South Florida for purely political reasons,[6] the unprecedented failure to process hundreds of routine Sinclair license renewals that came up in 2021, 2022, 2023, and 2024, and a multi-month campaign to jawbone social media companies into censoring their political opponents as well as books, videos, posts, and other online content.

---

[2] The Media and Democracy Project, Milo Vassallo, John McGinty, Peter Lems, Chenjerai Kumanyika, and Bill Hartman, Petition to Deny, LMS File No. 0000213362 (filed July 3, 2023) (Petition).

[3] *See Commission Announces Permit-But-Disclose Ex Parte Status and Establishes MB Docket No. 23-293 for Application for Renewal of License of WXTF-TV, Philadelphia, Pennsylvania*, Public Notice, MB Docket No. 23-293, DA 23-752 (MB, Aug. 23, 2023).

[4] *See* Letter from Peter S. Hyun, Acting Bureau Chief, Enforcement Bureau, Federal Communications Comm'n, to Daniel R. Suhr, President, Center for American Rights (Jan. 16, 2025); *Re: Preserving the First Amendment*, GN Docket No. 25-11, (GN, Jan. 16, 2025).

[5] *See* Letter from Reps. Anna G. Eshoo and Jerry McNerney to John T. Stankey, CEO, AT&T, Inc. (Feb. 22, 2021), https://web.archive.org/web/20210223052030/https://eshoo.house.gov/sites/eshoo.house.gov/files/Eshoo-McNerney-TV-Misinfo%20Letters-2.22.21.pdf.

[6] *See* Adrian Carrasquillo, *Hispanic Caucus Members Pressure FCC to Scrutinize Miami Radio Station Sale*, Newsweek, (Apr. 14, 2021), https://www.newsweek.com/hispanic-caucus-members-pressure-fcc-scrutinize-miami-radio-station-sale-1583890.

In doing so, the previous Administration established a two-tiered approach. Take, for example, the Biden FCC's decision to create a special Soros shortcut to expedite the acquisition of hundreds of broadcast licenses.[7] Never before had the Commission voted to approve the transfer of a single broadcast license—let alone the transfer of broadcast licenses for over 200 radio stations across more than 40 markets—without following the requirements and procedures codified in federal law. Not once. And yet the Commission broke that new ground without seeking public comment on altering our established regulations, without actually changing the rules on the books, and without seeking the feedback of other federal agencies with relevant equities. This is not the type of relief that the Biden FCC provided to parties unconnected to Soros.

The list of Biden-era weaponization goes on and on. But at the FCC we are now putting those days in the rearview mirror. We are ensuring that everyone receives fair and even-handed treatment from the FCC.

I appreciate the opportunity to respond to your letter.

Sincerely,

Brendan Carr
Chairman

[7] *See Audacy License, LLC, as Debtor-in-Possession (Assignor) and Audacy License, LLC (Assignee)*, Memorandum Opinion and Order, FCC 24-94 (rel. Sept. 30, 2024).

FEDERAL COMMUNICATIONS COMMISSION
WASHINGTON, DC 20554

Brendan Carr
Chairman

May 29, 2026

The Honorable Doris Matsui
Ranking Member
Subcommittee on Communications and Technology
Committee on Energy and Commerce
U.S. House of Representatives
2322 Rayburn House Office Building
Washington, DC 20515

Dear Ranking Member Matsui,

Thank you for your April 30, 2026, letter to the Federal Communications Commission ("FCC"). It provides an opportunity for me to correct the record on several misconceptions regarding the FCC's work.

Throughout the previous Administration, communications laws and FCC processes were repeatedly weaponized for political purposes. For instance, Democrats ran a campaign to pressure cable companies into dropping what Democrats described as "Right-wing media outlets," like Fox News, Newsmax, and OANN.[1] And that campaign worked, resulting in several providers dropping one or more of those channels. During the Biden years, Democrats successfully pressured the FCC to block the sale of a Spanish-language radio station for overtly political reasons.[2] During the Biden years, the FCC refused to renew hundreds of routine broadcast licenses following political pressure from Democrats in Congress.[3] And the Biden FCC teed up for action a petition seeking to take away a Fox broadcast license based on content that allegedly ran on a Fox News cable channel.[4] The list goes on and on, as I have detailed.

In contrast to the Biden years, I am focused as Chairman of the FCC on restoring the agency's commitment to basic fairness and faithful adherence to the Congressionally enacted Communications Act.

Through the diligent work of the FCC's talented staff, the agency has been delivering great results for the American people. Internet speeds are up. Prices are down. Competition is

---

[1] *See* Letter from Chairman Brendan Carr, Federal Communications Commission to Sen. Richard Blumenthal, Ranking Member, Permanent Subcommittee on Investigations (Mar. 26, 2025) (*Blumenthal Letter 2025*), https://docs.fcc.gov/public/attachments/DOC-410581A2.pdf.

[2] *Id.*

[3] *Id.*

[4] *Id.*

stronger than before. And the FCC has taken bold steps to promote our national security interests. There is much more work ahead. But the U.S. is now leading the world again in next-gen technologies—including ones that will connect families that had been stuck on the wrong side of the digital divide for far too long. The FCC is also freeing up spectrum after years of inaction. And we are cutting through the red tape that has slowed down Internet builds across the country.

With respect to the FCC's work on media issues, in particular, the reporting to date has left the public with one false impression after another. So, your letter provides me with a chance to address a lot of that misinformation.

On media policy, the FCC is administering the unique regulatory framework that Congress decided to apply to broadcasters many years ago. In doing so, the agency is working to empower local broadcast TV stations that serve diverse communities across the nation. It is important to me that local broadcast TV stations have the chance to succeed and thrive into the future. They provide the trusted sources of local news and information that so many find so important today. In many communities, they are the only sources of real reporting because misguided federal policies contributed to the hollowing out and closure of local newspapers. I want to ensure that America's local broadcasters do not go the way of defunct local newspapers.

As noted above, the reporting on the FCC's media policies have consistently misled the American public. For instance, the media and many in public life recently fell for a hoax apparently concocted by a former late night TV host and a Democrat candidate for Senate in Texas. Specifically, the candidate, in an apparent effort to get attention and political donations, falsely indicated that the FCC or the Administration censored or otherwise prevented one of his interviews from airing on broadcast TV. That claim was and is obviously false.[5] The government did not prevent any such interview from airing. Yet too many people ran with the story anyways.

Your letter asks about several additional instances of public reporting regarding the FCC's media policy. For example, your letter asks specifically about the FCC's decision to invoke the agency's longstanding authority to call in broadcast licenses for early renewal. As I have stated on several occasions, the FCC ordered the early renewal of Disney's ABC TV stations based on the agency's ongoing investigation into allegations that the relevant corporate entities discriminated on the basis of race, gender, and/or other protected characteristics in violation of federal law.[6] These are serious allegations, and this is an FCC enforcement matter that remains under consideration at the agency.

As you may know, the Communications Act and longstanding Commission rules prohibit FCC-regulated entities from engaging in discrimination on the basis of race, color, religion, national

---

[5] *See* Letter from Chairman Brendan Carr, Federal Communications Commission to Sen. Richard Blumenthal, Ranking Member, Permanent Subcommittee on Investigations (Mar. 06, 2026), https://docs.fcc.gov/public/attachments/DOC-420011A2.pdf.

[6] *See The Walt Disney Co.*, Order, DA 26-416 (MB rel. Apr. 28, 2026) (*Early Renewal Order*), https://docs.fcc.gov/public/attachments/DA-26-416A1.pdf.

origin, age, or sex.[7] The FCC's Equal Employment Opportunity ("EEO") rules impose specific obligations on regulated entities, including broadcast licensees such as Disney's ABC TV stations. The FCC has both the authority and the responsibility to ensure compliance with those obligations.[8]

Last year, following a series of public reports and allegations, on March 27, 2025, I asked the FCC's Enforcement Bureau to open an investigation into whether Disney was complying with the Commission's EEO requirements. Those reports, including ones based on whistleblower accounts and publicly available corporate initiatives, described practices that appeared to raise serious concerns under the FCC's nondiscrimination rules.

For example, public reporting indicated that Disney may have relied on race, gender, or other protected characteristics in making hiring and promotion decisions, made compensation decisions based on race, gender, or other protected characteristics, limited workplace opportunities to employees based on race, gender, or other protected characteristic, and/or made other decisions based on impermissibly discriminatory considerations.[9] Other reports described affinity groups and programs that appeared to segregate employees on the basis of race or identity characteristics.[10]

These allegations and reports, though concerning, do not represent FCC conclusions or determinations. Disney is submitting evidence, and the FCC is reserving judgment on the issues. But given the nature of the reports implicating the kind of race-based discrimination whose prohibition has been an essential part of the federal legal system for decades, the FCC had a responsibility to determine if any of Disney's practices implicated the Commission's EEO rules or other applicable federal nondiscrimination requirements.

The FCC's Enforcement Bureau advanced its investigation in June of 2025 by issuing a letter of inquiry ("LOI") to Disney. As you may know, LOIs are a standard investigative tool used by the Commission to obtain information relevant to potential violations of law or FCC rules. As the Bureau made clear in its June 5, 2025 letter of inquiry ("Initial LOI"), the action constituted an order of the FCC to produce the documents and information requested therein. Failure to fully respond to the LOI constitutes a violation of the Communications Act and FCC rules.[11] FCC

---

[7] *See, e.g.*, 47 U.S.C. § 151.

[8] *See, e.g.*, 47 CFR §§ 25.601, 90.168, 73.2080(a), 76.73.

[9] *See* Letter from Chairman Brendan Carr, Federal Communications Commission to Robert A. Iger, Chief Executive Officer, The Walt Disney Company (Mar. 27, 2025), https://www.fcc.gov/sites/default/files/Carr-Letter-to-Disney-DEI-03252027.pdf.

[10] *Id.*

[11] *See* 47 U.S.C. § 503(b)(1)(B); *see also Aura Holdings of Wisconsin, Inc.*, Notice of Apparent Liability for Forfeiture, 33 FCC Rcd 3688, 3696, para. 21 (2018), *forfeiture order issued*, 34 FCC Rcd 2540 (2019) (imposing a $19,693 penalty for failure to respond to LOI); *ABC Fulfillment Services LLC d/b/a HobbyKing USA LLC and HobbyKing.com, and Indubitably, Inc. d/b/a/ HobbyKing Corp., HobbyKing USA LLC, HobbyKing and HobbyKing.com*, Notice of Apparent Liability for Forfeiture, 33 FCC Rcd 5530 (2018), *aff'd*, Forfeiture Order, 35 FCC Rcd 7441 (2020) (imposing a $39,278 forfeiture for failure to respond to LOI); *Net One Int'l, Net One, LLC, Farrahtel Int'l, LLC*, Forfeiture Order, 29 FCC Rcd 264, 267, para. 9 (EB 2014), *recon. denied*, Memorandum Opinion and Order, 30 FCC Rcd 1021 (EB 2015) (imposing a $25,000 penalty for failure to respond to LOI);

staff reviewed Disney's response to the Initial LOI and a subsequent request for additional information. FCC staff continued to have concerns about Disney's compliance with federal antidiscrimination law following their review that took place over the course of months.

Accordingly, in February 2026, the FCC's Enforcement Bureau issued a supplemental LOI seeking additional materials, including documents that Disney apparently omitted from its initial production. Disney subsequently requested, and received, additional time to respond. Following FCC staff review of those supplemental materials, concerns were again raised regarding the adequacy of Disney's production, the adequacy of its response, and whether it complied with the agency's lawful enforcement requests. Indeed, the FCC has formally notified Disney that responses to the agency's lawful inquiries have been deficient, nonresponsive, and disingenuous.

Accordingly, after more than a year of investigative activity, multiple rounds of document requests, and ongoing engagement between FCC staff and Disney representatives, the FCC's Media Bureau issued an early renewal order pursuant to the Commission's longstanding rules and procedures.[12] FCC leadership signaled for months that an early renewal order was a distinct possibility in this and other cases. Indeed, under my leadership the FCC has been more transparent about the scope of our investigative work than prior leadership.

Consistent with the FCC's Early Renewal Order, Disney filed its renewal application with the FCC's Media Bureau on May 28, 2026. This triggers a process where interested parties will have the opportunity to file, both in support and in opposition to the application. The FCC will consider the whole record and evaluate whether to grant renewal or whether more process is called for to determine if the licensee is qualified to continue to hold its license.

Throughout, the FCC has not singled out any one company for special treatment. We have been considering early license renewal as a potential investigative or enforcement step involving broadcasters more generally.[13] Nor is early renewal limited to Disney's ABC stations. For example, the FCC has been investigating Bridge News, LLC, for repeated violations of the FCC's rules. After issuing two LOIs, the FCC determined in April that the appropriate next investigative step would be to call in its licenses early for renewal.[14] Additionally, the FCC's Media Bureau concluded that a short-term license renewal made sense as an appropriate step for SPB LLC, an AM Radio license holder, following continued violations of the FCC's online

---

*Conexions, LLC d/b/a Conexion Wireless*, Notice of Apparent Liability for Forfeiture and Order, 28 FCC Rcd 15318, 15325, para. 22 (2013) (proposing a $300,000 forfeiture for failure to provide timely and complete responses to an LOI); *Technical Commc'n Network, LLC*, Notice of Apparent Liability for Forfeiture and Order, 28 FCC Rcd 1018, 1020, para. 8 (EB 2013) (proposing a $25,000 forfeiture for failure to provide a complete response to an LOI); *SBC Commc'ns, Inc.*, Forfeiture Order, 17 FCC Rcd 7589, 7600, para. 28 (2002) (imposing $100,000 penalty for failing to submit a sworn written response); *Quadrant Holdings LLC, Q Link Wireless LLC, & Hello Mobile LLC*, Notice of Apparent Liability for Forfeiture, 37 FCC Rcd 9304, 9307, para. 9 (EB 2022).

[12] *See The Walt Disney Co.*, Order, DA 26-416 (MB rel. Apr. 28, 2026).

[13] *US FCC could speed up broadcast license reviews, says agency head Carr*, Reuters (Mar. 16, 2026), https://www.reuters.com/business/media-telecom/fcc-could-speed-up-broadcast-license-reviews-says-agency-head-carr-2026-03-16/.

[14] *See* Bridge News, LLC, Order, DA 26-413 (rel. Apr. 27, 2026).

public file rule, which called into question whether the station was meetings its public interest obligations.[15]

Reporting has also included a lot of misinformation about the FCC's enforcement of longstanding political equal opportunity regulations. Decades ago, Congress made the decision to prevent covered broadcast television programs from being used to advance certain partisan purposes. Specifically, through section 315 of the Communications Act of 1934, as amended,[16] Congress put protections in place to ensure equal access to broadcast station facilities for legally qualified candidates for office, regardless of political affiliation. A person is a legally qualified candidate for purposes of the FCC's equal opportunities or equal time rule if they meet certain requirements, including having publicly announced their intention to run for office and qualifying under applicable state or federal law to hold the office being sought.[17] Under section 315, if a broadcast station permits any legally qualified candidate for public office to use its facilities, it shall provide an equal opportunity to all other legally qualified candidates for that office.[18] This statutory requirement and the corresponding FCC rules[19] seek to ensure that no legally qualified candidate for office is unfairly given less access to the public airwaves than their opponent.

Furthermore, the FCC's political file rules require that, when "free time is provided for use by or on behalf of candidates, a record of the free time provided shall be placed in the political file."[20] Any such free use of broadcast airtime by a legally qualified candidate would require the broadcaster to place a record in its online political file "as soon as possible."[21] Other legally qualified candidates can then submit an equal opportunities request. As the FCC has determined, equal opportunities generally mean that a broadcaster must provide comparable time and placement to opposing legally qualified candidates.[22] Adherence to these requirements is central to a broadcast licensee's obligation to operate in the public interest.[23]

---

[15] *See* SPB LLC, Order on Reconsideration, DA 26-434 (rel. May 1, 2026).

[16] See 47 U.S.C. § 315(a). Although section 315(a) is also commonly referred to as the "equal time" rule, it requires the provision of comparable time and placement, rather than the provision of identical airtime to opposing candidates.

[17] The criteria for legally qualified candidates are specified in the FCC's rule at 47 CFR § 73.1940.

[18] 47 U.S.C. § 315(a).

[19] 47 CFR §§ 73.1212 (Sponsorship identification); 73.1940 (Legally qualified candidates for public office); 73.1941 (Equal opportunities); 73.1942 (Candidate rates); 73.1943 (Political file); 73.1944 (Reasonable access).

[20] 47 CFR § 73.1943(c).

[21] *Id*. § 73.1943(d).

[22] *See, e.g.*, Equal Opportunities Complaint Filed by Nicole Parra Against Pappas Telecasting Companies, 19 FCC Rcd 21994, para. 3 (MB 2004) ("The Commission has ruled that when a candidate is furnished time at no cost, competing candidates are entitled to receive the same amount of free time in comparable time periods."); Carter/Mondale Reelection Committee, Memorandum Opinion and Order, 81 FCC 2d 409, n.13 (1980) ("the time that is made available under 315(a) must have a comparable audience potential to that of the initial 'use.'"); *see also* Primer on Political Broadcasting & Cablecasting, Public Notice, 69 FCC 2d 2209, 2219 (1978) ("The station must, however, make periods that normally have comparable audiences available to competing candidates upon request.").

[23] 47 USC 312(a)(7).

The FCC did not create these statutory obligations and cannot simply disregard them. The FCC's role in these matters involves applying the framework established by Congress and longstanding FCC precedent.

Your letter also objects to the FCC's review of broadcaster conduct under the public interest standard. However, the FCC cannot selectively ignore that statutory obligation simply because certain regulated parties or commentators disagree with scrutiny applied in a particular case. The Communications Act expressly requires the FCC to determine whether broadcasters are operating in the public interest.

As the FCC has made clear, federal law requires broadcasters to comply with a basic and fundamental obligation—they must operate in the public interest. Congress first enshrined this concept in the law nearly 100 years ago,[24] and it charged the FCC with the responsibility of ensuring that broadcasters only obtain and maintain a license to the extent they are operating in a manner that serves the public interest.[25]

From those early days, as the courts have long recognized, "[t]he clear intent of the Act was that the award of a broadcasting license should be a 'public trust,'"[26] with broadcasters serving the role "of a 'public trustee' charged with the duty of fairly and impartially informing the public audience."[27] As the D.C. Circuit has stated, "broadcasters are temporary permittees—fiduciaries—of a great public resource and they must meet the highest standards which are embraced in the public interest concept."[28] It is this service as a public trustee[29]—and the corresponding obligation to offer programming responsive to the needs and interests of the local communities they are licensed to serve—that makes broadcasters unique and distinguishes them from other programmers. It is an obligation that broadcasters take on voluntarily, in exchange for the privilege of holding a license to operate using the public airwaves.[30] Throughout the decades, the law and the obligation it places on broadcasters have not departed from this fundamental public interest obligation.

---

[24] *See* Radio Act of 1927, Pub. L. No. 69-632, 44 Stat. 1162 (1927); Communications Act of 1934, as amended (Act), 47 U.S.C. § 151 *et seq*.

[25] *See, e.g.*, 47 U.S.C. §§ 303, 307(a), 309(a), 310(d); *see also Fed. Commc'ns Comm'n v. Pottsville Broad. Co.*, 309 U.S. 134, 137-8 (1940) (*Pottsville*).

[26] *Office of Communication of United Church of Christ v. FCC*, 707 F.2d 1413, 1427 (D.C. Cir. 1983) (*UCC 1983*).

[27] *Columbia Broadcasting System, Inc. v. Democratic National Committee*, 412 U.S. 94, 117 (1973).

[28] *Office of Communication of United Church of Christ v. FCC*, 425 F.2d 543, 548 (D.C. Cir. 1969) (*UCC 1969*).

[29] *See Complaint by Alf Pratte, Honolulu, Hawaii Concerning Political Broadcast Re Station KGMB-TV*, 67 F.C.C.2d 72, 73 (1977) ("Licensees are trustees, granted the privilege of using a scarce natural resource, the airwaves, and they are required to operate in the public interest.").

[30] *See FCC v. National Citizens Committee for Broadcasting*, 436 U.S. 775, 795 (1978) (stating that "the physical scarcity of broadcast frequencies, as well as problems of interference between broadcast signals, led Congress to delegate broad authority to the Commission to allocate broadcast licenses in the 'public interest'"); *UCC 1983*, 707 F.2d at 1427 (observing that "in return for the 'free and exclusive use of a limited and valuable part of the public domain,' broadcasters were to be 'burdened by enforceable public obligations'") (internal quotations omitted).

Accordingly, the FCC not only has authority, but the duty, to examine whether regulated entities are operating consistent with the public interest standard established by Congress. Any suggestion that the FCC must ignore credible allegations of misconduct or refuse to conduct oversight of regulated broadcasters would amount to an abdication of the FCC's statutorily obligations.

I appreciate the opportunity to respond to your letter and to clarify recent FCC actions. Under my leadership, the FCC will continue working to ensure fair and even-handed treatment for all parties appearing before the agency while faithfully carrying out the FCC's statutory obligations.

Additionally, I have renewed my April 29, 2025, response to your previous correspondence. It is attached to this letter.

Sincerely,

Brendan Carr,
Chairman

FEDERAL COMMUNICATIONS COMMISSION
WASHINGTON, DC 20554

Brendan Carr
Chairman

April 29, 2025

The Honorable Doris Matsui
Ranking Member
Subcommittee on Communications and Technology
Committee on Energy and Commerce
U.S. House of Representatives
2322 Rayburn House Office Building
Washington, DC 20515

**RE: March 31, 2025 Letter to FCC**

Dear Ranking Member Matsui,

Thank you for your March 31, 2025, letter to the Federal Communications Commission (FCC). Throughout the previous Administration, communications laws and FCC processes were repeatedly weaponized for political purposes. As Chairman, I am focused on restoring the FCC's commitment to basic fairness and even-handed treatment for all. In particular, I am working to ensure that everyone appearing before the agency gets a fair shake from their government, regardless of political affiliation.

My commitment on this front represents a departure from the years when peoples' politics often determined the answers they received from the FCC. If they were aligned with the previous Administration, then they would receive favorable and special treatment on a streamlined basis. If they were not, then they got the opposite treatment, including having previous FCC awards revoked for political reasons.

Your letter provides me with a welcome opportunity to correct some misconceptions regarding the FCC's work. Specifically, your letter suggests the FCC is treating a petition involving a CBS TV station differently than one involving a Fox TV station.[1] But that is not the case at all. Under my leadership, the FCC has merely followed agency precedent. We are putting the relevant complaint on the same procedural footing that the previous FCC found appropriate.

As you may recall, in 2023, a group filed a petition with the FCC asking the agency to take the broadcast license away from a Fox broadcast TV station in Philadelphia because the

---

[1] *See* Center for American Rights, Petition to Condition Grant by the Center for American Rights, MB Docket No. 25-73 (filed Dec. 16, 2024); The Media and Democracy Project, Milo Vassallo, John McGinty, Peter Lems, Chenjerai Kumanyika, and Bill Hartman, Petition to Deny, LMS File No. 0000213362 (filed July 3, 2023).

petitioners did not agree with the content that they argued was carried on a separate cable channel.[2] Despite the Fox petition failing to satisfy basic pleading requirements, the FCC chose to move forward. The previous FCC determined that it was in the public interest to entertain the filing and issued a public notice seeking comment on the Fox petition.[3]

The previous FCC then left the Fox proceeding open for more than a year, and it received about 200 comments from the public. The FCC did not dismiss or deny the Fox petition when the public comment cycle ended either. Instead, it waited through the entire 2024 election cycle to dismiss the petition against the Fox broadcast TV station.

However, the previous FCC took a different approach entirely when it came to the CBS petition.[4] Unlike the Fox petition, the Biden FCC just summarily dismissed the CBS one. Unlike the Fox petition, the Biden FCC did not seek public comment on the CBS petition. And unlike the Fox petition, the Biden FCC did not establish a record on the CBS one before issuing its decision. Instead, at the eleventh hour, the Biden FCC simply dismissed the CBS petition. It is not clear why previous FCC leadership dismissed the CBS complaint without nearly the same level of process that it applied to the Fox petition. Under my leadership, the FCC is seeking comment on the CBS petition, just as the prior FCC did on the Fox petition. In other words, the FCC is treating like cases alike and following the precedent set by the agency. That is the very definition of even-handed treatment.

Again, this is a marked contrast from the weaponization that prevailed during the Biden years. During the previous Administration, Democrats regularly weaponized their authority against their perceived political opponents, including running a campaign to pressure cable companies into dropping what they described as "Right-wing media outlets,"[5] pressuring the FCC to block the sale of a Spanish-language radio station in South Florida for purely political reasons,[6] the unprecedented failure to process hundreds of routine Sinclair license renewals that came up in 2021, 2022, 2023, and 2024, and a multi-month campaign to jawbone social media companies into censoring their political opponents as well as books, videos, posts, and other online content.

---

[2] The Media and Democracy Project, Milo Vassallo, John McGinty, Peter Lems, Chenjerai Kumanyika, and Bill Hartman, Petition to Deny, LMS File No. 0000213362 (filed July 3, 2023) (Petition).

[3] *See Commission Announces Permit-But-Disclose Ex Parte Status and Establishes MB Docket No. 23-293 for Application for Renewal of License of WXTF-TV, Philadelphia, Pennsylvania*, Public Notice, MB Docket No. 23-293, DA 23-752 (MB, Aug. 23, 2023).

[4] *See* Letter from Peter S. Hyun, Acting Bureau Chief, Enforcement Bureau, Federal Communications Comm'n, to Daniel R. Suhr, President, Center for American Rights (Jan. 16, 2025); *Re: Preserving the First Amendment*, GN Docket No. 25-11, (GN, Jan. 16, 2025).

[5] *See* Letter from Reps. Anna G. Eshoo and Jerry McNerney to John T. Stankey, CEO, AT&T, Inc. (Feb. 22, 2021), https://web.archive.org/web/20210223052030/https://eshoo.house.gov/sites/eshoo.house.gov/files/Eshoo-McNerney-TV-Misinfo%20Letters-2.22.21.pdf.

[6] *See* Adrian Carrasquillo, *Hispanic Caucus Members Pressure FCC to Scrutinize Miami Radio Station Sale*, Newsweek, (Apr. 14, 2021), https://www.newsweek.com/hispanic-caucus-members-pressure-fcc-scrutinize-miami-radio-station-sale-1583890.

In doing so, the previous Administration established a two-tiered approach. Take, for example, the Biden FCC's decision to create a special Soros shortcut to expedite the acquisition of hundreds of broadcast licenses.[7] Never before had the Commission voted to approve the transfer of a single broadcast license—let alone the transfer of broadcast licenses for over 200 radio stations across more than 40 markets—without following the requirements and procedures codified in federal law. Not once. And yet the Commission broke that new ground without seeking public comment on altering our established regulations, without actually changing the rules on the books, and without seeking the feedback of other federal agencies with relevant equities. This is not the type of relief that the Biden FCC provided to parties unconnected to Soros.

The list of Biden-era weaponization goes on and on. But at the FCC we are now putting those days in the rearview mirror. We are ensuring that everyone receives fair and even-handed treatment from the FCC.

I appreciate the opportunity to respond to your letter.

Sincerely,

Brendan Carr
Chairman

[7] *See Audacy License, LLC, as Debtor-in-Possession (Assignor) and Audacy License, LLC (Assignee)*, Memorandum Opinion and Order, FCC 24-94 (rel. Sept. 30, 2024).

FEDERAL COMMUNICATIONS COMMISSION
WASHINGTON, DC 20554

Brendan Carr
Chairman

May 29, 2026

The Honorable Frank Pallone
Ranking Member
Committee on Energy and Commerce
U.S. House of Representatives
2322 Rayburn House Office Building
Washington, DC 20515

Dear Ranking Member Pallone,

Thank you for your April 30, 2026, letter to the Federal Communications Commission ("FCC"). It provides an opportunity for me to correct the record on several misconceptions regarding the FCC's work.

Throughout the previous Administration, communications laws and FCC processes were repeatedly weaponized for political purposes. For instance, Democrats ran a campaign to pressure cable companies into dropping what Democrats described as "Right-wing media outlets," like Fox News, Newsmax, and OANN.[1] And that campaign worked, resulting in several providers dropping one or more of those channels. During the Biden years, Democrats successfully pressured the FCC to block the sale of a Spanish-language radio station for overtly political reasons.[2] During the Biden years, the FCC refused to renew hundreds of routine broadcast licenses following political pressure from Democrats in Congress.[3] And the Biden FCC teed up for action a petition seeking to take away a Fox broadcast license based on content that allegedly ran on a Fox News cable channel.[4] The list goes on and on, as I have detailed.

In contrast to the Biden years, I am focused as Chairman of the FCC on restoring the agency's commitment to basic fairness and faithful adherence to the Congressionally enacted Communications Act.

Through the diligent work of the FCC's talented staff, the agency has been delivering great results for the American people. Internet speeds are up. Prices are down. Competition is stronger than before. And the FCC has taken bold steps to promote our national security

---

[1] *See* Letter from Chairman Brendan Carr, Federal Communications Commission to Sen. Richard Blumenthal, Ranking Member, Permanent Subcommittee on Investigations (Mar. 26, 2025) (*Blumenthal Letter 2025*), https://docs.fcc.gov/public/attachments/DOC-410581A2.pdf.

[2] *Id.*

[3] *Id.*

[4] *Id.*

interests. There is much more work ahead. But the U.S. is now leading the world again in next-gen technologies—including ones that will connect families that had been stuck on the wrong side of the digital divide for far too long. The FCC is also freeing up spectrum after years of inaction. And we are cutting through the red tape that has slowed down Internet builds across the country.

With respect to the FCC's work on media issues, in particular, the reporting to date has left the public with one false impression after another. So, your letter provides me with a chance to address a lot of that misinformation.

On media policy, the FCC is administering the unique regulatory framework that Congress decided to apply to broadcasters many years ago. In doing so, the agency is working to empower local broadcast TV stations that serve diverse communities across the nation. It is important to me that local broadcast TV stations have the chance to succeed and thrive into the future. They provide the trusted sources of local news and information that so many find so important today. In many communities, they are the only sources of real reporting because misguided federal policies contributed to the hollowing out and closure of local newspapers. I want to ensure that America's local broadcasters do not go the way of defunct local newspapers.

As noted above, the reporting on the FCC's media policies have consistently misled the American public. For instance, the media and many in public life recently fell for a hoax apparently concocted by a former late night TV host and a Democrat candidate for Senate in Texas. Specifically, the candidate, in an apparent effort to get attention and political donations, falsely indicated that the FCC or the Administration censored or otherwise prevented one of his interviews from airing on broadcast TV. That claim was and is obviously false.[5] The government did not prevent any such interview from airing. Yet too many people ran with the story anyways.

Your letter asks about several additional instances of public reporting regarding the FCC's media policy. For example, your letter asks specifically about the FCC's decision to invoke the agency's longstanding authority to call in broadcast licenses for early renewal. As I have stated on several occasions, the FCC ordered the early renewal of Disney's ABC TV stations based on the agency's ongoing investigation into allegations that the relevant corporate entities discriminated on the basis of race, gender, and/or other protected characteristics in violation of federal law.[6] These are serious allegations, and this is an FCC enforcement matter that remains under consideration at the agency.

As you may know, the Communications Act and longstanding Commission rules prohibit FCC-regulated entities from engaging in discrimination on the basis of race, color, religion, national

---

[5] *See* Letter from Chairman Brendan Carr, Federal Communications Commission to Sen. Richard Blumenthal, Ranking Member, Permanent Subcommittee on Investigations (Mar. 06, 2026), https://docs.fcc.gov/public/attachments/DOC-420011A2.pdf.

[6] *See The Walt Disney Co.*, Order, DA 26-416 (MB rel. Apr. 28, 2026) (*Early Renewal Order*), https://docs.fcc.gov/public/attachments/DA-26-416A1.pdf.

origin, age, or sex.[7] The FCC's Equal Employment Opportunity ("EEO") rules impose specific obligations on regulated entities, including broadcast licensees such as Disney's ABC TV stations. The FCC has both the authority and the responsibility to ensure compliance with those obligations.[8]

Last year, following a series of public reports and allegations, on March 27, 2025, I asked the FCC's Enforcement Bureau to open an investigation into whether Disney was complying with the Commission's EEO requirements. Those reports, including ones based on whistleblower accounts and publicly available corporate initiatives, described practices that appeared to raise serious concerns under the FCC's nondiscrimination rules.

For example, public reporting indicated that Disney may have relied on race, gender, or other protected characteristics in making hiring and promotion decisions, made compensation decisions based on race, gender, or other protected characteristics, limited workplace opportunities to employees based on race, gender, or other protected characteristic, and/or made other decisions based on impermissibly discriminatory considerations.[9] Other reports described affinity groups and programs that appeared to segregate employees on the basis of race or identity characteristics.[10]

These allegations and reports, though concerning, do not represent FCC conclusions or determinations. Disney is submitting evidence, and the FCC is reserving judgment on the issues. But given the nature of the reports implicating the kind of race-based discrimination whose prohibition has been an essential part of the federal legal system for decades, the FCC had a responsibility to determine if any of Disney's practices implicated the Commission's EEO rules or other applicable federal nondiscrimination requirements.

The FCC's Enforcement Bureau advanced its investigation in June of 2025 by issuing a letter of inquiry ("LOI") to Disney. As you may know, LOIs are a standard investigative tool used by the Commission to obtain information relevant to potential violations of law or FCC rules. As the Bureau made clear in its June 5, 2025 letter of inquiry ("Initial LOI"), the action constituted an order of the FCC to produce the documents and information requested therein. Failure to fully respond to the LOI constitutes a violation of the Communications Act and FCC rules.[11] FCC

---

[7] *See, e.g.*, 47 U.S.C. § 151.

[8] *See, e.g.*, 47 CFR §§ 25.601, 90.168, 73.2080(a), 76.73.

[9] *See* Letter from Chairman Brendan Carr, Federal Communications Commission to Robert A. Iger, Chief Executive Officer, The Walt Disney Company (Mar. 27, 2025), https://www.fcc.gov/sites/default/files/Carr-Letter-to-Disney-DEI-03252027.pdf.

[10] *Id.*

[11] *See* 47 U.S.C. § 503(b)(1)(B); *see also Aura Holdings of Wisconsin, Inc.*, Notice of Apparent Liability for Forfeiture, 33 FCC Rcd 3688, 3696, para. 21 (2018), *forfeiture order issued*, 34 FCC Rcd 2540 (2019) (imposing a $19,693 penalty for failure to respond to LOI); *ABC Fulfillment Services LLC d/b/a HobbyKing USA LLC and HobbyKing.com, and Indubitably, Inc. d/b/a/ HobbyKing Corp., HobbyKing USA LLC, HobbyKing and HobbyKing.com*, Notice of Apparent Liability for Forfeiture, 33 FCC Rcd 5530 (2018), *aff'd*, Forfeiture Order, 35 FCC Rcd 7441 (2020) (imposing a $39,278 forfeiture for failure to respond to LOI); *Net One Int'l, Net One, LLC, Farrahtel Int'l, LLC*, Forfeiture Order, 29 FCC Rcd 264, 267, para. 9 (EB 2014), *recon. denied*, Memorandum Opinion and Order, 30 FCC Rcd 1021 (EB 2015) (imposing a $25,000 penalty for failure to respond to LOI);

staff reviewed Disney's response to the Initial LOI and a subsequent request for additional information. FCC staff continued to have concerns about Disney's compliance with federal antidiscrimination law following their review that took place over the course of months.

Accordingly, in February 2026, the FCC's Enforcement Bureau issued a supplemental LOI seeking additional materials, including documents that Disney apparently omitted from its initial production. Disney subsequently requested, and received, additional time to respond. Following FCC staff review of those supplemental materials, concerns were again raised regarding the adequacy of Disney's production, the adequacy of its response, and whether it complied with the agency's lawful enforcement requests. Indeed, the FCC has formally notified Disney that responses to the agency's lawful inquiries have been deficient, nonresponsive, and disingenuous.

Accordingly, after more than a year of investigative activity, multiple rounds of document requests, and ongoing engagement between FCC staff and Disney representatives, the FCC's Media Bureau issued an early renewal order pursuant to the Commission's longstanding rules and procedures.[12] FCC leadership signaled for months that an early renewal order was a distinct possibility in this and other cases. Indeed, under my leadership the FCC has been more transparent about the scope of our investigative work than prior leadership.

Consistent with the FCC's Early Renewal Order, Disney filed its renewal application with the FCC's Media Bureau on May 28, 2026. This triggers a process where interested parties will have the opportunity to file, both in support and in opposition to the application. The FCC will consider the whole record and evaluate whether to grant renewal or whether more process is called for to determine if the licensee is qualified to continue to hold its license.

Throughout, the FCC has not singled out any one company for special treatment. We have been considering early license renewal as a potential investigative or enforcement step involving broadcasters more generally.[13] Nor is early renewal limited to Disney's ABC stations. For example, the FCC has been investigating Bridge News, LLC, for repeated violations of the FCC's rules. After issuing two LOIs, the FCC determined in April that the appropriate next investigative step would be to call in its licenses early for renewal.[14] Additionally, the FCC's Media Bureau concluded that a short-term license renewal made sense as an appropriate step for SPB LLC, an AM Radio license holder, following continued violations of the FCC's online

---

*Conexions, LLC d/b/a Conexion Wireless*, Notice of Apparent Liability for Forfeiture and Order, 28 FCC Rcd 15318, 15325, para. 22 (2013) (proposing a $300,000 forfeiture for failure to provide timely and complete responses to an LOI); *Technical Commc'n Network, LLC*, Notice of Apparent Liability for Forfeiture and Order, 28 FCC Rcd 1018, 1020, para. 8 (EB 2013) (proposing a $25,000 forfeiture for failure to provide a complete response to an LOI); *SBC Commc'ns, Inc.*, Forfeiture Order, 17 FCC Rcd 7589, 7600, para. 28 (2002) (imposing $100,000 penalty for failing to submit a sworn written response); *Quadrant Holdings LLC, Q Link Wireless LLC, & Hello Mobile LLC*, Notice of Apparent Liability for Forfeiture, 37 FCC Rcd 9304, 9307, para. 9 (EB 2022).

[12] *See The Walt Disney Co.*, Order, DA 26-416 (MB rel. Apr. 28, 2026).

[13] *US FCC could speed up broadcast license reviews, says agency head Carr*, Reuters (Mar. 16, 2026), https://www.reuters.com/business/media-telecom/fcc-could-speed-up-broadcast-license-reviews-says-agency-head-carr-2026-03-16/.

[14] *See* Bridge News, LLC, Order, DA 26-413 (rel. Apr. 27, 2026).

public file rule, which called into question whether the station was meetings its public interest obligations.[15]

Reporting has also included a lot of misinformation about the FCC's enforcement of longstanding political equal opportunity regulations. Decades ago, Congress made the decision to prevent covered broadcast television programs from being used to advance certain partisan purposes. Specifically, through section 315 of the Communications Act of 1934, as amended,[16] Congress put protections in place to ensure equal access to broadcast station facilities for legally qualified candidates for office, regardless of political affiliation. A person is a legally qualified candidate for purposes of the FCC's equal opportunities or equal time rule if they meet certain requirements, including having publicly announced their intention to run for office and qualifying under applicable state or federal law to hold the office being sought.[17] Under section 315, if a broadcast station permits any legally qualified candidate for public office to use its facilities, it shall provide an equal opportunity to all other legally qualified candidates for that office.[18] This statutory requirement and the corresponding FCC rules[19] seek to ensure that no legally qualified candidate for office is unfairly given less access to the public airwaves than their opponent.

Furthermore, the FCC's political file rules require that, when "free time is provided for use by or on behalf of candidates, a record of the free time provided shall be placed in the political file."[20] Any such free use of broadcast airtime by a legally qualified candidate would require the broadcaster to place a record in its online political file "as soon as possible."[21] Other legally qualified candidates can then submit an equal opportunities request. As the FCC has determined, equal opportunities generally mean that a broadcaster must provide comparable time and placement to opposing legally qualified candidates.[22] Adherence to these requirements is central to a broadcast licensee's obligation to operate in the public interest.[23]

---

[15] *See* SPB LLC, Order on Reconsideration, DA 26-434 (rel. May 1, 2026).

[16] See 47 U.S.C. § 315(a). Although section 315(a) is also commonly referred to as the "equal time" rule, it requires the provision of comparable time and placement, rather than the provision of identical airtime to opposing candidates.

[17] The criteria for legally qualified candidates are specified in the FCC's rule at 47 CFR § 73.1940.

[18] 47 U.S.C. § 315(a).

[19] 47 CFR §§ 73.1212 (Sponsorship identification); 73.1940 (Legally qualified candidates for public office); 73.1941 (Equal opportunities); 73.1942 (Candidate rates); 73.1943 (Political file); 73.1944 (Reasonable access).

[20] 47 CFR § 73.1943(c).

[21] *Id*. § 73.1943(d).

[22] *See, e.g.*, Equal Opportunities Complaint Filed by Nicole Parra Against Pappas Telecasting Companies, 19 FCC Rcd 21994, para. 3 (MB 2004) ("The Commission has ruled that when a candidate is furnished time at no cost, competing candidates are entitled to receive the same amount of free time in comparable time periods."); Carter/Mondale Reelection Committee, Memorandum Opinion and Order, 81 FCC 2d 409, n.13 (1980) ("the time that is made available under 315(a) must have a comparable audience potential to that of the initial 'use.'"); *see also* Primer on Political Broadcasting & Cablecasting, Public Notice, 69 FCC 2d 2209, 2219 (1978) ("The station must, however, make periods that normally have comparable audiences available to competing candidates upon request.").

[23] 47 USC 312(a)(7).

The FCC did not create these statutory obligations and cannot simply disregard them. The FCC's role in these matters involves applying the framework established by Congress and longstanding FCC precedent.

Your letter also objects to the FCC's review of broadcaster conduct under the public interest standard. However, the FCC cannot selectively ignore that statutory obligation simply because certain regulated parties or commentators disagree with scrutiny applied in a particular case. The Communications Act expressly requires the FCC to determine whether broadcasters are operating in the public interest.

As the FCC has made clear, federal law requires broadcasters to comply with a basic and fundamental obligation—they must operate in the public interest. Congress first enshrined this concept in the law nearly 100 years ago,[24] and it charged the FCC with the responsibility of ensuring that broadcasters only obtain and maintain a license to the extent they are operating in a manner that serves the public interest.[25]

From those early days, as the courts have long recognized, "[t]he clear intent of the Act was that the award of a broadcasting license should be a 'public trust,'"[26] with broadcasters serving the role "of a 'public trustee' charged with the duty of fairly and impartially informing the public audience."[27] As the D.C. Circuit has stated, "broadcasters are temporary permittees—fiduciaries—of a great public resource and they must meet the highest standards which are embraced in the public interest concept."[28] It is this service as a public trustee[29]—and the corresponding obligation to offer programming responsive to the needs and interests of the local communities they are licensed to serve—that makes broadcasters unique and distinguishes them from other programmers. It is an obligation that broadcasters take on voluntarily, in exchange for the privilege of holding a license to operate using the public airwaves.[30] Throughout the decades, the law and the obligation it places on broadcasters have not departed from this fundamental public interest obligation.

---

[24] *See* Radio Act of 1927, Pub. L. No. 69-632, 44 Stat. 1162 (1927); Communications Act of 1934, as amended (Act), 47 U.S.C. § 151 *et seq*.

[25] *See, e.g.*, 47 U.S.C. §§ 303, 307(a), 309(a), 310(d); *see also Fed. Commc'ns Comm'n v. Pottsville Broad. Co.*, 309 U.S. 134, 137-8 (1940) (*Pottsville*).

[26] *Office of Communication of United Church of Christ v. FCC*, 707 F.2d 1413, 1427 (D.C. Cir. 1983) (*UCC 1983*).

[27] *Columbia Broadcasting System, Inc. v. Democratic National Committee*, 412 U.S. 94, 117 (1973).

[28] *Office of Communication of United Church of Christ v. FCC*, 425 F.2d 543, 548 (D.C. Cir. 1969) (*UCC 1969*).

[29] *See Complaint by Alf Pratte, Honolulu, Hawaii Concerning Political Broadcast Re Station KGMB-TV*, 67 F.C.C.2d 72, 73 (1977) ("Licensees are trustees, granted the privilege of using a scarce natural resource, the airwaves, and they are required to operate in the public interest.").

[30] *See FCC v. National Citizens Committee for Broadcasting*, 436 U.S. 775, 795 (1978) (stating that "the physical scarcity of broadcast frequencies, as well as problems of interference between broadcast signals, led Congress to delegate broad authority to the Commission to allocate broadcast licenses in the 'public interest'"); *UCC 1983*, 707 F.2d at 1427 (observing that "in return for the 'free and exclusive use of a limited and valuable part of the public domain,' broadcasters were to be 'burdened by enforceable public obligations'") (internal quotations omitted).

Accordingly, the FCC not only has authority, but the duty, to examine whether regulated entities are operating consistent with the public interest standard established by Congress. Any suggestion that the FCC must ignore credible allegations of misconduct or refuse to conduct oversight of regulated broadcasters would amount to an abdication of the FCC's statutorily obligations.

I appreciate the opportunity to respond to your letter and to clarify recent FCC actions. Under my leadership, the FCC will continue working to ensure fair and even-handed treatment for all parties appearing before the agency while faithfully carrying out the FCC's statutory obligations.

Additionally, I have renewed my April 29, 2025, response to your previous correspondence. It is attached to this letter.

Sincerely,

Brendan Carr,
Chairman

FEDERAL COMMUNICATIONS COMMISSION
WASHINGTON, DC 20554

Brendan Carr
Chairman

April 29, 2025

The Honorable Frank Pallone
Ranking Member
Committee on Energy and Commerce
U.S. House of Representatives
2322 Rayburn House Office Building
Washington, DC 20515

**RE: March 31, 2025 Letter to FCC**

Dear Ranking Member Pallone,

Thank you for your March 31, 2025, letter to the Federal Communications Commission (FCC). Throughout the previous Administration, communications laws and FCC processes were repeatedly weaponized for political purposes. As Chairman, I am focused on restoring the FCC's commitment to basic fairness and even-handed treatment for all. In particular, I am working to ensure that everyone appearing before the agency gets a fair shake from their government, regardless of political affiliation.

My commitment on this front represents a departure from the years when peoples' politics often determined the answers they received from the FCC. If they were aligned with the previous Administration, then they would receive favorable and special treatment on a streamlined basis. If they were not, then they got the opposite treatment, including having previous FCC awards revoked for political reasons.

Your letter provides me with a welcome opportunity to correct some misconceptions regarding the FCC's work. Specifically, your letter suggests the FCC is treating a petition involving a CBS TV station differently than one involving a Fox TV station.[1] But that is not the case at all. Under my leadership, the FCC has merely followed agency precedent. We are putting the relevant complaint on the same procedural footing that the previous FCC found appropriate.

As you may recall, in 2023, a group filed a petition with the FCC asking the agency to take the broadcast license away from a Fox broadcast TV station in Philadelphia because the petitioners did not agree with the content that they argued was carried on a separate cable

[1] *See* Center for American Rights, Petition to Condition Grant by the Center for American Rights, MB Docket No. 25-73 (filed Dec. 16, 2024); The Media and Democracy Project, Milo Vassallo, John McGinty, Peter Lems, Chenjerai Kumanyika, and Bill Hartman, Petition to Deny, LMS File No. 0000213362 (filed July 3, 2023).

channel.[2] Despite the Fox petition failing to satisfy basic pleading requirements, the FCC chose to move forward. The previous FCC determined that it was in the public interest to entertain the filing and issued a public notice seeking comment on the Fox petition.[3]

The previous FCC then left the Fox proceeding open for more than a year, and it received about 200 comments from the public. The FCC did not dismiss or deny the Fox petition when the public comment cycle ended either. Instead, it waited through the entire 2024 election cycle to dismiss the petition against the Fox broadcast TV station.

However, the previous FCC took a different approach entirely when it came to the CBS petition.[4] Unlike the Fox petition, the Biden FCC just summarily dismissed the CBS one. Unlike the Fox petition, the Biden FCC did not seek public comment on the CBS petition. And unlike the Fox petition, the Biden FCC did not establish a record on the CBS one before issuing its decision. Instead, at the eleventh hour, the Biden FCC simply dismissed the CBS petition. It is not clear why previous FCC leadership dismissed the CBS complaint without nearly the same level of process that it applied to the Fox petition. Under my leadership, the FCC is seeking comment on the CBS petition, just as the prior FCC did on the Fox petition. In other words, the FCC is treating like cases alike and following the precedent set by the agency. That is the very definition of even-handed treatment.

Again, this is a marked contrast from the weaponization that prevailed during the Biden years. During the previous Administration, Democrats regularly weaponized their authority against their perceived political opponents, including running a campaign to pressure cable companies into dropping what they described as "Right-wing media outlets,"[5] pressuring the FCC to block the sale of a Spanish-language radio station in South Florida for purely political reasons,[6] the unprecedented failure to process hundreds of routine Sinclair license renewals that came up in 2021, 2022, 2023, and 2024, and a multi-month campaign to jawbone social media companies into censoring their political opponents as well as books, videos, posts, and other online content.

---

[2] The Media and Democracy Project, Milo Vassallo, John McGinty, Peter Lems, Chenjerai Kumanyika, and Bill Hartman, Petition to Deny, LMS File No. 0000213362 (filed July 3, 2023) (Petition).

[3] *See Commission Announces Permit-But-Disclose Ex Parte Status and Establishes MB Docket No. 23-293 for Application for Renewal of License of WXTF-TV, Philadelphia, Pennsylvania*, Public Notice, MB Docket No. 23-293, DA 23-752 (MB, Aug. 23, 2023).

[4] *See* Letter from Peter S. Hyun, Acting Bureau Chief, Enforcement Bureau, Federal Communications Comm'n, to Daniel R. Suhr, President, Center for American Rights (Jan. 16, 2025); *Re: Preserving the First Amendment*, GN Docket No. 25-11, (GN, Jan. 16, 2025).

[5] *See* Letter from Reps. Anna G. Eshoo and Jerry McNerney to John T. Stankey, CEO, AT&T, Inc. (Feb. 22, 2021), https://web.archive.org/web/20210223052030/https://eshoo.house.gov/sites/eshoo.house.gov/files/Eshoo-McNerney-TV-Misinfo%20Letters-2.22.21.pdf.

[6] *See* Adrian Carrasquillo, *Hispanic Caucus Members Pressure FCC to Scrutinize Miami Radio Station Sale*, Newsweek, (Apr. 14, 2021), https://www.newsweek.com/hispanic-caucus-members-pressure-fcc-scrutinize-miami-radio-station-sale-1583890.

In doing so, the previous Administration established a two-tiered approach. Take, for example, the Biden FCC's decision to create a special Soros shortcut to expedite the acquisition of hundreds of broadcast licenses.[7] Never before had the Commission voted to approve the transfer of a single broadcast license—let alone the transfer of broadcast licenses for over 200 radio stations across more than 40 markets—without following the requirements and procedures codified in federal law. Not once. And yet the Commission broke that new ground without seeking public comment on altering our established regulations, without actually changing the rules on the books, and without seeking the feedback of other federal agencies with relevant equities. This is not the type of relief that the Biden FCC provided to parties unconnected to Soros.

The list of Biden-era weaponization goes on and on. But at the FCC we are now putting those days in the rearview mirror. We are ensuring that everyone receives fair and even-handed treatment from the FCC.

I appreciate the opportunity to respond to your letter.

Sincerely,



Brendan Carr
Chairman

[7] *See Audacy License, LLC, as Debtor-in-Possession (Assignor) and Audacy License, LLC (Assignee)*, Memorandum Opinion and Order, FCC 24-94 (rel. Sept. 30, 2024).