# Exhibit 9

# FCC Press Conference

FCC Chairman Brendan Carr speaks to reporters following the April meeting of the Federal Communications Commission. Read the transcript here.

May 4, 2026

**Hungry For More?**

Luckily for you, we deliver. Subscribe to our blog today.

Your Email*

SHARE THIS POST

**Copyright Disclaimer**

Under Title 17 U.S.C. Section 107, allowance is made for "fair use" for purposes such as criticism, comment, news reporting, teaching, scholarship, and research. Fair use is permitted by copyright statute that might otherwise be infringing.

Katie Gorscak (00:10):

All right, everyone, if you could please take your conversations outside. We'll be starting the chairman's press conference momentarily. All right. Every month, I get them quieter faster and faster. So thank you everyone for joining our chairman's press conference. Since we have some new faces here, as a reminder, we're going to start questions on this side of the table and work our way down. If you could just identify your outlet as well as your name, and press the button to turn on your microphone to red, we will hear you. Thank you so much. With that, I will hand it over to Chairman Brendan Carr.

Brendan Carr (00:52):

Well, thank you for the smattering of applause. That was a nice treat. So good to join all of you again today. It's been another busy, productive month at the FCC, including, obviously, the votes that we took right here, a number of really sort of core bread and butter actions for the agencies that we continue to push forward on on satellite broadband, increased high-speed internet from space. Big vote today, obviously, looking to increase capacity for space-delivered internet service by up to seven fold. That's going to be a really, really big win for America's consumers and great for our country's technology leadership. Robocalls, obviously, the biggest consumer complaint that we get. I get robocalls. You guys get them.

(01:34)
We've been trying to take a slightly different approach here at the agency over the last year or so in changing our tactics, and you see that with some of our votes today. We're putting a bigger burden on voice service providers to know their customer, so we're not allowing bad actors to even get onto our network to originate these illegal calls in the first place. National security, obviously, took another important step forward on a number of those initiatives. So glad to see that, but it's been a good, productive time, and I think everyone had an eventful last couple of weeks. Who here made it to the White House correspondence dinner? Do we have a number of folks here? Ended up being an eventful night.

(02:15)
So I was really looking forward to Oz's performance as a mentalist, but at the end of the day, I don't think he's that good of a mentalist. He didn't see that coming, so he really could have given us a heads-up perhaps. Really would have established his bona fides as a great mentalist, but that didn't happen. I also had the chance to get on the road, went down to North Carolina, spent some time with a tower crew up on top of another 2,000-foot broadcast tower. I got to say, when I started climbing these towers, it was about seven years ago, so I'm now seven years older. Every time I climb a tower, it's the oldest I've ever been climbing a tower, so it is increasingly challenging but always gives me great respect for everything that the teams are doing, these construction crews. They do phenomenal work.

(02:55)
We're going to continue to deliver here on our Build America agenda. We keep seeing downward pressure on prices, which is a good thing. In fact, AT&T just announced a new discounted program for low-income consumers. I think that's great news, and we just got to continue to drive prices down, but we're really happy with the general direction that we're seeing there. So with that, happy to open it up and have you guys have your questions.

Chris Cole (03:21):

Hi, Chairman Carr. Chris Cole with Law360. I just wanted to follow up on a petition that was filed last year, some former FCC officials concerning the News Distortion Policy. I'm wondering if you plan to take any action on that. The petition was asking for a repeal, but do you want to do anything to clarify the agency's legal position in that area?

Brendan Carr (03:50):

Well, the commission hasn't made a decision at this point on that petition. I think perhaps they're going to court there, so we'll talk to our office of general counsel about that. The FCC has a News Distortion Policy that's been in our case law books for a long, long time. It's a policy that broadcasters are well aware of, and policies that aren't on our books are policies that we should enforce. But other than that, no news to break for you. We don't have a plan at this point to repeal that.

Chris Cole (04:19):

Is there any reason not to bring it to a vote?

Brendan Carr (04:22):

Well, we get petitions all the time, and we work through them and we make different decisions on what to do with them. But the policy itself has already been voted on by the commission over the years, and it's in our case law. So we got lots and lots of policies that we've already voted on at the agency over the years, so that's one of them.

Jericho Casper (04:42):

Hi, Chairman Carr. Jericho Casper with Broadband Breakfast. So the high-cost modernization proposal that FCC is taking up next month flips the idea of including LEO satellites in the FCC's high-cost program for the first time. The imperium asks whether locations covered by LEO satellite service should be removed from high-cost carrier service obligations and whether high-cost support is justified in areas where competitive alternatives already exist. So is that to say that you would consider taking high-cost support from small rural telephone providers in these areas to

relocate to LEO providers or revoke support entirely-

Brendan Carr (05:10):

Very neutrally-balanced-framed question, I like it.

Jericho Casper (05:12):

... or revoke support entirely in areas served where other federal funding has been committed? I'm just trying to clarify.

Brendan Carr (05:18):

So, look, we're obviously going to work through this proceeding and this issue, but the impetus here is this. We have a number of carriers that are in existing legacy- support mechanisms that themselves are going to expire, are going to sunset. At the end of this year, there's another set that end at the end of 2028, and so that's sort of now or soon is an appropriate time to look at what's the future of these programs? How do we make sure that the communities that are being served through support from this program continue to be served with affordable quality broadband? The FCC, over the years, has looked, in some cases, high-speed internet.

(05:57)
We've done it in RDOF. We've done it in other programs, so it's not something that's never been done before. We're really open-minded here. There's no proposal here to do any sort of flash-cut change. We are open to feedback. We're looking in areas where there is lots of competition already. But again, these are legacy programs that haven't had a fresh look in a long time, and maybe we maintain it exactly the way it is. Maybe we increase support. It's just teeing up a range of questions based on the fact that these programs without any FCC action will sunset and stop. So I think now is the right time to just be very reasonable, be sensitive to all of the stakeholders, be sensitive to the investments that are in here. So we're starting to have that conversation, but it's going to be a conversation over a long period of time.

Mira Bhakta (06:51):

Hi, Chairman Carr. Mira Bhakta with Broadband Breakfast. I know you've given a nod to this in the past, but can you give any further comment on whether or not you plan to approve the Amazon LEO acquisition of Globalstar? Do you believe that actions like this put Amazon LEO in the right place to reach the FCC's July satellite deadline?

Brendan Carr (07:10):

Well, that recently announced deal doesn't relate to the deadline at the FCC. I'm not even sure if they filed at the FCC the paperwork yet for that transaction. What I will say is this, going back many months, as we worked with my advisors and with our Space Bureau, one of the things that we set out was to make sure that the United States leads the world in next-generation technologies. One of those technologies may prove to be... You never know what technology, right? We have to have some humility about that. One thing that it may prove to be is Direct-to-Cell technology. So Americans today have long had these satellite dishes, used to be big ones, now they're small ones, that you get connectivity from a satellite there, and you can hotspot off it or otherwise.

(07:55)
We've long had satellite phones that are, sort of, clunky and not really doing significant data or broadband. The deal with Direct-to-Cell is you can merge that and right in your smartphone, you can get high-speed internet directly from a satellite. We said from the get go, "We want the United States to be first out of the gate with that type of a technology," and so there's actions that have been brought to the FCC, for instance, on the spectrum side that we're doing to tee this up. There's regulatory reforms we're doing as well that can help do that. In fact, we're obviously taking steps today to help make it better, faster internet from space.

(08:32)
I think you want to have multiple players in that segment, so whether it ends up being Starlink and

Amazon. AST SpaceMobile is out there as well. I think you want to have three or more players in that market. Again, we'll see where it goes, but our overarching policy is to make sure that this agency is open-minded to the reforms and the actions needed to put the U.S. and U.S. businesses front and center in this new technology. So we're very open-minded on that deal, but we'll run it through our normal process.

Jeremy Barr (09:07):

Jeremy Barr from The Guardian. I'm surprised the ABC question lasted to me, but I'll take it.

Brendan Carr (09:12):

Do you want to know about Part 32 accounting rules? I'm sure.

Jeremy Barr (09:15):

I don't understand anything of what she said. Just covered TV news. So, obviously, the timing of the order to bring the ABC licenses up for early renewal has raised questions coming a day after President and his wife called for Jimmy Kimmel to be fired. I guess, do you see how people see that it might be connected to the Kimmel... I mean, let me just ask it this way. Was there any connection between the Kimmel comments last week, his ill-time joke, and the early-renewal request? I guess, do you see that perception, and are you... Do you disagree with the notion that it's causation there?

Brendan Carr (09:55):

Well, let me walk through the timeline, because I think that's part of what the confusion

Brendan Carr (10:00):

... infusion has been in some of the reporting that I've seen. You can go all the way back to more than a year ago in March of last year where I wrote a letter to Disney saying that there was evidence ... and Disney has the opportunity, will continue to have the opportunity to put in counter evidence, but there was evidence or allegations indicating that Disney, through this sort of invidious form of DEI discrimination, was creating,

as I specified in the letter to them, racially segregated spaces inside the company. There was other allegations that went to Disney forcing racial and identity quotas or preferences. And I said at the time that if that pans out, that's a big deal.

(10:46)
We need to sort of end any form of discrimination based on race or protected class. It's in the very first portion of the Communications Act. Obviously the Supreme Court, even just this week, reaffirmed it, that we can't be using race for preferences. And so we announced this investigation going all the way back to March. We said the Enforcement Bureau will be looking at it. I believe it was in June that we sent our first letter of inquiry to Disney on this topic. And they provided us ... LOIs is our version of discovery or subpoenas effectively. They provided us with hundreds of documents at the time. And I've been consistent and very public. I tend not to be shy speaking about these things publicly. And I've been saying for months that one thing that we're looking at in that investigation is an early renewal if that's where sort of the investigative steps tell us it needs to go. And I've said that publicly on multiple occasions going back weeks or months.

(11:49)
Flash forward, we didn't think we got all the documents that we needed from Disney for our investigation. So we then issued a supplemental letter of inquiry, I think in February of this year. They had some period of time, 30 days or some period of time to respond. They asked for an extension of time of 30 days. And that extension of time ran until last week. And so last week, Disney provided the FCC with a second round of production, another couple hundred pages of documents that our team was looking at and is looking at. And there's a view that Disney was not forthcoming with the agency in terms of its document production last week. And we don't need to hash out exactly why that is, but there is a concern that they weren't.

(12:37)
And so after saying publicly for weeks and months

that one next step in this investigation would be an early renewal, and we got the document production at the end of the last week that we thought Disney was hitting us up with the okey-doke. We decided to take that next step. It also wasn't the first, we've been looking across the board at lots of different entities. So on Monday, we issued an early renewal for a station group owner called Bridge News. The staff recommendation to do that came out in the middle of last week. We moved forward with the Disney one on Tuesday, and I think there should be another one here soon. On the radio side where we do a short renewal cycle as well. And so we've been very clear that we're holding broadcasters accountable to their obligations, not just public interest standards, but EEO obligations.

(13:31)
The FC has rules on the books. You can't discriminate based on race and gender. And there's evidence that had been submitted that that's what Disney was doing. And so that's the timeline of the agency's actions. I understand that anything that we do is now framed as in the wake of, in the headlines. And I understand that's how it is, but we got to make these decisions based on where we are in the investigations and what is best for next steps in that enforcement proceeding. And the headlines can be what the headlines are, but that was the basis for our decision.

Speaker 1 (13:59):

I mean, the NAB said that the decision was nearly unprecedented, the request to do this early. I mean, do you agree?

Brendan Carr (14:06):

There's a precedent from a day before, so it was fairly recent precedent.

Speaker 1 (14:09):

Right. But I mean ... Okay. I'm going to ask ... sorry, one final quick question. So in February 2025-

Brendan Carr (14:15):

Look broadcasters ...

Speaker 1 (14:16):

Yeah.

Brendan Carr (14:17):

NAB's going to say what NAB's going to say. I get it. I guess Disney's a member of NAB, but broadcasters are not all with NAB on this. We have the National Religious Broadcasters that filed a petition with the FCC calling on the FCC to take action on Disney. So I think broadcasters are not in a unanimous group here. And NAB knows very well that this was based on DEI conduct and not speech.

Speaker 1 (14:44):

So the Comcast investigation to DEI began a month before the Disney one. Is NBC at risk of having their licenses come up for early renewal?

Brendan Carr (14:54):

Well, it depends on where the investigations go. I mean, we're going to be driven by the facts of each individual investigation. I don't have an update right now on where we are in that Comcast one, but we've been very consistent across the board about what we view as invidious forms of DEI discrimination. As deals have come before the FCC, we have required people to look at their policies and make sure they don't have what we think is invidious forms of DEI.

(15:16)
Look, in ways, DEI is a tough concept because some people look at DEI and they view it as sort of just traditional non-discrimination, but there's other ways that you can do DEI policies that we view as the opposite of that, which is actually discrimination. So when you have debates over DEI, you can really be talking about two different things. When we talk about DEI, we talk about using protected characteristics, race and gender, to discriminate against people based on that. And so this idea that we care about in invidious forms

of DEI discrimination isn't new, isn't limited even to the broadcast segment. We've done it with ... Verizon's made commitments, Charter's made commitments, other broadcasters do it. We're doing it across the board.

Speaker 1 (15:59):

Thanks.

Diego Munoz (16:01):

Hi, Chairman.

Brendan Carr (16:02):

[inaudible 00:16:02] long question or did we let them go on too long? Okay.

Diego Munoz (16:05):

Diego Munoz from Punchbowl. I want to ask you about something that's not related to ABC, but I would remiss if I didn't ask you to respond to Senator Cruz's-

Brendan Carr (16:15):

You got to choose, one or the other. You got to choose.

Diego Munoz (16:16):

... comments about the ABC early renewal process in which he said the FCC should not operate as a speech police. But my non ABC question is, as I'm sure you know, the House Appropriations Committee included an amendment in the FSG bill, which funds the FCC to block the agency from reconfiguring, making any modifications to the 900 megahertz band. According to the appropriators, their intention is to block the next NAV petition. The FCC had notified OIRA that it was moving forward with a PNT rulemaking. I'm curious if the House Appropriations Committee's actions changes the calculus at all for the FCC moving forward on that rulemaking and whether you're going to wait for the Hill to resolve this issue before the FCC moves forward with anything on PNT.

Brendan Carr (17:14):

Well, on the first piece, look, I saw the Punchbowl headline and I understand some of the incentive structures to use headlines or to try to drive wedges on issues. But I got to say, I don't think there's the daylight there that Punchbowl was indicated. I agree with Senator Cruz, Chairman Cruz, that the FCC should not operate as a speech police. What we have to do is we have these rules and regulations, these policies on our books, and we have to apply them. In this particular case, this action is driven by an investigation into DEI conduct, not any speech at all. And so I don't read as much daylight there as I think the Punchbowl headline indicated.

(17:55)
On the latter, we're always open to feedback and input from Congress and anything that they pass we will do. We have started a PNT rulemaking and NOI. As you indicated, we're consulting through the now longstanding OMB OIR process. That process is still taking place. And until that process completes, there's no official position from us and there's no final agency action. So we're just going to continue to work through the process and remain open-minded about different paths forward.

Diego Munoz (18:27):

Just to clarify, since you said that I've maybe engaged in some type of yellow journalism or anything.

Brendan Carr (18:32):

I didn't go that far. I didn't go that far.

Diego Munoz (18:33):

I asked Senator Cruz to respond to the process. It was a very open question and that was his response. Yeah.

Brendan Carr (18:44):

Yeah. Like I said, I agree with Senator Cruz that the FCC shouldn't be in the business of being the speech police. What we have to do as an agency is to enforce our rules and regulations. And there are rules about non-discrimination that are

unrelated to speech that we have been pushing across the board, and that's the basis for the early renewal in the Disney case. The new Bridge case, the early renewal there, also not about speech. It was about allegations or concerns about unauthorized transfers of control. And there's this other one on the radio side that we're looking at that has to do more generally with public interest obligations. And so we're going to focus on those issues.

Dave Shepardson (19:26):

Dave Shepardson with Reuters, just to follow the precedent, I want to ask one about ABC, one about the China actions you're taking today.

Brendan Carr (19:31):

See, you can't do it. You just got to hold the hard line. But this is why I need my legal advisor, Danielle, here. She doesn't let people get away with this type of stuff.

Dave Shepardson (19:40):

I just want to drill down on the question-

Brendan Carr (19:42):

Side joke.

Dave Shepardson (19:42):

Did you get any pressure from the White House to take this action on Disney? Did you speak to President Trump? Did any of the White House direct you to do this? And I think one thing the critics have raised is that in November, when President Trump asked you and the commission to revoke Disney licenses after

Dave Shepardson (20:00):

... after an ABC reporter asked a question in the Oval Office of the Saudi Crown Prince, that the following day you announced you were opening a new review of the agreements between the local broadcast groups of the national broadcasters.

(20:14)
So was there any connection? Did you feel any

pressure? Was the timing at all as a result of White House pressure, what happened on Saturday night?

Brendan Carr (20:23):

No, this was a decision that we made inside this building based on where we were in the enforcement matter. There was no pressure from the outside. There was no suggestion from the outside. There was no call for agency action from the outside. This was based on our assessment of where we were.

(20:38)
With respect to President Trump, obviously he has every right, First Amendment right, to express his position on this. One of the great things about President Trump is he's very transparent. He has told publicly his position. He has every right to make the decisions that he's made, to make the public calls that he's made. Same with the First Lady. And there's a lot of people out there that agree with them.

Dave Shepardson (20:58):

And then will the Jimmy Kimmel, will that all or any speech issues, be part of this review? Or is it solely restricted to DEI, the early license reviews?

Brendan Carr (21:07):

Our DEI review is going to continue and is going to be part of that. We are calling their licenses in for early renewal. I think they have eight station licenses. Once they make that filing, then anybody can file petitions to deny. We can't control what claims they make in their petitions to deny. And we'll take a look at all of that and we'll work through it. Or if we don't have to work through it, we won't work through it. We'll make the next decisions based on their filing, based on any petitions to deny that come in.

(21:36)
But Disney as part of the filing is going to have to come in and demonstrate that they've been operating in the public interest. And the agency has a lot of case law out there that describes in

detail what those public interest obligations are, and they're going to have to demonstrate that they've met their burden.

Dave Shepardson (21:51):

Just quickly on China, you've taken a number of actions in the last three weeks toward Chinese telecom. You said the commission is considering barring companies on the covered list since 2024 from being able to export equipment to the U.S. You're considering banning Chinese telecoms from operating data centers, points of presence, not to mention the Chinese labs provision today.

(22:19)
Can you talk broadly about what's motivating all these actions toward China? Is it about Salt Typhoon? Is there any sort of common thread to all these different actions?

Brendan Carr (22:27):

Well, I would actually frame it slightly differently. I think our focus has been much more broad in terms of threats from foreign adversary nations, from bad actors abroad that aren't even nation state actors. And we specifically stood up a council on national security. And one of the good things is when you stand something up like that, it's going to be an active group. We've got a very hard charging, active group that is running point on our national security thing.

(22:54)
So again, we take actions, for instance, on drones. We prohibited all drones produced in foreign countries originally, whether it's Europe or anywhere. On router, same thing. It was about foreign-produced routers, again, almost regardless of where it is. And then we'll go through and create exceptions as necessary on a case-by-case basis. But I would view it more as national security as a general matter.

(23:17)
And there's always a component here too of when you take action to have bad actors out, that creates opportunity for domestic onshoring as well. So I would frame it more through that

broader perspective rather than narrowly a country-specific basis for our actions.

Monty Tayloe (23:35):

Is it okay if I go down here? I'm sorry.

Dave Shepardson (23:37):

Yeah.

Monty Tayloe (23:39):

Sorry.

(23:39)
Monty Tayloe, Comm Daily. You brought up the NRB complaint. That definitely was about what Kimmel said. Do you see-

Brendan Carr (23:45):

I didn't file it. NRB filed it.

Monty Tayloe (23:47):

You brought it up just now. And so I was wondering, do you see merit in that complaint? Is that something the FCC would pursue? The NRB's complaint that his speech was inciting violence?

(23:57)
And also, to pull a Shepardson, you said that the investigation's all about diversity. Doesn't the FCC have a bunch of-

Brendan Carr (24:09):

Discrimination.

Monty Tayloe (24:09):

Discrimination. Excuse me. Doesn't the FCC have a bunch of rules on the book requiring companies to take diversity measures, the EEO rules? Those are still in place. And where's the line between-

Brendan Carr (24:21):

Again, this goes back a little bit to what I was saying about how do you look at DEI, which perspective do you look at it through?

Monty Tayloe (24:26):

Yeah.

Brendan Carr (24:26):

But our EEO rules, in my view, do not promote or require or even allow invidious forms of discrimination. And with respect to your question about NRB, all I'm saying is they filed a petition. I honestly haven't read it all the way through, but we're going to treat it the way we treat any petition or document that we get.

Monty Tayloe (24:44):

Are the EEO rules going to be a target of the Delete proceeding?

Brendan Carr (24:48):

If we need to update them, then we'll take a look at updating. It's possible.

Monty Tayloe (24:51):

Okay. I'll be done now.

Brendan Carr (24:53):

Stay tuned.

Leah Nylen (24:56):

Hi. Leah Nylen from Bloomberg. I'd like to ask a question the D.C. Circuit asked you this week. When are you guys going to take action on the Media Bureau's order in Nexstar Tegna?

Brendan Carr (25:06):

Seems like the same question we got from the D.C. Circuit. So we will respond to the D.C. Circuit. They gave us until May 11th to provide a response on the status of the applications for review, and stay tuned to the May 11th FCC filing to see what we stay there. I was obviously pleased to see that the court generally denied the request for interlocutory appeal. Obviously, it's very rare and exceptional circumstances where that would happen, so I was pleased with the general disposition of it and we're happy to

provide the court with an update on May 11th in our filing.

(25:43)
Yeah.

Nancy Scola (25:43):

Thank you. Hi, Chairman. Nancy Scola. I'm writing for Washingtonian Magazine.

Brendan Carr (25:48):

I forgot about that.

Nancy Scola (25:48):

Do you think your thinking on the public interest obligation and the FCC's application of it has shifted over... Not shifted. Evolved over the years? Or has it remained constant throughout your career?

Brendan Carr (25:59):

Well, I guess you could say there's my view. There's FCC case law. There's what other FCC leaders have done over the years. And you can have debates about where there's daylight between those things. I think my position from the get-go has been very clear, which is I think the FCC has rules on the books that we're supposed to enforce. And I think that there have been agency leaders here over the last number of years that simply haven't done that. But I actually think that the agency itself has been clear about what the public interest standard is. If you go back, the entire model that the agency uses for the public interest in is what we refer to as a public trustee model.

(26:37)
And so broadcast, I think more people are actually getting this. Broadcast is fundamentally different than cable or streaming or newspaper or soapbox on the street. And the reason is this. You can have unlimited numbers of effectively streaming services, and today, almost unlimited cable and unlimited soapboxes and newspaper. There's no interference or conflict between them, so you don't need a government to pick a winner or a

loser or to license them. Broadcast by its very nature is different. You have to give somebody a monopoly on a particular set of frequencies because if you're not, as an old FCC say, it's like the Kilkenny cats. You can't hear each other because of the interference.

(27:17)
And so, because the government has to pick a winner, give someone a monopoly on that microphone and license them, the next question is, well, what happens to the community member that was denied the ability by the government to use it as a microphone? And one option is to say, tough luck. It's like cable. They can do whatever they want, say whatever they want. It's like a soapbox. It's like a newspaper. But that's not what Congress and the FCC decided. What they said was, no, we want a public trustee model. So yeah, you won. You got this for free. You can exclude others. You have a monopoly on this. But you need to nonetheless account for the entire community in terms of delivering your public interest obligation. You're supposed to assess the needs of the community, that's what localism is in our rule, and deliver it.

(28:05)
Again, there was a fork in the road where it could have said, you won, be like a cable channel, be like a newspaper, do whatever you want. But they said, no, because you got it for free, you got a monopoly, you got a license, you're standing not just in your shoes, but you're standing out for the interest of the whole community. And we've been very clear about that over the years. And the Supreme Court, it's gone all the way to the Supreme Court, and they've said that holding broadcasters to their public interest obligations isn't censorship. It isn't a violation of their First Amendment because of that analysis, that mode of First Amendment analysis, that applies uniquely in that monopoly.

(28:38)
So we can't step back the way you step back in cable or streaming or newspaper because of that physical reality of interference. I think it's less about people focus on scarcity. I think it's less

about scarcity. It's more about you have to exclude someone, the government does, otherwise there'd be interference.

Nancy Scola (28:57):

So just as a quick follow-up-

Brendan Carr (28:58):

We've said that pretty clearly. But if we need to compile some of those case laws together and put it together in a single document, I don't know, call it a public interest, public notice, then maybe we'll do that.

Nancy Scola (29:07):

So just for clarity, there's some measure of chairman's discretion, Commission discretion, involved there. As a [inaudible 00:29:13] telecom lawyer, you would look at your chairmanship and say, okay, that's the proper amount of applying the public interest obligations?

Brendan Carr (29:18):

Well, I'd say we're looking at the case law. Whether it's '50, '60, '70s case law or otherwise, this is what the FCC has said and we're reminding you that this is what the FCC has said. And I don't think it's making it up or not making it up. It's did someone else look the other way? Maybe. I don't know. But I'm not looking somewhere new. I'm looking to the actual decisions of the FCC and saying, we've said this. You know we've said it. We were serious. We're not just going to look the other way.

(29:42)
Because again, I think part of the dynamic that's happened here at the agency is you see the rise of the internet, you see the rise of social media, you see the rise of cable and you say, okay, let's eliminate all these regulations of broadcast and treat them just like cable. But it's not. It's technically not that way. The law doesn't allow us. And if Congress wants to come together

Brendan Carr (30:00):

... and the President and change it and say, we want broadcast to be like ... Again, I think there's a technical problem because of the nature of interference on spectrum that isn't present in those other places. But if Congress wants to deregulate it because of all of these, they can. But as of right now, it's just different technically and legally.

Speaker 2 (30:16):

Okay. Thank you.

Speaker 3 (30:20):

Thank you.

Brendan Carr (30:20):

Never thought I'd give such a long explanation of broadcast's public interests, but ...

Speaker 3 (30:24):

That was educational. Thank you.

Brendan Carr (30:27):

If you need to take a nap today, just rewind 10 minutes.

Speaker 3 (30:30):

This is enlivening. Thank you.

Brendan Carr (30:32):

No need for melatonin.

Speaker 3 (30:35):

One thing, Chairman, you said was that the President is entitled to his opinion on the networks. Do you agree with his point of view? Are you concerned about what you're seeing in terms of content, and those comments?

Brendan Carr (30:48):

But it's not just the President, you've got many, many members of Congress-

Speaker 3 (30:50):

I guess I'm asking specifically about the President though, if you can focus on that.

Brendan Carr (30:53):

... who have expressed this view that ... First lady has expressed her view. The President has expressed his view. I think over time here, you've heard me speak to these issues a lot. There's a lot of people that agree with the President on this one.

Speaker 3 (31:07):

Including yourself?

Brendan Carr (31:08):

There's a lot of people.

Speaker 3 (31:09):

There's a lot of people, including yourself. So it sounds to me, please correct me if I'm wrong, I'm summarizing that the timing was coincidental, it sounds like what you're saying. In terms of the announcement of their early review, or would you disagree with that?

Brendan Carr (31:23):

Well, again, we walked through the timeline very clearly, the idea of the investigation, where it was going, very publicly saying that this is probably going to be a next step depending on how the production goes. The production came in last week. We took a look at it. It felt to us like they were playing rope-dope and weren't being entirely forthcoming with the production. They're going to disagree with that, I'm sure, and they get the right to and they can say that.

Speaker 3 (31:47):

And I'm sorry, on that point, is it that they didn't produce the documents fully or on time or what specifically was the problem?

Brendan Carr (31:53):

There was an original production deadline. They said, "Hey, this is like a big request. We got to get

a lot of documents together. Can you give us another 30 days?" And so we said, "Sure." And that 30 days ran last week. If they produced the documents on the original deadline, I don't think we'd be in the same temporal moment as we are right now. And they actually produced fewer documents the second round, even though it was a bigger request than they did in the first round. And they, in our view, artificially narrowed the search that they did that's not consistent with the LOI that we sent them. Again, maybe it's an issue where lawyers disagree and we'll see what they say on that. But our initial assessment was we don't think that they were entirely forthcoming in that production. And so I said, "Look, we can't... " I can't use a bad word. "We can't mess around on this. It's an important issue. It's discrimination. Let's move to the next phase." And so maybe they'll take it more seriously at this point.

Speaker 3 (32:46):

And just my final thought or question is, you're really good at the process and being a telecom lawyer for so long, you know it really well. Can you step back for a second and talk about ... Which is great. I appreciate that. My question is more about perhaps the precedent you might be setting. And when I talk to telecommunications lawyer, they say that they haven't heard of an early review sort of action like this in decades.

Brendan Carr (33:16):

Not [inaudible 00:33:17], but yes.

Speaker 3 (33:17):

Or yesterday, which was also great timing.

Brendan Carr (33:20):

Yeah.

Speaker 3 (33:21):

How do you feel about that and what this reflects on you and your chairmanship in terms of doing something that's pretty aggressive?

Brendan Carr (33:31):

Well, look, I think to some level, the characterization of this being a commission that is doing new, different, aggressive things is a mindset that you see across every single vertical in this building. I understand the media focuses on the media portion, but look what we're doing with the space bureau. We're fundamentally transforming that place to operate much more in assembly line fashion to go quicker. We're taking an old rule that people felt bound by and saying, "No, no, no, no. We're not going to feel bound by that. Let's increase capacity 7X." "Well, Europe might not like it." Okay, we don't care on this particular one, apparently. Robocalls, we've done it this way. No, no, no. Let's rethink this and attack it at every portion of the lifestyle. Copper retirement, you had Chairman Pie who had a fairly aggressive deregulatory agenda, but they only went so far and we're like, "Let's go further than that."

(34:24)
And so I think it's the energy that we bring across every single docket. And yeah, you guys see it in the media space, but that's the agenda that we're running. It's pretty hard charging. It's pretty aggressive. I've been here since 2012, back when I actually had hair. I have an idea of what we want to get done. And in government, time is the most important thing. And so we're moving aggressively and quickly across the board.

Speaker 3 (34:46):

And success would look like what in terms of your media orders? What would that look like?

Brendan Carr (34:51):

Success what?

Speaker 3 (34:52):

What would success look like for you after all of this is done, just reviews, et cetera?

Brendan Carr (34:56):

Well, look, one, if you're asking about how people are going to describe the chairmanship and everything, I have no idea. I mean, The New York

Times has already written my obituary. It doesn't look good. I can't really do anything to improve that or hurt it at this point. So I'm not really that bothered by it. We just keep charging ahead.

(35:11)
When you've been in these jobs, you live through a lot of news cycle and you start to realize the irrelevancy of it to what really matters. We went through the great net neutrality repeal of 2017, CNN banner level headline, end of the internet as we know it. But going through that, you knew, all right, I got my North Star as a regulatory matter. I know we're right on this one. I know we're going to get killed short term. But flash forward to today, internet speeds are up, more competition. Europe, which had their version of net neutrality is just getting left behind in terms of investment and speeds. And so you live through that experience and you say, "Okay, I got my regulatory North Star. We've got the record, we've got the law, you motivate the people and you go forward and you have to just ignore the headlines."

(35:52)
You can't let The New York Times dictate how you're going to do your job. I got more New York Times stories as well, but I'll stop there.

Speaker 3 (35:59):

I don't want to dictate your job. Thank you.

Brendan Carr (36:00):

I got fired up with New York Times over the weekend. You want to hear about that?

Speaker 3 (36:05):

You go.

Brendan Carr (36:07):

No, it's okay. I tweeted it. I tweeted. It's fine.

(36:11)
All right. That was a lot of fun for me at least. Thanks, guys.

Speaker 4 (36:19):

Thank you, Chairman. I'm now going to hand it over to my colleague, Will Wyquist, who will run the Bureau Press conference. Thank you so much.