# Exhibit 13

**FEDERAL COMMUNICATIONS COMMISSION**
Enforcement Bureau
45 L Street, NE
Washington, DC 20554

January 16, 2025

**<u>VIA E-MAIL</u>**

Daniel R. Suhr
Center for American Rights
747 N. LaSalle St., Suite 210
Chicago, IL 60654
dsuhr@americanrights.org

**Re: *Preserving the First Amendment*, GN Docket No. 25-11**

Dear Mr. Suhr:

The Enforcement Bureau of the Federal Communications Commission (FCC or Commission) received a complaint dated October 16, 2024 (Complaint) filed by the Center for American Rights (Complainant) requesting an investigation into WCBS, a licensed television broadcast station in New York, for "news distortion" in the airing of a "60 Minutes" interview with the Vice President. For the reasons stated below, the request is denied, and the Enforcement Bureau will close its file on this matter.

***

The freedom of speech and the press is enshrined in the First Amendment of the United States Constitution, and is necessary to promote the vigorous dialogue necessary in a representative democracy.[1] When the government seeks to curtail the freedom of expression on "matters of valid public interest," doing so implicates the very heart of speech that the First Amendment is meant to protect.[2] Accordingly, for nearly a century since the Commission's inception in 1934, the Communications Act has expressly prohibited the Commission from engaging in the "power of censorship," or issuing regulations or conditions that "interfere with the right of free speech."[3]

---

[1] *See* U.S. Const. Amend. I; *see also* Pub. L. 111–223, § 2, Aug. 10, 2010, 124 Stat. 2380.

[2] *Id.*; *see also Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 258 (1974) ("[t]he choice of material to go into a newspaper . . . and treatment of public issues and public officials—whether fair or unfair—constitute the exercise of editorial control and judgment."); *Moody v. NetChoice*, 603 U.S. 707, 731 (2024) (citation omitted); *see generally Ark. Educ. Television Found. v. Forbes*¸ 523 U.S. 666, 673 (1998) ("As a general rule, the nature of editorial discretion counsels against subjecting broadcasters to claims of viewpoint discrimination. Programming decisions would be particularly vulnerable to claims of this type because even principled exclusions rooted in sound journalistic judgment can often be characterized as viewpoint based."); *Denver Area Educ. Telecomms. Consortium, Inc. v. FCC*, 518 U.S. 727, 737-38 (1996) ("[T]he editorial function itself is an aspect of 'speech,' and a court's decision that a private party, say, the station owner, is a 'censor,' could itself interfere with that private 'censor's' freedom to speak as an editor." (citation omitted)).

[3] *See* 47 U.S.C. § 326.

To this end, "the Commission does not—and cannot and will not–-act as a self-appointed, free-roving arbiter of truth in journalism."[4] Moreover, as has been noted, "[a] newsroom's decision about what stories to cover and how to frame them should be beyond the reach of any government official, not targeted by them."[5]

The Complaint runs contrary to these longstanding principles. It alleges, in conclusory fashion, that WCBS "engaged in news distortion by editing its news program to such a great extent that the general public cannot know what answer the Vice President actually gave to a question of great importance on a matter of national security policy."[6] The allegations are insufficient to rise to the level of an actionable enforcement matter.

***

Opening a news distortion enforcement action under Commission precedent – as rare as it is – turns on the important question of whether any information or extrinsic evidence was submitted to the Commission indicating an "intentional" or "deliberate" falsification of the news.[7] The Complaint submitted fails to do so. The Commission simply cannot wield its regulatory authority in a manner completely inconsistent with long-settled precedent that the Commission not "second guess" broadcast decisions.[8] It has instead plainly recognized that "[b]roadcasters—not the FCC or any other government

---

[4] *Free Press Emergency Petition for Inquiry Into Broadcast of False Information on COVID-19*, Letter, 35 FCC Rcd. 3032, 3033 (MB & OGC 2020) (*Free Press*).

[5] *FCC Commissioner Carr Responds to Democrats' Efforts to Censor Newsrooms*, Office of Commissioner Brendan Carr (Feb. 22, 2021), https://docs.fcc.gov/public/attachments/DOC-370165A1.pdf.

[6] Complaint at 6.

[7] *See In re Complaints Covering CBS Program "Hunger in America"*, Memorandum Opinion, 20 F.C.C.2d 143 (1969) (*Hunger in America*) ("The Commission is not the arbiter of truth"); *In re Complaint by Mrs. J. R. Paul, Houston, Tex. Concerning Fairness Doctrine Re Network's Coverage of President's Vietnam Address,* Letter, 26 F.C.C.2d 591, 591 (1969) ("[The Commission] cannot properly investigate to determine whether an account or analysis of a news commentator is "biased" or "true")*; In re Complaint against American Broadcasting Companies, Inc. by Central Intelligence Agency,* Decision, 57 R.R. 2d 1543 (MB 1985)*(Central Intelligence Agency); In Re: Melvin Pulley v. Station Wbfn, Quitman, Mississippi Concerning Pol. Broad.*, Letter, 58 F.C.C.2d 1224, 1224 (BB 1976) (*Melvin Pulley*) (in complaint involving political-related broadcast, declining to take action on news distortion allegations because "in order for the Commission appropriately to commence action in this sensitive area, it must receive significant extrinsic evidence of such deliberate news suppression, as, for example, statements by individuals who have personal knowledge that a licensee ordered such news suppression to take place"); *In the Matter of Complaint & Request for Section 403 Investigation*, Order, 16 FCC Rcd 7647, 7647 (EB 2001) (*Section 403*) (declining news distortion investigation into ABC, CBS, NBC, and FOX with respect to 2000 Presidential election and projection of electoral votes); *In Re Complaint by Wichita Cnty. Hum. Rels. Comm., Wichita Falls, Tex. Concerning Fairness Doctrine Re Stations Kauz-TV & Kfdx-TV*, Letter, 50 F.C.C.2d 322, 324 (BB 1974) (*Wichita Falls*); *In Re Complaint by Rodney D. Driver, Exeter, R.I. Concerning Fairness Doctrine Re Networks*, Letter, 48 F.C.C.2d 338, 340 (BB 1974) (taking no further action on news suppression complaint); *see also In the Matter of TVT License, Inc.,* Memorandum Opinion and Order, 22 F.C.C. Rcd. 13591*,* 13595, para. 17 (MB 2007) (*TVT*); *In re Petition to Deny Applications by Dr. Paul Klite*, Decision, 12 CR 79 (MB 1998) ("[F]or reasons rooted in the First Amendment and the no censorship provision of Section 326 of the Communications Act, editorial judgments regarding news programs are committed to a broadcaster's good faith discretion.").

[8] *See, e.g.*, *Free Press*, 35 FCC Rcd 3032, p.5, ("In short, we will not second-guess broadcasters [much less deploy the formal investigative power of the state against them] that are serving a critical function in providing the public comprehensive coverage of the current public health crisis and the government's response. We leave to the press its time-honored and constitutionally protected role in testing the claims made by our political leaders—as well as those made by national advocacy organizations."); *Melvin Pulley*, 58 F.C.C.2d 1224, 1227 ("Thus, in order for the

agency—are responsible for selecting the material they air" and that "our role in overseeing program content is very limited."[9]

Indeed, the Commission has established a high threshold to commencing any investigation into allegations of news distortion.[10] It is not sufficient for the Complainant to show that the material in question is false or even that the Licensee might have known or should have known about the falsity of the material.[11] A news distortion complaint must include extrinsic evidence that the Licensee took actions to engage in a deliberate and intentional falsification of the news.[12]

The allegations in the Complaint fall short of this demanding standard. The Complaint makes conclusory statements regarding the backdrop and import of outtakes that it alleges amount to "significant and substantial news alteration, made in the middle of a heated presidential campaign."[13] But such conclusory statements standing alone do not serve as a sufficient foundation for an allegation of "intentional" or "deliberate" falsification versus editorial judgment, which appropriately belongs to the broadcaster (and are typically dismissed).[14] The Commission is indeed "not the national arbiter of the 'truth' of news programming. Nor is the Commission prepared to judge the wisdom, accuracy, or adequacy with which particular news coverage may have been handled on the air."[15] Accordingly, while

---

Commission appropriately to commence action in this sensitive area, it must receive significant extrinsic evidence of such deliberate news suppression, as, for example, statements by individuals who have personal knowledge that a licensee ordered such news suppression to take place"); *In re Lynn J. Farris, Farris Broadcasting, Inc*, Letter, 22 FCC Rcd 11193, 11195 (MB 2007) (*Farris Broadcasting*) ("If the evidence does nothing more than indicate that there is a dispute about the truth of a reported event or statement, whether a particular event or statement should or should not have been reported, or the manner in which a news item was reported, the Commission will not intervene."); *In Re Complaint of Maurice Rogers Against Station Wbrc-TV, Birmingham, Alabama*, Order, 2 FCC Rcd 5680 (MB 1987) (In the absence of extrinsic evidence, the Commission has stressed that it cannot properly intervene).

[9] FCC, THE PUBLIC AND BROADCASTING, p.6 (Sep. 2021), https://www.fcc.gov/media/radio/public-and-broadcasting.

[10] *See supra* note 7; *cf. also In Re Application of Am. Broad. Companies, Inc. for Renewal of License of Station Kgo-TV San Francisco, California*, Memorandum Opinion and Order, 86 F.C.C.2d 3, 10, para. 16 (1981); *In the Matter of Liab. of NPR Phoenix, L.L.C. Licensee, Kpty(Fm) Gilbert, Az*, Memorandum Opinion and Order, 13 FCC Rcd 14070, para. 11 (MB 1998) (explaining difference between news distortion and indecency cases "because news and comment programming are at the core of speech which the First Amendment is intended to protect, we have long believed that a particularly high threshold should govern Commission intervention in this area.").

[11] *TVT*, 22 FCC Rcd at 13595, para. 17 (quoting *Galloway v. FCC,* 778 F.2d 16, 20 (D.C. Cir. 1985) (*Galloway*)).

[12] *Hunger in America*, 20 F.C.C.2d at 150, para. 20; *cf. also, Galloway*, 778 F.2d at 20; *In re Application for Renewal of License WXYZ-TV, Detroit, Michigan File No. BRCT-20050601AIB Facility ID No. 10267*, 22 FCC Rcd 12744 (1986) (in news distortion complaint allegation involving investigative story re: a Deputy Mayor, evidence evaluated, which was even arguably extrinsic, was still insufficient to raise a substantial and material question concerning deliberate distortion).

[13] Complaint at 1-2.

[14] *See supra* note 7.

[15] *Central Intelligence Agency,* 57 R.R. 2d 1543.

other remedies[16] might be available here to the complainant, the Commission cannot – and will not – manufacture a rationale here to depart from its longstanding precedent and applicable law.

***

The request in the Complaint is therefore hereby DENIED, and the Enforcement Bureau will be closing its file in this matter.

Sincerely,

Peter S. Hyun
Acting Bureau Chief
Enforcement Bureau

[16] *See Farris Broadcasting, Inc*, 22 FCC Rcd at 11195 ("To the extent that [the complainant] raises issues of defamation or invasion of privacy, such matters are not regulated by the Commission even when a broadcast station is involved.")