# Exhibit 21

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, DC**

*Early Renewal Applications of the*
*Walt Disney Company's ABC Licenses*

MB Docket No. 26-131

*Petition to Deny: KGO (298344), WLS (298337), WTVD (298327),*
*WPVI (298324), KTRK (298353)*
*Informal Objection: KFSN (298350); KABC (298356); WABC (298318)*

**PETITION TO DENY OF THE**
**CENTER FOR AMERICAN RIGHTS**

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** .......... **II**

**INTRODUCTION** .......... **1**

**STANDING** .......... **3**

**STANDARD OF REVIEW** .......... **3**

**SCOPE** .......... **5**

**ARGUMENT** .......... **5**

I. ABC'S BIAS ON BROADCAST TELEVISION IS A PATTERN OF DEEP DISREGARD FOR THE PUBLIC INTEREST. .......... 6

*1. Pending complaints detail ABC's operation in a partisan interest* .......... *9*

*2. Research and common sense show ABC's partisan interest.* .......... *13*

II. ABC'S OWNED TELEVISION STATIONS ARE ON AN IDEOLOGICAL MISSION TO ADVANCE A RACE & CULTURE AGENDA CONTRARY TO THE PUBLIC INTEREST. .......... 32

III. THE WALT DISNEY COMPANY'S DISCRIMINATORY EMPLOYMENT PRACTICES ARE INCOMPATIBLE WITH THE CHARACTER OF AN FCC LICENSEE. .......... 35

IV. ABC'S LACK OF HONESTY WITH THE COMMISSION IS ANOTHER REASON TO HAVE CONCERN ABOUT ITS CHARACTER AS A LICENSEE. .......... 43

V. ABC'S LACK OF RESPECT FOR ITS AFFILIATES AND ITS POTENTIAL VIOLATIONS OF THE FCC'S RIGHT TO PREEMPT RULE ARE SOURCES OF SERIOUS CONCERN. .......... 44

VI. DISNEY'S COZY RELATIONSHIP WITH THE CHINESE COMMUNIST PARTY RAISES THE SPECTER OF UNDUE FOREIGN INFLUENCE AND REFLECTS POORLY ON DISNEY'S CHARACTER AS A LICENSEE. .......... 45

VII. DISNEY'S PROCEDURAL OBJECTIONS ARE BASELESS. .......... 50

**CONCLUSION** .......... **61**

## TABLE OF AUTHORITIES

CASES

*Alexander v. Sandoval*, 532 U.S. 275 (2001) .......... 36

*Am. Sec. Council Educ. Found. v. FCC*, 1978 U.S. App. LEXIS 9065 (D.C. Cir. Sept. 13, 1978) .......... 1, 12

*Beaumont Branch of NAACP v. FCC*, 854 F.2d 501 (D.C. Cir. 1989) .......... 59

*Bennett v. Spear*, 520 U.S. 154 (1997) .......... 52

*CBS, Inc. v. FCC*,453 U.S. 367 (1981) .......... 2

*Central Florida Enterprises, Inc. v. FCC*, 683 F.2d 503 (D.C. Cir. 1982) .......... 4

*Columbia Broadcasting System, Inc. v. Democratic Nat'l Committee*, 412 U.S. 94 (1973) .......... 1

*FCC v. League of Women Voters*, 468 U.S. 364 (1984) .......... 1

*FCC v. National Citizens Comm. for Broadcasting*,436 U.S. 775 (1978) .......... 2

*Fulani v. FCC*, 49 F.3d 904 (2d Cir. 1995) .......... 23

*Ga. Latino Alliance for Human Rights v. Governor of Ga.*, 691 F.3d 1250 (11th Cir. 2012) .......... 51

*In re Aiken County*, 645 F.3d 428 (D.C. Cir. 2011) .......... 52

*Kay v. FCC*, 443 F.2d 638 (D.C. Cir. 1970) .......... 7

*Kennedy for President Committee v. FCC*, 636 F.2d 417 (D.C. Cir. 1980) .......... 1

*King Broadcasting Co. v. FCC*, 860 F.2d 465 (1988) .......... 6

*LULAC v. Exec. Off. of the President,* 780 F. Supp. 3d 135 (D.D.C. 2025) .......... 57

*MCA, Inc. v. Garden State Broadcasting Ltd. Partnership*, 1988 U.S. Dist. LEXIS 11007 (D.N.J. Sept. 29, 1989) .......... 48

*NOW, New York City Chapter v. FCC*, 555 F.2d 1002 (D.C. Cir. 1977) .......... 40

*Office of Communication of the United Church of Christ v. FCC*, 359 F.2d 994 (D.C. Cir. 1966) .......... 4

*Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367 (1969) .......... 1

*Rhodes v. Snyder*, 302 F. Supp. 3d 905 (E.D.Mich. 2011) .......... 57

*Trinity Methodist Church v. Federal Radio Com.*, 62 F.2d 850 (D.C. Cir. 1932) .......... 11

*Trump v. Thompson*, 20 F.4th 10 (D.C. Cir. 2021) .......... 57

*United States v. McIntosh*, 833 F.3d 1163 (9th Cir. 2016) ........................................ 51

STATUTES

47 U.S.C. 312(a)(7) .................................................................................... 4

OTHER AUTHORITIES

*Race-based Educational Programs*, 49 Op. O.L.C. __ (Dec. 2, 2025) ......................... 36

Sen. Engle, 105 CONG. REC. 14451 (1959) ............................................................. 6

REGULATIONS

47 CFR § 73.2080 .................................................................................... 55

47 CFR § 73.3539(c) ................................................................................ 48

47 CFR § 73.658 ...................................................................................... 42

FCC DECISIONS & STATEMENTS

*Applications for Assignment of Licenses from Sagamorehill of Columbus, Ga, Llc, Sagamorehill of Lubbock, Llc, & Subsidiaries of Block Communs., to Gray Tv Licensee, Llc*, 2026 FCC LEXIS 1041 (MB May 6, 2026) ....................................... 55

*Chairman Carr Ends FCC's Promotion of DEI*, 2025 FCC LEXIS 202 (Jan. 21, 2025) ........................................................................................................ 56

*Comm'r Brendan Carr Testimony before the U.S. House Subcommittee on National Security* (July 13, 2022), 2022 FCC LEXIS 2293 .................................................... 43

*Empowering Local Broadcasters*, 2025 FCC LEXIS 2528 (Nov. 19, 2025) ............... 42

*FCC Lays Groundwork*, 2025 FCC LEXIS 1731 (May 22, 2025) .............................. 47

*FCC Reminds Broadcasters of their Public Interest Obligations,* DA 26-530 (May 28, 2026) ........................................................................................................ 59

*FCC's Media Bureau Seeks Comment on Petition by Disney's ABC*, 2026 FCC LEXIS 1183 (MB May 22, 2026) .................................................................. 6, 11, 58

*Guidance on Political Equal Opportunities Requirement*, 2026 FCC LEXIS 142 (MB Jan. 21, 2026) ........................................................................................... 6

*In re ACC Licensee, Inc.*, 22 FCC Rcd 18535 (MB 2007) ............................................. 3

*In re Amendment of Part 73 of the Rules*, 12 F.C.C.2d 250 (1968) ............................. 6

*In re American Independent Party*, 62 F.C.C.2d 4 (1976) ........................................... 8

*In re Anti-Defamation League of B'Nai B'Rith Against Station Ktym*, 4 F.C.C.2d 190 (1966) ........ 11

*In re Application of Fox Television Stations*, 11 FCC Rcd 5714 (1995) ........ 47

*In Re Application of KTVO, Inc.*, 63 F.C.C.2d 770 (Rev. Bd. 1977) ........ 56

*In re Application of Tulsa 23*, 4 FCC Rcd 2067 (1989) ........ 49

*In Re Application of Ubiquitous Corp.*, 51 F.C.C.2d 780 (1975) ........ 10

*In re applications of Alpine Broadcasting*, 88 F.C.C.2d 1213 (ALJ 1981) ........ 54

*In Re Applications of Deep South Radio, et al.*, 47 F.C.C.2d 1045 (Rev. Bd. 1974) .. 52

*In re Applications of Heritage-Wisconsin Broadcasting Corp., et al.*, 8 FCC Rcd 5607 (1993) ........ 49

*In re applications of Morris, et al.*, 88 F.C.C.2d 713 (Rev. Bd. 1981) ........ 54

*In re Applications of Voce Intersectario Verdad America, Inc.*, 100 F.C.C.2d 1607 (Rev. Bd. 1985) ........ 8, 10

*In re Chapman*, 24 F.C.C.2d 282 (1970) ........ 54

*In re Chapman*, 34 F.C.C.2d 159 (Rev. Bd. 1972) ........ 54

*In re Chapman*, 38 F.C.C.2d 871 (Rev. Bd. 1973) ........ 4

*In re Chi. Fed'n*, 38 F.C.C.2d 417 (1972) ........ 5

*In re complaint against WSIR*, 89 F.C.C.2d 382 (1982) ........ 10

*In re Consent to the Transfer of Control of Tegna*, 2026 FCC LEXIS 620 (MB March 19, 2026) ........ 55

*In re Cox Enters.*, 2026 FCC LEXIS 461 (CB/OIA/WTB Feb. 27, 2026) ........ 55

*In re Domestic Section 214 Application Granted*, 40 FCC Rcd 4440 (WCB 2025) .... 55

*In re Fabrice Polynice & Harold Sido & Veronise Sido*, 33 FCC Rcd 6852 (2018) ... 51

*In re FCC Approves Skydance / Paramount (CBS) Transaction*, 40 FCC Rcd 5689 (2025) ........ 5, 47, 55, 62

*In re Frontier Commc'ns Parent, Inc.*, 2025 FCC LEXIS 2244 (WCB/OIA/WTB March 16, 2025) ........ 55

*In re Greater Wash. Educ. Telecomms. Ass'n*, 26 FCC Rcd 16509 (MB 2011)....... 6, 20

*In re KGMB-TV*, 67 F.C.C.2d 72 (1977) ........ 10

*In Re Lamar Life Broadcasting Co.,* 53 F.C.C.2d 928 (1975) ........ 40

*In re Lamar*, 58 F.C.C.2d 274 (Rev. Bd. 1976) ........ 54

*In re Leflore Broad. Co.*, 36 F.C.C.2d 101 (1972) ........ 49, 51, 52

*In re MB Seeks Comment on Market Dynamics of National Programmers/Affiliates*, 40 FCC Rcd 9062 (2025) ........ 48

*In re NBC*, 16 F.C.C.2d 698 (1969) ........ 7

*In re NBC*, 21 F.C.C.2d 195 (¶¶ 7-9) & 213 (¶ 35) (Rev. Bd. 1970) ........ 7

*In re PBS*, 7 FCC Rcd 4681 (1992) ........ 8

*In re Protecting Against Nat'l Sec. Threats to the Communs. Supply Chain Through FCC Programs, Huawei Designation, ZTE Designation*, 34 FCC Rcd 11423 (2019) ........ 43

*In re Request of ABC, Inc.*, 15 FCC Rcd 1355 (MMB 1999) ........ 60

*In Re Request of Belo Corp.*, 11 FCC Rcd 12306 (MMB 1996) ........ 60

*In re Request of King Broadcasting Co.*, 6 FCC Rcd 4998 (1991) ........ 60

*In Re Request of Millicom Inc.*, 4 FCC Rcd 4846 (CCB 1989) ........ 47

*In re Requests of Fox Broadcasting Co.*, 11 FCC Rcd 11101 (1996) ........ 6, 60

*In re Revisions to Pub. Inspection File Requirements*, 31 FCC Rcd 5796 (2016) ........ 7

*In re Service Electric Co.*, 77 F.C.C.2d 986 (1980) ........ 2

*In re Star Stations of Ind., Inc.*, 51 F.C.C.2d 95 (1975) ........ 59

*In re Walton Broad., Inc.*, 78 F.C.C.2d 857 (1980) ........ 48, 51, 55

*In re WBPZ-AM-FM*, 90 F.C.C.2d 524 (1982) ........ 10

*In re WCMP*, 41 F.C.C.2d 201 (1973) ........ 9

*In re William F. Crowell*, 31 FCC Rcd 8700 (EB 2016) ........ 51

*In re WIOO Inc.*, 40 F.C.C.2d 217 (Rev. Bd. 1973) ........ 40

*In re WRTA*, 69 F.C.C.2d 18 (1978) ........ 10

*In re WTB & OIA Issues Order Granting T-Mobile-UScellular Applications*, 40 FCC Rcd 4776 (WTB/OIA 2025) ........ 55

*In re WTB Grants AT&T-UScellular Applications Order*, 40 FCC Rcd 9290 (WTB 2025) ........ 55

*In re Zawila*, 34 FCC Rcd 13036 (2019) ........ 41

*In the Matter of Annual 1987 Access Tariff Filings*, 3 FCC Rcd 749 (1988) ........ 50

*In the matter of Arlington Telecom. Corp.*, 69 F.C.C.2d 1923 (1978) ........ 56

*In the Matter of MOU between the FCC and the EEOC*, 70 F.C.C.2d 2320 (1978) ... 53

*In the Matter of Paxson Communications License Company, LLC*, 22 FCC Rcd 4248 (MB 2007) .......... 4

*In the Matter of Petition for Rulemaking to Require Broad. Licensees to Show Nondiscrimination in Their Empl. Practices*, 13 F.C.C.2d 766 (1968) .......... 34

*In the Matter of Policies and Rules Concerning Children's Television Programming*, 6 FCC Rcd 5093 (1991) .......... 7

*In the Matter of Policy Regarding Character Qualifications in Broadcast Licensing*, 1 FCC Rcd 421 (¶ 16) (1986) .......... 42, 52

*In the Matter of Review of the Commission's Broadcast and Cable Equal Employment Opportunity Rules,* 13 FCC Rcd 23004 (1998) .......... 33

*In the Matter of Review of the Commission's Broadcast and Cable Equal Employment Opportunity Rules*, 15 FCC Rcd 2329 (2000) .......... 54

*In the matter of the handling of public issues under the Fairness Doctrine*, 48 F.C.C.2d 1 (1974) .......... 8

*In the Matter of: Carriage of Digital Television Broadcast Signals*, 20 FCC Rcd 4516 (2005) .......... 11

*Letter to Capt. James Hamilton*, 44 F.C.C. 999 (1957) .......... 10

*Letter to George Lato*, 6 FCC Rcd 5840 (MMB 1991) .......... 8

*Mass Media Action*, 1991 FCC LEXIS 4128 (Aug. 1, 1991) .......... 60

*Media Bureau Provides Guidance*, 2026 FCC LEXIS 142 .......... 30

*Notice of Proposed Rulemaking to Require Broadcast Licensees to Show Nondiscrimination in Their Employment Practices*, 13 F.C.C.2d 766 (1968) .......... 40

*Powel Crosley*, 11 F.C.C. 3 (1945) .......... 5

*Remarks of Chairman William E. Kennard*, 1998 FCC LEXIS 6209 (Dec. 2, 1998) 33

*Remarks of FCC Chairman Ajit Pai*, 2021 FCC LEXIS 84 (Jan. 5, 2021) .......... 44

*Report on Editorializing by Broadcast Licensees*, 13 F.C.C. 1246 (1949) .......... 5, 8

*Statement of Comm'r Nathan Simington*, 2024 FCC LEXIS 1916 .......... 11

## INTRODUCTION

When taking up this renewal Petition, the Commission should keep this at the forefront of its mind: "It is the right of the viewers and listeners, not the right of the broadcasters, which is paramount." *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 390 (1969). *Accord Kennedy for President Committee v. FCC*, 636 F.2d 417, 431 (D.C. Cir. 1980) ("in the area of broadcasting the interest of the public is the chief concern.").

It is likely lots of ink will be spilled in this proceeding focused on the First Amendment rights of Disney. ABC and its allies will "attempt[] to drape the mantle of First Amendment protection solely around those in the broadcast industry. This approach ignores the rest of the citizens of this country." *Am. Sec. Council Educ. Found. v. FCC*, 1978 U.S. App. LEXIS 9065, *10 (D.C. Cir. Sept. 13, 1978), *rev'd on other grounds en banc*, 607 F.2d 438, 452 (D.C. Cir. 1979). ABC's rights are important, but they are not preeminent. It is the right of viewers of ABC stations which must feature first and foremost in this Commission's considerations.

What are the rights of viewers? "It is the right of the public to receive ideas which is crucial." *FCC v. League of Women Voters*, 468 U.S. 364, 415 n.8 (1984) (cleaned up) (quoting *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 388-390 (1969)). One right of viewers is the "right to be informed," which can manifest as "a balanced presentation of information on issues of public importance." *Columbia Broadcasting System, Inc. v. Democratic Nat'l Committee*, 412 U.S. 94, 102 & 112 (1973). *Accord League of Women Voters*, 468 U.S. at 377 (The FCC may "seek to assure that the

public receives through this medium a balanced presentation of information on issues of public importance.").

Time and again, the Supreme Court has underlined this essential aspect of broadcasting regulation: to achieve "the widest possible dissemination of information from diverse and antagonistic sources." *FCC v. National Citizens Comm. for Broadcasting*, 436 U.S. 775, 799 (1978). Thus, "efforts to enhance the volume and quality of coverage of public issues through regulation of broadcasting may be permissible where similar efforts to regulate the print media would not be." *Id.* at 800 (cleaned up). The FCC may impose public interest obligations on broadcasters to "preserv[e] an uninhibited marketplace of ideas." *CBS, Inc. v. FCC*, 453 U.S. 367, 395 (1981).

Another right of viewers is to be served by licensees with the requisite character to hold a spectrum license. *In re Service Electric Co*., 77 F.C.C.2d 986, 991-992 (1980) ("a broadcaster has a special responsibility for the information generally disseminated to the public. Thus, the Commission has traditionally exhibited a major interest in the character qualifications of its broadcast licensees, finding that they owe the public a very high standard of duty in return for their privileged positions.").

In this proceeding generally, and in this Petition specifically, the Commission confronts serious allegations that Disney has failed in these core obligations to viewers.

ABC does not provide "a balanced presentation of information on issues of public importance." ABC does not expose viewers to "information from diverse and

antagonistic sources." ABC ignores long-standing Commission precedents and principles protecting the integrity of the news. ABC engages in explicit racial and gender discrimination. ABC cozies up to the Communist Chinese Party and airbrushes over religious and ethnic cleansing. ABC fails to respect this Commission's rules. For all these reasons, the Commission should designate this matter for a hearing, because the Petition and accompanying materials raise sufficient questions whether ABC is operating in the public interest or remains worthy of the public trust.

## STANDING

The Center for American Rights files a petition to deny on behalf of residents it represents in the following service areas: Chicago (WLS, 298337); Houston (KTRK, 298353); San Francisco (KGO, 298344); Philadelphia (WPVI, 298324); and Durham (WTVD, 298327). In the other three markets, it requests that the Commission treat this as an informal objection. *See In re Consent to the Transfer of Control of Tegna*, 2026 FCC LEXIS 620, ¶ 56 & 60 (MB Mar 19, 2026).

## STANDARD OF REVIEW

"Section 309(k) of the Communications Act states that the Commission shall grant a broadcast renewal application if it 'finds, with respect to that station, during the preceding term of its license' that the station has served the public interest and that there have been no serious violations of the Communications Act or the Commission's rules and no other violations of the Communications Act or the Commission's rules that constitute a 'pattern of abuse.'" *In re ACC Licensee, Inc.*, 22 FCC Rcd 18535,

18537 (MB 2007).[1] In other words, one big violation or a pattern of little violations can justify nonrenewal.

The Commission designates a license renewal for hearing where "the number, nature, and extent of the violations suggest that the applicant cannot operate the station in the public interest." *In the Matter of Paxson Communications License Company, LLC*, 22 FCC Rcd 4248, 4249 (MB 2007).[2]

Put differently, "A broadcaster seeks and is granted the free and exclusive use of a limited and valuable part of the public domain; when he accepts that franchise it is burdened with enforceable public obligations . . . . a broadcast license is a public trust subject to termination for breach of duty." *Office of Communication of the United Church of Christ v. FCC*, 359 F.2d 994, 1003 (D.C. Cir. 1966) (Burger, J.).[3]

---

[1] To the extent that the license renewal process includes a presumption favoring renewal of current licensees, "renewal expectancy will be factored in for the benefit of the public, not for incumbent broadcasters." *Central Florida Enterprises, Inc. v. FCC*, 683 F.2d 503, 507 (D.C. Cir. 1982). The Commission's question should not be whether renewal is convenient for Disney as the incumbent, but whether its continued licensure benefits the public.

[2] This petition focuses on violations of the FCC's rules and precedents, which always occupy first rank in this Commission's attention. However, a pattern of violations of other federal laws also can indicate an overall disrespect for law that concerns a licensee's character. *In re Chapman*, 38 F.C.C.2d 871, 871-872 (Rev. Bd. 1973) ("Violation of federal law, either by an applicant or one of its principals, on its face, raises a sufficient question regarding character to merit careful examination in order to determine whether an applicant is qualified to operate a broadcast station in the public interest."). Disney recently entered a $10 million settlement with the U.S. Department of Justice (and Federal Trade Commission) for violations of the Children's Online Privacy Protection Act (2025); a $2.75 million settlement with the California Attorney General for violations of the California Consumer Privacy Act (2026); a $43.25 million class settlement for gender pay discrimination (2024).

[3] Separately, Congress also stated that the Commission may revoke a license "for willful or repeated failure to allow reasonable access to . . . the use of a broadcasting station by a legally qualified candidate for Federal elective office on behalf of his

Disney has breached its duty and public trust to ABC's viewers nationwide and in these eight markets.

## SCOPE

Though this proceeding was initiated to assist the Commission in investigating invidious discrimination at Disney, this is a full license renewal process, which means that all aspects of license renewal are legitimate topics of inquiry. *See* Media Bureau Order, DA 26-416 (April 28, 2026) (early license renewal process "both allows the FCC to conduct its ongoing investigation and enables the FCC to ensure that the broadcaster has been meeting its public interest obligations more broadly.").

## SUMMARY OF THE ARGUMENT

1. Disney does not operate its ABC stations in the public interest. Pending complaints and a review of the license period record for ABC's network programs show a consistent and overt partisan bias to its programming across multiple shows.
2. ABC's Owned Stations run a Race & Culture effort that intentionally brings an ideological agenda to local newsrooms and documentary shows. It's DEI TV, and it's not in the public interest.

---

candidacy." 47 U.S.C. 312(a)(7). "The Commission has historically interpreted this provision to mean "[a] commercial station is required either to provide reasonable amounts of free time or permit purchase of reasonable amounts of time." *Kennedy for President Committee v. FCC*, 636 F.2d 432, 441 (D.C. Cir. 1980) (quoting *Use of Broadcast and Cablecast Facilities by Candidates for Public Office*, 34 F.C.C.2d 510, 537 (1972)). However, the provision illustrates how seriously Congress took a station's decision to selectively put a thumb on the scale in favor of one candidate by denying access to another candidate: willful or repeated violations should result in revocation of a license.

3. A company that engages in race-based discrimination lacks the character to hold an FCC license. The petition documents eight different programs in which Disney is engaged in race- or gender-based discrimination.
4. A company that is not forthright with the Commission lacks the character to hold an FCC license. The chairman's letter to Congress indicates that Disney has been disingenuous with the Commission.
5. A company that violates important Commission rules lacks the character to hold an FCC license. Serious questions have been raised whether ABC as a network has in place affiliation agreements that are incompatible with 47 CFR § 73.658(e), the right to reject / preempt rule.
6. A company that operates under malign foreign influence lacks the character to hold an FCC license. Serious questions have been raised about the extent of Chinese Communist Party influence on Disney.
7. Disney's procedural and other legal objections associated with its application are contrary to Supreme Court and Commission precedent.

## ARGUMENT

### I. ABC's bias on broadcast television is a pattern of deep disregard for the public interest.

The public interest lies in seeing broadcast stations carry an "array of news and entertainment programming [that] embodies a diversity of viewpoints across the political and ideological spectrum and that [broadcast] reporting is fair, unbiased, and fact-based." *In re FCC Approves Skydance / Paramount (CBS) Transaction*, 40 FCC Rcd 5689, 5714 (2025). *Accord In re Chi. Fed'n*, 38 F.C.C.2d 417, 428 (1972)

("objective news reporting"); *In re Amendment of Part 73 of the Rules*, 12 F.C.C.2d 250, 251 (1968) ("[n]ews gathering and dissemination" are "an area where the licensee must be scrupulously fair."); *Report on Editorializing by Broadcast Licensees*, 13 F.C.C. 1246, 1254-55 (1949) ("The basis for any fair consideration of public issues, and particularly those of a controversial nature, is the presentation of news and information concerning the basic facts of the controversy in as complete and impartial a manner as possible."); *Powel Crosley*, 11 F.C.C. 3 (1945) ("full and fair reporting of the news").

The opposite of programming that is "fair" and "unbiased" and that "embodies a diversity of viewpoints across the political and ideological spectrum" is programming that pursues a "narrow partisan, political interest." *Guidance on Political Equal Opportunities Requirement*, 2026 FCC LEXIS 142, *4 (MB Jan. 21, 2026). The equal time statute codifies the broader public interest principle that broadcasters cannot "unfairly put[] their thumbs on the scale for one political candidate or set of candidates over another." *Id.* Congress designed the equal time statute as an embodiment of its "fear" of "favoritism or bias on the part of the news media." *King Broadcasting Co. v. FCC*, 860 F.2d 465, 467 (D.C. Cir. 1988). In the words of one senator, the goal was "to prevent a candidate from acquiring an unfair advantage over an opponent through favoritism of a station." *Id.* (quoting Sen. Engle, 105 CONG. REC. 14451 (1959)).[4] *Accord FCC's Media Bureau Seeks Comment*, 2026 FCC

[4] What evidence "strongly supports" a "contention that there is no partisan purpose" to a series? Providing the same coverage "spanning the administrations of Presidents of both major parties." *In re Greater Wash. Educ. Telecomms. Ass'n*, 26 FCC Rcd

LEXIS 1183, *2 (MB May 22, 2026) ("broadcast television stations [ ] have an obligation to operate in the public interest--not in any narrow partisan, political interest."); *Kay v. FCC*, 443 F.2d 638, 647 (D.C. Cir. 1970) (FCC tells court a broadcaster cannot, in the court's paraphrase, "give extensive free time amounting to saturation publicity only to candidates of one party").

Yet across the past five years of this license window, a clear track record emerges. ABC's reporting is not fair or unbiased, and too often it is not fact-based or accurate. Indeed, the consistent pattern shows a partisan purpose at work.[5]

---

16509, 16513 (MB 2011). Or asking the same questions of both candidates for an office, or giving candidates equal airtime. *In re Requests of Fox Broadcasting Co., et al.*, 11 FCC Rcd 11101, 11112 (1996).

[5] This Commission's review of ABC's public interest obligations "occurs in conjunction with consideration of a station's license renewal application." *In re Revisions to Pub. Inspection File Requirements*, 31 FCC Rcd 5796, 5800 (2016). This includes not only the performance of the individual stations, but ABC as a network, because it is Disney as the licensee whose qualifications are before the Commission. *In the Matter of Policies and Rules Concerning Children's Television Programming*, 6 FCC Rcd 5093, 5102 (1991) ("broadcast affiliates have traditionally been responsible for network compliance with the Commission Rules"); *In re NBC*, 21 F.C.C.2d 195, 199-200 (¶¶ 7-9) & 213 (¶ 35) (Rev. Bd. 1970) (in an individual station license proceeding involving an NBC-owned station, "substantial questions" that had been previously raised concerning three NBC network programs were "an appropriate issue" for review in the license proceeding "to determine the circumstances surrounding the three programs and the effects, if any, upon NBC's qualifications to be a Commission licensee."). *See In re NBC*, 16 F.C.C.2d 698, 703 (1969) (Dissenting Statement of Comm'r N. Johnson) ("the only opportunity to review the licensee responsibility and performance of a corporate conglomerate network with owned and operated stations is at the renewal of its broadcast properties -- the first renewals after the behavior in question."). *See also* WABC FCC FORM 2100, SCHEDULE 303-S Public Interest Statement at 5 ("WABC leverages ABC Network resources to enhance the information it provides to viewers.").

### 1. Pending complaints detail ABC's operation in a partisan interest.

The Commission can take this opportunity to address multiple pending complaints against ABC related to its programming.

First, the Center for American Rights has a pending consumer complaint against ABC and ABC-owned WPVI in Philadelphia for the 2024 presidential debate.[6] To briefly recap, the Commission has consistently warned against debate decisions that "serv[e] the political interest of one of the candidates." *In re American Independent Party*, 62 F.C.C.2d 4, 8 (1976). *See In re PBS*, 7 FCC Rcd 4681, 4682 (1992); *Letter to George Lato*, 6 FCC Rcd 5840, 5840 (MMB 1991). In this instance, the complaint showed that ABC's debate co-anchor Linsey Davis said publicly that the fact-checking arrangement was put in place specifically to target President Trump. Gabriel Hays, *ABC's Linsey Davis admits fact-checking of Trump was because CNN let his statements 'hang' at first debate*, Fox News (Sept. 14, 2024). And that design was then executed in an entirely one-sided way that served the political interest of one candidate. *See In re Applications of Voce Intersectario Verdad America, Inc.*, 100 F.C.C.2d 1607, 1611 (Rev. Bd. 1985).

Second, the Center has a pending consumer complaint regarding ABC's inaccurate labeling of "Maryland resident" Kilmar Abrego Garcia. Every broadcast licensee has an "obligation to present the news in an accurate manner." *In the matter of the handling of public issues under the Fairness Doctrine*, 48 F.C.C.2d 1, 21 (1974). Going

[6] According to WPVI's website, the network's debate was "produced in conjunction with the ABC-owned Philadelphia news station WPVI-TV."

back decades, this Commission has insisted that a licensee may not "distort or suppress the basic factual information upon which any truly fair and free discussion of public issues must necessarily depend." *Report on Editorializing*, 13 F.C.C. at 1254. Abrego Garcia was the subject of a major national news story for months. During that time, ABC and other broadcasters continually "misle[d] the American public—implying that Abrego Garcia was merely a law abiding U.S. citizen, just a regular 'Maryland man.'" @BrendanCarrFCC (April 16, 2025).

As CAR reported to the Commission in its complaint: "Multiple ABC News national broadcasts referred to him as a 'Maryland man' (April 14; April 12); 'a husband and father who lived in Maryland' (April 15); 'an undocumented immigrant from El Salvador [who] was working and living in Maryland with his American wife and children' (April 16); from 'Maryland, where he lives with his wife, Jennifer, and 5-year-old son who has autism' (April 1); and 'a Maryland husband and father' (April 16)." Even after the Chairman's post raising concerns about this misinformation, ABC continued with its line, referring to "Maryland resident Kilmar Abrego Garcia" (May 1); "Kilmar Abrego Garcia, the Maryland man who was wrongfully deported" (May 1); "when you talk about Abrego Garcia, basically here legally, being taken and deported to El Salvador" (Sunny Hostin on *The View*, April 30); "Abrego Garcia, the Maryland man wrongly deported" (April 20); "Kilmar Abrego Garcia, a father living in Maryland" (April 20). This litany of examples shows that ABC was not committed to accurate and objective journalism on that story, even after the Chairman pointed out the issue.

Third, the Center has a pending consumer complaint regarding Jimmy Kimmel's failure to disclose his significant partisan political activities while hosting guests on his show. "Although most prior Commission rulings regarding disclosure of personal interests have dealt with financial interests, we believe the same principle governs personal political interests as well, since our basic purpose is that the public shall know by whom it is being persuaded." *In re WCMP*, 41 F.C.C.2d 201, 206 (1973). Thus, several Commission precedents have required disclosure of partisan conflicts of interest to listeners and viewers. *In re complaint against WSIR*, 89 F.C.C.2d 382, 386 (1982); *In re WRTA*, 69 F.C.C.2d 18, 19 (1978); *In re KGMB-TV*, 67 F.C.C.2d 72 (1977); *In re WBPZ-AM-FM*, 90 F.C.C.2d 524, 526 (1982); *In Re Application of Ubiquitous Corp*., 51 F.C.C.2d 780, 794 (1975).[7] Mr. Kimmel headlined the largest fundraiser in Democratic Party history and personally donated to numerous Democratic candidates whom he hosted soon thereafter on this show—the failure to disclose these partisan activities to viewers is contrary to Commission precedent.

We also remind the Commission of our supplemental filing against Mr. Kimmel for his partisan presentation in the wake of Charlie Kirk's assassination, as well as the National Religious Broadcasters' complaint against Mr. Kimmel in the wake of the attempted assassination of the President.

---

[7] Though the Commission later stated that its precedents on economic conflicts of interest had merged into the Commission's plugola and payola rules, and that these rules set the correct standard for economic conflicts of interest, the Commission's order in this regard made no mention of withdrawing or mooting precedents regarding non-economic conflicts of interest. *See In the Matter of Elimination of Unnecessary Broadcast Regulation*, 1985 FCC LEXIS 3945, *14-20 (Feb. 5, 1985).

The Center further reminds the Commission of ABC's settlement with President Trump for $16 million after it allegedly defamed the President. As part of the settlement, ABC released an editor's note: "ABC News and George Stephanopoulos regret statements regarding President Donald J. Trump made during an interview by George Stephanopoulos with Rep. Nancy Mace on ABC's This Week on March 10, 2024." In a renewal proceeding, the FCC "may [] refuse a renewal of license to one who has abused it to broadcast defamatory and untrue matter." *Trinity Methodist Church v. Federal Radio Com.*, 62 F.2d 850, 851 (D.C. Cir. 1932)). *Accord Statement of Comm'r Nathan Simington*, 2024 FCC LEXIS 1916, *3 ("malicious and dishonest political speech is not, in my view, in the public interest"); *In re Applications of Voce Intersectario Verdad America*, 100 F.C.C.2d 1607, 1611 (Rev. Bd. 1985); *In re Anti-Defamation League of B'Nai B'Rith Against Station Ktym*, 4 F.C.C.2d 190, 193 (1966) (statement of Comm'r Cox); *Letter to Capt. James Hamilton*, 44 F.C.C. 999, 1000 (1957).

The Center also reminds the Commission of its pending investigation into ABC Owned KTRK in Houston, Texas, for alleged failure to comply with the equal time statute. *See FCC's Media Bureau Seeks Comment on Petition by Disney's ABC*, 2026 FCC LEXIS 1183 (MB May 22, 2026). If the Commission concludes that ABC violated the statute, this finding will constitute another black mark on its management.

Collectively, these pending actions and investigations into ABC's broadcasting show that ABC displays a consistent disregard for Commission rules and standards.

**2. Research and common sense show ABC's partisan interest.**

Commissioner Michael Copps once warned against "broadcasters' news coverage" "that has been increasingly devoid of information to help citizens participate in their democracy, or, worse yet, promoting an ideology or unbalanced political agenda thinly disguised as journalism." *In the Matter of: Carriage of Digital Television Broadcast Signals*, 20 FCC Rcd 4516, 4555 (2005) (Statement of Comm'r Copps).

For an unbalanced political agenda thinly disguised as journalism, look no further than ABC News.

*World News Tonight*

Start with *World News Tonight with David Muir*. Looking at the 2024 presidential campaign coverage prior to the ABC debate, "[Media Research Center] analysts reviewed all 100 campaign stories that aired on ABC's *World News Tonight* from the day Harris entered the race (July 21) through September 6, including weekends. Our analysts found 25 clearly positive statements about Harris from reporters, anchors, voters or other non-partisan sources, with zero negative statements — none. That computes to a gravity-defying 100% positive spin score for the Vice President. As for Trump, our analysts found just five clearly positive comments, vs. 66 negative statements, for a dismal 7 percent positive (93% negative) spin score." Muir's show was, in MRC's estimation, the most "Most Pro-Harris, Left-Wing Newscast" compared to NBC and CBS.[8]

[8] Rather than present the Commission with a laundry list of individual instances of biased, one-sided, and inaccurate or incomplete coverage, we are relying on MRC and other studies. When the Commission had before it a nonprofit organization's

Then came the David Muir-hosted debate itself. As Southern Methodist University professor Ben Voth wrote for *The Hill*, "Most analysts recognize that Muir and Davis engaged in arguably partisan fact checking against the Trump campaign." ABC's moderators "fact-checked Trump five times without ever fact checking Harris, even though Harris made a number of provocative factual statements arguably worthy of fact-checking." He concluded, "Failure to rise to that ethical demand is not only problematic in terms of having an informed electorate but may also rise to a legal violation of our campaign laws designed to protect the public from abuse of their broadcast powers. Election law presently states that every political debate 'must include at least two candidates and must be structured so that it does not promote or advance one candidate over another.' ABC's conduct of the Sept. 10 debate arguably failed that legal standard." As noted above, the Center has a pending complaint arguing that the debate did in fact fail that standard and documenting at length the accuracy of Professor Voth's observations.

Once President Trump returned to office, *World News Tonight* continued to mark out its position at the far-left end of the television news spectrum. MRC looked at Trump's first 100 days of his second term and found that on his signature campaign

---

"elaborate statistical analysis" of 274 news items from CBS's evening news program, the FCC was required to proceed to at least open an investigation: "The soundness of ASCEF's methodology and the probativeness of its particular examples are questions for the merits, to be resolved on the basis of responsive submissions by the network and the complainant. They are not questions that must unanimously be answered in favor of ASCEF before an inquiry is even made to the licensee." *Am. Sec. Council Educ. Found. v. FCC*, 1978 U.S. App. LEXIS 9065, *3 (D.C. Cir. Sept. 13, 1978), *rev'd on other grounds en banc*, 607 F.2d 438, 452 (D.C. Cir. 1979).

issue, "[o]ut of nearly four hours of coverage devoted to the topic [of immigration], these newscasts spent only a meager 3 minutes, 29 seconds — 110 seconds on NBC, 90 seconds on CBS, and just 9 seconds on ABC — letting viewers know just how much Trump had reduced border crossings compared to his predecessor."

*This Week with George Stephanopoulos*

The host of ABC's weekly Sunday morning politics show is George Stephanopoulos. Stephanopoulos started his career in Washington, D.C., as an aide to Democratic congressman Ed Feighan of Ohio, eventually rising to serve as Feighan's chief of staff. He took a break to work as head of rapid reaction for the 1988 Dukakis presidential campaign before returning to the House as executive floor assistant to Majority Leader Dick Gephardt. He joined the Clinton for President campaign in 1991—"He became Clinton incarnate, so imbued with the candidate's philosophy and policy that when he spoke it was as if Clinton were there," reported *Time*. He then served as White House Communications Director for President Clinton. He joined ABC News within a year of leaving the White House, and shortly thereafter became an ABC News regular. Within five years, he was named anchor of *This Week*, and thereafter ABC News' chief Washington correspondent as well before dropping that title when he added *Good Morning America.*

His move from the White House to top positions at ABC News represents a direct pipeline from Democratic Party politics to broadcast news that is unique in its directness and seniority among major network anchors. As former *New York Times* editor Max Frankel wrote at the time: "The overnight transformation of George

Stephanopoulos from partisan pitchman to television journalist highlights a disturbing phenomenon: the progressive collapse of the walls that traditionally separated news from propaganda. Self-respecting news organizations used to pride themselves on the sturdy barriers they maintained to guard against all kinds of partisan contamination....[Stephanopoulos's] case shows how no one even bothers any longer to decontaminate a convert (like, say, Bill Moyers) by stretching out his passage from politics to reporting over a cleansing period of time." The pipeline flows straight from Democratic politics into broadcast news.

Stephanopoulos faced a "credibility crisis" in 2015 when it came out that he had made three donations, in 2012, 2013, and 2014, totaling $75,000 to the Clinton Foundation. He did not disclose those donations even as he interviewed *This Week* guests like Peter Schweizer, the author of the book *Clinton Cash*, concerning their eponymous foundation.[9]

The episode exposed the underlying reality, as former ABC News anchor Carole Simpson told CNN: "There is a coziness that George cannot escape. While he did try to separate himself from his political background to become a journalist, he really isn't a journalist."

---

[9] Though these and other facts in the petition lie outside the license review window, they are included because they provide helpful context or background for the behavior and trends that we see inside the license period at issue. *See In re RKO Gen., Inc.*, 78 F.C.C.2d 147, 219 n.32 (ALJ 1974) (noting testimony in administrative record regarding programming outside the license period). Evidence from prior periods is discounted but not excluded. *In Re Application of KMAP*, 63 F.C.C.2d 470, 476 (1977).

Stephanopoulos has contributed to anti-Trump fervor as much as anyone. He introduced *This Week* immediately before the 2024 election as follows: "No election since the Civil War has posed such a test of our constitutional system. Whether to accept election results and the peaceful transfer of power has never been on the ballot like this. The stakes in this election are as high as it gets. The differences between the candidates are as stark as it gets."

And previously, in April 2024: "Until now, no American president had ever faced a criminal trial. No American president had ever faced a federal indictment for retaining and concealing classified documents. No American president had ever faced a federal indictment or a state indictment for trying to overturn an election, or been named an unindicted co-conspirator in two other states for the same crime. No American president ever faced hundreds of millions of dollars in judgments for business fraud, defamation and sexual abuse. Until now, no American presidential race had been more defined on what's happening in courtrooms than what is happening on the campaign trail. Until now. The scale of the abnormality is so staggering that it can actually become numbing. It's all too easy to fall into reflective [*sic*] habits—to treat this as a normal campaign where both sides embrace the rule of law, where both sides are dedicated to a debate based on facts and the peaceful transfer of power. But that is not what's happening this election year. Those bedrock tenets of our democracy are being tested in a way we haven't seen since the Civil War. It's a test for the candidates, for those of us in the media, and for all of us as citizens."

Stephanopoulos' overwrought rhetoric and doomsday prophecies are just further proof of his politics—the merger of East Coast elite values with the Democratic party.

Again, comparing ABC's *This Week* to NBC and CBS, the Media Research Center has concluded that of the "Sunday shows, ABC is likely the guiltiest of overwrought editorializing in service of an agenda."[10]

*Good Morning America*

The Media Research Center asks: "How much does ABC News hate Donald Trump and his administration? And how far will they go to show they don't want viewers to care about anything except hating Trump? On the day of perhaps the most important moment in U.S. space history since 1972, Wednesday's *Good Morning America* took over 15 minutes and seven anti-Trump team reports before it finally started covering in earnest the possible launch of NASA's Artemis II on a flight around the moon." Again, "*CBS Mornings* and NBC's *Today* didn't have this problem of deciding on what the real top story is as they placed NASA on the front burner with multiple lead-off reports."

ABC says that *Good Morning America* is part of its news division, though most news shows don't feature performances by troupes of same-sex salsa dancers,

---

[10] Though now dated, academic research confirms this fact. In a paper published in 2023 but evaluating coverage from 2001 to 2012, a trio of professors found that ABC, NBC, and CBS all had a consistent and perceptible bias against President George W. Bush. When President Obama took office, the paper found that NBC and CBS shifted slightly to the right, which the professors attributed to a "watchdog-like anti-government bias." No such shift occurred at ABC News, again showing it is the most liberal of the three major networks. Lea Bernhardt, Ralf Dewenter, & Tobias Thomas, *Measuring partisan media bias in US newscasts from 2001 to 2012*, European J. of Political Econ. (June 2023).

complete with rainbow stage accents. Michael Strahan introduced the segment: "That was an amazing performance by Pride Salsa, helping us kick off Pride Month celebrations here at GMA, shining a light on the beauty of the LGBTQ+ community." Again, "news."[11]

The "news" show is anchored by Strahan, a former NFL player, Robin Roberts, a former sports reporter on ESPN, and Stephanopoulos, a former Clinton White House spin doctor.

*Jimmy Kimmel Live!*

Jimmy Kimmel is an overtly partisan Democrat. Which would be fine, if he didn't use his show as a propaganda platform to advance his personal political views. But he does, and that's not in the public interest.

The first proposition—that Kimmel is a partisan Democrat—is obvious from any number of facts. Kimmel has made over $125,000 in political donations, all of which has gone to Democrats (his most recent: $1,000 to Maine Democrat Graham Planter). He's also headlined a "Get Out the Vote" rally for Nevada Democrats in November 2018, and he returned to the Nevada campaign trail for stops at Kamala Harris's field offices and union halls in October 2024.

Kimmel also uses his celebrity to fundraise for Democrats. Most notably, he headlined a Los Angeles fundraiser for President Joe Biden's then-reelection campaign in June 2024. The event "raised $30 million, a record sum for a single

---

[11] Or, as ABC News correspondent David Wright put it, "now you can't watch 'Good Morning America' without there being a Disney princess or a Marvel Avenger appearing."

Democratic fundraiser." He also headlined a high-end Los Angeles fundraiser for House Democrats, led by Minority Leader Hakeem Jeffries and former Speaker Nancy Pelosi, in March 2026. The event raised more than $2 million from a small crowd of 50 or so guests, with tickets priced between $23,000 and $310,100. In 2018, he was the featured guest at a star-studded reception to benefit ten Democratic state parties in swing states, which raised more than $1.5 million. He penned a fundraising appeal for Nevada Senator Jacky Rosen in August 2024, and he sent another fundraising email for Kamala Harris and Tim Walz in September 2024.

The second proposition—that he uses his television show to platform his personal political views—is also evident from the facts.

Over a period just shy of three years (January 2023 – September 2025), "Kimmel told a total of 7,797 political jokes over 369 episodes. Of these, 7,189 were about right-leaning people, groups, or things. Only 565 (7 percent) were about left-leaners. . ."

Over a similar period (September 2022 – September 2025), "97 percent of his political guests have been liberals"—61 out of 63 such guests. And of the two conservatives, one was My Pillow CEO Mike Lindell, who was trapped the entire time in an arcade claw machine game.

There's also his infamous 2024 pre-election plea to vote for Kamala Harris delivered nationwide over the airwaves, which would have cost millions of dollars if it had been classified as an advertisement rather than a show monologue. As *The Hill's* headline put it: "Jimmy Kimmel appeals to Republicans to reject Trump in 19-minute monologue." It was a massive abuse of the airwaves: a 19-minute screed

against a single candidate a week before the election with the sole purpose of moving moderate Republicans to vote against the nominee of their party.

Or consider what Kimmel wouldn't joke about: Joe Biden's obvious decline in office. As *Politico* put it in 2024, today's late-night is "more proudly partisan. More one-sided. More cautious in its targets. And it's generally soft on Biden." *Politico* goes on, "By any metric, Biden is a rich vein of material for late night or sketch comics. [Yet f]or all his ripeness as a comic target, though, Biden has largely escaped the kind of pillorying that some of his predecessors got." The hosts have "pulled their punches" on Biden, "styling themselves as sentinels of the Trump resistance rather than stiletto-wielding stand-ups for whom anyone was fair game." "About the 81-year-old president's health, Kimmel said, 'People act like the results of that physical are going to somehow influence who we vote for. I don't care if he comes out of that office in an iron lung; I would be fully okay with a *Weekend at Bernie's*-type White House situation if it means no Trump.'" You know it's bad if *Politico Magazine* notices it.

*The View*[12]

To see the one-sided nature of *The View*, just look at the blatant, consistent partisan slant of its guest lists. Democrats are featured on *The View* at an insanely high ratio compared to Republicans.[13] In 2025, *The View* hosted a total of 348 guests.

---

[12] This section is largely drawn from the Center's submission in the separate docket looking at *The View*, MB 26-124, which we incorporate by reference here.

[13] *In re Greater Wash. Educ. Telecomms. Ass'n*, 26 FCC Rcd 16509, 16511 (MB 2011) ("Congress qualified all four categories of exempt news programming with the term 'bona fide,' which 'was intended to emphasize Congress' intent that the program be of genuine news value and not be designed to serve the political advantage of any particular candidacy.'").

Of those, Media Research Center reports that the hosts talked politics with 128 liberal guests and just two conservatives. Twenty-five of the liberal guests were Democrat politicos, including Senators John Fetterman (twice), Elizabeth Warren, Bernie Sanders, Amy Klobuchar, Elissa Slotkin, Chuck Schumer, Tammy Duckworth, Cory Booker, Joe Manchin, and Raphael Warnock; Governors Gretchen Whitmer, JB Pritzker, and Wes Moore; Representatives Hakeem Jeffries and Jasmine Crockett (twice); former President Joe Biden; former Vice President Kamala Harris; and New York mayoral candidates Anthony Weiner and Zohran Mamdani. The other 100 or so liberals were journalists, academics, and activists.

The two "conservatives" were actress Cheryl Hines, wife of HHS Secretary Robert F. Kennedy, Jr., and Congresswoman Marjorie Taylor Greene. And Hines was until recently a "lifelong Democrat" herself, while Greene was invited on at a time when she was having a very public dispute with House GOP Leadership.

Another way to view *The View's* partisanship is looking at its hosts. Whoopi Goldberg has made multiple donations to Democrats, including five separate donations to Kamala Harris in 2024. Sunny Hostin and Joy Behar have also made multiple donations to Democratic candidates, and Joy has written a book entitled, *The Great Gasbag: An A-to-Z Study Guide to Surviving Trump World.*[14] In fact, Brian

---

[14] Here is how the publisher, HarperCollins, describes the book:

> Now in paperback, one of our most beloved comedians, the brilliantly witty and outspoken star of *The View*, hits the most unpopular President ever elected where it hurts—and makes us laugh and cheer—in this hilarious alphabetical guide to everything that's wrong with the "Orange One," Donald Trump
>
> Put down the knife, lock away the gun, lay aside the noose, Joy Behar is here to save you from suicide as she hot walks you through the next four years (two if we

Teta, the executive producer of *The View*, once joked that he asked AI how to handle Behar. Its answer: "Bring up politics but only if you're aligned with her, otherwise run away. Compliment her standup past." AI's answer confirms both that she's a comedian (not a journalist) and that she is an absolute partisan as a cohost.

Ana Navarro and Alyssa Griffin are both former GOP political aides who both nevertheless voted for Kamala Harris over Donald Trump in 2024 (so did the final cohost, Sara Haines). Teta once described Griffin as "not a Trump supporter." She told him that once she was close enough to the first Trump administration, (in his words) she "realize[d] this is not the way. This is not somebody that should be leading our country."

Navarro may have worked for Republicans, but she has also donated over $25,000 to Democratic politicians and PACs—spread across 30+ gifts in amounts from $250 to $2000—dating from 1997 to present, with recipients like Joe Biden, Kamala

---

are lucky, less if liberal dreams come true). Besides despair, the sane response to the insanity in the White House is laughter. On her hit ABC daytime show *The View*, Joy has been blunt in her condemnation of the comb over-in-chief, and her words have electrified and inspired millions in the resistance for whom #notmypresident has become a rallying cry.

*The Great Gasbag* is Joy's answer to the hell that is the Trump Orange House. Structured as an A-Z guide (G is for Gold . . . en shower; P is for Pence and pussy-grabbing; T is for Tweets; Twits, and Twats, etc.), Joy, joined by *New York Times* bestselling humor author Larry Amoros, offers much-needed doses of levity and humor for everyone determined to #resist. With a major network television profile and a social media audience in the millions, this fearlessly confident star has a powerful platform to entertain Americans of all stripes—from Never Trumpers to fired-up progressives—as she takes on the worst president since . . . well, since ever.

Harris, Debbie Wasserman Schultz, Bob Menendez, Xavier Becerra, and Democrats Win Seats PAC.

This supposed Republican strategist told *View* viewers on May 18, 2026, that Americans "have got to vote Democrats in in November, period." And a month later, the "lifelong Republican" told *View* viewers: "The other thing I'm going to do to celebrate the birthday of America, is come November, I'm going to show up and vote, to vote out the feckless Republicans who are putting no accountability on this administration," to which Whoopi replied, "I like that."

Of even greater note, Navarro was a featured speaker at the 2024 Democratic National Convention, praising Vice President Harris and slamming President Trump. The "bona fide news events" exemption is supposed to cover broadcasting a political convention, not proving your partisanship by speaking at one!

Sitting in CNN's broadcast booth at the convention, Navarro told CNN, "I broke with the Republican Party, the Trump Party way back then [in 2016], and haven't looked back." She continued, "I did all I could to get Joe Biden elected, Joe Biden a man I've known for over 20 some years." And she closed, "I am incredibly excited, elated to help my girl Kamala accept the nomination here today. I've known her for about seven years, and she's my friend."

Finally, an apples-to-apples comparison of recent shows proves the bias.[15] The simplest exercise to evaluate for fairness versus favoritism is to compare Vice

[15] We ask the Commission to do nothing more than the U.S. Court of Appeals for the Second Circuit did in a similar case: "Our review of the transcript leads us to believe that the tenor of the proceedings was as critical as it was flattering, generally

President J.D. Vance's recent guest appearance to the visits of President Joe Biden, First Lady Jill Biden, and Vice President Kamala Harris.

When Kamala Harris went on the show on October 6, 2024, the studio audience was asked to "[p]lease welcome back the next President of the United States." When Jill Biden went on the show on May 8, 2025, to promote her new book, the segment opened by introducing "the woman who has devoted her life to initiatives that make education accessible to everyone, a fierce advocate for women's rights, and a devoted wife of 47 years." When President Joe Biden visited on September 25, 2024, Whoopi introduced him: "After 50 years of proud public service, President Joe Biden stepped up to lead us out of the dark, a very divisive era, and became one of the most substantial presidents of the past half century." In all three segments, Harris, Jill Biden, and Joe Biden were showered with love, praise, and softball questions from the hosts—no surprise, given that several hosts are "friends" and donors to them.

Here's how a writer for *Slate* (not the Media Research Center or Breitbart, but *Slate*) described the Vance interview: "the co-hosts launched into hard-hitting questions pretty much immediately. . . . At least four of the six [cohosts] on Tuesday's show seemed openly hostile to Vance. Judging by her face, Ana Navarro, a vocally anti-Trump Republican, often seemed outright pissed to be sitting next to him. Also

---

evidencing no undue favoritism by ABC toward Perot. Audience members asked Perot probing questions -- questions that had been prescreened and preselected by ABC -- in a manner wholly consistent with the typical news interview. Jennings repeatedly pressed Perot for specifics during the question-and-answer segment of the broadcast. Taken together, these facts provide an ample basis for the conclusion that the network did not intend to advance Perot's candidacy." *Fulani v. FCC*, 49 F.3d 904, 913 (2d Cir. 1995).

not letting him off easy were Whoopi Goldberg, Joy Behar, and Sunny Hostin. . . the co-hosts peppered him with questions about the Trump administration and tried to hold him accountable for both his own and his boss's words."

*ABC News In General*

Evaluating ABC News' two morning and evening newscasts, MRC found that it provided "by far the most slanted [coverage of presidential pardons, compared to CBS and NBC], giving an absurd 27 times more coverage to Trump's pardons than to Biden's." Looking at ABC's coverage of the President's cabinet picks, MRC found the network's news shows "spent 19 minutes and 25 seconds on Trump's nominees, 90 percent of which was negative. The network devoted 13 minutes and 33 seconds of that time to Hegseth, with a 91 percent negative slant."

Terry Moran served as an ABC News national correspondent for 28 years. On June 8, 2025, Moran posted on X stating his view that White House Deputy Chief of Staff Stephen Miller was "a man who is richly endowed with the capacity for hatred. He's a world-class hater. You can see this just by looking at him because you can see that his hatreds are his spiritual nourishment. He eats his hate." Moran further wrote: "Trump is a world-class hater. But his hatred is only a means to an end, and that end is his own glorification. That's his spiritual nourishment."

Though he deleted the post, he stood by it in subsequent interviews, characterizing his statements as "accurate and true," and saying, "I wrote it, because I thought it was true." He further explained, "My own feeling is that you don't sacrifice your citizenship as a journalist. Your job is not to be objective." And "I don't

take back or regret a syllable of the post I wrote about Stephen Miller and Donald Trump . . . I think it was an accurate, fair, and true description of those men."

Moran was not the only ABC employee suspended for his vicious Trump-bashing. In 2017, ABC suspended its reporter Brian Ross for a "serious error" in his reporting on President Trump and supposed Russian collusion, which ABC later admitted was a "mistake" and "the information was wrong." In 2020, ABC suspended veteran reporter David Wright after he self-identified as a "socialist" and complained that the network was struggling to "figure out how to challenge" Trump, whom he referred to as, "this f---g president."

Separately, the Disney executive with oversight of ABC News is Dana Walden. She and her husband Matt are, according to Vice President Harris, "extraordinary friends." *The New York Times* reports that the two "have donated money to Ms. Harris's political campaigns since at least 2003, when she ran for district attorney in San Francisco." The pair hosted a fundraiser for Harris at their home in 2022. The *Times* continues: "rare is the genuine, enduring friendship like that between Ms. Harris and Ms. Walden. Their closeness is no secret in Los Angeles and Washington circles. . ." Though ABC says Ms. Walden does not influence ABC's editorial decisions, the *Times* says "[o]n paper, the potential for a conflict of interest seems obvious."

Finally, no analysis of ABC News' bias would be complete without reference to its 2020 Wisconsin poll. Just weeks before the presidential election (October 20–25), ABC News polled 809 likely voters in Wisconsin, with a supposed margin of error of 4 points. It showed Biden 57, Trump 40—a 17-point Biden margin in a state Trump

had won in 2016 by less than 1 point, and that Biden would go on to win in 2020 by less than 1 point. Crystal Ball called it a "staggering" result, while FiveThirtyEight labeled it a "stunning margin." Stunningly incorrect—it was a margin that would make Anne Selzer and *The Des Moines Register* blush.

Indeed, ABC's polling seems to consistently display a similar bias against President Trump. Look at its ten polls of his favorability during the 2024 presidential election year, from Real Clear:

| | | | | | |
|---|---|---|---|---|---|
| NBC News | 10/30 - 11/2 | 1000 RV | 42 | 51 | Spread -9 |
| Emerson | 10/30 - 11/2 | 1000 LV | 48 | 52 | Spread -4 |
| ABC News/Ipsos | 10/29 - 11/1 | 2267 LV | 37 | 60 | Spread -23 |
| Yahoo News | 10/29 - 10/31 | 1074 LV | 45 | 54 | Spread -9 |
| Forbes/HarrisX | 10/27 - 10/29 | 3718 RV | 46 | 52 | Spread -6 |

| | | | | | |
|---|---|---|---|---|---|
| Gallup | 10/1 - 10/12 | 930 RV | 52 | 47 | Spread +5 |
| NBC News | 10/4 - 10/8 | 1000 RV | 43 | 51 | Spread -8 |
| ABC News/Ipsos | 10/4 - 10/8 | 2631 A | 35 | 58 | Spread -23 |
| Marquette | 10/1 - 10/10 | 699 LV | 45 | 54 | Spread -9 |
| Morning Consult | 10/4 - 10/6 | 2122 LV | 45 | 53 | Spread -8 |

| | | | | | |
|---|---|---|---|---|---|
| Economist/YouGov | 8/25 - 8/27 | 1368 RV | 45 | 54 | Spread -9 |
| Quinnipiac | 8/23 - 8/27 | 1611 LV | 46 | 52 | Spread -6 |
| ABC News/Ipsos | 8/23 - 8/27 | 2496 A | 33 | 58 | Spread -25 |
| Yahoo News | 8/22 - 8/26 | 1195 RV | 45 | 54 | Spread -9 |
| Reuters/Ipsos | 8/23 - 8/25 | 1028 A | 38 | 56 | Spread -18 |

| | | | | | |
|---|---|---|---|---|---|
| Yahoo News | 9/11 - 9/13 | 1086 LV | 45 | 55 | Spread -10 |
| TIPP | 9/11 - 9/13 | 1721 RV | 44 | 51 | Spread -7 |
| ABC News/Ipsos | 9/11 - 9/13 | 3276 A | 35 | 58 | Spread -23 |
| Atlas Intel | 9/11 - 9/12 | 1775 LV | 46 | 51 | Spread -5 |
| Gallup | 9/3 - 9/15 | 1007 A | 46 | 53 | Spread -7 |

| | | | | | |
|---|---|---|---|---|---|
| Morning Consult | 7/26 - 7/28 | 2223 RV | 45 | 53 | Spread -8 |
| Reuters/Ipsos | 7/26 - 7/28 | 1025 A | 41 | 55 | Spread -14 |
| ABC News/Ipsos | 7/26 - 7/27 | 1200 A | 36 | 52 | Spread -16 |
| Wall Street Journal | 7/23 - 7/25 | 1000 RV | 47 | 50 | Spread -3 |
| Forbes/HarrisX | 7/22 - 7/25 | 3013 RV | 44 | 50 | Spread -6 |

| | | | | | |
|---|---|---|---|---|---|
| Morning Consult | 7/19 - 7/21 | 2201 RV | 46 | 52 | Spread -6 |
| Forbes/HarrisX | 7/19 - 7/21 | 2753 RV | 45 | 52 | Spread -7 |
| ABC News/Ipsos | 7/19 - 7/20 | 1141 A | 40 | 51 | Spread -11 |
| Economist/YouGov | 7/13 - 7/16 | 1404 RV | 45 | 54 | Spread -9 |
| Forbes/HarrisX | 7/13 - 7/15 | 1918 RV | 43 | 52 | Spread -9 |

| | | | | | |
|---|---|---|---|---|---|
| Morning Consult | 5/31 - 6/2 | 2204 RV | 43 | 53 | Spread -10 |
| Data for Progress (D)** | 5/31 - 6/1 | 1216 LV | 43 | 56 | Spread -13 |
| ABC News/Ipsos | 5/31 - 6/1 | 781 A | 31 | 56 | Spread -25 |
| Morning Consult | 5/26 - 5/28 | 10721 RV | 44 | 53 | Spread -9 |
| Economist/YouGov | 5/25 - 5/28 | 1547 RV | 44 | 55 | Spread -11 |

| | | | | | |
|---|---|---|---|---|---|
| Morning Consult | 5/4 - 5/5 | 1819 RV | 43 | 54 | Spread -11 |
| Economist/YouGov | 4/28 - 4/30 | 1479 RV | 45 | 54 | Spread -9 |
| ABC News/Ipsos | 4/25 - 4/30 | 2260 A | 33 | 58 | Spread -25 |
| Rasmussen Reports | 4/24 - 4/28 | 1092 LV | 50 | 47 | Spread +3 |
| Harvard-Harris | 4/24 - 4/25 | 1961 RV | 50 | 46 | Spread +4 |

| | | | | | |
|---|---|---|---|---|---|
| USA Today/Suffolk | 3/8 - 3/11 | 1000 RV | 40 | 55 | Spread -15 |
| Yahoo News | 3/8 - 3/11 | 993 RV | 47 | 51 | Spread -4 |
| ABC News/Ipsos | 3/8 - 3/9 | 536 A | 29 | 59 | Spread -30 |
| Emerson | 3/5 - 3/6 | 540 RV | 48 | 52 | Spread -4 |
| Economist/YouGov | 3/3 - 3/5 | 1450 RV | 45 | 53 | Spread -8 |

| | | | | | |
|---|---|---|---|---|---|
| Economist/YouGov | 1/14 - 1/16 | 1472 RV | 45 | 53 | Spread -8 |
| Economist/YouGov | 1/7 - 1/9 | 1417 RV | 45 | 54 | Spread -9 |
| ABC News/Ipsos | 1/4 - 1/8 | 2228 A | 35 | 56 | Spread -21 |
| Economist/YouGov | 12/31 - 1/2 | 1343 RV | 46 | 52 | Spread -6 |
| Quinnipiac | 12/14 - 12/18 | 1647 RV | 41 | 54 | Spread -13 |

*In every single instance*, the ABC News poll showed the President's approval rating lower than the four most contemporaneous polls. The contemporaneous polls averaged Trump's favorability at -7.4, while ABC's average had it at -22.2, a difference of about fifteen points.

*Section Conclusion*

Since leaving ABC News and opening a Substack, former senior ABC newsman Terry Moran opened up about his perception of bias and objectivity at ABC News: "Were we biased? Yes. Almost inadvertently, I'd say. ABC News has the same problem so many leading cultural institutions do in America: A lack of viewpoint

diversity. . . . It is no secret. There are hardly any people who supported Donald Trump at ABC News—or the other corporate/legacy/mainstream news networks. And this is bound to impact coverage, not so much out of malevolent bias (that's the cartoon version peddled by Trump, Brendan Carr and online MAGA), but more out of what is a kind of deafness. The old news divisions don't hear many of the voices of the country, because those voices aren't in the newsroom."[16]

---

[16] This is not a new problem. Here's how ABC News' *The Note,* its political insider tip-sheet, wrote about the topic in a surprisingly honest moment of navel gazing in 2024:

> Like every other institution, the Washington and political press corps operate with a good number of biases and predilections. They include, but are not limited to, a near-universal shared sense that liberal political positions on social issues like gun control, homosexuality, abortion, and religion are the default, while more conservative positions are "conservative positions."
>
> They include a belief that government is a mechanism to solve the nation's problems; that more taxes on corporations and the wealthy are good ways to cut the deficit and raise money for social spending and don't have a negative affect [sic] on economic growth; and that emotional examples of suffering (provided by unions or consumer groups) are good ways to illustrate economic statistic stories. …
>
> The press, by and large, does not accept President Bush's justifications for the Iraq war – in any of its WMD, imminent threat, or evil-doer formulations. It does not understand how educated, sensible people could possibly be wary of multilateral institutions or friendly, sophisticated European allies. It does not accept the proposition that the Bush tax cuts helped the economy by stimulating summer spending. It remains fixated on the unemployment rate.
>
> It believes President Bush is "walking a fine line" with regards to the gay marriage issue, choosing between "tolerance" and his "right-wing base."
>
> It still has a hard time understanding how, despite the drumbeat of conservative grass-top complaints about overspending and deficits, President Bush's base remains extremely and loyally devoted to him – and it looks for every opportunity to find cracks in that base.
>
> Of course, the swirling Joe Wilson and National Guard stories play right to the press's scandal bias – not to mention the bias towards process stories (grand juries produce ENDLESS process!).

To put it simply, missing the views and voices of half the country in a national newsroom is not in the public interest.

If one of these shows consistently leaned liberal, but was balanced by another show that leaned conservative, that could still offer an overall mix of programming in the public interest. But it doesn't matter what show you watch on ABC, whether it is *Good Morning America, The View, World News Tonight,* or *Jimmy Kimmel Live!*, at any hour of the day when the ABC network is talking politics, it is liberals pushing liberalism and Democrats.

Such a deep and consistent lack of balance indicates the airtime is being used "in service of a political agenda" rather than as an exercise in good-faith newscasting. *Media Bureau Provides Guidance*, 2026 FCC LEXIS 142, at *3.[17] The persistent bias

---

> The worldview of the dominant media can be seen in every frame of video and every print word choice that is currently being produced about the presidential race.

[17] Writing on Lawfare.com, former Obama Administration Department of Justice official Eric Columbus observed concerning the Equal Time statute:

> [H]ere, Carr would seem to have a point. Colbert's show is plainly ideological in its choice of guests. According to online compendiums of show guests, Colbert has hosted current or prior U.S. electoral candidates 30 times in 2025 and 2026. All but one were Democrats. And the remaining one is the exception that proves the rule—Adam Kinzinger, a former Republican congressman who broke with Trump, served on the Jan. 6 committee, and endorsed Kamala Harris for president in 2024.
>
> The equivalent numbers for "The View" reflect a similar imbalance: 31 to 4. And once again, the exceptions were telling: Reps. Marjorie Taylor Greene (twice) and Thomas Massie—following their well-publicized breaks with Trump on key issues—and Schwarzenegger himself, who had endorsed Harris.
>
> Such numbers make it difficult to argue that the interviews qualify for the "bona fide news interview exception" given the FCC's long-standing position, rooted in legislative history, that the selection of guests must lack a partisan purpose. While the FCC typically has been deferential in applying this standard—as in the

in favor of Democratic candidates and their ideological advocates and allies indicates ABC's shows are collectively "unfairly putting their thumbs on the scale for one political candidate or set of candidates over another." *Id.* at *4. That is not in the public interest.

This problem is longstanding, and it must be addressed. In his inimitable way, John Stossel, then of ABC's *20/20* program, put it succinctly in 2004: "At ABC, people say 'conservative' the way people say 'child molester.'" The only thing that has changed in 20 years is that the lonely libertarian Stossel is gone from ABC, and no one with a similar viewpoint has taken his place.

## II. ABC's Owned Television Stations are on an ideological mission to advance a Race & Culture agenda contrary to the public interest.

Separate from ABC's network programming, ABC Owned Television Stations have their own agenda-driven approach to the news that is far from "fair [and] unbiased." One of ABC's Owned Stations' main projects is its "race and culture content team of diverse storytellers dedicated to inclusive storytelling. The team's mission is to amplify the voices of the underrepresented and marginalized communities while celebrating their heritage and triumphs." The team looks for

---

Leno/Schwarzenegger decision—the staggering partisan imbalance makes it hard to say the shows qualify. (Colbert's show, at least, used to be more balanced. In his show's first two months on the air in 2015, his guests included GOP presidential candidates Jeb Bush, Ted Cruz, John Kasich, and Donald Trump—and John McCain as well.)

If certain shows are "plainly ideological" in their choice of guests, and thus do not qualify as "bona fide news," how can those same shows qualify as "in the public interest" when one element of the public interest standard is that television cannot be plainly partisan for one side?

"culturally relevant topics" and to "reflect the voices and experience of diverse communities." It reflects an attitude of "intentional inclusion" and "a culture where diverse representation matters and is prevalent amongst our storytellers and behind the camera," all to achieve "diverse programming and representation."

In an interview, Race & Culture team co-leader Nzinga Blake from ABC's Los Angeles station said the team aims to highlight "underrepresented and marginalized voices." She explained, "Last year there was a lot of conversation about allyship, and we can help create those tools." The tools will "help people get an understanding of how we can be effective allies." The goal, then, is to use the station's platform to advocate and educate to transform viewers into fellow advocates.

In other words, the Race & Culture team is DEI TV.

The pursuit of the ABC Owned Stations' DEI agenda comes across most visibly in its series *Our America* (though the Race & Culture team says its goal is to incorporate a race-based lens into every evening newscast). *Our America* episodes focus on the LGBTQIA+ community, Indigenous peoples' land acknowledgment, a "drag king," stereotypes about gay Asian men, climate change, "Black queer clergy," and Mexicans maintaining an independent culture within the United States.[18]

---

[18] June 19, 2025: "Our America: Who I'm Meant to Be"; November 15, 2024: "Our America: Indigenous Futures"; October 13, 2025: "Our America: Pride in History V"; June 14, 2022: "Biracial gay chef Jeff Kawakami shares journey to self-acceptance"; October 2, 2021: "Our America: Climate of Hope"; June 7, 2022: "'God loves you': Black, gay faith leaders find common ground in experiences of racism, homophobia"; September 15, 2021: "'We are invisible': How native Mexicans carve out their own space in U.S."

In addition to race, the ABC Owned Stations are on a mission to advance the "LGBTQIA+" (Disney's term) agenda. In 2021, ABC Owned Stations launched an eight-episode *Our America* series that "amplifies the voices of the transgender community across America." Individual stations highlighted Pride content such as the hour-long "Thrive with Pride Celebration" on KABC-LA. In 2022, the ABC Owned Stations hosted a full month of "Pride content," including live broadcasts of Pride parades in LA, New York, Chicago, and San Francisco. All ABC Owned Stations also aired "'Our America: Who I'm Meant to Be,' the one-hour Pride documentary, [ ] with a new focus highlighting intersectionality and exploring how LGBTQ individuals' identities exemplify who they are." In 2023, ABC Owned Stations repeated the monthlong Pride celebration, with an *Our America* "one-hour special showcase[ing] six transgender people from The GenderCool Project." In 2024, ABC Owned Stations simulcast their local parades for a five-hour Pride Parade special, "Pride Across America," streamed on Hulu. This continued in 2025: "ABC Owned Television Stations is broadcasting the largest official Pride parades and festivities happening in all eight markets, covering some of the biggest celebrations in the country." ABC Owned Stations must have been careful about what portions of the parades they broadcast, as during "San Francisco's Pride march attendees openly performed oral sex on each other and engaged in disturbing sexual acts."

The FCC has encouraged stations to pay attention to all viewers within their markets, and not to ignore stories, sports, and events of interest to viewers besides the median viewer. That is fine. However, like everything else, when that project is

pursued in an explicitly ideological, one-sided way, it turns from positive diversity into an ideological machine that undermines and ignores viewpoint diversity. Only elite-preferred stories are told. The FCC once critiqued stations that were only telling elite-preferred stories for white communities, ignoring the voices of African-Americans and others. Today, elites prefer stories from other sectors of society but largely ignore the voices and stories of evangelical Christians, orthodox Jews, hunters and fishermen, or other "deplorables." ABC Owned Stations' Race and Culture content team is another manifestation of the same underlying problem: a pervasive elite-driven ideological agenda that highlights certain preferred voices and issues while ignoring others. It is the irony of DEI: intentional inclusion of certain voices has resulted in the marginalization and exclusion of others.

## III. The Walt Disney Company's discriminatory employment practices are incompatible with the character of an FCC licensee.

"A licensee who has discriminated on the basis of someone's race, ethnicity or gender cannot demonstrate the character needed to be a public trustee." *In the Matter of Review of the Commission's Broadcast and Cable Equal Employment Opportunity Rules,* 13 FCC Rcd 23004, 23050 (1998) (Joint Statement of Chairman Wm. Kennard and Comm'r Gloria Tristani). *See Remarks of Chairman William E. Kennard*, 1998 FCC LEXIS 6209, *11 (Dec. 2, 1998) (same).

"[T]he Commission should take into account allegations raising substantial questions whether the applicant has violated, or is in violation of, the Civil Rights Act or a pertinent State law in this field. If a violation has been established, this clearly raises a question as to the applicant's qualifications to be a broadcast

licensee. . . . [E]ven where no violation of a specific statute is established or alleged, specific allegations may raise serious public interest issues warranting a full hearing." *In the Matter of Petition for Rulemaking to Require Broad. Licensees to Show Nondiscrimination in Their Empl. Practices*, 13 F.C.C.2d 766, 769 (1968). Indeed, "we simply do not see how the Commission could make the public interest finding [necessary for a license] as to a broadcast applicant who is deliberately pursuing or preparing to pursue a policy of discrimination." *Id.* "[A]llegations of discriminatory hiring practices go to the heart of operation in the public interest, and call for careful Commission scrutiny, whether or not a violation of Federal or State law may be involved." *Id.* Therefore, "a petition or complaint raising substantial issues of fact concerning discrimination in employment practices calls for full exploration by the Commission before the grant of the broadcast application before it." *Id.* at 771.

This renewal review raises substantial issues of fact concerning discrimination in employment practices by Disney. The Commission has the best window into Disney's actual operations based on its ongoing review of thousands of internal Disney documents. Here, the Petitioners incorporate into the record Chairman Carr's March 2025 letter to Disney and America First Legal Foundation's 2024 complaint to the Equal Employment Opportunity Commission (EEOC).

The Petitioners wish to highlight a few other specific programs that demonstrate race and gender-based discrimination.

1. *Disney Future Storytellers:* Disney's Future Storytellers program is "an initiative aimed to increase access to careers in storytelling and innovation for individuals from historically underrepresented or marginalized communities." The program is currently in the middle of a five-year commitment to fund "the Disney Storytellers Fund at Florida Agricultural & Mechanical University's (FAMU) School of Journalism & Graphic Communication (SJGC). Through this fund, selected scholars are supported with tuition and housing scholarships, a stipend, specialized programming, mentoring, leadership development, and more. Scholars also have the opportunity to pursue internships and professional opportunities at Disney." FAMU is a Historically Black College or University (HBCU), which is central to why Disney selected it for the $1 million grant: "The Disney Storytellers Fund at Florida A&M University's School of Journalism and Communication will help empower the next generation of Black journalists, news and media executives," according to a Disney VP.

2. *Disney on the Yard:* The FAMU program is separate from but similar to Disney on the Yard, which "helps to build a long-term pipeline of Black talent, expand access to opportunities for students from Historically Black Colleges and Universities (HBCUs) within the entertainment industry, and build a community for HBCU alumni across the company. Through its Innovation Challenge, students pitch their innovative ideas, receive mentorship, and can win scholarships."[19]

---

[19] *Accord* 2025 Sustainability & Social Impact Report; 2022 Corporate Social Responsibility Report ("build[] a robust, long-term pipeline of Black talent.").

3. *Disney UNCF Corporate Scholars Program:* Both the FAMU and Disney on the Yard programs are similar to the Disney UNCF Corporate Scholars Program: "Scholars receive an annual scholarship, a paid summer internship at Disney, mentorship opportunities, and assistance with securing possible full-time roles with Disney upon graduation." The Disney UNCF program is restricted to "Historically underrepresented rising juniors, enrolled full-time at a four-year college or university," with a preference given to students at HBCUs. Disney sponsors specific programs in partnership with UNCF for ESPN, FX, and National Geographic.

As the Commission looks at the FAMU, HBCU, and UNCF programs, it should bear in mind recent guidance from the U.S. Department of Justice Office of Legal Counsel: *Race-based Educational Programs*, 49 Op. O.L.C. __ (Dec. 2, 2025). In that opinion, OLC analyzed the constitutionality of numerous federal programs targeted at race-conscious institutions like HBCUs. OLC largely concluded that the programs were not constitutional because of their race-conscious approach. Though the OLC opinion was undertaken using the lens of the Fifth Amendment, a similar analysis would guide application to Title VI or Title VII of the Civil Rights Act. *See Alexander v. Sandoval*, 532 U.S. 275, 279–81 (2001) ("tak[ing] as given" that Title VI "proscribe[s] only those racial classifications that would violate the Equal Protection Clause or the Fifth Amendment").

4. *Disney Entertainment Television:* "Disney Entertainment Television's Entertainment Incubator Program provides an apprentice-style, rotational experience for individuals with a diversity of perspectives, contributing to talent

development across the company's television brands." DET runs two specific programs for diverse candidates: the DET "Directing Program is a highly-selective, one-year program for diverse directors." The 2026 Cohorts included seven women, one African-American man, and one Caucasian man. "The Disney Entertainment Television (DET) Writing Program is a highly selective, annual TV staffing program. The goal is to staff emerging and diverse television writers on DET scripted series." The 2026 Cohort included seven women and two African-American men, such that between the two programs only one Caucasian male received a spot alongside 16 women or African-American men.

5. *CODE: Rosie:* Disney's "CODE: Rosie [is] a program that gives women already at the company in non-technical roles an opportunity to switch careers. After three months of training—in everything from basic computer-science concepts to programming languages such as Python—they'll segue into a yearlong apprenticeship consisting of two six-month chunks in different teams within the company. Then they'll have the opportunity to take a job within one of Disney's technical groups."

6. *Television Studios:* In 2019, Disney announced two new DEI programs: "Walt Disney Television has announced two new initiatives designed to create opportunities for individuals from underrepresented backgrounds: the Executive Incubator Program, which is intended to create a pipeline of next-generation network executives, and the Walt Disney Television Studios Intern Program, which will offer a career path for diverse talent behind the camera. These new programs continue

Disney|ABC's commitment to expand its diverse talent workforce and better reflect the audiences it serves, and will seek out talent with diverse and varied perspectives, including women, people of color, the LGBTQ+ community, military veterans, people with disabilities and others aspiring to hold network executive roles and production positions across the Walt Disney Television studios." The announcement noted a preexisting Women's Production Program as well.

7. *Talent Networks:* Disney runs several programs for preferred employees to rise within the company, including its Black Talent Network and Women's Talent Network. "[T]he Black Talent Network, which launched in 2020[, ] expands exposure for Black talent across the Company and helps to increase representation in senior-level roles. Participants engage with senior leaders and create career plans to expand their opportunities within the Company." "[O]ur Black Talent Network has an explicit goal to accelerate exposure for Black Vice Presidents to senior leaders across the enterprise and provide opportunities for development." Similarly, the "Women's Talent Network [launched specific initiatives] to enhance careers for Asian American & Pacific Islander (AAPI) as well as Latina employees."

8. *Charitable Giving:* "In FY21, [Disney] achieved [its] goal of directing more than 50% of our charitable giving to programs supporting underrepresented communities. That equated to more than $150 million of our giving directed to programs that support Asian American, Pacific Islander, Black and African American, Hispanic and Latino, Native American and Indigenous, and Multicultural communities, as well as women, veterans, people with disabilities, and those who identify as LGBTQ+." "Star

Imagine UK, a new short film incubator program that Disney supports in collaboration with The National Film and Television School, grants teams from underrepresented backgrounds £25,000 to develop their uniquely personal stories. The Film Independent Imaginar Producers Residency is another new program made possible by Disney and Searchlight Pictures in collaboration with the National Association of Latino Independent Producers. The residency supports Hispanic and Latino independent producers with a $50,000 grant, professional coaching, mentorship, project development support from industry professionals, and access to creative workplaces." "Disney Australia & New Zealand helped expand the next generation of leaders through MINUS 18's Young Leaders Program. The program is designed to build the skills, confidence, and social connection of LGBTQIA+ youth by increasing their work readiness and connection to future job opportunities."

Some of the foregoing programs likely violate Title VII by restricting employment opportunities based on race. The EEOC's guidance on Title VII clearly specifies that unlawful discrimination includes, "Access to or exclusion from training (including training characterized as leadership development programs); Access to mentoring, sponsorship, or workplace networking / networks; [and] Internships." [20] Certain scholarship or internship programs would likely violate Title VI (the Civil Rights Act's title for educational programs) if administered directly by a federally funded

[20] EEOC, "What You Should Know About DEI-Related Discrimination at Work."

college or university.[21] And others are not technically illegal, such as targeted charitable giving, but still constitute discrimination based on certain characteristics.

Even in those cases where Title VI or VII or some other statute does not directly bar the program at issue, *i.e.*, "even where no violation of a specific statute is established or alleged, specific allegations [of racial discrimination] may raise serious public interest issues warranting a full hearing." *In re WIOO Inc.*, 40 F.C.C.2d 217, 219 n.7 (Rev. Bd. 1973) (quoting *Notice of Proposed Rulemaking to Require Broadcast Licensees to Show Nondiscrimination in Their Employment Practices*, 13 F.C.C.2d 766, 769 (1968)).[22] *Accord In Re Lamar Life Broadcasting Co.,* 53 F.C.C.2d 928, 932 n.4 (1975) (same).

In this instance, the foregoing eight points alone would constitute a deeply disconcerting record of race, gender, and sexual-orientation-based discrimination. Seen alongside the evidence in America First Legal's EEOC complaint and the Commission's own investigation, these "[discriminatory employment] practices raise questions about the character qualifications of the licensee" which call for designation for a hearing. *See NOW v. FCC*, 555 F.2d 1002, 1017 (D.C. Cir. 1977).

---

[21] *See* U.S. Department of Education Releases Frequently Asked Questions on Dear Colleague Letter About Racial Preferencing (March 1, 2025).

[22] We understand that Disney has withdrawn some of its DEI programs from its public filings with the SEC. However, one analyst sees this as going underground with the same practices: "This shift in public disclosure doesn't signal companies are abandoning DEI. Rather, they're selectively reframing commitments, reducing public exposure, and embedding oversight more quietly yet firmly into governance and human capital management." This is nothing more than "stripping divisive language from public filings while maintaining substantive workplace policies." Disney's action "seems more like a reframing, rather than an outright rejection of DEI practices."

## IV. ABC's lack of honesty with the Commission is another reason to have concern about its character as a licensee.

Separate from the substance of the Commission's concerns about racial discrimination by Disney, Chairman Carr has said that Disney's response to the Commission's investigation has been "deficient, nonresponsive, and disingenuous."[23]

This also raises serious concerns about Disney's qualification to hold a license. When the FCC's chief administrative law judge "found that [a licensee's] responses to the Enforcement Bureau's interrogatories reflected 'disingenuous stonewalling' and that [the licensee] had failed to respond on a timely basis to the Enforcement Bureau's document requests and requests for admissions," the judge found that it "justified making negative findings with respect to the issues specified in the [hearing designation order]." The full commission affirmed his ruling. *In re Zawila*, 34 FCC Rcd 13036, 13038 (2019).

In a concurring statement, Commissioner Rosenworcel wrote, "Long ago the Federal Communications Commission established that the 'trait of truthfulness' is a necessary element of the character required to operate a broadcast station in the public interest. . . honesty with the FCC is a foundational requirement for holding a license." *Id.* at 13047 (Statement of Comm'r Rosenworcel). Commissioner Starks similarly concurred: "engaging in misrepresentation or lack of candor before the Commission is among the most serious offenses a regulatee can commit. . . . particularly when it comes to broadcasters, a lack of candor to the Commission is a

---

[23] Letter from Chairman Carr to U.S. Rep. Yvette Clark (May 29, 2026).

strong indication that a party may not possess the requisite character to hold a Commission license. Moreover, in the case of an unscrupulous licensee with multiple stations, misrepresentation and lack of candor constitutes 'serious deliberate misconduct' that could put all of a broadcaster's licenses at risk." *Id.* at 13048 (Statement of Comm'r Starks).

At this point, the public does not know the exact nature of Disney's "deficient, nonresponsive, and disingenuous" response to the Enforcement Bureau. However, presuming the record supports the Chairman's statement that Disney was less than fully forthcoming in its responses to the Commission, that would constitute a separate serious violation of the Commission's rules and character expectations.

## V. ABC's lack of respect for its affiliates and its potential violations of the FCC's right to preempt rule are sources of serious concern.

A network's misconduct in its relationship with its affiliates is an appropriate subject of review during a license proceeding for its owned-and-operated stations because it speaks to the owner's FCC-related character. *In the Matter of Policy Regarding Character Qualifications in Broadcast Licensing*, 1 FCC Rcd 421, 423 (¶ 16) (1986). "Parties to affiliation agreements that violate existing rules are already subject to enforcement action. Particularly egregious behavior could result in an order to file an early license renewal application, a short-term renewal period, or designation for hearing." *Empowering Local Broadcasters*, 2025 FCC LEXIS 2528, *18 n.28 (Nov. 19, 2025).

The Petitioners incorporate into the record here the letter of then-Commissioner Brendan Carr to Disney on potentially abusive practices between ABC as a national

programmer (network) and its affiliates.[24] The Petitioners also incorporate concerns that ABC's affiliate contacts may unlawfully restrict affiliates' right to preempt in violation of 47 CFR § 73.658. *In re Character Qualifications*, 1 FCC Rcd at 423 ("a violation of these and any other pertinent rules is a relevant area of concern in broadcast licensing proceedings because such misconduct is 'FCC-related.'").

The Petitioners urge the Commission to include within its license renewal investigation a review of Disney's affiliation contracts to determine whether they violate the right to reject rule by unlawfully circumscribing affiliate discretion. The Petitioners further urge the Commission to investigate whether ABC threatened unlawful retaliation against affiliates that exercised their right to reject by saying it would withhold premium programming unless they ended their public-interest preemption. Out of respect for the fact that these are sensitive and proprietary corporate documents, and that they involve one set of parties (the affiliates) whose licenses are not at issue in this proceeding, it makes sense for the Commission staff rather than Petitioners to ask these questions directly to preserve confidentiality.

## VI. Disney's cozy relationship with the Chinese Communist Party raises the specter of undue foreign influence and reflects poorly on Disney's character as a licensee.

Chairman Carr has stressed many times the dangers of the Chinese Communist Party (CCP) as America's primary global adversary in the 21st Century.[25] Disney's

---

[24] Letter from Commissioner Brendan Carr to Mr. Bob Iger (Dec. 21, 2024).

[25] *See, e.g.*, *Comm'r Brendan Carr Testimony before the U.S. House Subcommittee on National Security* (July 13, 2022), 2022 FCC LEXIS 2293; *In re Protecting Against Nat'l Sec. Threats to the Communs. Supply Chain Through FCC Programs, Huawei*

track record of close relations with the CCP while producing its content is a source of significant concern to lawmakers and should be a significant source of concern to this Commission.

After an initial decision to push back on CCP pressure with the distribution of *Kundun*, a movie about the life of the Tibetan Dalai Lama, Disney soon switched gears. To open its Disneyland Shanghai, "Disney is sharing the keys to the Magic Kingdom with the Communist Party. While that partnership has made it easier to get things done in China, it has also given the government influence over everything from the price of admission to the types of rides at the park." According to *The New York Times*, Disney and the CCP are literal business partners: the Chinese government "took a 57 percent stake in the Shanghai resort, which includes revenue from hotels, restaurants and merchandise sold on the grounds. Disney also gave the government a 30 percent piece of the Disney management company that runs the property." The *Times* concluded, "Disney is going to extraordinary lengths to prove its commitment to China and the Communist Party."

Significant congressional attention started in 2020, following the release of Disney's *Mulan* live-action film, which was partially shot in the Xinjiang region of China. *See Remarks of FCC Chairman Ajit Pai*, 2021 FCC LEXIS 84, *4 (Jan. 5, 2021) ("the many examples of the Chinese Communist Party's appalling behavior, from the repression and detention of Muslims in Xinjiang. . .").

---

*Designation, ZTE Designation*, 34 FCC Rcd 11423, 11536 (2019) (Statement of Comm'r Carr).

Six senior members of the U.S. House Committee on Oversight and Government Reform wrote to Disney saying, "Despite universally-recognized abuses occurring in Xinjiang, the film credits offered special thanks to over a dozen Chinese institutions that assisted with filming, including four Chinese Communist Party (CCP) propaganda departments in the XUAR. These credits include the Turpan Municipal Bureau of Public Security, a CCP-run agency actively facilitating and orchestrating human rights abuses and the genocide of the Uyghur people." At the same time, the letter pointed out, Disney had publicly warned that it would not film in the State of Georgia if a new pro-life law went into effect.[26]

U.S. Rep. Jim Jordan echoed this comparison in an X post: "Disney threatened to boycott filming in Georgia when the state passed a pro-life bill. But thanked the Chinese Communist Party for letting the studio film in Xinjiang, which houses China's concentration camps. Can't make this stuff up."

A second, bipartisan, bicameral letter to Disney led by U.S. Senator Marco Rubio said: "Disney's apparent cooperation with officials of the People's Republic of China (PRC) who are most responsible for committing atrocities—or for covering up those crimes—is profoundly disturbing."[27] A third letter from U.S. Senator Josh Hawley was even harsher: "Your decision to uncritically approve this film's release rather than apologizing to those harmed by Disney's actions is reprehensible. Your decision

[26] Letter from U.S. Rep. James Comer, et al., to Robert Chapek, et al. (Sept. 14, 2020).
[27] Letter from U.S. Sen. Marco Rubio, et al., to Mr. Robert Chapek (Sept. 11, 2020).

to put profit over principle, to not just ignore the CCP's genocide and other atrocities but to aid and abet them, is an affront to American values."[28]

Later that same year, U.S. Attorney General William Barr accused Hollywood of "censor[ing] its own movies to appease the Chinese Communist Party, the world's most powerful violator of human rights." One example he highlighted stemmed from a Disney franchise: "In the Marvel Studios blockbuster *Dr. Strange*, filmmakers changed the nationality of a major character known as the 'Ancient One,' a Tibetan monk in the comic books, from Tibetan to Celtic. When challenged about this, a screenwriter explained that 'if you acknowledge that Tibet is a place and that he's Tibetan, you risk alienating one billion people.' Or, he continued, the Chinese government might say '[w]e're not going to show your movie because you decided to get political.'"[29]

Congressional engagement and criticism continued. A dozen House members wrote Disney the following year when Disney+ removed a single episode of *The Simpsons* from its Chinese streaming service because it included a joke about Tiananmen Square. "We are deeply concerned by the apparent decision of Disney to scrub history on behalf of the Communist tyrants in Beijing, even in a satirical environment like 'The Simpsons.' . . . This deplorable action raises serious questions of yet another American company undermining American principles at the apparent demand of the CCP."

---

[28] Letter from U.S. Sen. Josh Hawley to Mr. Robert Chapek (Sept. 9, 2020).

[29] Attorney General William P. Barr Delivers Remarks on China Policy at the Gerald R. Ford Presidential Museum (July 16, 2020).

After meetings between the U.S. House's Select Committee on China and Disney leadership in 2023, the *Los Angeles Times* reported that the committee chairman's "China censorship worries [were] 'stronger than ever' after Disney meeting." House Select Committee Chairman Mike Gallagher reiterated those concerns in September 2023, saying at a committee roundtable: "companies like Disney bend over backwards to avoid portraying the CCP in a negative light."[30]

Disney's engagement with China has continued. Just this year, the Chinese Embassy to the U.S. released a meeting readout: "On January 9, 2026, Member of the Standing Committee of the Political Bureau of the Communist Party of China (CPC) Central Committee and Vice Premier of the State Council Ding Xuexiang met with Chief Executive Officer of The Walt Disney Company of the United States Robert Alan Iger in Beijing."[31] This consistent engagement reflects the reality that "Disney, of course, has more business in China than perhaps any other American entertainment conglomerate."

The Commission has a duty to "safeguard domestic station licensees from undue foreign influence and control and to insure the American character of licensees. That [congressional] intent was particularly strong when combined with concerns for national security." *In re Application of Fox Television Stations*, 11 FCC Rcd 5714, 5722 (1995). Though this normally includes an evaluation of ownership percentages,

[30] MEDIA PACKAGE: Select Committee on CCP Roundtable: "The CCP's Propaganda and Censorship" (Sept. 13, 2023).

[31] Chinese Embassy to the United States, Readout (Jan. 9, 2026).

it can include other forms of foreign influence, such as board seats. *See, e.g., In Re Request of Millicom Inc.*, 4 FCC Rcd 4846, 4847 (CCB 1989).

This Commission is engaging its full "regulatory, investigatory, and enforcement authorities to protect Americans and counter foreign adversaries, particularly the threats posed by China and the Chinese Communist Party." *FCC Lays Groundwork*, 2025 FCC LEXIS 1731, *2 (May 22, 2025). Given strong congressional concern about Disney's relationship with the CCP, as part of its regulatory review, the Commission should ensure that the CCP is not "able to direct or influence [Disney's] corporate policy." *In re FCC Approves Skydance / Paramount (CBS) Transaction*, 40 FCC Rcd 5689, 5713 (2025).

## VII. Disney's procedural objections are baseless.

1. The Media Bureau appropriately exercised its authority to call in Disney's licenses for early renewal.

"[T]he Commission has the power to order that a renewal application be filed earlier if the Commission determines that the application is 'essential to the proper conduct of a hearing or investigation.'" *MCA, Inc. v. Garden State Broadcasting Ltd. Partnership*, 1988 U.S. Dist. LEXIS 11007, *3 n.3 (D.N.J. Sept. 29, 1989) (quoting 47 CFR 73.3539(c)).[32] And though the power is not exercised often, hopefully that reflects

[32] Disney seems to preserve for a future appeal an argument that this rule is contrary to statute based on a hyper-textualist reading of 47 U.S.C. § 309(k)(1), emphasizing the statutory language that renewal must be based on an evaluation of the licensee's performance "during the preceding term of its license." Disney reads this to mean that it is entitled to the full term of its license, and that an order to file an early renewal application is therefore contrary to statute. WABC Objection to Unlawful Early Renewal ("Objection") at 6. In doing so, Disney misses the importance of a neighboring statutory provision, 47 U.S.C. § 3079(c)(1), which provides in part: "Consistent with the foregoing provisions of this subsection, the Commission may by

primarily on the good conduct and character of the vast majority of Commission licensees.

Early license renewal is available to address "[p]articularly egregious behavior." *In re MB Seeks Comment on Market Dynamics of National Programmers/Affiliates*, 40 FCC Rcd 9062, 9067 (MB 2025). Indeed, Disney distinguishes its situation from that of *Bridge News* by saying that case "involved clear and egregious misconduct by the licensee." WABC Objection to Unlawful Early Renewal ("Objection") at 2 n.3. But what counts as "clear and egregious misconduct" is apparently in the eye of the beholder—as recited above, in the past Commission has firmly stated that a licensee is engaged in egregious misconduct if the licensee violates the Civil Rights Act by engaging in racial discrimination. *See, e.g., In re Walton Broad., Inc.,* 78 F.C.C.2d 857, 878 (1980) ("we wish to emphasize the seriousness with which we view violations of the EEO Rules. Questions of EEO compliance go to an applicant's basic qualifications to be a licensee.").

Indeed, this Commission's action follows its precedent in *In re Leflore Broad. Co.*, 36 F.C.C.2d 101 (1972). In that case, the Commission confronted significant allegations of racial discrimination in employment by a broadcast licensee. The Commission found that the complainants "raised substantial and material questions

---

rule prescribe the period or periods for which licenses shall be granted and renewed for particular classes of stations, but the Commission may not adopt or follow any rule which would preclude it, in any case involving a station of a particular class, from granting or renewing a license for a shorter period than that prescribed for stations of such class if, in its judgment, the public interest, convenience, or necessity would be served by such action." The Commission's early renewal rule is an exercise of this congressional authorization.

of fact as to whether Leflore's operation of Station WSWG is consonant with the public interest." *Id*. at 104. The Commission further determined "in the circumstances the public interest would be served by prompt institution of that hearing rather than delaying the hearing until the end of the regular license term." *Id*. Therefore, the Commission ordered Leflore to submit an early license renewal application.

The Commission has subsequently cited *Leflore* as holding that it may order a licensee to "renewal of the license prior to the end of the license term" if it finds issues with a licensee engaged in employment discrimination. *In re Application of Tulsa 23*, 4 FCC Rcd 2067, 2069 n.12 (1989). *Accord In re Applications of Heritage-Wisconsin Broadcasting Corp., et al.*, 8 FCC Rcd 5607, 5613 (1993).

Disney continues its objection to early renewal by saying the proceeding is not necessary—that the Enforcement Bureau can simply continue its investigation with "its existing tools." Objection at 3. First off, the subject of an investigation does not normally get to dictate to the police or prosecutor what tools of investigation he or she may use—the criminals cannot say, "We only consent to investigation by the local police but not the FBI." Second, as cited above, the Chairman has said that Disney's responses to this point have been "deficient, nonresponsive, and disingenuous."[33] Disney's obstreperous and obstructionist behavior justifies an intensification of the investigation. Put differently, it's understandable that the Commission does not want to proceed further on the current path when Disney is not cooperating on the current path. Third, and reinforcing this point, moving to early license renewal underlines

[33] Letter from Chairman Carr to U.S. Rep. Yvette Clark (May 29, 2026).

for Disney the seriousness with which the Commission takes this matter. The topic at hand—racial discrimination—is an important issue that goes directly to Disney's qualifications to hold an FCC license. Disney has apparently taken a noncooperative attitude with the investigation to this point. Moving to a license call-up informs Disney—and all other licensees—of the Commission's serious attitude toward discrimination. Fourth, early license renewal allows the public to participate in the investigation. Members of the public such as these Petitioners may bring forth information about Disney's discriminatory practices (eight of which are listed above) which the Commission may not have known otherwise. It may elicit whistleblowers who submit new information. *See* "Whistleblower Urges FCC to Deny Renewal of Disney's KABC-TV License", *Communications Daily* (June 11, 2026). These four reasons, and perhaps others, justify and explain the bureau's decision. Ultimately, the bureau may decide "about the methods we have chosen to perform tasks that are committed to our discretion," including choosing between different types of investigatory tools. *In the Matter of Annual 1987 Access Tariff Filings*, 3 FCC Rcd 749, 751 (1988).

What is more, the Commission would be justified acting as it did even without a precedent like *Leflore*. "It is well settled that the Commission has wide discretion in determining the appropriate sanction to be applied for licensee misconduct. . . . the Commission is not bound to deal with all cases at all times as it has dealt with some cases that seem comparable. . . . the choice of remedies and sanctions is a matter within the Commission's broad discretion and [the D.C. Circuit] found no abuse of

discretion where the Commission imposed a sanction more severe than previously imposed." *In re Walton Broad., Inc.*, 78 F.C.C.2d at 868 n.17. *Accord In re Fabrice Polynice & Harold Sido & Veronise Sido*, 33 FCC Rcd 6852, 6857 (2018). *See In re William F. Crowell*, 31 FCC Rcd 8700, 8710 n.77 (EB 2016).

Chairman Carr has made abundantly clear that he views ending race- and gender-based discrimination at Commission licensees as a priority—just ask Verizon or T-Mobile or Skydance. In doing so, he is aligned with President Trump's vision to end DEI practices. *See, e.g.,* Executive Order 14151.

We should not be surprised when appointees "exercise their discretion in a manner consistent with the established enforcement priorities of the Administration they serve." *Ga. Latino Alliance for Human Rights v. Governor of Ga.*, 691 F.3d 1250, 1265 (11th Cir. 2012). It's fairly normal for a "a new administration [to] shift enforcement priorities to place greater emphasis on prosecuting" one or another topic. *United States v. McIntosh*, 833 F.3d 1163, 1179 n.5 (9th Cir. 2016). In this case, the Chairman and Media Bureau have made combatting race-based discrimination at licensees an enforcement priority, and their decision to do so is solidly within their discretion.

More particularly, Disney objects that the Media Bureau ordered "simultaneous license renewal applications from a group of stations commonly owned with a network." Objection at 1. *Accord id.* at 14. Again, the Bureau's action makes perfect sense in context. The allegation of racial discrimination goes directly to Disney's character as a licensee. That would be true if Disney held one license or one hundred licenses. If Disney lacks the character to be a Commission licensee because it is has

engaged in race-based discrimination, then it lacks the character whether the license in question is WABC in New York or WLS in Chicago or anywhere else. *Policy Regarding Character Qualifications in Broadcast Licensing*, 1 FCC Rcd 421, 423 (1986) ("networks are often multiple station licensees, and, like any other multiple owner, any misconduct within the parameters of this Policy Statement could have an effect on other commonly owned stations."). *See, e.g., In Re Applications of Deep South Radio, et al.*, 47 F.C.C.2d 1045, 1048 (Rev. Bd. 1974) (holding radio station application pending resolution of racial discrimination investigation of another radio station (*Leflore*) with a shared owner because the results of that investigation "could possibly reflect on his fitness to be a Commission licensee.").

Finally, though Disney may invoke the language of the Administrative Procedure Act ("arbitrary and capricious"), Petitioners are dubious that Disney could challenge the proceeding at this point because an order to complete a license renewal application, without more, does not constitute "final agency action." *In re Aiken County*, 645 F.3d 428, 437 (D.C. Cir. 2011) (summarizing holding of *Bennett v. Spear*, 520 U.S. 154, 178 (1997): "'final' agency action must both mark consummation of an agency's decision making process and either determine rights or obligations or be an action from which legal consequences will flow.").

2. The Commission has a clear standard for EEO compliance and has issued strong sanctions for non-compliance.

Disney charges that the order is arbitrary and capricious because it "implies that certain types of employment policies . . . will factor into the renewal adjudication. That would constitute a new interpretive standard for measuring public interest

compliance, adopted without notice or an opportunity for comment." Objection at 8. "Neither the Act nor the Commission's rules suggest that DEI practices are relevant to renewal evaluation." Objection at 9. Disney complains, "WABC has no fair notice of what conduct the Commission now expects, what prior conduct it deems deficient, or how the Commission will execute on its apparent plan to begin weighing DEI practices in the renewal process." *Id.*

Wrong. The Commission has held *for decades* that companies engaged in racially discriminatory practices lack the character requisite to hold a commission license, and that such discriminatory practices justify significant investigation and enforcement. *In the Matter of MOU between the FCC and the EEOC*, 70 F.C.C.2d 2320, 2323 (1978) ("no one who discriminates against employees or potential employees on the basis of race, color, sex, national origin or religion could be said to be operating in the public interest. . . . we feel that the Commission's authority to prevent employment discrimination is well grounded. . . . Given this recognized responsibility, the FCC retains, as in other areas of its authority, expansive powers to deal with employment discrimination.").

Indeed, the Commission has gone so far as to say that racially discriminatory activities and associations *outside* the broadcast station itself by the same principal are so disconcerting as to be potentially disqualifying. *In re Lamar*, 58 F.C.C.2d 274, 277 (Rev. Bd. 1976) (proposed station CEO served on board of a racially discriminatory school); *In re Chapman*, 34 F.C.C.2d 159, 163 (Rev. Bd. 1972) (proposed station principals engaged in racial discrimination in housing); *In re*

*Chapman*, 24 F.C.C.2d 282, 284 (1970) (proposed station owner owned a racially discriminatory cemetery). *See also In re applications of Alpine Broadcasting*, 88 F.C.C.2d 1213, 1220 & n.9 (ALJ 1981) (principal belonged to gender-discriminatory business/professional organization).[34]

What the Commission expects of its licensees is, and has been, quite clear: "we have no doubt that it requires us to deny licenses to those who would discriminate on the basis of race, ethnicity or gender. Such persons do not have the basic character qualifications to hold a valuable government license." *In the Matter of Review of the Commission's Broadcast and Cable Equal Employment Opportunity Rules*, 15 FCC Rcd 2329, 2331 (2000).

The Commission does not need to spell out in exacting detail what this means, adopting a rule that says no "racially discriminatory internship programs," or "gender discriminatory training programs," or "racially discriminatory executive mentorship programs." It is sufficient to adopt a rule that says, "Equal opportunity in employment shall be afforded by all licensees . . . to all qualified persons, and no person shall be discriminated against in employment by such stations because of race, color, religion, national origin, or sex," 47 CFR § 73.2080, and then to say that violations of that rule go directly to the heart of a license. *In re Walton Broad., Inc.*, 78 F.C.C.2d at 859 (significant violations of EEO rule and misstatements to FCC

---

[34] Holding disputed, *In re applications of Morris, et al.*, 88 F.C.C.2d 713, 722 (Rev. Bd. 1981).

about EEO program "would constitute a separate and independent ground for denial of its renewal application.").

The Commission has also developed this body of law substantially in the last two years. *See, e.g., Applications for Assignment of Licenses from Sagamorehill of Columbus, Ga, Llc, Sagamorehill of Lubbock, Llc, & Subsidiaries of Block Communs., to Gray Tv Licensee, Llc*, 2026 FCC LEXIS 1041, *25-26 (MB May 6, 2026); *In re Consent to the Transfer of Control of Tegna*, 2026 FCC LEXIS 620, *67-69 (MB March 19, 2026); *In re Cox Enters.*, 2026 FCC LEXIS 461, *24 (CB/OIA/WTB Feb. 27, 2026); *In re WTB Grants AT&T-UScellular Applications Order*, 40 FCC Rcd 9290, 9312 (WTB 2025); *In re FCC Approves Skydance / Paramount (CBS) Transaction*, 40 FCC Rcd 5689, 5714 (2025); *In re WTB & OIA Issues Order Granting T-Mobile-UScellular Applications*, 40 FCC Rcd 4776, 4840 (WTB/OIA 2025); *In re Domestic Section 214 Application Granted*, 40 FCC Rcd 4440, 4446 (WCB 2025); *In re Frontier Commc'ns Parent, Inc.*, 2025 FCC LEXIS 2244, *46-47 (WCB/OIA/WTB March 16, 2025). To the extent that the Commission decided some of these more recent matters while this investigation was ongoing, the Commission staff should apply the new rule to pending investigations like this one. *In Re Application of KTVO, Inc.*, 63 F.C.C.2d 770, 777 (Rev. Bd. 1977).[35] And Disney was on notice that this was a Commission enforcement

[35] Disney says in a footnote regarding these precedents: "These private commitments, made in the context of specific transactions, do not and cannot legally serve as sufficient notice to licensees of a change in the Commission's EEO rules or its license renewal requirements." Objection at 9 n.24. These are not private commitments, but FCC orders adopting representations made by transaction applicants. Regardless, they do not represent a "change" in the Commission's EEO rules. Rather, they embody a change in the Commission's enforcement priorities—the Commission has

priority—it could have changed its practices to conform to this new standard, as Paramount did, but chose not to. *Letter from Chairman Carr to Mr. Bob Iger* (March 27, 2025).

Finally, even if this precedent did not exist, the FCC is not obligated to define the public interest only through rulemaking—it may do so through an adjudicatory proceeding as well. *In the matter of Arlington Telecom. Corp.*, 69 F.C.C.2d 1923, 1937 (1978).

In sum, the Commission has held for decades that its licensees may not engage in racial or gender discrimination. This standard has been clear and longstanding. The bureau is not acting capriciously or arbitrarily to investigate enforcement of that standard through this proceeding.

3. The Commission is not suppressing Disney's speech through this proceeding.

The Commission does not suppress Disney's speech (or the speech of anyone else) by undertaking this proceeding. Disney says, "The only plausible reason to issue the Order is to punish the Station for speech the government does not like." Objection at 13. Actually, the plausible reason to issue the Order is to further an important investigation on a key enforcement priority in the face of obstreperous behavior by the licensee.

---

taken a reinvigorated approach to enforcing its EEO expectations. The Commission is not obligated to give a public notice of a newfound enforcement priority, and in all events it has clearly done so from the literal start of this administration. *Chairman Carr Ends FCC's Promotion of DEI*, 2025 FCC LEXIS 202 (Jan. 21, 2025).

To accuse the Commission of "pretext" is a nice way of calling the chairman of a federal agency a liar. *Compare* Objection at 14 *with* Jeremy Barr, "FCC chair denies ABC license review is related to Kimmel controversy", *The Guardian* (April 30, 2026) ("Brendan Carr claims agency's renewal order is strictly related to investigation into network's DEI initiatives.").

Such an attack runs headlong into the longstanding presumption of regularity ascribed to agency actions, including their motives. *LULAC v. Exec. Off. of the President,* 780 F. Supp. 3d 135, 177 (D.D.C. 2025) ("agencies benefit from a presumption of motivational regularity."). "Accordingly, the [agency head] is entitled to a presumption of motivational regularity when he exercises an authority confided to him by law, even in the face of a plaintiff's allegations of partisan motives." *Id.* (cleaned up; relying on *Trump v. Thompson*, 20 F.4th 10, 39 (D.C. Cir. 2021)). The challenger must produce "compelling evidence of impermissible intent," *id.*, to overcome the presumption.

There is no compelling evidence here—just circumstantial suppositions about the timing of this action alongside the timing of other statements by the administration. This is insufficient to overcome the high standard for compelling evidence. *See Rhodes v. Snyder*, 302 F. Supp. 3d 905, 911 (E.D.Mich. 2011) (circumstantial evidence not sufficient to meet heavy burden to show discriminatory intent by policymaker).

Moreover, there is plenty of evidence pointing in the opposite direction. Chairman Carr has clearly made unlawful DEI practices at commission licensees a top enforcement priority, which establishes the bureau's good faith in moving forward

with this investigation in a serious way. Also, the Chairman does not shy away from directly confronting Disney's partisanship in programming, as is evidenced by his separate investigation into *The View*. *See FCC's Media Bureau Seeks Comment on Petition by Disney's ABC*, 2026 FCC LEXIS 1183, *2 (MB May 22, 2026) ("broadcast television stations [ ] have an obligation to operate in the public interest--not in any narrow partisan, political interest."). He has no need to do *sub rosa* what he is clearly willing to do directly.

Any time that the FCC pursued any licensing action against a broadcaster, the broadcaster could argue that the FCC's action is really retaliation for speech because all broadcasters engage in speech. The segregationist station owners of the Civil Rights era could have argued that the Commission's investigation into their racist hiring practices, or their racist activities outside the station, was simply a pretext to target them for pro-segregation speech on the airwaves. That argument would have fallen flat then, and this argument should fall flat today—the Commission has every reason based on the public record to believe that Disney is engaged in unlawful discrimination and to take action to end it.

## CONCLUSION

The Petitioners ask the Commission to designate this matter for a hearing. There should be no question that designation is appropriate for the complaints of racial and gender discrimination. *Beaumont Branch of NAACP v. FCC*, 854 F.2d 501, 507 (D.C. Cir. 1989) ("A documented pattern of intentional discrimination will almost invariably disqualify a broadcaster from obtaining or retaining a license. When a

responsible and well-pleaded claim of discrimination has been made, we have held that the FCC may be required to hold a hearing in advance to consider the charges and to determine whether to grant the license at all.").

We believe the information presented above on Issues I (news bias) and II (ABC Owned Television Stations Race & Culture) also present sufficient issues to justify designation. *See In re Star Stations of Ind., Inc.*, 51 F.C.C.2d 95, 96 (1975) (recounting procedural history of designating for hearing license renewal for stations accused of biased and partisan programming).

We ask the Commission staff to further investigate Issues IV (Affiliate relations) and V (Chinese Communist influence) to determine whether they should also be designated for hearing.

"When the Commission finds that a broadcaster has failed to serve the public interest, the Commission may take appropriate action, including enforcement action [i.e., a forfeiture], grant of a renewal application with conditions and/or on a short term basis, . . . or designating an application for hearing" (which can ultimately result in denial of a license renewal). *FCC Reminds Broadcasters of their Public Interest Obligations,* DA 26-530 (May 28, 2026), at 6.

Disney thus faces a choice: shape up or put your licenses at serious risk. What would it look like for Disney to shape up? (1) End the DEI. All of it. Rip it out root-and-branch. End the set-asides, the fast-track programs, and the preferences. Open everything up to everyone. Follow the well-trod path of other FCC licensees like Paramount, which did the same for its DEI company-wide during the Skydance

transaction. (2) Eliminate the Race & Culture content team at ABC Owned Stations. Open up the *Our America* program to include a variety of perspectives. (3) Overhaul ABC network programming, including ABC News, *The View*, and *Jimmy Kimmel Live!*, to move the ball between the 40-yard lines of American life and politics.

As part of a programming overhaul, ABC would need to adopt objective structural safeguards against bias and candidate favoritism. "[O]bjective structural safeguards satisfy Congress' concern with the possibility of broadcaster abuse in the coverage of the political arena." *Mass Media Action*, 1991 FCC LEXIS 4128, *2 (Aug. 1, 1991). "[S]tructural safeguards [ ] prevent against possible candidate favoritism." *In re Requests of Fox Broadcasting Co.*, 11 FCC Rcd 11101, 11102 (1996). *See In re Request of King Broadcasting Co.*, 6 FCC Rcd 4998, 5000 n.4 (1991); *In Re Request of Belo Corp.*, 11 FCC Rcd 12306, 12310 (MMB 1996); *In re Request of ABC, Inc.*, 15 FCC Rcd 1355, 1359 (MMB 1999).

What "structural safeguards" make sense here?

First, ABC should commit to an even(ish) mix of Republican and Democrat candidates and elected officials as guests on its interview programs (*Good Morning America*, *The View*, *Jimmy Kimmel Live!*, and *This Week*).

Second, ABC should commit to hiring several prominent, Trump-aligned actual Republicans as on-air talent for its shows. Stephanopoulos, Kimmel, Goldberg, Behar, Hostin—these are all prominent, enthusiastic Democrats. And the only two "Republicans"—Navarro and Griffin—are, in actuality, anything but: Navarro is a Biden and Harris donor in 2020 and 2024, while Griffin voted for Harris in 2024.

Third, following the example set by CBS, ABC should commit to only using live or live-to-tape interviews with public officials to avoid selective and deceptive editing. *See* Stephen Battaglio, "CBS' 'Face the Nation' will no longer edit taped interviews after Kristi Noem backlash", *Los Angeles Times* (Sept. 5, 2025).

Fourth, ABC should commit to a policy that all senior network and Owned Station employees (in other words, both on-air talent and off-camera producers and executives) that touch politics (in other words, ABC News *and* entertainment programs with political interviews like *The View* and *Kimmel*) will not donate to, host fundraisers for, or campaign for political candidates, parties, PACs, or causes. It has been reported in the past that ABC News has a policy against news employees making political donations. And in 2016, George Stephanopoulos publicly apologized for failing to disclose $75,000 in donations to the Clinton Foundation at the same time Hillary was running for president. However, it's clear that *The View* cohosts regularly donate to politicians, as does Jimmy Kimmel. A rule against donations and campaigning for candidates is a clear guardrail to preserve at least the appearance of objectivity.

ABC can also put in place a news ombudsman like CBS. *In re FCC Approves Skydance / Paramount (CBS) Transaction*, 40 FCC Rcd at 5714.[36]

---

[36] The CBS ombudsman mechanism has been less than effective to this point. To the public, the ombudsman only exists as a website where "viewers, employees, and other stakeholders" can submit concerns, but only up to 2,000 characters at a time. The Center has submitted concerns twice and received no substantive response. We encourage CBS's ombudsman to (1) give a major public address at a university or think tank that describes his approach to the role; (2) respond with some substantive

If Disney chooses to agree to a performance improvement plan, the Commission should pair the structural safeguards with a shortened renewal review cycle of three years. As we are (re)learning watching the experience at CBS News, Rome isn't built in a day. These news networks are big ships that turn slowly and the "deep state" of employees with deep-set biases is real. A reform-minded leader will experience significant resistance in bringing about change, and firing literally everyone at once isn't a great option. Three years seems an appropriate interval for ABC to have enough time to come into line with its public-interest obligations by making real change without a dangerous or debilitating timeframe to do it in.

Disney faces three options: First, it can make real changes to ensure it complies with its public interest obligations. Second, if Disney isn't ready to seriously comply with its public interest duty, then it should turn in its television licenses and focus on the theme park business. Third, Disney can decide to fight in court. In doing so, it will have to convince the courts that the chairman of the FCC is a liar, contrary to a strong presumption of regularity and significant evidence of his authentic interest in this investigation, or substantively defend its record of race- and gender-based discrimination in the face of decades of Commission precedent condemning such misconduct.

The Commission should designate the licenses for a hearing.

---

acknowledgment to serious submissions; and (3) release a report once every six months on the complaints received and their resolution.

Respectfully submitted,

*/s/ Daniel R. Suhr*
Daniel R. Suhr
Center for American Rights
1341 W. Fullerton Ave., Suite 170
Chicago, IL 60614
dsuhr@americanrights.org