# Exhibit 23

# First on CNBC: Transcript: FCC Chairman Brendan Carr Speaks with CNBC's "Squawk on the Street" Today

PUBLISHED FRI, JUL 10 202612:35 PM EDT

WATCH LIVE
SHARE

WHEN: Today, Friday, July 10, 2026

WHERE: CNBC's "Squawk on the Street"

Following is the unofficial transcript of a CNBC interview with FCC Chairman Brendan Carr on CNBC's "Squawk on the Street" (M-F, 9AM-12PM ET) today, Friday, July 10. Following are links to video on CNBC.com: https://www.cnbc.com/video/2026/07/10/fcc-chairman-brendan-carr-weighs-in-on-abcs-the-view-editorial-standards-amid-recent-filing.html and https://www.cnbc.com/video/2026/07/10/watch-cnbcs-full-interview-with-fcc-chairman-brendan-carr.html.

**All references must be sourced to CNBC.**

SARA EISEN: Joining us here first on CNBC is FCC Chairman Brendan Carr. Chair Carr, welcome back. It's good to have you.

BRENDAN CARR: Yeah, good to be with you. Thanks.

EISEN: So, the big headline in this, in this filing that came from Disney and ABC this week is that they said that the FCC has already ruled on this back in 2002, that it is a bona fide news program, is therefore exempt. What's different now?

CARR: Well, the 2002 was a staff-level decision that was based on representations made in the record all the way back in 2002, and so there's a question of, is the program still the same today as it was back then? That's exactly what has been teed up for the public to weigh in on and what we're seeing is a lot of people expressing some concern or at least skepticism that "The View" with co-hosts Whoopi Goldberg and others is a bona fide news program just like any other sort of standard bona fide news program like "Meet the Press." I think, you know, Versant and every other news organization has their own internal standards for the news side, and I can imagine maybe you can tell me that if you were to go on air right now and endorse a particular political candidate or say that we're in an existential crisis and the House or the

Senate must flip, do you think that the sort of the news standards at Versant would allow you to do that?

EISEN: I don't think I would be allowed to do that, but I do think it gets to this question, which I'm not sure how it's defined, which is what is news, and how are you defining that? A lot of people get their news from watching "The View."

CARR: Yeah, the FCC has a long-standing test on that, which is newsworthiness, which is, are the decisions that are being made at these organizations designed to promote partisan political purposes, or are they based on newsworthiness? And again, nobody is saying that people can't watch "The View" and get news and information from it, but rather it's a very narrow question of whether it's a bona fide news program under the law, because the general rule is, if you're a broadcaster, you have to provide equal political opportunity to all legally qualified candidates. And again, one of the things that Disney has been doing throughout this is misrepresenting the nature of the rule. Even if "The View" is not a bona fide news program, we haven't decided that yet, that wouldn't dictate that they have to have any particular candidate on the show. Rather, the rule just means that the TV station has to provide comparable time and placement, so they would still retain discretion even if the FCC were to rule against them.

EISEN: But I guess the broader worry there is that it would create a chilling effect on this program and other programs, and influence decisions, and potentially hesitation around booking political candidates. In fact, if you look over the last, you know, few months since you've launched this investigation, they haven't actually had too many candidates for office, perhaps because they're worried about what you're going to do about it.

CARR: Well, one of the arguments that Disney and other broadcasters are making really goes to the heart of the bargain that Congress struck on behalf of the American people. The idea was that, unlike a cable channel, broadcasters get their spectrum, their forms of distribution, for free, effectively subsidized because they're using taxpayer resources. But in exchange, the American people, all of them, get something back, which is broadcasters operating the public interest in complying with unique obligations, including political equal opportunities. Again, if broadcasters don't like that, that's okay. They can become a cable channel, they can become a podcast, they can stream online. But if you want to uniquely be on the public's airwaves, you have to comply with those obligations. But if they don't want to, there's other ways they can continue to operate.

EISEN: I think they want to. I mean, you just cited some of the responses. They cited overwhelming support in the responses. Which, you said that they orchestrated a misinformation campaign. Should they not have rallied public support?

CARR: Well, those are all decisions that Disney is free to make. At the end of the day, we're going to make our decision based on the facts and the record that's developed at the agency. Again, the Disney issue and the media docket, more broadly, is ultimately a small part of what we do at the FCC. We have a much bigger agenda that we're running. I know the media likes to focus on the media stuff, but we have a really important economic agenda. In fact, we're voting just next week or the week after to open up a huge swath of spectrum in the C-Band. It's called create effectively a midband super-band of spectrum. And that's going to be used to drive down prices for consumer, to increase competition. And we're really excited about that economic agenda.

CARL QUINTANILLA: I'm sure you don't want to dive into hypotheticals, but it is interesting how thinly you can slice this, Chair. What if Sara goes on "The View" and doesn't endorse a candidate but endorses a policy view, says that we should elect politicians who embrace free markets? I don't know. It could be anything.

EISEN: Which I did. Actually, that happened.

QUINTANILLA: Is that news?

CARR: Well, look, again, these are questions that we raised at the FCC, and this is why we have longstanding precedent on this. And, again, the baseline position is that all political candidates should get equal time on these types of shows. But we'll work through all these issues as they arise.

EISEN: Yeah, but I think the broader point is we don't want the government making programming decisions, do we?

CARR: Well, we don't. We don't on cable. We don't on podcasts. But what Congress has said is that if you are on this one unique medium, there are special public interest obligations. And it's OK if the broadcaster doesn't like it. In fact, there was a late-night show not that long ago that decided to take a segment that they otherwise would put on broadcast TV and put it on I think either YouTube or another online streaming service. And that's fine. That doesn't violate any FCC rule or regulation. But Congress ultimately put these rules in place, and we've got to enforce them.

EISEN: So, is the DEI investigation into ABC and Disney completely separate? And where does that stand? Because as I understand it, it's still ongoing, and you still have this accelerated timeline for license renewal.

CARR: Yeah, we continue to have concerns there. That investigation was launched a long time ago, all the way back in March of 2005. And there was evidence that goes in a number of buckets, including possibly having Disney be involved in promoting or discriminating, compensating people based on race and gender. That's ongoing. We've been getting document productions from them. We've been doing letters of inquiry to them on those issues, and we're continuing to work through that record.

EISEN: Yeah, I mean, do you expect to do this with other networks? Disney, ABC was far from alone in implementing DEI policies.

CARR: Yeah. We have. We've looked at a number of different entities. We have been reviewing some of Comcast's practices with respect to DEI for a long time. We've looked at a lot of other regulated entities, from Verizon to T-Mobile to AT&T. We've engaged in productive discussions with many of those, and a lot of them have ended up changing their practices. And that's a good thing because I don't think Americans should be discriminated on based on protected characteristics. And so at least with respect to the regulated space that we're in, that's what we're pushing towards at the FCC. And I think I think it's a good result.

QUINTANILLA: We've been looking at prediction markets. I'm not sure how reliable any of us think they really are, but this is a good question. Will the FCC pull a big four tv station license by April 1st, '27, 22 percent? Which would you take the over or under?

CARR: Well, I had not seen that yet. What I can tell you is obviously we've called in Disney's ABC licenses early for early renewal. That's pending before the FCC, there have been petitions to deny the renewal of those station licenses. Disney now is in the process of being able to file in response to that. And we're going to look at what the arguments are. But ultimately, if Disney has not been operating its ABC TV stations in the public interest over the last several years, then that's a pretty long putt for them. But ultimately, we have not made our decision yet. But we'll be guided based on the record before us. But of course, we're open minded to that type of outcome, whether it's for Disney or others. As I've said before, broadcast licenses are not sacred cows. You have to comply with certain public interest obligations to get them and to maintain them and to renew them. If there's nothing you could do to ever lose a license, then it's not a license, it's something entirely different. And so we do

want to take a hard look at broadcasters as a general matter and make sure they're living up to, again, that fundamental deal the American people were supposed to benefit from.

EISEN: Yeah, I guess people are just wondering if you're just using it as a threat and a scare tactic, or if you're for real.

CARR: Well, we're moving forward. It's not just Disney. We've moved forward with other broadcasters. We are, you know, probably moving to a hearing designation order, which is the next step you have to do to deny or revoke a license with another broadcaster that's further along in the process than Disney. So again, we're not singling anyone out, any particular broadcast, but we are telling all broadcasters that you've got to live up to your end of the bargain with the American people.

QUINTANILLA: Chair, I wonder while we have you, if you'd entertain one question off topic, our team did an investigation in recent days about Chinese-made lidar in vehicles and sort of the national security risks. Is that something that the agency has purview over, or do you have broader thoughts about Chinese made tech?

CARR: Well, we've stood up an entire national security council within the FCC and have been taking a lot of unprecedented actions with respect to foreign adversaries and a lot of other bad actors. And some of that ties back to companies with ties inside China. So, for instance, you may remember, we banned all foreign produced drones not that long ago. And that's actually producing really good economic benefits, not just national security. In fact, since that ban on foreign drones, there's a study that shows that something like $4 billion have flown into investments into U.S. domestic drone manufacturing and related manufacturing. That means thousands of jobs, hundreds of square feet of manufacturing space. So we're seeing good efforts from both the national security side, but also working to reindustrialize the country. Same thing on routers. We prohibited foreign produced routers. And about a year ago, there was really zero companies in the U.S. investing in that space. And something like 20 or more are now invested there. So we're seeing good results on our national security agenda.

EISEN: Alright. Speaking of other topics, I was curious if you read the if you read the landmark supreme court ruling on the FTC commissioner, Rebecca Slaughter, of course, this was all about regulatory agencies and how much presidential power they should have. What's really interesting is you were mentioned by Justice Gorsuch in the concurring opinion, and he mentioned you actually as sort of almost critical or cautionary tale of how much regulatory reach an agency like the FCC can have. He was referring to the criticism of late night host

Jimmy Kimmel as evidence that maybe you have too much power. Did you, were you surprised to see that?

CARR: Well, I think what Justice Gorsuch was saying there is that congress has, in fact, provided a lot of authority to various regulatory agencies, he noted, obviously, the Federal Communications Commission, he noted the Federal Trade Commission, I think the FCC as well. And I would agree with Justice Gorsuch to the extent that Congress has provided the FCC with a lot of authority. And again, if Congress wants to change that, then they're entirely free to do that and work with the president to change the delegations. But it was a point about how much authority has been delegated. And again, I agree that we've been delegated a lot of authority. Yeah.

EISEN: Yeah, I mean, he said they do this with hardly any statutory guidance based on broad grants of legislative authority. I also wonder if this decision has implications for the FCC itself. You do have a democratic commissioner. Her term is up, but she can stay as long as, you know, until there's another Senate confirmation of a new commissioner. Do you think that this case will impact her tenure?

CARR: Well, it's interesting. Technically, the Slaughter case doesn't affect anything at the FCC because that case involving an FTC commissioner, FTC commissioners were protected statutorily, ostensibly from removal by the president, meaning that the president had to have cause to remove an FTC commissioner. That's actually never been the case with respect to the FCC, because we were involved in a communications act passed before some of that supreme court precedent. So the president has always had the ability to fire me or any other commissioner for any reason or no reason at all. So in that respect, it may change other agencies, but it doesn't actually change the status quo at the FCC.

EISEN: Got it. Well, Chairman Carr, it's always good to talk to you about all of these hot button issues. Thank you for the time.

CARR: Yeah. Good to see you. Thanks.

EISEN: You too. That is the chairman of the FCC, Brendan Carr.