# Exhibit 24

CNBC NEWS RELEASES

# First on CNBC: Transcript: FCC Chairman Brendan Carr Speaks with CNBC's "Squawk on the Street" Today

PUBLISHED FRI, MAY 29 202612:49 PM EDT

WATCH LIVE
SHARE

WHEN: Today, Friday, May 29, 2026

WHERE: CNBC's "Squawk on the Street"

Following is the unofficial transcript of a CNBC interview with FCC Chairman Brendan Carr on CNBC's "Squawk on the Street" (M-F, 9AM-12PM ET) today, Friday, May 29. Following are links to video on CNBC.com: https://www.cnbc.com/video/2026/05/29/fcc-chair-brendan-carr-no-company-is-above-the-law-including-disney.html and https://www.cnbc.com/video/2026/05/29/watch-cnbcas-full-interview-with-fcc-chairman-brendan-carr.html.

**All references must be sourced to CNBC.**

SARA EISEN: All right, let's turn to Disney firing back at the FCC, filing a renewal application for eight of its broadcast stations, Disney saying in the filing they're submitting the application quote "under protest in response to an unlawful, arbitrary, and unconstitutional order by the FCC." Remember, back in April, the FCC launched an early review of Disney-owned ABC stations, following concerns around the company's diversity, equity, and inclusion efforts. The licenses were originally up for renewal between 2028 and 2031. Joining us now first on CNBC for some reaction is FCC Chairman Brendan Carr. Chair Carr, welcome back. Good to see you.

BRENDAN CARR: Thanks. Good to be here.

EISEN: So what is your reaction to Disney filing these renewals, but saying they did it under protest and it's unconstitutional?

CARR: Well, Disney has been embroiled in controversies for years now related to their DEI policies. There's reporting that suggests that Disney's leadership went all in on what could end up being invidious forms of DEI discrimination. We launched this investigation into

Disney's DEI practices all the way back in March of 2025. We have gone through rounds of our versions of subpoenas with them, getting documents from them. And the evidence is starting to fall into a couple buckets. One, have they been discriminating in the hiring of people based on race, gender, protected characteristics, compensation, promotion, workplace activities? Disney has its view. Disney has its evidence. And we haven't made a final decision. But there is evidence coming in that points to some of those buckets.

EISEN: But they say that it's not about that. They say this is about the First Amendment. They say it's about you trying to chill their free speech and exert editorial control on the networks.

CARR: We have been very clear what this investigation is about. In fact, FCC staff, before they filed this renewal, sent them what we call a deficiency notice based on their responses and evidence produced. And that notice indicated that, in the staff's view, Disney has been filing incomplete responses, they have been deficient in their responses and been disingenuous in the submissions they have been making with the FCC. And, at the end of the day, a lot of what Disney's arguments appear to go to is a fundamental disagreement that they should be held accountable to the unique regulatory framework that just applies to broadcasters. And the Supreme Court has already taken this up, and they have said there's no First Amendment right to hold a broadcast license.

EISEN: But you can see why they think this is about something else, right? I mean, you called for the early review of the broadcast licenses right after President Trump called for Jimmy Kimmel to be fired. And there have been a number of instances where you and the president have been critical of what you have seen on ABC.

CARR: Well, look, obviously, the president has every right to express his view. And, again, broadcasters have to be accountable to the public interest, which makes them different from a cable channel or a newspaper. And I understand Disney wants to make this about a lot of other things, and their P.R. machine has been in high gear. But we have been very clear about what this is, concerns about invidious forms of DEI discrimination. And the next step here is, probably as soon as today, we will issue a public notice at the FCC that creates a pleading cycle, so that people that want a petition to deny the renewal of Disney's licenses can file. And then Disney again will have an opportunity then to file an opposition. There will be reply. So we are moving down the path at this point of that additional process, and all these issues can be aired out. But once that process runs its course, then there will be another decision point for the FCC. You can either renew the license at that point or you can

designate the license for hearing. And we're going to follow the facts and the law wherever it goes. And, at the end of the day, there's no company that's above the law, and that includes Disney.

CARL QUINTANILLA: This line from them is interesting, where they say that the review's true purpose, Chair Carr, is "to cause the station and others to think twice before they say something the government might dislike." Is there anything you can say to those stations that would reassure them that you're not there to monitor every living, waking moment of their airtime?

CARR: Yes, every broadcast station should be free to operate in the public interest. And that's the only guardrail that exists. In fact, we put out a public notice earlier this week that goes back to all the FCC case law and what the public interest standard means with respect to their operations. And they obviously should be familiar with that law anyways. But we provided that additional clarity. And there's a tremendous amount of room, obviously, for people to make their own decisions about how they want to run their broadcast operations. But there's a couple of things you have to do, and operate in the public interest is one of them.

EISEN: So you're not trying to get them to fire Kimmel?

CARR: No, we are pursuing this enforcement matter that has to do with DEI. And, again, I know Disney wants to make this about a lot of other things that they think, either from a P.R. or a political position, may, in their view, put them in a stronger position. But we have been very focused on this investigation.

EISEN: Well, what, OK. So let's talk about the DEI thing. I mean, they, like so many other companies in corporate America, including other media companies, think, probably would admit that they over-rotated on that front during a period of time and have since gone back on some of those measures they put in place around hiring. Would you agree with that? Why is Disney being singled out here?

CARR: I think Disney probably did make some changes in the last couple of years but what you see across the Trump administration is, whether it's the Department of Justice, or the EEOC, or me here at the FCC, we want to make sure that you weren't violating federal law over the last couple of years. And, to your point, there was a lot of companies that went all in on this really invidious form of DEI discrimination. And we're going to see if Disney was one that dabbled in it and didn't go too far or if it crossed the line. But, ultimately, if the facts show

that Disney was discriminating against people based on their race or their gender, that could be a real problem with respect to their ability to continue to hold a license. But we will see what the facts ultimately show.

EISEN: Well, then, my other question, Chair Carr, is then why, why threaten the broadcasting license in the middle of this investigation?

CARR: Yeah, it's a good question. We have been signaling for a long time that we want Disney to take seriously our investigation. And it was only after we felt like, again, and we provided them notice now, that we thought their responses were disingenuous, that they were incomplete, that they were, frankly, nonresponsive to a number of questions, that we thought was important to take this next step in our investigation to make sure that they're being fully responsive to our proceeding. Now, look, once they have filed this application, as I noted, we're going to open a pleading cycle for people to file petitions to deny. And Disney's going to have to demonstrate that they have been operating more broadly in the public interest.

EISEN: I mean, are, do you think there's a good chance that you actually would pull their license, any of their licenses?

CARR: Well, we're going to follow the facts and the law wherever they go. If Disney shows that they have operated in the public interest and our investigation shows there's no actionable issues, then we will move on and renew the licenses. If there's concern or if you can't make a positive finding, what the law says, the Communications Act, is, if you can't make that finding, then you do designate it for a hearing. And, again, that will be additional process before the FCC.

QUINTANILLA: I'm thinking of what Seth Meyers said at the NBC upfront a couple of weeks ago, where I think the quote was: "I'm Seth Meyers, or, as the FCC calls me, next." I wonder, is that a role that you relish, an image that you relish?

CARR: Well, I don't think about Seth Meyers that much, but I do think we have been trying to do a couple things at the FCC, which is, I think there's been some creep over the years, where people assumed that they were just like a cable channel or a podcast, and it was like 'Nam. There was no rules or regulations that limited what they could do. And what we have been very clear is, no, broadcast is a unique medium because it's the public's resource. The American people own it. It's worth billions of dollars. And you can do whatever you want on the Internet, on a podcast, on social media. But if you want the unique privilege to be on

broadcast, which gets you, again, carriage on cable, free distribution, then you have got to play by the rules of the road that have been on the books for many, many decades.

EISEN: Yes, but the -- but some of the moves you're taking are very unprecedented. I guess the last time you guys called for early renewals or anything like this was 1980.

CARR: Yes, look, I think we have been trying to reinvigorate the public interest standard. And, again, to the extent that the FCC or broadcasters thought that the FCC had moved on from enforcing the law, we have been very clear that, no, we're going to enforce the law that's on the books. And, at the same time, if evidence does show that there's been discrimination based on race and gender, I'd argue it's been many decades since there were serious allegations that companies were engaging in that behavior. So, if they are, it's an appropriate step to take.

EISEN: And does this have anything to do with your also, you have another investigation around "The View" and equal time for politicians. I know we have talked about before you have a public comment period on that about whether "The View" is a news program. But that's also ABC and Disney. So is this related?

CARR: Well, if there's a relationship there, it's simply back to our North Star of across the board holding broadcasters accountable for the public interest. That particular one is, there's a rule on the book that says, if you have one legally qualified candidate for office on, you have to offer comparable time to others. And, again, I think a lot of broadcasters thought, well, the FCC is never going to enforce this rule again, so we can do what we want. And we've been clear, no, we're going to enforce it. So Disney has filed a petition that case saying that "The View" is bona fide news under the law and therefore should be effectively exempt from equal time. We've put that out for public comment, and people can weigh in, in the next couple of days and weeks on that before we reach a decision there.

QUINTANILLA: Meantime, Commissioner Gomez has been, I'd say, fairly vocal as well. She's gone on various TV shows and accused the agency of a campaign of, I think she called it straight-up censorship against Disney and ABC. Do you guys talk?

CARR: Yes, we have a great relationship. Look, I've been a commissioner in the minority at the FCC during the Biden years. Obviously, I was not at all shy of expressing my views on what I thought the majority was doing there. I mean, that's sort of her job. It was my job. But I think, at a personal level, we get along. We vote together, obviously, on almost every single

item. We don't see eye to eye on this one, apparently, and that's perfectly fine. We should have robust debate in this country about these issues.

EISEN: I guess, and, I mean, we've gone through this, but this, obviously, this is a huge story, Chairman. Every broadcaster in America is watching this proceeding. And the lesson they're drawing is, if you say something that the administration does not like, they, you will come after their broadcast license. Are you saying that that's not true?

CARR: I think it's slightly different than that. I think it's, if you're not complying with the public interest obligations, then we're going to hold you accountable. And you see that, for instance. We took action on this company called Bridge News that owns TV stations that potentially were engaged in unlawful transfers of their licenses. We called them in for early renewal, just like Disney. We had a radio station in Mississippi that it wasn't clear they were complying with their public interest obligations. And we put them on what's called a short renewal. So we gave them a renewal, but for one year, and they have to come back. So, I know there's a lot of focus on Disney. And I understand it. It's a big company. But what we're doing across the board is trying to reinvigorate that public interest standard, without focusing in on any one company.

EISEN: So, they can what? They can remedy this by taking your investigation seriously on the DEI stuff?

CARR: It would be a good start. It would be a good start. We have asked them to remedy their deficient responses from before. We're also going to be issuing them another round of document production and requests here soon, and I do hope that they take it seriously. Again, they're free to put in all their evidence. We're open-minded, and we're just going to follow the facts wherever it goes. If it goes towards a hearing designation order, if it goes towards license revocation, if that's where the facts take us, great. If not, then that's OK too.

EISEN: OK, Chairman Brendan Carr, thank you very much for taking the questions, obviously a big, big story in our world and on Wall Street as well. Thank you.

CARR: Thanks.

EISEN: Chairman Brendan Carr.