UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN BROADCASTING COMPANIES, INC. *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>FEDERAL COMMUNICATIONS COMMISSION, *et al.*,<br><br>Defendants. | Civil Action No. 26-2902 (LLA) |

**DEFENDANTS' COMBINED**
**MOTION TO DISMISS, OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY RELIEF, AND MEMORANDUM IN SUPPORT THEREOF**

# TABLE OF CONTENTS


Table of Contents ..... i

Table of Authorities ..... ii

Introduction ..... 1

Background ..... 4

I. Statutory and Regulatory Framework. ..... 4

A. Broadcast Licensing. ..... 4

B. Investigatory Power. ..... 7

C. Judicial Review of FCC Orders. ..... 7

II. The Disney Antidiscrimination Investigation. ..... 8

III. The License Renewal Proceeding. ..... 10

Legal Standards ..... 12

I. Preliminary Injunctions under *Winter*. ..... 12

II. Dismissal under Rule 12(b)(1). ..... 13

Argument ..... 13

I. Plaintiffs Are Unlikely to Succeed on the Merits. ..... 14

A. This Court Lacks Jurisdiction Because Congress Has Channeled Judicial Review of Commission Orders to the Courts of Appeals. ..... 14

B. Plaintiffs' First Amendment Retaliation Claim Fails on the Merits. ..... 22

II. Plaintiffs Have Failed to Establish Irreparable Harm. ..... 36

III. The Balance of Equities and Public Interest Favor Denying Injunctive Relief. ..... 44

IV. The Court Should Require Plaintiffs to Post Security. ..... 45

Conclusion ..... 46

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AFL-CIO v. Sonderling*,
Civ. A. No. 26-2061 (JEB), 2026 WL 1906727 (D.D.C. July 2, 2026) ....................... 41, 42, 43

*Air Trans. Ass'n of Am. v. Export-Import Bank of the U.S.*,
840 F. Supp. 2d 327 (D.D.C. 2012) .......................................................................... 42

*Alpine Secs. Corp. v. Fin. Indus. Reg. Auth.*,
121 F.4th 1314 (D.C. Cir. 2024) ................................................................................ 41

*Alter v. FCC*,
Civ. A. No. 24-0745 (AHA), 2025 WL 1454377 (D.D.C. May 21, 2025) ............................. 15

*Am. Nat'l Ins. Co. v. FDIC*,
642 F.3d 1137 (D.C. Cir. 2011) ................................................................................ 13

*Arbaugh v. Y&H Corp.*,
546 U.S. 500 (2006) ................................................................................................ 13

*Aref v. Lynch*,
833 F.3d 242 (D.C. Cir. 2016) ............................................................................ 22, 23

*AT&T Corp. v. FCC*,
220 F.3d 607 (D.C. Cir. 2000) ................................................................................ 15

*Axon Enter., Inc. v. FTC*,
598 U.S. 175 (2023) ........................................................................................... passim

*Barnes v. E-Sys., Inc. Grp. Hosp. Med. & Surgical Ins. Plan*,
501 U.S. 1301 (1991) .............................................................................................. 44

*Beaumont Branch of the NAACP v. FCC*,
854 F.2d 501 (D.C. Cir. 1988) ............................................................................. 5, 24

*Bilingual Bicultural Coal. on Mass Media, Inc. v. FCC*,
595 F.2d 621 (D.C. Cir. 1978) .................................................................................. 5

*Biovail Corp. v. FDA*,
448 F. Supp. 2d 154 (D.D.C. 2006) .......................................................................... 44

*Bland v. Blanche*,
Civ. A. No. 25-3499 (APM), 2026 WL 1998552 (D.D.C. July 10, 2026) .............................. 17

*Bold Alliance v. FERC*,
Civ. A. No. 17-1822 (RJL), 2018 WL 4681004 (D.D.C. Sept. 28, 2018) ............................... 17

*Chao v. Day*,
436 F.3d 234 (D.C. Cir. 2006) ............................................................................................ 14

*Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006) ..................................................................................... 36, 37

*Clevinger v. Advoc. Holdings, Inc.*,
134 F.4th 1230 (D.C. Cir. 2025) .................................................................................. 37, 41

*ConverDyn v. Moniz*,
68 F. Supp. 3d 34 (D.D.C. 2014) ....................................................................................... 42

*Cruz v. DHS*,
Civ. A. No. 19-2727 (DLF), 2019 WL 8139805 (D.D.C. Nov. 21, 2019) .............................. 44

*Damus v. Nielsen*,
313 F. Supp. 3d 317 (D.D.C. 2018) .................................................................................... 12

*Davis v. Pension Ben. Guar. Corp.*,
571 F.3d 1288 (D.C. Cir. 2009) .......................................................................................... 12

*Doe v. DEA*,
484 F.3d 561 (D.C. Cir. 2007) ............................................................................................ 16

*DSE, Inc. v. United States*,
169 F.3d 21 (D.C. Cir. 1999) .............................................................................................. 45

*Elgin v. Dep't of Treasury*,
567 U.S. 1 (2012) ................................................................................................................. 18

*Endocrine Soc'y v. FTC*,
832 F. Supp. 3d 1 (D.D.C. 2026) ....................................................................... 21, 23, 24, 26

*FCC v. ITT World Commc'ns, Inc.*,
466 U.S. 463 (1984) ............................................................................................................. 15

*Feinerman v. Bernardi,*
558 F. Supp. 2d 36 (D.D.C. 2008) ...................................................................................... 42

*Food & Water Watch, Inc. v. Vilsack*,
808 F.3d 905 (D.C. Cir. 2015) ..................................................................................... 12, 22

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*,
561 U.S. 477 (2010) ........................................ 18, 19

*FTC v. Standard Oil Co. of Cal.*,
449 U.S. 232 (1980) ........................................ 15, 20

*Fund for Animals v. Frizzell*,
530 F.2d 982 (D.C. Cir. 1975) ........................................ 43

*Gordon v. Holder*,
632 F.3d 722 (D.C. Cir. 2011) ........................................ 44

*Grand Lodge of Fraternal Order of Police v. Ashcroft*,
185 F. Supp. 2d 9 (D.D.C. 2001) ........................................ 13

*Hanson v. Dist. of Columbia*,
120 F.4th 223 (D.C. Cir. 2024) ........................................ 37, 45

*Hartman v. Moore*,
547 U.S. 250 (2006) ........................................ 24

*Houston Cmty. Coll. Sys. v. Wilson*,
595 U.S. 468 (2022) ........................................ 23

*Huang v. Wheeler*,
215 F. Supp. 3d 100 (D.D.C. 2016) ........................................ 13

*In re Halkin*,
598 F.2d 176 (D.C. Cir. 1979) ........................................ 17

*Jenner & Block LLP v. U.S. Dep't of Just.*,
784 F. Supp. 3d 76 (D.D.C. 2025) ........................................ 42, 43

*Kareem v. Haspel*,
986 F.3d 859 (D.C. Cir. 2021) ........................................ 13

*Khalil v. President, United States*,
164 F.4th 259 (3d Cir. 2026) ........................................ 21, 45

*La Voz Radio de la Communidad v. FCC*,
223 F.3d 313 (6th Cir. 2000) ........................................ 15

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ........................................ 13

*Make the Road N.Y. v. Mullin*,
179 F.4th 16 (D.C. Cir. 2026) .......... 12

*McLaughlin Chiropractic Assocs. v. McKesson Corp.*,
606 U.S. 146 (2025) .......... 15, 16

*Media Matters for Am. v. FTC*,
No. 25-5302, 2025 WL 2988966 (D.C. Cir. 2026) .......... 21, 23, 25

*Media Matters for Am. v. Paxton*,
138 F.4th 563 (D.C. Cir. 2025) .......... 37, 38, 39

*Media Matters for Am. v. FTC*,
805 F. Supp. 3d 105 (D.D.C. 2025) .......... 31

*Mullin v. Doe*,
146 S. Ct. 2121 (Jun. 26, 2026) .......... 13, 16, 36

*Mylan Pharms., Inc. v. Shalala*,
81 F. Supp. 2d 30 (D.D.C. 2000) .......... 43

*Nat. Res. Def. Council, Inc. v. U.S. NRC*,
680 F.2d 810 (D.C. Cir. 1982) .......... 20

*Nat'l Ass'n of Broad. v. FCC*,
147 F.4th 978 (D.C. Cir. 2025) .......... 16, 22

*Nat'l Broad. Co. v. United States*,
319 U.S. 190 (1943) .......... 23

*Nat'l Mining Ass'n v. Jackson*,
768 F. Supp. 2d 34 (D.D.C. 2011) .......... 42, 43

*Nieves v. Bartlett*,
587 U.S. 391 (2019) .......... 22

*Nken v. Holder*,
556 U.S. 418 (2009) .......... 12, 44

*Nuclear Info. & Res. Serv. v. NRC*,
509 F.3d 562 (D.C. Cir. 2007) .......... 36

*Off. of Commc'n of United Church of Christ v. FCC*,
707 F.2d 1413 (D.C. Cir. 1983) .......... 4

*Petroleum Expl., Inc. v. Pub. Serv. Comm'n*,
304 U.S. 209 (1938) ........ 20

*Red Lion Broad. Co. v. FCC*,
395 U.S. 367 (1969) ........ 23

*Renegotiation Bd. v. Bannercraft Clothing Co.*,
415 U.S. 1 (1974) ........ 41

*Seattle Times Co. v. Rhinehart*,
467 U.S. 20 (1984) ........ 17

*Sherley v. Sebelius*,
644 F.3d 388 (D.C. Cir. 2011) ........ 12

*Singh v. Carter*,
185 F. Supp. 3d 11 (D.D.C. 2016) ........ 12

*Stahlman v. FCC*,
126 F.2d 124 (D.C. Cir. 1942) ........ 7

*Starbucks Corp. v. McKinney*,
602 U.S. 339 (2024) ........ 12

*Susman Godfrey LLP v. Exec. Off. of Pres.*,
789 F. Supp. 3d 15 (D.D.C. 2025) ........ 43

*Telecomms. Rsch. and Action Ctr. v. FCC*,
750 F.2d 70 (D.C. Cir. 1984) ........ passim

*Thomas v. Principi*,
394 F.3d 970 (D.C. Cir. 2005) ........ 13

*Thunder Basin Coal Co. v. Reich*,
510 U.S. 200 (1994) ........ 18, 19

*Time Warner Ent. Co. v. FCC*,
93 F.3d 957 (D.C. Cir. 1996) ........ 17

*Trump v. United States*,
603 U.S. 593 (2024) ........ 36

*United States v. Oakland Cannabis Buyers' Coop.*,
532 U.S. 483 (2001) ........ 45

*Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n*,
259 F.2d 921 (D.C. Cir. 1958) ........ 39

*Virginian R. Co. v. Ry. Emps.*,
300 U.S. 515 (1937) ........ 45

*Wagner v. FEC*,
717 F.3d 1007 (D.C. Cir. 2013) ........ 15

*Weinberger v. Romero-Barcelo*,
456 U.S. 305 (1982) ........ 44

*Winter v. NRDC*,
555 U.S. 7 (2008) ........ 3, 12

*Wisc. Gas Co. v. FERC*,
758 F.2d 669 (D.C. Cir. 1985) ........ 36, 41

*Xiaomi Corp. v. Dep't of Def.*,
Civ. A. No. 21-0280 (RC), 2021 WL 950144 (D.D.C. Mar. 12, 2021) ........ 42

**Statutes**

15 U.S.C. § 41 et seq ........ 21

28 U.S.C. § 1331 ........ 15

28 U.S.C. § 1651(a) ........ 17

28 U.S.C. § 2342(1) ........ passim

47 U.S.C. § 151 ........ 4, 24

47 U.S.C. § 307(a) ........ 5, 6

47 U.S.C. § 307(c)(1) ........ 2, 5, 7

47 U.S.C. § 307(c)(3) ........ 2, 40, 45

47 U.S.C. § 309 ........ 26

47 U.S.C. § 309(a) ........ 1, 5

47 U.S.C. § 309(d)(1) ........ 6

47 U.S.C. § 309(e) ........ 6, 43, 45

47 U.S.C. § 309(k)(1) .......... 6

47 U.S.C. § 309(k)(3) .......... 6, 34

47 U.S.C. § 402 .......... 6, 7

47 U.S.C. § 402(a) .......... 3, 8, 14, 39

47 U.S.C. § 402(b) .......... passim

47 U.S.C. § 403 .......... 7

**Rules**

Fed. R. Civ. P. 12(b)(1) .......... 1, 13, 22

Fed. R. Civ. P. 65(c) .......... 45

**Regulations**

47 C.F.R. § 0.459 .......... 9

47 C.F.R. § 1.62 .......... 2

47 C.F.R. § 73.1020(a) .......... 7

47 C.F.R. § 73.2080(a) .......... 4

47 C.F.R. § 73.3539(c) .......... 1, 7, 26, 30

47 C.F.R. § 73.3584 .......... 6

47 C.F.R. § 73.3584(b) .......... 6

47 C.F.R. § 73.3587 .......... 6

**Other Authorities**

Exec. Order No. 14151, *Ending Radical and Wasteful Government DEI Programs and Preferencing*, 90 Fed. Reg. 8339 (Jan. 20, 2025) .......... 24

*Reregulation of Radio and TV Broadcasting*, 72 F.C.C.2d 534 (1979) .......... 30

*Review of the Commission's Broadcast and Cable Equal Employment Opportunity Rules and Policies*, 17 FCC Rcd 24018 (2002) .......... 5

The Federal Communication Commission and the remaining Defendants hereby oppose Plaintiffs' preliminary injunction motion ("PI Mot.," Dkt. 2) and respectfully move this Court to dismiss the Complaint (Dkt. 1) for lack of subject-matter jurisdiction, *see* Fed. R. Civ. P. 12(b)(1).

## INTRODUCTION

This case arises from an investigation of the FCC's Enforcement Bureau into allegations of unlawful discrimination by The Walt Disney Company ("Disney"), including by means of company-wide policies and practices governing its subsidiaries American Broadcasting Companies, Inc. ("ABC") and eight ABC owned and operated broadcast television stations ("Disney ABC stations" or "stations"). A year into that investigation, Disney's responses to Commission information requests were deficient and nonresponsive. So, on April 28, 2026, the Commission's Media Bureau issued an order directing the stations to apply for renewal of their licenses early, as is allowed in service of investigations under a longstanding Commission rule. *See* 47 C.F.R. § 73.3539(c).

The license renewal proceeding has generated a voluminous record, which consists of public comments both for and against renewal, including submissions relevant to the FCC's discrimination investigation. The Commission is now analyzing that record, as well as Disney's responses to the Enforcement Bureau's inquiries. If, on review of those materials, the Commission determines that the license renewal criteria are satisfied, it will grant the stations' applications. If instead the record raises "substantial and material questions of fact" as to whether renewal would serve "the public interest, convenience, and necessity," or if the Commission is otherwise unable to make a public interest finding (for example, because of serious or repeated violations of the communications laws), the statute would require additional process—namely, a hearing on the applications. 47 U.S.C. § 309(a), (d), (e), (k).

The Commission's Chairman has repeatedly emphasized that, although the allegations against Disney are serious, he and the agency remain "open-minded," have "not made a decision," and are "going to follow the facts and the law wherever they [lead]." Ex. 1, David Shepardson, *FCC Chair Says All Options Remain on Table in ABC License Review*, Reuters, at 3 (June 25, 2026) (attached). And the renewal process in progress does not abridge or otherwise affect Plaintiffs' rights. Licensees with pending renewal applications are entitled to continue operating without interruption during the license period for the duration of the renewal proceeding—even were it to result in a hearing. *See* 47 U.S.C. § 307(c)(1), (c)(3); 47 C.F.R. § 1.62. In fact, even if the Commission were to deny the stations' applications, their licenses would remain in effect for however long they might wish to seek judicial review. 47 U.S.C. § 307(c)(3).

Plaintiffs are not content to let the Commission's ordinary investigative processes (and, if needed, ordinary processes of judicial review) run their course. They instead ask this Court to halt the license renewal proceeding in its tracks by issuing a preliminary injunction preventing the Commission from designating the matter for hearing—regardless what the evidence may show and before anyone would have seen the basis for such action. PI Mem. (Dkt. 2-1) at 51.[1] Granting Plaintiffs' request would mean taking administrative processes off the table before the Commission has seen and analyzed the voluminous evidence. This would only hobble the Commission's efforts to investigate and resolve serious allegations that Disney has engaged in unlawful discrimination, and from otherwise ensuring that Disney's stations are serving the public interest. Plaintiffs, in return, would only free themselves from the burdens of proving their case in administrative proceedings.

---

[1] All pin cites are to the ECF-generated page numbers, appearing in blue color at the top, right corner of each page.

Plaintiffs have not justified such "extraordinary" relief. *Winter v. NRDC*, 555 U.S. 7, 24 (2008). They are unlikely to prevail on the merits because this Court lacks jurisdiction over the subject matter of this case. Congress has limited judicial review of Commission orders to the federal courts of appeals, *see* 28 U.S.C. § 2342(1); 47 U.S.C. § 402(a), and for many categories of licensing orders, to the United States Court of Appeals for the District of Columbia, 47 U.S.C. § 402(b). Under a well-established line of decisions beginning with *Telecomms. Rsch. and Action Ctr. v. FCC (TRAC)*, 750 F.2d 70, 75-79 (D.C. Cir. 1984), these statutory claims-channeling provisions deprive district courts of federal-question jurisdiction in FCC cases—even where, as here, the agency has not yet issued any final, reviewable order. Plaintiffs cannot bypass these jurisdictional limits by framing their claim as one for "retaliation" in response to speech protected by the First Amendment. That theory requires them to show that "but for" animus toward Plaintiffs' speech, the Commission would not have initiated the early renewal proceeding. Abundant evidence belies that conclusion; it was Disney's lack of cooperation with the antidiscrimination inquiry that triggered the need for that additional investigatory step.

Nor have Plaintiffs satisfied the other requirements for an injunction. Their claim of irreparable harm from retaliation fails for the same reasons they are unlikely to prevail on the merits of that claim. In addition, they have shown (at most) minimal and self-inflicted effects on speech, and no harms that could justify a preliminary injunction.

The balance of equities and the public interest just as clearly weigh against enjoining the Commission's investigation. Broadcasters are highly regulated parties subject to the Commission's comprehensive oversight. Licenses grant them exclusive access—awarded for free—to highly valuable portions of the electromagnetic spectrum, an important and finite public resource. In return for that public benefit, Congress has required broadcasters to operate in the

public interest. To foreclose the Commission from using all the tools at its disposal to investigate whether Plaintiffs are meeting their statutory and regulatory duties would seriously harm both the government and the public. Those harms outweigh the comparatively minor injuries Plaintiffs attempt to show, particularly because the Communications Act ensures they may continue operating as usual while the Commission's investigation unfolds.

## BACKGROUND

## I. Statutory and Regulatory Framework.

### A. Broadcast Licensing.

Congress established the Commission "to make available, so far as possible, to all the people of the United States," communications over "wire and radio"—"without discrimination on the basis of race, color, religion, national origin, or sex." 47 U.S.C. § 151. To that end, because broadcast television and radio transmissions require access to "radio" spectrum, awarding broadcast licenses is among the Commission's core functions. *See id.* §§ 303, 307, 309.

Spectrum is a valuable, finite public resource. And broadcast licenses confer exclusive access (for designated locations and frequency ranges) to that public resource for free. Courts accordingly recognize that "the award of a broadcast license should be a 'public trust.'" *Off. of Commc'n of United Church of Christ v. FCC*, 707 F.2d 1413, 1427 (D.C. Cir. 1983).

Consistent with that recognition, and with the Commission's duty to guard against unlawful discrimination, 47 U.S.C. § 151, the agency's rules set forth antidiscrimination obligations for broadcasters. *See* 47 C.F.R. § 73.2080(a). Broadcasters have additional public interest obligations as well, including requirements to maintain public inspection files; a duty to provide equal opportunity for airtime to political candidates; and responsibilities not to engage in news distortion, broadcast hoaxes, or indecent broadcasting. *See, e.g.*, Ex. 2, *FCC Reminds Broadcasters of Their*

*Public Interest Obligations*, DA 26-530, at 5-6 (May 28, 2026) ("May 28 Public Notice," attached, collecting these requirements).

Under the Communications Act of 1934, as amended, the Commission "shall grant" radio licenses, including for broadcast television stations, only if doing so would serve the "public convenience, interest, or necessity." 47 U.S.C. § 307(a). Likewise, broadcast licenses may be renewed only "if the Commission finds that [the] public interest, convenience, and necessity would be served thereby," and other necessary requirements are satisfied. *Id.* § 307(c)(1); *see also id.* § 309(a), (k). It is well settled that "a license renewal will not be deemed to be in the public interest if a licensee has engaged in intentional employment discrimination" on the basis of race, sex, national origin, or religious affiliation. *Beaumont Branch of the NAACP v. FCC*, 854 F.2d 501, 506 (D.C. Cir. 1988); *accord Bilingual Bicultural Coal. on Mass Media, Inc. v. FCC*, 595 F.2d 621, 628 (D.C. Cir. 1978) (en banc); *see also Review of the Commission's Broadcast and Cable Equal Employment Opportunity Rules and Policies*, 17 FCC Rcd 24018, 24036 ¶ 46 (2002) ("[a] documented pattern of intentional discrimination would put seriously into question a licensee's character qualifications to remain a licensee" (alteration in original; quoting *Bilingual Bicultural Coal.*, 595 F.2d at 629)).

When "the licensee of a broadcast station submits an application to the Commission for renewal of such license, the Commission shall grant the application if it finds" that three conditions are satisfied:

> (A) the station has served the public interest, convenience, and necessity;
>
> (B) there have been no serious violations by the licensee of [the Communications Act] or the rules and regulations of the Commission; and
>
> (C) there have been no other violations by the licensee of [the Communications Act] or the rules and regulations of the Commission which, taken together, would constitute a pattern of abuse.

47 U.S.C. § 309(k)(1). "Any party in interest" with administrative standing may oppose a renewal application (and any license application) by "fil[ing] with the Commission a petition to deny." *Id.* § 309(d)(1); *see also* 47 C.F.R. § 73.3584. The Commission's rules allow for responses to such petitions, and also for replies. *See* 47 C.F.R. § 73.3584(b). In addition, the Commission accepts informal comments that support or oppose broadcast license applications. Ex. 3, FCC, License Renewal Applications for Television Broadcast Stations (attached); *see* 47 C.F.R. § 73.3587 (informal objections).

After a public notice period of at least thirty days (and, for license renewal applications, no fewer than thirty days before expiration of the current license term) the Commission "shall grant" applications where it has determined that doing so would serve the public interest. 47 U.S.C. § 307(a); *see also id.* §§ 307(d), 309(a), (b), (k). If the Commission is unable to reach that determination, however—including because "a substantial and material question of fact" is presented concerning whether the applicant has met the requirements for renewal—the agency must "formally designate the application for hearing." *Id.* § 309(e); *see also id.* § 309(k)(3). If a hearing is designated, the "matters and things in issue" will be specified with "particularity," and it will be a "full hearing" in which the applicant and all other parties in interest "shall be permitted to participate." *Id.* § 309(e).

While a renewal application is pending, the broadcast licensee's existing license "continue[s] . . . in effect." *Id.* § 307(c)(3). The period during which the existing license remains in effect includes the time needed for "any administrative or judicial hearing and final decision on" the renewal application, including "the disposition of any petition for rehearing pursuant to [47 U.S.C. §§ 402 and 405]." *Id.* If renewal proceedings do not prolong the existing license

period, broadcast licenses (other than initial licenses) ordinarily expire after a term of eight years. *See id.* § 307(c)(1); 47 C.F.R. § 73.1020(a).

The default eight-year license term, however, is not unalterable. *See* 47 U.S.C. §§ 307(c)(1), 309(k)(2). In fact, the Communications Act bars the Commission from "adopt[ing] or follow[ing] any rule which would preclude it . . . from granting or renewing a license for a shorter period . . . if, in its judgment, the public interest, convenience or necessity would be served by" a shorter term. *Id.* Of particular relevance here, a longstanding FCC rule provides that licensees may be required to apply for renewal ahead of the default schedule "[w]henever the FCC regards [the] application . . . as essential to the proper conduct of a hearing or investigation." 47 C.F.R. § 73.3539(c).

**B. Investigatory Power.**

The Communications Act grants the Commission

> full authority and power at any time to institute an inquiry, on its own motion, in any case and as to any matter or thing concerning which complaint is authorized to be made, to or before the Commission by any provision of [the Act], or concerning which any question may arise under any provisions of [the Act], or relating to the enforcement of any of the provisions [of the Act].

47 U.S.C. § 403. This authority "embrace[s] an investigation aimed at the prevention or disclosure of practices contrary to the public interest." *Stahlman v. FCC*, 126 F.2d 124, 127 (D.C. Cir. 1942); *see also id.* at 128 ("The Commission's right to grant licenses or to revoke licenses in the public interest . . . implies the grant of all means necessary or appropriate to the discharge of the powers expressly granted.").

**C. Judicial Review of FCC Orders.**

Under the Communications Act and the Administrative Orders Review Act, 28 U.S.C. §§ 2341-2351—commonly known as the "Hobbs Act"—judicial review of FCC actions is limited to final orders of the Commission. *See id.* §§ 2342(1), 2344; 47 U.S.C. § 402. Review of most

Commission orders is governed by the Hobbs Act, which grants exclusive jurisdiction to any United States Court of Appeals other than the Federal Circuit. *See* 28 U.S.C. § 2342(1); 47 U.S.C. § 402(a). For a narrower category of mostly licensing-related Commission orders, the Communications Act limits judicial review exclusively to the D.C. Circuit. 47 U.S.C. § 402(b). These claims-channeling provisions foreclose district court review of "any suit seeking relief that might affect the Circuit Court's future jurisdiction." *TRAC*, 750 F.2d at 78. That principle applies even before there is any final, reviewable agency order. *See id.* at 75-79.

## II. <u>The Disney Antidiscrimination Investigation.</u>

In early 2025, following a series of public reports and allegations of racially or otherwise discriminatory practices at Disney, the FCC's Chairman directed the Enforcement Bureau to open an investigation into whether Disney was complying with the Commission's antidiscrimination requirements. *See* Ex. 4, Letter from Chairman Brendan Carr, FCC, to Ranking Member Yvette Clarke, House Subcommittee on Oversight and Investigations, at 4 (May 29, 2026) ("Letter to Rep. Clarke"). Chairman Carr advised Disney of this investigation on March 27, 2025. *See* Ex. 5, Letter from Chairman Brendan Carr, FCC, to Chief Executive Officer Robert A. Iger, Disney (Mar. 27, 2025) ("March 2025 Letter").

The Chairman's letter identified a number of public reports and allegations that prompted concern. *See id.* at 2 & nn.3, 5-10. Collectively, those sources suggested that Disney

- "may have relied on race, gender, or other protected characteristics in making hiring and promotion decisions";
- "made compensation decisions based on race, gender, or other protected characteristics";
- "limited workplace opportunities to employees based on race, gender, or other protected characteristic[s]";
- "and/or made other decisions based on impermissibly discriminatory considerations."

Ex. 4, Letter to Hon. Yvette Clarke at 4. "Other reports described affinity groups and programs that appeared to segregate employees on the basis of race or identity characteristics." *Id.*; *see* Ex. 5, March 2025 Letter at 3 & n.4.

The Enforcement Bureau issued its initial investigatory letter of inquiry to Disney on June 5, 2025. Ex. 4, Letter to Rep. Clarke at 4. In mid-June, Disney's counsel contacted staff in the Bureau to request additional time to respond, and to seek to narrow the scope of the investigatory requests. *See* Ex. 26, E-mails Concerning First Letter of Inquiry, at 11-12 (attached) (e-mail from Disney's outside counsel on June 18, 2025, at 20:14 ET).[2] After engaging with Disney's requests through the remainder of June and into early July, the Bureau informed Disney that, "[t]o expedite this process, and without waiving or prejudicing our ability to renew our demand" for a broader range of documents in the future, the Commission would extend various negotiated deadlines. *Id.* at 7-8 (email from FCC to Disney's outside counsel on July 2, 2025, at 13:14 ET).

When Disney's response to the initial letter of inquiry did not resolve the Commission's concerns of possible discrimination, the Bureau issued a supplemental letter of inquiry in February 2026. Ex. 4, Letter to Rep. Clarke at 4. After the Bureau extended Disney's time to respond to that request, Disney responded on April 21, 2026. *Id.* That response, however, did not meet the agency's expectations, and it raised "considerable concerns" for Commission staff. *See* Ex. 27, E-mail from Pamela Kane, FCC Enforcement Bureau, to Suzanne Tetreault, Outside Counsel for Disney, at 2 (May 15, 2026, at 12:52 ET) (attached); Letter to Rep. Clarke at 3. The staff

[2] The Commission's rules permit parties to submit materials to the agency with a request for confidential treatment. *See* 47 C.F.R. § 0.459. Exhibits 26 and 27 are redacted to protect information that Disney has asked the Commission to treat as confidential. Because the redacted material currently remains under seal before the agency, *see id.* § 0.459(d)(3), undersigned counsel is not authorized to make it public at this time.

memorialized these concerns in an eleven-page, single-spaced explanatory document, which it shared with Disney's counsel on May 15, 2026. *See* Attachment, Ex. 27, at 3-13.

## III. <u>The License Renewal Proceeding.</u>

A week after Disney's deficient response to the Enforcement Bureau's supplemental letter of inquiry, on April 28, 2026, the Media Bureau issued its order "calling in Disney's ABC licenses for early renewal." Wilkinson Ex. 41 (Dkt. 2-4), *The Walt Disney Company*, DA 26-416, ¶ 3 (Media Bur. Apr. 28, 2026) ("Early Renewal Order"). As of that date, the Commission had conducted "more than a year of investigative activity" related to the reports and allegations of discrimination at Disney, including through the Enforcement Bureau's letters of inquiry. Ex. 4, Letter to Rep. Clarke at 5. But despite "ongoing engagement" with Disney concerning those requests, *id.*, the Commission was not receiving information that staff required—including "documents on behalf of more than [the] Disney-owned broadcast stations," Ex. 27, at 3; *see id.* at 3-13, which the Commission required to inform its investigation into the activities of the licensees. The Media Bureau accordingly called the stations' licenses for early renewal, aiming to assist the agency's investigation of possible unlawful discrimination. Wilkinson Ex. 41, Early Renewal Order ¶ 2.

The stations filed their renewal applications on May 28, 2026, and the Media Bureau announced procedures governing their consideration the following day. *See* Wilkinson Ex. 45 (Dkt. 2-4), *FCC's Media Bureau Establishes Pleading Cycle and Ex Parte Procedures for the Early Renewal Applications of the Walt Disney Company's ABC Licenses*, DA 26-541 (May 29, 2026). Among other things, the Media Bureau established a docket in which the public could submit information relevant to the stations' applications, and it established a pleading cycle under which petitions to deny were due "no later than June 29, 2026," oppositions no later than July 29, and replies by August 5. *See id.*

The Commission received six pleadings styled as petitions to deny the applications in the renewal proceedings. *See* Compl. (Dkt. 1) ¶ 106 n.84 (citing FCC Electronic Comment Filing System, MB Docket No. 26-131, https://perma.cc/C36P-K9AN). Those submissions, in turn, generated lengthy oppositions—including from Disney—and replies. *See, e.g.*, PI Mem. (Dkt. 2-1) at 20 n.26 (citing Opposition of The Walt Disney Co. et al. to Petitions to Deny Renewals of Licenses, MB Dkt. No. 26-131 (July 29, 2026), https://perma.cc/SH7V-BNMZ). There were hundreds of other substantive filings, both in support of and against renewal, from a wide variety of parties—individual citizens, members of Congress, trade associations, unions, local governments, and public interest organizations from across the political spectrum. *See generally* MB Dkt. No. 26-131. As Plaintiffs recognize, the Commission also received over 150,000 "express" comments, largely in support of renewal.[3] Compl. (Dkt. 1) ¶ 106. The New York Times and other media outlets have reported that the stations solicited these comments through commercials urging viewers to "tell the agency not to take away their 'trusted local station'" and providing "a QR code that led viewers directly to the F.C.C. website." Ex. 6, John Koblin, *ABC Formally Rebukes F.C.C. for Review of TV Licenses*, N.Y. TIMES, at 3 (July 30, 2026) (attached).

The Commission is now in the process of reviewing and analyzing this voluminous record. As the Chairman has emphasized, although the "allegations and reports" of discrimination at Disney companies are "concerning," they "do not represent FCC conclusions or determinations"; the agency is "reserving judgment on the issues" while assessing the evidence. Ex. 4, Letter to Rep. Clarke at 4; *see also* Ex. 1, Shepardson, at 3.

[3] The FCC's express-comment form allows members of the public to participate less formally in FCC proceedings by submitting "brief comments" directly into an online form. *See* Ex. 7, FCC, Submit an Express Comment (attached).

## LEGAL STANDARDS

### I. Preliminary Injunctions under *Winter*.

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22. To obtain it, the movant must show that (1) "he is likely to succeed on the merits"; (2) "he is likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in his favor"; and (4) "an injunction is in the public interest." *Id*. The latter two factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). The Supreme Court has held that at least the second factor—irreparable harm—must be likely and "not just a possibility." *Winter*, 555 U.S. at 21.

Before *Winter*, courts weighed these factors on a "sliding scale," allowing "an unusually strong showing on one of the factors" to overcome a weaker showing on another. *Damus v. Nielsen*, 313 F. Supp. 3d 317, 326 (D.D.C. 2018) (quoting *Davis v. Pension Ben. Guar. Corp.*, 571 F.3d 1288, 1291-92 (D.C. Cir. 2009)). The D.C. Circuit has not had occasion to conclusively decide whether that sliding scale survives *Winter* and *Nken*. *Make the Road N.Y. v. Mullin*, 179 F.4th 16, 25 (D.C. Cir. 2026). The Supreme Court has made clear, however, that "[t]he default rule is that a plaintiff seeking a preliminary injunction must make a clear showing" as to each *Winter* element. *Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024); *see also Sherley v. Sebelius*, 644 F.3d 388, 392-93 (D.C. Cir. 2011) (*Winter* "suggest[s] if not hold[s]" that each of the factors "is an 'independent, free-standing requirement'"); *Singh v. Carter*, 185 F. Supp. 3d 11, 16-17 (D.D.C. 2016) (sliding scale approach is "highly questionable," and a plaintiff "bears the burden of persuasion on all four preliminary injunction factors").

If a claim fails as a matter of law, on a point of jurisdiction or on the merits, a preliminary injunction is unwarranted. *See, e.g.*, *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913

(D.C. Cir. 2015) ("inability to establish a substantial likelihood of standing requires denial of the motion for preliminary injunction"); *see also Mullin v. Doe*, 146 S. Ct. 2121, 2137 (Jun. 26, 2026). And if a court "concludes that it lacks subject-matter jurisdiction, it must dismiss the complaint." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006).

## II. <u>Dismissal under Rule 12(b)(1).</u>

Under Rule 12(b)(1), a plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). A court considering a Rule 12(b)(1) motion must "assume the truth of all material factual allegations in the complaint and 'construe the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged.'" *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quoting *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005)). The standard for a complaint to survive a motion to dismiss under Rule 12(b)(1), however, is "less forgiving" than under Rule 12(b)(6). *Huang v. Wheeler*, 215 F. Supp. 3d 100, 106 (D.D.C. 2016). Specifically, given a court's "affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority," "the [p]laintiff's factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion." *Id.* at 107 (alterations in original; quoting *Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13 (D.D.C. 2001)). And when applying Rule 12(b)(1), courts "may consider material outside the pleadings," including judicially noticeable agency materials. *See Kareem v. Haspel*, 986 F.3d 859, 866 n.7 (D.C. Cir. 2021).

## ARGUMENT

Plaintiffs have failed to establish any of the requirements for preliminary relief. First, they fail to show that they are likely to succeed on the merits. Because they challenge the constitutionality of how the Commission is exercising (or may, in the future, exercise) its lawful powers under the Communications Act—they do not contend that the FCC is "unconstitutional in

much of [its] work"—this is not the kind of "extraordinary" case in which a district court may exercise jurisdiction outside the "ordinary statutory review scheme" for FCC orders. *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 180 (2023). Nor have Plaintiffs established retaliation in violation of the First Amendment. The remaining equitable factors favor permitting the Commission to pursue its investigation to conclusion. The Court should therefore deny Plaintiffs' motion for preliminary injunction and grant the Commission's motion to dismiss the complaint.

## I. <u>Plaintiffs Are Unlikely to Succeed on the Merits.</u>

Plaintiffs are unlikely to succeed on the merits because this Court lacks jurisdiction over this dispute. Nor are Plaintiffs likely to prevail on the substance of their First Amendment claim.

### A. This Court Lacks Jurisdiction Because Congress Has Channeled Judicial Review of Commission Orders to the Courts of Appeals.

#### 1. <u>*TRAC* Forecloses Jurisdiction in District Court.</u>

Several interlocking statutory provisions establish the process for judicial review of Commission orders. Statutory interpretation "begins . . . with the text of the statute." *Chao v. Day*, 436 F.3d 234, 235 (D.C. Cir. 2006). First, the Hobbs Act vests the "court of appeals" with "exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of . . . all final orders of the [Commission] made reviewable by section 402(a) of title 47." 28 U.S.C. § 2342(1). Section 402(a), then, defines the Commission orders subject to Hobbs Act review in the court of appeals: "any order of the Commission under this chapter (except those appealable under [47 U.S.C. § 402(b)])." 47 U.S.C. § 402(a). Section 402(b) of the Communications Act covers a specified list of orders concerning licenses. *See id.* § 402(b). For those orders (and certain ancillary orders), Section 402(b) provides for judicial review exclusively in the D.C. Circuit. *Id*. Under the plain reading of these provisions, therefore, "pre-enforcement" review of FCC orders—that is, judicial review before the order is applied against the challenger—

must be pressed in the federal courts of appeals. *See McLaughlin Chiropractic Assocs. v. McKesson Corp.*, 606 U.S. 146, 152-53 (2025) (Hobbs Act); *see also Wagner v. FEC*, 717 F.3d 1007, 1012 n.5 (D.C. Cir. 2013) (per curiam) (Section 402(b) "confer[s] exclusive jurisdiction to review those actions on this court" (citing *AT&T Corp. v. FCC*, 220 F.3d 607, 615 (D.C. Cir. 2000)); *FCC v. ITT World Commc'ns, Inc.*, 466 U.S. 463, 468 (1984) ("Exclusive jurisdiction for review of final FCC orders . . . lies in the Court of Appeals.").

In reference to these provisions, the D.C. Circuit has held that, "where a statute commits review of agency action to the Court of Appeals, any suit seeking relief that might affect the Circuit Court's future jurisdiction is subject to the exclusive review of the Court of Appeals." *TRAC*, 750 F.2d at 78-79; *accord id.* at 75 & n.26. Thus, even where there is not yet a "final" reviewable agency order, if allowing a claim to proceed in district court would deprive the court of appeals of its future jurisdiction under a claims-channeling statute like the Hobbs Act or Section 402(b), a district court lacks federal-question jurisdiction under 28 U.S.C. § 1331. *See TRAC*, 750 F.2d at 75 & n.26, 77; *see also La Voz Radio de la Communidad v. FCC*, 223 F.3d 313, 318 (6th Cir. 2000) (applying *TRAC* in a licensing case under Section 402(b)); *Alter v. FCC*, Civ. A. No. 24-0745 (AHA), 2025 WL 1454377, at *2 (D.D.C. May 21, 2025) (district courts lack jurisdiction "no matter which of the two routes to judicial review [of FCC orders] applies").

As the Supreme Court recently reaffirmed, the mere fact that a special statutory review scheme requires parties to await the conclusion of an agency's proceeding before judicial review becomes available does not mean district courts may side-step Congress's jurisdictional design. *See Axon*, 598 U.S. at 192. That is true even when a party claims that a "protracted adjudicatory proceeding" will involve "expense and disruption." *Id.* (quoting *FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 244 (1980)). Specialized review schemes allow agencies "a heightened role in

matters [they] customarily handle[], and can apply distinctive knowledge to." *Id.* at 186. And once an agency's processes have run their course, exclusive review in the courts of appeals ensures "rapid, conclusive, and nationwide dispute resolution." *Nat'l Ass'n of Broad. v. FCC*, 147 F.4th 978, 1007 (D.C. Cir. 2025). Specialized review schemes thus help avoid "delays and uncertainty that otherwise could ensue from multiple pre-enforcement suits filed across time in multiple district courts and from subsequent appeals in the courts of appeals." *McLaughlin*, 606 U.S. at 153. And generally, "an agency's subsidiary decisions merge into the final agency action, which is then subject to review." *Mullin*, 146 S. Ct. at 2136 (plurality opinion).

Here, the Commission has not yet issued any reviewable order as to Disney, ABC, or the stations. To be sure, Plaintiffs fear that the Commission might issue one that "den[ies] renewal or even revoke[s] [their] licenses." PI Mem. (Dkt. 2-1) at 16; *see id. also* at 28, 32, 38; Compl. (Dkt. 1) ¶¶ 12, 114. But this only confirms that Plaintiffs are in the wrong tribunal. The statute is clear that action seeking to enjoin or otherwise block any such order is subject to exclusive review in the D.C. Circuit. *See* 47 U.S.C. § 402(b)(2), (5). In these circumstances, the Communications Act preserves the prospective jurisdiction of the court of appeals, and this Court lacks jurisdiction. *See TRAC*, 750 F.2d at 75. To accept any other conclusion "encourages forum shopping and encourages dissatisfied claimants to 'jump the gun' by going directly to the district court to develop their case instead of exhausting their administrative remedies before the agency." *Doe v. DEA*, 484 F.3d 561, 570 (D.C. Cir. 2007). "Moreover, it encourages duplicative and potentially conflicting review, and the delay and expense incidental thereto." *Id.* (citation modified). The D.C. Circuit has closed that door. *TRAC*, 750 F.2d at 74-79.

Plaintiffs profess concern that "the Commission may intentionally prolong the adjudicative process, miring ABC in years of costly litigation, with the threat of adverse action ever present."

Compl. (Dkt. 1) ¶ 12; *see* PI Mem. (Dkt. 2-1) at 49. But special review schemes routinely and permissibly "require parties to wait before appealing," and thus "'the expense and disruption' of 'protracted adjudicatory proceedings' . . . do not justify immediate review." *Axon*, 598 U.S. at 192. And if agency action is unreasonably delayed, Plaintiffs are not without recourse. As *TRAC* provides, *see* 750 F.2d at 77-78, a party may pursue relief from any undue delay under the All Writs Act, 28 U.S.C. § 1651(a), by seeking a writ of mandamus or writ of prohibition, *see In re Halkin*, 598 F.2d 176, 179 n.1 (D.C. Cir. 1979) (these writs are "counterparts"), *overruled on other grounds by Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 31 (1984).

2. The Narrow Path Courts Have Allowed for Judicial Review Outside Claims-Channeling Statutes Does Not Apply.

"[O]rdinary statutory review" will "not preclude a district court from entertaining" certain "extraordinary claims": those that encompass "fundamental, even existential" challenges that "an agency is wielding authority unconstitutionally in all or a broad swath of its work." *Axon*, 598 U.S. at 180, 189. This narrow exception to ordinary claims channeling does not mean every claim of unconstitutional agency action is reviewable in district court. Numerous cases recognize, for example, that claims challenging "the manner in which [an] agency has exercised or . . . failed to exercise" its statutory authority—unlike claims challenging the constitutionality of the underlying federal statute—may not be reviewed in district court. *Time Warner Ent. Co. v. FCC*, 93 F.3d 957, 965 (D.C. Cir. 1996)); *see also Bland v. Blanche*, Civ. A. No. 25-3499 (APM), 2026 WL 1998552, at *5 (D.D.C. July 10, 2026) (recognizing this distinction, and applying *TRAC*, not *Axon*, to separation-of-powers and bias claims); *Bold Alliance v. FERC*, Civ. A. No. 17-1822 (RJL), 2018 WL 4681004, at *5 (D.D.C. Sept. 28, 2018) (no exception to *TRAC* where "constitutional theories go to [agency's] *practice* of adjudicating claims—not to its power to do so").

At a "30,000-foot" level, the Court in *Axon* explained that whether district court review is available involves grouping a plaintiff's claims into one of two categories. 598 U.S. at 188-89. Claims "of the type" that "Congress thought belonged within a statutory [review] scheme" involve challenges to an agency's "specific substantive decision" or "the commonplace procedures agencies use to make such a decision." *Id.* at 189. On the other hand, claims challenging "the core of [an agency's] existence" or "structure" are immediately reviewable because such claims "protest the 'here-and-now' injury of subjection to an unconstitutionally structured decisionmaking process." *Id.* at 189, 192. That sort of injury is inflicted "irrespective of [the proceeding's] outcome, or of other decisions made within it." *Id.* at 192.

Not so here. Plaintiffs' claim rather fits into the first category, to which claims channeling applies. Plaintiffs do not contend that the Commission is unconstitutionally structured; challenge the legality of the agency's existence; or deny that the Commission may lawfully investigate broadcasters and seek to ensure they serve the public interest and comply with the communications laws. Instead, Plaintiffs complain that the Commission is exercising its lawful authority to unlawfully retaliate against them for their constitutionally protected expression.

This case is thus unlike *Free Enterprise Fund v. Public Co. Accounting Oversight Board*, 561 U.S. 477 (2010), where "the complaint alleged that the Board's 'freedom from Presidential oversight' rendered unconstitutional 'all power and authority [that the Board] exercised," *Axon*, 598 U.S. at 189 (alteration in original; quoting *Free Enter. Fund*, 561 U.S. at 508). Rather, this case aligns with *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), and *Elgin v. Dep't of Treasury*, 567 U.S. 1 (2012), which involved "'threshold' and other 'questions'" that were "squarely within the [agencies'] expertise," *Axon*, 598 U.S. at 187. To resolve Plaintiffs' claim that the Commission used the early renewal process for an improper purpose, this Court necessarily

must understand details about broadcast licensing, the public interest obligations of broadcasters under the Communications Act, and the Commission's rules. More importantly, the Court would be required to delve deeply into the antidiscrimination investigation that was the impetus for the early license renewal process. Legal and factual questions of that kind implicate the Commission's expertise concerning the governing statutory and regulatory framework.

Likewise, a correct application of *Thunder Basin* confirms the propriety of adhering to Congress's decision in the Communications Act to vest exclusive authority to review licensing decisions in the D.C. Circuit. *Axon*, 598 U.S. at 189. Under *Thunder Basin*, the first question is, "[C]ould precluding district court jurisdiction 'foreclose all meaningful judicial review' of the claim?" *Id.* at 186 (quoting *Thunder Basin*, 510 U.S. at 212-13)). Second, is "the claim 'wholly collateral to [the] statute's review provisions'"? *Id.* (alteration in original; quoting *Thunder Basin*, 510 U.S. at 212). And third, "is the claim 'outside the agency's expertise'"? *Id.* (quoting *Thunder Basin*, 510 U.S. at 212). Each of those factors, correctly applied here, supports that Congress intended to channel Plaintiffs' claim to the courts of appeals, and in particular, to the D.C. Circuit.

First, precluding district court jurisdiction does not deprive Plaintiffs of any "meaningful avenue of relief." *Id.* at 188 (quoting *Free Enter. Fund*, 561 U.S. at 491); *cf. TRAC*, 750 F.2d at 78 ("where a denial of review in the District Court will truly foreclose all judicial review, district court review might be predicated on the general federal question jurisdiction statute"). If the Commission should ultimately deny the renewal applications or revoke the licenses—as Plaintiffs' speculate—they can challenge any such order in the D.C. Circuit. 47 U.S.C. § 402(b). And if the Commission were to "drag out" the administrative proceedings to "exert[] pressure" on them unlawfully, PI Mem. (Dkt. 2-1) at 49, Plaintiffs could seek relief in the court of appeals from "unreasonable agency delay." *TRAC*, 750 F.2d at 79.

Plaintiffs would rather not await a final Commission order or participate in the ongoing license renewal proceedings. PI Mem. (Dkt. 2-1) at 48-49. But Congress may "require parties to wait before appealing, even when doing so subjects them to 'significant burdens.'" *Axon*, 598 U.S. at 192. Particularly when Plaintiffs have pursued licenses to do business in a closely regulated industry, "the expense and annoyance of litigation" is not a sufficient basis to justify interlocutory challenges to ongoing agency proceedings. *Standard Oil Co.*, 449 U.S. at 244 (quoting *Petroleum Expl., Inc. v. Pub. Serv. Comm'n*, 304 U.S. 209, 222 (1938)); *see also Nat. Res. Def. Council, Inc. v. U.S. NRC*, 680 F.2d 810, 816 (D.C. Cir. 1982) (effort and expense of "additional administrative proceedings" is "inherent in a system of judicial review that is limited to final orders" and "cannot justify reviewing agency action that is otherwise interlocutory").

Second, Plaintiffs' retaliation claim is not "wholly collateral" to the Communications Act's judicial review provisions. *Axon*, 598 U.S. at 186. On the contrary, it calls into question the validity of the Commission's justifications for calling the Disney ABC station licenses in for early renewal—justifications that Plaintiffs argue were "obviously pretextual." PI Mem. (Dkt. 2-1) at 35; *see also id.* at 34-41. But resolving those contentions of pretext would require this Court to consider the basis and justification for the Commission's investigation. Plaintiffs' retaliation claim thus is not separate from "anything particular about how [the agency's investigatory power] was wielded." *Axon*, 598 U.S. at 193. Instead, it closely "relate[s] to the subject of the [investigatory] actions" and the legitimacy of the agency's underlying concerns. *Id.*

Third, Plaintiffs contend that the Commission has no knowledge or expertise that could be brought to bear by allowing the agency to consider their First Amendment objections. PI Mem. (Dkt. 2-1) at 50-51. But the First Amendment objections, again, are bound up with the validity of the Commission's basis for investigating questions of unlawful discrimination and other possible

public interest violations. Plaintiffs' constitutional objections are thus "intertwined with [and] embedded in matters on which the [Commission is] expert." *Axon*, 598 U.S. at 195. And Plaintiffs cannot dispute that the court of appeals "can hear constitutional claims." *Khalil v. President, United States*, 164 F.4th 259, 280 (3d Cir. 2026) (per curiam). In sum, there is no reason to conclude that Plaintiffs' retaliation claim should escape the specific scheme that Congress established to channel judicial review of Commission orders to the courts of appeals.

Invoking a handful of recent, nonbinding decisions, Plaintiffs ask this Court to expand *Axon*'s scope to hold that congressionally provided special review schemes can never apply where a plaintiff alleges that an agency used its statutory authority to suppress the plaintiff's protected speech. *See* PI Mem. (Dkt. 2-1) at 51 (citing *Endocrine Soc'y v. FTC*, 832 F. Supp. 3d 1 (D.D.C. 2026), and *Media Matters for Am. v. FTC*, No. 25-5302, 2025 WL 2988966 (D.C. Cir. 2026) (per curiam)). Both are readily distinguishable.

First, both *Media Matters* and *Endocrine Society* concerned the application of the Federal Trade Commission Act, 15 U.S.C. § 41 *et seq.*, which does not channel judicial review to the courts of appeals. Instead, there was "no dispute" in either case that "the next step for review of [the plaintiff's] constitutional claims [was] in district court." *Endocrine Soc'y*, 832 F. Supp. 3d at 10 (quoting *Media Matters*, 2025 WL 2988966, at *5). Thus, the plaintiffs in those cases—unlike Plaintiffs here and in *Thunder Basin*—did "not seek to circumvent an administrative proceeding followed by judicial review in a court of appeals." *Media Matters*, 2025 WL 2988966, at *5.

Notably, too, the plaintiffs in *Endocrine Society* and *Media Matters* had no path to judicial review unless the FTC elected to enforce the civil investigative demands at issue by suits in district court—"a step that might never happen." *Media Matters*, 2025 WL 2988966, at *5; *see also* 832 F. Supp. 3d at 9-10. By contrast here, as explained above, *see supra* p. 16-17, Plaintiffs are

statutorily entitled to challenge any final order the Commission may issue against their licenses. And in the meantime, as explained, they have a path to judicial review under the All Writs Act if the agency's proceeding is unreasonably delayed.

In sum, this Court lacks subject-matter jurisdiction, which both prevents Plaintiffs from meeting their burden to demonstrate a likelihood of success on the merits, *see Food & Water Watch*, 808 F.3d at 913, and requires dismissal of the case, Fed. R. Civ. P. 12(b)(1).

**B. Plaintiffs' First Amendment Retaliation Claim Fails on the Merits.**

Even if this Court finds that it has jurisdiction, Plaintiffs are unlikely to succeed on the merits of their First Amendment retaliation claim.[4] To establish such a claim requires a plaintiff to prove, first, that "he engaged in conduct protected under the First Amendment"; second, that "the defendant took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again"; and third, "a causal link between the exercise of a constitutional right and the adverse action taken against him." *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016). The improper motive "must be a 'but-for' cause [of the government action], meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Nieves v. Bartlett*, 587 U.S. 391, 399 (2019). Plaintiffs are unable to satisfy these elements.

For one, aspects of broadcaster speech have long been subject to regulation. While broadcasters make editorial decisions that may receive First Amendment protection, this does not convert their employment conduct into protected speech, nor does it insulate them from the Commission's regulation and oversight. *See Nat'l Ass'n of Broad.*, 147 F.4th at 1002 ("[T]he

---

[4] The Commission does not move to dismiss for failure to state a claim pursuant to Rule 12(b)(6). Such a motion would accept all well-pleaded facts as true. Here, the FCC disputes many factual allegations in the Complaint but does so relying in part on evidence outside the Complaint.

Supreme Court has recognized that—in conferring public benefits—the government has significant regulatory leeway to impose speech restrictions that might otherwise be forbidden as a direct regulation of private conduct."); *see also Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 389 (1969) ("No one has a First Amendment right to a license or to monopolize a radio frequency; to deny a station license because 'the public interest' requires it 'is not a denial of free speech.'" (quoting *Nat'l Broad. Co. v. United States*, 319 U.S. 190, 227 (1943)).

In addition, the Disney ABC stations have corporate owners with immense financial and other resources.[5] They are thus far better able than the plaintiffs in *Endocrine Society* and *Media Matters*—which were much smaller, nonprofit organizations—to assume the burdens of government investigation. *See Media Matters*, 2025 WL 2988966, at *1; *Endocrine Soc'y*, 832 F. Supp. 3d at 3. It is far from clear that a "person of ordinary firmness" in Plaintiffs' "position" would be deterred from speaking based on the early renewal order or the possibility of a hearing designation order. *Aref,* 833 F.3d at 258. And to the extent Plaintiffs argue that Chairman Carr's public statements are themselves "adverse actions" that give rise to an actionable retaliation claim, PI Mem. (Dkt. 2-1) 33-34, public officials are expected "to speak freely on questions of government policy"; free expression of that kind, unconnected with any administrative conduct, is not an adverse action. *See Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 477-78 (2022).

Regardless, the most significant obstacle to Plaintiffs' retaliation claim is their failure to establish the required "causal link," i.e., that "but for" the retaliatory animus alleged, the Commission would not have issued the early renewal order. Establishing this element is a

---

5 For the fiscal year ended September 27, 2025, Disney had $94.425 billion in revenue. *See* The Walt Disney Co., Annual Report (Form 10-K), at 36 (Nov. 13, 2025), *available at* https://s206.q4cdn.com/979796730/files/doc_financials/2025/ar/2025-Annual-Report.pdf (last visited Sept. 3, 2026).

"difficult task." *Endocrine Soc'y*, 832 F. Supp. 3d at 15. Allegations (or even "proof") "of some retaliatory animus in [an] official's mind" are insufficient. *Hartman v. Moore*, 547 U.S. 250, 260 (2006). Moreover, the "longstanding presumption of regularity" that attaches to government action is at its peak in the context of law-enforcement investigations, which involve a "high order" of "executive discretion." *Id.* at 263. If "retaliation was not the but-for cause of [an adverse action], the claim fails for lack of causal connection between unconstitutional motive and resulting harm." *Id.* at 260. Plaintiffs here have not established the necessary "causal link."

1. <u>The Impetus for the Early Renewal Proceeding Was the Need for More Information to Support the Antidiscrimination Investigation.</u>

Ensuring that broadcasters operate in the public interest—without engaging in "intentional employment discrimination" on the basis of race, sex, or other protected classes, *Beaumont Branch of the NAACP*, 854 F.2d at 506—is among the Commission's core functions. 47 U.S.C. § 151. And the President has established combatting unlawful discrimination through policies purporting to promote "diversity, equity, and inclusion" ("DEI") as a policy priority. *See, e.g.*, Exec. Order No. 14151, *Ending Radical and Wasteful Government DEI Programs and Preferencing*, 90 Fed. Reg. 8339 (Jan. 20, 2025) (directing agencies to terminate DEI initiatives within government). Chairman Carr has signaled his commitment to that priority from the outset of his leadership of the Commission. *See, e.g.*, Ex. 8, Press Release, Office of Chairman Brendan Carr, FCC, *Agency Will Completely Carry Out Statutory Mission Without Discrimination* (Jan. 21, 2025).

Consistent with that priority, the Chairman informed Disney on March 27, 2025, that the Enforcement Bureau had opened an investigation into allegations of "invidious forms of DEI discrimination" at Disney companies. Ex. 5, March 2025 Letter at 2. He was transparent about the reasons for doing so: "[P]ublic reports" and "whistleblower documents" had called the agency's attention to company standards that imposed "racial and identity quotas" for the selection

of "writers, directors, crew, and vendors" at ABC. *Id*. at 3. Evidence further suggested that ABC had "utilized race-based hiring databases and restricted fellowships to select demographic groups," and that "executive bonuses may . . . have been tied to DEI 'performance.'" *Id.*

Chairman Carr announced the investigation into these practices long before making any of the statements about *The View*, Jimmy Kimmel, or President Trump's July 2026 public address on which Plaintiffs focus their narrative in this case. *See* PI Mem. (Dkt. 2-1) at 20-23, 25-26; *see also infra* p. 38-39 (discussing chronology).

The investigation began, as is typical, with letters of inquiry seeking documents and narrative responses from Disney. *See* Ex. 4, Letter to Rep. Clarke at 4. These letters sought information relevant to whether Disney's regulated broadcast stations had engaged in unlawful discrimination, *id.*, including by seeking information about "enterprise-wide policies that impact its owned station group," Ex. 27, at 3. Disney did not dispute the Commission's authority to investigate discrimination at the broadcast stations; it sought instead to narrow the scope of the investigatory requests and obtain more time to respond. *See* Compl. (Dkt. 1) ¶ 66. Staff in the Enforcement Bureau engaged with Disney on the company's requests. *See* Ex. 4, Letter to Rep. Clarke at 5. And whereas the courts in both *Media Matters* and *Endocrine Society* found that the FTC's civil investigative demands did not make the grounds for the agency's investigations clear—a finding that weighed heavily in both cases—here, there is no dispute that the Enforcement Bureau's letters of inquiry made the grounds for the Commission's investigation clear. *See, e.g.*, Compl. (Dkt. 1) ¶¶ 64-65 (referencing the Commission's stated reasons for the investigation); *cf. Media Matters*, 2025 WL 2988966, at *7 (in considering whether the FTC's reasons for its civil investigative demand were potentially pretextual, "the district court permissibly weighed the fact that the [FTC's] sweeping demand was issued without the statutorily required explanation of the

permissible grounds for its issuance"); *Endocrine Soc'y*, 832 F. Supp. 3d at 18 (it was "unclear who the Commission hypothesize[d] [was] violating the FTC Act," and the agency "offer[ed] no answers").

Yet after more than a year of investigation, the Commission was still awaiting information it expected to receive. *See* Ex. 4, Letter to Rep. Clarke, at 5. Then, on April 21, 2026, Disney made a submission to the agency that the staff found woefully deficient. *See id.*; *see also* Ex. 27, at 3-13 (memorializing the deficiencies of Disney's responses in the antidiscrimination investigation). The next week, the Media Bureau called for early renewal of the Disney ABC station licenses. Wilkinson Ex. 41 (Dkt. 2-4), Early Renewal Order ¶ 3.

The order explained that initiating the early renewal process would "allow[] the FCC to conduct its ongoing investigation and enable[] the FCC to ensure that the broadcaster[s] [have] been meeting [their] public interest obligations." *Id.* ¶ 2. That is so because early renewal, unlike the enforcement investigation, is a public process that includes the possibility of an evidentiary hearing under 47 U.S.C. § 309. *See supra* p. 15. In other words, the Commission responded to what it perceived as a pattern of evasion in the antidiscrimination investigation by initiating a process in which it would have broader access to information in the investigation—just as the Commission's rules contemplate. *See* 47 C.F.R. § 73.3539(c).

Throughout this time, as public officials do, Chairman Carr made public statements, gave interviews, and posted on social media about a range of issues relevant to the Commission's work, including its focus on ensuring that broadcasters meet their statutory public interest obligations. Plaintiffs' one-sided assembly of the Chairman's statements seeks to portray him as targeting Disney. But they cite his statements out of context at every turn.

Perhaps most prominently, Plaintiffs state, incorrectly, that Chairman Carr claimed credit for "coercive" FCC regulatory efforts resulting in certain changes at media companies during March 2026 remarks. *See* Pl. Mem. (Dkt. 2-1) at 27; *id.* at 41 & n.68. But Chairman Carr did no such thing. He was not listing changes brought about by any form of coercive or even FCC action. He was describing changes in the media sector that have taken place over many years for many reasons—from legislation that Congress passed, to the President's choice to take his message directly to the public, which disintermediated the media. *See* Wilkinson Ex. 38 (Dkt. 2-4), Ryan Mancini, *FCC's Brendan Carr: Trump Is "Winning" Against "Fake News Media*," The Hill, at 3 (Mar. 28, 2026) (President Trump "smashed the façade" of legacy media). The actions that media companies and Congress took in response had nothing to do with any action, or threatened action, by the FCC. *See id.* Nowhere in the cited statement did Chairman Carr "celebrate[]" that the Commission had supposedly extracted concessions from media companies for political purposes, which it had not. *Contra* PI Mem. at 41.

Plaintiffs also misconstrue an interview during which Chairman Carr told a reporter: "If you didn't take us seriously, now you should." PI Mem. (Dkt. 2-1) at 10. Plaintiffs urge the Court to interpret that statement to relate to remarks by Jimmy Kimmel and to President Trump's statement that Kimmel should be fired. *See id.* at 9-10. But Chairman Carr made that statement not about Jimmy Kimmel, but about the Commission's decision to use the early renewal proceeding in aid of the antidiscrimination investigation. *See* Wilkinson Ex. 44 (Dkt. 2-4), Anna Nicolaou, *'The US Needed A Shock To The System': Brendan Carr, Media Watchdog*, Financial Times, at 33 (May 15, 2026). And indeed, far from saying that as a threat in connection with Kimmel, Chairman Carr went on to tell the reporter: "We have to make decisions based on where

we are in the enforcement [and] investigative matter, and to some extent, ignore how that's going to play in the court of public opinion." *Id.* at 3.

In another example, Plaintiffs assert that "the Chairman has publicly declared his belief that the public interest standard should account for the 'political ideology' of a broadcaster's programming." PI Mem. (Dkt. 2-1) at 40. That is not what he said. In context, the quote sets forth Chairman Carr's perspective that late-night hosts have gone "from being court jesters that would make fun of everybody in power to being court clerics and enforcing a very narrow political ideology." Wilkinson Ex. 24 (Dkt. 2-3), Jasmine Baehr, *FCC Chair Brendan Carr Defends ABC Affiliates Pulling Jimmy Kimmel Show After Monologue About Charlie Kirk*, Fox News, at 156 (Sept. 17, 2025). And far from suggesting that the Commission "should get to dictate the content of network television," PI Mem. at 12, Chairman Carr has unequivocally stated that "the FCC should not operate as a speech police," *see* Ex. 9, FCC, *Press Conference Following Commission Open Meeting of April 30, 2026*, Rev at 17:14 (May 4, 2026) (attached); *accord id.* at 18:44.

More generally, the Chairman has consistently emphasized that the Commission intends to ensure all broadcasters—not just ABC—operate in the public interest, and he has participated in a robust public debate on what that entails. *See, e.g.*, Ex. 10, David Shepardson, *US FCC could speed up broadcast license reviews, says agency head Carr*, Reuters (Mar. 16, 2026) (attached); *see also* Ex. 4, Letter to Rep. Clarke at 5 ("[T]he FCC has not singled out any one company for special treatment."); Ex. 2, May 28 Public Notice (reminding broadcasters of their public interest obligations). And he has repeatedly underscored that the "allegations and reports" of discrimination at Disney companies "do not represent FCC conclusions or determinations," and that the agency is "reserving judgment on the issues" while assessing the evidence. Ex. 4, Letter to Rep. Clarke at 4; *see also, e.g.*, Ex. 1, Shepardson, at 3 (FCC will "follow the facts and the law

wherever they take" the Disney investigation). In short, the Commission initiated the early renewal proceeding to serve its legitimate investigatory needs.

2. The Commission's Investigatory Interests Are Not Pretextual.

Plaintiffs' various attempts to portray the Commission's investigatory interests as pretextual are unpersuasive. PI Mem. (Dkt. 2-1) at 34-41.

***Selective Chronology.*** To begin, Plaintiffs give short shrift to the history of the Commission's investigation into reports and allegations of invidious discrimination at Disney. In the chronology they supply, for example, they conspicuously omit any reference to that investigation. *See generally* PI Mem. (Dkt. 2-1) at 53-63. The chronology fails to acknowledge (1) the Chairman's letter disclosing the investigation to Disney in March 2025; (2) the Enforcement Bureau's letter of inquiry dated June 5, 2025, and subsequent engagement with Disney on that request; (3) the follow-up letter of inquiry in February 2026, as to which Disney requested and received extra time to respond; (4) the deficient response that Disney supplied on April 21, 2026; and (5) the Commission's subsequent correspondence detailing the deficiencies of Disney's responses. *See supra* pp. 17-19; Ex. 27, at 3-13.

Those are meaningful omissions. The listed materials demonstrate that the Commission's investigation of potentially discriminatory practices at Disney was well underway before Chairman Carr made any of the comments that Plaintiffs highlight about either *The View* (first made on July 24, 2025), late-night host Jimmy Kimmel (first made on September 17, 2025), or ABC's carriage of President Trump's July 2026 speech. *See* PI Mem. (Dkt. 2-1) at 57, 58, 63. Quite clearly, an FCC investigation begun in March 2025 could not have been in reaction to comments made months (or a year) later. Similarly, in asserting a connection between the early renewal order issued on April 28, 2026, and President Trump's statements the day before, Plaintiffs ignore the fact that the

renewal order followed on the heels of their April 21 deficient response to the Enforcement Bureau's February 2026 supplemental letter of inquiry.

***Depiction of the Investigation as Unprecedented.*** Where Plaintiffs do acknowledge the antidiscrimination investigation, they exaggerate its "volume and scope," calling it "unheard-of in modern FCC practice." PI Mem. (Dkt. 2-1) at 37. That characterization is unsupported. Disney is a large and complex corporation, and the challenged practices extended to each of its eight owned and operated broadcast stations. It is hardly surprising that, in pursuing their investigation, Commission staff would ask a comprehensive set of initial and follow-up questions to get a complete picture of Disney's complex structure and operations and the scope of its potentially discriminatory policies.

Plaintiffs also place undue weight on the relative rarity of early renewal proceedings. Indeed, they refer to the Commission's early renewal order as "unprecedented" at least ten times. PI Mem. (Dkt. 2-1) at 9, 11, 24 & n.40, 31, 32, 35, 38. No one disputes—and Chairman Carr himself has acknowledged—that in recent decades, the Commission has not (except once) "used [the] tool" of calling for early renewal of broadcast licenses. *See* Wilkinson Ex. 44 (Dkt. 2-4), Nicolaou at 33. But the rule permitting calls for early renewal is longstanding. *See* 47 C.F.R. § 73.3539(c); *Reregulation of Radio and TV Broadcasting*, 72 F.C.C.2d 534, 535, 570 (1979) (codifying the current version of this rule). And already in March 2026, Chairman Carr discussed the possibility of reinvigorating the use of the rule with respect to broadcasters generally. *See* Ex. 4, Letter to Rep. Clarke at 5 & n.13 (citing Ex. 10, Shepardson). That was many weeks before President Trump's comments on April 27, 2026, that Plaintiffs say was the impetus for the early renewal order. *See* PI Mem. (Dkt. 2-1) at 24. And Plaintiffs' stations are not the only ones as to which the Commission has recently called for early renewal. *See* Ex. 11, *Bridge News, LLC*, DA

26-413 (Apr. 27, 2026). That the Commission is now availing itself of all lawful tools to support its investigation into the practices of the Disney ABC stations, as well as other broadcasters, demonstrates responsible enforcement vigor, not animus.

***Allegation of Differential Treatment for "Disfavored" Broadcasters.*** Plaintiffs additionally contend that Chairman Carr was "'chomping at the bit' to target [them]" because, immediately upon assuming leadership of the Commission, he reinstated a complaint against Disney ABC station WPVI alleging that WPVI had engaged in "news distortion" during its carriage of the Presidential debate of September 10, 2024. PI Mem. (Dkt. 2-1) at 37-38 (quoting *Media Matters for Am. v. FTC*, 805 F. Supp. 3d 105, 136 (D.D.C. 2025)). They contrast this action with the Media Bureau's parallel inaction in a licensing proceeding for Fox station WTFX. *See id.* at 38 & n.65. According to Plaintiffs, that inaction reflects preferential treatment for a favored broadcaster (Fox) and, by extension, is evidence of the agency's "retaliatory objective . . . targeting [Disney]." *Id.* Yet again, Plaintiffs omit important context that undermines their claim of "retaliatory intent." *Id.* at 37.

The complaint against WPVI was one of three complaints filed against broadcasters during the 2024 election season that the FCC denied in the waning days of the Biden Administration, on January 16, 2025. *See* Ex. 12, Letter Order, *Preserving the First Amendment*, GN Docket No. 25-11 (Enforcement Bur. 2025) (WPVI Order, attached); Ex. 13, Letter Order, *News Distortion Complaint Involving CBS Broadcasting Inc., licensee of WCBS, New York, NY* (Enforcement Bur. 2025) ("WCBS Order," attached); Ex. 14, *Equal Opportunities Complaint Involving NBC Telemundo License, LLC, licensee of WNBC, New York, NY et al*, DA 25-56 (Media Bur. 2025) ("NBC Order," attached). Like the complaint against WPVI, the complaint against WCBS alleged news distortion (in connection with a *60 Minutes* interview of then-Vice President Harris). The

complaint against WNBC alleged a violation of the Commission's "equal time" rule (after Vice President Harris appeared on Saturday Night Live).

In parallel, also on January 16, 2025, the Media Bureau granted renewal of the license of Fox station WTXF. *See* Ex. 15, *Preserving the First Amendment*, DA 25-57 (Media Bur. 2025) ("WTXF Order," attached). In renewing that license, the Bureau denied a "petition to deny" that had been filed in the proceeding in July 2023. *See id.*; Ex. 16, The Media and Democracy Project et al., Petition to Deny, LMS File No. 0000213362 (filed July 3, 2023) (attached). The petition centered on allegations of news distortion, relying in large part on a state court's finding that a cable network under common control with WTXF had disseminated false statements during the 2020 election. *See* WTXF Order ¶ 13. There was no evidence, however, that WTXF had ever aired any of the cable programming at issue. *See id.* ¶ 14. On that basis, and for other reasons explained in the order, the Media Bureau denied the petition. *See id.* ¶ 16.

On January 22, 2025, once Chairman Carr assumed the Commission's leadership, the complaints against WCBS, WNBC, and WPVI were reinstated. *See* Ex. 17, *News Distortion Complaint Involving WPVI Television (Philadelphia), LLC*, DA 25-84 (Enforcement Bur. 2025) ("WPVI Reinstatement Order," attached); Ex. 18, *News Distortion Complaint Involving CBS Broad. Inc.*, DA 25-85 (Enforcement Bur. 2025) ("WCBS Reinstatement Order," attached); Ex. 19, *Equal Opportunities Complaint Involving NBC Telemundo License, LLC, licensee of WNBC, New York NY*, DA 25-83 (Media Bur. 2025) ("WNBC Reinstatement Order," attached). The Media Bureau did not reinstate the petition to deny in the WTFX renewal proceeding or repeal the order granting WTFX's application for renewal. *See* Compl. (Dkt. 1) ¶ 62.

Without acknowledging this context, Plaintiffs characterize the reinstatement against WPVI, and inaction as to WTFX, as "evidence that similarly situated persons were treated

differently." PI Mem. (Dkt. 2-1) at 38 n.65. But as the above discussion makes clear, there were both procedural and substantive differences between the WTFX proceeding and the others (including the NBC and CBS proceedings, which Plaintiffs ignore altogether). *See* Ex. 20, Letter from Chairman Brendan Carr, FCC, to Ranking Member Richard Blumenthal, Permanent Subcommittee on Investigations, at 3-4 (Mar. 26, 2025) ("Letter to Sen. Blumenthal," attached). The petition to deny against WTFX had been pending for more than a year and a half when the Media Bureau denied it. The Bureau had compiled a record on the petition, reviewed it, and explained why the petition did not warrant an evidentiary hearing. *See* Ex. 15, WTFX Order ¶¶ 4-6, 11-19. Among other reasons, the petition was denied because it centered on allegedly false statements by a cable network, not the broadcast licensee. *See id.* ¶ 14. The Commission does not license cable networks, and they do not have the same public interest obligations as broadcasters. *See* Ex. 20, Letter to Sen. Blumenthal at 4.

By contrast, the complaints against the ABC, CBS, and NBC stations were more recent and concerned material aired on the regulated broadcast stations—not on affiliated cable networks. When those complaints were dismissed in the last days of the Biden Administration, the Commission had not compiled a record concerning the allegations. The orders issued on January 22 thus reasonably recognized that the January 16 orders denying those complaints had been "issued prematurely based on an insufficient investigatory record for the station-specific conduct at issue." *E.g.*, Ex. 17, WPVI Reinstatement Order ¶ 1. Reinstating those complaints so that the Commission could consider them in the ordinary course was "even-handed treatment," Ex. 20, Letter to Sen. Blumenthal at 4, not evidence of retaliatory animus.

***Utility of the Renewal Proceeding.*** Plaintiffs also seek to show pretext by arguing that the Commission "does not explain why [the early renewal proceeding] is essential to . . . the

[antidiscrimination] investigation." PI Mem. (Dkt. 2-1) at 39. But as the complaint reflects, the Enforcement Bureau repeatedly engaged with Disney concerning the inadequacy of its responses. *See* Compl. (Dkt. 1) ¶ 67 (referencing "the Bureau's continued insistence on document productions and narrative responses covering entities operating wholly separate from the Stations"); Ex. 26 at 2-5; Ex. 27 at 3-13. Disney disagrees that the information the agency sought was relevant, but targets of agency investigations routinely seek to narrow the scope of investigatory requests. What was unusual here is that Disney "unilaterally limited" its responses to the letters of inquiry. Ex. 27 at 3.

After Disney failed to fully respond to two written information requests, the Media Bureau called for early renewal of the station licenses. *See* Wilkinson Ex. 41 (Dkt. 2-4), Early Renewal Order ¶ 1. That step furthered the investigation in two significant respects. First, an early renewal proceeding, unlike an enforcement investigation, allows for public input. *See supra* p. 15. That process has already generated numerous comments supporting licenses renewal, but also two petitions to deny that specifically address allegedly discriminatory practices at Disney. *See* Ex. 21, Petition to Deny of the Center for American Rights, MB Dkt. 26-131, at 42-51 (June 30, 2026) (highlighting "specific programs that demonstrate race and gender-based discrimination") (attached); Ex. 22, Petition to Deny Renewal Licenses of America First Legal, MB Dkt. 26-131 at 8-15 (June 30, 2026) (describing Disney's "Inclusion Standards" and asking the FCC to "remedy [ABC's] discriminatory employment practices") (attached). The Commission is determining whether the submissions are sufficient to address the agency's antidiscrimination and broader public interest concerns. If more information is needed, however, a public evidentiary hearing in which the Commission would have broader access to information will now be available as a backstop—the second benefit of calling for early renewal. *See* 47 U.S.C. § 309(k)(3). Given

Disney's unwillingness to provide complete responses to the Enforcement Bureau's investigative requests and the availability, in the license renewal context, of public input and an evidentiary hearing, the Media Bureau reasonably concluded that calling for early renewal of the Disney ABC station licenses was "essential within the meaning of agency regulations" to the antidiscrimination investigation. Wilkinson Ex. 41, Early Renewal Order ¶ 3.

***Chairman Carr's Public Statements.*** Finally, Chairman Carr has not suggested that either the antidiscrimination investigation or the early renewal proceeding is "a direct response to ABC's speech." PI Mem. (Dkt. 2-1) at 35. Instead, he has observed that the Commission went "through rounds and rounds of discovery" with Disney, that "[t]heir responses were deficient," and that "the timing of [early renewal] was based on where [the agency was] in the discovery process." Wilkinson Ex. 53 (Dkt. 2-4), Alisa Vasquez, *Full Transcript: Chairman of the Federal Communications Commission Brendan Carr*, Politico, at 115-16 (July 31, 2026).

The Chairman has also repeatedly emphasized that the agency "has not singled out any one company for special treatment." Ex. 4, Letter to Rep. Clarke at 5; *see also* Ex. 23, News Release, CNBC, *First on CNBC: Transcript: FCC Chairman Brendan Carr Speaks with CNBC's "Squawk on the Street" Today*, at 5 (July 10, 2026) ("July 10 Eisen Interview," attached) (agency will "be guided based on the record," "whether it's for Disney or others"). And while he has not denied that the allegations of invidious discrimination at Disney are serious and concerning, he has consistently stressed that the Commission has not yet reached any determinations and will "follow the facts and the law wherever it goes." Ex. 24, News Release, CNBC, *First on CNBC: Transcript: FCC Chairman Brendan Carr Speaks with CNBC's "Squawk on the Street" Today*, at 4 (May 29, 2026) ("May 29 Eisen Interview," attached); *see also* Ex. 23, July 10 Eisen Interview, at 5 ("But

ultimately, we have not made our decision yet. But we'll be guided based on the record before us.").[6]

The mere fact that an agency official may "speak vigorously, sometimes colorfully" in the public sphere to "spark debate" does not imply prejudgment of a licensing proceeding. *Nuclear Info. & Res. Serv. v. NRC*, 509 F.3d 562, 571 (D.C. Cir. 2007). "Political discourse by prominent public figures," even when "couched in terms" that members of the public find "scandaliz[ing]," does not establish animus. *Mullin*, 146 S. Ct. at 2139.[7]

Because Plaintiffs do not establish the necessary "causal link between [their] protected speech and the early renewal proceedings," PI Mem. (Dkt. 2-1) at 34, they have failed to show a likelihood of success on the merits of their First Amendment retaliation claim.

## II. Plaintiffs Have Failed to Establish Irreparable Harm.

The D.C. Circuit "has set a high standard for irreparable injury." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). The moving party must demonstrate an injury that is "'both certain and great'" and "of such *imminence* that there is a 'clear and present' need for equitable relief to prevent irreparable harm." *Id*. (emphasis in original; quoting *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). The injury must be beyond remediation; the

---

6 *See also* Wilkinson Ex. 15 (Dkt. 2-3), David Folkenflik, *Trump taps FCC's Brendan Carr to lead the agency*, NPR, at 114 (Nov. 17, 2024) ("we'll see what [broadcasters] have to say"); Wilkinson Ex. 44 (Dkt. 2-4), Nicolaou at 34 ("We have to make the decisions based on where we are in the enforcement and investigative matter, and to some extent, ignore how that is going to play out in the court of public opinion.").

7 Plaintiffs' attempt to establish animus by pointing to the President's statements is even less persuasive. *See Trump v. United States*, 603 U.S. 593, 629 (2024) ("As the sole person charged by the Constitution with executing the laws of the United States, the President oversees—and thus will frequently speak publicly about—a vast array of activities that touch on nearly every aspect of American life. Indeed, a long-recognized aspect of Presidential power is using the office's 'bully pulpit' to persuade Americans, including by speaking forcefully or critically, in ways that the President believes would advance the public interest.").

"possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Clevinger v. Advoc. Holdings, Inc.*, 134 F.4th 1230, 1234 (D.C. Cir. 2025).

First, Plaintiffs claim to have established irreparable harm simply by alleging that they "are 'suffering from a campaign of retaliation against them in response to their exercise of their First Amendment Rights.'" PI Mem. (Dkt. 2-1) at 42 (quoting *Media Matters for Am. v. Paxton*, 138 F.4th 563, 580 (D.C. Cir. 2025)). But as explained above (Argument II.B), Plaintiffs are unlikely to succeed on the merits of that claim. A meritless constitutional claim does not meet the D.C. Circuit's "high standard for irreparable injury." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297; *cf. Hanson v. Dist. of Columbia*, 120 F.4th 223, 244 (D.C. Cir. 2024) (per curiam) ("Even in the sensitive areas of freedom of speech and religion, where the risk of chilling protected conduct is especially high, [courts] do not 'axiomatically' find that a plaintiff will suffer irreparable harm simply because it alleges a violation of its rights.").

Plaintiffs alternatively contend that they have shown irreparable harm from "ongoing adverse effects to [their] First Amendment rights." PI Mem. (Dkt. 2-1) at 42 (quoting *Paxton*, 138 F.4th at 585). This theory fails, too. In *Paxton*, the D.C. Circuit found "significant evidence of ongoing adverse effects" to the plaintiff media company's "First Amendment Rights," 138 F.4th at 585. The evidence allowed the court to find "present, concrete, and objective harms (not merely 'chilling effects') resulting from retaliatory government actions that [had] adversely affected [the plaintiff's] newsgathering activities and media business operations." *Id.* at 579. In particular, the plaintiff's chief operating officer declared that "staff [were] unwilling to speak internally on topics related to the investigation; outside groups [had] limited their collaboration with Media Matters; and Media Matters [had] paused similar reporting for at least one other media platform." *Id.* A

reporter stated that "his editors declined to publish two of his articles; he declined to pitch ideas for related reporting; and he left out relevant details in some articles being published." *Id*. And the editor-in-chief declared that "Media Matters [had] changed its review process; pared back its reporting; and declined to pursue follow-up on the challenged article." *Id*. By contrast here, Plaintiffs' evidence of "concrete impacts to their programming" does not approach that showing. PI Mem. (Dkt. 2-1) at 43. They primarily rely on the declaration of Eric Lieberman, in-house counsel for Disney, for this purpose. *See* PI Mot. Ex 5, Lieberman Decl. (Dkt. 2-5) ¶¶ 23-38. And that declaration does not establish irreparable harm.

Mr. Lieberman first points to ABC's decision to carry the President's July 16, 2026, primetime address on its nonbroadcast streaming service (purportedly against its better judgment), and he recites public criticism from the President and the Chairman concerning ABC's decision not to broadcast the speech over the air. Lieberman Decl. (Dkt. 2-5) ¶¶ 23-26. He hypothesizes that ABC will experience additional pressure from the "approaching midterm elections." *Id.* ¶ 28. The Court should not credit these claims. Contrary to Mr. Lieberman's assertion that ABC "ordinarily would not have" streamed President Trump's speech, *id.* ¶ 23, ABC took the same approach in 2022, when ABC News LIVE apparently streamed a Presidential address (President Biden's) that it declined to air on broadcast television. *See* ABC News Prime, *Biden's primetime speech; Trump special master showdown; Ukraine plant in crossfire* (ABC News LIVE, streamed Sept. 1, 2022, at 20:01:38 ET), *available at* https://www.youtube.com/live/c2IZg5mOKCU (last visited Sept. 3, 2026). And more fundamentally, the claim that ABC "decided to livestream the speech" out of concern that the Commission would retaliate against it makes little sense when, as Mr. Lieberman acknowledges, the Chairman had expressed the view that "broadcasters should be carrying" the speech—i.e., airing it on broadcast television. Lieberman Decl. ¶¶ 23, 26.

Livestreaming was not responsive to the Chairman's statement. In that sense, the "livestreaming" episode, if anything, shows that Plaintiffs have *not* adapted their behavior to supposed "pressure" from the Commission. Lieberman Decl. ¶ 28.

Mr. Lieberman next discusses the talk show *The View*, and the Commission's review of that program's exemption from the "equal opportunities" rule. Lieberman Decl. (Dkt. 2-5) ¶¶ 29-30. But, again, he does not say that ABC has changed its editorial process as a result of that review. *Id*. He asserts that "losing [the] exemption" might, in the future, require ABC to decide "*against* interviewing a candidate it deems newsworthy and otherwise *would* have aired." *Id.* ¶ 30. That is a speculative future harm that, in any event, could be redressed on judicial review of any future decision depriving *The View* of the exemption. *See* 28 U.S.C. § 2342(1); 47 U.S.C. § 402(a); *see also Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958) (per curiam) ("The possibility that adequate . . . corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.").

While Mr. Lieberman does assert that "the process for evaluating potential guests for *The View* has changed," Lieberman Decl. (Dkt. 2-5) ¶ 32, he insists at the same time that there has been no "change in the program's editorial standards regarding the newsworthiness of any candidate who might otherwise have been invited during this period," *id.* ¶ 33. Entirely missing from his declaration—or anything else Plaintiffs have proffered—is evidence that the Commission's actions in any way have impeded Plaintiffs' newsgathering, their collaboration with third parties, or reporters' willingness to pitch reporting ideas. *Paxton*, 138 F.4th at 581. At most, Mr. Lieberman states that *The View* has been more cautious about which political candidates to invite on the program, and that it has "pass[ed] on further consideration of booking several political candidates." Lieberman Decl. (Dkt. 2-5) ¶ 33.

Second, even if the Court credits Mr. Lieberman's declaration and treats increased "circumspect[ion] in booking political candidates" for *The View* as a First Amendment injury, PI Mem. (Dkt. 2-1) at 22, that theory of irreparable harm has two additional, fatal shortcomings. First, Plaintiffs attempt to tie this alleged injury to "the early license renewal process," and the "cumulative pressures" that process creates. PI Mem. (Dkt. 2-1) at 22; *see also id.* at 16 (Commission has "raised the stakes yet again by directing the Stations to apply for license renewals years ahead of schedule"); *id.* at 32 ("These licenses generate substantial advertising and retransmission-consent revenue, all of which would be lost if the Commission decides not to renew (or even to revoke) the licenses."). But as already explained, the Communications Act allows licensees to continue operating under their existing licenses for the duration of a renewal proceeding, including any evidentiary hearing or "judicial hearing" that Plaintiffs may pursue if they receive an adverse decision. 47 U.S.C. § 307(c)(3). For that reason, Plaintiffs cannot credibly link circumspection at *The View* to the early renewal proceeding—taken alone or cumulatively.

There is also a mismatch between Plaintiffs' asserted injuries and the relief they seek. Enjoining the "early renewal proceedings" and prohibiting the FCC from taking "any actions . . . to coerce or threaten Plaintiffs with sanctions"—the remedies Plaintiffs seek in their motion, *see* PI Mem. (Dkt. 2-1) 51; Proposed Order (Dkt. 2-8)—would not stop the antidiscrimination investigation or the Commission's review of *The View's* equal time exemption. Plaintiffs do not appear to challenge the Commission's authority to continue those proceedings or request that they be enjoined. Indeed, they insist that Disney has cooperated with the antidiscrimination investigation. *See* PI Mem. at 19-20. That cooperation belies Plaintiffs' claimed injury.

Meanwhile, Jimmy Kimmel and *The View* remain on the air and Plaintiffs, not the Commission, retain full editorial control over their programing. For example, it was Disney that

"made the decision to suspend production on [*Jimmy Kimmel Live*] to avoid further inflaming a tense situation at an emotional moment for our country." Ex. 25, GMA Team, *Jimmy Kimmel to return to air on Tuesday*, ABC News, at 3 (Sept. 22, 2025 1:01 p.m.) (attached). According to Disney, it made that decision because it "felt some of [Jimmy Kimmel's] comments were ill-timed and thus insensitive." *Id.* Likewise, it was Disney that decided to put the show back on the air after "thoughtful conversations with Jimmy." *Id.* In these circumstances, Plaintiffs do not satisfactorily explain why preliminary relief is needed "before [the C]ourt can issue final judgment." *AFL-CIO v. Sonderling*, Civ. A. No. 26-2061 (JEB), 2026 WL 1906727, at *6 (D.D.C. July 2, 2026).

Third, Plaintiffs argue that they are suffering economic damages, in the form of "time, money, and resources responding to [the Commission's] pretextual investigative demands and preparing the license renewal applications." PI Mem. (Dkt. 2-1) at 44. "Mere litigation expense, even substantial and unrecoupable cost, does not constitute irreparable injury." *Renegotiation Bd. v. Bannercraft Clothing Co.*, 415 U.S. 1, 24 (1974). Even if it did, Plaintiffs do not even attempt to make the requisite showing that either their participation in the renewal process or the possible outcome will "forc[e] [them] to shutter . . . operations immediately." *Alpine Secs. Corp. v. Fin. Indus. Reg. Auth.*, 121 F.4th 1314, 1329 (D.C. Cir. 2024); *see also Clevinger*, 134 F.4th at 1235 ("financial injury" must be "so great as to threaten its continued existence"); *Wisc. Gas Co.*, 758 F.2d at 674 (holding that economic harm qualifies as irreparable harm only when the alleged injury "threatens the very existence of the movant's business"); *AFL-CIO*, 2026 WL 1906727, at *5 (rejecting conclusory assertion of "significant costs" as not supported by evidence).

Plaintiffs nonetheless insist that their unquantified economic injuries are irreparable on account of the government's sovereign immunity against damages in First Amendment cases. PI

Mem. (Dkt. 2-1) at 45. The D.C. Circuit has never recognized such an exception to *Wisconsin Gas*, and this Court should not accept Plaintiffs' invitation to do so. The cases in which courts have considered economic loss unrecoverable on account of the government's sovereign immunity have required a showing of "significant" economic loss. *See*, *e.g.*, *AFL-CIO*, 2026 WL 1906727, at *5; *Xiaomi Corp. v. Dep't of Def.*, Civ. A. No. 21-0280 (RC), 2021 WL 950144, at *10 (D.D.C. Mar. 12, 2021). "[E]ven in this situation, damages do not become *per se* irreparable" because to "hold otherwise would essentially eviscerate the irreparable harm requirement for any cases brought against the government: '[a]ny movant that could show any damages against an agency with sovereign immunity —even as little as $ 1—would satisfy the standard.'" *Xiaomi Corp.*, 2021 WL 950144, at *10 (quoting *Air Trans. Ass'n of Am. v. Export-Import Bank of the U.S.*, 840 F. Supp. 2d 327, 335 (D.D.C. 2012)).

True, one judge in this district once "characterized economic damages that are unrecoverable due to sovereign immunity as 'irreparable *per se*.'" *ConverDyn v. Moniz*, 68 F. Supp. 3d 34, 49 (D.D.C. 2014) (quoting *Feinerman v. Bernardi,* 558 F. Supp. 2d 36, 51 (D.D.C. 2008)). But that judge later recognized that *Feinerman* "goes too far[,] and the inability to recover economic losses can more accurately be considered as a factor in determining whether the movant has shown irreparable harm." *Id.* (citing *Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34, 53 (D.D.C. 2011)). "Otherwise, a litigant seeking injunctive relief against the government would always satisfy the irreparable injury prong, nullifying that requirement in such cases." *Id.*

Plaintiffs' own cited authority, *Jenner & Block LLP v. U.S. Dep't of Just.*, 784 F. Supp. 3d 76 (D.D.C. 2025), confirms this. PI Mem. (Dkt. 2-1) at 45. There, the court found that, to warrant injunctive relief, any economic loss must be "significant." *Jenner & Block*, 784 F. Supp. 3d at 114. The alleged harm was "Jenner's ability to attract and retain clients and personnel," which

allegedly put “a large amount of income” at risk. *Id.* By contrast, Plaintiffs here offer only conclusory statements on economic loss, without providing any specifics sufficient to establish irreparable harm. *See Nat’l Mining Ass’n*, 768 F. Supp. 2d at 52. And where this Court considered the government’s sovereign immunity as a factor in *Susman Godfrey LLP v. Exec. Off. of Pres.*, 789 F. Supp. 3d 15 (D.D.C. 2025) (AliKhan, J.), it did so in the context of evidence of “significant financial loss” to the business of a law firm subject to an executive order that potentially threatened “a third” of the firm’s matters, *id.* at 56. Plaintiffs thus have not carried their “considerable burden” of establishing irreparable economic harm. *Nat’l Mining Ass’n*, 768 F. Supp. 2d at 50.

Fourth, Plaintiffs assert unspecified reputational harm. PI Mem. (Dkt. 2-1) at 45. They cite a single, conclusory paragraph in the Lieberman declaration, which in its entirety reads:

> The ongoing attacks directed at ABC for its speech, false accusations that ABC has failed to comply with investigations, and existential threat to the Stations in the impending early license renewal process have tarnished, and continue to tarnish, the reputation that Plaintiffs have cultivated over numerous decades.

Lieberman Decl. (Dkt. 2-5) ¶ 35. “That conclusory assertion is not backed up” and does not prove that “the loss would be great.” *AFL-CIO*, 2026 WL 1906727, at *5. Plaintiffs’ unsupported claim is impossible to square not only with their assertion that public comments in the renewal proceeding “are overwhelmingly supportive of the Stations,” Compl. (Dkt. 1) ¶ 106, but also, more fundamentally, with their attempt, in seeking preliminary relief, to short-circuit an administrative process through which they could make their case to the public and remove any “tarnish[]” from their reputation, PI Mem. (Dkt. 2-1) at 45; *see also* 47 U.S.C. § 309(e).

Finally, Plaintiffs’ delay in bringing suit and seeking injunctive relief serves to underscore their lack of irreparable harm. *See Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975) (per curiam) (finding that a 44-day delay in seeking injunctive relief was inexcusable and bolstered the finding of no irreparable harm); *see also Mylan Pharms., Inc. v. Shalala*, 81 F. Supp.

2d 30, 44 (D.D.C. 2000) (delay in bringing action "militates against a finding of irreparable harm"); *Biovail Corp. v. FDA*, 448 F. Supp. 2d 154, 165 (D.D.C. 2006) ("The delay in filing this suit further undermines any showing of irreparable injury"); *Cruz v. DHS*, Civ. A. No. 19-2727 (DLF), 2019 WL 8139805, at *6 (D.D.C. Nov. 21, 2019) (same).

Plaintiffs' delay in filing the case is not "on its own" a sufficient reason to deny the preliminary injunction motion. *Gordon v. Holder*, 632 F.3d 722, 724 (D.C. Cir. 2011). Still, Plaintiffs knew the Commission was investigating Disney for antidiscrimination violations as early as March 27, 2025, *see* PI Mem. (Dkt. 2-1) at 19, and only initiated this case on August 18, 2026—509 days later, *see generally* Compl. (Dkt. 1). They do not explain that delay. Even if the Court counts from the date on which the Commission ordered the Disney ABC stations to submit renewal applications, that occurred on April 28, 2026—112 days before Plaintiffs initiated this lawsuit. Compl. (Dkt. 1) ¶ 98. Considering the army of lawyers representing Plaintiffs in this case, this leisurely approach does not signal an emergency.

## III. The Balance of Equities and Public Interest Favor Denying Injunctive Relief.

Finally, granting a preliminary injunction would be contrary to the public interest. The balance of harms and the public interest elements of the injunctive relief test merge when the government is the opposing party, *Nken*, 556 U.S. at 435, and courts must "pay particular regard for the public consequences in employing the extraordinary remedy of injunction," *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312-13 (1982). Courts "explore the relative harms to applicant and respondent, as well as the interests of the public at large." *Barnes v. E-Sys., Inc. Grp. Hosp. Med. & Surgical Ins. Plan*, 501 U.S. 1301, 1305 (1991).

Here, the Commission has initiated a review to determine whether renewing Plaintiffs' broadcast licenses is in the public interest. Congress has vested the Commission with the authority to make that determination and has prescribed the procedures for administrative and judicial

review. And the Commission's review appropriately includes considerations of whether the stations comply with the Commission's antidiscrimination requirements and other Commission rules. Granting Plaintiffs' requested relief—suspension of the administrative proceedings—effectively insulates their broadcast stations from the regulatory requirements and processes that Congress has prescribed. A court "cannot 'ignore the judgment of Congress, deliberately expressed in legislation.'" *United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 497 (2001) (quoting *Virginian R. Co. v. Ry. Emps.*, 300 U.S. 515, 551 (1937)).

Plaintiffs do not require an injunction to continue using their broadcast licenses, *see* 47 U.S.C. § 307(c)(3), and will be able to seek review in the D.C. Circuit of any adverse final licensing order, *id.* § 402(b). Meanwhile, they can continue to press their constitutional objections in the renewal proceeding, where the Communications Act ensures their ability to develop the administrative record. *See id.* § 309(e), (k)(3). Plaintiffs do not need relief from this Court to obtain meaningful judicial review. *See Khalil*, 164 F.4th at 280. And particularly because the injunction Plaintiffs seek would alter—not preserve—the status quo, the Court should allow the renewal proceeding to conclude. *See Hanson*, 120 F.4th at 248 ("first, do no harm").

## IV. <u>The Court Should Require Plaintiffs to Post Security.</u>

For the reasons stated above, the Court should deny Plaintiffs' motion in its entirety. But should the Court issue any injunctive relief, it should order Plaintiffs to post security. The Court may issue a preliminary injunction "only if the movant gives security" for "costs and damages sustained" by the Government if they are later found to "have been wrongfully enjoined." Fed. R. Civ. P. 65(c). Plaintiffs should be required to post an appropriate bond commensurate with the scope of any injunction. *See DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999).

## CONCLUSION

For these reasons, the Commission respectfully requests that the Court grant this motion to dismiss, deny Plaintiffs' motion for preliminary relief (Dkt. 2), and dismiss this case.

Dated: September 3, 2026

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney

By: *_/s/ Dimitar P. Georgiev_*
DIMITAR P. GEORGIEV, D.C. Bar # 1735756
Assistant United States Attorney
601 D Street, NW
Washington, DC 20530
(202) 252 – 2500 (main)

*Attorneys for the United States of America*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN BROADCASTING COMPANIES, INC. *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>FEDERAL COMMUNICATIONS COMMISSION, *et al.*,<br><br>Defendants. | Civil Action No. 26-2902 (LLA) |

**[PROPOSED] ORDER**

UPON CONSIDERATION of Defendants' combined motion to dismiss and opposition to Plaintiffs' motion for preliminary relief, Plaintiffs' motion for preliminary relief (Dkt. 2), and the entire record herein, it is hereby

ORDERED that Defendants' motion to dismiss is GRANTED, and it is further

ORDERED that Plaintiffs' motion for preliminary relief is DENIED as moot, and it is further

Ordered that this case is hereby DISMISSED.

SO ORDERED:

____________________
Date

________________________________________
LOREN L. ALIKHAN
United States District Judge