**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

*American Broadcasting Companies, et al.*

*v.* Civil Case No. 1:26-cv-02902

*Federal Communications Commission, et al.*

# AMICUS BRIEF OF THE CENTER FOR AMERICAN RIGHTS

Christopher E. Mills
Spero Law LLC
557 East Bay St. #22251
Charleston, SC 29413
843-606-0640
cmills@spero.law

Daniel R. Suhr*
Center for American Rights
1341 W. Fullerton Ave., Suite 170
Chicago, IL 60614
414-588-1658
dsuhr@americanrights.org
**Pro Hac Vice Motion Filed Simultaneously*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .......... iii

INTEREST OF THE AMICUS .......... 1

INTRODUCTION .......... 2

ARGUMENT .......... 2

I. This investigation is real and serious—it is not "pretextual." .......... 2

A. This Court owes the Commission significant deference in its investigatory choices. .......... 3

B. The Commission and Chairman Carr have significant credibility on their commitment to ending discriminatory employment practices at FCC licensees. .......... 5

II. Disney's countervailing narrative of pretext is not persuasive. .......... 9

III. Disney cannot establish irreparable harm. .......... 18

IV. The limits of Disney's editorial freedom. .......... 20

A. Disney misreads *NRA v. Vullo*. .......... 20

B. The Commission is justified in its actions toward Disney on The View. .......... 23

V. The public interest favors allowing the investigation to move forward. .......... 25

CONCLUSION .......... 25

## TABLE OF AUTHORITIES

CASES

*Am. Sec. Council Educ. Found. v. FCC*, 1978 U.S. App. LEXIS 9065 (D.C. Cir. Sept. 13, 1978) ..... 25

*Aref v. Lynch*, 833 F.3d 242 (D.C. Cir. 2016) ..... 3, 20

*Arneault v. O'Toole*, 513 F. App'x 195 (3d Cir. 2013) ..... 1

*AT&T Corp. v. FCC*, 449 U.S. App. D.C. 106 (D.C. Cir. 2020) ..... 4

*Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963) ..... 21

*Beaumont Branch of NAACP v. FCC*, 854 F.2d 501 (D.C. Cir. 1988) ..... 5, 12

*Bilingual Bicultural Coalition on Mass Media v. Federal Communications Commission*, 595 F.2d 621 (D.C. Cir. 1978) ..... 2, 5, 6, 16

*Black Broadcasting Coalition v. FCC*, 556 F.2d 59 (D.C. Cir. 1977) ..... 6

*CBS v. FCC*, 453 U.S. 367 (1981) ..... 1

*Citizens for Jazz on WRVR, Inc. v. FCC*, 775 F.2d 392 (D.C. Cir. 1985) ..... 2

*Comm. on Ways & Means, U.S. House of Reps. v. U.S. Dep't of Treasury*, 45 F.4th 324 (D.C. Cir. 2022) ..... 3

*Community Coalition for Media Change v. FCC*, 646 F.2d 613 (D.C. Cir. 1980) ..... 6

*Doe v. District of Columbia*, 796 F.3d 96 (D.C. Cir. 2015) ..... 3

*FCC v. National Citizens Comm. for Broadcasting*, 436 U.S. 775 (1978) ..... 20

*FCC v. Pottsville Broadcasting Co.*, 309 U.S. 134 (1940) ..... 4

*FCC v. Schreiber*, 381 U.S. 279 (1965) ..... 4

*FCC v. WJR, Goodwill Station, Inc.*, 337 U.S. 265 (1949) ..... 4

*Federal Radio Com. v. Nelson Bros. Bond & Mortg. Co.*, 289 U.S. 266 (1933) ..... 2

*Florida State Conference of Branches of the NAACP v. FCC*, 24 F.3d 271 (D.C. Cir. 1994) ..... 6

*Ga. Latino Alliance for Human Rights v. Governor of Ga.*, 691 F.3d 1250 (11th Cir. 2012) ..... 7

*Indep. Ins. Agents of America, Inc. v. Ludwig*, 997 F.2d 958 (D.C. Cir. 1993) ..... 24

*Kennedy for President Committee v. FCC*, 636 F.2d 417 (D.C. Cir. 1980) ..... 25

*LULAC v. Exec. Off. of the President,* 780 F. Supp. 3d 135 (D.D.C. 2025) ..... 3

*Lutheran Church Missouri Synod v. FCC*, 141 F.3d 344 (D.C. Cir. 1998) ..... 14

*Malkan FM Associates v. FCC*, 935 F.2d 1313 (D.C. Cir. 1991) ..... 24

*MCA, Inc. v. Garden State Broadcasting Ltd. Partnership*, 1988 U.S. Dist. LEXIS 11007 (D.N.J. Sept. 29, 1988) ........ 10

*MD/DC/DE Broadcasters Ass'n v. FCC*, 236 F.3d 13 (D.C. Cir. 2001) ........ 14

*Multimedia Holdings Corp. v. Circuit Court*, 544 U.S. 1301 (2005) ........ 4

*National Black Media Coalition v. FCC*, 775 F.2d 342 (D.C. Cir. 1985) ........ 5

*National Rifle Association v. Vullo*, 602 U.S. 175 (2024) ........ 20, 21

*New York Club Ass'n v. City of New York*, 487 U.S. 1 (1988) ........ 13

*Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367 (1969) ........ 25

*Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984) ........ 13

*Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537 (1987) ........ 13

*SEC v. Jerry T. O'Brien, Inc.*, 467 U.S. 735 (1984) ........ 4

*Trump v. Thompson*, 20 F.4th 10 (D.C. Cir. 2021) ........ 4

*United States v. Texas*, 599 U.S. 670 (2023) ........ 4

OTHER AUTHORITIES

Alyssa Ray, *Trump Slams Fox News Correspondent Over Iran Coverage*, The Wrap (Aug. 27, 2026) ........ 16

Brian Lowry, *Disney is finally standing up to Trump. Will other broadcasters join them?*, MSNOW.com (Aug. 20, 2026) ........ 13

David Beito, *The New Deal's War on the Bill of Rights* (Independence Institute 2025) ........ 22

EEOC, *What You Should Know About DEI-Related Discrimination at Work* ........ 9

Eric Columbus, *Brendan Carr Has a Point About the Equal Time Rule*, Lawfare (March 4, 2026) ........ 23

Executive Order 14151, "Ending Radical And Wasteful Government DEI Programs And Preferencing" (January 20, 2025) ........ 7

Executive Order 14173, "Ending Illegal Discrimination and Restoring Merit-Based Opportunity" (January 21, 2025) ........ 7

Executive Order 14398, "Addressing DEI Discrimination by Federal Contractors" (March 26, 2026) ........ 8

Gigi Sohn, LinkedIn ........ 23

Hanna Panreck, *Rosie O'Donnell hammers Trump repeatedly in Kimmel guest-host gig as White House fires back*, FoxNews.com (Aug. 21, 2026) ........ 18

Judy Kurtz, *Original 'View' co-host: Show wasn't 'supposed to be political,'* The Hill (Feb. 16, 2022) ........ 24

Letter from Chairman Carr to U.S. Rep. Yvette Clarke (May 29, 2026) .................................... 10

Memorandum from the Attorney General, "Ending Illegal DEI and DEIA Discrimination and Preferences" (Feb. 5, 2025) ........................................................................................... 8

Memorandum from the President, "Removing Discrimination and Discriminatory Equity Ideology From the Foreign Service" (March 19, 2025) ................................................... 8

Paul Matzko, *"Do Something about* Life Line*": The Kennedy Administration's Campaign to Silence the Radio Right*, 48 Presidential Studies Quarterly 817 (Dec. 2018).......................... 23

Paul Matzko, *The Radio Right* (Oxford U. Press 2020) ............................................................ 23

Todd Purdum, *Clinton Takes on Violent Television*, N.Y. Times (July 11, 1995) ........................ 22

*TV chiefs agree to curb sex and violence*, The Independent (March 1, 1996)............................. 22

U.S. Department of Education Releases Frequently Asked Questions on Dear Colleague Letter About Racial Preferencing (March 1, 2025)................................................................... 9

*Whistleblower Urges FCC to Deny Renewal of Disney's KABC-TV License*, Communications Daily (June 11, 2026)........................................................................................................11

William L. Anderson, *Presidents Have a Long History of Using the FCC to Silence Their Critics*, Mises Institute (Sept. 25, 2025) ......................................................................................... 23

STATUTES

47 U.S.C. § 307(c)(3)................................................................................................................ 18

47 U.S.C. § 315......................................................................................................................... 23

REGULATIONS

47 C.F.R. § 73.3539(c)............................................................................................................. 10

FCC DECISIONS AND STATEMENTS

*Applications for Assignment of Licenses from Sagamorehill of Columbus, Ga, Llc, Sagamorehill of Lubbock, Llc, & Subsidiaries of Block Communs., to Gray Tv Licensee, Llc*, 2026 FCC LEXIS 1041 (May 6, 2026) ................................................................................................ 7

*Broadcast Actions*, 40 F.C.C. 314 (1960) .................................................................................. 16

*Carr Applauds Decision Overturning Biden-Era 'Digital Equity Rules' Unanimous Decision Determines 2023 Agency Action Was Unlawful Power Grab*, 2026 FCC LEXIS 1074 (May 6, 2026) ......................................................................................................................................... 7

*Character Policy*, 102 F.C.C.2d 1179 (1986) ..........................................................................11

*Communications Vending Corp.*, 17 FCC Rcd 24201 (2002)..................................................... 24

*In re Application of Tulsa 23*, 4 FCC Rcd 2067 (1989) ............................................................ 10

*In re applications of Alpine Broadcasting*, 88 F.C.C.2d 1213 (ALJ 1981)................................. 13

*In re Applications of Heritage-Wisconsin Broadcasting Corp., et al.*, 8 FCC Rcd 5607 (1993).. 10

*In re applications of Morris, et al.*, 88 F.C.C.2d 713 (Rev. Bd. 1981) ....................................... 13

*In re AT&T Application for Review*, 31 FCC Rcd 12977 (2016)................................................ 23

*In re Chapman*, 24 F.C.C.2d 282 (1970)........................................................................................ 13

*In re Chapman*, 34 F.C.C.2d 159 (Rev. Bd. 1972)......................................................................... 12

*In re Cox Enters*., 2026 FCC LEXIS 461 (Feb. 27, 2026)............................................................. 7

*In re FCC Approves Skydance / Paramount (CBS) Transaction*, 40 FCC Rcd 5689 (2025).... 7, 14

*In re Frontier Commc'ns Parent, Inc*., 2025 FCC LEXIS 2244 (May 16, 2025).......................... 7

*In re Lamar*, 58 F.C.C.2d 274 (Rev. Bd. 1976).............................................................................. 13

*In re Leflore Broad. Co.*, 36 F.C.C.2d 101 (1972) ......................................................................... 10

*In re MB Denies Application of Fox TV Stations*, 40 FCC Rcd 438 (MB 2025)......................... 16

*In re request of Fonawin Corp*., 62 F.C.C.2d 432 (1976) .......................................................... 23

*In re Walton Broad., Inc*., 78 F.C.C.2d 857 (1980) .......................................................................11

*In re WTB & OIA Issues Order Granting T-Mobile-UScellular Applications*, 40 FCC Rcd 4776 (2025)............................................................................................................................................ 7

*In re WTB Grants AT&T-UScellular Applications Order,* 40 FCC Rcd 9290 (2025)..................... 7

*In the Matter of Annual 1987 Access Tariff Filings*, 3 FCC Rcd 749 (1988) ...............................11

*In the Matter of Consent to the Transfer of Control of TEGNA Inc*., 2026 FCC LEXIS 620 (March 19, 2026) ............................................................................................................................. 7

*In the Matter of Equal Opportunities Complaint Filed by Angelides For Governor*, 21 FCC Rcd 11919 (MB 2006)........................................................................................................................ 16

*In the Matter of GMD Microcable Partnership*, 13 FCC Rcd 8479 (MMB 1998) ...................... 24

*In the Matter of Petition for Rulemaking to Require Broad. Licensees to Show Nondiscrimination in Their Empl. Practices*, 13 F.C.C.2d 766 (1968) ..................................................................... 5

*In the Matter of Review of the Commission's Broadcast and Cable Equal Employment Opportunity Rules,* 13 FCC Rcd 23004 (1998) ........................................................................... 5

*In the Matter of Review of the Commission's Broadcast and Cable Equal Employment Opportunity Rules*, 15 FCC Rcd 2329 (2000) ................................................................................ 6

*In the Matter of Review of the Commission's Broadcast and Cable Equal Employment Opportunity Rules and Policies*, 17 FCC Rcd 24018 (2002) .................................................. 14

*KMPC, Station of the Stars*, 14 Fed. Reg. 4831 (Aug. 3, 1949)................................................. 21

*KMPC, Station of the Stars*, 14 Fed. Reg. 6096 (Oct. 6, 1949) .................................................... 21

*Luncheon Remarks by Chairman James H. Quello*, 1993 FCC LEXIS 1346 (March 23, 1993) . 22

*Market Dynamics of National Programmers/Affiliates*, 40 FCC Rcd 9062 (2025)...................... 10

*Notice of Apparent Liability to WERC*, 7 FCC Rcd 6537 (MBB 1992) ....................................... 16

*Remarks by Chairman Reed Hundt*, 1995 FCC LEXIS 5518 (Aug. 18, 1995) ............................ 22

*Remarks of Chairman Reed Hundt*, 1995 FCC LEXIS 5692 (Aug. 24, 1995)............................. 22

*Remarks of Comm'r Jessica Rosenworcel to the NAB*, 2018 FCC LEXIS 1073 (April 9, 2018) 23

*Star Stations*, 51 F.C.C.2d 95 (1975) ......................................................................................... 21

## INTEREST OF THE AMICUS

"It is the right of the viewers and listeners, not the right of the broadcasters, which is paramount" when courts evaluate constitutional claims in the broadcasting context. *CBS v. FCC*, 453 U.S. 367, 395 (1981). The Center for American Rights represents the rights of viewers, including several specific viewers in ABC owned-and-operated television markets who have filed a petition to deny in the pending license review at the Federal Communications Commission.

The Center has shown in its petition that Disney, the corporate parent that holds the ABC local station licenses, is engaging in race- and sex-based discriminatory employment practices. Rather than end its invidious discrimination, Disney's response is to file this lawsuit, which attempts to prematurely cut off the FCC's investigation into these viewers' concerns.

The viewers' "right to petition extends to all departments of the Government, including administrative agencies." *Arneault v. O'Toole*, 513 F. App'x 195, 198 n.2 (3d Cir. 2013) (cleaned up). Here, the Center has filed a consumer complaint against ABC and its station WPVI (Compl. ¶ 54) and a petition to deny on the early renewal applications (*see* Compl. ¶ 88).

ABC's motion to immediately enjoin the license renewal process would stop the government's review of the Center's petition dead in its tracks. ABC is trying to prioritize its speech rights over and above viewers' paramount rights to broadcasting in the public interest—by short-circuiting the FCC's review of these viewers' exercise of their petition rights. Along the way, ABC takes multiple shots at the Center for American Rights and its filings. *See, e.g.,* ECF Dkt. 2-1, Disney's Memorandum in Support of Motion ("Disney") 9.

The Center has been a fierce advocate for the Commission to enforce its nondiscrimination rules. In December 2024, even before Chairman Carr took office as chairman, the Center filed a petition to condition the grant of Paramount's transfer of CBS on ending unlawful DEI.

## INTRODUCTION

On the merits of this motion, the issue is indeed "simple" (Disney 1): Disney got caught red-handed engaging in corporate-level employment practices that discriminated based on race and sex. Under its own and D.C. Circuit precedent, the Commission is obligated to investigate and seriously punish any such discriminatory practices.[1] Under further D.C. Circuit precedent, judicial review of such decisions is "particularly deferential."[2] Seen in the light of the Commission's longstanding commitment to nondiscrimination and the courts' deferential review of the Commission's enforcement discretion, the Commission's current investigation into Disney is fully justified.

Underlying Disney's First Amendment retaliation claim is an attitude that Disney feels entitled to unregulated use of the public airwaves. Disney believes those airwaves belong to it, not the American people. It believes it should hold its broadcast licenses—and maintain the unique power, influence, and economic benefit that goes with those licenses—in perpetuity regardless of whether its actions serve the public interest. That's not the law—and hasn't been since at least 1933.[3]

## ARGUMENT

### I. This investigation is real and serious—it is not "pretextual."

Disney's motion comes down to one question: given the high standard for a preliminary injunction, on the limited record before the Court, can the Court say the FCC's investigation into

---

[1] "[T]he Commission *must* investigate broadcasters' employment practices and, in assessing the character qualifications of broadcast licensees, consider whether they have engaged in intentional employment discrimination." *In the Matter of Review of the Commission's Broadcast and Cable Equal Employment Opportunity Rules and Policies*, 17 FCC Rcd 24018, 24029 (2002) (italics original) (citing *Bilingual Bicultural Coalition v. FCC*, 595 F.2d 621, 628-29 (D.C. Cir. 1978) (en banc)).

[2] *Citizens for Jazz on WRVR, Inc. v. FCC*, 775 F.2d 392, 398 (D.C. Cir. 1985).

[3] *Federal Radio Com. v. Nelson Bros. Bond & Mortg. Co.*, 289 U.S. 266, 279-81 (1933).

Disney's employment discrimination is pretextual rather than genuine? *See* Disney 4, 8, 11, 12 n.26, 17, 24, 30-31 (discussing "pretextual investigation"). Disney's entire claim for retaliation is dependent on that determination. As Disney has pled, it must show three elements to win a pretext claim, including "a causal link between the exercise of a constitutional right and the adverse action taken against him." Compl. ¶ 136, quoting *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016). "To satisfy the causation link, a plaintiff must allege that his or her constitutional speech was the 'but for' cause of the defendants' retaliatory action." *Doe v. District of Columbia*, 796 F.3d 96, 107 (D.C. Cir. 2015) (cleaned up). For causation, "[t]he improper motive must be a but-for cause of the government action, meaning that the adverse action . . . would not have been taken absent the retaliatory motive." *Comm. on Ways & Means, U.S. House of Reps. v. U.S. Dep't of Treasury*, 45 F.4th 324, 340 (D.C. Cir. 2022).

Disney cannot show that causal link in this case. As demonstrated below, there are reams of reasons to show the FCC has valid, indeed compelling, reasons to proceed with this investigation. Moreover, the FCC has made fighting DEI at licensees an enforcement priority, as has the Trump Administration as a whole, further showing the lack of but-for causation. Without that, there is no likelihood of success on the merits, and what's more there's no irreparable harm for being subject to a lawful investigation. *See* Disney 34 (irreparable harm tied into the merits in this case).

**A. This Court owes the Commission significant deference in its investigatory choices.**

The Commission is entitled to a presumption of regularity in its investigations. Courts ascribe a presumption of regularity to agency actions, including their motives. *LULAC v. Exec. Off. of the President,* 780 F. Supp. 3d 135, 177 (D.D.C. 2025) ("agencies benefit from a presumption of motivational regularity."). "Accordingly, the [agency head] is entitled to a presumption of motivational regularity when he exercises an authority confided to him by law, even in the face of

a plaintiff's allegations of partisan motives." *Id*. (cleaned up) (quoting *Trump v. Thompson*, 20 F.4th 10, 39 (D.C. Cir. 2021)). The challenger must produce "compelling evidence of impermissible intent," *id*., to overcome the presumption.

The Commission is further entitled to a presumption of deference when it chooses to enforce laws entrusted to its stewardship. "Under Article II, the Executive Branch possesses authority to decide how to prioritize and how aggressively to pursue legal actions against defendants who violate the law," including discretion to "prioritize its enforcement efforts." *United States v. Texas*, 599 U.S. 670, 678-79 (2023) (cleaned up). The executive's constitutional "complete discretion" includes both "whether" to enforce and "how to do so." *See Multimedia Holdings Corp. v. Circuit Court*, 544 U.S. 1301, 1305 (2005) (Kennedy, J., in chambers).

The Commission is also entitled to discretion in the tools it uses to investigate and enforce its rules. In general, Congress "left largely to [the FCC's] judgment the determination of the manner of conducting its business which would most fairly and reasonably accommodate those ends" set out in the Communications Act. *FCC v. WJR, Goodwill Station, Inc.*, 337 U.S. 265, 282 (1949). Multiple times the Supreme Court has recognized the FCC's "broad discretion to prescribe rules for specific investigations." *FCC v. Schreiber*, 381 U.S. 279, 289 (1965). *Accord FCC v. Pottsville Broadcasting Co*., 309 U.S. 134, 138 (1940), and *WJR*, 337 U.S. at 282.

Evaluating a "comparable" statutory scheme to the FCC, the Supreme Court held that "Congress intended to vest the SEC with considerable discretion in determining when and how to investigate possible violations of the statutes administered by the Commission." *SEC v. Jerry T. O'Brien, Inc*., 467 U.S. 735, 745 (1984). The FCC has that considerable discretion as well. *AT&T Corp. v. FCC*, 449 U.S. App. D.C. 106, 116 (D.C. Cir. 2020) (per curiam) (FCC "retains traditional enforcement discretion in deciding whether or how to investigate [a] complaint.").

Particular to this case, the Commission is entitled to "broad discretion" in how it handles nondiscrimination investigations. *Beaumont Branch of NAACP v. FCC*, 854 F.2d 501, 507 (D.C. Cir. 1988). The FCC has "discretion to choose between holding [a] hearing or conducting [an] investigation" through the Enforcement Bureau. *National Black Media Coalition v. FCC*, 775 F.2d 342, 347 (D.C. Cir. 1985) (summarizing holding of *Bilingual Bicultural Coalition on Mass Media v. FCC*, 595 F.2d 621, 628-31 (D.C. Cir. 1978) (en banc)). Given this precedent, Disney cannot demand that the FCC proceed through a bureau investigation rather than by calling a license hearing through early renewal. *Contra* Disney 16-17.

### B. The Commission and Chairman Carr have significant credibility on their commitment to ending discriminatory employment practices at FCC licensees.

The Commission's commitment to combatting unlawful discrimination is deep and longstanding. For nearly six decades, it has been Commission policy to investigate "allegations raising substantial questions whether the applicant has violated, or is in violation of, the Civil Rights Act or a pertinent State law in this field. If a violation has been established, this clearly raises a question as to the applicant's qualifications to be a broadcast licensee." *In the Matter of Petition for Rulemaking to Require Broad. Licensees to Show Nondiscrimination in Their Empl. Practices*, 13 F.C.C.2d 766, 769 (1968). This is true even if particular race- or sex-based discrimination may not technically violate Title VII or other state and federal civil rights laws. *Id*.

The Commission's attitude of robust enforcement against discrimination has carried through to the modern era: "A licensee who has discriminated on the basis of someone's race, ethnicity or gender cannot demonstrate the character needed to be a public trustee." *In the Matter of Review of the Commission's Broadcast and Cable Equal Employment Opportunity Rules,* 13 FCC Rcd 23004, 23050 (1998) (Joint Statement of Chairman Kennard and Comm'r Tristani).

The goal of the FCC's ban on racial discrimination in hiring by broadcasters is to "further Dr. King's dream of a colorblind society." *In the Matter of Review of the Commission's Broadcast and Cable Equal Employment Opportunity Rules*, 15 FCC Rcd 2329, 2492 (2000) (Statement of Chairman Kennard). "The only good approach to discrimination is zero tolerance." *Id*.

As a result of this longstanding commitment, the FCC is "duty-bound" to "investigate, by one means or another, substantial allegations that its licensees have engaged in employment discrimination."[4] "A hearing ordinarily will be required if the facts alleged point to actual discriminatory conduct." *Community Coalition for Media Change v. FCC*, 646 F.2d 613, 615 (D.C. Cir. 1980) (summarizing holding of *Bilingual Bicultural Coalition*, 595 F.2d 621). Though the FCC has not yet ordered a hearing on the petitions in Disney's renewal application, "evidence of actual discriminatory conduct in most cases will present a substantial and material question of fact warranting a renewal hearing." *Florida State Conference of Branches of the NAACP v. FCC*, 24 F.3d 271, 273 (D.C. Cir. 1994) (quoting *Bilingual Bicultural Coalition*, 595 F.2d at 629). *Accord Black Broadcasting Coalition v. FCC*, 556 F.2d 59, 64-65 (D.C. Cir. 1977) ("a full hearing is required" for "allegations of actual discrimination").

Chairman Carr's commitment to combatting unlawful discrimination is equally obvious. On January 21, 2025, one day after President Trump's inauguration, Chairman Carr announced that combatting unlawful DEI discrimination would be a top priority: "Promoting invidious forms of discrimination runs contrary to the Communications Act and deprives Americans of their rights to fair and equal treatment under the law." Throughout his tenure, he has made ending DEI at Fortune 500 companies that hold commission licenses a top priority[5]—just ask Verizon, T-Mobile, Charter,

---

[4] *Bilingual Bicultural Coalition*, 595 F.2d at 636 (Robinson, J., dissenting in part).

[5] *See Carr Applauds Decision Overturning Biden-Era 'Digital Equity Rules' Unanimous Decision Determines 2023 Agency Action Was Unlawful Power Grab*, 2026 FCC LEXIS 1074, *1-2 (May

Paramount, Nexstar, and Gray Media.[6] Importantly, consistent with longstanding Commission policy, these merger orders end DEI throughout each company, not only in the individual broadcasting station components of the company.

And Chairman Carr makes ending unlawful DEI an enforcement priority because the entire Trump Administration makes ending DEI an enforcement priority. We should not be surprised when appointees "exercise their discretion in a manner consistent with the established enforcement priorities of the Administration they serve." *Ga. Latino Alliance for Human Rights v. Governor of Ga.*, 691 F.3d 1250, 1265 (11th Cir. 2012). Chairman Carr is entitled to make ending DEI discrimination an enforcement priority, and pursuing that priority is not pretext for attacking Disney's speech but an embodiment of his lawful discretion.

Disney waxes at length about all of President Trump's posts or comments about the overt political bias of ABC's programming content, suggesting they tell the FCC what to do. But Disney never mentions any of President Trump's declarations instructing administration agencies to combat DEI. At the start of his second administration, the President issued Executive Order 14151, which directs agencies to "align agency" "enforcement activities" with combatting DEI. Executive Order 14173 separately orders "all agencies to enforce our longstanding civil-rights laws and to combat illegal private-sector DEI preferences, mandates, policies, programs, and activities."

---

6, 2026) ("the FCC is focused on advancing our Build America Agenda and ensuring that regulated entities do not discriminate, including through our efforts to end invidious forms of DEI discrimination.").

[6] *Applications for Assignment of Licenses from Sagamorehill of Columbus, Ga, Llc, Sagamorehill of Lubbock, Llc, & Subsidiaries of Block Communs., to Gray Tv Licensee, Llc*, 2026 FCC LEXIS 1041, *26 (May 6, 2026); *In the Matter of Consent to the Transfer of Control of TEGNA Inc.*, 2026 FCC LEXIS 620, *69 (March 19, 2026); *In re Cox Enters.*, 2026 FCC LEXIS 461, *24 (Feb. 27, 2026); *In re WTB Grants AT&T-UScellular Applications Order,* 40 FCC Rcd 9290, 9312 (2025); *In re WTB & OIA Issues Order Granting T-Mobile-UScellular Applications*, 40 FCC Rcd 4776, 4840 (2025); *In re Frontier Commc'ns Parent, Inc.*, 2025 FCC LEXIS 2244, *47 (May 16, 2025); *In re FCC Approves Skydance / Paramount (CBS) Transaction*, 40 FCC Rcd 5689, 5714 (2025).

Multiple subsequent presidential and administration actions have followed, showing that combatting unlawful DEI is an ongoing priority. *See, e.g.,* Executive Order 14398, "Addressing DEI Discrimination by Federal Contractors" (March 26, 2026); Memorandum from the President, "Removing Discrimination and Discriminatory Equity Ideology From the Foreign Service" (March 19, 2025); Memorandum from the Attorney General, "Ending Illegal DEI and DEIA Discrimination and Preferences" (Feb. 5, 2025).

Disney's theory is that Chairman Carr is acting at President Trump's behest when investigating Disney. That may well be so—President Trump has directed Chairman Carr and all other agency leaders to investigate private-sector DEI—which is just what Chairman Carr is doing at Disney.

Here, the facts alleged against Disney are substantial. Consider the Center's petition[7]:

Disney sponsors three separate programs—Future Storytellers, On the Yard, and Disney Scholars—with the explicit intent to "empower the next generation of Black journalists, news and media executives" and "build a long-term pipeline of Black talent." As a result, qualifying students receive scholarships, internships, mentorships, and a fast track to a coveted Disney job.

Disney's television incubator runs special programs for "diverse directors" and "diverse television writers." "[I]ndividuals from underrepresented backgrounds" can also enter a television-specific "pipeline of next-generation network executives" or an internship "which will offer a career path for diverse talent behind the camera."

Disney's "Black Talent Network, which launched in 2020[, ] expands exposure for Black talent across the Company and helps to increase representation in senior-level roles. Participants engage with senior leaders and create career plans to expand their opportunities within the Company."

---

[7] The Commission also has before it a petition to deny from America First Legal that is replete with additional allegations of unlawful and inappropriate discrimination (¶¶ 21-34).

"[O]ur Black Network has an explicit goal to accelerate exposure for Black Vice Presidents to senior leaders across the enterprise and provide opportunities for development." Similarly, the "Women's Talent Network [launched specific initiatives] to enhance careers for Asian American & Pacific Islander (AAPI) as well as Latina employees."

The Aspen Institute's blog reports that Disney's "CODE: Rosie [is] a program that gives women already at the company in non-technical roles an opportunity to switch careers. After three months of training—in everything from basic computer-science concepts to programming languages such as Python—they'll segue into a yearlong apprenticeship consisting of two six-month chunks in different teams within the company. Then they'll have the opportunity to take a job within one of Disney's technical groups."

The EEOC's guidance on Title VII specifies that unlawful discrimination includes: "Access to or exclusion from training (including training characterized as leadership development programs); Access to mentoring, sponsorship, or workplace networking / networks; [and] Internships."[8] Disney's scholarship or internship programs would likely violate Title VI (the Civil Rights Act's title for educational programs) if administered directly by a federally funded college or university.[9] And this is just what the Center was able to uncover on Google—the FCC doubtless has a more significant record from the 10,000-plus pages secured through its Letters of Inquiry.

## II. Disney's countervailing narrative of pretext is not persuasive.

Disney proclaims its outrage to attack the credibility of this investigation, but the FCC's "unprecedented" proceeding here says more about the rarity of overt discrimination and Disney's commitment to defending its discriminatory policies than about the FCC's enforcement.

---

[8] EEOC, *What You Should Know About DEI-Related Discrimination at Work*.

[9] *See* U.S. Department of Education Releases Frequently Asked Questions on Dear Colleague Letter About Racial Preferencing (March 1, 2025).

A. Disney says that "[u]ntil the day before, the Commission had not called for an early license renewal in over fifty years." Disney 1. But the Commission clearly has "the power to order that a renewal application be filed earlier if the Commission determines that the application is 'essential to the proper conduct of a hearing or investigation.'" *MCA, Inc. v. Garden State Broadcasting Ltd. Partnership*, 1988 U.S. Dist. LEXIS 11007, *3 n.3 (D.N.J. Sept. 29, 1988) (quoting 47 C.F.R. § 73.3539(c)). Early renewal is available to address "[p]articularly egregious behavior." *Market Dynamics of National Programmers/Affiliates*, 40 FCC Rcd 9062, 9067 (MB 2025). The fact that the Commission uses this tool rarely can be explained simply: few Commission licensees engage in particularly egregious behavior like overt, corporate-wide racial discrimination. Prior to this year, the last time the Commission used this particular tool was for this precise situation—to investigate racial discrimination in employment. *In re Leflore Broad. Co.*, 36 F.C.C.2d 101 (1972).[10]

Disney continues its objection to early renewal by complaining this method of proceeding is not "essential," suggesting the Commission should pursue other avenues of enforcement instead. Disney 16-17. First off, the subject of an investigation does not normally get to dictate to the police or prosecutor what tools of investigation he or she may use—the criminals cannot say, "We only consent to investigation by the local police but not the FBI." Second, the Chairman has said that

[10] Chairman Fowler attacks the Center's interpretation of *Leflore*, insisting it relates to misrepresentation rather than discrimination. Fowler Decl., Dkt. 2-6, ¶ 11. That is not how the Commission has read the case. *See In re Application of Tulsa 23*, 4 FCC Rcd 2067, 2069 n.12 (1989) (citing *Leflore* as the basis for early renewal to advance employment discrimination investigations); *In re Applications of Heritage-Wisconsin Broadcasting Corp., et al.*, 8 FCC Rcd 5607, 5613 (1993) (In *Leflore*, the FCC "ordered the licensee to file early renewal applications because inter alia, the licensee inexplicably terminated Black employees subsequent to assuming control of the stations."). In all events, if Disney has been "deficient, nonresponsive, and disingenuous" in its responses to the FCC, that could fit under *Leflore* even as Mr. Fowler reads it.

Disney's responses to this point have been "deficient, nonresponsive, and disingenuous."[11] Disney's obstreperous and obstructionist behavior justifies an intensification of the investigation. Put differently, it's understandable that the Commission does not want to proceed on the current path when Disney is not cooperating on the current path. Third, and reinforcing this point, moving to early renewal underlines for Disney the seriousness with which the Commission takes this matter. Moving to a license call-up informs Disney—and all other licensees—of the Commission's zero-tolerance attitude toward discrimination. Fourth, early renewal allows the public to participate in the investigation. Members of the public such as the Center may bring forth information about Disney's discriminatory practices that the Commission may not have known otherwise. It may elicit whistleblowers who submit new information. *See Whistleblower Urges FCC to Deny Renewal of Disney's KABC-TV License*, Communications Daily (June 11, 2026). These four reasons, and perhaps others, justify and explain the FCC's decision. Ultimately, the FCC may decide "about the methods we have chosen to perform tasks that are committed to our discretion," including choosing between different types of investigatory tools. *In the Matter of Annual 1987 Access Tariff Filings*, 3 FCC Rcd 749, 751 (1988).

B. Disney says that "the Commission has *never* demanded simultaneous renewal applications from a group of stations commonly owned with a broadcast network." Disney 1. But doing so is the logical path under the Commission's precedent. *See Character Policy*, 102 F.C.C.2d 1179, 1223 (1986) ("some behavior may be so fundamental to a licensee's operation that it is relevant to its qualifications to hold any station license."). Discrimination based on race is one of those fundamental flaws in a license-holder's character. *In re Walton Broad., Inc.*, 78 F.C.C.2d 857, 878 (1980) (FCC "emphasize[s] the seriousness with which we view violations of the EEO Rules.

[11] Letter from Chairman Carr to U.S. Rep. Yvette Clarke (May 29, 2026).

Questions of EEO compliance go to an applicant's basic qualifications to be a licensee."). As a result, a licensee that engages in race- and sex-based discrimination is subject to losing all of its individual station licenses, whether that is one license or eight or eighteen or eighty.

C. Disney says that "[w]ith the public comment period on the early renewal applications now closed, at any moment the Commission could order an administrative hearing forcing the Stations to defend their right to exist." Disney 2. Yes. Putting all of Disney's licenses at risk is the cost of unlawful discrimination. The law is very clear: "A documented pattern of intentional discrimination will almost invariably disqualify a broadcaster from obtaining or retaining a license." *Beaumont Branch of NAACP,* 854 F.2d at 507.[12] Disney may not like that, but it's the law. When Disney embraced DEI, it may have thought its legal exposure was limited to an occasional EEOC proceeding for reverse-discrimination without thinking about the FCC's jurisdiction over the company as the license-holder. But that's a failure by Disney's lawyers to advise their client well on the risks it was running by engaging in these programs. And if Disney's lawyers did advise their client and the client decided the litigation risk was worth it because the cultural zeitgeist demanded DEI, that's on them.

D. Disney says that the FCC's investigative "demands concerned not only employment practices at the Stations subject to FCC regulation but also at the parent company and its entire family of companies, including some that have nothing to do with broadcasting." Disney 11. *See id.* 29; Fowler Decl., Dkt. 2-6, ¶ 8. This objection helps Disney not a whit. The Commission has always evaluated *any* discriminatory practices by the licensee, whether at the licensed stations or in another part of the licensee's business empire. *In re Chapman*, 34 F.C.C.2d 159, 163 (Rev. Bd.

[12] "It is now far beyond dispute that broadcasters must not intentionally discriminate, and that past activity of that nature will justify, if not demand, nonrenewal of a communications license." *Bilingual Bicultural Coalition*, 595 F.2d at 640 (Robinson, J., dissenting in part).

1972) (proposed licensees engaged in racial discrimination in housing); *In re Chapman*, 24 F.C.C.2d 282, 284 (1970) (proposed licensee owned a racially discriminatory cemetery). *See also In re Lamar*, 58 F.C.C.2d 274, 277 (Rev. Bd. 1976) (proposed station CEO served on the board of a racially discriminatory school); *In re applications of Alpine Broadcasting*, 88 F.C.C.2d 1213, 1220 & n.9 (ALJ 1981) (station principal belonged to gender-discriminatory business/professional organization).[13] That's because engaging in overt race- and sex-based discrimination goes to the licensee's overall character to hold a license.

E. Disney says that "[t]he Commission has also approved recent mergers only after extracting concessions on DEI. . . . By contrast, the Commission has given Plaintiffs no similar opportunity to settle the issues alleged in its ongoing DEI investigation, demonstrating that this investigation is really a pretext for the Commission's efforts to punish Plaintiffs' speech." Disney 12 n.26. Putting aside that the prosecuted party has no right to demand a settlement, this is one of Disney's more curious claims. For the past several weeks since filing this lawsuit, Disney has basked in the glow of elite applause for refusing to cave to the Trump Administration like every other media company.[14] Now Disney is saying it wants to cave, but the FCC won't let it?

Disney's sudden openness to settlement is belied by its statements elsewhere. Before the FCC, Disney has asserted that it has a constitutional right to discriminate in its employment practices. Opposition 37 & 41.[15] And Disney's CEO said in a recent public statement, "I think you saw in our FCC filings our position on this is clear. We're very principled on this. We're going to stand

---

[13] Holding disputed, *In re applications of Morris, et al.*, 88 F.C.C.2d 713, 722 (Rev. Bd. 1981).

[14] *See, e.g.,* Brian Lowry, "Disney is finally standing up to Trump. Will other broadcasters join them?," MSNOW.com (Aug. 20, 2026).

[15] A position that is hard to square with *New York Club Ass'n v. City of New York*, 487 U.S. 1 (1988), *Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537 (1987), and *Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984), but c'est la vie. *See* Comment of the American Alliance for Equal Rights.

up to what we believe is journalistic and integrity, and we're not going to be told how to run that side of our business." This Court should not credit Disney's professed desire to settle in the face of its enthusiastic defense and its CEO's public commitment to fight.

F. Disney baldly asserts the Commission "encouraged" its racially discriminatory programs. Disney 29. Balderdash. The FCC has always drawn a clear line: it "encourage[s] broad outreach" but bans "race-based hiring decisions." *In the Matter of Review of the Commission's Broadcast and Cable Equal Employment Opportunity Rules and Policies*, 17 FCC Rcd 24018, 24020 (2002) (citing *Lutheran Church Missouri Synod v. FCC*, 141 F.3d 344 (D.C. Cir. 1998)). What counts as "broad outreach"? "The core of the recruitment requirement was that broadcasters widely disseminate information concerning all job vacancies." *Id.* That means holding job fairs in the inner city as well as the suburbs or sending job flyers to Ivy League schools *and* state schools. At the same time, the rule made clear what was not okay: "making race a consideration in employment," *i.e.,* "invidious discrimination." *MD/DC/DE Broadcasters Ass'n v. FCC*, 236 F.3d 13, 18 (D.C. Cir. 2001). Because Disney's programs clearly crossed the line into the latter category, they are appropriately subject to investigation and sanction.

G. Disney's treatment is not unlike that of other networks. Look at the corporate parents for the Big Four: Disney (ABC), Paramount (CBS), Comcast (NBC), and Fox. In January 2025, Fox removed all references to DEI from its job postings, explaining, "FOX News Media routinely reviews our legal obligations including under federal, state, and local law and we have removed this language." Paramount agreed to drop all DEI practices across the corporation, a commitment incorporated into the FCC's order approving Skydance's acquisition. *In re FCC Approves Skydance / Paramount (CBS) Transaction*, 40 FCC Rcd 5689, 5714 (2025).

Meanwhile, the FCC also has an open investigation of unlawful DEI at Comcast (NBC) initiated by Chairman Carr in February 2025. The President also does not like the programming and editorial choices at NBC. Compl. ¶¶ 49, 52b, 53a, 60, 69a, 69f, 69g. The President was directly critical of NBC alongside ABC for refusing to air his recent address to the nation. Compl. ¶¶ 9, 113. The Center for American Rights filed a complaint against NBC over *Saturday Night Live*'s blatant partisan preference for Vice President Kamala Harris, a complaint that Chairman Carr reinstated upon taking office. On this preliminary record, we don't know why Disney's investigation has led to early renewal review while Comcast's is still in the investigation stage. But it doesn't really matter why. It undermines the credibility of Disney's claim for speech retaliation when the President has also said that NBC should lose its license for fake news.

That's even more true in the light of the President's criticism of CBS. The President was critical of CBS prior to the Ellisons' takeover. Compl. ¶¶ 49, 52b, 52c, 53b-c. The President remained critical of CBS's coverage after the Ellison acquisition. Compl. ¶ 69g. Just ask Norah O'Donnell, whom the President recently called a "disgrace" on air. The President's dislike for Stephen Colbert was just as pronounced as his dislike for Jimmy Kimmel or *The View*. And CBS News has an active page alongside ABC on the White House's media offenders site. But Paramount has ended its DEI and thus does not find itself under a DEI investigation.

H. As part of making its case that Disney was targeted for retaliation based on its speech, Disney complains about supposed comparators who have not been subject to FCC scrutiny because their speech is supposedly aligned with the President: "while the Chairman reinstated the CAR complaint against ABC Owned Station WPVI, he did not renew an investigation against a Fox-owned television station. . . . And while enforcing the equal opportunities requirement against *The*

*View* . . . the Commission has declined to enforce the same requirement against conservative talk radio." Disney 30 n.65. *See id.* 13-14 (making the same point about talk radio).

Fox News Channel has not been exempt from the President's ire. *See, e.g.,* Alyssa Ray, *Trump Slams Fox News Correspondent Over Iran Coverage*, The Wrap (Aug. 27, 2026). Fox News Channel is, however, exempt from the FCC's oversight because it uses cable rather than broadcast for its distribution—that is one reason the Biden FCC gave for dismissing the complaint against Fox. *In re MB Denies Application of Fox TV Stations*, 40 FCC Rcd 438, 440, 443-45 (MB 2025).

The critique of Chairman Carr's "inaction" on talk radio isn't new. Nor is it particularly persuasive. First, the same rules *do* apply to talk radio—any liberal activist group can at any point file a complaint with the Commission about a talk radio station violating the equal time rule. Second, the Commission has said in the past that a radio station's "morning talk program is not a news program exempt from Section 315." *Notice of Apparent Liability to WERC*, 7 FCC Rcd 6537, 6537 (MBB 1992) (accepting stipulation), *aff'd* 9 FCC Rcd 228, 229 (MBB 1994). So the action on *The View* could be seen as bringing the rules for television in line with the precedent that already exists for radio. Third, the rules for talk television have been murky over the years. *Compare Broadcast Actions*, 40 F.C.C. 314 (1960) (Jack Paar's talk show did not qualify for exemption), *with In the Matter of Equal Opportunities Complaint Filed by Angelides For Governor*, 21 FCC Rcd 11919, 11924 (MB 2006) (Jay Leno's talk show did qualify for exemption). Thus, it was appropriate for the FCC to clarify how those standards apply.

Finally, it could be that the facts are different for talk radio. Two weeks ago, Sean Hannity devoted an extended conversation to "go[] one-on-one with Democratic strategist Corbyn Trent, a former aide to Bernie Sanders and former communications director for Alexandria Ocasio-Cortez." (Aug. 21, 2026). Before that, Hannity's guests included "longtime Democratic strategist

Doug Schoen" (Aug. 17, 2026). A few weeks before that, Hannity had on "former Chuck Schumer aide Chris Hahn" (July 24, 2026). In June, two shows featured both Schoen and Hahn (June 4 and 27, 2026). Fox also has a policy against show hosts appearing at campaign rallies or making campaign donations, while the cohosts of *The View* are Democratic donors and campaign cheerleaders. Furthermore, Hannity's radio show does not feature the steady diet of actors, singers, authors, and other celebrities who are the bread and butter of *The View*. All of this speaks to whether a program counts as "bona fide news." This one example shows there's more to the story.

*Conclusion on likelihood of success on the merits:*

Disney has a very high hill to climb here. It fails to do so.

The FCC is entitled to a presumption of regularity in its investigations and enforcement actions. The FCC is entitled to discretion in setting its enforcement priorities. The FCC is entitled to "broad discretion" in the manner and methods of its investigations and enforcement actions. The FCC is entitled to "broad discretion" in how it handles its anti-discrimination investigations and enforcement actions. So a number of doctrines counseling deference, discretion, and judicial restraint run in the FCC's favor.

A number of key facts also run in the FCC's favor. The FCC has significant institutional credibility to claim that fighting unlawful discrimination at licensee businesses is an enforcement priority. The current FCC leadership also has significant credibility to show that fighting unlawful discrimination at licensee businesses is an enforcement priority. The FCC has before it a significant body of serious allegations showing Disney engaged in race- and sex-based employment discrimination practices. The FCC has conducted this investigation in line with its rules and precedents. And the FCC's conduct toward Disney's competitor networks credits its claim that it prioritizes fighting unlawful discrimination at the networks.

Disney has failed to carry its burden to show it is likely to win its claim of pretext here. The easy way to resolve this motion is to find that Disney failed to show the third prong of the test for unconstitutional retaliation—Disney did not establish that the retaliatory motive was the "but for" reason for the investigation in the face of a mountain of evidence otherwise.

**III. Disney cannot establish irreparable harm.**

Disney acts as though this investigation is a sword of Damocles hanging over its head: "The looming threat of a potential hearing alone is coercive." Disney 20.[16] This makes no sense. Any final order from the FCC not renewing Disney's licenses is automatically stayed by operation of law pending judicial review. 47 U.S.C. § 307(c)(3). There is no way that Disney can suffer concrete harm—non-renewal of its licenses—until the D.C. Circuit permits it (and the U.S. Supreme Court rejects an appeal). So even if this whole thing is somehow a charade with a foregone conclusion at the FCC, Disney still won't be harmed until the D.C. Circuit validates the FCC's conclusion.[17]

This Court should also hesitate before endorsing a theory that will functionally stop FCC enforcement dead in its tracks across the broadcasting industry. Disney's theory is that it and any other media company in its shoes will self-censor if it faces FCC sanction, as Disney cites a case where the sanction was a $10,000 fine. Disney 23-24. The FCC's job is to regulate broadcasters who broadcast news and entertainment programming, both local stations and national networks. The FCC issues fines over $10,000 for all sorts of things—indecent language, indecent body part exposure, failure to maintain required files, violating payola and plugola promotional rules, etc. If

---

[16] Disney says that "where some Petitions to Deny have called for non-renewal based on the political affiliations of guests on ABC's programming, the process for evaluating potential guests for The View has changed." Disney 14. So now the actions of independent petitioners like the Center have resulted in Disney changing its practices, and this is the FCC's fault?

[17] Also, if this is ABC's editorial judgment on a short leash—Hanna Panreck, *Rosie O'Donnell hammers Trump repeatedly in Kimmel guest-host gig as White House fires back*, FoxNews.com (Aug. 21, 2026)—imagine how much politicking happens with ABC unhinged.

every time the FCC opened an investigation that *could* result in a fine over $10,000, the station could respond by filing a First Amendment lawsuit to stop the investigation dead in its tracks because the station would self-censor its coverage of the president who appoints the FCC Chairman so as not to offend the investigating agency, that would grind the FCC to a halt.

Disney's dilatory attitude toward filing this case should also factor. The Commission opened its investigation into Disney DEI on March 27, 2025. The Commission issued its order directing Disney to file its early renewal applications on April 28, 2026. But Disney did not file this case until August 18, 2026. During those three-plus months, Disney apparently self-censored its content without filing for a TRO? Disney had the First Amendment arguments and factual research on retaliation at its fingertips—it was all incorporated in its FCC application filings. Is the sword of Damocles represented by a potential hearing designation order really that coercive when Disney was willing to live under it for three months without filing for a TRO?

The only explanation Disney provides is that Bloomberg reported a hearing designation order was possible by Labor Day. Disney 2. So? If Disney has been self-censoring to this point, why does that matter? And what's the constitutionally significant difference ascribed to a hearing designation? The hearing results in a mini-trial before an FCC administrative law judge. Disney will be subject to discovery by any parties who filed petitions to deny, but that discovery will be limited to the issues designated in the hearing order and will be managed by the ALJ. So if the FCC only designates DEI for review, the parties will only get discovery on DEI (and Disney seems to think it has already turned over all relevant documents). Following discovery there will be summary judgment briefing and potentially a trial before the ALJ, who then issues a report and *recommendation* to the Commission. So the ALJ can't actually revoke Disney's ABC licenses.

Disney's filing offers no explanation for how the move from the renewal application to a hearing is meaningfully different to suddenly justify its self-censorship or irreparable harm.

### IV. The limits of Disney's editorial freedom.

As a predicate for a retaliation claim, Disney must first show that it "engaged in conduct protected under the First Amendment." Disney 23 (quoting *Aref*, 833 F.3d at 258). Of course, Disney's operation of the ABC network and its licensed local stations enjoys some First Amendment protection. But that protection is meaningfully different from the protection afforded to other types of media like newspapers because only broadcasters like ABC use a publicly owned asset as their medium (namely spectrum). "[E]fforts to enhance the volume and quality of coverage of public issues through regulation of broadcasting may be permissible where similar efforts to regulate the print media would not be." *FCC v. National Citizens Comm. for Broadcasting*, 436 U.S. 775, 800 (1978) (cleaned up). Indeed, if at the end of this process the FCC decides to revoke ABC's licenses, no First Amendment violation is committed because Disney has no First Amendment right to its license: "to deny a station license because the public interest requires it is not a denial of free speech." *Id*. (cleaned up).

#### A. Disney misreads *NRA v. Vullo*.

In the very first paragraph of the complaint, Disney leads off with its reliance on *National Rifle Association v. Vullo*, 602 U.S. 175 (2024). *Vullo* is essential to Disney's claims because it is Disney's best case to say that a mere investigation can constitute coercive pressure contrary to the First Amendment. Disney 25. Still, *Vullo* has clear limits, and Disney fails to acknowledge those limits, likely because this case lies outside those boundaries.

First, *Vullo* acknowledges that President Trump and Chairman Carr both enjoy their own free speech, which includes the right to criticize the media and ABC. "The government can say what it

wishes and select the views that it wants to express." 602 U.S. at 187 (cleaned up). That covers the White House's right to criticize what it perceives to be unfair media coverage with its "media offenders" page. *Id*. at 188 ("A government official can share her views freely and criticize particular beliefs, and she can do so forcefully in the hopes of persuading others to follow her lead."). *Contra* Compl. ¶¶ 80-82. And certainly then-candidate Trump enjoyed full free speech rights during his 2024 campaign prior to retaking office. *Contra* Compl. ¶¶ 51-53.

Second, *Vullo* says its primary precedent, *Bantam Books*, "stands for the principle that a government official cannot do indirectly what she is barred from doing directly." 602 U.S. at 190 (citing *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963)). Here, however, Chairman Carr can do directly exactly that which he is accused of doing indirectly: regulating ABC based on its programming content. Indeed, if Chairman Carr were to directly investigate Disney for preferring one political party over another in its news coverage contrary to the public interest, he would act in accord with established FCC precedent. *KMPC, Station of the Stars*, 14 Fed. Reg. 6096 (Oct. 6, 1949) & 14 Fed. Reg. 4831 (Aug. 3, 1949); *Star Stations*, 51 F.C.C.2d 95 (1975).

That's why a *Vullo* claim is dependent on exerting governmental pressure on a third party to get at someone else's speech: "To state a claim that the government violated the First Amendment *through coercion of a third party*, a plaintiff must plausibly allege conduct that, viewed in context, could be reasonably understood to convey a threat of adverse government action in order to punish or suppress the plaintiff's speech." 602 U.S. at 191 (emphasis added). In *Vullo*, the banking commissioner had jurisdiction over financial entities, and the commissioner illegitimately leaned on those entities to target the free speech of a third party, the financial entities' client the NRA. *Id*. ("Vullo violated the First Amendment by coercing DFS-regulated entities into disassociating with the NRA in order to punish or suppress the NRA's gun-promotion advocacy."); *id*. at 194 & 197.

The Court rejected efforts by "government officials to 'expand their regulatory jurisdiction to suppress the speech of organizations that they have no direct control over.'" *Id*. at 197-98.

Here, there is no pressure applied via a third party. The FCC is not illegitimately attempting to expand its regulatory jurisdiction. The FCC is directly regulating a company within the core of its regulatory zone of authority: Disney holds eight FCC licenses and is accountable for them.

Consider an analogous situation. In the early 1990s, President Bill Clinton and Vice President Al Gore said many times that there was too much sex and violence on television. *See, e.g.,* Todd Purdum, *Clinton Takes on Violent Television*, N.Y. Times (July 11, 1995). Two of President Clinton's chairmen of the FCC repeated that theme directly to broadcasters. *Luncheon Remarks by Chairman James H. Quello*, 1993 FCC LEXIS 1346, *1 (March 23, 1993); *Remarks of Chairman Reed Hundt*, 1995 FCC LEXIS 5692, *1-2 (Aug. 24, 1995). One even tied it to license renewals, criticizing the Reagan-Bush FCC for introducing an era where the FCC "has not taken away the license of a single broadcaster for failure to operate in the public interest." *Id.* at *4. What happened after this pressure campaign? The headline says it all: *TV chiefs agree to curb sex and violence*, The Independent (March 1, 1996). And did this violate the First Amendment? No. As Clinton's chairman said, "Just as public land can be used for public purposes, so our rules can require that the public airwaves be used for specific, concrete, and real public interest purposes. So the First Amendment claim is the proverbial red herring that should not lure broadcasters off the path of change." *Remarks by Chairman Reed Hundt*, 1995 FCC LEXIS 5518, *8-9 (Aug. 18, 1995). The Court cannot issue a ruling that cuts off the conversation between a regulator and its regulated community when that regulator is charged with protecting the public interest.[18]

[18] Former FCC Chairman Mark Fowler asserts, "Never in its history has the agency ever acted so corruptly and unlawfully to intrude on broadcasters' First Amendment rights." Dkt. 2-6, Decl. ¶ 7. That's hard to credit given the historical record involving Presidents Franklin D. Roosevelt, John

**B. The Commission is justified in its actions toward Disney on *The View*.**

Though this proceeding does not directly attack the FCC's proceeding on *The View*, it frequently incorporates it to spin Disney's story about the company being unjustly targeted. Compl. II(F), ¶¶ 81-89, 107, 125, 138. In reality, the FCC's actions are entirely justified.

Congress has charged the FCC to enforce the equal time statute. 47 U.S.C. § 315. In this case, that statute requires equal time unless a program qualifies for a "bona fide news" exception. This isn't the time or place to brief that issue out in full, but suffice it to say that even prominent Democrats agree with Chairman Carr's reinvigorated interpretation of the statute and its application to talk shows like *The View*. *See* former Biden FCC nominee Gigi Sohn, LinkedIn (the Public Notice "restated the law and the agency's precedent"); former Biden DOJ appointee Eric Columbus, *Brendan Carr Has a Point About the Equal Time Rule*, Lawfare (March 4, 2026).

Disney relies heavily on the staff-level exemption issued on *The View* in 2002. First, such a "ruling is limited to the facts presented." *In re request of Fonawin Corp*., 62 F.C.C.2d 432, 433 (1976). Any such ruling is "valid only so long as the conditions described in" the petition remain

---

F. Kennedy, Lyndon B. Johnson, and Richard Nixon. *See* David Beito, *The New Deal's War on the Bill of Rights* (Independence Institute 2025) (chapters 4 and 5 cover FDR's use of the Federal Radio Commission to quash dissent); Paul Matzko, *"Do Something about* Life Line*": The Kennedy Administration's Campaign to Silence the Radio Right*, 48 Presidential Studies Quarterly 817 (Dec. 2018); Paul Matzko, *The Radio Right* (Oxford U. Press 2020) (from the abstract: "As this Radio Right phenomenon grew, President John F. Kennedy responded with the most successful government censorship campaign of the last half century. Taking the advice of union leader Walter Reuther, the Kennedy administration used the Internal Revenue Service and the Federal Communications Commission to pressure stations into dropping conservative programs."); William L. Anderson, *Presidents Have a Long History of Using the FCC to Silence Their Critics*, Mises Institute (Sept. 25, 2025) ("After JFK was assassinated, Lyndon B. Johnson continued his predecessor's policies against broadcast opposition using the same federal agencies."); *Remarks of Comm'r Jessica Rosenworcel to the NAB*, 2018 FCC LEXIS 1073, *4 (April 9, 2018) ("In 1974, allies of President Richard Nixon targeted the license renewals by the FCC of two television stations that were owned by the *Washington Post*, the newspaper investigating his involvement in Watergate.").

true. *Id*. at 432. If "factual developments" occur after a ruling, then the FCC can reevaluate the ruling in light of the new facts. *In re AT&T Application for Review*, 31 FCC Rcd 12977, 12985-86 (2016).

Here, today's program looks little like the program that aired in 2000 when ABC submitted its petition. For one thing, Barbara Walters produced and led *The View* at the time. She had decades of real journalism experience. For another, the show was not "political," according to original cohost Debbie Matenopoulos, who said, "The show has become super political now."[19]

Second, the staff-level ruling is very bare-bones—a single-page letter from a midlevel staffer with zero reasoning or analysis. Unpublished and unexplained staff letters are not authoritative. *Indep. Ins. Agents of America, Inc. v. Ludwig*, 997 F.2d 958, 962 (D.C. Cir. 1993) ("In the real world of agency practice, informal unpublished letters should not engender reliance." (cleaned up)).

Even a weightier staff ruling would hold no value: "parties who rely on staff advice or interpretations do so at their own risk. When staff advice is contrary to the Commission's rules, the Commission may still enforce its rules, despite any reliance by the public." *In the Matter of GMD Microcable Partnership*, 13 FCC Rcd 8479, 8484 (MMB 1998) (citations omitted) (citing *Malkan FM Associates v. FCC*, 935 F.2d 1313 (D.C. Cir. 1991)). *See Communications Vending Corp.*, 17 FCC Rcd 24201, 24215 (2002) ("as the D.C. Circuit has stated, advice by staff members does not bind the Commission and does not excuse parties who rely on such advice and rulings from the consequences of their conduct.").

[19] Judy Kurtz, *Original 'View' co-host: Show wasn't 'supposed to be political*,' The Hill (Feb. 16, 2022).

Nonetheless, the 2002 letter may explain why the Commission directed Disney to file a petition for a declaratory judgment. Doing so was actually *more* gracious to Disney than opening an enforcement investigation because a declaratory judgment could not result in a backward-looking sanction but only a forward-looking clarification of whether *The View* qualifies.[20]

**V. The public interest favors allowing the investigation to move forward.**

ABC "attempts to drape the mantle of First Amendment protection solely around those in the broadcast industry. This approach ignores the rest of the citizens of this country." *Am. Sec. Council Educ. Found. v. FCC*, 1978 U.S. App. LEXIS 9065, at *10 (D.C. Cir. Sept. 13, 1978), *vacated and rev'd on other grounds en banc*, 607 F.2d 438, 452 (D.C. Cir. 1979). And it's the rest of the citizens of the country who are the courts' priority. "It is the right of the viewers and listeners, not the right of the broadcasters, which is paramount." *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 390 (1969). *Accord Kennedy for President Committee v. FCC*, 636 F.2d 417, 431 (D.C. Cir. 1980) ("in the area of broadcasting the interest of the public is the chief concern."). Here, the public's interest favors ensuring Disney does not engage in employment discrimination. And it favors letting the FCC do its job, which includes reviewing petitions and enforcing the equal time statute.

**CONCLUSION**

The Court should deny the preliminary injunction. Disney has not borne its burden to show it is likely to succeed on the merits—namely, that the government's supposed retaliatory motive is the but-for cause of the Commission's investigation into Disney's unlawful discrimination.

---

[20] Chairman Fowler says, "The FCC's proceedings against ABC are a gross denial of procedural and substantive due process for ABC." Dkt. 2-6, Decl. ¶ 7. Far from being denied procedural due process, Disney has received nothing *but* process—a declaratory judgment petition that cannot result in backward-looking sanctions and an early renewal petition where the default presumption favors license renewal. *See id*. ¶ 10. And Disney had plenty of time to solicit scores of letters in support of its applications from elected officials, community organizations, and local businesses.

Respectfully submitted,

*/s/ Christopher E. Mills*
Christopher E. Mills
Spero Law LLC
557 East Bay St. #22251
Charleston, SC 29413
843-606-0640
cmills@spero.law

Daniel R. Suhr*
Center for American Rights
1341 W. Fullerton Ave., Suite 170
Chicago, IL 60614
414-588-1658
dsuhr@americanrights.org
**Pro Hac Vice Motion Filed Simultaneously*