**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN BROADCASTING COMPANIES, et al.,<br><br>*Plaintiffs*,<br><br>v.<br><br>FEDERAL COMMUNICATIONS COMMISSION, et al.,<br><br>*Defendants*. | No. 26-cv-2902-LLA |

# BRIEF OF AMERICA FIRST LEGAL FOUNDATION AS AMICUS CURIAE IN SUPPORT OF DEFENDANTS

Emily Percival
Robert A. Crossin
AMERICA FIRST LEGAL FOUNDATION
611 Pennsylvania Avenue SE, #231
Washington, D.C. 20003
Tel.: 202.596.9846
emily.percival@aflegal.org
bobby.crossin@aflegal.org

*Counsel for Amicus Curiae America First Legal Foundation*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ii
INTEREST OF AMICUS CURIAE 1
INTRODUCTION 3
ARGUMENT 4
I. The FCC's authority to call for early license renewal is within the bounds of its broad delegated authority. 4
a. Congress delegated broad authority to the FCC to regulate broadcasting. 5
b. The early renewal rule is one tool the FCC may use to execute its functions. 7
II. This Court lacks jurisdiction to hear this case, which must be brought as an APA claim. 10
a. Plaintiffs' claim is an APA claim that must be brought under the special statutory review scheme. 11
b. Plaintiffs' claim does not fall into any of the exceptions to *Thunder Basin*. 14
1. Meaningful judicial review would not be foreclosed. 14
2. Plaintiffs' claims are not wholly collateral to the statutory review provisions. 15
3. The claims are not outside the Commission's expertise. 17
III. Grant of preliminary injunction would be inequitable. 20
CONCLUSION 22

**TABLE OF AUTHORITIES**

Page(s)

*Am. Fed. of Gov't Emps. Local 2018 v. Biden*,
598 F. Supp. 3d 241 (E.D. Pa. 2022) ..... 13

*Am. Fed. of Gov't Emps. Local 2586 v. Biden*,
616 F. Supp. 3d 1275 (W.D. Okla. 2022) ..... 13

*Axon Enter., Inc. v. FTC*,
598 U.S. 175 (2023) ..... 11, 14, 16

*Block v. Cmty. Nutrition Inst.*,
467 U.S. 340 (1984) ..... 18

*Bowen v. Mich. Acad. of Family Physicians*,
476 U.S. 667 (1986) ..... 17, 18

*City of Tacoma v. Taxpayers of Tacoma*,
357 U.S. 320 (1958) ..... 13

*Elgin v. Dep't of Treasury*,
567 U.S. 1 (2012) ..... 11, 14, 15, 17

*Endocrine Soc'y v. FTC*,
832 F. Supp. 3d 1 (D.D.C. 2026) ..... 18

*FCC v. ITT World Commc'n, Inc.*,
466 U.S. 463 (1984) ..... 12

*FCC v. Nat'l Citizens Comm. for Broad.*,
436 U.S. 775 (1978) ..... 6

*FCC v. Pottsville Broad. Co.*,
309 U.S. 134 (1940) ..... 5, 7

*FCC v. WNCN Listeners Guild*,
450 U.S. 582 (1981) ..... 6

*FCC v. WJR, The Goodwill Sta.*,
337 U.S. 265 (1949) ..... 8

*Fed. Radio Comm'n v. Nelson Bros. Bond & Mortg. Co.*,
289 U.S. 266 (1933) ..... 5

*Heckler v. Chaney*,
470 U.S. 821 (1985) ..... 7

*Int'l Ass'n of Machinists & Aerospace Workers v. Nat'l Mediation Bd.*,
374 F. Supp. 2d 135 (D.D.C. 2005) ..... 20, 21

*Leflore Broad. Co., Inc. v. FCC*,
636 F.2d 454 (D.C. Cir. 1980) .......... 9

*Media Matters for America v. FTC*,
No. 25-5302, 2025 WL 2988966 (D.C. Cir. 2025) .......... 18

*Merritt v. Shuttle, Inc.*,
245 F.3d 182 (2d Cir. 2001) .......... 12

*Nat'l Broad. Co. v. United States*,
319 U.S. 190 (1943) .......... 4, 5, 6

*Off. of Commc'n of United Church of Christ v. FCC*,
359 F.2d 994 (D.C. Cir. 1966) .......... 2

*Off. of Commc'n. of United Church of Christ*,
425 F.2d 543 (D.C. Cir. 1969) .......... 6

*Off. of Commc'n. of United Church of Christ*,
779 F.2d 702 (D.C. Cir. 1985) .......... 9

*People for Ethical Treatment of Animals, Inc. v. U.S. Dep't of Agric.*,
60 F. Supp. 3d 14 (D.D.C. 2014) .......... 10

*Red Lion Broad. Co. v. FCC*,
395 U.S. 367 (1969) .......... 6

*Rydie v. Biden*,
2022 WL 1153249 (4th Cir. Apr. 19, 2022) .......... 13

*Syracuse Peace Council v. FCC*,
867 F.2d 654 (D.C. Cir. 1989) .......... 6, 9

*Telecomm. Rsch. & Action Ctr. v. FCC*,
750 F.2d 70 (D.C. Cir. 1984) .......... 11

*Thunder Basin Coal Co. v. Reich*,
510 U.S. 200 (1994) .......... 11, 13, 14, 15, 16, 19

*Trump v. New York*,
592 U.S. 125 (2020) .......... 15

*United States v. Am. Tel. & Tel Co.*,
461 F. Supp. 1314 (D.D.C. 1978) .......... 6

*United States v. Sw. Cable Co.*,
392 U.S. 157 (1968) .......... 4

**Statutes**

5 U.S.C. § 704 ........ 15
Communications Act of 1934, Pub. L. No. 73-416, 48 Stat. 1064 ........ 3
47 U.S.C. § 151 ........ 4, 6
47 U.S.C. § 154 ........ 4
47 U.S.C. § 303 ........ 4
47 U.S.C. § 309 ........ 1, 4
47 U.S.C. § 402 ........ 13, 19
28 U.S.C. § 2342 ........ 12, 18

**Agency Proceedings**

Application of RKO General, Inc.,
1 F.C.C Rcd. 1081 (1986) ........ 10
In re Application of Narragansett Broad. Co.,
15 F.C.C. 887 (1951) ........ 8
In re Application of Northern Corp. (WMEX), Boston, Mass.,
12 F.C.C. 940 (1948) ........ 7
In re Applications of WWOR-TV, Inc.,
6 F.C.C. Rcd. 6569 (1991) ........ 10
In re Implementation of Sections 204(A) & 204(C) of the Telecommunications Act of 1996,
11 F.C.C. Rcd. 6363 (1996) ........ 10
In re Radio Deregulation,
84 F.C.C.2d 968 (1981) ........ 9
Greater Portland Broad. Corp.,
3 F.C.C. 1953 (1988) ........ 10
Leflore Broad. Co.,
36 F.C.C.2d 101 (1972) ........ 9
Review of the Commission's Broadcast and Cable Equal Employment Opportunity Rules and Policies, Second Report and Order,
17 FCC Rcd 24018 (2002) ........ 3, 21

## INTEREST OF AMICUS CURIAE[1]

America First Legal Foundation ("AFL") is a public interest law firm providing citizens with representation in cases of broad public importance. AFL has a particularized interest in this case because it concerns the validity of the FCC's authority to regulate broadcasting in the public interest—authority that parties in interest rely upon in proceedings before the Federal Communications Commission ("FCC.")

On June 29, 2026, AFL filed a Petition to Deny the renewal of all eight Disney licenses at issue in this case, on behalf of residents in each station's service area who are regular viewers. *See generally* Petition to Deny, *In re Walt Disney Co.*, MB Docket No. 26-131 (FCC June 29, 2026). The petition alleges that Disney has committed serious violations of the Commission's equal employment opportunity rules and requests the Commission deny license renewal. *Id.* ¶ 3. That proceeding remains pending before the Commission.

AFL is not a party to this litigation. But the relief Plaintiffs seek would directly prejudice AFL and parties in interest by terminating the Commission's adjudication of their claims before they can be heard on the merits. AFL's petitioners are parties in interest under Section 309(d) of the Communications Act, with standing recognized

[1] This brief was not written in whole or in part by counsel for any party, and no person or entity other than the amicus has made a monetary contribution to the preparation and submission of this brief. Pursuant to FRAP 29(a) and DDC Rule 7CvR7(o), Amicus files this brief with timely notice and contemporaneously with its Motion for Leave to File.

under *Off. of Commc'n of United Church of Christ v. FCC*, 359 F.2d 994, 1002 (D.C. Cir. 1966). They are among the last remaining petitioners with an interest in the renewal proceeding. AFL files this brief to ensure the Court is aware that the proceeding it is being asked to enjoin involves not only the interests of the parties before it, but also the interests of the viewing public who have invoked their right to participate in the Commission's licensing process.

## INTRODUCTION

The Walt Disney Company ("Disney") and its eight ABC affiliate stations ("ABC" or "ABC stations") continue to propagate the same narrative: the Federal Communications Commission ("FCC" or "Commission") and the President of the United States colluded to "punish" or "retaliate" against ABC for the content in its broadcasts. This narrative omits the essential detail of the proceedings below: that Disney and ABC committed serious violations of the Communications Act and FCC rules by discriminating in employment decisions. "Discrimination is so fundamentally inconsistent with the public interest that rules are justified to deter even the possibility of discrimination."[2] Plaintiffs called into question their own fitness to continue holding a broadcast license by violating these rules and now seek relief from this Court to end the inquiry into that fitness.

However, almost one hundred years ago, Congress chose to vest all regulatory authority over "commerce in communication by wire and radio" in the FCC and gave the FCC broad authority to consider the suitability of broadcasters to steward the public airways through the privilege of holding a license. Pub. L. No. 73-416, § 1, 48 Stat. 1064, 1064 (1934). In pursuit of this charge, in early 2025, the FCC opened an investigation into the Disney regarding certain alleged violations of FCC equal opportunity employment ("EEO") rules. As part of this authorized administrative

[2] *Review of the Commission's Broadcast and Cable Equal Employment Opportunity Rules and Policies*, Second Report and Order and Third Notice of Proposed Rule Making, 17 FCC Rcd 24018, 24039 (2002).

proceeding, the FCC called the eight ABC stations' licenses for early renewal. This was not retaliation but rather the exercise of a congressionally delegated FCC authority.

This brief in support of the Commission and in opposition to the Plaintiffs' motion for a preliminary injunction shows three things: (1) that historically, the FCC has had broad authority and myriad tools to use to regulate the public broadcast airwaves; (2) here, the FCC acted within that authority; and (3) because the FCC acted within its authority, this Court lacks jurisdiction to adjudicate this case.

## ARGUMENT

### I. The FCC's authority to call for early license renewal is within the bounds of its broad delegated authority.

For nearly a century, Congress has entrusted the FCC with expansive authority to regulate the nation's airwaves in public the interest. *See, e.g., Nat'l Broad. Co. v. United States*, 319 U.S. 190, 213 (1943); *United States v. Sw. Cable Co.*, 392 U.S. 157, 167 (1968). That authority, *see generally* 47 U.S.C. §§ 151–163 encompasses certain statutory investigation and enforcement tools, *Id* § 303, 309(d), (k), and allows the FCC to "perform any and all acts, make such rules and regulations, and issue such orders … as may be necessary in the execution of its functions." 47 U.S.C. § 154(i). The early license renewal process—authorized by 47 C.F.R. § 73.3539(c)—is one such regulation.

Plaintiffs assert that the Commission's usage of the early renewal process is an unprecedented overreach that should be reined in by the Court. ECF No. 1 ¶ 102. Yet, the text, the history, and the law say otherwise.

**a. Congress delegated broad authority to the FCC to regulate broadcasting.**

The FCC's regulatory authority over broadcasting is among the broadest delegations of power in American administrative law. That authority traces to the Radio Act of 1927, which Congress enacted "in order to protect the national interest . . . of broadcasting" and which formulated a "unified and comprehensive" regulatory scheme. *Nat'l Broad. Co.*, 319 U.S. at 214. As the Supreme Court explained, "the basic provisions of the Act are incorporated in the Communications Act of 1934," and its subsequent goals remained "unaltered." *Id.* at 213, 214. It was the newfound usage of the radio spectrum that prompted Congress to create the FCC, sensing the need for a regulatory body to monitor broadcast frequencies on this new medium. *See Red Lion Broad. Co. v. FCC.,* 395 U.S 367, 375–77 (1969). These conditions demanded a regulatory power that is not "niggardly but expansive." *Id.* at 380 (citing *Nat'l Broad. Co.*, 319 U.S. at 219).

Under that mandate, the public interest standard governs every aspect of the Commission's authority, including its ability to license. The Radio Act of 1927 established the Federal Radio Commission (later known as the FCC) with robust licensing and regulatory powers. *Fed. Radio Comm'n v. Nelson Bros. Bond & Mortg. Co.,* 289 U.S. 266, 279 (1933). Indeed, [t]he Commission is specifically directed to consider the demands of the "public interest in the course of granting licenses . . . reviewing them . . . and modifying them," *Red Lion Broad. Co.*, 395 U.S at 379, and such requirement has long been upheld. *FCC v. Pottsville Broad. Co.*, 309 U.S. 134, 138 (1940).

The corollary is the public trustee model: broadcasters are "temporary permittees—fiduciaries—of a great public resource." *Off. of Commc'n. of United Church of Christ*, 425 F.2d 543, 548 (D.C. Cir. 1969). Indeed, "no one has a First Amendment right to a license." *Red Lion Broad. Co.*, 395 U.S. at 389 (quoting *Nat'l Broad. Co.*, 319 U.S. at 227). Congress's vesting of licensing power in the FCC is how it ensured the fiduciary obligation had teeth.

And this framework has proven durable. The Supreme Court has repeatedly upheld the public interest standard, *see FCC v. WNCN Listeners Guild*, 450 U.S. 582, 596 (1981); *Red Lion Broad. Co.*, 395 U.S. at 367; *FCC v. Nat'l Citizens Comm. for Broad.*, 436 U.S. 775, 795 (1978), and even the Commission's 1987 repeal of the Fairness Doctrine left the underlying authority intact. *See generally Syracuse Peace Council v. FCC*, 867 F.2d 654 (D.C. Cir. 1989). It is a "comprehensive mandate" of the FCC, and a duty to act in accordance with such interest. *Nat'l Broad. Co.*, 319 U.S. at 216, 219.

It is the FCC—not the Office of the President, the White House, nor the myriad employees who "serve at the pleasure"—which is entrusted with this duty. *See* 47 U.S.C § 151. Contrary to the bulk of ABC's assertions, *see* ECF No. 1 ¶¶ 7, 60, the FCC is an *independent* agency, wholly outside of "executive control." *See United States v. Am. Tel. & Tel Co.,* 461 F. Supp. 1314, 1335 (D.D.C. 1978). This Court has recognized Congress's choice: an independent Commission and members who "do not serve at the pleasure of the President." *See* 461 F. Supp. at 1335.

**b. The early renewal rule is one tool the FCC may use to execute its functions.**

The early renewal rule is not new—it has existed in one form or fashion for close to one hundred years. ABC's attempt to paint the FCC's use of this process as somehow outside of its normal authority due to historical under-use is misplaced as decisions regarding how and when to prioritize enforcement are entirely within an agency's discretion. *Heckler v. Chaney*, 470 U.S. 821, 833 (1985); *see also FCC v. Pottsville Broad. Co.* 309 U.S. 134 at 137–38 ("[Questions of procedure in ascertaining the public interest, when the Commission's licensing authority is invoked … were explicitly and by implication left to the Commission's own devising so long, of course, as it observes the basic requirements designed for protection of private as well as public interest.").

The early renewal rule first appeared as § 1.320(b) of the Commission's rules of practice and procedure, and the Commission exercised it as early as 1948. It directed the Northern Corporation to file an early renewal application for Radio Station WMEX after finding that inaccurate information was allegedly submitted concerning the station's ownership. *See In Re Application of Northern Corp. (WMEX), Boston, Mass*, 12 F.C.C. 940, 940 (1948). The Commission rejected Northern's challenge to its authority, as those judgments are left "to the discretion of the Commission, to be exercised in light of the pertinent practical considerations." *Id.* at 941. The following year, the Commission directed Narragansett Broadcasting Company to file an early renewal application after the licensee's proposed transfer of control raised questions about whether it remained the most qualified operator. *See In re Application of*

*Narragansett Broad. Co*, 15 F.C.C. 887, 888 (1951). Narragansett filed under protest, *id.* at n.1, challenging the Commission's authority to compel the filing. The Commission rejected that challenge, and after a full hearing, granted renewal on the merits. *Id.* at 913.

The rule was later renumbered and consolidated into Part 73, *see* Rules Applicable in Common to Broadcast Stations, 34 Fed. Reg. 19762 (Dec. 17, 1969), and redesignated to its current form, *see* Application for Renewal of License, 44 Fed. Reg. 38495 (July 2, 1979). Through every iteration, the operative language has not changed: the Commission may order early renewal whenever it "regards" such filing as "essential to the proper conduct of a hearing *or* investigation." 47 C.F.R. § 73.3539(c) (emphasis added).

The terms "hearing" and "investigation" have never been defined in the Act, but Congress "left largely to [the Commission's] judgment the determination of the manner of conducting its business which would most fairly and reasonably accommodate the ends of justice." *FCC v. WJR, The Goodwill Sta.*, 337 U.S. 265, 282 (1949). In other words, there is no specific context nor fact pattern for which hearings and investigations have been prescribed. The FCC may utilize those proceedings as it sees fit and may "regard" a renewal application as "essential" to such hearing or investigation accordingly.

In line with this, "the Commission is (not) bound … to deal with all cases at all times as it has dealt with some that seem comparable." *Leflore Broad. Co., Inc. v. FCC*, 636 F. 2d 454, 463 (D.C. Cir. 1980). In *Leflore*, the FCC ordered early renewal

of the application of a broadcasting company after finding "substantial and material questions of fact" about a licensee's employment discrimination. *Leflore Broad. Co.*, 36 F.C.C.2d 101, 104 (1972). The Commission called up the licensee's renewal application as part of its investigation with the intent to hold a hearing to clear up disputed facts. The D.C. Circuit once again affirmed the Commission's authority, recognizing it had "wide latitude" in "the choice of remedies and sanctions." *Leflore Broad. Co., Inc. v. FCC*, 636 F.2d 454, 463 (D.C. Cir. 1980).

Far from being "unprecedented" these cases show the pattern: a licensee engages in conduct that calls into question their fitness to continue holding a license, the FCC investigates, factual disputes arise, the FCC calls renewal applications early, and a hearing is held to resolve factual disputes. In each instance, the Commission invokes the early renewal rule to address serious questions about a licensee's fitness—ownership misrepresentation, qualifications, and employment discrimination. This case is no different.

Following *Leflore*, the Commission eliminated programming content requirements for licensees, *In re Radio Deregulation*, 84 F.C.C.2d 968, 1125 (1981), and repealed the Fairness Doctrine, *see Syracuse Peace Council*, 867 F.2d at 654. Any choices, good or bad, made by a broadcaster were now shielded behind closed doors. Naturally, the occasions to call for early renewal declined. [3] But the authority did not

[3] *See Off. of Commc'n. of United Church of Christ*, 779 F.2d 702, 705 (D.C. Cir. 1985) (discussing the deregulation of the radio industry).

lapse.[4] It may be that "the agency has simply not yet encountered a[n] incident it considers worthy of its time and resources," *People for Ethical Treatment of Animals, Inc. v. U.S. Dep't of Agric.*, 60 F. Supp. 3d 14, 18 (D.D.C. 2014), until now.

Though the Telecommunications Act of 1996 continued to face change, §73.3539(c) did not, nor were rules rescinded related to the statute. *See In re Implementation of Sections 204(A) & 204(C) of the Telecommunications Act of 1996*, 11 F.C.C. Rcd. 6363, 6363 (1996). The FCC has amended the rule multiple times since—most recently in 2023—without eliminating subsection (c). *See* 47 C.F.R. § 73.3539(c). That repeated choice confirms the rule is standard in the FCC's toolkit and not a relic of a bygone era or tied to a single policy issue. The Commission has reaffirmed as such, stating that early renewal remains available for "[p]articularly egregious behavior." Public Notice, 90 Fed. Reg. 54686 (Nov. 28, 2025).

What the Plaintiffs paint as the Commission's "blunderbuss" approach, *see* ECF No. 1 ¶ 102, the history demonstrates is a measured exercise of authority the Commission has held since 1948—invoked to address serious questions about a licensee's fitness to serve the public interest.

## II. This Court lacks jurisdiction to hear this case, which must be brought as an APA claim.

If the process the FCC employed was a valid exercise of authority, which it was, then the only questions that remain are those regarding the decisions the FCC made

[4] *See, e.g. Greater Portland Broad. Corp.*, 3 F.C.C. 1953, 1954 (1988); *Application of RKO General, Inc.*, 1 F.C.C Rcd. 1081, 1085 (1986); *In re Applications of WWOR-TV, Inc.*, 6 F.C.C. Rcd. 6569, 6574 (1991).

during the process. These decisions are protected by sovereign immunity, unless that immunity is expressly waived under the Administrative Procedure Act ("APA"). Plaintiffs go to great lengths to avoid challenging the Commission under the Administrative Procedure Act because they know that any such claim would be unripe and this Court would lack jurisdiction. They devote considerable space in their preliminary injunction brief attempting to shore up the proposition that this Court has jurisdiction. ECF No. 2-1 at 39–43.

**a. Plaintiffs' claim is an APA claim that must be brought under the special statutory review scheme**

Plaintiffs' claim is a clear challenge of agency decision-making and action and must be channeled through the special statutory review scheme Congress established. Plaintiffs may not circumvent this scheme by styling their claims as constitutional. As the Supreme Court has held, "the creation of such a review scheme for agency action divests district courts of their ordinary jurisdiction over the covered cases." *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 185 (2023) (citing *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207–13 (1994)); *see generally Elgin v. Dep't of Treasury*, 567 U.S. 1, 10–15 (2012). Under this framework, "[t]he agency effectively fills in for the district court, with the court of appeals providing judicial review." *Axon*, 598 U.S. at 185.

This exclusivity forecloses district-court relief that would displace the Commission's authority. The D.C. Circuit has explained that "a statute which vests jurisdiction in a particular court cuts off original jurisdiction in other courts in all cases covered by that statute." *Telecomm. Rsch. & Action Ctr. v. FCC*, 750 F.2d 70, 77 (D.C.

Cir. 1984). The "appropriate procedure for obtaining judicial review of the agency's disposition of [regulatory] issues [is] appeal to the Court of Appeals as provided by statute." *FCC v. ITT World Commc'n, Inc.*, 466 U.S. 463, 468 (1984). Plaintiffs cannot evade that command by styling their requested relief as an equitable claim rather than as a direct attack on a final order.

Statutes "that vest judicial review of administrative orders exclusively in the courts of appeals also preclude district courts from hearing claims that are 'inescapably intertwined' with review of such orders." *Merritt v. Shuttle, Inc.*, 245 F.3d 182, 187 (2d Cir. 2001). Plaintiffs' constitutional claim is clearly intertwined with the not-yet-issued final agency order regarding ABC's licenses. Every question that ABC poses regarding the intent, motive, or diligence of the FCC during the underlying agency investigation is best left answered after issuance of a final agency order through production of the full administrative record produced in the special statutory review process laid out by Congress. ABC asks this Court to commandeer the agency process below to preempt the conclusion of the FCC's process and foreclose meaningful review under the APA on a final order. This Court may not assume control over that regulatory process merely because Plaintiffs disagree with how the process is unfolding.

The statutory review scheme for licensing decisions by the FCC is among the most established in federal administrative law. Under the Hobbs Act, the courts of appeals possess "exclusive jurisdiction" to review final Commission orders. 28 U.S.C. § 2342(1). The Communications Act provides that appeals from Commission orders

relating to licensing "may be taken" to the courts of appeals. 47 U.S.C. § 402(b). These provisions prescribe "the specific, complete and exclusive mode for judicial review of the Commission's orders." *City of Tacoma v. Taxpayers of Tacoma*, 357 U.S. 320, 336 (1958). "Hence, upon judicial review of the Commission's order, all objections to the order, to the license it directs to be issued, and to the legal competence of the licensee to execute its terms, must be made in the Court of Appeals or not at all." *Id.*

Congress's intent to preclude initial judicial review is evident. *Thunder Basin* asks whether it is "fairly discernible in the statutory scheme" that Congress intended to preclude such review. 510 U.S. at 207. Here, the Communications Act and the Hobbs Act create a comprehensive enforcement and review structure that channels challenges through agency proceedings and then to the courts of appeals.[5] The Court rejected the effort in *Thunder Basin* to bypass that structure: "Nothing in the language and structure of the Act or its legislative history suggests that Congress intended to allow mine operators to evade the statutory-review process by enjoining the Secretary from commencing enforcement proceedings." *Id.* at 216. The same reasoning applies here. Nothing in the Communications Act suggests Congress intended to

[5] *Cf. Am. Fed. of Gov't Emps. Local 2586 v. Biden*, 616 F. Supp. 3d 1275, 1280–81 (W.D. Okla. 2022) (Substantially-similar CRSA which affords "procedural rights, including notice, representation by counsel, the opportunity to respond," the right to appeal, and the right "to appeal from the Board to the Federal Circuit" precluded extra-statutory judicial review) (citing *Rydie v. Biden*. 2022 WL 1153249, at *3–4 (4th Cir. Apr. 19, 2022)); *Am. Fed. of Gov't Emps. Local 2018 v. Biden*, 598 F. Supp. 3d 241, 247 (E.D. Pa. 2022) ("comprehensive, detailed, elaborate, and integrated" scheme of CRSA barred extra-statutory judicial review).

allow broadcasters to evade review by enjoining the Commission from conducting license-renewal proceedings.

**b. Plaintiffs' claim does not fall into any of the exceptions to *Thunder Basin***

The Supreme Court has recognized a narrow exception where a claim falls "outside" the statutory review scheme under the three-factor *Thunder Basin*/*Axon* test: (1) whether precluding district court jurisdiction could "foreclose all meaningful judicial review"; (2) whether the claim is "wholly collateral" to the statute's review provisions; and (3) whether the claim is "outside the agency's expertise." *Axon*, 598 U.S. at 186 (quoting *Thunder Basin*, 510 U.S. at 212–13). Plaintiffs' arguments are wrong on each count.

**1. Meaningful judicial review would not be foreclosed.**

Plaintiffs assert that requiring them to proceed through the statutory review scheme would "foreclose all meaningful judicial review." *See* ECF No. 2-1 at 41–42. But this conflates the desire for *immediate* review with *meaningful* review. In *Elgin*, 567 U.S. at 1, the Court held that even constitutional claims must be brought within the statutory review process—notwithstanding the agency's inability to adjudicate constitutional questions. *Id.* at 15–22. The employees' claims could be "meaningfully addressed" by the reviewing court of appeals. *Id.* at 22.

The same logic applies here. Plaintiffs' First Amendment claims can be fully adjudicated by the court of appeals upon review of any final Commission order. Under *Elgin*, what matters is whether a reviewing court will address those claims. It indisputably will. The *Thunder Basin* test asks whether meaningful review would be

*foreclosed*, not *delayed*. "[T]he mere fact that some delay may attend the vindication of constitutional rights does not defeat congressional intent to channel review." *Elgin*, 567 U.S. at 22 n.7. Further, Plaintiffs' concerns about delay are entirely speculative. They ask the Court to assume bad faith by the Defendants and issue a ruling predicated on the premise that the Commission *might* drag out the proceedings for years. Plaintiffs' arguments are "riddled with contingencies and speculation that impede [this Court's] judicial review." *Trump v. New York*, 592 U.S. 125, 131 (2020).

Section 704 of the APA reinforces this conclusion. It provides that "[f]inal agency action for which there is no other adequate remedy in a court [is] subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action." 5 U.S.C. § 704. The early renewal order is, at most, an intermediate procedural step: it initiates a process that will culminate in a final licensing order but does not decide whether any station will be renewed. Plaintiffs will have every opportunity to present all their objections, including constitutional ones, on review of that final order before the Court of Appeals.

**2. Plaintiffs' claims are not wholly collateral to the statutory review provisions.**

Despite their equitable framing, Plaintiffs' claims are "inescapably intertwined" with the Commission's ongoing license renewal proceedings—not "wholly collateral" to them. *Thunder Basin*, 510 U.S. at 212. The relief they seek would directly enjoin the administrative proceedings the statutory review scheme governs. ECF No. 1 ¶¶ 98–101. A challenge to the initiation of agency proceedings under a statute

whose review scheme covers those proceedings is the antithesis of a wholly collateral claim.

Plaintiffs' claim is effectively a preemptive challenge to the agency's enforcement authority—precisely what *Thunder Basin* rejected. The Court emphasized that "[n]othing in the language and structure of the Act . . . suggests that Congress intended to allow mine operators to evade the statutory-review process by enjoining the Secretary from commencing enforcement proceedings." 510 U.S. at 216. Plaintiffs similarly ask this Court to enjoin the Commission before any final determination. Like the mining company in *Thunder Basin*, they cannot evade the statutory review process by racing to district court.

The contrast with *Axon* is instructive. There, the claims were wholly collateral because they challenged the structural constitutionality of the adjudicative body—the manner in which ALJs were appointed and insulated from removal. 598 U.S. at 190–92. Those claims went to the lawfulness of the tribunal, not to what it might decide. Here, Plaintiffs challenge the Commission's exercise of its delegated authority to initiate early renewal proceedings—a discretionary regulatory act squarely within the statutory review framework. *See* § I, *supra*. It is not "wholly collateral" to the statutory scheme; it is at the heart of it.

Plaintiffs characterize their claim as a challenge to the Commission's "power to proceed *at all*." *See* ECF No. 2-1 at 42 (citing *Axon*, 598 U.S. at 192). But in *Axon*, the challenge was whether the Constitution permitted the agency to adjudicate through its existing structure. Here, Plaintiffs contend the Commission's *motive* for

invoking its concededly lawful authority was retaliatory—a challenge to the application of the statute, not to the agency's power, and one that falls within, not outside, the statutory review scheme (emphasis added).

**3. The claims are not outside the Commission's expertise.**

Plaintiffs argue that their First Amendment retaliation claim is "outside the agency's expertise" because the Commission lacks authority to adjudicate constitutional questions. ECF No. 2-1 at 42–43. But *Elgin* forecloses that argument as there are "many threshold questions that may accompany a constitutional claim and to which the [Merit Systems Protection Board] can apply its expertise." 567 U.S. at 22. What mattered was that the agency's factual determinations provided a useful foundation for the reviewing court's resolution of the constitutional question. *Id.*

That reasoning applies here. The Commission possesses deep expertise in broadcast licensing and the public interest standard, i.e., the regulatory framework within which Plaintiffs' retaliation claim arises. Determining whether the early renewal order was pretextual requires evaluating the Commission's historical use of its authority, the regulatory context, and its asserted justifications—all matters within the Commission's core competence and matters which would be best fleshed out through production of the full administrative record. The Commission's factual findings will inform any reviewing court's assessment of the constitutional claim.

Nor does the presumption favoring judicial review alter the result. *Bowen v. Mich. Acad. Family Physicians*, 476 U.S. 667, 670 (1986). That presumption may be overcome through "specific language or specific legislative history that is a reliable

indicator of congressional intent," or by a specific congressional intent to preclude judicial review that is "fairly discernible in the detail of the legislative scheme." *Id.* at 673 (quoting *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 349, 351 (1984)). Congress has not precluded judicial review here; it has channeled review to the courts of appeals after the Commission issues a reviewable order. That arrangement fully satisfies the presumption.

Plaintiffs rely on *Endocrine Soc'y v. FTC*, 832 F. Supp. 3d 1 (D.D.C. 2026), and *Media Matters for America v. FTC*, No. 25-5302, 2025 WL 2988966 (D.C. Cir. 2025), for the proposition that First Amendment retaliation claims belong in district court. *See* ECF No. 1 ¶ 39; ECF No. 2-2 at 42–43. But those cases involved the FTC's civil investigative demands: instruments not subject to the comprehensive statutory review scheme Congress enacted for FCC licensing decisions. Congress created an elaborate scheme for review of Commission licensing orders through the Hobbs Act and Communications Act, with exclusive jurisdiction vested in the courts of appeals. 28 U.S.C. § 2342(1); 47 U.S.C. § 402(b). No comparable regime governs FTC Civil Investigative Demands ("CID").

Moreover, in both cases, the government was initiating *new* investigatory action through CIDs, not issuing a request that is specifically designed to be part of an ongoing administrative "investigation," which is the case here. The early renewal proceeding is a far cry from an ad hoc investigatory demand.

The "inescapably intertwined" doctrine applies with special force here. The Commission's proceedings will produce a final order directly reviewable in the courts

of appeals under 47 U.S.C. § 402(b), providing Plaintiffs an opportunity to raise every objection, including their First Amendment claim. By contrast, the FTC's CIDs might never have produced a final reviewable order, giving those plaintiffs a colorable argument that meaningful review would be foreclosed. Here, the statutory path is not speculative—the FCC licensing process culminates in an order reviewable by the court of appeals. That distinction is dispositive.

The consequences of accepting Plaintiffs' jurisdictional theory would be severe. If a regulated party could bypass the APA's review framework by recasting its challenge as a freestanding constitutional claim, every party subject to an enforcement action or administrative proceeding could invoke district court jurisdiction and paralyze the administrative adjudicative apparatus.

The consequences are particularly acute in broadcasting. If licensees could bypass the renewal process by filing district-court suits challenging the Commission's motives, the Commission's ability to fulfill its statutory mandate would be crippled. Every licensee facing unfavorable action could halt proceedings before the agency compiled a record,[6] depriving reviewing courts of the factual foundation they need to review agency decisions. This is precisely the outcome Congress sought to prevent by channeling FCC review to the courts of appeals.

This Court should decline to open that floodgate. Congress enacted the Hobbs Act and Communications Act review provisions to ensure challenges to Commission action are resolved on a complete administrative record, by courts with specialized

[6] *See* 510 U.S. at 308.

expertise, and in accordance with the standards Congress prescribed. Plaintiffs brought what is functionally a challenge to the Commission's licensing authority under the guise of a standalone equitable claim. Their claims are subject to the exclusive statutory review framework, and this Court should dismiss for lack of jurisdiction.

* * *

For the foregoing reasons, this Court lacks jurisdiction over Plaintiffs' claims. Plaintiffs' standalone equitable constitutional claim is not cognizable where Congress has provided a comprehensive statutory review scheme for Commission action. Their claims fall squarely within that scheme, and all three *Thunder Basin* factors confirm that they must be channeled through it. This Court should dismiss the Complaint.

## III. Grant of preliminary injunction would be inequitable.

To obtain a preliminary injunction in this Court, Plaintiffs must show: "(1) a substantial likelihood of success on the merits; (2) that they would suffer irreparable injury if the injunction is not granted; (3) that an injunction would not substantially injure other interested parties; and (3) that the public interest would be furthered by the injunction." *See Int'l Ass'n of Machinists & Aerospace Workers v. Nat'l Mediation Bd.,* 374 F. Supp. 2d 135, 139 (D.D.C. 2005). Regarding the third and fourth prongs, Plaintiffs argue that the "Government" and the "Commission" are "in no way harmed by issuance of a preliminary injunction." ECF No. 2 at 38. "But, the [Government] is not the only interested party in this case." *See Int'l Ass'n of Machinists*, 374 F. Supp. 2d at 142.

Below, AFL represents fifteen parties in interest to the Commission's administrative proceedings. Each is a member of the viewing public for one of the stations whose license was called for renewal. Each signed a declaration that they opposed renewal because of the station's race-based employment practices, which they believe harm both the quality of the broadcast and their local communities. Plaintiffs' attempt to remove the proceeding to the district court—and ultimately enjoin the license renewal proceeding—would prejudice the interested parties, both those represented by AFL and those not, by ejecting them from the proceeding. "In other words, the harms seem to be evenly balanced, and a preliminary injunction might harm other interested parties." *Id.*

Finally, "[w]here lies the public interest? In litigation involving the administration of regulatory statutes designed to promote the public interest, this factor necessarily becomes crucial. The interests of private litigants must give way to the realization of public purposes." *Virginia Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958). It is not in the public interest to allow Plaintiffs to evade justified scrutiny into their employment practices by enjoining the FCC's early license renewal process. As the FCC has repeatedly stated, "Discrimination is so fundamentally inconsistent with the public interest that rules are justified to deter even the possibility of discrimination."[7] Plaintiffs chose to break these rules

[7] *Review of the Commission's Broadcast and Cable Equal Employment Opportunity Rules and Policies*, Second Report and Order and Third Notice of Proposed Rule Making, 17 FCC Rcd 24018, 24039 (2002).

and risked the very investigation and potential consequences they now face. The public interest weighs heavily in favor of denying the preliminary injunction.

**CONCLUSION**

For the foregoing reasons, the Court should deny the Plaintiffs' Motion for Preliminary Injunction.

Dated: September 16, 2026

Respectfully submitted,

/s/ *Emily Percival*

Emily Percival
DC Bar No. 90001650
Robert A. Crossin
DC Bar No. 90036740
AMERICA FIRST LEGAL FOUNDATION
611 Pennsylvania Avenue SE, #231
Washington, D.C. 20003
Tel.: 202.596.9846
emily.percival@aflegal.org
bobby.crossin@aflegal.org

*Counsel for Amicus Curiae*
*America First Legal Foundation*