**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN BROADCASTING COMPANIES, INC., *et al.*,<br><br>*Plaintiffs*<br><br>v.<br><br>FEDERAL COMMUNICATIONS COMMISSION, *et al.*,<br><br>*Defendants.* | Case No.1:26-cv-2902 (LLA) |

# [PROPOSED] BRIEF OF *AMICI CURIAE* FORMER FCC CHAIRMEN, COMMISSIONERS, AND SENIOR-LEVEL STAFF IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY RELIEF


Janine Lopez
**Protect Democracy Project**
2020 Pennsylvania Avenue NW
Suite 163
Washington DC 20006
(202) 579-4582

Conor S. Gaffney
**Protect Democracy Project**
201 St. Charles Avenue, Suite 114
New Orleans, LA 70170

Tobin Raju
Rachel E. Goodman
**Protect Democracy Project**
82 Nassau Street, # 601
New York, NY 10038

Andrew Jay Schwartzman
**Andrew Jay Schwartzman, PLLC**
525 9th Street NW, Seventh Floor
Washington, DC 20004

Gigi Sohn
**G Squared Strategies**
3503 Alton Place NW
Washington, DC 20008

Berin Szóka
Ari Cohn
**TechFreedom**
1500 K Street NW, Floor 2
Washington, DC 20005

*Counsel for Amici Curiae*

# TABLE OF CONTENTS


Table of authorities ..... ii

Introduction ..... 1

Identity of Amici ..... 2

Argument ..... 3

- I. Chairman Carr has embarked on a campaign of abusing FCC authority to retaliate against First Amendment-protected expression. ..... 3
  - A. The Chairman has repeatedly exceeded the bounds of FCC authority to suppress speech and evade judicial review. ..... 4
  - B. The ABC early renewal proceedings mark an extraordinary departure from agency practice. ..... 8
- II. Plaintiffs' claim challenging this retaliation may be heard directly by this Court. ..... 13
  - A. Under FCC rules and practice, Chairman Carr may prolong early renewal proceedings, denying meaningful review of Plaintiffs' here-and-now-injury. ..... 14
  - B. Plaintiffs' First Amendment retaliation claim is wholly collateral to the statutory scope of review in early renewal proceedings. ..... 16
  - C. The FCC lacks expertise in adjudicating Plaintiffs' retaliation claims. ..... 17
  - D. The Hobbs Act does not channel Plaintiffs' claim either. ..... 19

Conclusion ..... 19

## TABLE OF AUTHORITIES

**Cases**

*Arnett v. Kennedy*,
416 U.S. 134 (1974) ........ 16

*Axon Enterprises, Inc. v. FTC*,
598 U.S. 175 (2023) ........ 13, 14, 16, 17

*Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963) ........ 11, 13

*Broadband Communications Association of Pennsylvania v. FCC,*
No. 26-1062, 2026 WL 2055661 (D.C. Cir. July 9, 2026) ........ 7

*Columbia Broadcast Systems, Inc. v. DNC*,
412 U.S. 94 (1973) ........ 3

*Denver Area Educational Telecommunications Consortium, Inc. v. FCC*,
518 U.S. 727 (1996) ........ 4

*Department of Commerce v. New York*,
588 U.S. 752 (2019) ........ 11

*Endocrine Society v. FTC*,
832 F. Supp. 3d 1 (D.D.C. 2026) ........ 13, 17, 18

*FCC v. League of Women Voters of California*,
468 U.S. 364 (1984) ........ 4

*FCC v. National Citizens Committee for Broadcasting*,
436 U.S. 775 (1978) ........ 8

*First Choice Women's Resource Centers, Inc. v. Davenport*,
608 U.S. 174 (2026) ........ 16

*Greater Boston Television Corp. v. FCC*,
444 F.2d 841 (D.C. Cir. 1970) ........ 8

*In re Murchison*,
349 U.S. 133 (1955) ........ 18

*McLaughlin Chiropractic Associates, Inc. v. McKesson Corp.*,
606 U.S. 146 (2025) ........ 19

*MD/DC/DE Broadcasters Association v. FCC*,
236 F.3d 13 (D.C. Cir. 2001) ........ 13

*Media Matters for America v. FTC*,
No. 25-5302, 2025 WL 2988966 (D.C. Cir. Oct. 23, 2025) .................................................. 16

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024) .................................................................................................. 10

*National Rifle Association of America v. Vullo*,
602 U.S. 175 (2024) .................................................................................................. 11

*PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.*,
588 U.S. 1 (2019) ..................................................................................................... 19

*SGCI Holdings III LLC v. FCC*,
No. 23-1083 (D.C. Cir. Apr. 3, 2023) ............................................................................ 7

*Singletary v. District of Columbia*,
351 F.3d 519 (D.C. Cir. 2005) ..................................................................................... 11

*Telecommunications Research and Action Center v. FCC*,
750 F.2d 70 (D.C. Cir. 1984) ....................................................................................... 19

*Thunder Basin Coal Co. v. Reich*,
510 U.S. 200 (1994) .................................................................................................. 13

*United States v. Stanchich*,
550 F.2d 1294 (2nd Cir. 1977) .................................................................................... 11

**Statutes**

47 U.S.C. § 155 ......................................................................................................... 7, 14

47 U.S.C. § 307 ............................................................................................................. 12

47 U.S.C. § 309 ...................................................................................................... 8, 10, 17

47 U.S.C. § 326 ............................................................................................................... 7

47 U.S.C. § 402 ............................................................................................................. 17

47 U.S.C. § 403 ............................................................................................................. 12

Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 ........................................... 9

**Administrative Materials**

47 C.F.R. § 0.283 (2025) ................................................................................................ 14

47 C.F.R. § 0.5 (2023) .................................................................................................... 14

47 C.F.R. § 1.1 (2026) .......... 12

47 C.F.R. § 73.1020 (2026) .......... 8

Application for Renewal of Fox Television Stations (WTXF-TV),
40 FCC Rcd. 438 (MB 2025) .......... 7

Applications for Assignment of Licenses from Subsidiaries of Allen Media, LLC to Gray Television Licensee, LLC,
DA 26-281, 2026 WL 1013551 (MB Mar. 23, 2026) .......... 7

Applications for Consent to the Transfer of Control of TEGNA Inc. to Nexstar Media Inc.,
DA 26-267, 2026 WL 1013487 (MB Mar. 19, 2026) .......... 7

Applications for Exchange of Licenses Between Gray and Scripps,
DA 26-417, 2026 WL 1284547 (MB Apr. 28, 2026) .......... 7

Applications of New Cingular Wireless PCS, LLC and United States Cellular Corporation For Consent to Assign Licenses,
40 FCC Rcd. 9290 (WTB 2025) .......... 7

Applications of T-Mobile US, Inc. and U.S. Cellular Corp. for Consent to Transfer Control of Licenses, Authorizations, & Leases,
40 FCC Rcd. 4776 (WTB & OIA 2025) .......... 7

Bridge News, LLC,
DA 26-413, 2026 WL 1383752 (FCC Apr. 27, 2026),
https://docs.fcc.gov/public/attachments/DA-26-413A1.pdf .......... 9

Former Chairs, Commissioners, Chiefs of Staff, General Counsels, & Bureau Chiefs, Comment Letter Opposing Petitions to Deny (July 28, 2026),
https://www.fcc.gov/ecfs/document/26110060005/1 .......... 10

KNOK Broad., Inc.,
29 F.C.C.2d 47 (1971) .......... 10

Leflore Broad. Co.,
36 F.C.C.2d 101 (1972) .......... 10

Media Bureau Clarifies Lowest Unit Charge Obligations,
DA 26-300, 2026 WL 1013722 (MB Mar. 30, 2026) .......... 7

Multimedia Ent., Inc.,
56 Pike & Fischer 2d 143 (1984), 1984 FCC LEXIS 2665 .......... 6

Petition for Declaratory Ruling (Fed. Commc'ns Comm'n May 7, 2026),
https://www.fcc.gov/ecfs/search/search-filings/filing/1052208716798 .......... 5

Petition for Special Relief in the Matter of Repeal of the News Distortion Policy (Fed. Commc'ns Comm'n Nov. 13, 2025), https://protectdemocracy.org/wp-content/uploads/2025/11/News-Distortion-Petition-for-Special-Relief.pdf ............................ 5

RKO Gen., Inc.,
1 FCC Rcd. 1081 (1986) ............................................................................................ 10

Stangland,
9 F.C.C.2d 683 (1967) .............................................................................................. 10

Syracuse Peace Council,
2 FCC Rcd. 5043 (1987) ............................................................................................ 18

Thomas,
17 F.C.C.2d 375 (1969) ............................................................................................ 10

WABC Television (N.Y.), LLC (WABC-TV), Objection to Unlawful Early Renewal (FCC Form 2100, sched. 303-S)
(May 28, 2026), https://perma.cc/Y4MT-5Z2A ........................................................ 9

**Other Authorities**

Addendum to Petition for a Writ of Mandamus, *In re Radio Television Digital News Ass'n*, No. 26-1099, https://protectdemocracy.org/wp-content/uploads/2026/04/Addendum.pdf#page=25 (Decl. of Ruth Milkman) ....................... 15

Alexander Bolton,
*Cruz says FCC chair's threats over Kimmel 'right out of Goodfellas,' 'dangerous as hell'*, Hill, Sept. 19, 2025, https://thehill.com/homenews/senate/5513131-cruz-fcc-chair-kimmel/ . 5

Anna M. Gomez, Commissioner, FCC,
Remarks at UnidosUS Annual Conference (July 30, 2026),
https://docs.fcc.gov/public/attachments/DOC-424029A1.pdf................................................. 6

Brendan Carr (@BrendanCarrFCC), X (Apr. 16, 2025, at 06:58PM ET),
https://x.com/BrendanCarrFCC/status/1912641900558893377 .............................................. 5

Donald J. Trump (@realDonaldTrump), Truth Social (Apr. 27, 2026, at 1:26 PM ET),
https://truthsocial.com/@realDonaldTrump/posts/116477838570626860.............................. 9

Kelcee Griffis & Saijel Kishan,
*ABC License Renewal Call Surprised FCC Staff and Shattered Norms*, Bloomberg (Apr. 29, 2026), https://news.bgov.com/bloomberg-government-news/abc-license-renewal-call-surprised-fcc-staff-and-shattered-norms ...................................................................... 10

Kelcee Griffis,
*FCC Nearing Rulings Against Disney Over 'The View,' TV Licenses*, Bloomberg (July 15,

2026), https://www.bloomberg.com/news/articles/2026-07-15/fcc-nearing-rulings-against-disney-over-the-view-tv-licenses ........ 12

Letter from Peter S. Hyun, Acting Chief, FCC Enforcement Bureau, to Daniel R. Suhr, President, Center for American Rights, Re: Preserving the First Amendment, GN Docket No. 25-11 (Jan. 16, 2025), https://docs.fcc.gov/public/attachments/DOC-408880A1.pdf ........ 4

Melania Trump (@MelaniaTrump), Truth Social (Apr. 27, 2026, at 10:21 AM ET), https://truthsocial.com/@MelaniaTrump/posts/116477113100031370 ........ 9

Petition for a Writ of Mandamus, *In re Radio Television Digital News Association*, No. 26-1099 (D.C. Cir. Apr. 28, 2026), https://protectdemocracy.org/wp-content/uploads/2026/04/Petition-for-Writ-of-Mandamus.pdf ........ 15

Shawn McCreesh, *President and First Lady Demand ABC Fire Jimmy Kimmel Over 'Widow' Joke*, New York Times (Apr. 27, 2026), https://www.nytimes.com/2026/04/27/us/politics/trump-jimmy-kimmel-abc-widow-joke.html ........ 9

Statement of Anna Gomez, Commissioner, FCC, On Media Bureau Summary Dismissal of Petition to Repeal the News Distortion Policy (July 1, 2026), https://docs.fcc.gov/public/attachments/DOC-422758A1.pdf ........ 16

Statement of Jessica Rosenworcel, Chairwoman, FCC, Re: Preserving the First Amendment, GN Docket No. 25-11 (Jan. 16, 2025), https://docs.fcc.gov/public/attachments/DOC-408913A1.pdf ........ 4

## INTRODUCTION

*Amici curiae* are a bipartisan group of former FCC chairmen, commissioners, general counsel, chiefs of staff, and bureau chiefs. They have served Republican and Democratic administrations, from President Reagan to President Biden. Since Brendan Carr became FCC Chairman in January 2025, *amici* have watched with growing alarm as the agency they once stewarded has unleashed a wide-ranging campaign of threats and retaliation to bring an independent press to heel. From local AM radio stations to multi-billion-dollar media conglomerates, daytime talk shows to late-night comedy, no speaker is safe from the FCC's regulatory retaliation.

For more than a year, the Chairman has violated the First Amendment in plain view. He has faced little consequence for doing so, having deployed FCC authority in a manner designed to escape judicial review and to disincentivize formal legal challenges. This case thus represents a critical opportunity for this Court to safeguard the constitutional rights to free speech and a free press that are foundational to our democracy.

*Amici* submit this brief to offer their expertise from combined decades of experience at the FCC. During their time at the FCC, *amici* were tasked with interpreting the Communications Act and applying the FCC's rules and regulations, including those the agency has invoked in the proceedings at issue here. Plaintiffs' briefing makes clear that Congress did not intend to channel First Amendment retaliation claims into the very proceedings alleged to be retaliatory in the first place.

In this brief, *amici*'s description of FCC practice and the limited scope of renewal proceedings underscores that point. The Chairman's control of those proceedings allows him to prolong almost indefinitely the "here-and-now" constitutional injury that these proceedings inflict, manipulating their progress to evade judicial review and chill protected expression indefinitely.

Plaintiffs' claim is wholly collateral to the narrow standard Congress has prescribed for license renewal proceedings—a standard that does not address the agency's motive in opening the proceedings. And the FCC's First Amendment expertise in broadcast and telecommunications policy does not translate into expertise in the entirely different context of Plaintiffs' First Amendment retaliation claim. Requiring Plaintiffs to endure the very proceedings being weaponized against them would only exacerbate the ongoing constitutional injury that they seek to remedy. This Court should hear Plaintiffs' claim rather than leaving the government fox to guard the constitutional henhouse.

## IDENTITY OF AMICI

*Amici curiae* are a bipartisan group of former FCC chairmen, commissioners, chiefs of staff, general counsels, and bureau chiefs. These individuals served under both Republican and Democratic leadership, collectively representing decades of experience leading the work of the FCC, interpreting its statutory powers, and carrying out its regulatory duties within the limits of the Communications Act and the Constitution. While *amici* may differ on key questions of telecommunications law and policy, they are united in their belief that the First Amendment forbids the ongoing campaign of censorship and control that Plaintiffs challenge here.

*Amici* are: [1]

- **Kathryn C. Brown**, chief of staff to FCC Chairman William E. Kennard from 1998 until 2001.
- **Rick Chessen**, acting chief of staff to acting FCC Chairman Michael Copps from January 2009 to June 2009.
- **Rachelle B. Chong,** Republican commissioner on the FCC from 1994 to 1997, appointed by President Bill Clinton.

---

[1] No party or its counsel had any role in authoring this brief. No person or entity—other than amici curiae and their counsel—contributed money to fund the preparation of this brief. Plaintiffs consent to the filing of this amicus brief, and Defendants do not oppose its filing.

- **Michael Copps**, Democratic commissioner on the FCC from 2001 to 2011, appointed by President George W. Bush; acting Chairman of the FCC from January 2009 to June 2009.
- **Ervin Duggan,** Democratic commissioner on the FCC from 1990 to 1994, appointed by President George H.W. Bush.
- **Jerald N. Fritz**, legal advisor and chief of staff to FCC Chairman Mark Fowler from 1981 to 1987.
- **Rosemary Harold**, FCC Enforcement Bureau chief from 2017 to 2022.
- **Diane Hinson**, FCC General Counsel from 1986 to 1989.
- **Peter Hyun**, acting FCC Enforcement Bureau chief from November 2024 to January 2025.
- **William T. Lake**, FCC Media Bureau chief from 2009 to 2017.
- **Blair Levin**, chief of staff to Chairman of the FCC Reed Hundt from 1993 to 1997.
- **Ruth Milkman**, chief of staff to Chairman of the FCC Thomas E. Wheeler from 2013 to 2017.
- **Dennis R. Patrick,** Republican commissioner and Chairman of the FCC from 1987 to 1989, appointed by President Ronald Reagan.
- **Peter Pitsch,** chief of staff to Chairman of the FCC Dennis R. Patrick from 1987 to 1989.
- **Alfred C. Sikes**, Republican commissioner and Chairman of the FCC from 1989 to 1993. appointed by President George H.W. Bush.
- **Gloria Tristani,** Democratic commissioner of the FCC from 1997 to 2001, appointed by President Bill Clinton.
- **Thomas E. Wheeler**, Democratic commissioner and Chairman of the FCC from 2013 to 2017, appointed by President Barack Obama.
- **Christopher J. Wright,** general counsel of the FCC from 1997 to 2001.

## ARGUMENT

### I. Chairman Carr has embarked on a campaign of abusing FCC authority to retaliate against First Amendment-protected expression.

The Supreme Court has made clear that the First Amendment requires the Commission to minimize the risk of expanding "[g]overnment control over the content of broadcast discussion of public issues." *Columbia Broad. Sys., Inc. v. DNC*, 412 U.S. 94, 126 (1973). The Commission's

recent abuses of authority reflect the inverse of that mandate: a Chairman eager to intrude on the editorial discretion of broadcasters to chill and retaliate against speech perceived as unfavorable to the current administration. *See FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 375–76 (1984) ("[E]xpression of editorial opinion on matters of public importance . . . is entitled to the most exacting degree of First Amendment protection."); *Denv. Area Educ. Telecomms. Consortium, Inc. v. FCC*, 518 U.S. 727, 737 (1996) (plurality opinion) (explaining that for broadcasters, "the editorial function itself is an aspect of speech") (citation modified).

### A. The Chairman has repeatedly exceeded the bounds of FCC authority to suppress speech and evade judicial review.

Since becoming Chairman in January 2025, Brendan Carr has waged a sustained campaign of regulatory speech suppression against licensees, networks, and even particular journalists and comedians he and the President disfavor. Ranging in target and subject matter, the Chairman's campaign bears three hallmarks: it is retaliatory; it requires invoking FCC regulatory power beyond the boundaries set by law, regulation, and historical agency practice; and it is calculated to evade judicial review. These features of the Chairman's conduct bear on both the merits of Plaintiffs' First Amendment claims and this Court's jurisdiction to hear them.

The actions undertaken by Chairman Carr as part of this speech-suppressive campaign are far too numerous to detail here, so *amici* highlight a handful of his greatest hits. Carr began his chairmanship by reopening complaints against ABC, CBS, and NBC about content they broadcast—which the outgoing Chair had dismissed together as "at odds with the First Amendment" and lacking any evidence of malfeasance.[2] Of the four complaints the outgoing Chair

[2] Statement of Jessica Rosenworcel, Chairwoman, FCC, Re: Preserving the First Amendment, GN Docket No. 25-11 (Jan. 16, 2025), https://docs.fcc.gov/public/attachments/DOC-408913A1.pdf; *see also* Letter from Peter S. Hyun, Acting Chief, FCC Enf't Bureau, to Daniel R. Suhr, President, Ctr. for Am. Rts., Re: Preserving the First Amendment, GN Docket No. 25-11 (Jan. 16, 2025), https://docs.fcc.gov/public/attachments/DOC-408880A1.pdf ("The

had dismissed together, Carr declined to reopen only the one against Fox, the President's preferred broadcaster. Later in 2025, after late-night comedian Jimmy Kimmel made a joke that offended the President's base, the Chairman appeared on a podcast and threatened ABC with allegations of news distortion: "We can do this the easy way or the hard way," Chairman Carr said.[3] As in this case before the Court, there was the brazen interplay between public anti-ABC network attacks by President Trump and the correlative, responsive FCC actions by Carr. Trump demands retribution; Carr acts. The Chairman also asserted that NBC's editorial decision to refer to Kilmar Ábrego Garcia—whom the administration had wrongfully deported to a notorious prison in El Salvador—as a "Maryland man" was an instance of actionable news distortion.[4] After U.S. Senate candidate James Talarico, a Democrat, appeared on the ABC program *The View* in February 2026, the Commission ordered the station to initiate proceedings to revisit whether *The View*, which had long been exempted from the equal opportunities requirement, remained so.[5] *Amici* are not aware of the Commission ever ordering a licensee to initiate such a proceeding. More broadly, the

---

Commission has routinely closed similar complaints, even with more information provided, and will also do so here in light of the Commission's longstanding precedent.").

[3] Alexander Bolton, *Cruz says FCC chair's threats over Kimmel 'right out of Goodfellas,' 'dangerous as hell'*, Hill, Sept. 19, 2025, https://thehill.com/homenews/senate/5513131-cruz-fcc-chair-kimmel/. Given that threat, it is deeply disingenuous for the Commission to suggest that Plaintiffs' suspension decision was fully their own. *See* ECF 24 ("Defs. Br.") at 40–41.

[4] Brendan Carr (@BrendanCarrFCC), X (Apr. 16, 2025, at 06:58PM ET), https://x.com/BrendanCarrFCC/status/1912641900558893377. Several of these *amici* have argued the news distortion policy must be repealed altogether given its First Amendment problems in light of these and additional abuses. Petition for Special Relief in the Matter of Repeal of the News Distortion Policy (Fed. Commc'ns Comm'n Nov. 13, 2025), https://protectdemocracy.org/wp-content/uploads/2025/11/News-Distortion-Petition-for-Special-Relief.pdf.

[5] Petition for Declaratory Ruling § III-B, 27–29 (Fed. Commc'ns Comm'n May 7, 2026), https://www.fcc.gov/ecfs/search/search-filings/filing/1052208716798; *see also* ECF 2-1 ("Pls.' Br.") at 13-15.

Commission's recent notice on equal opportunities[6] broke with more than four decades of deference to broadcasters' discretion, and it has already had the intended effect of deterring broadcast stations from hosting candidate speech, contrary to Congress's intention to "encourage increased news coverage of political campaign activity" by "giv[ing] substantial discretion to the good faith news judgments of broadcast licensees." Multimedia Ent., Inc., 56 Pike & Fischer 2d 143 (1984), 1984 FCC LEXIS 2665, at *4 ¶ 4. None of this straightforward retaliation for speech the administration disfavors has resulted in a final action susceptible to judicial review.

Woven throughout the Chairman's specific retaliatory actions are broad threats and ominous warnings to the entire media ecosystem. Invoking a deliberately vague notion of licensee's "public interest obligations," the Chairman has created a regulatory regime in which any broadcaster, including ABC, can be found guilty of transgressions at any time for seemingly any thing. The effect is an unconstitutional chilling of the broadcast press. Networks, including ABC, are engaging in self-censorship. This is precisely the result Chairman Carr seeks.[7]

Chairman Carr evades judicial review by directing that actions on licensing matters be taken by staff on delegated Commission authority,[8] even when those actions exceed the delegated authority. Under D.C. Circuit precedent, Courts cannot review these actions unless and until

---

[6] Fed. Commc'ns Comm'n, FCC's Media Bureau Provides Guidance on Political Equal Opportunities Requirement for Broadcast Television Stations, 41 FCC Rcd. 301 (MB 2026).

[7] The net effect of Carr's campaign of intimidation has been to alter not only editorial judgments made by broadcasters but even to alter who is making those judgments, as Commissioner Gomez has noted: "I have sat across from station owners who have told me that they are genuinely afraid of being dragged before the FCC simply for doing their jobs. I have heard from a respected journalist whose own broadcaster told him his contract would be ended early, not because of his ratings or his conduct, but because his past coverage had angered this administration and they did not want to risk angering it further. This administration has become remarkably skilled at building that kind of fear, and not just with journalists and broadcasters." Anna M. Gomez, Comm'r, FCC, Remarks at UnidosUS Annual Conference (July 30, 2026), https://docs.fcc.gov/public/attachments/DOC-424029A1.pdf

[8] *See infra* Section II.A.

aggrieved parties file applications for review and the Chairman chooses to present them to the full Commission for a vote.[9] Numerous long-pending applications for review challenging, *inter alia,* the validity of staff action in excess of delegated authority remain in limbo.[10] Parties have also filed applications for review from many other recent staff actions, but cannot obtain recourse to judicial review until the full Commission acts.[11]

Since creating the Federal Radio Commission, the FCC's predecessor, in 1927, Congress has been cautious of the danger of content-based regulation. Congress specified that nothing should be "construed to give the Commission the power of censorship" and that the Commission should create no "regulation or condition . . . which shall interfere with the right of free speech." 47 U.S.C. § 326 (incorporating the anticensorship provisions of the Federal Radio Act of 1927). Chairman Carr has ignored this command, and with it, the First Amendment, transforming the

---

[9] *See, e.g., Broadband Commc'ns Ass'n of Pa. v. FCC,* No. 26-1062, 2026 WL 2055661, at *2 (D.C. Cir. July 9, 2026) ("Congress required the filing of an application for review as a 'condition precedent' to judicial review of an FCC bureau order, and further provided that the window for filing an appeal of such an order begins on the date when 'public notice is given of orders disposing of all applications for review.' (citing 47 U.S.C. § 155(c)(7) and cases); Order, *SGCI Holdings III LLC v. FCC*, No. 23-1083 (D.C. Cir. Apr. 3, 2023) (district court appeal dismissed pending full commission resolution).

[10] *See, e.g.*, Media Bureau Clarifies Lowest Unit Charge Obligations, DA 26-300, 2026 WL 1013722 (MB Mar. 30, 2026); Applications for Consent to the Transfer of Control of TEGNA Inc. to Nexstar Media Inc., DA 26-267, 2026 WL 1013487 (MB Mar. 19, 2026), *appeal dismissed*, *Broadband Commc'ns Ass'n of Pa.*, 2026 WL 2055661; Applications of New Cingular Wireless PCS, LLC and United States Cellular Corporation For Consent to Assign Licenses, 40 FCC Rcd. 9290 (WTB 2025); Applications of T-Mobile US, Inc. and U.S. Cellular Corp. for Consent to Transfer Control of Licenses, Authorizations, & Leases, 40 FCC Rcd. 4776 (WTB & OIA 2025); Application for Renewal of Fox Television Stations (WTXF-TV), 40 FCC Rcd. 438 (MB 2025). *See also*, Rates for Interstate Inmate Calling Services, 40 FCC Rcd. 4309 (WCB 2025) (rulemaking).

[11] *See, e.g.*, Applications for Exchange of Licenses Between Gray and Scripps, DA 26-417, 2026 WL 1284547 (MB Apr. 28, 2026); Applications for Assignment of Licenses from Subsidiaries of Allen Media, LLC to Gray Television Licensee, LLC, DA 26-281, 2026 WL 1013551 (MB Mar. 23, 2026).

Commission into an instrument of retaliation and censorship that has remained largely insulated from judicial scrutiny.

### B. The ABC early renewal proceedings mark an extraordinary departure from agency practice.

The early renewal proceedings that led to this lawsuit are the latest in Chairman Carr's campaign to punish speech disfavored by the President. They bear all three hallmarks of the Chairman's abuse of power: retaliation, irregularity, and calculation to evade judicial review.

License renewal is a systematic administrative process in which broadcast licensees ordinarily file an application for renewal every eight years. The Commission "shall grant" a license renewal application if it finds that the station, in the preceding term, has "served the public interest, convenience, and necessity"; there have been no "serious violations by the licensee of . . . the rules and regulations of the Commission"; and there have been no other violations "which, taken together, would constitute a pattern of abuse." 47 U.S.C. § 309(k)(1). In 1996, Congress enacted Section 309(k), which codified the presumption of renewal previously recognized by the Supreme Court: a licensee that "has given meritorious service has a 'legitimate renewal expectanc[y]' that is 'implicit in the structure of the Act' and should not be destroyed absent good cause." *FCC v. Nat'l Citizens Comm. for Broad.*, 436 U.S. 775, 805 (1978) (alteration in original) (quoting *Greater Bos. Television Corp. v. FCC*, 444 F.2d 841, 854 (D.C. Cir. 1970)).

The Commission last renewed the eight licenses at issue in this proceeding between 2020 and 2024, for terms that will not expire until 2028 to 2031. 47 C.F.R. § 73.1020 (2026). But on April 23, 2026, late-night talk show host Jimmy Kimmel made a joke about President Trump and

First Lady Melania Trump.[12] Following an attempted shooting at the White House Correspondents Dinner, on April 27, 2026, the President and First Lady both criticized Kimmel and called for his removal by ABC.[13] One day later, the FCC issued an order calling up the licenses of all eight ABC-owned-and-operated stations for early renewal.[14] The early renewal order directed ABC to file renewal applications within thirty days.[15] In every other case, stations know when an application for renewal will be due years in advance, which provides adequate time to compile a complete record demonstrating the stations' service in the public interest over the prior license term. The early renewal order denied the stations that opportunity.[16]

There was not one early renewal proceeding in *amici*'s combined decades on the Commission—even before the 1996 amendments[17] significantly streamlined the renewal process and permitted the extension of license terms to eight years. *Amici* cannot recall so much as a discussion of calling for an early renewal filing as a predicate for an investigation, as the agency has done here. The FCC's order is virtually unprecedented, invoking a provision that—until April—had not been used in more than 50 years.[18] Moreover, calling in eight station licenses

[12] Shawn McCreesh, *President and First Lady Demand ABC Fire Jimmy Kimmel Over 'Widow' Joke*, N.Y. Times (Apr. 27, 2026), https://www.nytimes.com/2026/04/27/us/politics/trump-jimmy-kimmel-abc-widow-joke.html.

[13] Donald J. Trump (@realDonaldTrump), Truth Soc. (Apr. 27, 2026, at 1:26 PM ET), https://truthsocial.com/@realDonaldTrump/posts/116477838570626860; Melania Trump (@MelaniaTrump), Truth Soc. (Apr. 27, 2026, at 10:21 AM ET), https://truthsocial.com/@MelaniaTrump/posts/116477113100031370.

[14] Decl. of Beth A. Wilkinson Ex. 41, at 2 ¶ 2, ECF 2-4 ("Early Renewal Order").

[15] *Id.*

[16] The Media Bureau also denied the stations' request for a 60-day extension without explanation. WABC Television (N.Y.), LLC (WABC-TV), Objection to Unlawful Early Renewal (FCC Form 2100, sched. 303-S), at 16 (May 28, 2026), https://perma.cc/Y4MT-5Z2A.

[17] *See* Telecommunications Act of 1996, Pub. L. No. 104-104, § 204(a), 110 Stat. 56, 112–13.

[18] The day before the ABC early renewal order was issued, the Commission called for early renewal of licenses held by Bridge News, LLC. *See* Bridge News, LLC, DA 26-413, 2026 WL 1383752 (FCC Apr. 27, 2026), https://docs.fcc.gov/public/attachments/DA-26-413A1.pdf;

simultaneously—and thus undermining the notion of any community-level evaluation—appears to be completely unprecedented and inconsistent with the requirement that the Commission examine each license renewal application individually "with respect to that station," 47 U.S.C. § 309 (k)(1). *Amici*'s experience underscores the hollowness of Defendants' attempt to wave away these facts. *See* Defs.' Br. at 30–31. The "Commission has always been circumspect in its discretionary use of the callup procedure." Thomas, 17 F.C.C.2d 375, 380 (1969). Early renewals are to be sought only under compelling circumstances, which are absent here.[19]

The single time in the last 55 years that the Commission called for an early renewal in no way mirrors the Commission's conduct here. In Leflore Broadcasting, the Commission called for early renewal proceedings of a license over possible intentional misrepresentations in the licensee's prior renewal application. 36 F.C.C.2d at 104. That proceeding has no bearing here, where there is no allegation of any such misrepresentation.[20] The purpose of a renewal proceeding is to assess whether a licensee has complied with the Commission's rules—not whether the licensee has achieved what the agency considers the right balance of speech. *See Moody v. NetChoice, LLC*, 603 U.S. 707, 719 (2024) ("[T]his Court has many times held, in many contexts, that it is no job for government to decide what counts as the right balance of private expression—to 'un-bias' what it thinks biased.").

---

Kelcee Griffis & Saijel Kishan, *ABC License Renewal Call Surprised FCC Staff and Shattered Norms*, Bloomberg (Apr. 29, 2026), https://news.bgov.com/bloomberg-government-news/abc-license-renewal-call-surprised-fcc-staff-and-shattered-norms. Before then, the Commission had not called for early renewal since 1972. *See* Leflore Broad. Co., 36 F.C.C.2d 101, 104 (1972).

[19] *See, e.g.*, Stangland, 9 F.C.C.2d 683, 684 (1967) (explaining the Commission's "practice of not requiring the filing of early renewal applications absent some compelling reason"); KNOK Broad., Inc., 29 F.C.C.2d 47, 50 (1971) (finding no compelling reason for demanding an early renewal application); RKO Gen., Inc., 1 FCC Rcd. 1081, 1085 (1986) (same).

[20] *See* Former Chairs, Comm'rs, Chiefs of Staff, Gen. Couns., & Bureau Chiefs, Comment Letter Opposing Petitions to Deny 6–7 (July 28, 2026), https://www.fcc.gov/ecfs/document/26110060005/1.

The FCC's purported justification for its alarming departure from the usual process is the investigation of possible violations of the "agency's prohibition on unlawful discrimination."[21] But while a regulator "can pursue violations of [the law], she cannot do so in order to punish or suppress . . . protected expression." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 196 (2024). Regardless of any potentially valid law enforcement interest, "the First Amendment prohibits government officials from relying on the 'threat of invoking legal sanctions and other means of coercion . . . to achieve the suppression' of disfavored speech." *Id.* (alteration in original) (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963)). The FCC's early renewal order explicitly expanded the inquiry beyond the scope of its employment discrimination investigation, stating that calling the licenses for early renewal "*both* allows the FCC to conduct its ongoing investigation *and* enables the FCC to ensure that the broadcaster has been meeting its public interest obligations more broadly."[22] This was also an invitation to third-party petitioners to raise all manner of other issues with petitions to deny, including content-related charges about political bias. And the timing of the Kimmel joke, the President's criticism, and the subsequent renewal order impacting all ABC-owned-and-operated stations betray that the offered justification is pretext for the Chairman's continued campaign of suppressing disfavored speech. *See Singletary v. District of Columbia*, 351 F.3d 519, 525 (D.C. Cir. 2005) (contextual evidence of temporal proximity between speech and adverse action can demonstrate retaliation); *see also Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019) (in assessing pretextual justifications, a court is "not required to exhibit a naiveté from which ordinary citizens are free") (quoting *United States v. Stanchich*, 550 F.2d 1294, 1300 (2nd Cir. 1977) (Friendly, J.)).

---

[21] Early Renewal Order at 1 ¶ 1.

[22] *Id*. at 2 ¶ 2 (emphases added).

Moreover, as Plaintiffs correctly explain in detail, "nothing about the license renewal application . . . would advance the [employment practices] investigation." Pls.' Br. at 31. The license renewal application does not request information on employment issues, and Disney-ABC had been timely responding to the agency's letters of inquiry. *Id*. The FCC also has the tools to open an investigation, subpoena witnesses, and require the production of evidence without ordering an unprecedented early renewal proceeding, but those other tools do not create the opportunity for third party petitioners to raise their separate complaints. 47 U.S.C. § 403; 47 C.F.R. § 1.1 (2026). The FCC's unprecedented and unnecessary leap to early renewal proceedings makes clear that it has chosen process as punishment.

Public reporting suggests that Chairman Carr prejudged the outcome of the early renewal proceedings before any opposing filings were submitted.[23] That a Chair would foreshadow a result long before the renewal pleading cycle concludes is unheard of. If accurate, such reporting only confirms that the stations were denied any meaningful due process and that the early renewal order was mere pretext for punishing Plaintiffs for their protected speech. Denying the injunctive relief sought by Plaintiffs would force them to endure years of uncertainty about the status of their licenses without effective judicial recourse. Even if the Commission ultimately voted to renew ABC's licenses, it could not do so "more than thirty days prior to the expiration of the original license," 47 U.S.C. § 307(d), which will not occur until between mid-2028 and 2031, depending on the license. Ordering the filing of an early renewal application is therefore inherently punitive because it forces ABC to defend against the theoretical loss of eight licenses on an expedited basis,

---

[23] Kelcee Griffis, *FCC Nearing Rulings Against Disney Over 'The View,' TV Licenses*, Bloomberg (July 15, 2026), https://www.bloomberg.com/news/articles/2026-07-15/fcc-nearing-rulings-against-disney-over-the-view-tv-licenses (reporting that the FCC is contemplating escalating the license reviews to an "internal judicial review"); Pls.' Br. at 2.

with a truncated record, and years in advance. At best, ABC will spend those years with the future status of those licenses unclear.

The Commission's actions here signal a retaliatory effort to punish ABC-owned-and-operated stations for speech the administration dislikes. The Supreme Court has long recognized that even "informal censorship may sufficiently inhibit [free speech] to warrant injunctive relief." *Bantam Books*, 372 U.S. at 67. Allowing the retaliatory early renewal proceedings to continue would force Plaintiffs to participate in a burdensome review process and potentially endure years of uncertainty about the status of its licenses, over which the Commission possesses "life and death power." *MD/DC/DE Broads. Ass'n v. FCC*, 236 F.3d 13, 19 (D.C. Cir. 2001). Relief from that retaliatory process can only come from this Court.

**II. Plaintiffs' claim challenging this retaliation may be heard directly by this Court.**

Plaintiffs have ably explained why their First Amendment claim should not have to await resolution of the FCC's administrative proceedings under *Axon Enterprises, Inc. v. FTC*, 598 U.S. 175 (2023) and *Thunder Basin Coal Company v. Reich*, 510 U.S. 200 (1994). As to the first *Thunder Basin* factor, it is the early renewal proceedings themselves which are the source of the Plaintiffs' constitutional injury—Plaintiffs are "being subjected to unconstitutional agency authority," an injury that would be "impossible to remedy once the proceeding is over." *Axon*, 598 U.S. at 191 (citation modified). As to the second, Plaintiffs' claim is "wholly collateral" to the early renewal proceedings, which are purportedly limited to whether The Walt Disney Company, ABC's parent, has violated agency rules on unlawful employment practices or otherwise failed to meet its public interest obligations. And as to the third *Thunder Basin* factor, while the FCC has considerable expertise in applying the First Amendment to broadcast policy and regulation, it has no experience in "self-policing" the kind of retaliation claim that Plaintiffs bring. *Endocrine Soc'y v. FTC*, 832 F. Supp. 3d 1, 12 (D.D.C. 2026).

*Amici* file this brief to explain with an insider's view how the FCC's unusual structure and administrative practice allows the Chairman to transform early renewal proceedings into a prolonged "here-and-now-injury," *Axon* 598 U.S. at 191, (citation modified), how this First Amendment injury is wholly collateral to the limited, lawful scope of early renewal proceedings, and how the agency's First Amendment regulatory expertise in the broadcast context does not translate to adjudicatory expertise in First Amendment retaliation claims like that which Plaintiffs have brought. *Amici*'s combined decades of experience conducting license renewal proceedings and administering the FCC's other regulatory powers may aid the Court in understanding how far outside of the agency's proper scope of review Plaintiffs' claim falls.

### A. Under FCC rules and practice, Chairman Carr may prolong early renewal proceedings, denying meaningful review of Plaintiffs' here-and-now-injury.

The FCC is unusual among federal regulatory agencies. Under the Communications Act, Commission rules, and longstanding Commission practice, the Chairman wields near-exclusive power over the staffing and operation of the bureaus, as well as the agency's docket. As a result, with respect to the first *Thunder Basin* factor, he can prolong early renewal proceedings and Plaintiffs' here-and-now constitutional injury indefinitely.

The Chairman is "the chief executive officer of the Commission" with the "duty to preside at all meetings and sessions of the Commission . . . and generally to coordinate and organize the work of the Commission." 47 U.S.C. § 155(a). FCC staff, organized into several bureaus, act on limited delegations of Commission authority. *E.g.*, 47 C.F.R. § 0.283 (2025) (delegating specific authority to the Media Bureau). These delegations, however, are narrowly circumscribed. Staff may exercise delegated authority only "to act on matters which are minor or routine or settled in nature." *Id.* § 0.5(c) (2023).

As several of *amici* have explained to the D.C. Circuit, Commission practice defers complete control over the agency's staff and agenda to the Chairman consistent with his statutory designation as chief executive officer. *See* Petition for a Writ of Mandamus 18–20, *In re Radio Television Digital News Ass'n*, No. 26-1099 (D.C. Cir. Apr. 28, 2026), https://protectdemocracy.org/wp-content/uploads/2026/04/Petition-for-Writ-of-Mandamus.pdf. The Chairman selects all senior staff, including office heads and bureau chiefs, who draft Commission decisions at the direction and under the supervision of the Chairman. *See* Addendum to Petition for a Writ of Mandamus at 23, *In re Radio Television Digital News Ass'n*, No. 26-1099, https://protectdemocracy.org/wp-content/uploads/2026/04/Addendum.pdf#page=25 (Decl. of Ruth Milkman). These decisions are then presented to the full Commission with a recommended outcome. *Id*. The Chairman determines whether and when matters are presented to the full Commission for action. *Id*. There is no mechanism for other commissioners to bring a matter to the full Commission. *Id*. In short, Chairman Carr wields total control over the progress and procedure of Plaintiffs' early renewal proceedings before the Media Bureau and the Commission.

These proceedings have the fingerprints of the Chairman all over them. The FCC has not instituted an early renewal proceeding for more than half a century—and even then, as described above, under vastly different circumstances. The agency has never, to *amici*'s knowledge, called up all the licenses owned by a network *en masse*. And the compressed filing schedule set by the agency—giving ABC 30 days to file an application that usually takes several years—is a stark departure from historical practice. In short, these proceedings are not the regular work of the Media Bureau or the Commission. Rather, they appear to be the work of a Chairman who, in the words of sitting Commissioner Anna Gomez, "has repeatedly used the Media Bureau to take actions that are inconsistent with longstanding Commission precedent that violate both the Communications

Act and the First Amendment." Statement of Anna Gomez, Comm'r, FCC, On Media Bureau Summary Dismissal of Petition to Repeal the News Distortion Policy 1 (July 1, 2026), https://docs.fcc.gov/public/attachments/DOC-422758A1.pdf.

The Chairman's power to administer the early renewal proceedings matters because the "interaction between the alleged injury and the timing of review" is critical to this Court's jurisdiction channeling analysis. *Axon* 598 U.S. at 191. "Allowing the party that has issued a demand that is causing concrete and ongoing First Amendment injury to dictate when, if ever, judicial review can commence could deprive parties of all meaningful judicial review of constitutional claims." *Media Matters for Am. v. FTC*, No. 25-5302, 2025 WL 2988966, at *5 (D.C. Cir. Oct. 23, 2025) (citing *Axon*, 598 U.S. at 190–91). Precisely so here. Not only do the retaliatory early renewal proceedings inflict a here-and-now-injury, but because of the Chairman's unique level of administrative control over the Media Bureau and Commission, he may prolong that here-and-now injury indefinitely, both exacerbating the injury and delaying a judicially reviewable order. Defendants can only pretend otherwise by ignoring the First Amendment injury actually at issue. *See* Defs.' Br. at 19.

Absent intervention from this Court, Chairman Carr may keep the Sword of Damocles that these proceedings constitute hanging over the Plaintiffs' heads for as long as he likes. After all, "the value of a sword of Damocles is that it hangs—not that it drops." *First Choice Women's Res. Ctrs., Inc. v. Davenport*, 608 U.S. 174, 192 (2026) (quoting *Arnett v. Kennedy*, 416 U.S. 134, 231 (1974) (Marshall, J., dissenting)).

### B. Plaintiffs' First Amendment retaliation claim is wholly collateral to the statutory scope of review in early renewal proceedings.

As to the second *Thunder Basin* factor: In evaluating broadcast license renewal applications, Congress requires the FCC to consider whether (1) "the station has served the public

interest, convenience, and necessity;" (2) whether there have been "serious violations by the licensee of [the Communications Act] or the rules and regulations of the Commission;" and (3) whether there have been less-than-serious violations that "would constitute a pattern of abuse." 47 U.S.C. § 309 (k)(1). If not, the FCC "shall" renew the station's license. *Id.* An FCC order applying *this* standard is then subject to eventual judicial review by a court of appeals. *Id.* § 402(b). This statutory review scheme does not encompass Plaintiffs' First Amendment retaliation claim. The renewal proceeding focuses only on the Plaintiffs' public interest conduct and their compliance with the Communications Act and FCC rules. It does not involve the elements of a retaliation claim, *i.e.*, whether the Plaintiffs' have engaged in protected speech, whether the renewal proceedings themselves constitute adverse action, or whether the FCC initiated these unprecedented proceedings because of Plaintiffs' protected speech. Those questions are "wholly collateral" to the Communications Act's license renewal standard and its judicial review provisions.

Plaintiffs' retaliation "claim turns on the Commission's motive" in initiating the proceedings, not on whether the Commission's future findings meet the standard for renewal. *Endocrine Soc'y*, 832 F. Supp. 3d at 11. Plaintiffs' retaliation claim will not be—and could not be—adjudicated in the early renewal proceeding. Their claim "is precisely the sort of injury" that Justice Gorsuch stated "can be remedied by a court without regard to the eventual outcome of agency proceedings." *Id.* at 12 (quoting *Axon*, 598 U.S. at 210 (Gorsuch, J., concurring)).

**C. The FCC lacks expertise in adjudicating Plaintiffs' retaliation claim.**

As to the final *Thunder Basin* factor, the FCC has no special expertise when it comes to Plaintiffs' claim. While *amici* are deeply familiar with the First Amendment expertise the FCC possesses relevant to broadcast regulation, they also know that this expertise does not and could not give the agency any advantage in adjudicating First Amendment retaliation claims levied

against itself. No accused entity is well-suited to evaluate such a claim in a neutral and detached manner. *See, e.g.*, *In re Murchison*, 349 U.S. 133, 136 (1955) ("[N]o man can be a judge in his own case[.]").

Beyond that, the First Amendment law on which Plaintiffs' claim relies is different from the First Amendment expertise the agency has developed in the context of its regulatory duties. Consider the agency's review of the former fairness doctrine for compatibility with the First Amendment as an example of the FCC's constitutional expertise in matters of regulating the content of speech. The fairness doctrine required broadcasters to cover "vitally important controversial issues of interest in their communities" and to provide an opportunity for the presentation of contrasting views on these issues. Syracuse Peace Council, 2 FCC Rcd. 5043, 5043 n.2 (1987). When the FCC decided to reexamine the policy and constitutional implications of the doctrine, it "considered more than one hundred formal comments and reply comments, hundreds of informal submissions, and oral arguments presented in two full days of hearings." *Id*. at 5043. The agency then issued a formal report analyzing this record and concluding that the fairness doctrine had the practical effect of broadly chilling speech, in violation of the First Amendment and the Communications Act's public interest mandate. *Id*. at 5058.

In contrast to the market and policy expertise utilized to review the constitutionality of the fairness doctrine, Plaintiffs' retaliation claim requires evaluating the "purported *abuse* of [the FCC's] own authority in order to suppress Plaintiff[s'] speech." *Endocrine Soc'y*, 832 F. Supp. 3d at 12 (emphasis added). Although the First Amendment is relevant to both analyses, they employ fundamentally different inquiries, capacities, and expertise to determine where that limit lies. On this factor, too, Plaintiffs' claim to this Court's jurisdiction succeeds.

### D. The Hobbs Act does not channel Plaintiffs' claim either.

The FCC's additional jurisdictional defense—that Plaintiffs should have filed their retaliation claim with the D.C. Circuit rather than this court—is also unavailing. The Hobbs Act channels only "facial, pre-enforcement challenges to agency orders" to the courts of appeals. *PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.*, 588 U.S. 1, 13 (2019) (Kavanaugh, J., concurring). Moreover, "ambiguity does not suffice to deprive a party of that judicial review," *McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*, 606 U.S. 146, 162 (2025), and the Hobbs Act does not expressly address situations like this one, where there is no agency order. Thus, the Hobbs Act cannot force into appellate review as-applied constitutional challenges to agency action, like Plaintiffs' claim—which depends on evidentiary development ill-suited to the courts of appeals. Far from foreclosing district court review, *Telecommunications Research and Action Center v. FCC* recognized that "district court review might be predicated on the general federal question jurisdiction," when "denial of review *in the District Court* will truly foreclose all judicial review." 750 F.2d 70, 78 (D.C. Cir. 1984) (emphasis added).

## CONCLUSION

For the foregoing reasons, and for those articulated by Plaintiffs, this Court should grant the preliminary relief that Plaintiffs seek.

Dated: September 17, 2026

Respectfully submitted,

*/s/ Janine Lopez*
Janine Lopez
**Protect Democracy Project**
2020 Pennsylvania Avenue NW
Suite 163
Washington DC 20006
(202) 579-4582

Conor S. Gaffney
**Protect Democracy Project**
201 St. Charles Avenue, Suite 114
New Orleans, LA 70170

Tobin Raju
Rachel E. Goodman
**Protect Democracy Project**
82 Nassau Street, # 601
New York, NY 10038

*Counsel for Amici Curiae*

Andrew Jay Schwartzman
**Andrew Jay Schwartzman, PLLC**
525 9th Street NW, Seventh Floor Washington, DC 20004

Gigi Sohn
**G Squared Strategies**
3503 Alton Place NW
Washington, DC 20008

Berin Szóka
Ari Cohn
**TechFreedom**
1500 K Street NW, Floor 2
Washington, DC 20005