IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AMERICAN BROADCASTING COMPANIES, INC., *et al.*,

*Plaintiffs*,

v.

FEDERAL COMMUNICATIONS COMMISSION, *et al.*,

*Defendants*.

Civil Case No. 1:26-cv-2902-LLA

Judge Loren L. AliKhan

**PLAINTIFFS' COMBINED OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND REPLY IN SUPPORT OF MOTION FOR PRELIMINARY RELIEF**

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ iii

INTRODUCTION ........ 1

LEGAL STANDARDS ........ 5

ARGUMENT ........ 5

I. THIS COURT HAS JURISDICTION TO REVIEW PLAINTIFFS' CLAIMS. ........ 5

A. *Axon* Makes Clear That This Court Has Jurisdiction ........ 7

B. The *Thunder Basin* Factors Confirm That This Court Has Jurisdiction ........ 8

C. *TRAC* Does Not Foreclose This Court's Jurisdiction ........ 15

II. PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR FIRST AMENDMENT RETALIATION CLAIM ........ 19

A. Plaintiffs' Editorial Decisions Are Protected By The First Amendment ........ 19

B. Defendants' Retaliatory Campaign Would Have A Chilling Effect On A Person Of Ordinary Firmness ........ 20

C. Defendants Ordered Early License Renewal To Punish Plaintiffs For Their Protected Speech ........ 22

III. PLAINTIFFS HAVE ESTABLISHED IRREPARABLE INJURY ........ 38

IV. THE BALANCE OF EQUITIES FAVORS INJUNCTIVE RELIEF ........ 40

V. A BOND IS NOT WARRANTED ........ 42

Conclusion ........ 43

## TABLE OF AUTHORITIES

**Cases and Administrative Adjudications**

*Am. Ass'n of Univ. Professors v. Rubio*,
802 F. Supp. 3d 120 (D. Mass. 2025) ....................37

*Am. Ass'n of Univ. Professors v. Trump*,
815 F. Supp. 3d 907 (N.D. Cal. 2025)....................37

*American Family Association*,
Notice of Apparent Liability for Forfeiture, 19 FCC Rcd. 14072 (EB 2004) ....................34

*Anthropic PBC v. U.S. Dep't of War*,
825 F. Supp. 3d 1101 (N.D. Cal. 2026)....................37

*Aramnahad v. Rubio*,
2025 WL 973483 (D.D.C. 2025) ....................14

*Aviel v. Gor*,
780 F. Supp. 3d 1 (D.D.C. 2025) ....................42

*Axon Enterprise, Inc. v. FTC*,
598 U.S. 175 (2023) ....................passim

*Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963) ....................21

*Bland v. Blanche*,
2026 WL 1998552 (D.D.C. 2026) ....................18

*Bold Alliance v. FERC*,
2018 WL 4681004 (D.D.C. 2018) ....................18

*Columbia Broad. Sys., Inc. v. Dem. Nat. Comm.*,
412 U.S. 94 (1973) ....................19

*Contemporary Media, Inc.*, Order to Show,
Cause and Hearing Designation Order, 10 FCC Rcd. 13685 (1995) ....................36

*Cutler v. Hayes*,
818 F.2d 879 (D.C. Cir. 1987) ....................16

*Dep't of Com. v. New York*,
588 U.S. 752 (2019) ....................37

Empowering Local Broadcast TV Stations to Meet Their Public Interest Obligations,
90 Fed. Reg. 54,686 (Nov. 28, 2025) ....................35

*Endocrine Soc'y v. FTC*,
832 F. Supp. 3d 1 (D.D.C. 2026) .......... passim

*Entercom License, LLC*,
Hearing Designation Order, 31 FCC Rcd. 12196 (2016) .......... 36

*Entertainment Media Trust*,
Hearing Designation Order and Notice of Opportunity for Hearing,
34 FCC Rcd. 4351 (MB 2019) .......... 36

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) .......... 19

*FCC v. Schreiber*,
381 U.S. 279 (1965) .......... 35

*Fed. Educ. Ass'n. v. Trump*,
795 F. Supp. 3d 74 (D.D.C. 2025) .......... 37

*Fox Television Stations, Inc.*,
Notice of Apparent Liability for Forfeiture, 25 FCC Rcd. 7074 (2010) .......... 34

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*,
561 U.S. 477 (2010) .......... 10, 14, 16

*Glob. Health Council v. Trump*,
153 F.4th 1 (D.C. Cir. 2025) .......... 40

*Hartman v. Moore*,
547 U.S. 250 (2006) .......... 8, 17, 22

*Hispanic Christian Community Network, Inc.*,
Order to Show Cause, 38 FCC Rcd. 7277, 7278 (MB 2023) .......... 36

*In re Grant*,
635 F.3d 1227 (D.C. Cir. 2011) .......... 14

*In re Nat. Res. Def. Council*,
645 F.3d 400 (D.C. Cir. 2011) .......... 16

*Knapp Med. Ctr. v. Hargan*,
875 F.3d 1125 (D.C. Cir. 2017) .......... 5

*L.G.M.L. v. Noem*,
800 F. Supp. 3d 100 (D.D.C. 2025) .......... 42

*League of United Latin Am. Citizens v. Exec. Off. of the President*,
780 F. Supp. 3d 135 (D.D.C. 2025) .......... 42

*Loving v. IRS*,
742 F.3d 1013 (D.C. Cir. 2014) ........................................................................13

*Mahmoud v. Taylor*,
606 U.S. 522 (2025) ......................................................................................18

*Mayor & City Council of Baltimore v. Trump*,
416 F. Supp. 3d 452 (D. Md. 2019) ...............................................................25

*Media Matters for Am. v. FTC*,
2025 WL 2988966 (D.C. Cir. 2025) .......................................................... 8, 13, 14

*Media Matters for Am. v. FTC*,
805 F. Supp. 3d 105 (D.D.C. 2025) ..................................................... 8, 13, 37, 41

*Media Matters for Am. v. Paxton*,
138 F.4th 563 (D.C. Cir. 2025)...............................................................passim

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*,
429 U.S. 274 (1977) ......................................................................................29

*N. Am.'s Bldg. Trades Unions v. Dep't of Def.*,
783 F. Supp. 3d 290 (D.D.C. 2025) ...............................................................42

*N.Y. Times Co. v. Dep't of Def.*,
2026 WL 1872765 (D.D.C. June 30, 2026)...................................................25, 37

*Nat. Res. Def. Council, Inc. v. SEC*,
606 F.2d 1031 (D.C. Cir. 1979) ....................................................................37

*Nat'l Broad. Co. v. FCC*,
516 F.2d 1101 (D.C. Cir. 1974) ....................................................................19

*Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*,
775 F. Supp. 3d 100 (D.D.C. 2025) ...............................................................42

*Nat'l Pub. Radio, Inc. v. Trump*,
827 F. Supp. 3d 48 (D.D.C. 2026) ............................................................25, 37

*Nat'l Rifle Ass'n of Am. v. Vullo*,
602 U.S. 175 (2024) ......................................................................................21

*Nieves v. Bartlett*,
587 U.S. 391 (2019) ......................................................................................22

*Opp Educational Broadcasting Foundation*,
Notice of Apparent Liability for Forfeiture and Order,
24 FCC Rcd. 11237 (EB 2009).......................................................................34

*P.J.E.S. ex rel. Escobar Francisco v. Wolf*,
502 F. Supp. 3d 492 (D.D.C. 2020) ....................42

*Perkins Coie LLP v. DOJ*,
783 F. Supp. 3d 105 (D.D.C. 2025) ....................25

*President and Fellows of Harvard College v. DHS*,
788 F. Supp. 3d 182 (D. Mass. 2025) ....................37

*Price v. Socialist People's Libyan Arab Jamahiriya*,
294 F.3d 82 (D.C. Cir. 2002)....................5

*Red Lion Broad. Co. v. FCC*,
395 U.S. 367 (1969)....................19

*Roger Wahl*,
Hearing Designation Order, Order to Show Cause, and Notice of Opportunity for Hearing,
36 FCC Rcd. 14628 (MB 2021)....................36

*SGCI Holdings III LLC v. FCC*,
2025 WL 2400880 (D.D.C. 2025) ....................18

*Smith v. Berryhill,*
587 U.S. 471 (2019) ....................5

*Snyder v. Phelps*,
562 U.S. 443 (2011)....................20

*Susman Godfrey LLP v. Exec. Off. of President*,
789 F. Supp. 3d 15 (D.D.C. 2025)....................37

*Taylor v. Trump*,
823 F. Supp. 3d 17 (D.D.C. 2026)....................25

*Telecomms. Rsch. and Action Ctr. v. FCC*,
750 F.2d 70 (D.C. Cir. 1984)....................15, 16

*Terry Keith Hammond*,
Order to Show Cause, Notice of Opportunity for Hearing, and Hearing Designation Order,
21 FCC Rcd. 10267 (2006)....................36

*Thunder Basin Coal Co. v. Reich*,
510 U.S. 200 (1994) ....................passim

*Time Warner Entertainment Co. v. FCC*,
93 F.3d 957 (D.C. Cir. 1996)....................18

*Trump v. Slaughter*,
146 S. Ct. 2283 (2026) ....................26

*UAW-Lab. Emp. & Training Corp. v. Chao*,
325 F.3d 360 (D.C. Cir. 2003) ....................38

*Unique Broadcasting, L.L.C.*,
Forfeiture Order, 22 FCC Rcd 17636 (EB 2007) ....................34

*United States v. Stanchich*,
550 F.2d 1294 (2d Cir. 1977) ....................37

*Webster v. Doe*,
486 U.S. 592 (1988) ....................5

*Whitman v. Dep't of Transp.*,
547 U.S. 512 (2006) ....................6

**Statutes**

28 U.S.C. § 1331 ....................6, 7

47 U.S.C. § 307(c)(3) ....................39

47 U.S.C. § 307(d) ....................32, 35

47 U.S.C. § 309(k) ....................11

47 U.S.C. § 402(a) ....................6

47 U.S.C. § 403 ....................35

47 U.S.C. § 503(b)(3)(A) ....................36

47 U.S.C. § 503(b)(4) ....................34

**Regulations**

47 C.F.R. § 1.430 ....................35

47 C.F.R. § 1.80(h) ....................36

47 C.F.R. § 73.3539(c) ....................4, 35

# INTRODUCTION[1]

The Commission ordered an unprecedented early license renewal proceeding to punish Plaintiffs for media coverage that the Administration dislikes. Defendants do not—and cannot—dispute that the First Amendment prohibits the government from exercising its regulatory powers to retaliate against a media organization for disfavored speech. And nothing in their brief refutes the substantial evidence of Defendants' retaliatory motive.

Faced with the Administration's repeated, explicit calls for the Federal Communications Commission to revoke Plaintiffs' licenses because of the content and viewpoints expressed on Plaintiffs' network programming and broadcasts, Defendants simply ask the Court to ignore that record. Confronted with the Chairman's own statements indicating that he will use the early license renewal proceeding to review Plaintiffs' editorial decisions, including Plaintiffs' decision not to broadcast a scheduled presidential address, Defendants offer no response. Presented with the extraordinary nature of the Commission's actions, Defendants concede the "relative rarity of early renewal proceedings," Defs. Combined Mot. to Dismiss and Opp'n to Mot. for Prelim. Inj. ("PI Opp.") 30, Dkt. No. 23, and do not dispute that the Commission has never demanded simultaneous renewal applications from a group of stations commonly owned with a broadcast network. This evidence—and the other substantial evidence in the record—is more than sufficient to carry Plaintiffs' burden on all four preliminary-injunction factors.

---

[1] Given that Defendants filed a single brief combining (1) Defendants' opposition to Plaintiffs' motion for temporary restraining order and preliminary injunction and (2) Defendants' motion to dismiss Plaintiffs' complaint under Rule 12(b)(1), Plaintiffs are likewise filing a combined brief that includes (1) Plaintiffs' reply in support of their motion for temporary restraining order and preliminary injunction and (2) Plaintiffs' opposition to Defendants' motion to dismiss. Defendants have filed identical briefs at Dkt. 23 and Dkt. 24; for avoidance of confusion, Plaintiffs' brief responds equally to Defendants' briefs at Dkt. 23 and Dkt. 24.

To avoid this conclusion, Defendants tell this Court that it lacks jurisdiction to consider Plaintiffs' First Amendment retaliation claims and purport to offer a non-retaliatory justification for initiating the early license renewal proceeding. Neither argument has merit.

Defendants' jurisdictional argument rests on a distortion of Plaintiffs' claims. Defendants seek to reframe the lawsuit around the underlying merits of Plaintiffs' license renewal applications which Defendants now say hinge on alleged equal employment opportunity ("EEO") violations and the Commission's separate investigation into the same topic. But Plaintiffs challenge the Commission's unconstitutional exercise of its early license renewal authority to retaliate against them for protected speech—not the underlying merits of their license renewal applications. As the Supreme Court explained in *Axon Enterprise, Inc. v. FTC*, 598 U.S. 175 (2023), when an agency wields its authority unconstitutionally to subject a party to proceedings that never should have occurred in the first place, district courts can—indeed, must—exercise jurisdiction to stop that abuse. An injury that stems from the existence of the proceeding itself cannot be remedied after the fact—a proceeding that has already happened cannot be undone. That is especially true in this case, where the ongoing threat of a formal hearing itself has an unconstitutional chilling effect on Plaintiffs' speech.

Defendants' purported justification for the early license renewal proceeding fares no better. Defendants contend that the Commission instituted this proceeding because it was dissatisfied with the scope of productions that Plaintiffs made in response to the EEO investigation. In Defendants' telling, the Commission launched an unprecedented proceeding and threatened Plaintiffs with the broadcaster equivalent of the death penalty, all because of standard discovery negotiations that occur every day in regulatory and Article III proceedings.

This explanation is not credible. For one, the timing undermines Defendants' story. Defendants did not raise their purported concerns with the scope of Plaintiffs' productions until 17 days *after* ordering early license renewal, even though the supposed deficiency would have been apparent for months. That supposed discovery deficiency thus cannot explain the timing of Defendants' early license renewal order. But Defendants' retaliatory animus can: in fact, the Commission's order came *the day after* the President publicly called for ABC to fire Jimmy Kimmel.

Moreover, the Commission's own order refutes it: the order's justification for the early license renewal process is not limited to the EEO investigation, but also expressly invokes unspecified "public interest obligations more broadly."[2] And the Chairman has made clear that those "broader public interest concerns," PI Opp. 34, relate to the content and viewpoints expressed on Plaintiffs' network programming and broadcasts. As he has explained publicly, "the FCC walked away from enforcing that public interest obligation" over the years, and he does not "think we're better off as a country for it."[3] In the next breath, the Chairman gave the example of late-night hosts (in his view) having gone "from being court jesters that would make fun of everybody in power" to "enforcing a very narrow political ideology." *Id.* The Chairman has separately confirmed that the early license renewal proceeding will reach some of Plaintiffs' specific editorial

---

[2] Exhibit 41 to Wilkinson Decl., Aug. 18, 2026, Dkt. 2-02 ("Wilkinson Ex.") (*The Walt Disney Company, American Broadcasting Company et al.*, Order, DA 26-416, ¶ 2 (MB Apr. 28, 2026), https://perma.cc/NMV3-C3NE), at 2. Note that Wilkinson Exhibits 1 through 56 were filed in support of Plaintiffs' motion for temporary restraining order and preliminary injunction on August 18, 2026. *See* Dkt. 2-3 and 2-4. Wilkinson Exhibits 57 through 66 are being simultaneously filed with this brief.

[3] Wilkinson Ex. 24 (Jasmine Baehr, *FCC Chair Brendan Carr Defends ABC Affiliates Pulling Jimmy Kimmel Show After Monologue About Charlie Kirk*, Fox News (Sept. 17, 2025), https://perma.cc/6A9J-65WZ).

decisions about media coverage.[4] Earlier, the Chairman had issued a direct warning to Plaintiffs that left no room for ambiguity, saying, "[W]e can do this the easy way or the hard way. These companies can find ways to change conduct to take action, frankly, on Kimmel or, you know, there's going to be additional work for the FCC ahead."[5] Contrary to Defendants' assertion, those public statements underscore that the purpose of the Commission's call for early license renewal is not to investigate discrimination; it is to license viewpoints.

In any event, ordering early license renewal is grossly disproportionate to Plaintiffs' supposed discovery violations and departs dramatically from Defendants' typical and longstanding response to alleged noncompliance by investigation targets. And it is not, as Defendants claim, "essential" to the ongoing EEO investigation.[6] Even after the early license renewal order, Defendants have continued to issue the same kinds of investigatory demands issued prior to that order, and Plaintiffs have continued to respond to those demands. Defendants obtain no additional investigatory tool by virtue of initiating the early license renewal proceeding—the Commission has separate authority to seek public comment and to order an evidentiary hearing on their allegations of EEO violations. Instead, the plain purpose of initiating the early license renewal process was to obtain additional leverage over Plaintiffs by hanging the threat of the broadcaster death penalty of license non-renewal or revocation over Plaintiffs' every editorial decision.

---

[4] Wilkinson Ex. 51 (Todd Spangler, *FCC Chair Says ABC's Decision to Not Broadcast Trump Speech Live Will Be Part of Agency's Review of Station Licenses*, Variety (July 22, 2026, 11:24 AM PT), https://perma.cc/6ZF2-G7E3).

[5] Benny Johnson, Kash Patel Testifying LIVE Now on Charlie Kirk Assassin, at 1:31:36–54, 1:31:55–32:05, 1:32:59–1:33:18, 1:35:54–1:36:13 (YouTube, Sept. 17, 2025), https://perma.cc/68CA-XGSP.

[6] Wilkinson Ex. 41, at 2 (citing 47 C.F.R. § 73.3539(c)).

Defendants' motion to dismiss should be denied, and the Court should enjoin the early license renewal proceeding and any further actions by Defendants to coerce or threaten Plaintiffs with sanctions in an effort to alter their exercise of editorial discretion.

## LEGAL STANDARDS

The relevant standard for a preliminary injunction is set out in Plaintiffs' opening brief. *See* Pls.' Mot. for Prelim. Inj. ("PI Mot.") 21, Dkt. No. 2-1. Defendants also move to dismiss under Rule 12(b)(1). Where that motion is concerned, because Defendants challenge the court's jurisdiction based on a purely legal question rather than a factual dispute, the Court must "tak[e] the plaintiffs' allegations as true and draw[] all reasonable inferences in their favor."[7] *Knapp Med. Ctr. v. Hargan*, 875 F.3d 1125, 1128 (D.C. Cir. 2017). This standard "is similar to that of Rule 12(b)(6), under which dismissal is warranted if no plausible inferences can be drawn from the facts alleged that, if proven, would provide grounds for relief." *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 93 (D.C. Cir. 2002). And, while Plaintiffs "bear the burden of establishing jurisdiction," courts "presume the Congress intends that agency action be judicially reviewable." *Knapp Medical Ctr.*, 875 F.3d at 1128.

## ARGUMENT

### I. THIS COURT HAS JURISDICTION TO REVIEW PLAINTIFFS' CLAIMS.

Defendants do not dispute that courts apply a strong presumption in favor of judicial review of agency actions. *See Smith v. Berryhill,* 587 U.S. 471, 483 (2019); *see also Webster v. Doe*, 486 U.S. 592, 603 (1988) ("[W]here Congress intends to preclude judicial review of constitutional

[7] While Defendants dispute "many factual allegations in the Complaint," they do so only with respect to whether Plaintiffs are likely to succeed on the merits for purposes of preliminary injunctive relief. *See* PI Opp. at 22 n.4. With respect to jurisdiction, Defendants' sole argument is that the Communications Act precludes jurisdiction over Plaintiffs' claim as a matter of law.

claims its intent to do so must be clear.”). They nowhere deny the basic point that, when a district court is asked to enjoin unconstitutional government action, “[t]he question . . . is not whether [some statute] confers jurisdiction,” but whether a specific statute “removes the jurisdiction given to the federal courts” under 28 U.S.C. § 1331. *Whitman v. Dep’t of Transp.*, 547 U.S. 512, 514 (2006) (per curiam). And they do not disagree that a party subjected to unlawful agency retaliation suffers a here-and-now irreparable injury the moment that retaliation occurs—an injury that continues for as long as that retaliation persists, and regardless of whether the underlying agency proceeding ultimately resolves in their favor. *Media Matters for Am. v. Paxton*, 138 F.4th 563, 580, 585 (D.C. Cir. 2025). Those uncontested points of law, combined with *Axon Enterprise, Inc. v. FTC*, 598 U.S. 175 (2023), and *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), make clear that this Court has jurisdiction over Plaintiffs’ claims that Defendants forced them into a retaliatory early license renewal proceeding in violation of the First Amendment. *See* PI Mot. 39–43.

Defendants’ arguments against this Court’s jurisdiction address a fundamentally different argument from the one Plaintiffs advance. Contrary to Defendants’ suggestion, *see* PI Opp. 16, Plaintiffs do not seek “to enjoin, set aside, annul, or suspend any order of the Commission” on its merits, 47 U.S.C. § 402(a). Instead, Plaintiffs seek to enjoin the Commission’s unlawful use of the early license renewal proceeding as retaliation for Plaintiffs’ protected speech, and the Commission’s effort to alter Plaintiffs’ editorial judgments by threatening sanctions—claims that turn on Defendants’ motive rather than on Defendants’ application of law to fact. Put differently, Plaintiffs challenge *the constitutionality of the Commission’s actions in the first place*, not whether any ultimate decision by the agency will be consistent with administrative law and governing statutes. Plaintiffs’ claims therefore fall squarely within this Court’s jurisdiction.

### A. *Axon* Makes Clear That This Court Has Jurisdiction

Federal district courts have original jurisdiction to hear "all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. Congress may delay judicial review by channeling certain claims related to agency actions through statutory administrative review schemes. But even where Congress creates such a review scheme, a particular claim may still belong in district court if it is not "of the type" that Congress intended to channel through that scheme. *Axon*, 598 U.S. at 188–89 (quoting *Thunder Basin*, 510 U.S. at 212). "The ultimate question is how best to understand what Congress has done—whether the statutory review scheme, though exclusive where it applies, reaches the claim in question." *Id.* at 186.

In answering that question in *Axon*, the Supreme Court contrasted two kinds of claims. The first (where district courts lack jurisdiction) involves challenges to an agency's "specific substantive decision" or "the commonplace procedures agencies use to make such a decision." 598 U.S. at 189. The second (where district courts retain jurisdiction) includes claims that a party never should have been subjected to agency proceedings in the first place, such as where "an agency is wielding authority unconstitutionally in all or a broad swath of its work." *Id.*

Plaintiffs' claims fall within the second category. Plaintiffs do not in this lawsuit challenge any specific substantive decision by the Commission on the merits of whether the Stations meet the statutory standard for renewal, or any commonplace agency procedures used to make such a decision. Plaintiffs instead challenge the Commission's effort to alter their protected editorial judgments through a campaign of threats and retaliation in violation of the First Amendment. Under *Axon*, that type of claim belongs in district court because it is a "charge that an agency is wielding authority unconstitutionally." 598 U.S. at 189.

The constitutional challenge here is fundamentally the same type of challenge as was raised in *Axon*. In both cases, plaintiffs challenge the agency's authority to subject them to the agency

proceeding in the first place. The only difference is the constitutional source of the asserted limitation on that authority. In *Axon*, the plaintiffs' claim rested on constitutional separation-of-powers principles, whereas here, Plaintiffs' claim rests on the First Amendment. In each case, the claimed injury is not the decision that might result from the administrative process; it is the "here-and-now harm" of being subjected to an exercise of agency authority that the Constitution itself forbids.

Defendants claim that *Axon* applies only where a plaintiff alleges that an agency "is unconstitutionally structured" or that the agency's entire existence is unlawful. PI Opp. 18. But an agency can wield its authority unconstitutionally under *Axon* in ways that are not based on its structure or existence—for instance, by subjecting someone to a proceeding that is illegitimate from the get-go because that person effectively has a "right not to stand trial." 598 U.S. at 192 (citation modified). The right to be free of proceedings initiated to punish protected speech is no different. *See Hartman v. Moore*, 547 U.S. 250, 256 (2006) ("[T]he law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out."). Accordingly, courts, including the D.C. Circuit, have recognized that district court jurisdiction exists to address whether agencies have wielded their authority as part of unlawful retaliatory schemes. *See Endocrine Soc'y v. FTC*, 832 F. Supp. 3d 1, 10–11 (D.D.C. 2026); *Media Matters for Am. v. FTC*, 805 F. Supp. 3d 105, 124 (D.D.C. 2025); *Media Matters for Am. v. FTC*, 2025 WL 2988966, at *4–5 (D.C. Cir. 2025) (per curiam) (denying stay pending appeal).

### B. The *Thunder Basin* Factors Confirm That This Court Has Jurisdiction

Although the "ultimate question" is simply whether the claim falls outside the statutory administrative review scheme, there are "three considerations designed to aid in that inquiry, commonly known now as the *Thunder Basin* factors." *Axon*, 598 U.S. at 186. As *Axon* explained,

courts presume that Congress did not intend to strip jurisdiction where "the answer to all three questions is yes." *Id*. But *Axon* also made clear that not all three factors are required to be satisfied: "the same conclusion might follow if the factors point in different directions." *Id*. Here all three *Thunder Basin* factors reinforce that this Court has jurisdiction.

***Meaningful judicial review.*** The first factor asks: "could precluding district court jurisdiction 'foreclose all meaningful judicial review' of the claim?" *Axon*, 598 U.S. at 186 (quoting *Thunder Basin*, 510 U.S. at 212–13). The answer is plainly yes. As the D.C. Circuit has explained, plaintiffs "suffering from a campaign of retaliation against them in response to their exercise of their First Amendment rights" experience a present, cognizable "irreparable injury." *Paxton*, 138 F.4th at 585. As the target of the Commission's campaign of threats and retaliation, Plaintiffs suffer harm to their First Amendment rights regardless of whether the Commission ever issues a hearing designation order—the Commission is using the threat of a hearing and the potential loss of Plaintiffs' licenses to coerce Plaintiffs to change their editorial practices. As a result, Plaintiffs are forced to weigh editorial decisions against the risk that Defendants will retaliate further if Plaintiffs broadcast content that the Administration dislikes or choose not to broadcast content that the Administration likes. And if the Commission does issue a hearing designation order, Plaintiffs would suffer further harm to their First Amendment rights even if the proceedings ultimately come out in their favor—"the process is the punishment."[8] Judicial review under the Communications Act would accordingly "come too late to be meaningful," destroying Plaintiffs' "right[] not to undergo the complained-of agency proceedings" in the first place. *Axon*, 598 U.S. at 191–92.

---

[8] Wilkinson Ex. 43 (Letter from Anna M. Gomez, Comm'r, FCC, to Josh D'Amaro, CEO, The Walt Disney Company, at 1 (May 11, 2026), https://perma.cc/3VWL-TB6E).

All Defendants can muster in response is that Plaintiffs could seek review of an order "deny[ing] the renewal applications or revok[ing] the licenses" in the D.C. Circuit, and that many administrative review schemes "require parties to wait before appealing." PI Opp. 19–20. Both contentions miss the point. First, as in *Axon*, Plaintiffs here are "being subjected to unconstitutional agency authority," an injury that exists "irrespective of the [proceeding's] outcome." *Axon*, 598 U.S. at 191–192 (citation modified). The ability of a court of appeals to eventually "hear constitutional claims," PI Opp. 21 (citation modified), says nothing about whether that later review is meaningful for the here-and-now injury of chilled speech, which can only be remedied while the proceeding is ongoing.

Second, if Plaintiffs are forced to wait, they may not get their day in court at all. The Commission's early renewal order and associated threats of license nonrenewal have already had and will continue to have chilling effects on Plaintiffs' editorial practices even in the absence of a formal hearing and final appealable order—Defendants may decide they have accomplished their retaliatory ends without those further actions. On the other hand, if Defendants do initiate a formal hearing and issue a ruling, Plaintiffs would be harmed by being forced to endure a hearing improperly instituted for retaliatory reasons. And if Plaintiffs were to somehow prevail during the agency proceedings, there would be nothing to appeal to the D.C. Circuit, despite the injuries Plaintiffs would have suffered along the way. Defendants' ability to harm Plaintiffs while depriving them of a final reviewable order further shows why this Court has jurisdiction—where the unlawful agency action may be unreviewable because the channeling statute requires a "final Commission order or rule," there is no "meaningful judicial review." *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 489–90 (2010) (weighing in favor of district court

jurisdiction the fact that the plaintiff could not appeal, for instance, an investigation that produces no sanction).

***Collateral claim.*** The second factor asks: "is the claim wholly collateral to the statute's review provisions?" *Axon*, 598 U.S. at 186 (citation modified) (quoting *Thunder Basin*, 510 U.S. at 212–13). Again, the answer is yes. Because Plaintiffs' suit challenges the Commission's ability to initiate retaliatory proceedings at all, as opposed to the underlying merits of Plaintiffs' early license renewal applications, the claims here are wholly collateral to the Communications Act's review provisions. The early license renewal proceeding addresses whether the Stations satisfy the statutory criteria for renewing broadcast licenses. *See* 47 U.S.C. § 309(k). Plaintiffs' retaliation claim asks a different question: whether the Commission initiated the early license renewal proceeding to punish Plaintiffs for engaging in protected speech. Put simply, Plaintiffs challenge the Commission's "power to proceed at all, rather than actions taken in the agency proceedings." *Axon*, 598 U.S. at 192.

Defendants counter that "resolving . . . contentions of pretext would require this Court to consider the basis and justification for the Commission's investigation." PI Opp. 20; *see also id.* at 19 (claiming that resolving Plaintiffs' claims would require the Court "to delve deeply into the antidiscrimination investigation that was the impetus for the early license renewal process"). But that argument conflates the "what" (the merits of Plaintiffs' early license renewal applications) with the "why" (whether the Commission's decision to initiate the early license renewal proceeding in the first place was retaliatory). This Court can resolve that latter question without ever adjudicating whether Plaintiffs would satisfy the statutory criteria for license renewal in a constitutional and properly constituted early license renewal proceeding.

The fact that those two distinct inquiries may involve some overlapping evidence does not change that Plaintiffs' claims in this case are collateral to the Communications Act review framework.[9] True, evidence that Plaintiffs unquestionably meet the statutory criteria is powerful corroboration that Defendants' effort to strip Plaintiffs of their licenses is wholly pretextual. But that does not negate the collateral nature of Plaintiffs' First Amendment claims. The early license renewal proceeding is "merely the tool giving effect to the [FCC's] alleged retaliation." *Endocrine Soc'y*, 832 F. Supp. 3d at 11–12. Plaintiffs do not, for example, seek "a narrowing" of the early license renewal proceeding "for want of relevance or lack of clarity of its terms." *Id.* at 12. Plaintiffs instead "protest the 'here-and-now' injury of subjection to an unconstitutional process." *Axon*, 598 U.S. at 192. That is precisely the sort of injury that "can be remedied by a court without regard to the eventual outcome of agency proceedings." *Id.* at 210 (Gorsuch, J., concurring in the judgment) (citation modified).

Defendants' position requires this Court to accept that there is no remedy for the here-and-now injury imposed by an agency that initiates a proceeding for a retaliatory purpose until the conclusion of that proceeding, merely because every retaliation claim requires weighing the agency's proffered rationale for its action against evidence of animus.

***Agency expertise.*** The third factor asks: "is the claim 'outside the agency's expertise'?" *Axon*, 598 U.S. at 186 (quoting *Thunder Basin*, 510 U.S. at 212–13). Yet again, the answer is yes. The Commission "has no expertise in adjudicating First Amendment retaliation claims that parties bring against the Commission itself." *Endocrine Soc'y*, 832 F. Supp. 3d at 12 (citation modified). As discussed in detail below, the First Amendment retaliation analysis examines whether Plaintiffs

[9] Nor is there any guarantee that the evidence would overlap. If the Commission does not ultimately end up issuing a hearing designation order, there will be no opportunity for Plaintiffs to present their evidence of First Amendment retaliation at all.

engaged in conduct protected under the First Amendment; whether Defendants took some retaliatory action sufficient to deter a person of ordinary firmness in Plaintiffs' position from speaking again; and whether there is a causal link between Plaintiffs' exercise of their constitutional rights and the adverse action taken against Plaintiffs. That inquiry is routinely resolved by courts, not the FCC. An agency cannot point to its institutional expertise to block judicial review of whether its *own* investigatory and enforcement decisions were unconstitutionally retaliatory. *See Loving v. IRS*, 742 F.3d 1013, 1022 (D.C. Cir. 2014) ("[T]he fox-in-the-henhouse syndrome is to be avoided by taking seriously, and applying rigorously, in all cases, statutory limits on agencies' authority." (citation modified)).

In response, Defendants again improperly conflate the nature of Plaintiffs' retaliation claims with the underlying substance of the early license renewal proceeding. They argue that Plaintiffs' claims "are bound up with the validity of the Commission's basis for investigating questions of unlawful discrimination and other possible public interest violations." PI Opp. 20–21. But Plaintiffs do not ask this Court to determine whether there was any violation of FCC rules. Instead, Plaintiffs contend that the Commission initiated the early renewal proceeding to retaliate against Plaintiffs in violation of the First Amendment. And Defendants have no legitimate expertise on that issue.

* * *

Applying the *Thunder Basin* factors, courts within this District have exercised jurisdiction to enjoin First Amendment retaliatory action, notwithstanding the possibility of subsequent judicial review of any final agency action. *See Endocrine Soc'y*, 832 F. Supp. 3d at 10–11; *Media Matters*, 805 F. Supp. 3d at 124; *Media Matters*, 2025 WL 2988966, at *4–5. Defendants minimize these decisions as "nonbinding," PI Opp. 21, but the latter is a reasoned decision by the D.C.

Circuit. Although unpublished, its thoughtful discussion of district court jurisdiction over agency retaliation claims is a "proper legal authority" that may be cited for its persuasive value "'because the panel issuing such a disposition must unanimously agree that it does not alter, modify, or significantly clarify a rule of law.'" *Aramnahad v. Rubio*, 2025 WL 973483, at *7 (D.D.C. 2025) (quoting *In re Grant*, 635 F.3d 1227, 1232 (D.C. Cir. 2011)). And *Endocrine Society*, 832 F. Supp. 3d at 9–12, thoroughly marches through the *Thunder Basin* factors before arriving at the same conclusion as the D.C. Circuit in *Media Matters*: a First Amendment retaliation claim is precisely the kind of claim that cannot be meaningfully reviewed after the fact, is collateral to the merits of the proceeding in question, and does not implicate agency expertise.

Defendants' effort to distinguish those cases because they involved the Federal Trade Commission also fails. Defendants assert that under the structure of the FTC Act, the plaintiffs in *Media Matters* and *Endocrine Society* had no guaranteed avenue to final judicial review, since review depended on the FTC electing to sue to enforce its civil investigative demands. PI Opp. 21–22. And if the FTC did sue, the plaintiffs could have sought review in district court. *Id.*

Those purported distinctions do not matter. For one, there is no guarantee of eventual judicial review here either. The Commission alone controls whether—and when—it will issue a final renewal order. The Commission may wish to drag out the process as leverage, hanging the threat of non-renewal or revocation over Plaintiffs' head and chilling Plaintiffs' speech and editorial discretion as a result. Allowing the agency "that is causing concrete and ongoing First Amendment injury to dictate when, if ever, judicial review can commence could deprive parties of all meaningful judicial review of constitutional claims." *Media Matters*, 2025 WL 2988966, at *5; *see also Free Enter. Fund*, 561 U.S. at 490.

More fundamentally, the possibility of judicial review *someday* cannot be sufficient to strip a district court of jurisdiction over a claim of here-and-now injury. *See Axon*, 598 U.S. at 190–91 (recognizing federal-question jurisdiction even though the parties "c[ould] (eventually) obtain review of their constitutional claims through an appeal from an adverse action to a court of appeals"). And that point applies irrespective of the forum in which after-the-fact review is lodged. While *Media Matters* and *Endocrine Society* discussed differences between the review scheme applicable to FTC civil investigative demands and the review schemes at issue in *Axon* and *Thunder Basin*, both cases ultimately held that injury caused by an agency's retaliatory action cannot be remedied by after-the-fact review. The critical question is not, therefore, whether eventual review falls to a district court versus a court of appeals. Instead, it is whether denying Plaintiffs a judicial forum at this time would perpetuate a here-and-now harm that cannot be remedied later.

As in *Axon, Media Matters*, and *Endocrine Society*, Plaintiffs' claims "sail[] through the three considerations relevant to assessing whether Congress has intended to remove district courts' jurisdiction over a particular claim." *Endocrine Soc'y*, 832 F. Supp. 3d at 11 (citation modified). Congress's choice to channel review of licensing orders to the courts of appeals does not strip district courts of jurisdiction over a claim that an agency is invoking that authority unlawfully for retaliatory ends.

### C. *TRAC* Does Not Foreclose This Court's Jurisdiction

Unable to distinguish *Axon* and *Thunder Basin*, Defendants cling to a decades-old and inapposite D.C. Circuit decision that long predates both *Axon* and *Thunder Basin*. *See Telecomms. Rsch. and Action Ctr. v. FCC*, 750 F.2d 70 (D.C. Cir. 1984) (*TRAC*). In *TRAC*, the D.C. Circuit held that "where a statute commits final agency action to review by the Court of Appeals, the appellate court has exclusive jurisdiction to hear suits seeking relief that might affect its future

statutory power of review." 750 F.2d at 72. But this protective jurisdiction under *TRAC* is "narrow." *In re Nat. Res. Def. Council*, 645 F.3d 400, 405 (D.C. Cir. 2011). It only "cuts off original jurisdiction in other courts in all cases *covered by that statute*." *TRAC*, 750 F.2d at 77 (emphasis added). Even before *Axon*, courts recognized that *TRAC*'s limitation does not apply to claims outside the purview of any channeling provisions in the statute. *See, e.g.*, *Cutler v. Hayes*, 818 F.2d 879, 888 n.61 (D.C. Cir. 1987) ("[B]ecause in this case no statute commits direct review of FDA new drug regulations to this court, *TRAC* does not apply, and the District Court properly exercised jurisdiction."). Nor does it apply "where a denial of review in the District Court will truly foreclose all judicial review." *TRAC*, 750 F.2d at 78.

*TRAC* has no bearing on this case. Contrary to Defendants' claims, PI Opp. 14, Plaintiffs do not seek "'pre-enforcement' review of FCC orders." Plaintiffs instead request an injunction preventing the ongoing, irreparable harm caused by the Commission using its licensing authority as an instrument to punish Plaintiffs for exercising their First Amendment rights. Compare that with the claim in *TRAC*, which sought an order compelling the FCC to act on pending applications before the agency after assessing the substance of matters squarely within the agency's purview and the future court of appeals' review authority. 750 F.2d at 72, 74. Unlike the claim at issue in *TRAC*, Plaintiffs' retaliation claims do not require this Court to delve into the merits of a pending proceeding to evaluate, for instance, nuances of telecommunications policy. *See also Free Enter. Fund*, 561 U.S. at 491 (authorizing immediate district court review where questions raised did "not require technical considerations of agency policy" (citation modified)). And unless Plaintiffs' claims are reviewed by this Court now, Plaintiffs will be forced to endure continued First Amendment harm with no possible remedy after the fact. For retaliation claims, justice delayed is justice denied.

Defendants' efforts to resist this conclusion wither under scrutiny. They note that the expense and duration of agency proceedings do not always justify immediate review in district court, PI Opp. 15, 17, but the Supreme Court has explained that review in district court depends on "the nature of the claims and accompanying harms" plaintiffs assert. *Axon*, 598 U.S. at 192. Because Plaintiffs are suffering a "here-and-now" injury of being subjected to an exercise of agency authority that the Constitution forbids and experiencing ongoing chilling effects as a result of retaliation in violation of the First Amendment, *id.*, the Communications Act's channeling provisions do not apply. Defendants also contend that Plaintiffs should not be allowed to "develop their case instead of exhausting their administrative remedies before the agency," PI Opp. 16 (citation modified), but agency proceedings would address the separate issue of whether Plaintiffs satisfy the statutory requirements for license renewal. They further claim that recognizing jurisdiction in this case could encourage duplicative and potentially conflicting review, *id.*, but that is clearly wrong because an injunction halting the early license renewal proceeding would eliminate that possibility. And their nod to the potential availability of an extraordinary writ based on unreasonable delay, PI Opp. 17, 19, 22, misses the mark because those types of relief address only the pace of agency action rather than whether the Commission's action was retaliatory in motive from the outset. A writ at some later point cannot remedy the ongoing chill to protected speech Plaintiffs suffer now.

Defendants fare no better by claiming that *TRAC* has been construed to deny jurisdiction over some constitutional claims. PI Opp. 17. None of those cases involved retaliation in violation of the First Amendment, where courts have made clear, time and again, that a plaintiff suffers irreparable harm the minute that retaliation occurs. *See, e.g.*, *Paxton*, 138 F.4th at 585; *see also Hartman*, 547 U.S. at 256 ("[T]he law is settled that as a general matter the First Amendment

prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out"); *Mahmoud v. Taylor*, 606 U.S. 522, 569 (2025) ("[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." (citation modified)). Nor do those cases involve claims that attack the "entire course of the FCC proceedings" as void from the outset. *See SGCI Holdings III LLC v. FCC*, 2025 WL 2400880, at *13–14 (D.D.C. 2025) (finding that *TRAC* did not preclude district court jurisdiction of a claim that the challenged FCC action was part of a racist conspiracy), *aff'd*, 2026 WL 2482614 (D.C. Cir. 2026). And while Defendants cite *Time Warner Entertainment Co. v. FCC*, 93 F.3d 957 (D.C. Cir. 1996) (per curiam), that decision only reinforces that jurisdiction is proper here. There, the court held that *TRAC* did *not* deprive the district court of jurisdiction to consider facial constitutional challenges to various statutory provisions. *Id.* at 965. In doing so, the court ruled that the district court had jurisdiction in part because "the case [was] entirely independent of any agency proceedings, whether actual or prospective." *Id.* So too here. And although the court observed that claims challenging "the manner in which the agency has exercised or . . . failed to exercise" its statutory authority may not trigger district courts' federal-question jurisdiction, *id.*, such dicta, offered decades before *Axon*, cannot overcome *Axon*'s clear holding and logic—especially as to First Amendment violations, which the D.C. Circuit has made clear beyond doubt impose immediate, irreparable injuries.[10]

[10] Other cases relied on by Defendants either predate *Axon* or do not involve First Amendment injury. *See Bold Alliance v. FERC*, 2018 WL 4681004, at *5 (D.D.C. 2018) (pre-*Axon* case following *Time Warner*'s dicta without addressing whether the alleged violations impose a here-and-now injury irremediable on later judicial review after the administrative process has run its course); *Bland v. Blanche*, 2026 WL 1998552, at *4-5 (D.D.C. 2026) (meaningful judicial review would not have been denied because the plaintiffs could have sought review of their non-First Amendment claims in the D.C. Circuit).

## II. PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR FIRST AMENDMENT RETALIATION CLAIM

Defendants' merits arguments are also unpersuasive. Defendants barely contest the first two elements of Plaintiffs' First Amendment retaliation claim. As for the third—causation—Defendants fail to undermine Plaintiffs' substantial evidence of retaliatory animus and instead offer an explanation for the early license renewal order that strains credulity. Accordingly, Plaintiffs' First Amendment retaliation claim is likely to succeed on the merits. And that conclusion all but guarantees Plaintiffs' entitlement to a preliminary injunction. *See Paxton*, 138 F.4th at 584 ("In First Amendment cases, the likelihood of success will often be the determinative factor." (citation modified)).

### A. Plaintiffs' Editorial Decisions Are Protected By The First Amendment

Defendants do not meaningfully contest the first element of Plaintiffs' retaliation claim, which asks whether Plaintiffs "engaged in conduct protected under the First Amendment." *Id.* Defendants concede that "broadcasters make editorial decisions that may receive First Amendment protection." PI Opp. 22. And although Defendants note that "*aspects* of broadcaster speech have long been subject to regulation," *id.* (emphasis added),[11] nowhere do they contend that the government may retaliate against broadcasters for their political speech.

[11] While a dubious line of Supreme Court precedent holds that the government has more power to regulate the speech of broadcasters than the speech of ordinary citizens, *see Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 386 (1969); *but see FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 530 (2009) (Thomas, J., concurring) ("*Red Lion* [was] unconvincing when [it] was issued, and the passage of time has only increased doubt regarding [its] continued validity."), even those precedents do not remove all First Amendment limitations on government interference with broadcaster editorial discretion. Nor do those precedents allow the government to retaliate against broadcasters for disfavored editorial decisions and media coverage. *See also, e.g.*, *Nat'l Broad. Co. v. FCC*, 516 F.2d 1101, 1119 (D.C. Cir. 1974) ("[A]ny approach whereby a government would undertake to govern 'day-to-day editorial decisions of broadcast licensees' endangers the loss of journalistic discretion and First Amendment values." (quoting *Columbia Broad. Sys., Inc. v. Dem.*

Instead, Defendants again seek to rewrite Plaintiffs' complaint, contending that Plaintiffs' *employment* conduct is not protected speech. PI Opp. 22. But Plaintiffs are claiming unconstitutional retaliation based on the editorial decisions and viewpoints expressed on their programs—not based on any employment decisions they made. *See* PI Mot. 23–24 (tying Defendants' early license renewal order to, among other things, ABC News's decision to incorporate fact checking in the 2024 presidential debate, *The View*'s decision to host a Democratic political candidate, Jimmy Kimmel's on-air comments about political figures, and ABC News's decision not to broadcast the President's July 16th address). These editorial decisions regarding matters of political import occupy "the highest rung of the hierarchy of First Amendment values." *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (citation modified). Accordingly, Plaintiffs are likely to succeed in showing that they have engaged in conduct protected by the First Amendment.

**B. Defendants' Retaliatory Campaign Would Have A Chilling Effect On A Person Of Ordinary Firmness**

Nor do Defendants' two attempts to defeat the second element—whether Defendants "took some retaliatory action sufficient to deter a person of ordinary firmness in [Plaintiffs'] position from speaking again," *Paxton*, 138 F.4th at 584 (citation modified)—withstand scrutiny.

Defendants first make the remarkable claim that Plaintiffs are too wealthy to be harmed by retaliation. PI Opp. at 23. But Defendants cite no authority for the proposition that the extent of First Amendment protection hinges on the wealth of the speaker. And the government made the same argument in *Endocrine Society*. *See* Defs.' Opp. to Pl.'s Mot. for Prelim. Inj. at 35, *Endocrine Soc'y v. FTC*, 832 F. Supp. 3d 1 (D.D.C. 2026) (No. 26-cv-00512), Dkt. No. 30 ("Endocrine Society's claim of chill is implausible, given the organization's size and substantial

---

*Nat. Comm.*, 412 U.S. 94, 120 (1973))). In any event, Plaintiffs maintain that the *Red Lion* line of cases was incorrectly decided and reserve the right to so argue on appeal.

resources."). Yet the court there nevertheless concluded that the plaintiff was likely to prevail on the second element of its claim and preliminarily enjoined the government's retaliatory investigative demand. *Endocrine Soc'y*, 832 F. Supp. 3d at 4, 15.

That is unsurprising, because the caselaw makes clear that the chilling effect of a threat corresponds not to the plaintiff's wealth, but instead to that threat's gravity. *See Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 191 (2024) ("[T]he greater and more direct the government official's authority, the less likely a person will feel free to disregard a directive from the official."). Here, the Commission threatens the loss of Plaintiffs' ability to broadcast—a corporate death penalty for the eight Stations. No broadcaster—well-resourced or not—would ignore such an existential threat. And the Chairman has expressly stated that the Commission will target the largest media companies for their speech that the Administration does not like.[12]

Defendants' second contention, that the Chairman's "public statements" somehow do not qualify as adverse actions, PI Opp. at 23, is similarly meritless. Although the Chairman is free to express publicly that he dislikes Jimmy Kimmel or thinks that no one should watch *The View*, he cannot threaten retaliatory enforcement against speech he dislikes. Such threats indisputably qualify as adverse action. *See Vullo*, 602 U.S. at 187 (recognizing that a government official violates the First Amendment when she "threaten[s] enforcement actions . . . in order to punish or suppress [speech]"); *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963) (holding that "informal censorship" by way of "the threat of invoking legal sanctions" may "sufficiently inhibit

---

[12] *See, e.g.*, Wilkinson Ex. 58 (Brendan Carr (@BrendanCarrFCC), X (Mar. 25, 2026, 7:58PM), https://perma.cc/W6EU-PAT3) (referencing "billionaires in media who have no interest in the FCC holding them accountable to their statutory public interest obligations" and claiming "they want free rein to distort the news, broadcast hoaxes, and serve their own narrow interests and in doing so force their radical worldview on Americans without any regard to their broadcast license obligations").

[protected conduct] to warrant injunctive relief"). The Chairman's threats of enforcement action[13] are thus adverse actions.

### C. Defendants Ordered Early License Renewal To Punish Plaintiffs For Their Protected Speech

Defendants focus most of their fire on the final element of Plaintiffs' retaliation claim: causation. The parties agree that the ultimate causation question is whether "the adverse action against the plaintiff would not have been taken absent the retaliatory motive." PI Opp. 22 (quoting *Nieves v. Bartlett*, 587 U.S. 391, 399 (2019)). But contrary to Defendants' implication, this showing is not "plaintiff[s'] to prove." PI Opp. 22. Instead, "upon a prima facie showing of retaliatory harm, the burden shifts to the defendant to demonstrate that even without the impetus to retaliate he would have taken the action complained of." *Hartman*, 547 U.S. at 260.

Defendants nowhere contend that Plaintiffs have failed to make this prima facie showing. As a result, Defendants bear the burden of persuading the Court that the required causal nexus is lacking. Defendants have not met this burden. They fail to undermine the evidence of retaliatory motive that Plaintiffs present, and their alternative explanation for the early license renewal order is not credible. Accordingly, Plaintiffs are likely to succeed in proving that the early license renewal order was motivated by the government's retaliatory animus.

#### *1. Defendants' Own Statements Demonstrate Retaliatory Motive*

In most First Amendment retaliation cases, plaintiffs must make an inferential case of retaliatory motive, as it is rare for government officials to explicitly connect their actions to their

[13] *See, e.g.*, Wilkinson Ex. 37 (Brendan Carr (@BrendanCarrFCC), X (Mar. 14, 2026, 12:24 PM ET), https://perma.cc/VFL3-QNA9) ("Broadcasters that are running hoaxes and news distortions - also known as the fake news - have a chance now to correct course before their license renewals come up.").

disdain for plaintiffs' speech. This, however, is not such a case.[14] The President has repeatedly and expressly called for the Commission to revoke Plaintiffs' licenses because of his displeasure with the content of Plaintiffs' coverage:

- "I keep saying if they're reporting fake news, ***how come they can keep getting a license***? Whether it's ABC, whether it's NBC, CBS, or of course CNN . . . ."[15]

- "ABC took a big hit last night. I mean, to be honest, they're a news organization. They have to be licensed to do it. ***They ought to take away their license*** for the way they did that."[16]

- "If she did give the questions to Kamala, ***ABC's license should be TERMINATED***."[17]

- "I think CBS should lose its license, but ***I think ABC should lose its license*** also because of what they've done."[18]

- "ABC & NBC FAKE NEWS, two of the worst and most biased networks in history, give me 97% BAD STORIES. IF THAT IS THE CASE, THEY ARE SIMPLY AN ARM OF THE DEMOCRAT PARTY AND SHOULD, ***ACCORDING TO MANY, HAVE THEIR LICENSES REVOKED BY THE FCC***. I would be totally in favor of that because they are so biased and untruthful, an actual threat to our Democracy!!! MAGA"[19]

- "Why is it that ABC and NBC FAKE NEWS, two of the absolute worst and most biased networks anywhere in the World, aren't paying Millions of Dollars a year in LICENSE

---

[14] *See* Wilkinson Ex. 59 (Press Release from Commissioner Anna Gomez, FCC's Egregious Assault on the First Amendment Will Fail, at 2 (April 28, 2026), https://perma.cc/D9PN-E2US (noting in response to the Commission's early license renewal order that "the broader pattern of political threats against broadcasters is part of the public record" and "the motivation here is clear").

[15] Wilkinson Ex. 2 (*Donald Trump Campaign Rally Speech Bemidji, Minnesota*, Rev (Sept. 18, 2020), https://perma.cc/QX2E-L5K4) (emphasis added).

[16] Wilkinson Ex. 6 (*Interview: Donald Trump Calls Into Fox And Friends For An Interview After The Debate*, Roll Call Factbase (last visited Aug. 16, 2026), https://perma.cc/GEL9-ZGAU) (emphasis added).

[17] Wilkinson Ex. 10 (Donald J. Trump (@realDonaldTrump), Truth Social (Sept. 12, 2024, at 7:40 PM ET), https://perma.cc/M7Q6-8C2E) (emphasis added).

[18] Wilkinson Ex. 15 (Donald J. Trump, *Donald Trump Holds a Campaign Rally in Henderson, Nevada*, Roll Call Factbase (Oct. 31, 2024), https://perma.cc/F3JC-2M2H) (emphasis added).

[19] Wilkinson Ex. 22 (Donald J. Trump (@realDonaldTrump), Truth Social (Aug. 24, 2025, at 9:59 PM ET), https://perma.cc/4DMG-KKG8) (emphasis added).

FEES. ***They should lose their Licenses*** for their unfair coverage of Republicans and/or Conservatives . . . ."[20]

- "This is just one of the many reasons that ***the Federal Communications Commission should look into the license*** of NBC, which shows almost exclusively positive Democrat content. Likewise, ABC Fake News—About the same thing, 97% negative to Republicans!"[21]

- "***I think the license should be taken away from ABC*** because your news is so fake, and it's so wrong, and we have a great Commissioner, a Chairman, who should look at that."[22]

- "If Network NEWSCASTS, and their Late Night Shows, are almost 100% Negative to President Donald J. Trump, MAGA, and the Republican Party, ***shouldn't their very valuable Broadcast licenses be terminated***? I say, YES!"[23]

- "In a rare move, NBC and ABC fake news have both said that they would not cover this speech. They knew what it was about. Because of the fact that they don't like the topic . . . Fraud like this should mean ***a revocation of their licenses***."[24]

Defendants do not address the President's repeated threats,[25] burying in a footnote the argument that the President may use "the office's 'bully pulpit' to persuade Americans." PI Opp.

[20] Wilkinson Ex. 23 (Donald J. Trump (@realDonaldTrump), Truth Social (Aug. 24, 2025, at 10:58 PM ET), https://perma.cc/C48H-XQEP) (emphasis added).

[21] Wilkinson Ex. 27 (Donald J. Trump (@realDonaldTrump), Truth Social (Oct. 5, 2025, at 7:19 PM ET), https://perma.cc/J7SP-32CY) (emphasis added).

[22] Wilkinson Ex. 29 (Transcript, *President Trump Holds a Bilat with Mohammed bin Salman of Saudi Arabia*, Senate Democratic Caucus (Nov. 18, 2025), https://perma.cc/2CTN-A58E) (emphasis added).

[23] Wilkinson Ex. 34 (Donald J. Trump (@realDonaldTrump), Truth Social (Dec. 24, 2025, at 12:36 AM ET), https://perma.cc/6MJX-Y4R8) (emphasis added).

[24] Wilkinson Ex. 51 (emphasis added).

[25] The President's threatening rhetoric against ABC and the press more broadly has continued after the filing of this lawsuit. *See* Wilkinson Ex. 65 (Malcolm Ferguson, *Trump Lunges at Female Reporter Asking About Those Supposed $5K Checks*, New Republic (Sept. 11, 2026 at 9:00 AM ET), https://perma.cc/53BY-JFHL) (interrupting ABC reporter Rachel Scott's question about stimulus checks with the following: "[N]ot you. Your network . . . you're the worst"); Wilkinson Ex. 62 (Donald J. Trump (@realDonaldTrump), Truth Social (Aug. 30, 2026, at 9:00 AM ET), https://perma.cc/H2CP-GMVX) (stating that NBC's *Meet the Press* anchor will be "reported to the FCC for rebuke or punishment" based on the content of her reporting). And Defendants have responded in their usual fashion by threatening further regulatory action against the disfavored media. Wilkinson Ex. 63 (Madison Colombo, *FCC boss signals major crackdown on TV networks*

at 36 n.7 (citation modified). But on their face, the statements in question are not simply efforts by the President to "persuade Americans." To the contrary, they are instructions to *Defendants*—government actors within the Executive Branch—to take an affirmative action (rescind Plaintiffs' licenses) for a retaliatory purpose (because the President does not like the content of Plaintiffs' coverage). Courts routinely rely on similar presidential statements as evidence of animus in First Amendment retaliation cases. *See, e.g.*, *Perkins Coie LLP v. DOJ*, 783 F. Supp. 3d 105, 167 (D.D.C. 2025) (finding that "President Trump's statements over nearly the past decade" confirm "the Trump Administration's animus toward plaintiff"); *Nat'l Pub. Radio, Inc. v. Trump*, 827 F. Supp. 3d 48, 65 (D.D.C. 2026) (noting, in the course of enjoining an executive order defunding NPR, that "[t]hroughout 2024 and 2025, President Trump repeatedly announced his desire to defund NPR and PBS based on his disapproval of their speech"); *N.Y. Times Co. v. Dep't of Def.*, 2026 WL 1872765, at *10 (D.D.C. June 30, 2026) (weighing in favor of a finding of retaliatory animus the following statement by the President: "I actually think it's sort of treasonous what you write. But you at the New York Times and CNN, I would say are the worst"). And courts likewise examine presidential statements to determine whether the President corrupted agency processes. *See Taylor v. Trump*, 823 F. Supp. 3d 17, 33–39 (D.D.C. 2026) (relying on statements by the President and then-Attorney General as evidence that agency officials following those statements violated plaintiffs' due-process rights by unlawfully predetermining where plaintiff prisoners would be transferred); *Mayor & City Council of Baltimore v. Trump*, 416 F. Supp. 3d 452, 512–15 (D. Md. 2019) (relying on statements by the President as evidence of animus). This court should do the same here.

---

*pushing 'fake polls' ahead of the midterms*, Fox News (Sept. 7, 2026, at 1:48 PM EDT), https://perma.cc/WA4D-G5EK) (forecasting an FCC crackdown on the topic—polling numbers—covered on the relevant *Meet the Press* episode).

The Chairman has similarly and repeatedly made clear through his words and actions that he is carrying out the President's specific directives aimed at curbing speech critical of the Administration. When the President expressed frustration in a social media post about news coverage of the Iran conflict, the Chairman warned that stations airing "fake news" had "a chance now to correct course before their license renewals come up," explaining that "they will lose their licenses if they do not." *See* PI Mot. at 27 & n.60.[26] When the President publicly called on ABC to fire Jimmy Kimmel, the Commission ordered all eight ABC Owned Stations to apply for early license renewal the very next day. *See* PI Mot. at 15–16. And when the President again called for the revocation of ABC's licenses, this time based on its decision not to broadcast his July 16 address, the Chairman one week later promised that the Commission would consider ABC's decision during the early license renewal proceeding. *See* PI Mot. at 18. The Chairman's implementation of the President's retaliatory animus makes sense—if the President were to deem the Chairman insufficiently responsive to his directives, the President could fire the Chairman at will. *Trump v. Slaughter*, 146 S. Ct. 2283, 2297 (2026); *see also id.* at 2316 (Gorsuch, J., concurring) ("[T]he fourth branch's powers still exist; they have just been reassigned to the President.").

The Chairman has also made clear that under his leadership, the Commission considers the viewpoints expressed on a broadcaster's programs in the course of its regulatory and enforcement actions[27]:

---

[26] *See also* Wilkinson Ex. 63 (documenting the Chairman's announcement, in the wake of the President's Truth Social complaint regarding NBC's coverage of the midterm elections, of a Commission crackdown on "fake" polls).

[27] As with presidential statements, courts have considered statements by agency heads as evidence of animus in retaliation cases. *See, e.g.*, *Endocrine Soc'y*, 832 F. Supp. 3d at 6 (considering retaliatory statements made by then-FTC Commissioner Andrew Ferguson while seeking nomination for Chairman).

- "These companies can find ways to change conduct to ***take action, frankly, on Kimmel***, or, you know, there's going to be additional work for the FCC ahead."[28]

- "The Communications Act requires broadcasters to operate in the public interest—not a ***narrow, partisan one***."[29]

- "If you're ***fake news***, you're not going to qualify as the bona fide news exception."[30]

- "Broadcasters that are running hoaxes and news distortions - ***also known as the fake news*** - have a chance now to correct course before their license renewals come up. The law is clear. ***Broadcasters must operate in the public interest, and they will lose their licenses if they do not.***"[31]

- "Hollywood and New York have enjoyed nearly unchecked power over broadcast TV for years. A little bit of balance is a good thing—Newsom's fake news notwithstanding. In fact, broadcasters made a deal with the American people. Broadcasters get free access to a public resource (airwaves) and, in exchange, ***they must operate in the public interest—not a narrow, partisan one***."[32]

These statements by both the President and the Chairman—and the associated actions by the Commission—are more than sufficient to show Defendants' retaliatory animus.

***2. The Timing of the Early License Renewal Order Confirms Retaliatory Motive***

Defendants similarly distort the early license renewal chronology in their attempt to dispel retaliatory motive. They claim that there can be no retaliatory motive because the Chairman announced the Commission's EEO investigation "long before making any of the statements about *The View*, Jimmy Kimmel, or President Trump's July 2026 public address." PI Opp. 25. But

[28] Benny Johnson, *Kash Patel Testifying LIVE Now on Charlie Kirk Assassin*, at 1:31:36–54, 1:31:55–32:05, 1:32:59–1:33:18, 1:35:54–1:36:13 (YouTube, Sept. 17, 2025), https://perma.cc/68CA-XGSP (emphasis added).

[29] Wilkinson Ex. 55 (Brendan Carr (@BrendanCarrFCC), X (Aug. 3, 2026, at 2:53 PM ET), https://perma.cc/A3VD-E5MQ) (emphasis added).

[30] Wilkinson Ex. 36 (John Hendel, *Talk Radio Isn't a Target of FCC's 'Equal Time' Notice, Brendan Carr Says*, Politico (Jan. 29, 2026, 6:02 PM EST), https://perma.cc/UU87-5L9N) (emphasis added).

[31] Wilkinson Ex. 37 (emphasis added).

[32] Wilkinson Ex. 61 (Brendan Carr (@BrendanCarrFCC), X (Aug. 6, 2026, at 8:27 PM ET), https://perma.cc/S2RU-LXFZ) (emphasis added).

Defendants ignore that the President had demonstrated retaliatory animus toward Plaintiffs—and called for Plaintiffs' licenses to be revoked—numerous times *before* the Chairman announced the EEO investigation on March 27, 2025.[33] Indeed, no fewer than five of the President's calls for license revocation quoted above, *see supra* pgs. 23–25, predate the EEO investigation. And the Chairman had likewise signaled both his distaste for Plaintiffs' media coverage and his willingness to pursue license revocation against broadcasters for editorial decisions he deems unfavorable to the President well before opening the EEO investigation.[34] Alleged deficiencies in Plaintiffs' production during the EEO investigation cannot explain any of these threats.

Defendants' related assertion that the Chairman "discussed the possibility of reinvigorating [early renewal]" in March 2026—i.e., "many weeks before President Trump's comments on April 27, 2026, that Plaintiffs say was the impetus for the early renewal order," PI Opp. at 30—actually undercuts their arguments. Again, the President's April 27 statement is not the only time he has demonstrated retaliatory animus against Plaintiffs and other members of the news media whose speech he disfavors. Defendants ignore that on Saturday, March 14, 2026—just three days before the reporting on which they rely—the President complained online about the "Fake News Media['s]" coverage of the Iran war, with the Chairman adding that "[b]roadcasters that are running hoaxes and news distortions—also known as the fake news—have a chance now to correct

---

[33] That timeline may suggest that the EEO investigation is itself unlawful retaliation for Plaintiffs' speech, though the Court need not decide that question to conclude that the early license renewal process is retaliatory.

[34] *See* Letter from Brendan Carr, Comm'r, FCC, to Robert A. Iger, CEO, Walt Disney Co. (Dec. 21, 2024), https://perma.cc/XN49-6MU4 ("ABC's own conduct has certainly contributed to th[e] erosion in public trust [in media]. For instance, ABC News recently agreed to pay $15 million to President Trump's future presidential foundation and museum and an additional $1 million in attorney fees to settle a defamation case."); Wilkinson Ex. 16 (David Folkenflik, *Trump taps FCC's Brendan Carr to lead the agency*, NPR (Nov. 17, 2024), https://perma.cc/6WEU-K9HV) (threatening, after Kamala Harris appeared on SNL, that "[w]e need to keep every single remedy on the table," including "license revocation").

course before their license renewals come up."[35] At the time of those remarks, the Chairman was visiting with the President at Mar-a-Lago.[36] And the following Monday, Reuters reported that the Chairman told them the Commission was considering early license renewal orders against ABC, NBC, PBS, and NPR. PI Opp. Ex. 10, at 3. Far from being exculpatory, the Chairman's March statement is further evidence that he is following the President's retaliatory directives and using early license renewals to punish broadcasters for disfavored speech.

***3. The Government's Alternative Explanation For Early License Renewal Is Pretextual***

Needing an alternative explanation to justify the extraordinary call for early license renewal, Defendants rest their entire argument on a garden-variety discovery dispute. According to Defendants, the Commission has instituted what even Defendants acknowledge is an unprecedented procedure because the Commission was dissatisfied with Plaintiffs' production of materials in response to the EEO investigation. *See* PI Opp. 1, 3, 10, 26, 34–35. But it is not enough for Defendants merely to identify some alternative explanation—they must show by "a preponderance of the evidence" that they would have initiated the early license renewal proceeding absent Plaintiffs' protected speech. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). And Defendants fail to make that showing.

The Commission initiated the EEO investigation on March 27, 2025, and issued its first letter of inquiry ("LOI") several weeks later in June 2025. *See* Lieberman Decl. ¶¶ 14–15, Aug. 18, 2026, Dkt 2-5. Over approximately the next year, the agency issued roughly 400 separate requests, *see* Lieberman Decl. ¶ 2, Sept. 17, 2026—requests with an unusual volume and sweeping

---

[35] Wilkinson Ex. 37.

[36] Wilkinson Ex. 57 (Brian Stelter, *Trump and his officials pressure the news media in unison as Iran war scrutiny intensifies*, CNN (Mar. 16, 2026), https://perma.cc/8DS6-MLCC).

scope relative to typical practice, *see* Fowler Decl. ¶¶ 7–8, Dkt. No. 2-6. For example, those requests concerned employment practices not only at the Stations subject to FCC regulation but also at the parent company and its entire family of companies, including some that have nothing to do with broadcasting. Compl. ¶ 65. Many other requests were too broad to practicably address on their literal terms, such as Defendants' demand for "all Communications between [The Walt Disney Company] and any Owned Station referring or relating to any Owned Station's recruitment; employment; career development and training; compensation, including bonuses and benefits; and/or discrimination complaints"[37]—in essence, a demand for every Human Resources email sent between employees of any of the Stations and employees of the parent company.

Though Plaintiffs objected to the scope of some of these demands, they nonetheless timely and thoroughly responded, providing over 92 pages of written narrative responses and producing over 10,000 pages of documents through the date of the early license renewal order. *See* Lieberman Decl. ¶ 2, Sept. 17, 2026. Plaintiffs' cooperation simply begat further, more aggressive demands with aggressive deadlines, including extensive new LOIs issued while Plaintiffs were still preparing responses to a previously issued LOI. *See* Compl. ¶ 67. Yet Plaintiffs have continued to respond to the Commission's requests, including most recently with written responses on August 14, 2026, and document productions on August 21, 2026.[38] *See* Lieberman Decl. ¶ 3, Sept. 17, 2026.

Defendants nonetheless hinge the decision to institute the early license renewal process on Plaintiffs' purported "lack of cooperation with the [Commission's] antidiscrimination inquiry." PI

---

[37] *See* Wilkinson Ex. 60, at 32 (The Walt Disney Company, Response to FCC Enf't Bureau, Investigation & Hearings Div. May 15, 2026, Email (May 29, 2026)).

[38] As of the time of this filing, the Commission has issued over 600 requests in the EEO investigation, and Plaintiffs have provided 276 pages of written narrative responses and produced over 18,600 pages of documents. *See* Lieberman Decl. ¶ 4, Sept. 17, 2026.

Opp. 3. In support of that justification, Defendants identify only one alleged deficiency. Defendants contend that Plaintiffs failed to produce "documents on behalf of more than the Disney-owned broadcast stations." *Id.* at 10. But Defendants do not mention that this question of scope had been discussed—and seemingly resolved—early in the investigation. When responding to Defendants' first LOI, Plaintiffs raised the concern that "[t]he production of information concerning the practices of business units not subject to FCC EEO requirements would only burden both Disney and the Bureau's staff with the production and review of irrelevant material." PI Opp. Ex. 26, at 8. In response, the Commission stated the following:

> [T]o expedite this process, and without waiving or prejudicing our ability to renew our demand that Disney produce documents . . . on behalf of more than those Disney-owned broadcast stations that are subject to EEO requirements set forth in the FCC's rules, *we agree to accept . . . the production of documents limited to Disney-owned broadcast stations that are subject to EEO requirements set forth in the FCC's rules.*

*Id.* (emphasis added).

Accordingly, Plaintiffs' responses to the first and second LOIs adopted this agreed-upon scope. Upon receiving those responses, the Commission did not object. Nor did it renew its request for a broader scope. Instead, the Commission did not raise the scope issue again until seventeen days *after* the early license renewal order—an order they now claim was justified by Plaintiffs' purported deficiency on that precise issue.[39]

Until the day before that order issued, the Commission had not called for a renewal application ahead of schedule in more than half a century. Nor had it *ever* demanded simultaneous early renewal applications from a group of stations commonly owned with a single broadcast

[39] PI Opp. Ex. 27, at 1; *see also* Wilkinson Ex. 60, at 2 (outlining the Commission's delay in raising its scope concerns).

network—much less stations with the record of public service and award-winning journalism like these Stations. Compl. ¶¶ 41–46.[40]

Defendants' contention that a routine discovery negotiation justified the unprecedented step of instituting the early license renewal proceeding is not credible.

*First*, Defendants' retrospective effort to attribute that decision solely to alleged discovery deficiencies in the investigation cannot be reconciled with the fact that the Administration has repeatedly stated that the Stations' licenses should be scrutinized because of Plaintiffs' speech.[41] Moreover, as Defendants separately acknowledge, the Commission is *also* using early license renewal to address unspecified "broader public interest concerns." PI Opp. 34.[42] The Chairman has made clear that those "concerns" relate to the content and viewpoints expressed on Plaintiffs' broadcasts and network programming. In the Chairman's own words, "the FCC walked away from enforcing that public interest obligation" over the years, and he does not "think we're better off as a country for it." Wilkinson Ex. 24.[43] In the next breath, the Chairman gave the example of

---

[40] The decision to call for early renewal applications from all eight Stations at once is particularly suspect: licenses are reviewed on an individual basis, *see* 47 U.S.C. § 307(d), and the alleged EEO violations that the Commission is investigating are not particularized to any of the individual Stations. That reveals the Commission's true purpose—not to enforce any purported EEO violation at a Station, but instead to use the threat of the early license renewal proceeding to coerce ABC to change its network programming.

[41] *See* Wilkinson Ex. 49 (*Speech: Donald Trump Delivers a Primetime Address to the Nation - July 16, 2026*, Roll Call Factbase (July 16, 2026), https://perma.cc/227P-G5R7) (quoting the President's assertion that "NBC and ABC fake news have both said that they would not cover this speech . . . . [T]his should mean a revocation of their licenses"); Wilkinson Ex. 51 (describing the Chairman's promise to consider Plaintiffs' decision not to broadcast the President's address as part of the early license renewal proceeding); *see also, e.g.*, Wilkinson Ex. 23 (Truth Social post from the President asserting that ABC "should lose their Licenses for their unfair coverage of Republicans and/or Conservatives").

[42] *See also* Wilkinson Ex. 41, at 2 (explaining that early renewal "enables the FCC to ensure that the broadcaster has been meeting its public interest obligations more broadly").

[43] Contrary to Defendants' suggestion that this statement was taken out of context, PI Opp. 28, the full video makes clear that the Chairman was suggesting that the public interest standard should

late-night hosts having gone (in his view) from being "court jesters that would make fun of everybody in power" to "enforcing a very narrow political ideology." The Chairman has since reiterated, in response to Jimmy Kimmel's decision to provide his interview with James Talarico on YouTube instead of over broadcast, *see infra* pg. 40, that the Commission will consider the content and viewpoints expressed on broadcast as part of its effort to "ensur[e] that broadcasters meet those public interest obligations, as required by their licenses."[44] In each instance, the Chairman's invocation of the "public interest" is thus a transparent attempt to legitimize the Commission's use of its regulatory authority to retaliate against Plaintiffs for their protected speech.

*Second*, the timeline contradicts Defendants' theory. Defendants accepted Plaintiffs' narrowed scope for the discovery requests on July 2, 2025.[45] Consistent with that understanding, Plaintiffs submitted multiple responses to Defendants' first and second LOIs between July 2025 and April 2026.[46] At no point in those many months did Defendants object that Plaintiffs'

---

account for the political ideologies expressed on broadcast programming. For the full video of the Chairman's remarks, *see* Jasmine Baehr, *FCC Chair Brendan Carr defends ABC affiliates pulling Jimmy Kimmel show after monologue about Charlie Kirk*, at 3:39–4:20, FOX News (Sept. 17, 2025), https://perma.cc/3Y8A-K6FT ("[W]ith that license comes a unique obligation to operate in the public interest. And over the years, the FCC walked away from enforcing that public interest obligation. I don't think we're better off as a country for it. But, look, President Trump ran directly at these legacy broadcast outlets, and he exposed them to these market forces. And a lot of these affiliate groups said, to your point, we're tired of carrying this stuff. Late-night shows, something's gone seriously awry there. They went from going for applause from laugh lines to applause lines. They went from being court jesters that would make fun of everybody in power to being court clerics and enforcing a very narrow political ideology.").

[44] Wilkinson Ex. 66 (Brendan Carr (@BrendanCarrFCC), X (Sept. 12, 2026, at 9:07 PM ET), https://perma.cc/W4FY-RT4A).

[45] Wilkinson Ex. 60, at 2.

[46] *Id.*

responses were limited to the scope agreed upon in the July 2, 2025 email.[47] Nor did Defendants renew their request for a broader scope of information or productions in response to their first and second LOIs.[48] On April 28, 2026, Defendants issued the early license renewal order, which referenced the EEO investigation but did not specifically identify any deficiencies with Plaintiffs' responses.[49] It was not until May 15, 2026—seventeen days after the early license renewal order—that Defendants sent the email raising the purported deficiencies in the scope of Plaintiffs' productions on which Defendants now hang their cap. Moreover, even after the early license renewal order, Defendants have continued to issue the same kinds of investigatory demands issued prior to that order, and Plaintiffs have continued to respond to those demands. *See* Lieberman Decl. ¶ 3, Sept. 17, 2026. That uncontroverted timeline of events simply does not support Defendants' story.

*Third*, there is a fundamental mismatch between the purported problem that Defendants identify (alleged discovery deficiencies) and the extreme regulatory tool they say they have chosen to address that problem (early license renewal with the Stations' very existence at stake). Ordinarily, the agency's response to an alleged discovery deficiency is to issue a Notice of Apparent Liability for monetary forfeiture for several thousand dollars.[50] *See* 47 U.S.C.

---

[47] *Id.*

[48] *Id.*

[49] Wilkinson Ex. 41.

[50] Examples of this routine approach include the following: *Fox Television Stations, Inc.*, Notice of Apparent Liability for Forfeiture, 25 FCC Rcd. 7074, 7081 (2010) (proposing forfeiture of $25,000); *Opp Educational Broadcasting Foundation*, Notice of Apparent Liability for Forfeiture and Order, 24 FCC Rcd. 11237, 11241 (EB 2009) (proposing forfeiture of $19,000); *Unique Broadcasting, L.L.C.*, Forfeiture Order, 22 FCC Rcd 17636, 17638 (EB 2007) (issuing forfeiture of $3,600); *American Family Association*, Notice of Apparent Liability for Forfeiture, 19 FCC Rcd. 14072, 14076–77 (EB 2004) (proposing forfeiture of $10,000). Indeed, the Commission has resorted to Notices of Apparent Liability even in cases where investigation targets (in investigations implicating national security) completely failed to respond to letters of inquiry. *See,*

§ 503(b)(4). But Defendants instead have reached for the nuclear option of early license renewal, a process which (contrary to Defendants' mistaken assertion, PI Opp. 1) cannot result in a license renewal for any of the Stations any time soon, *see* 47 U.S.C. § 307(d) (barring the Commission from granting a renewal application "more than thirty days prior to the expiration of the original license"). Accordingly, an adverse outcome is the only possible result, which further underscores the disproportionality of ordering early renewal.

Defendants nonetheless insist that early license renewal was "essential"[51] to provide the Commission with "broader access to information" through "public input" and the "possibility of an evidentiary hearing," PI Opp. at 15, 34–35. That makes no sense—the agency does not need the early license renewal proceeding to solicit public input or to hold a hearing. Just last year, the Commission sought public comment on a broadcast-related matter unconnected to any investigatory, enforcement, or rulemaking proceeding via its notice of inquiry authority. *See* 47 C.F.R. § 1.430 (authorizing notices of inquiry); Empowering Local Broadcast TV Stations to Meet Their Public Interest Obligations, 90 Fed. Reg. 54,686 (Nov. 28, 2025). And the Commission has previously invoked its general investigatory authority under 47 U.S.C. § 403 to order an evidentiary hearing. *See, e.g.*, *FCC v. Schreiber*, 381 U.S. 279, 281–83 (1965) (describing "an investigatory proceeding conducted by the Federal Communications Commission pursuant to § 403" in which a Commission hearing examiner could "subpoena witnesses, compel their

---

*e.g.*, *Cogito Tech Company Limited*, Notice of Apparent Liability for Forfeiture and Order, DA 26-694 (EB July 10, 2026) (proposing forfeiture of $25,000); *Fikaxo Technology Inc.*, Notice of Apparent Liability for Forfeiture and Order, DA 26-695 (EB July 10, 2026) (same); *Lyno Dynamics LLC*, Notice of Apparent Liability for Forfeiture and Order, DA 26-696 (EB July 10, 2026) (same); *Skyhigh Tech LLC*, Notice of Apparent Liability for Forfeiture and Order, DA 26-697 (EB July 10, 2026) (same); *Spatial Hover Inc*, Notice of Apparent Liability for Forfeiture and Order, DA 26-698 (EB July 10, 2026) (same).

[51] The Commission's early renewal rule permits the agency to invoke this mechanism only if it is "essential to the proper conduct of a hearing or investigation." 47 C.F.R. § 73.3539(c).

attendance, and require the production of any records or documents deemed relevant to the inquiry").[52] Moreover, the Commission has continued to issue letters of inquiry to Plaintiffs separately from the early renewal process,[53] a course which undermines any contention that the Commission has been forced to resort to alternate means of acquiring information to support its EEO investigation. Ultimately, none of Defendants' explanations justify responding to a discovery dispute with the equivalent of the corporate death penalty for a broadcaster.[54]

[52] The Commission also has authority to determine a forfeiture penalty through a hearing in front of an administrative law judge. 47 U.S.C. § 503(b)(3)(A); *see also* 47 C.F.R. § 1.80(h) (describing procedures for a hearing conducted under section 503(b)(3)(A)).

[53] Lieberman Decl. ¶ 15, Aug. 18, 2026.

[54] Historically, licensees have ordinarily been designated for hearing only in connection with serious or repeated violations of the Commission's rules involving substantial misrepresentations regarding material licensing issues or serious criminal convictions—circumstances totally dissimilar from what the Commission has alleged here. *See, e.g., Hispanic Christian Community Network, Inc.*, Order to Show Cause Why a Cease and Desist Order Should not be Issued, Order to Show Cause Why an Order of Revocation Should not be Issued, Hearing Designation Order, Notice of Opportunity for Hearing, and Notice of Apparent Liability for Forfeiture, 38 FCC Rcd. 7277, 7278 (MB 2023) (licenses designated for hearing for potential revocation and non-renewal for allegations of several abuses of FCC processes, including engaging in sham transactions to disguise unlawful foreign ownership, engaging in unauthorized transfers of control of FCC licenses, and lack of candor before the FCC); *Roger Wahl*, Hearing Designation Order, Order to Show Cause, and Notice of Opportunity for Hearing, 36 FCC Rcd. 14628, 14628 (MB 2021) (license designated for hearing for potential revocation following licensee's felony and misdemeanor convictions involving taking and transmitting nude photos without consent); *Entertainment Media Trust*, Hearing Designation Order and Notice of Opportunity for Hearing, 34 FCC Rcd. 4351, 4353 (MB 2019) (licenses designated for hearing for potential non-renewal for allegations of unauthorized transfers of control and lack of candor before the FCC); *Entercom License, LLC*, Hearing Designation Order, 31 FCC Rcd. 12196, 12211 (2016) (license designated for potential non-renewal after conducting an on-air contest resulting in the death of participant); *Terry Keith Hammond*, Order to Show Cause, Notice of Opportunity for Hearing, and Hearing Designation Order, 21 FCC Rcd. 10267, 10267 (2006) (license designated for hearing for potential revocation and non-renewal following licensee's conviction for felony theft and allegations of false certifications and lack of candor to the FCC and violations of station operational rules.); *Contemporary Media, Inc.*, Order to Show Cause and Hearing Designation Order, 10 FCC Rcd. 13685, 13685 (1995) (licenses designated for potential revocation following licensee's felony convictions, including multiple sexual assault crimes against minors).

#### *4. The Above Evidence Rebuts Any Presumption of Regularity*

That leaves only Defendants' single-sentence resort to the presumption of regularity. PI Opp. at 24. How that presumption applies here (if at all) should be analyzed against the backdrop that many courts have already enjoined actions by this Administration as retaliatory in violation of the First Amendment. *Fed. Educ. Ass'n. v. Trump*, 795 F. Supp. 3d 74, 89–90 (D.D.C. 2025) (declining to apply presumption of regularity in the face of "instance after instance of departures" by the Administration from the tradition that officers act in obedience to their duty), *stay pending appeal denied*, 2025 WL 2738626 (D.C. Cir. Sept. 25, 2025).[55] But even if some shade of the presumption remains, it is rebutted by the evidence of retaliatory animus here. The presumption is rebutted, for instance, "where the agency has demonstrated undue bias towards particular private interests," and "when an agency has departed from its consistent and longstanding precedents or policies"—circumstances that are both present here. *See Nat. Res. Def. Council, Inc. v. SEC*, 606 F.2d 1031, 1050 n.23 (D.C. Cir. 1979). And it does not require courts, when evaluating an explanation for agency action that does not align with the facts, to "exhibit a naiveté from which ordinary citizens are free." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019) (quoting *United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir. 1977) (Friendly, J.)). Accepting Defendants'

[55] *See also Media Matters*, 805 F. Supp. 3d at 111–12 (FTC investigation of media group); *Endocrine Soc'y*, 2026 WL 1257289, at *1 (FTC investigation of gender affirming care nonprofit) (D.D.C. May 7, 2026); *N.Y. Times*, 2026 WL 1872765, at *10 (Pentagon journalist escort requirement); *Nat'l Pub. Radio*, 827 F. Supp. 3d at 69–70 (executive order defunding NPR); *Anthropic PBC v. U.S. Dep't of War*, 825 F. Supp. 3d 1101, 1121 (N.D. Cal. 2026) (ban on military business with both Anthropic and those who do business with Anthropic); *Susman Godfrey LLP v. Exec. Off. of President*, 789 F. Supp. 3d 15, 47 (D.D.C. 2025) (executive order targeting law firms with sanctions, including EEOC DEI investigations); *President and Fellows of Harvard College v. DHS*, 788 F. Supp. 3d 182, 204 (D. Mass. 2025) (agency campaign of retaliation against Harvard); *Am. Ass'n of Univ. Professors v. Trump*, 815 F. Supp. 3d 907, 949 (N.D. Cal. 2025) (agency campaign of retaliation against UCLA); *Am. Ass'n of Univ. Professors v. Rubio*, 802 F. Supp. 3d 120 (D. Mass. 2025) (retaliatory changes in immigration status).

explanation for their early license renewal order would require just such naiveté. The presumption of regularity therefore falls away.

## III. PLAINTIFFS HAVE ESTABLISHED IRREPARABLE INJURY

Defendants do not dispute that, where parties "suffer[] from a campaign of retaliation against them in response to their exercise of their First Amendment rights," that alone constitutes "an irreparable injury." *Paxton*, 138 F.4th at 585. Instead, they state that Plaintiffs suffer no irreparable harm because "Plaintiffs are unlikely to succeed on the merits of that claim." PI Opp. 37. If this Court concludes that Plaintiffs are likely to succeed on the merits, it is thus uncontested that Plaintiffs have established irreparable harm. This Court need go no further on this point.

In any event, Plaintiffs have likewise established numerous other types of irreparable harm, including chilling effects, financial injuries, and reputational damage. Defendants' efforts to discount those additional harms are meritless.

For example, Plaintiffs cite numerous chilling effects resulting from Defendants' retaliatory campaign, which Defendants weakly seek to discredit. Plaintiffs rely in part on ABC's decision to livestream the President's July 16, 2026 address instead of not carrying it at all. It is beyond dispute that being pressured to air content that one otherwise would not qualifies as First Amendment injury. *See UAW-Lab. Emp. & Training Corp. v. Chao*, 325 F.3d 360, 365 (D.C. Cir. 2003) ("[T]he First Amendment includes not only the right to speak, but also the right not to speak"). But Defendants encourage the Court to discredit sworn testimony stating that ABC "ordinarily would not have" livestreamed the address, Lieberman Decl. ¶ 23, Aug. 18, 2026, on the basis that ABC previously livestreamed and did not broadcast an address by President Biden, *see* PI Opp. at 38. Those two addresses were made in different contexts on different topics. It does not follow that because ABC livestreamed one, it would necessarily livestream the other. Moreover, the chilling effects of Defendants' retaliatory campaign have continued even since the

filing of this lawsuit. Just last week, Jimmy Kimmel's interview of Texas candidate for U.S. Senate James Talarico was made available on YouTube rather than as part of the normal broadcast, with Kimmel specifically citing the FCC's retaliatory campaign against Plaintiffs as the reason for this decision.[56]

Defendants' attacks on Plaintiffs' evidence of harm to *The View* also fail. As Plaintiffs explained, as a result of the cumulative pressures of Defendants' retaliatory campaign, they have "pass[ed] on further consideration of booking several political candidates," and "chosen not to air clips that [it] otherwise would have aired" on the program. Lieberman Decl. ¶ 23, Aug. 18, 2026. Defendants acknowledge, as they must, that an investigation target's reasonable self-censorship qualifies as irreparable First Amendment injury. PI Mot. 37–38 (citing *Paxton*, 138 F.4th at 579). And, like the investigatory target in *Paxton*, *The View* has made programming decisions cognizant of the risk that its coverage decisions "might be cited by the Commission as a basis for non-renewal of the Stations' licenses in the impending proceedings." Lieberman Decl. ¶ 31, Aug. 18, 2026.

Defendants also argue that the above injuries are not connected to the early license renewal order because Plaintiffs cannot lose their licenses until the conclusion of the renewal proceeding. PI Opp. 40 (citing 47 U.S.C. § 307(c)(3)). This argument, though, makes Plaintiffs' point. The chilling effect results from the *risk* that Plaintiffs will lose their licenses—a risk that increases with every editorial decision that Plaintiffs make that might upset the Administration and motivate further adverse action. An eventual appeal of a license nonrenewal order does not redress the chilling effects of that risk. It is unrealistic for Defendants to expect Plaintiffs to ignore the risk

[56] Wilkinson Ex. 64 (Benjamin Mullin & John Koblin, *Jimmy Kimmel Moves Talarico Interview to YouTube Because of F.C.C. 'Threat'*, N.Y. Times (Sept. 10, 2026, at 1:35 PM PT), https://perma.cc/K3JB-PHTF).

of catastrophic license loss. And it is from that risk that Plaintiffs' irreparable First Amendment injuries flow.

Finally, Defendants suggest that "Plaintiffs' delay in bringing suit" undermines their assertion of irreparable injury. PI Opp. 43. But there was no delay—and even if there were, Defendants themselves acknowledge it would not be a "sufficient reason" to deny Plaintiffs' motion. *Id*. at 44. Defendants' retaliatory campaign against Plaintiffs has steadily intensified over the past 18 months, ultimately culminating in the requirement that all eight of the stations file early license renewal applications. And that threat was amplified even further when, in response to Plaintiffs' decision not to broadcast his July 16 address, the President called for the revocation of Plaintiffs' licenses during that address, and the Chairman confirmed the following week that Plaintiffs' editorial decision would factor into the Commission's review of their early license renewal applications. Although Plaintiffs had worked for months to cooperate with the Commission's regulatory demands, those existential threats forced Plaintiffs to come to this Court reluctantly with no alternative means to eliminate these ongoing and immediate threats other than total capitulation to the Administration's demands. Accordingly, once the public comment period on the early license renewal applications closed on August 5, 2026, Plaintiffs filed this lawsuit nine business days later on August 18, 2026.

## IV. THE BALANCE OF EQUITIES FAVORS INJUNCTIVE RELIEF

The balance of equities and the public interest, which merge when the government is a party, *Glob. Health Council v. Trump*, 153 F.4th 1, 12 (D.C. Cir. 2025), strongly favor an injunction. Plaintiffs have an interest in "vindicating the right to be free of retaliation for [their] protected speech." *Endocrine Soc'y*, 832 F. Supp. 3d at 21. "'[T]here is always a strong public interest in the exercise of free speech rights otherwise abridged by an unconstitutional' government action." *Paxton*, 138 F.4th at 585 (citation modified). And "[t]he Government is in no way harmed

by issuance of a preliminary injunction which prevents [it] from [continuing proceedings] likely to be found unconstitutional." *Media Matters*, 805 F. Supp. 3d at 138 (citation modified). Preventing Defendants from continuing their retaliatory campaign against Plaintiffs serves Plaintiffs, other broadcasters, and the public alike.

Defendants dispute none of that. Instead, they claim that an injunction would disrupt Congress's choice to delegate authority to the Commission "to determine whether renewing Plaintiffs' broadcast licenses is in the public interest." PI Opp. 44. But that again presupposes that Plaintiffs will not establish a likelihood of success on the merits. If this Court agrees that Plaintiffs have made that showing, Defendants offer no serious argument that the balance of equities and the public interest favor them. Congress did not delegate the Commission authority to retaliate against Plaintiffs in violation of the First Amendment.

Defendants are also wrong that a preliminary injunction would "effectively insulate the[] broadcast stations from the regulatory requirements and processes that Congress has prescribed." PI Opp. 45. As Defendants acknowledge, the Court can enjoin the early license renewal proceeding without "stop[ping] the antidiscrimination investigation or the Commission's review of *The View*'s equal time exemption." PI Opp. 40. And although Defendants state that Plaintiffs would "be able to seek review in the D.C. Circuit of any adverse final licensing order," PI Opp. 45, that ignores the here-and-now injuries inflicted on Plaintiffs. Plaintiffs are not seeking to litigate the merits of their stations' license renewal applications but instead to enjoin Defendants' abuse of the early license renewal process as a means of retaliating against Plaintiffs' protected

speech. For that claim, appellate review after the license renewal proceeding would come too late to be meaningful.[57]

## V. A BOND IS NOT WARRANTED

Plaintiffs have established that Defendants unlawfully retaliated against them in violation of the First Amendment. Requiring a bond under these circumstances would "contravene the interests of justice." *Aviel v. Gor*, 780 F. Supp. 3d 1, 16 n.7 (D.D.C. 2025), *appeal dismissed*, 2025 WL 2553305 (D.C. Cir. Sept. 2, 2025). Defendants fail to "identify any tangible financial harm—let alone quantifiable costs—they would incur" from an injunction. *N. Am.'s Bldg. Trades Unions v. Dep't of Def.*, 783 F. Supp. 3d 290, 315 (D.D.C. 2025). Nor would the FCC and its officials "personally face [any] monetary injury." *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 775 F. Supp. 3d 100, 130 (D.D.C. 2025), *vacated on other grounds*, 2026 WL 2451517 (D.C. Cir. Aug. 21, 2026). Accordingly, courts in this district routinely "decline[] to require plaintiffs to post any bond as a condition of obtaining an injunction against agencies or officers of the federal government." *League of United Latin Am. Citizens v. Exec. Off. of the President*, 780 F. Supp. 3d 135, 224–25 (D.D.C. 2025) (collecting cases), *aff'd*, 2026 WL 1991571 (D.C. Cir. July 2, 2026). This Court should similarly exercise its "broad discretion" to decline Defendants' request for bond here. *P.J.E.S. ex rel. Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492, 520 (D.D.C. 2020). In the alternative, the Court should set a nominal bond of $1. *See, e.g.*, *L.G.M.L.*

---

[57] It makes no difference that certain third parties have filed petitions in the FCC process advocating for the denial of Plaintiffs' applications to renew their licenses. *See* Br. of Amicus Curiae Kenneth Douglass Newman 12, Dkt. No. 20-1; Br. of Amicus Curiae Center for American Rights 1, Dkt. No. 32; Br. of Amicus Curiae America First Legal 2, Dkt. No. 35-2. The participation of those third parties does not change the fact that Defendants unconstitutionally instituted the early license renewal process for a retaliatory purpose. That retaliation should be enjoined. But the injunction Plaintiffs seek would not prevent the Commission from exercising its authority lawfully, or petitioners from filing future complaints about FCC rule violations.

*v. Noem*, 800 F. Supp. 3d 100, 134 (D.D.C. 2025) (setting a nominal bond of $1 given "the important rights [Plaintiffs] seek to vindicate").

## CONCLUSION

Plaintiffs respectfully request that the Court grant their motion for temporary restraining order and preliminary injunction, and deny Defendants' motion to dismiss.

Dated: September 17, 2026

By: /s/ Beth A. Wilkinson

Beth A. Wilkinson (D.C. Bar No. 462561)
Jenna P. Swarbrick (D.C. Bar No. 1614398)
Daniel Epps (*pro hac vice*, D.C. Bar No. 1002523)
Luke Churchill (D.C. Bar No. 90020985)
**WILKINSON STEKLOFF LLP**
2001 M St. NW, 10th Floor
Washington, DC 20036
Telephone: (202) 847-4000
Facsimile: (202) 847-4005
bwilkinson@wilkinsonstekloff.com
jpswarbrick@wilkinsonstekloff.com
depps@wilkinsonstekloff.com
lchurchill@wilkinsonstekloff.com

Caroline Li (D.C. Bar No.1779285)
**WILKINSON STEKLOFF LLP**
130 W 42nd St., 24th Floor
New York, NY 10036
Telephone: (212) 294-8910
Facsimile: (202) 847-4005
cli@wilkinsonstekloff.com

Paul D. Clement (D.C. Bar No. 433215)
Jeffrey C. Thalhofer (D.C. Bar No. 1658324)
**CLEMENT & MURPHY, PLLC**
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com
jeff.thalhofer@clementmurphy.com

*Counsel for Plaintiffs American Broadcasting Companies, Inc.; The Walt Disney Company; KABC Television, LLC; KFSN Television,*

*LLC; KGO Television, Inc.; KTRK Television, Inc.; WABC Television (New York), LLC; WLS Television, Inc.; WPVI Television (Philadelphia), LLC; and WTVD Television, LLC.*