# WILKINSON EXHIBIT 57

# Trump and his officials pressure the news media in unison as Iran war scrutiny intensifies

**edition.cnn.com**/2026/03/16/media/trump-carr-hegseth-fcc-media-iran-war

Brian Stelter March 16, 2026



Every day brings a new complaint — or three — from the Trump administration about the American news media's coverage of the Iran war.

President Trump is using words like "criminal" and "unpatriotic" to assail media companies. His FCC chairman, Brendan Carr, is threatening broadcasters' licenses. His defense secretary, Pete Hegseth, is insulting news outlets from the Pentagon press briefing podium.

There's nothing subtle about their attack-the-messenger strategy. But it may betray some anxiety about the war's unusually low public approval ratings — or about how the war itself is actually going.

After hearing Hegseth's criticism last Friday, CNN senior political commentator David Axelrod observed, "It feels like a decision has been made that if the war news isn't better, better to attack those who report news of the war."

Axelrod theorized that Trump is "envious" of countries without a First Amendment: "Putin doesn't have to put up with this!"

Major news outlets are undeterred by the administration's criticism, recognizing that attempts to deter and discredit wartime reporting are as old as war coverage itself.

As CNN chairman and CEO Mark Thompson recently pointed out in a statement, "Politicians have an obvious motive for claiming that journalism which raises questions about their decisions is false. At CNN our only interest is in telling the truth to our audiences in the U.S. and around the world and no amount of political threats or insults is going to change that."

That said, the rhetoric is worth monitoring and analyzing, since it's a window into the president's worldview and it shapes his supporters' perceptions.

Trump's media-bashing, often a dull roar in the background, is an unusually loud howl right now. On Sunday night, he repeatedly dismissed difficult questions about the war by calling stories "fake." He accused Iran of spreading misinformation but then spread some of it himself.

And the wartime media criticism is coming not just from Trump's White House but from across his government, with cabinet officials, regulators and MAGA allies all part of a campaign to discourage independent reporting.

## Trump cries ‘treason’




Trump went on a tear against “corrupt media outlets” in a 401-word Truth Social post on Sunday evening.

He accurately pointed out that fake, AI-generated videos showing imaginary Iranian military victories have been circulating. News outlets like CNN and The New York Times have been debunking those videos.

But then Trump falsely claimed that Iran has been “working in close coordination with the Fake News Media” to show the videos, including one especially obvious fake showing the USS Abraham Lincoln on fire. He wrote, “You can say that those Media Outlets that generated it should be brought up on Charges for TREASON for the dissemination of false information!”

While the made-up video is easy to find on YouTube, responsible news outlets have not distributed it, contrary to Trump’s charge.

Speaking with reporters aboard Air Force One on Sunday night, Trump sounded frustrated by the proliferation of the AI-generated videos. He blamed AI repeatedly and said, "Iran is known for a lot of fake news," using the "fake news" phrase that he personally popularized a decade ago to demean real US news outlets.

"I actually think it's pretty criminal," Trump went on to say, "because our media companies, who have no credibility whatsoever, are putting out information that they know is false."

News outlets have no incentive to do such a thing. The whole business model is built on truthful information, though the "fog of war" is real — it can be very difficult to separate fact from fiction in wartime.

Trump also bristled when an ABC News reporter brought up the fact that "your PAC put out a fundraising email" using photos taken at a dignified transfer of US service members killed in Kuwait. "Do you think that's an appropriate email to send?" Trump said yes, and that he didn't see the email, then asked where the reporter worked, and proceeded to tear into ABC News as an organization.

"I don't want any more from ABC," he added, and then looked around the plane for other questioners.

When the ABC reporter tried again later and asked a simple question about US deployments to the region — "Can you explain why we're sending 5,000 marines and sailors?" — Trump replied, "You're a very obnoxious person."

## The FCC attack dog




Also on Sunday, Trump praised his handpicked FCC chairman, Brendan Carr, who visited him at Mar-a-Lago earlier in the weekend.

While there, Carr posted on X, threatening the licenses of local broadcasters. He attached one of Trump's recent messages complaining about news coverage of the war.

Curiously, Trump's stated complaint was about Times and Wall Street Journal coverage, and neither outlet is subject to FCC regulation. But local TV stations are, since they broadcast over the public airwaves, and are granted licenses for eight years at a time. "Broadcasters must operate in the public interest, and they will lose their licenses if they do not," Carr wrote.

Experts told CNN that Carr has little ability to follow through and actually strip stations of licenses, but they said the potential chilling effect is concerning, nonetheless.

Numerous Democratic lawmakers denounced Carr's threat as a page straight out of an autocratic playbook.

"This is vindictive, fascist stuff," Senate minority leader Chuck Schumer wrote on X, adding, "If Carr continues down this route, Democrats will hold him accountable. Threatening broadcasters' licenses for war coverage this administration doesn't like is the worst thing Carr has done — and that's saying something."

Some of Trump's fiercest allies also expressed apprehension. When asked about Carr's threat during a Fox News appearance, Republican Sen. Ron Johnson said, "I'm a big supporter of the First Amendment. I do not like the heavy hand of government, no matter who's wielding it."

But Trump wrote Sunday evening that he was thrilled that Carr is "looking at the licenses of some of these Corrupt and Highly Unpatriotic 'News' Organizations."

## Hegseth versus the headlines



Hegseth made his media criticism the centerpiece of last Friday's Pentagon briefing. Clearly attuned to the daily coverage, the former Fox News host suggested networks swap on-screen banners such as "Mideast War Intensifies" for something more to his liking: "Iran Increasingly Desperate."

Coincidentally or not, Hegseth's old show, "Fox & Friends Weekend," used that exact phrase — "Mideast War Intensifies" — as an on-air chyron during its coverage two days later.

At the briefing, Hegseth also decried a CNN report about the Trump administration underestimating the Iran war's potential impact on the Strait of Hormuz. He referred to Paramount's pending takeover of Warner Bros Discovery, including CNN, and invoked Paramount CEO David Ellison by name.

"The sooner David Ellison takes over that network, the better," Hegseth said, prompting gasps and grumbles from some of the journalists in the room.

The White House also boosted several complaints about CNN last week, including an objection to the network's decision to show purported comments from the new Iranian supreme leader's first public statement. CNN said the comments were aired "for their obvious news value."

Then came a Trump White House press release that baselessly claimed, "CNN Is Lying to Undermine Operation Epic Fury's Crushing Success." Thompson's subsequent statement emphasized that "we stand by our journalism" and said the network won't waver.

On Sunday, the Committee for the First Amendment, a free speech group reconstituted by Jane Fonda last year, connected the dots between Carr, Hegseth and other assaults on the media.

"Make no mistake about it: These are direct attacks on the First Amendment and part of a deliberate march toward authoritarianism," the committee said. "In that world, journalists are punished for telling the truth, media companies are expected to fall in line, and dissent is treated as a threat."

"But that future is not inevitable," the committee continued. "Do not obey in advance. Speak loudly, stand with journalists, and defend the very freedoms that make moments like today possible. None of this is normal — and we must act accordingly, together."

# WILKINSON EXHIBIT 58

**Post** Log in Sign up

**Brendan Carr** @BrendanCarrFCC

Gavin Newsom isn't standing up to me or for any legitimate interest.

He's simply doing the bidding of his liberal Hollywood donors—the billionaires in media who have no interest in the FCC holding them accountable to their statutory public interest obligations.

They want free rein to distort the news, broadcast hoaxes, and serve their own narrow interests and in doing so force their radical worldview on Americans without any regard to their broadcast license obligations.

Not anymore.

> **Headquarters** @HQNewsNow · Mar 24
>
> Gov. Newsom on the Nexstar-Tegna merger:
>
> "I think it's a disgrace. I think Brendan Carr is a disgrace. This is the same Brendan Carr who said he wants Dear Leader to get better coverage or he won't renew broadcast licenses. This consolidation of right wing media is happenin...




7:58 PM · Mar 25, 2026 · **587.1K** Views

649 412 1.9K 42

**Silas (still testing, on a new schedule)** @coolingreviews · Mar 26

>They want free rein to distort the news, broadcast hoaxes, and serve their own narrow interests and in doing so force their radical worldview on Americans

Every accusation is a confession of your crimes.

4 381 4.5K

**Woke Won! us 💙 🤍 - NO DMs please** @wokealwayswins · Mar 26

By news do you mean Fox? We LEFTIES are just telling folks the TRUTH after you make FoxNews LIE. Governor Newsom helps us with that.

2 4 376 3.4K

**Fartknocker 🌊** @SeaSettler · Mar 26

What are you going to do about the lies President Trump tells and which get broadcast on the network stations?

Shouldn't Trump be sanctioned or fined by the FCC?

4 13 314 3.5K

# WILKINSON EXHIBIT 59

FCC NEWS from the Office of Commissioner Anna M. Gomez

**Media Contact:**
Gomez.Press@fcc.gov

**For Immediate Release**
**April 28, 2026**

# GOMEZ: FCC's EGREGIOUS ASSAULT ON THE FIRST AMENDMENT WILL FAIL

*Politically Motivated Effort to Censor Speech Could Take Years*

WASHINGTON — FCC Commissioner Anna M. Gomez issued the following statement today after the FCC's Media Bureau took the unprecedented step of directing Disney-owned local TV stations to file early license renewals. The FCC cannot revoke any broadcast licenses without a lengthy review process that can be appealed to the full Commission and challenged in federal court, a process that could take years:

**"This is the most egregious action this FCC has taken in violation of the First Amendment to date. As part of its ongoing campaign of censorship and control, the White House called publicly for the silencing of a vocal critic, and this FCC has now answered that call. This is an unprecedented and politically motivated attempt to interfere with how broadcasters operate, and this unlawful overreach will fail. This should be a lesson to media companies that no amount of capitulation to this Administration will buy them protection. The only choice is to stand up and stand firm in defense of the First Amendment."**

**Background:** The FCC is moving to force early license renewal reviews of Disney's eight ABC-owned television stations, a politically targeted action that experts say is without modern precedent. Disney as the parent company is not the license holder, its subsidiary owns the stations and they are individually licensed. Each individual station would face its own lengthy review process.

Broadcast licenses are normally renewed on an eight-year cycle, with renewals processed on a staggered schedule by state. An early renewal order forces stations to file renewal applications ahead of schedule, opening the door to formal scrutiny of their licenses before that review would otherwise occur.

Under normal practice, any effort to revoke or deny a license renewal requires a public comment and reply period, followed by the designation for a hearing before an FCC Administrative Law Judge, a full evidentiary proceeding that can take months or years. The ALJ's decision can then be appealed to the full Commission, and any final Commission action can be challenged in federal court. Any attempt to bypass a review by an independent ALJ would call for additional legal scrutiny.

The FCC bears the burden of proof at every stage. Any action premised on a broadcaster's content or editorial choices runs directly into the Communications Act's prohibition on

censoring broadcaster content and the First Amendment, barriers courts have consistently upheld. The government cannot weaponize the licensing process to punish speech it disapproves of and attempts to do so have consistently failed. Efforts like this one are exceedingly rare, almost never succeed, and face even longer odds when the underlying motivation is silencing speech the government dislikes.

Even if the FCC grounds its case in a different legal theory, the broader pattern of political threats against broadcasters is part of the public record, and Disney can use that record in its defense. Courts take motivation seriously, and the motivation here is clear.

###

Office of Commissioner Anna M. Gomez: (202) 418-2100
ASL Videophone: (844) 432-2275
www.fcc.gov/leadership/anna-gomez

*This is an unofficial announcement of Commission action. Release of the full text of a Commission order constitutes official action. See MCI v. FCC, 515 F.2d 385 (D.C. Cir. 1974).*

# WILKINSON EXHIBIT 60

**The Walt Disney Company**

**Response to FCC Enforcement Bureau**
**Investigation and Hearings Division**
**May 15, 2026 Email**
**File No. EB-IHD-25-00038333**
**May 29, 2026**

## I. Introduction

This document responds to the Enforcement Bureau's May 15, 2026, email to The Walt Disney Company ("TWDC" or "Company") ("May 15 email") alleging various deficiencies in the Company's response to the February 20, 2026 Supplemental Letter of Inquiry ("SLOI").[1] As demonstrated below, the Company responded fully and in good faith to the SLOI and in all its previously provided responses.[2] In its May 15 email, the Bureau ignores full responses already provided by the Company and in other cases seeks new information it had never previously sought. The Company therefore contests the Bureau's characterization of the Company's response as "improper" and "disingenuous." Indeed, the Bureau's inaccurate list of alleged inadequacies and unsupported accusations of impropriety and disingenuousness, when viewed in the context of the Commission's other recent actions, calls into question the true purpose of its May 15 email.[3]

While the Company has responded in good faith to the Bureau's inquiries, we are available to meet for additional discussions to clarify the additional information the Bureau sought in the May 15 email.

***The Bureau's Assertions About the Agreed Scope Are Unsupported by the Facts[4]***

As an overarching point, the Bureau claims—wrongly—that the Company had no basis for applying the Agreed Scope. As we discuss below, however, the Agreed Scope aligns with the scope of the Commission's investigative authority and is therefore the proper scope for the

---

[1] Email from Pamela S. Kane, Investigations & Hearings Division, to Suzanne Tetreault, Counsel for TWDC (May 15, 2026, 3:52 pm) ("May 15 email").

[2] The Company provided responses to the initial June 5, 2025, Letter of Inquiry ("LOI") on July 8, 2025 ("July 8, 2025 Response"), July 16, 2025, and July 22, 2025 ("July 22, 2025 Response"). The Company also provided responses to an August 2025 email from the Bureau on September 10, 2025 ("Sept. 10, 2025 Response") and September 17, 2025 ("Sept. 17, 2025 Response"). Further, the Company provided responses to the SLOI on March 23, 2026 ("Mar. 23, 2026 Response") and April 21, 2026 ("Apr. 21, 2026 Response").

[3] As stated in the legal exhibits to the renewal applications filed on May 28, 2026 by the Owned Stations, (*see, e.g.*, WABC Television (New York), LLC, Renewal of License, LMS File No. 0000298318 (filed May 28, 2026)), the Commission has engaged in a series of efforts to suppress speech under the guise of bureaucratic process. Its attempt to allege inadequacies in the Company's responses and then use those alleged inadequacies to justify its actions is consistent with those efforts. We note that earlier today, before the Company's response to the May 15 email had been submitted, the Enforcement Bureau sent the Company a Second Supplemental Letter of Inquiry containing 73 new Requests for Information and 22 new Requests for Documents.

[4] The Bureau created the term "Disney's Defined Scope" in Attachment A to the May 15 email. TWDC contests that characterization and continues to use the term "Agreed Scope" in this response.

SLOI. Moreover, the record makes clear that the Agreed Scope TWDC previously negotiated with the Bureau applied to the SLOI response and included narrative responses as well as document requests.

TWDC negotiated the Agreed Scope with the Bureau in July 2025 when it was responding to the LOI. When the Bureau sent the SLOI, it expressly presented that letter as a continuation of the investigation begun last June. It gave the SLOI the same file number as the LOI. It stated in the opening paragraph that the SLOI seeks "further information for the Bureau's investigation."[5] And, notably, the Bureau numbered the requests for information ("RFI") and documents ("RFD") in the SLOI to pick up sequentially after the last numbers used in the LOI, which .plainly indicated that the SLOI was a continuation of the LOI. Based on all these factors, and in the absence of any statement from the Bureau to the contrary, TWDC's good faith understanding was that the Agreed Scope applies equally to the SLOI as to the LOI.

TWDC's application of the Agreed Scope to the SLOI was no secret—the Company was explicit about its understanding, beginning with the initial response to the SLOI on March 23. The first paragraph of the Mar. 23, 2026 Response states that "[t]his response reflects and is consistent with discussions between FCC staff and counsel, *including EB's agreement to limit the scope of responses to information pertaining to the employment practices of its owned station group as well as its enterprise-wide policies that impact its owned station group ("Agreed Scope")*" (emphasis added).[6] The Bureau took no issue with that approach even as it knew that the Company was working on its more extensive final response and would presumably use the Agreed Scope there as well. The Bureau now claims that the Agreed Scope was inapplicable, yet when it had the opportunity to correct this purported misunderstanding a full month before the Company submitted its final response to the SLOI, the Bureau said nothing. The Bureau cannot in good faith now suggest that TWDC was "disingenuous" in continuing to apply the Agreed Scope in the face of the Bureau's silence.

The Bureau also now asserts for the first time that the Agreed Scope never applied to anything but document requests. While we acknowledge that the final email in the chain between TWDC's counsel and the Bureau refers to documents, every other portion of that exchange refers to both the RFIs and the RFDs. Nothing suggests that the parties were considering something narrower in coming to the agreement on Agreed Scope. Moreover, TWDC's reasonable, contemporaneous understanding, stated explicitly in the July 22, 2025 Response to the LOI, was that the Agreed Scope applied to the entire response. TWDC was clear that it had applied the Agreed Scope to its narrative responses to the LOI,[7] yet the Bureau now claims for the first time—*eight months later*—that it had not agreed to that limitation. The Bureau raised no concerns even as it asserted that there were other defects in the LOI response

[5] SLOI at 1.

[6] Mar. 23, 2026 Response at 1.

[7] The July 22, 2025 Response stated that "[t]he scope of this response reflects and is consistent with discussions between FCC staff and counsel," citing the email exchange with Ms. Feigen, and that "consistent with the EB's agreement to limit the scope of this response, we will refer to 'TWDC' *throughout this response* with reference to this subset of Company entities" (emphasis added). *See* July 22 response at 1 & n.2. All references to TWDC in the narrative responses thus expressly incorporated the Agreed Scope.

(to which the Company responded).[8] The Company's initial response to the SLOI in March also repeatedly cited the Agreed Scope as a limitation on its narrative responses, but the Bureau said nothing during the month between the initial and final responses.

Under these facts, the Bureau clearly had no issue with TWDC's interpretation of the agreement throughout the conduct of the investigation until its May 15 email. At a minimum, there is no basis for the Bureau to claim in good faith that the Company's understanding of the Agreed Scope was unreasonable or that its actions were improper or disingenuous.

***The Bureau's Direction to Provide Expanded Responses Exceeds its Authority***

The Bureau states in Attachment A to the May 15 email that it "did not – and does not" agree to limit the Company's responses consistent with the Agreed Scope. As noted above, the Bureau and the Company in fact did have an agreement as to the scope of the Company's responses to the Bureau's inquiries. Nevertheless, the Company acknowledges that the Bureau is within its rights to terminate that agreement and, as it did in Attachment A to the May 15 email, make new inquiries. But where the Bureau's new inquiries seek information and documents having no relationship to or impact on the Owned Stations, they exceed the Bureau's investigative authority.

The Commission's investigative authority under Section 403 of the Communications Act is not unlimited—the agency's inquiries must be tethered to matters within its jurisdiction.[9] Here, the Company understands that the Bureau is investigating potential violations of the Commission's rules, including Section 73.2080, by the Owned Stations. Accordingly, only information and documents relating to or having an impact on the Owned Stations could possibly be relevant to the investigation and within the lawful scope of the Bureau's inquiries. And as the Commission itself has stated, the requirements of Section 73.2080 and the Commission's oversight of nondiscrimination in employment by broadcast licensees are limited to "individual broadcast stations" and do not extend to "related segments of the mass media industry."[10] If the Commission's regulation and oversight do not extend to "related segments of the mass media market," they certainly do not extend to elements of the Company's businesses that are unrelated to and/or have no impact on the Owned Stations. And they certainly cannot extend to the many and varied companies encompassed within the SLOI's definition of the term "Disney," which appears in several inquiries.

---

[8] *See* Email from Christina Thomas, Investigations & Hearings Division, Enforcement Bureau, to Jennifer Tatel, Counsel for TWDC (Aug. 25, 2025, 5:00 pm).

[9] *See, e.g.*, *Nat'l Religious Broad. v. FCC*, 138 F.4th 282, 292 (5th Cir. 2025) (Section 403 "does authorize 'inquir[ies],' but only into 'case[s]' or 'matter[s] or thing[s]' permissible under 'this chapter.'").

[10] *Amendment of Part 73 of the Commission's Rules Concerning Equal Employment Opportunity in the Broadcast Radio and Television Services*, Report and Order, 2 FCC Rcd 3967, 3999 n.17 (1987), *cited in Application of National Broadcasting Co., Inc. for Renewal of License of Station WNBC(TV), New York, New York*, Memorandum Opinion and Order and Notice of Apparent Liability, 14 FCC Rcd 9026, 9029 (MB 1999); *see also Applications of Univision Holdings, Inc. and Perenchio Television, Inc.*, Memorandum Opinion and Order, 7 FCC Rcd 6672, 6683 (1992) ("We have limited our EEO policies to employment practices of stations and headquarters personnel of group owners. We have specifically declined to extend those policies to cover network operations.").

As a result, the Bureau cannot, consistent with Section 403 of the Communications Act and the Commission's own statements, claim authority to require the Company to provide information and documents that do not relate to or impact the Owned Stations. The Bureau therefore has no basis to reject the Company's application of the Agreed Scope to its past or present SLOI responses, as such application excludes only information and documents with no such relationship or impact. The Company thus objects to the Bureau's instruction to provide "unlimited" responses.

***The Bureau Makes Several Other Erroneous Assertions***

Finally, the Company notes that the Bureau's Attachment A to the May 15 email makes a number of incorrect assertions that misstate the SLOI questions; injects new follow-up questions beyond the scope of the original inquiries; or asks for information that has already been provided. Each of these instances is specifically addressed below.

## II. EB's Assertions Regarding Individual Responses

Information that is the subject of the Company's Request for Confidential Treatment submitted on March 23, 2026, is denoted in this response with the symbols **[[ ]]**. In addition, any documents produced in connection with this response that are subject to the accompanying Request for Confidential Treatment are marked "CONFIDENTIAL – NOT FOR PUBLIC INSPECTION." The Company also wishes to underscore that, as the Commission has recognized, "both EB and the parties under investigation have legitimate interests in keeping the investigative phase of a proceeding non-public."[11]

**Requests for Information**

16. *The Bureau requested that the Company explain the relationship between each Owned Station Ownership Entity (OSOE) and TWDC. In addition to narrowing its response based on Disney's Defined Scope, the Company simply directed the Bureau to a chart. As discussed above, the Company had no basis for narrowing its narrative response to Disney's Defined Scope. In addition, a chart cannot and does not "explain" the relationship between each OSOE and TWDC. The Bureau directs the Company to supplement its response to provide all of the information requested.*

*RESPONSE:*

As to the application of the Agreed Scope, see the discussion in the Introduction above.

The Company disagrees with the contention that providing organizational charts depicting the ownership structure of the relevant entities does not explain the relationship between them. The fundamental purpose of an organizational chart is to explain the relationships between the depicted entities, as those produced with the Mar. 23, 2026 Response do. *See* BATES Nos. Disney-14-000001 – Disney-14-000008. **[[**For instance, as clearly demonstrated in the organizational charts, American Broadcasting Companies, Inc. is related to ABC Holding

[11] *Amendment of Certain of the Commission's Part 1 Rules of Practice and Procedure and Part 0 Rules of Commission Organization*, Report and Order, 26 FCC Rcd 1594, 1596 ¶ 7 (2011).

Company, Inc. as its wholly owned direct subsidiary. ABC Holding Company, Inc., in turn, is related to ABC, Inc. as its wholly owned direct subsidiary. And all three of these OSOEs are related to TWDC as wholly owned indirect subsidiaries.**]]** In response to the ambiguous request to "explain the relationship," the Company provided a reasonable, good faith response,[12] and the Bureau's direction to supplement the initial response is a new request for as-yet unspecified information. The Company is available for additional discussions with the Bureau to clarify the specific additional information the Bureau is seeking.

17. *The Bureau requested that the Company define the term "DEI" as used by Disney during the period covering the SLOI, and to the extent that Disney's definition of DEI has changed during the relevant time period, to explain when and how the definition has changed. The Company's response failed to explain how the definition of what it defines as "DEI" has changed during the relevant time period or explain when, why and how it has changed. The Bureau directs the Company to supplement its response to provide all of the information requested.*

*RESPONSE:*

As stated in the Apr. 21, 2026 Response, the term "DEI" can refer to various principles of equal employment opportunity, diversity, equity, and inclusion depending on the specific context in which it is used.[13] This fundamental understanding of "DEI" has remained unchanged during the time period, even as the Company's policies and programs have evolved over a multi-year period. At no time and in no context has the Company's use of the term "DEI" sanctioned unlawful employment discrimination.

20. *The Bureau requested that the Company state, for each Owned Station (as that term is defined in the SLOI), whether there were policies or goals established, directed, or monitored by any OSOE or other entity in the TWDC ownership chain that relate to recruitment, employment, career development and training, compensation including bonuses and benefits and contracting, based on race, color, national origin, sex, and/or religion. The Bureau further requested that if the answer was yes, that the Company list and describe each such policy or goal of the OSOE or other entity establishing, directing or monitoring the policies or goals, and explain any changes to the same for the dates covered by this SLOI.*

*The Company not only improperly limited its response based on Disney's Defined Scope, but it also failed to identify whether any OSOE or other entity in the TWDC ownership chain established, directed, or monitored policies that relate to recruitment, employment, career development and training, compensation including bonuses and benefits and contracting, based on race, color, national origin, sex, and/or religion. As a result, the Company's response did not address whether any OSOE or other entity in the TWDC ownership chain established, directed, or monitored "outreach efforts to ensure equal employment opportunity" or "the goals WPVI identified in its 2022 AOP submission." Also, the Company's response did not address whether any OSOE or any entity in the TWDC chain established, directed, or monitored WTVD's goal (referred to in response to RFI 18) of hiring those who represented the WTVD audience. The*

[12] *See* Apr. 21, 2026 Response at 3.

[13] *See id.* at 3-4.

*Bureau directs the Company to supplement its response to provide all of the information requested.*

*RESPONSE:*

The Company's application of the Agreed Scope to its response to this request included information relating to or impacting the Owned Stations and therefore was appropriate for the reasons set forth in the Introduction above.

As to the additional information the Bureau asserts was missing from the Company's responses, the Company has already provided the information requested. Such information was either previously expressly provided or was apparent from the information provided.

- **[[**As stated in the Apr. 21, 2026 Response, the Owned Stations follow the Company's Equal Employment Opportunity ("EEO") Policy, which does not permit recruitment, employment, or contracting decisions on the basis of race, color, national origin, sex, and/or religion.[14] By extension, no OSOE or other entity in the TWDC ownership chain establishes, directs, or monitors any policy or goal whereby recruitment, employment, career development and training, compensation including bonuses and benefits, and contracting are conducted based on race, color, national origin, sex, and/or religion, as no such policy or goal exists.

- In the Apr. 21, 2026 Response, the Company addressed its compliance monitoring processes and procedures, including those covering equal employment opportunities.[15]

- As stated in the Apr. 21, 2026 Response, the goals WPVI identified in its 2022 AOP submission were independently proposed by WPVI staff but were never implemented.[16] Thus, the goals were not established, directed, or monitored by any OSOE or other entity in the TWDC ownership chain.

- As explained in the Apr. 21, 2026 Response, the aspirational statements of WTVD, which were never implemented, were independently proposed by WTVD staff.[17] Thus, the goals were not established, directed, or monitored by any OSOE or other entity in the TWDC ownership chain.**]]**

21. *The Bureau requested that the Company explain, for each Owned Station, whether and how TWDC and the OSOEs communicate policies or goals that originate with TWDC and/or the OSOEs to the employees of each Owned Station. To the extent TWDC or the OSOEs changed their method of communication over time, the Bureau asked the Company to describe those changes and the relevant dates.*

---

[14] *See id.* at 6-7, 16-17.

[15] *See id.* at 16-17.

[16] *See id.* at 6-7.

[17] *See id.* at 6.

*The Company's response did not sufficiently address how the OSOEs communicate policies or goals to the Owned Stations' employees. The Company also failed to address how TWDC communicates its goals to the Owned Stations or whether TWDC communicates its policies through any method or Document other than its Employee Policy Manual. Lastly, the Company did not explain whether TWDC or the OSOEs changed their method of communication over time, and if so, the changes made and the relevant dates. The Bureau directs the Company to supplement its response to provide all of the information requested.*

*RESPONSE:*

The Company has already provided the information requested. As stated in the Apr. 21, 2026 Response, TWDC communicates its policies, including its EEO Policy, through its Employee Policy Manual, which is provided to Owned Station employees upon hiring and during periodic training, and remains available on the Company's intranet.[18] The Employee Policy Manual is updated annually, and Owned Station employees are emailed a link that takes them to the updated manual on the intranet. With its July 22, 2025 Response and Sept. 10, 2025 Response, the Company provided all versions of the Employee Policy Manual since December 2020.[19] The method of communication did not change during the relevant time period.

23. *The Bureau requested that the Company identify each OSOE that participates in, monitors, or controls the Owned Station's daily operations and to describe the way such participation, monitoring, or control is executed. The Bureau also requested that the Company explain if the OSOE's participation, monitoring, or control changed over time, and if so, the relevant dates.*

*The Company's response focused on the interpretation of what constitutes "control" of a broadcast license under section 310(d) of the Communications Act of 1934, as amended (Act) and provided that the Owned Stations "maintained control" over daily operations. This response, however, lacked any reference to the portion of the RFI that asks about the OSOE's participation in or monitoring of the Owned Stations' daily operations. It also failed to explain whether the OSOE's participation, monitoring, or control has changed over time. The Bureau directs the Company to supplement its response to provide all of the information requested.*

*RESPONSE:*

The daily operations of each Owned Station are conducted by the staff and management of that station. OSOEs do not have a daily operational role in the Owned Stations and do not conduct monitoring of daily operations. This model of independent local operations did not change during the relevant time period.

---

[18] *See id.* at 7.

[19] *See* BATES Nos. Disney-08-000001 (Jan. 2020 EEO Policy); Disney-08-000003 (Mar. 2020 Update EEO Policy); Disney-08-000005 (July 2020 Update EEO Policy); Disney-08-000007 (May 2021 EEO Policy); Disney-08-000011 (Jan. 2022 EEO Policy); Disney-08-000015 (Nov. 2022 Update EEO Policy); Disney-08-000019 (Feb. 2023 EEO Policy); Disney-08-000023 (July 2023 EEO Policy); Disney-08-000027 (June 2024 EEO Policy); Disney-08-000342 – Disney-08-000872 (Employee Policy Manuals).

24. *The Bureau requested that the Company identify each OSOE that participates in, monitors, or controls each Owned Stations' [sic] employment, supervision, and dismissal of personnel as well as compliance with section 73.2080 of the Commission's rules. The Bureau also requested that the Company explain if the OSOE's participation, monitoring, or control changed over time, and if so, the relevant dates.*

*Consistent with its response to RFI 23, in its response to RFI 24, the Company focused on section 310(d) of the Act and on its interpretation of "control." This response, however, lacked any reference to the portion of the RFI that asks about the OSOE's participation in or monitoring of the Owned Stations' employment, supervision, and dismissal of personnel and compliance with section 73.2080 of the Commission's rules. It also failed to explain whether the OSOE's participation, monitoring, or control has changed over time. The Bureau directs the Company to supplement its response to provide all of the information requested.*

*RESPONSE:*

As stated above, the daily operations of each Owned Station are conducted by the staff and management of the station. This includes operations relating to employment, supervision, and dismissal of personnel and compliance with Section 73.2080 of the Commission's rules. [[No OSOE participates in or controls such operations, and no OSOE monitors such operations on a regular, ongoing basis. However, appropriate levels of oversight as to matters of significance are performed by certain employees of ABC, Inc., American Broadcasting Companies, Inc. and The Walt Disney Company.**]]** These arrangements did not change during the relevant time period.

25. *The Bureau requested that the Company identify each OSOE that participates in, monitors, or controls each Owned Stations' programming decisions. The Bureau also requested that the Company explain if the OSOE's participation, monitoring, or control changed over time, and if so, the relevant dates.*

*Consistent with its response to RFI 23 and RFI 24, in its response to RFI 25, the Company focused its response on section 310(d) of the Act and on its interpretation of "control." This response, however, lacked any reference to the portion of the RFI that asks about the OSOEs' participation in or monitoring of the Owned Stations' programming decisions. It also failed to explain whether the OSOEs' participation, monitoring, or control has changed over time. The Bureau directs the Company to supplement its response to provide all of the information requested.*

*RESPONSE:*

As stated above, the daily operations of each Owned Station are conducted by the staff and management of the Owned Stations. This includes operations relating to programming decisions. Each Owned Station airs ABC Television Network programming. Local programming (i.e., programming other than ABC Television Network programming) is determined by the staff and management of each Owned Station. **[[**No OSOE participates in or controls such decisions, and no OSOE monitors such decisions on a regular, ongoing basis. However, appropriate levels of oversight as to matters of significance are performed by certain

employees of ABC, Inc, American Broadcasting Companies, Inc. and The Walt Disney Company.**]]** These arrangements did not change during the relevant time period.

26. *The Bureau requested that the Company identify each OSOE that participates in, monitors, or controls each Owned Stations'[sic] payment of financial obligations. The Bureau also requested that the Company explain if the OSOE's participation, monitoring, or control changed over time, and if so, the relevant dates.*

*Consistent with its response to RFI 23-25, in its response to RFI 26, the Company focused its response on section 310(d) of the Act and on its interpretation of what constitutes "control." This response, however, lacked any reference to the portion of the RFI that asks about the OSOEs' participation in or monitoring of the Owned Stations' payment of financial obligations. It also failed to explain whether the OSOEs' participation, monitoring, or control has changed over time. The Bureau directs the Company to supplement its response to provide all of the information requested.*

*RESPONSE:*

As stated above, the daily operations of each Owned Station are conducted by the staff and management of the Owned Stations. **[[**Accordingly, the Owned Stations are responsible for payments of financial obligations on behalf of the Owned Stations. No OSOE participates in, monitors, or controls the Owned Stations' processes for payment of financial obligations. These arrangements did not change during the relevant time period.**]]**

28. *The Bureau requested that the Company state the purpose and formation and/or termination dates of the following three teams: Disney Entertainment Human Resources team; Disney Entertainment DEI team; and Disney Enterprise DEI team. The Bureau also requested that the Company identify, for each team, its authority to draft, issue, review, suggest or rescind policies or goals that influence or affect the OSOEs, including the Owned Stations.*

*The Company provided a limited response based on Disney's Defined Scope. As discussed above, the Company had no basis for narrowing its narrative response in this way. In addition, the Company's response to this RFI is insufficient in several ways. For example, in the first paragraph of the response, the Company suggested that it identified Employee Relations (ER) teams instead of Human Resources (HR) functions, but it failed to explain the significance of this distinction or to address whether each of the three listed teams are ER teams. The SLOI response also failed to explain whether the Disney Entertainment Television (DET) team is still in existence.*

*In the second paragraph of the response, the Company stated that "certain employment positions and departments within its HR (now People & Culture) organization" have been renamed, but it is not clear from the response how, if at all, these name changes affect the three teams identified in this request. In addition, it is not clear which employment positions and departments have been renamed, when they were renamed, or why. It is also not clear how the Opportunity & Inclusion department differs, if at all, from the former Diversity, Equity, and Inclusion department in form or function.*

*In the third paragraph of the response, the Company referred to four teams by acronyms. The Bureau directs the Company to confirm the full name of each of these teams, the segment or segments to which they apply, the year the team originated, if they are still in existence, and the year the team's name was changed.*

*Finally, the response failed to identify, for any of the three teams set out in the request, or the additional four teams named in the last paragraph of the Company's response, to describe the authority each had "to draft, review, issue, suggest or rescind policies or guidance applicable to the Owned Stations."*

*The Bureau directs the Company to supplement its response to provide all of the information requested.*

*RESPONSE:*

Nearly every topic the Bureau raises above is either asking new follow-up questions about the information that the Company provided in response to RFI 28 or asking for information that was already included in that response or elsewhere. TWDC stands by the sufficiency of its response but provides the following information.

- [[*Regarding the Agreed Scope*: In the Apr. 21, 2026 Response, the Company responded using the previously agreed time limitation, beginning December 2020, which is the same time period that the Bureau specified in the SLOI.[20]

- *Regarding the follow-up question about the significance of the distinction between ER teams and HR functions*: In its July 22, 2025 Response, the Company explained the distinction between ER and HR functions:

> All employees in the Company's Human Resources ("HR") organizations are dedicated to our equal employment opportunity policies, among others, and, more specifically, the Employee Relations ("ER") groups within HR are dedicated to ensuring compliance with such policies.[21]

With the July 8, 2025 Response, the Company also provided organizational charts for each of the segments identified below and this overview of each segment:[22]

> <u>ER, Center of Excellence and Corporate</u>: ER team responsible for ensuring compliance across the Company and within the corporate segment.
>
> <u>Disney Entertainment Television ("DET") ER</u>: ER Team responsible for ensuring compliance within the Owned Stations.

---

[20] SLOI at 4.

[21] July 22, 2025 Response at 29.

[22] *See* Bates Nos. Disney-09-000001 – Disney-09-000004; July 22, 2025 Response at 29.

> Enterprise DEI:[23] Team with company-wide scope focused on ensuring equal access to employment opportunities and fostering a workplace where employees feel they belong.
>
> Disney Entertainment ("DE") DEI:[24] The team that covers the Owned Stations and several other businesses focused on ensuring equal access to employment opportunities and fostering a workplace where employees feel they belong.

In RFI 28, the Bureau asked follow-up questions about the Disney Entertainment Human Resources Team, which was not one of the teams the Company had identified. Rather, the response to RFI 9 identified the Employee Relations Team. *See* BATES No. Disney-09-000002. The Company understood RFI 28 to relate back to RFI 9 and therefore responded as to the team identified in the response to RFI 9.

- *Regarding the Bureau's follow-up questions about the renaming of certain positions and departments*: This information was not requested in the SLOI, but nevertheless, the information was provided in the Apr. 21, 2026 Response. Specifically, the Company provided information on how these name changes affected the identified teams and which employment positions and departments have been renamed and why:

> The Company has renamed certain employment positions and departments within its HR (now People & Culture) organization to more accurately reflect their scope and work. Consistent with those changes, the Company now has an Opportunity & Inclusion ("O&I") department rather than a Diversity, Equity, and Inclusion or DEI department. This reflects the team's focus on ensuring equal access to employment opportunities and fostering a workplace in which employees feel they belong and can do their best work, regardless of race, ethnicity, religion, or other characteristics, in alignment with the Company's values [. . .] [S]pecifically identified position or department titles that included references to "DEI" or "Diversity, Equity, and Inclusion" at the time of the Company's prior responses have been renamed to "Opportunity & Inclusion." This change does not affect the titles of any employees of the Owned Stations, as no such roles used DEI-referenced titles.[25]

- *Regarding the four acronyms the Bureau refers to*: The Company has already provided the full name of these teams. As was stated in the first through third paragraphs of the Apr. 21, 2026 Response to RFI 28,[26] "DET ER" stands for Disney Entertainment Television Employee Relations, "DMED ER" stands for Disney Media and

---

[23] As explained in the Apr. 21, 2026 Response and below, the Company has renamed specifically identified position or department titles that included references to "DEI" or "Diversity, Equity, and Inclusion" at the time of the Company's prior responses have been renamed to "Opportunity & Inclusion" ("O&I"). *See* Apr. 21, 2026 Response at 9-10. Thus, the DEI department is now named the O&I department.

[24] The DE DEI team is now named the DE O&I team.

[25] Apr. 21, 2026 Response at 9-10 (footnotes omitted).

[26] *Id.*

Entertainment Distribution Employee Relations, "Enterprise O&I" stands for Enterprise Opportunity & Inclusion, and "DE O&I" stands for Disney Entertainment Opportunity & Inclusion. It is unclear what the Bureau means by "the segment or segments to which they apply," but we note that the full names that were spelled out in the initial response identify where in the Company these teams are situated.

- To the new questions on whether the teams are still in existence and what year their names were changed, in addition to the question about the formation dates, we respond as follows: As was stated in the Apr. 21, 2026 Response, within the applicable timeframe, DMED ER supported the Owned Stations from December 1, 2020 through approximately July 2023.[27] Responsibility transitioned to the DET ER team around that time.[28] The Enterprise O&I team has been in existence since December 21, 2020.[29] The DE O&I team has been in existence since June 2023.[30] The name changes occurred in 2025. The DET team is still in existence.

- *Regarding authority of the Bureau-identified teams "to draft, review, issue, suggest or rescind policies or guidance applicable to the Owned Stations"*: The RFI asked the Company to "state" (not "describe") their authority to take the steps listed. As was stated in the Apr. 21, 2026 Response, DET ER, DMED ER, Enterprise O&I, and DE O&I had authority, within their respective remit, to draft, review, issue, suggest, or rescind policies or guidance applicable to the Owned Stations.[31] The Bureau has not explained what additional information it is now requesting, and therefore the Company is unable to respond further.]]

29. *The Bureau requested that the Company provide a chart that lists the job title, duties, and relevant date(s) of membership and/or employment for each individual on the Disney Entertainment Human Resources team; Disney Entertainment DEI team; and Disney Enterprise DEI team.*

*Here again, the Company's response is deficient. The Company responded that it identified ER teams instead of HR functions, but it failed to explain the significance of this distinction or to address whether each of the teams are ER teams. The Bureau directs the Company to supplement its response to provide all of the information requested.*

*RESPONSE:*

The Company has already provided the information requested. See the response above to RFI 28 for additional information the Company has provided about the distinction between ER and HR. As was stated in the Apr. 21, 2026 Response, the Company identified its ER teams in its

---

[27] *See id.*

[28] *See id.*

[29] *See id.* at 10 n.25.

[30] *See id.* at 10.

[31] *See id.* at 9-10.

July 8, 2025 Response, rather than its HR function generally, in response to RFI 9.[32] *See* Bates Nos. Disney-09-000001 – Disney-09-000004. The Company also described the relationship between the ER and HR teams in the July 8, 2025 Response.[33] In the Apr. 21, 2026 Response, the Company provided the information it understood the Bureau to be seeking, including charts and job descriptions for the DET ER team, the former DMED ER team, the Enterprise O&I team, and the DE O&I team. *See* BATES Nos. Disney-29-000001 – Disney-29-000355. The Company provides a chart and job description for the HR teams along with this response. *See* BATES Nos. Disney-29-000356 – Disney-29-000520.

31. *The Bureau requested that the Company state, for each Owned Station, whether any policy or goal identified in response to RFI 30 was implemented, and if so, to provide the dates it was in effect and a description of the policy and/or goal.*

*Instead of providing the requested information, the Company simply responded that the Owned Stations are governed by the Employee Policy Manual and the Enterprise Strategic Inclusion Framework. The Company did not describe any specific policy and/or goal, it did not identify the dates that policy and/or goal was in effect, and it did not confirm whether any specific policy and/or goal was implemented. The Bureau directs the Company to supplement its response to provide all of the information requested.*

*RESPONSE:*

The Company has already provided the information requested, as the documents that the Company cited contain the information that the Bureau has requested. As was stated in the Apr. 21, 2026 Response, the Owned Stations are governed by the enterprise-wide policies and goals that were described in response to RFIs 18 and 30.[34] Those policies and goals are contained and described in two documents, the Employee Policy Manual and the Enterprise-wide Strategic Inclusion Framework.[35] The Company has provided to the Commission every version of the Employee Policy Manual that has been in effect during the applicable time period, and each of those documents was dated, which denotes the time period during which it was in effect. *See* BATES Nos. Disney-08-000342 – Disney-08-000872. Further, in its July 22, 2025 Response and the accompanying documents, the Company described and provided the policies followed by the Owned Stations for addressing discrimination complaints that were in effect during the relevant time period, including the Company's Speak Up policies and EEO policies.[36] *See* BATES Nos. Disney-08-000001 – Disney-08-000034.

Additionally, with the Apr. 21, 2026 Response, the Company provided the Strategic Inclusion Framework, including the original version and the most recent version dated February 20, 2026. *See* BATES Nos. Disney-17-000001 – Disney-17-000002. The Apr. 21, 2026 Response also

[32] *See* July 8, 2025 Response at 18.

[33] *See id.*

[34] *See* Apr. 21, 2026 Response at 4-5, 10-11.

[35] *See id.*

[36] *See* July 22, 2025 Response at 28-29.

included descriptions of the Strategic Inclusion Framework.[37] Further, the Company notes that, for the purposes of cooperating with the Commission's inquiry, the Company also has provided the Inclusion Standards, which did not apply to the Owned Stations but did set forth various non-mandatory mechanisms to help enable inclusive hiring and employment practices on its television productions.[38] *See* BATES Nos. Disney-35-000001 – Disney-35-000022.

40. *The Bureau requested that the Company provide information concerning the database of diverse and underrepresented talent and crew referenced in RFI 39 such as its creation date, its contents, each OSOE or Owned Station with access, and its termination date (if applicable).*

*The Company refused to provide any response based on Disney's Defined Scope. As discussed above, the Company had no basis for narrowing its narrative response in this way. The Bureau directs the Company to supplement its response to provide all of the information requested.*

*RESPONSE:*

The Company's application of the Agreed Scope to its response to this request limited the response to information relating to or impacting the Owned Stations and therefore was appropriate for the reasons set forth in the Introduction above. As stated in the Apr. 21, 2026 Response and the Mar. 23, 2026 Response, the Owned Stations do not have access to the Creative Talent Development & Inclusion's ("CTDI") referral database or the information therein, nor did they leverage the former supplier diversity program.[39] To further clarify, the Owned Stations also did not access the CTDI's referral database or the information in it, or leverage the former supplier diversity program via any OSOE.

42. *The Bureau requested that the Company describe Disney's Reimagine Tomorrow website, including its purpose; the date(s) it was made available internally and to the public; the materials and services made available via the website; the reason(s) for taking the website offline; and an explanation including the date(s) and reason(s) for any changes.*

*The Company's response is incomplete. For example, RFI 42(a) requests that the Company describe the purpose of the Reimagine Tomorrow website. The Company failed to do this. The Company also failed to identify the materials and services made available via the website as requested by RFI 42(d). Further, although the Company acknowledged the Reimagine Tomorrow website was deactivated on February 11, 2025, it did not explain why it was deactivated as requested by RFI 42(e).*

*Lastly, the Company failed to provide any response to RFI 42(f) – an explanation including the date(s) and reason(s) for any changes to the website's purpose and the materials and services made available.*

---

[37] *See* Apr. 21, 2026 Response at 3-5, 16.

[38] *See id.* at 12.

[39] *See id.* at 15 (citing Mar. 23, 2026 Response at 4 n.10).

*The Bureau directs the Company to supplement its response to provide all of the information requested.*

*RESPONSE*:

The Company disagrees with the contention that its response was incomplete, as the Company has already provided the information requested. **[[**As stated in the Reimagine Tomorrow website to which the Bureau was provided access in the Sept. 17, 2025 Response,[40] the purpose of the website was to amplify underrepresented voices and untold stories as well as to champion the importance of accurate representations in media and entertainment. There were no changes to this purpose during the relevant time period. As stated in the Apr. 21, 2026 Response, "[t]he Reimagine Tomorrow website included a Disney Music Group Playlist page featuring multiple playlists curated by Disney Music Group. No other materials or services were offered through the site."[41] As further stated in the Apr. 21, 2026 Response, the website was deactivated due to the adoption of a new framework.[42] The Company is maintaining an archived version of the website solely for the purposes of responding to the Bureau's inquiries.**]]**

44. *The Bureau requested that the Company state whether and how Disney has monitored, tracked, or ensured that the Owned Stations have not employed, compensated, terminated, promoted or demoted any personnel based on protected characteristics, including criteria based on race, color, religion, national origin, or sex and, if so, to identify the guidelines and policies, if any, by which Disney has done so.*

*The Company's response failed to explain whether the Company monitors, tracks, or ensures that the Owned Stations comply with the Company's EEO Policy or other guidelines or policies to ensure that Owned Stations have not employed, compensated, terminated, promoted or demoted any personnel based on protected characteristics, including criteria based on race, color, religion, national origin, or sex. The Company also failed to explain how the Company monitors, tracks or otherwise ensures that the Owned Stations comply with the Company's EEO policy and/or other similar guidelines and policies. The Bureau directs the Company to supplement its response to provide all of the information requested.*

*RESPONSE:*

The Company has already provided the information requested. In its Apr. 21, 2026 Response to RFI 44, the Company describes in detail the compliance processes with respect to the Company's EEO Policy.[43] As previously produced with and described in prior responses, the EEO Policy provides for equal employment opportunity for employees and applicants and

---

[40] *See* Sept. 17, 2025 Response at 8.

[41] *See* Apr. 21, 2026 Response at 16.

[42] *See id.*

[43] *See id.* at 16-17.

requires employment decisions to be made without regard to a person's race, color, national origin, sex, religion, or any other legally protected status.[44]

45. *The Bureau requested that the Company list and describe, for each Owned Station, any recruitment opportunities limited to students from Historically Black Colleges and Universities and/or single-sex colleges or universities and/or colleges or universities with at least 50% of minority students and any job training opportunities limited to minorities and female employees.*

*The Company's narrative response is incomplete. It stated that other than as described in response to RFI 46, no Owned Station restricts job training opportunities to minorities and female employees. However, the Company's narrative response to RFI 46 did not indicate which, if any, of the trainings listed therein were limited to minorities and female employees. The Bureau directs the Company to supplement its response to provide all of the information requested.*

*RESPONSE:*

The Company has already provided the information requested. **[[**In the Apr. 21, 2026 Response, the Company identified the following three professional development programs which were in effect from December 2020 to 2022: the Black Talent Network; the Hispanic Women's Talent Network; and the AAPI Women's Talent Network.[45] Participant employees were invited based on their prior voluntary self-disclosure as members of a particular demographic group.[46] Participation was voluntary, and no employee received a tangible employment benefit from it or detriment based on the decision to participate or not participate in the programs.[47] The programs' activities and events were not limited to the participating cohort—participants' supervisors were invited, and some sessions included facilitators and outside speakers. Along with the Apr. 21, 2026 Response, the Company produced over 500 pages of documents providing more information on these programs. *See* BATES Nos. Disney-46-000001 – Disney-46-000506.**]]**

46. *The Bureau requested that the Company list and describe, for each Owned Station, every recruitment, employment, career development training or professional development program based on race, color, national origin, sex, and/or religion that it offered to its employees and contractors.*

---

[44] *See* Apr. 21, 2026 Response at 16-17; Sept. 10, 2025 Response at 8; July 22, 2025 Response at 28-29; *see also* BATES Nos. Disney-08-000001 (Jan. 2020 EEO Policy); Disney-08-000003 (Mar. 2020 Update EEO Policy); Disney-08-000005 (July 2020 Update EEO Policy); Disney-08-000007 (May 2021 EEO Policy); Disney-08-000011 (Jan. 2022 EEO Policy); Disney-08-000015 (Nov. 2022 Update EEO Policy); Disney-08-000019 (Feb. 2023 EEO Policy); Disney-08-000023 (July 2023 EEO Policy); Disney-08-000027 (June 2024 EEO Policy); Disney-08-000342 – Disney-08-000872 (Employee Policy Manuals).

[45] Apr. 21, 2026 Response at 18.

[46] The Company is required by the Equal Employment Opportunity Commission ("EEOC") to provide the voluntary self-disclosure form to new hires and to use this data for its annual EEO-1 workforce demographics reporting.

[47] *See* Apr. 21, 2026 Response at 18.

*In the first 3 bullets of the narrative response, the Company identified three programs that were available to Owned Station employees. However, it did not appear to confirm whether these programs were limited based on race, color, national origin, sex, and/or religion, or to identify on which basis these programs were limited. The Bureau directs the Company to supplement its response to provide all of the information requested.*

*RESPONSE:*

RFI 46 asked about training or professional development "based on," not "limited based on" the listed factors. **[[**The Apr. 21, 2026 Response listed in the first three bullets the following three training programs that were available to Owned Stations: Hiring Inclusively for Talent Acquisition; Hiring Inclusively for Hiring Leaders; and Advanced Consulting.[48] *See* BATES Nos. Disney-46-000507 – Disney-46-000950. The Company listed these programs because the topics of race, color, national origin, sex and/or religion are discussed in such training in the context of equal opportunity and inclusive hiring and thus were the most responsive to the inquiry about training or professional development "based on" the listed factors. While RFI 46 did not ask for confirmation as to "whether these programs were limited based on race, color, national origin, sex, and/or religion, or to identify on which basis these programs were limited," the Company confirms that none of the trainings listed in the first three bullets of the Company's response were limited based on those characteristics.**]]**

51. *The Bureau requested a description of the actions the Company has taken to comply with Executive Orders 14151 and 14173.*

*The Company responded that these Executive Orders directed certain actions be taken by federal agencies, departments, commissions, and for 14173, the federal government, and as such imposed no obligations on a private party such as the Company. The Bureau requests that the Company confirm that it has not taken any actions to comply with these two Executive Orders.*

*RESPONSE:*

As stated in the Apr. 21, 2026 Response, the Executive Orders imposed no obligations on the Company. Accordingly, there are no actions that the Company could have taken to "comply" with them.[49]

52. *The Bureau requested a description of any actions taken by an OSOE and/or the Owned Station to comply with Executive Orders 14151 and 14173.*

*The Company responded that these Executive Orders directed certain actions be taken by federal agencies, departments, commissions, and for 14173, the federal government, and as such imposed no obligations on a private party such as the Company. The Bureau requests that*

---

[48] *See id.*

[49] *See* Apr. 21, 2026 Response at 19-20.

*the Company confirm that neither an OSOE nor an Owned Station has taken any actions to comply with these two Executive Orders.*

*RESPONSE:*

As stated in the Apr. 21, 2026 Response, the Executive Orders imposed no obligations on private parties. Accordingly, there are no actions that an OSOE or an Owned Station could have taken to "comply" with them.[50]

54. *The Bureau requested a description of the internship program that WABC-TV described as placing "special emphasis on seeking out and identifying female and minority students," and the dates of participation by WABC-TV or any of the other Owned Stations.[2] Additionally, the Bureau asked for details regarding what "special emphasis" was put in place and how it was effected in practice.*

*The Company provided a limited response based on its application of Disney's Limited Scope. As discussed above, the Company had no basis for narrowing its narrative response in this way. Additionally, the Company's response did not address the request for a description of the "special emphasis on seeking out and identifying female and minority students," put in place and how it was effected in practice. The Bureau directs the Company to supplement its response to provide all of the information requested.*

*RESPONSE:*

The Company's application of the Agreed Scope to its response to this request was limited to the period of time covered by the Agreed Scope.

As explained in the Apr. 21, 2026 Response, **[[**WABC has a general practice of promoting internship opportunities through a wide range of methods, including by distributing information concerning internship opportunities at job fairs, workshops, conferences, community meetings, and student tours in order to ensure a broad slate of candidates for open positions, as required by Commission rules.[51] Such dissemination was consistent with the fundamental purpose and directives of the Commission's long-standing EEO program requirements.[52] The phrase "special emphasis on seeking out and identifying female and minority students" has been part of the station's general description of the program since at least 2004, and the Company has not been able to find any records indicating what was intended by its inclusion in the description.

---

[50] *See id.*

[51] *See id.* at 22 (noting that the EEO rules obligate broadcasters to undertake outreach activities, some of which impact women and minorities or otherwise reach community members who may be interested in the broadcast industry). *See also Review of the Commission's Broadcast and Cable Equal Employment Opportunity Rules and Policies*, Second Report and Order and Third Notice of Proposed Rulemaking, 17 FCC Rcd 24018, 24058-59 ¶ 127 (2002) ("2002 EEO Second R&O and Third NPRM") (requiring broadcaster participation in activities like internships "to encourage outreach to persons who may not be aware of the opportunities available in broadcasting . . . or have not yet acquired the experience to compete for current vacancies").

[52] *See* Apr. 21, 2026 Response at 22; 47 C.F.R. § 73.2080(c).

No such "special emphasis" was operationalized by the station during the time period covered by this SLOI.**]]**

55. *For each Owned Station, the Bureau requested that the Company describe the activities, goals, decisions, policies, and participation, if any, for Disney's Black Talent Network, Hispanic Women's Talent Network, AAPI Women's Talent Network, and other similar development programs. The Bureau also requested a description of why each program was created, the current status, and the TWDC or OSOE Entity that directed each Owned Station to implement the program, if applicable.*

*The Company's response did not address the information requested. The response did not explain the activities, goals, decision, policies, and participation for each of the programs and why each program was created. Additionally, the Company's response did not identify the TWDC or OSOE entity that directed each Owned Station to implement each program. The Bureau directs the Company to supplement its response to provide all of the information requested.*

*RESPONSE:*

As stated in the July 22, 2025 Response, in the Apr. 21, 2026 Response, and in addressing RFIs 46 above, **[[**TWDC offered these three professional development programs, the programs have not been in effect since 2022, and participation in all three programs was voluntary.[53] The Company has sponsored these professional development programs for populations the Company had concluded would benefit from career development discussions and networking, and the Company does not maintain records of the participant demographics for these programs.[54] Participation in these programs was not directed by the Company, TWDC, or any other entity in the ownership chain, and some of the Owned Stations opted not to participate. Further, the Company provided hundreds of documents related to all three programs that include illustrative information on the activities and goals of these programs. *See* BATES Nos. Disney-46-000001 – Disney-46-000438.**]]**

56. *The Bureau requested a description of the activities, goals, decisions and policies of, and the Owned Stations' participation in, the Women+Tech BERG and "Code: Rosie" as well as an explanation of why each program was created, the current status of each program, and an identification of the individual or entity that directed each Owned Station to implement the programs, if applicable.*

*The Company's response simply stated that "[n]o employee of the Owned Station participated in Code: Rosie, and the program is no longer active." Missing from this response is a description of the activities, goals, decisions and policies of, and the Owned Stations' participation in, the Women+Tech BERG and "Code: Rosie." Additionally, the Company did not provide information regarding the creation of Code: Rosie, as well as the name of the individual or entity that directed each Owned Station to implement these two programs. Additionally, for the Women+Tech BERG, the Company's response did not provide the current status of this*

---

[53] *See* July 22, 2025 Response at 26; Apr. 21, 2026 Response at 18.

[54] *See* Apr. 21, 2026 Response at 22.

*program. The Bureau directs the Company to supplement its response to provide all of the information requested.*

*RESPONSE:*

As stated in the July 22, 2025 Response, **[[**there are no requirements or prohibitions on membership in Belonging Employee Resource Groups ("BERGs") other than that certain groups are specific to a particular business unit within TWDC.[55] Accordingly, as stated in the Apr. 21, 2026 Response, the Women+Tech BERG, like all Company BERGs, is open to all employees and was created as a grassroots, collaborative effort focused on exploring partnership and opportunities to advance women and allies in technology across TWDC and the community, inspiring and advancing a culture of balance and belonging.[56] *See, e.g.*, BATES Nos. Disney-04-000831 – Disney-04-000859.

Additionally, as stated in the Apr. 21, 2026 Response, no employee of the Owned Stations participated in Code: Rosie, which was terminated in 2023.[57] As explained in documents provided to the Commission with the Sept. 10, 2025 Response, Code: Rosie gave female TWDC employees an opportunity to explore a new career path in software engineering by providing participants with a three-month education in software engineering and one-year apprenticeship. *See* BATES No. Disney-04-000845.

No individual or entity directed any Owned Station to implement these programs.**]]**

57. *The Bureau requested information regarding the African American High School Recognition Ceremony Scholarship (reportedly associated with KFSN), including the first date Disney funded the scholarship; the Entity(ies) that provided funds; an explanation of the decision to fund the scholarship and identification of the decision maker(s); the date(s) funding ceased (if applicable); an explanation of Disney's role and/or any OSOE role, if any, in selecting scholarship award recipients; and, whether the scholarship gave preference to potential awardees based on race, color, national origin, sex, or religion. Additionally, the Bureau requested the date(s) that Disney and/or any OSOE became aware that the scholarship gave preference to potential awardees based on the subparts identified in RFI 57(f).*

*The Company provided a limited response based on Disney's Defined Scope. As discussed above, the Company had no basis for narrowing its narrative response in this way. In addition, the Company did not provide any dates that Disney and/or any OSOE became aware that the scholarship gave preference based on race, color, national origin, sex or religion. The Bureau directs the Company to supplement its response to provide all of the information requested.*

*RESPONSE:*

The Company's application of the Agreed Scope to its response to this request was limited to (i) the period of time covered by the Agreed Scope and (ii) information relating to or impacting the

---

[55] July 22, 2025 Response at 27.

[56] *See* Apr. 21, 2026 Response at 22-23; *see also* Sept. 10, 2025 Response at 6.

[57] *See* Apr. 21, 2026 Response at 22-23.

Owned Stations, and therefore was appropriate for the reasons set forth in the Introduction above.

**[[**With respect to the question as to the "dates that Disney and/or any OSOE became aware that the scholarship gave preference based on race, color, national origin, sex or religion," the Company has been unable to establish with any certainty the first time any employee of any relevant entity may have become aware of some or all of the criteria at issue. That said, as stated in the Apr. 21, 2026 Response, it is KFSN's understanding that all local graduating high school seniors are eligible to apply for this scholarship.[58] Further, neither the Company nor KFSN was involved in determining the eligibility criteria or selecting scholarship award recipients.[59]

As explained in the Apr. 21, 2026 Response, KFSN decided to sponsor the program by donating to the organization's pooled scholarship fund as a way to support local high school students and to facilitate compliance with the Commission's long-standing EEO program requirements, which obligate broadcasters to undertake outreach activities, some of which impact women and minorities or otherwise reach community members who may be interested in the broadcast industry and who may not learn of employment opportunities through traditional channels.[60]**]]**

58. *The Bureau requested information regarding the Central California Asian Pacific Women Scholarship (reportedly associated with KFSN) including the first date Disney funded the scholarship; the Entity(ies) that provided funds; an explanation of the decision to fund the scholarship and an identification of the decision maker(s); the date(s) funding ceased (if applicable); an explanation of Disney's role and/or any OSOE role, if any, in selecting scholarship award recipients; and, whether the scholarship gave preference to potential awardees based on race, color, national origin, sex, or religion.*

*Additionally, the Bureau requested the date(s), if ever, that Disney and/or any OSOE became aware that the scholarship gave preference to potential awardees based on the subparts identified in RFI 58(f).*

*The Company provided a limited response based on its application of Disney's Limited Scope. As discussed above, the Company had no basis for narrowing its narrative response in this way. In addition, the Company did not provide any dates that Disney and/or any OSOE became aware that the scholarship gave preference based on race, color, national origin, sex or*

---

[58] *See* Apr. 21, 2026 Response at 23-24; *see also, e.g.*, *2024 Scholarship Application*, San Joaquin Valley Alumnae Chapter Delta Sigma Theta Sorority, Inc. (2024), https://studentaffairs.fresnostate.edu/are/documents/recruitment/scholarship2023.pdf; *2025 Scholarship Application*, San Joaquin Valley Alumnae Chapter Delta Sigma Theta Sorority, Inc. (2025), https://studentaffairs.fresnostate.edu/are/documents/aarppdf2025application.pdf; *2026 Scholarship Application*, San Joaquin Valley Alumnae Chapter Delta Sigma Theta Sorority, Inc. (2026), https://studentaffairs.fresnostate.edu/are/documents/recruitment/aahsrcscholarshipapp2026.pdf.

[59] *See* Apr. 21, 2026 Response at 24.

[60] *See* Apr. 21, 2026 Response at 23-24; 47 C.F.R. § 73.2080(c); 2002 EEO Second R&O and Third NPRM, 17 FCC Rcd at 24055 ¶ 113, 24058-59 ¶ 127.

*religion. The Bureau directs the Company to supplement its response to provide all of the information requested.*

*RESPONSE:*

The Company's application of the Agreed Scope to its response to this request was limited to (i) the period of time covered by the Agreed Scope and (ii) information relating to or impacting the Owned Stations, and therefore was appropriate for the reasons set forth in the Introduction above.

**[[**With respect to the question as to the "dates that Disney and/or any OSOE became aware that the scholarship gave preference based on race, color, national origin, sex or religion," the Company has been unable to establish with any certainty the first time any employee of any relevant entity may have become aware of some or all of the criteria at issue. That said, as stated in the Apr. 21, 2026 Response, the Central California Asian Pacific Women organization provides scholarships to low-income Asian American Native Hawaiian Pacific Islander women from Central California who are pursuing higher education.[61] Neither the Company nor KFSN was involved in determining the eligibility criteria or selecting scholarship award recipients.[62]

As explained in the Apr. 21, 2026 Response, KFSN decided to support the program as part of a celebration of Asian American Pacific Islander Heritage Month and to facilitate the Commission's long-standing EEO program requirements, which obligate broadcasters to undertake outreach activities, some of which impact women and minorities or otherwise reach community members who may be interested in the broadcast industry and who may not learn of employment opportunities through traditional channels.[63]**]]**

59. *The Bureau requested information regarding the Emma Bowen Foundation for Minority Interests in Media Scholarship Program (reportedly associated with WABC-TV) including the first date Disney funded the scholarship; the Entity(ies) that provided funds; an explanation of the decision to fund the scholarship and identification of the decision maker(s); the date(s) funding ceased (if applicable); an explanation of Disney's role and/or any OSOE role, if any, in selecting scholarship award recipients; and, whether the scholarship gave preference to potential awardees based on race, color, national origin, sex, or religion. Additionally, the Bureau requested the date(s), if ever, that Disney and/or any OSOE became aware that the scholarship gave preference to potential awardees based on the subparts identified in RFI 59(f).*

*The Company provided a limited response based on Disney's Defined Scope. As discussed above, the Company had no basis for narrowing its narrative response in this way. The Company's response is also incomplete as it focused on the fellows that WABC-TV hosted and stated that WABC-TV did not contribute to the Emma Bowen Foundation. The Bureau's questions, however, focused on not only WABC-TV but also the Company and the OSOEs and whether any of those entities contributed to the Emma Bowen Foundation for Minority Interests*

---

[61] *See* Apr. 21, 2026 Response at 24-25.

[62] *See id.*

[63] *See id.*; 47 C.F.R. § 73.2080(c); 2002 EEO Second R&O and Third NPRM, 17 FCC Rcd at 24055 ¶ 113, 24058-59 ¶ 127.

*in Media Scholarship Program. The Bureau directs the Company to supplement its response to provide all of the information requested.*

*RESPONSE:*

The Company's application of the Agreed Scope to its response to this request was limited to (i) the period of time covered by the Agreed Scope and (ii) information relating to or impacting the Owned Stations, and therefore was appropriate for the reasons set forth in the Introduction above.

As explained in the Apr. 21, 2026 Response, WABC's last donation to the Emma Bowen Foundation for Minority Interests Scholarship Program was made prior to the Agreed Scope for timing,[64] and only WABC had made such donations.[65]

**[[**As explained in the Apr. 21, 2026 Response, WABC decided to participate in the program to facilitate compliance with the Commission's long-standing EEO program requirements, which obligate broadcasters to undertake outreach activities, some of which impact women and minorities or otherwise reach community members who may be interested in the broadcast industry and who may not learn of employment opportunities through traditional channels.[66]**]]**

60. *The Bureau requested information regarding the Joe Becton Scholarship at Fayetteville State University (reportedly associated with WTVD) including the first date Disney funded the scholarship; the Entity(ies) that provided funds; an explanation of the decision to fund the scholarship and identification of the decision maker(s); the date(s) funding ceased (if applicable); an explanation of Disney's role and/or any OSOE role, if any, in selecting scholarship award recipients; and, whether the scholarship gave preference to potential awardees based on race, color, national origin, sex, or religion.*

*Additionally, the Bureau requested the date(s), if ever, that Disney and/or any OSOE became aware that the scholarship gave preference to potential awardees based on the subparts identified in RFI 60(f).*

*The Company provided a limited response based on Disney's Defined Scope. As discussed above, the Company had no basis for narrowing its narrative response in this way. Additionally, the Company did not provide any dates that Disney and/or any OSOE became aware that the scholarship gave preference based on race, color, national origin, sex or*

---

[64] This donation was to a pooled fund in support of the organization's provision of scholarships and student participation in the organization's annual conference. *See* Apr. 21, 2026 Response at 25 n.73.

[65] *See* Apr. 21, 2026 Response at 25-26.

[66] *See id.*; 47 C.F.R. § 73.2080(c); 2002 EEO Second R&O and Third NPRM, 17 FCC Rcd at 24055 ¶ 113, 24058-59 ¶ 127.

*religion. The Bureau directs the Company to supplement its response to provide all of the information requested.*

*RESPONSE:*

The Company's application of the Agreed Scope to its response to this request was limited to (i) the period of time covered by the Agreed Scope and (ii) information relating to or impacting the Owned Stations, and therefore was appropriate for the reasons set forth in the response to the Introduction above.

**[[**With respect to the question as to the "dates that Disney and/or any OSOE became aware that the scholarship gave preference based on race, color, national origin, sex or religion," the Company has been unable to establish with any certainty the first time any employee of any relevant entity may have become aware of some or all of the criteria at issue. That said, as stated in the Apr. 21, 2026 Response, WTVD provided funding for a scholarship to Fayetteville State University to award to a student in the school's Communications Department, and Fayetteville State University administered this scholarship, which it awarded based on need and/or academic performance.[67] Neither the Company nor WTVD was involved in determining eligibility criteria or selecting scholarship award recipients.[68]

As explained in the Apr. 21, 2026 Response, WTVD decided to support the program in memory of Joe Becton, a former WTVD employee, and to facilitate compliance with the Commission's long-standing EEO program requirements, which obligate broadcasters to undertake outreach activities, some of which impact women and minorities or otherwise reach community members who may be interested in the broadcast industry and who may not learn of employment opportunities through traditional channels.[69]**]]**

61. *The Bureau requested information regarding the American Indian College Fund including the first date Disney funded the scholarship; the Entity(ies) that provided funds; an explanation of the decision to fund the scholarship and identification of the decision maker(s); the date(s) funding ceased (if applicable); an explanation of Disney's role and/or any OSOE role, if any, in selecting scholarship award recipients; and, whether the scholarship gave preference to potential awardees based on race, color, national origin, sex, or religion. Additionally, the Bureau requested the date(s), if ever, that Disney and/or any OSOE became aware that the scholarship gave preference to potential awardees based on the subparts identified in RFI 61(f). The Company provided a limited response based on Disney's Defined Scope. As discussed above, the Company had no basis for narrowing its narrative response in this way. Additionally, the Company did not provide information regarding whether the scholarship gave preference to potential awardees based on race, color, national origin, sex, or religion or the date(s), if ever, that Disney and/or any OSOE became aware that the scholarship gave preference to potential awardees based on race, color, national origin, sex, or religion.*

---

[67] *See* Apr. 21, 2026 Response at 26-27.

[68] *See id.*

[69] *See id.* at 27; 47 C.F.R. § 73.2080(c); 2002 EEO Second R&O and Third NPRM, 17 FCC Rcd at 24055 ¶ 113, 24058-59 ¶ 127.

*The Bureau directs the Company to supplement its response to provide all of the information requested.*

*RESPONSE:*

The Company's application of the Agreed Scope to its response to this request was limited to (i) the period of time covered by the Agreed Scope and (ii) information relating to or impacting the Owned Stations, and therefore was appropriate for the reasons set forth in the response to the Introduction above.

**[[**With respect to the question as to the "dates that Disney and/or any OSOE became aware that the scholarship gave preference based on race, color, national origin, sex or religion," the Company has been unable to establish with any certainty the first time any employee of any relevant entity may have become aware of some or all of the criteria at issue. That said, as stated in the Apr. 21, 2026 Response, the American Indian College Fund provides scholarships to Native American and Alaska Native students who have financial need.[70] Neither the Company nor Disney Worldwide Services ("DWS") (which provided the grants to the scholarship) was involved in determining eligibility criteria or selecting scholarship award recipients.[71]

As explained in the Apr. 21, 2026 Response, DWS chose to support this program to help pipeline students into rewarding early career opportunities within the entertainment industry, consistent with the Commission's long-standing EEO program requirements, which obligate broadcasters to undertake outreach activities, some of which impact women and minorities or otherwise reach community members who may be interested in the broadcast industries and who may not learn of employment opportunities through traditional channels.[72]**]]**

62. *The Bureau requested information regarding the APIA Scholars including the first date Disney funded the scholarship; the Entity(ies) that provided funds; an explanation of the decision to fund the scholarship and identification of the decision maker(s); the date(s) funding ceased (if applicable); an explanation of Disney's role and/or any OSOE role, if any, in selecting scholarship award recipients; and, whether the scholarship gave preference to potential awardees based on race, color, national origin, sex, or religion. Additionally, the Bureau requested the date(s), if ever, that Disney and/or any OSOE became aware that the scholarship gave preference to potential awardees based on the subparts identified in RFI 62(f).*

*The Company provided a limited response based on Disney's Defined Scope. As discussed above, the Company had no basis for narrowing its narrative response in this way. Additionally, the Company did not provide information regarding whether the scholarship gave preference to potential awardees based on race, color, national origin, sex, or religion. Additionally, the Company failed to identify the date(s), if ever, that Disney and/or any OSOE became aware that the scholarship gave preference to potential awardees based on race, color,*

[70] *See* Apr. 21, 2026 Response at 27.

[71] *See id.*

[72] *See* Apr. 21, 2026 Response at 27; 47 C.F.R. § 73.2080(c); 2002 EEO Second R&O and Third NPRM, 17 FCC Rcd at 24055 ¶ 113, 24058-59 ¶ 127.

*national origin, sex, or religion. The Bureau directs the Company to supplement its response to provide all of the information requested.*

*RESPONSE:*

The Company's application of the Agreed Scope to its response to this request was limited to (i) the period of time covered by the Agreed Scope and (ii) information relating to or impacting the Owned Stations, and therefore was appropriate for the reasons set forth in the response to the Introduction above.

**[[**With respect to the question as to the "dates that Disney and/or any OSOE became aware that the scholarship gave preference based on race, color, national origin, sex or religion," the Company has been unable to establish with any certainty the first time any employee of any relevant entity may have become aware of some or all of the criteria at issue. That said, as stated in the Apr. 21, 2026 Response, until 2024, APIA Scholars provided scholarships to Asian and/or Pacific Islander students but, beginning in 2025, APIA Scholars opened the program to all college and university students regardless of race or ethnicity.[73] Neither the Company nor DWS was involved in determining eligibility criteria or selecting scholarship award recipients.[74]

As explained in the Apr. 21, 2026 Response, DWS chose to support this program to help pipeline such students into rewarding early career opportunities within the entertainment industry, consistent with the Commission's long-standing EEO program requirements, which obligate broadcasters to undertake outreach activities, some of which impact women and minorities or otherwise reach community members who may be interested in the broadcast industry and who may not learn of employment opportunities through traditional channels.[75]**]]**

63. *The Bureau requested information regarding the Hispanic Scholarship Fund (HSF) Scholar Program including the first date Disney funded the scholarship; the Entity(ies) that provided funds; an explanation of the decision to fund the scholarship and identification of the decision maker(s); the date(s) funding ceased (if applicable); an explanation of Disney's role and/or any OSOE role, if any, in selecting scholarship award recipients; and, whether the scholarship gave preference to potential awardees based on race, color, national origin, sex, or religion. Additionally, the Bureau requested the date(s), if ever, that Disney and/or any OSOE became aware that the scholarship gave preference to potential awardees based on the subparts identified in RFI 63(f).*

*The Company provided a limited response based on Disney's Defined Scope. As discussed above, the Company had no basis for narrowing its narrative response in this way. In addition, the Company did not provide information regarding whether the scholarship gave preference to potential awardees based on race, color, national origin, sex, or religion. Additionally, the Company failed to identify the date(s), if ever, that Disney and/or any OSOE became aware that the scholarship gave preference to potential awardees based on race, color, national origin, sex,*

[73] *See* Apr. 21, 2026 Response at 28.

[74] *See id.*

[75] *See id.*; 47 C.F.R. § 73.2080(c); 2002 EEO Second R&O and Third NPRM, 17 FCC Rcd at 24055 ¶ 113, 24058-59 ¶ 127.

*or religion. The Bureau directs the Company to supplement its response to provide all of the information requested.*

*RESPONSE:*

The Company's application of the Agreed Scope to its response to this request was limited to (i) the period of time covered by the Agreed Scope and (ii) information relating to or impacting the Owned Stations, and therefore was appropriate for the reasons set forth in the response to the Introduction above.

**[[**With respect to the question as to the "dates that Disney and/or any OSOE became aware that the scholarship gave preference based on race, color, national origin, sex or religion," the Company has been unable to establish with any certainty the first time any employee of any relevant entity may have become aware of some or all of the criteria at issue. That said, as stated in the Apr. 21, 2026 Response, the Hispanic Scholarship Fund Scholar Program provides scholarships to students of Hispanic heritage.[76] Neither the Company nor DWS was involved in determining eligibility criteria or selecting scholarship award recipients.[77]

As explained in the Apr. 21, 2026 Response, DWS decided to support this program to help pipeline such students into rewarding early career opportunities within the entertainment industry, consistent with the Commission's long-standing EEO program requirements, which obligate broadcasters to undertake outreach activities, some of which impact women and minorities or otherwise reach community members who may be interested in the broadcast industry.[78]**]]**

64. *The Bureau requested information regarding the Walt Disney UNCF Enhanced Scholars Internship Program including the first date Disney funded the scholarship; the Entity(ies) that provided funds; an explanation of the decision to fund the scholarship and identification of the decision maker(s); the date(s) funding ceased (if applicable); an explanation of Disney's role and/or any OSOE role, if any, in selecting scholarship award recipients; and, whether the scholarship gave preference to potential awardees based on race, color, national origin, sex, or religion. Additionally, the Bureau requested the date(s), if ever, that Disney and/or any OSOE became aware that the scholarship gave preference to potential awardees based on the subparts identified in RFI 64(f).*

*The Company provided a limited response based on Disney's Defined Scope. As discussed above, the Company had no basis for narrowing its narrative response in this way. Additionally, the Company did not provide information regarding whether the scholarship gave preference to potential awardees based on race, color, national origin, sex, or religion. The Company also failed to identify the date(s), if ever, that Disney and/or any OSOE became aware that the scholarship gave preference to potential awardees based on race, color, national*

---

[76] *See* Apr. 21, 2026 Response at 29.

[77] *See id.*

[78] *See id.*; 47 C.F.R. § 73.2080(c).

*origin, sex, or religion. The Bureau directs the Company to supplement its response to provide all of the information requested.*

*RESPONSE:*

The Company's application of the Agreed Scope to its response to this request was limited to (i) the period of time covered by the Agreed Scope and (ii) information relating to or impacting the Owned Stations, and therefore was appropriate for the reasons set forth in the response to the Introduction above.

**[[**With respect to the question as to the "dates that Disney and/or any OSOE became aware that the scholarship gave preference based on race, color, national origin, sex or religion," the Company has been unable to establish with any certainty the first time any employee of any relevant entity may have become aware of some or all of the criteria at issue. That said, as stated in the Apr. 21, 2026 Response, UNCF currently provides scholarships to historically underrepresented rising juniors enrolled full-time at a four-year college or university.[79] From 2021-2024, UNCF provided scholarships to African American rising juniors enrolled full-time at a four-year college or university students. UNCF selects the semifinalists from an initial pool of applicants and provides the Company with the opportunity to make recommendations as to which of the semifinalists should be selected as finalists.[80] UNCF, however, ultimately determines which applicants are selected as finalists. Except as described in this response, neither the Company nor DWS is involved in determining eligibility criteria or selecting scholarship award recipients.

As explained in the Apr. 21, 2026 Response, DWS decided to support this program to help pipeline such students into rewarding early career opportunities within the entertainment industry, consistent with the Commission's long-standing EEO program requirements, which obligate broadcasters to undertake outreach activities, some of which impact women and minorities or otherwise reach community members who may be interested in the broadcast industry.[81]**]]**

75. *The Bureau requested that the Company, for each year from 2021 to the present, for each Owned Station, list and describe all factors considered and evaluated for all decisions related to hiring, terminating, and promoting employees at all salary bands, including executives.*

*The Company's response did not list and describe all factors that each Owned Station considered and evaluated in making employment decisions, as was requested. Instead, the Company's response was limited to identifying the Company's expectations concerning employment decisions and to identifying several factors on which Company employment decisions are based. If the Company's expectations as to the factors to be considered for all decisions related to hiring, terminating, and promoting employees at all salary bands, including*

[79] *See* Apr. 21, 2026 Response at 30.

[80] *See id.*

[81] *See id.*; 47 C.F.R. § 73.2080(c).

*executives, also applied to the Owned Stations, the Company needed to clarify this point and explain how those "expectations" were communicated to the Owned Stations. If hiring, promotion, and termination at the Owned Stations is based on "legitimate business reasons," the Company needed to identify the "legitimate business reasons" that were considered for each role at the Owned Stations and the entity/individual that established these "legitimate business reasons." The Bureau directs the Company to supplement its response to provide all of the information requested.*

*RESPONSE:*

The Company contests the assertion that it did not provide the information requested. [[As the Company described in its Apr. 21, 2026 Response, hiring, promotion, and termination decisions are based on legitimate business reasons, consistent with the Company's requirement that all employment decisions be made without consideration of race, color, national origin, or sex.[82] This statement referred to the practices of the Owned Stations. Legitimate business reasons for hiring, terminating, and promoting employees vary on a position-by-position basis and are impacted by any number of factors particular to the position, the station, the market, and timing. It is not possible for TWDC to exhaustively catalogue every factor that may have been considered at any Owned Station over a period of several years, and thus, the original question was unreasonable in its scope. The Company notes, however, that "legitimate business reasons" likely include, but are by no means limited to, the duties of the position, necessary or desirable qualifications, experience, specialized knowledge, skills, or abilities, budgetary issues, employment market conditions, performance factors, availability of positions, and other factors that may arise in the course of operating a business.]]

RFI 75 asked only for a list of factors; it did not request information concerning communications with the Owned Stations or each entity and individual that established the reasons for every hire, promotion, or termination for every role within the applicable timeframe.[83]

To the extent that the Commission is *newly* requesting information concerning communications of the Company's expectations and policies to the Owned Stations, the Company refers to prior responses explaining that TWDC communicates its policies, including the EEO Policy, through its Employee Policy Manual. *See* BATES Nos. Disney 08-000342 – Disney-08-000872. The EEO Policy expressly states that the Company's employment actions—including hiring, promotion, and termination, among other employment actions—are made without regard to race, color, national origin, or sex. *See* BATES No. Disney-08-000349. The Employee Policy Manual is provided to Owned Station employees upon hiring and during periodic training and remains available on the Company's intranet.[84] In accordance with the EEO Policy,

[82] *See* Apr. 21, 2026 Response at 34.

[83] SLOI at 14.

[84] *See* Apr. 21, 2026 Response at 7.

employment actions and decisions—including hiring, promotion, and termination decisions—are made without consideration of race, color, national origin, or sex.[85]

**Requests for Documents**

4. *The Bureau requested that the Company provide copies of **all** documents identifying or describing TWDC's policies or goals related to recruitment; employment; career development and training; compensation, including bonuses and benefits; and contracting based on race, color, natural [sic] origin, sex, and/or religion.*

*In response, the Company referred the Bureau to a single document – the TWDC Employee Policy Manual and Standards of Business Conduct that it had previously produced in response to the Initial LOI. Aside from the fact that this document does not appear to identify or describe TWDC's policies for each of the categories set forth in RFD 4, the Bureau finds it difficult to believe that this is the only responsive document.*

*The Bureau directs the Company to supplement its production to include **all** documents identifying or describing TWDC's policies or goals related to recruitment; employment; career development and training; compensation, including bonuses and benefits; and contracting based on race, color, natural origin [sic], sex, and/or religion. As a reminder, "Document" as defined by the SLOI, is quite broad, and includes "any taped, recorded, transcribed, written, typed, printed, filmed, punched, computer-stored, electronically stored, or graphic matter of every type and description" and "communications from messaging applications." To the extent the Company contends it has no additional responsive documents, the Bureau directs the Company to affirm to that in its response.*

*RESPONSE:*

With the July 22, 2025 Response and Sept. 10, 2025 Response, and as explained in the Apr. 21, 2026 Response, the Company has provided several documents (not one)—the Standards of Business Conduct and multiple versions of the Employee Policy Manual, totaling more than 550 pages.[86] Contrary to the Bureau's assertion, these documents address all of the enumerated topics. See, for example, BATES No. Disney-08-000349 addressing recruitment, employment, compensation, and training; and BATES No. Disney-08-000330, addressing purchasing, vendors, and suppliers.

---

[85] *See id.* at 34.

[86] *See* BATES Nos. Disney-08-000001 (Jan. 2020 EEO Policy); Disney-08-000003 (Mar. 2020 Update EEO Policy); Disney-08-000005 (July 2020 Update EEO Policy); Disney-08-000007 (May 2021 EEO Policy); Disney-08-000011 (Jan. 2022 EEO Policy); Disney-08-000015 (Nov. 2022 Update EEO Policy); Disney-08-000019 (Feb. 2023 EEO Policy); Disney-08-000023 (July 2023 EEO Policy); Disney-08-000027 (June 2024 EEO Policy); Disney-08-000318 – Disney-08-000341 (Standards of Business Conduct); Disney-08-000342 – Disney-08-000872 (Employee Policy Manuals).

In responding, the Company was required to interpret the specific terms used in RFD 5 and reasonably interpreted the request as referring to official statements of policy and goals.[87] Accordingly, these are the documents that "Identify or describe" the Company's policies or goals on the enumerated topics.

5. *The Bureau requested all Communications within each Owned Station referring or relating to recruitment; employment; career development and training; compensation, including bonuses and benefits; and contracting based on race, color, natural origin [sic], sex, and/or religion.*

*In response, the Company referred the Bureau to each Owned Stations' Affirmative Action Plans (AAP) that were produced in response to the Initial LOI as well as to each Owned Stations' [sic] Annual Operating Plans (AOP) that were produced on April 21, 2026. The Bureau finds it difficult to believe these documents are the only "Communications" – as that term is defined by the SLOI – referring or relating to recruitment; employment; career development and training; compensation, including bonuses and benefits; and contracting and race, color, natural origin [sic], sex, and/or religion. The Company did not produce a single email, for example, within each Owned Station that refers or relates to recruitment; employment; career development and training; compensation, including bonuses and benefits; and contracting based on race, color, natural origin [sic], sex, and/or religion.*

*The Bureau directs the Company to supplement its production to produce all Communications requested in RFD 5. To the extent the Company contends it has no additional responsive documents, the Bureau directs the Company to affirm to that contention in its response.*

*RESPONSE:*

As the Company stated in its Apr. 21, 2026 Response[88] and July 22, 2025 Response,[89] it has one policy concerning employment actions and decisions based on race, color, national origin, sex and/or religion—the EEO Policy communicated to employees through the Employee Policy Manual. As set forth in the EEO Policy, discrimination on the basis of race, color, national origin, sex, and/or religion is prohibited. Consequently, the policy prohibits the Owned Stations and its employees from the practices described in RFD 5, i.e., recruiting, hiring, training, et cetera, based on race, color, national origin, sex, and/or religion. Thus, it should not be surprising that the Company has not located any Communications that refer or relate to recruiting, et cetera, based on race, color, national origin, sex, and/or religion. Nevertheless, consistent with the Company's efforts to cooperate throughout this investigation, the Company's response to this request referred to the previously provided AAPs and AOP presentations. Similarly, to the extent the Bureau may believe that this request encompasses communications within an Owned Station that refer or relate to the broad outreach efforts the Owned Stations undergo pursuant to their duties under Commission rules 73.2080(b) and (c),

[87] Those terms have no clear and specific meanings as used in this context where they refer to the abstract concepts of "policies" and "goals." Notwithstanding the Bureau's capitalization of "Identify," nothing in the SLOI defines either of those words in a way that fits this request or is contrary to the Company's interpretation of them.

[88] *See* Apr. 21, 2026 Response at 4, 7, 17.

[89] *See* July 22, 2025 Response at 28-29.

communications about such efforts are not responsive because they do not address recruitment or employment based on race, color, national origin, sex and/or religion. The Company has referenced such broad outreach efforts in its responses to the LOI and SLOI, however. Finally, the Company does not interpret RFD 5 to seek communications that refer or relate to the Company's policy that employment actions and decisions are not to be based on race, color, national origin, sex and/or religion and accordingly has not searched for all such documents.

The Company has in good faith responded to RFD 5. The Company is available and open to additional discussions with the Bureau to further clarify the specific types of documents the Bureau is seeking so as to better inform further efforts.

7. *The Bureau requested that the Company provide copies of all Communications between TWDC and any Owned Station referring or relating to recruitment; employment; career development and training; compensation, including bonuses and benefits; and contracting based on race, color, natural origin [sic], sex, and/or religion.*

*The Company's only response was to direct the Bureau to the Company's response to RFD 5. Yet, as noted above, the Company's response to RFD 5 was limited to each Owned Station's AAPs and AOPs. It is unclear how, if at all, these documents constitute a "Communication" between TWDC and the Owned Stations. The Bureau also finds it difficult to believe these documents are the only "Communications" between TWDC and the Owned Stations referring or relating to recruitment; employment; career development and training; compensation, including bonuses and benefits; and contracting based on race, color, natural origin [sic], sex, and/or religion.*

*The Bureau directs the Company to supplement its production to produce all Communications requested in RFD 7. To the extent the Company contends it has no additional responsive documents, the Bureau directs the Company to affirm to that contention in its response.*

*RESPONSE:*

As the Company stated in its Apr. 21, 2026 Response[90] and July 22, 2025 Response,[91] it has one policy concerning employment actions and decisions based on race, color, national origin, sex and/or religion—the EEO Policy communicated to employees through the Employee Policy Manual. As set forth in the EEO Policy, discrimination on the basis of on race, color, national origin, sex, and/or religion is prohibited. Consequently, the policy prohibits the practices described in RFD 5, i.e., recruiting, hiring, training, et cetera, based on race, color, national origin, sex, and/or religion. Thus, it should not be surprising that the Company has not located Communications that refer to or relate to recruiting, et cetera, based on race, color, national origin, sex, and/or religion. See also the response above regarding RFD 5.

9. *The Bureau requested that the Company provide copies of all Communications between any OSOE and any Owned Station referring or relating to recruitment; employment; career*

[90] *See* Apr. 21, 2026 Response at 4, 7, 17.

[91] *See* July 22, 2025 Response at 28-29.

*development and training; compensation, including bonuses and benefits; and contracting based on race, color, natural origin [sic], sex, and/or religion.*

*The Company's only response was to direct the Bureau to the Company's response to RFD 5. Here again, as noted above, the Company's response to RFD 5 was limited to each Owned Station's AAPs and AOPs. It is unclear how, if at all, these documents constitute a "Communication" between any OSOE and the Owned Stations. The Bureau also finds it difficult to believe these documents are the only "Communications" between any OSOE and the Owned Stations referring or relating to recruitment; employment; career development and training; compensation, including bonuses and benefits; and contracting based on race, color, natural origin [sic], sex, and/or religion.*

*The Bureau directs the Company to supplement its production to produce all Communications requested in RFD 9. To the extent the Company contends it has no additional responsive documents, the Bureau directs the Company to affirm to that contention in its response.*

*RESPONSE:*

As the Company stated in its Apr. 21, 2026 Response[92] and July 22, 2025 Response,[93] it has one policy concerning employment actions and decisions based on race, color, national origin, sex and/or religion—the EEO Policy communicated to employees through the Employee Policy Manual. As set forth in the EEO Policy, discrimination on the basis of on race, color, national origin, sex, and/or religion is prohibited. Consequently, the policy prohibits the practices described in RFD 5, i.e., recruiting, hiring, training, et cetera, <u>based on race, color, national origin, sex, and/or religion</u>. Thus, it should not be surprising that the Company has not located Communications that refer to or relate to recruiting, et cetera. based on race, color, national origin, sex, and/or religion. See also the response above regarding RFD 5.

11. *The Bureau requested that the Company produce copies of all Documents and Communications referring or relating to potential or enacted changes to TWDC policies, goals, contracts, procedures, presentations, programs, or trainings to comply with Executive Orders 14151 or 14173.*

*In response, the Company did not state that it did not have responsive Documents and Communications – as those terms are defined in the SLOI. Instead, it directed the Bureau to its narrative response to RFI 51, in which the Company states that neither of these executive orders imposed any obligation on a private party. This narrative response is not responsive to RFD 11. The Company's narrative response to RFI 51 failed to address whether there were potential or enacted changes to TWDC policies, goals, contracts, procedures, presentations, programs, or trainings to comply with Executive Orders 14151 or 14173. Moreover, it is difficult to believe that the Company did not have any Documents or Communications referring or relating to potential or enacted changes to TWDC policies, goals, contracts, procedures,*

[92] *See* Apr. 21, 2026 Response at 4, 7, 17.

[93] *See* July 22, 2025 Response at 28-29.

*presentations, programs, or trainings to comply with Executive Orders 14151 or 14173 that are responsive to RFD 11.*

*The Bureau directs the Company to supplement its production to produce all of the Documents and Communications requested in RFD 11. To the extent the Company contends it has no additional responsive Documents or Communications, the Bureau directs the Company to affirm that contention in its response.*

*RESPONSE:*

As the response to RFI 51 explained, the Executive Orders imposed no obligations on private parties. There are, therefore, no potential or enacted changes that could be made to OSOE policies, goals, contracts, procedures, presentations, programs, or trainings "to comply" with the Order, and thus there cannot be responsive Documents or Communications.

12. *The Bureau requested that the Company produce copies of all Documents and Communications referring or relating to potential or enacted changes to OSOE policies, goals, contracts, procedures, presentations, programs, or trainings to comply with Executive Orders 14151 or 14173.*

*In response, the Company did not state that it did not have responsive Documents and Communications – as those terms are defined in the SLOI. Instead, the Company directed the Bureau to its narrative response to RFI 51, in which the Company states that neither of these executive orders imposed any obligation on a private party. This narrative response is not responsive to RFD 12. The Company's narrative response to RFI 51 failed to address whether there were potential or enacted changes to OSOE policies, goals, contracts, procedures, presentations, programs, or trainings to comply with Executive Orders 14151 or 14173. Moreover, it is difficult to believe that the Company did not have any Documents or Communications referring or relating to potential or enacted changes to OSOE policies, goals, contracts, procedures, presentations, programs, or trainings to comply with Executive Orders 14151 or 14173 that are responsive to RFD 12.*

*The Bureau directs the Company to supplement its production to produce all of the Documents and Communications requested in RFD 12. To the extent the Company contends it has no additional responsive Documents or Communications, the Bureau directs the Company to affirm that contention in its response.*

*RESPONSE:*

As the response to RFI 51 explained, the Executive Orders imposed no obligations on private parties. There are, therefore, no potential or enacted changes that could be made to OSOE policies, goals, contracts, procedures, presentations, programs, or trainings "to comply" with the Order, and thus there cannot be responsive Documents or Communications.

13. *The Bureau requested that the Company produce copies of all Documents and Communications referring or relating to potential or enacted changes to each Owned Stations' policies, goals, contracts, procedures, presentations, programs, or trainings to comply with Executive Orders 14151 or 14173.*

*In response, the Company did not state that it did not have responsive Documents and Communications – as those terms are defined in the SLOI. Instead, the Company directed the Bureau to its narrative response to RFI 51, in which the Company states that neither of these executive orders imposed any obligation on a private party. This narrative response is not responsive to RFD 13. The Company's narrative response to RFI 51 failed to address whether there were potential or enacted changes to the Owned Stations' policies, goals, contracts, procedures, presentations, programs, or trainings to comply with Executive Orders 14151 or 14173. Moreover, it is difficult to believe that the Company did not have any Documents or Communications referring or relating to potential or enacted changes to the Owned Stations' policies, goals, contracts, procedures, presentations, programs, or trainings to comply with Executive Orders 14151 or 14173 that are responsive to RFD 13.*

*The Bureau directs the Company to supplement its production to produce all of the Documents and Communications requested in RFD 13. To the extent the Company contends it has no additional responsive Documents or Communications, the Bureau directs the Company to affirm that contention in its response.*

*RESPONSE:*

As the response to RFI 51 explained, the Executive Orders imposed no obligations on private parties. There are, therefore, no potential or enacted changes that could be made to the Owned Stations' policies, goals, contracts, procedures, presentations, programs, or trainings "to comply" with the Order, and thus there cannot be responsive Documents or Communications.

*Supplemental response to RFD 19*

**[[**The company has identified, and is producing, two additional complaints that inadvertently were not previously addressed in its responses. BATES Nos. Disney-19-000001 – Disney-19-000015 relate to a complaint that the Company recently discovered had been internally tagged incorrectly as relating only to age. BATES Nos. Disney-19-000016 – Disney-19-000028 relate to a complaint that the EEOC served on the Company on March 17, 2026 and dismissed on March 18.**]]**

**Declaration of Jennifer K. Reberger**

I, Jennifer K. Reberger, declare that I have reviewed the foregoing Response of The Walt Disney Company ("the Company") to the Enforcement Bureau's May 15, 2026 email concerning the Supplemental Letter of Inquiry dated February 20, 2026 (File No. EB-IHD-25-00038333) (the "Response") and, to the best of my information, knowledge, and belief, which includes knowledge based on information provided to me by others, (1) the information set forth in the Response is true and accurate, (2) all identified information requested by the May 15, 2026 email as described and limited in the Response that is in the Company's possession, custody, or control is being produced, and (3) the documents produced with the Response are true and accurate copies of the original documents.

I declare under penalty of perjury that the foregoing is true and correct.

Jennifer K. Reberger
EVP, Human Resources, Disney Entertainment Television

Executed on: May 29, 2026

# WILKINSON EXHIBIT 61

X ← **Post** Log in Sign up

**Brendan Carr** @BrendanCarrFCC

Hollywood and New York have enjoyed nearly unchecked power over broadcast TV for years.

A little bit of balance is a good thing—Newsom's fake news notwithstanding.

In fact, broadcasters made a deal with the American people. Broadcasters get free access to a public resource (airwaves) and, in exchange, they must operate in the public interest—not a narrow, partisan one.

The FCC will continue with common sense reforms.

> **Governor Gavin Newsom** @CAgovernor · Aug 6
> Trump continues to create a propaganda machine for his MAGA agenda.
>
> This move by the FCC weakens longstanding ownership protections for broadcast media, making it easier for him to control what Americans see, hear, and read....

8:27 PM · Aug 6, 2026 · **70.7K** Views

91 571 2.9K 48

**AwakenedOutlaw** ⚒️ @AwakenedOutlaw · Aug 7
Thank you, Commissioner! This is so badly needed. The news media using our public airways are split (left/right) like 90/10, favoring Democrats... and probably worse than that.

4 36 848

**Florida Pureblood us** ✝️ @Floridared1776 · Aug 7
Brian Stelter was crying about this too so that automatically tells me this is a great thing!!!

1 7 122

**GoPoundSand** @Go_PoundSand · Aug 7
This is the only fake News coming out of the airwaves




1 6 109

# WILKINSON EXHIBIT 62

TRUTH.

# Truth Details

1217 replies

**Donald J. Trump**
@realDonaldTrump

Kristen Welker, the Unpopular "Hostess" of the once great Meet the Press, now considered Meet the Fake Press, just stated that Donald Trump has "mixed results" on his Endorsements of Candidates, when the recent WINS of Darline Graham and Mike Mazzei, stand at 100% for the U.S. Senate, and 98% for the U.S. House, recently and over the longterm. How can anyone be allowed to say this, working for freely given Public Airwaves? Results are attached. Because of this purposeful inaccuracy, she will be reported to the FCC for rebuke or punishment. Unfortunately, she is not the only one. The Radical Left News is going out of their way to harass, demean, and libel anything "TRUMP." Their new weapon is to say that my 99% SUCCESS Rate on Endorsements, 100% on Senatorial Endorsements (Many of whom were not even given a shot of winning until I Endorsed!), is either a mixed result, or not very good. In actuality, it is, without question, the strongest Endorsement in the History of Politics. If it were not, I would be the first to admit it. Darline Graham's run for the Senate was the biggest story in all of Politics, because she wasn't expected to win, and then, when I Endorsed her, and she easily won, the story of her Victory was hardly covered by anybody. Likewise, the future Governor of Oklahoma, who was behind in every Poll, I Endorsed him, he won, and the story was barely covered! The Press is a Disgrace to our Nation, and I hope that Chairman Brendan Carr, and the fine people of his Commission, will take this Threat to our Country very seriously. Thank you for your attention to this very important matter of Fake Polls and Commentary! President DONALD J. TRUMP




**4.03k** ReTruths **14.6k** Likes Aug 30, 2026, 9:00 AM

# WILKINSON EXHIBIT 63

Print Close

# FCC boss signals major crackdown on TV networks pushing 'fake polls' ahead of the midterms

By Madison Colombo

Published September 07, 2026

Fox News

The Federal Communications Commission could soon issue guidance to broadcast television networks over what FCC Chairman Brendan Carr called "fake polls" ahead of the midterms.

Speaking on "The Sunday Briefing," Carr argued that broadcast television is subject to different federal requirements than cable channels or online platforms because stations operate under FCC licenses.

"The one thing that President Trump gets, fundamentally, is that broadcast TV is completely different than other forms of distribution, including cable," Carr said Sunday.

**FCC CHAIR SUGGESTS ABC SKIPPING TRUMP'S SPEECH WILL FACTOR IN LICENSE RENEWAL DECISION**



FCC Chairman Brendan Carr, right, speaks with Sen. Dan Sullivan, R-Alaska, after attending a Commander-in-Chief's Trophy presentation in the East Room of the White House on March 20, 2026, in Washington, D.C. (Chip Somodevilla/Getty Images)

"And so many broadcasters right now, they [want to] break the deal that they cut with the American people. They get billions of dollars in taxpayer, effectively, subsidized distribution. And what they're supposed to do in exchange is operate in the public interest, not some sort of narrow partisan interest," he added.

His comments come after President Donald Trump criticized NBC News's Kristen Welker on August 30 over what he said was a mischaracterization of his endorsement record in political primaries. Welker, speaking during a segment on a local NBC affiliate, noted that Trump would "loom large" over the midterms before pointing to his endorsement record.

**DEMS DERIDED TRUMP'S MIDTERM GAMBLE — UNTIL HE ENDED UP WINNING BIG**

"He, of course, has endorsed a slate of candidates in the primaries," Welker said. "He's had some mixed results, but most recently, his pick of Senator Darline Graham, of course, the sister of the late Senator Lindsey Graham, was successful in her primary battle."



Then-President-elect Donald Trump speaks with Brendan Carr, whom he selected to lead the Federal Communications Commission, while attending SpaceX's sixth Starship test flight on Nov. 19, 2024, in Brownsville, Texas. (Brandon Bell/Getty Images)

Trump responded on Truth Social, writing, "Kristen Welker, the Unpopular 'Hostess' of the once great Meet the Press, now

considered Meet the Fake Press, just stated that Donald Trump has 'mixed results' on his Endorsements of Candidates," before pointing to his endorsement record, including his backing of Sen. Darline Graham.

**NEW YORK TIMES BLASTS 'ABUSIVE' TRUMP SUBPOENAS TARGETING REPORTERS' SOURCES**

"How can anyone be allowed to say this, working for freely given Public Airwaves? Results are attached. Because of this purposeful inaccuracy, she will be reported to the FCC for rebuke or punishment," he added.

NBC News defended Welker in a statement to Fox News Digital, backing its "Meet the Press" moderator following Trump's threat.

"Kristen is one of the best in the business, and we stand by her," an NBC News spokesperson said.

**MYSTERIOUS POLLING FIRM BEHIND FAKE ELECTION SURVEYS CLOSES AFTER ADMITTING 'SOCIAL EXPERIMENT'**

Carr said there has been particular interest in reminding broadcasters about their obligations regarding what he called "fake polls," which he warned could be used to suppress voters heading into the fall midterms.

"I think President Trump is over the target, and we're looking at a lot of actions. For instance, there's a lot of interest right now in fake polls that are out there," Carr said.

"And so the FCC may put guidance out soon to remind broadcasters about their obligations with respect to not airing fake polls, particularly if they're done to suppress people heading into the fall," he added.

**DON'T LET FAKE ELECTION WEBSITES FOOL YOU BEFORE 2026 MIDTERMS**

FCC Commissioner Anna Gomez publicly rejected the idea of penalizing reporters, posting on X: "As I've said many times, the FCC has no authority to punish journalists this administration doesn't like. These threats to press freedom are dangerous. They undermine the foundation of our democracy, and they have no place in it."

**CLICK HERE TO DOWNLOAD THE FOX NEWS APP**

*Fox News's CJ Womack contributed to this report.*

Madison Colombo is a writer for Fox News Digital's Flash, Media, and Culture team, covering daily breaking news and trending topics with an award-winning background in broadcast and digital journalism.

Print Close

**URL**

https://www.foxnews.com/media/fcc-boss-signals-major-crackdown-tv-networks-pushing-fake-polls-ahead-midterms

Home | Video | Politics | U.S. | Opinion | Entertainment | Tech | Science | Health | Travel | Lifestyle | World | Sports | Weather

Privacy | Terms

This material may not be published, broadcast, rewritten, or redistributed. © FOX News Network, LLC. All rights reserved. Quotes displayed in real-time or delayed by at least 15 minutes. Market data provided by Factset. Powered and implemented by FactSet Digital Solutions. Legal Statement. Mutual Fund and ETF data provided by LSEG. Do Not Sell my Personal Information - New Terms of Use - FAQ

# WILKINSON EXHIBIT 64

# *Jimmy Kimmel Moves Talarico Interview to YouTube Because of F.C.C. 'Threat'*

In a monologue on Wednesday, Mr. Kimmel said that the show made the decision because the F.C.C. had "threatened" ABC over "traditional editorial decisions."

Listen · 5:05 min





The decision by Jimmy Kimmel, left, to move his interview with James Talarico, the Democratic candidate for Senate in Texas, is the latest development in a yearlong battle between ABC and the Federal Communications

Commission. Phil Mccarten/Invision, via Associated Press, Brandon Bell/Getty Images




**By Benjamin Mullin and John Koblin**

Sept. 10, 2026

"Jimmy Kimmel Live" has decided against broadcasting an interview on Thursday night with James Talarico, the Democratic Senate candidate in Texas, and will instead post it on YouTube, the latest development in a yearlong battle between ABC and the Federal Communications Commission.

During his monologue on Wednesday night, Mr. Kimmel said that his show preemptively made the decision because of pressure from President Trump and the F.C.C. over "simple, traditional editorial decisions; guest bookings it would seem they don't like."

"Now that he's president, his F.C.C. has threatened me, threatened our show, threatened our network, ABC, our affiliates, our local stations," Mr. Kimmel said. "So if you want to learn about a candidate for the Senate tomorrow, you will have to go to the 'Jimmy Kimmel Live!' YouTube channel," he added.

A spokesman for Brendan Carr, the chairman of the F.C.C., did not immediately respond to a request for comment. A spokeswoman for ABC, which broadcasts "Jimmy Kimmel Live!," had no comment.

Mr. Carr has taken a combative approach to media outlets since being appointed by Mr. Trump last year. NPR, PBS, Disney, CBS and NBCUniversal owner Comcast have come under scrutiny as he has opened investigations into their hiring practices, re-examined rules around interviews with political candidates, parsed their interviews and ordered a review of station broadcast licenses. Some of those moves have been met with outcry from First Amendment advocates, who have accused Mr. Carr of attempting to curtail free expression.

Mr. Carr and Mr. Kimmel clashed last year. After Mr. Kimmel commented on the way President Trump's supporters were characterizing the politics of the man accused of assassinating the conservative activist Charlie Kirk, Mr. Carr said on a podcast that Mr. Kimmel's remarks were part of a "concerted effort to lie to the American people." He added that the F.C.C. was "going to have remedies that we can look at."



Brendan Carr, chairman of the Federal Communications Commission, has taken a combative approach to media outlets since being appointed by Mr. Trump last year. Eric Lee for The New York Times

Some TV station groups responded by boycotting Mr. Kimmel's show, and Disney, which owns ABC, pulled him off the air as the controversy snowballed. But Mr. Kimmel returned the next week, addressing his suspension in an emotional monologue.

Disney's troubles with the F.C.C. didn't end there. In April, the F.C.C. ordered a review of all station licenses held by ABC, saying in a filing that the decision stemmed from an investigation into ABC's diversity and inclusion policies. It has also opened an investigation into "The View," a daytime talk show aired by ABC, over equal-time rules that apply to appearances by political candidates.

Disney has sued to block the F.C.C.'s attempt to revoke its licenses, accusing the commission of violating the First Amendment.

**Get updates when new midterm election polls are added to our poll trackers.** When new polling data drops we'll send an update straight to your inbox. Get it sent to your inbox.

Mr. Carr's interpretation of a century-old rule around "equal time" has had a chilling effect on talk show bookings since the beginning of the year. In February, Stephen Colbert announced on his former late night show that CBS had prevented him from interviewing Mr. Talarico, citing the same guidance from the F.C.C.

The interview, which Mr. Colbert's show posted to YouTube, garnered 9.5 million views and more than 71,000 comments. By comparison, Mr. Colbert's 2019 interview with Joseph R. Biden Jr., who had already launched his presidential campaign for the 2020 election, generated 681,791 views and 3,402 comments on YouTube while also airing on CBS.

ABC said in a lawsuit that it filed in a federal court against the F.C.C. last month that Mr. Carr's updated guidance has affected the types of guests "The View" books as well. In the suit, ABC said that "The View" has been "more circumspect in booking political candidates, and has resulted in passing on further consideration of booking several political candidates."

The updated F.C.C. guidance, announced in January, affects only political candidates running for office, not elected officials. For example, "The View" had Senator Ted Cruz as a guest on Wednesday morning's show.

Mr. Carr has argued that his interpretation of the law offers “more speech, not less — you can have more candidates on,” he said earlier this year.

“Congress passed the equal time provision for a very specific reason,” Mr. Carr said at a news conference in February. “They didn’t want the media elites in Hollywood and New York to put their thumb on the scale and pick the winners and losers in primaries and general elections.”

**Benjamin Mullin** reports for The Times on the major companies behind news and entertainment. Contact him securely on Signal at +1 530-961-3223 or at benjamin.mullin@nytimes.com.

**John Koblin** covers the television industry for The Times.

---

A version of this article appears in print on , Section B, Page 1 of the New York edition with the headline: Kimmel Moves Talarico Interview to YouTube After F.C.C. ‘Threat’

# WILKINSON EXHIBIT 65

# Trump Lunges at Female Reporter Asking About Those Supposed $5K Checks

newrepublic.com/post/215316/trump-lunges-female-reporter-5000-check-rachel-scott

Malcolm Ferguson September 11, 2026

Breaking News
from Washington and beyond

## Donald Trump can't handle even simple questions about his midterm bribe.



Donald Trump responds to ABC's Rachel Scott on September 10.
Andrew Harnik/Getty Images

President Trump got in the face of ABC's Rachel Scott after she asked him a question about the rationale behind his national midterm voter bribe.

"Mr. President, on the checks: The U.S. is still $40 trillion in debt. If your economic policies are working, why do you need an incentive for people to turn out to vote?" she asked Thursday night.

"I didn't do it for turning out the vote, I did it as a reward for people having to put up with five years and four years of a horrible situation caused by Biden," Trump replied. "You look at the border, you look at the crime.... It's almost a reward for the people having to put up with Biden's policies."

"But you also offered checks through—"

"Not you. Not you!" Trump snapped, leaning in threateningly close to Scott. "Hey, not you," he said again with a snarl. "Your network … you're the worst."



**Aaron Rupar**
@atrupar

Q: On the checks, we have $40 trillion in debt. If your economic policies are working, why do you need an incentive for people to turn out to vote?

TRUMP: I'm doing it as a reward for people having to put up for five years and four years of a horrible situation caused by Biden https://t.co/Iq4LpS1pNt




Sep 10, 2026 · View on X

This is not the first time Trump has crashed out after being asked a tough question by a woman. In April, he yelled "Quiet, quiet, quiet!" at CNN's Kristen Holmes, calling her disrespectful for asking a pertinent question about U.S. relations with North Korea. He's lobbed transphobic attacks at CNN's Kaitlan Collins, and last year told Bloomberg reporter Catherine Lucey, "Quiet, Piggy!" He's also lashed out at Scott before, calling her "stupid" after she dared ask about gas prices.

His angry response to Scott yet again displays his disdain for female journalists and his lack of preparedness for even the most straightforward questions.

## Trump Whines About How He Can't Give Himself Medal of Honor

### He said this in front of an audience full of medal of honor recipients.



President Trump greets Medal of Honor recipients during an event at the National Medal of Honor Museum in Arlington, Texas, on September 10.
Andrew Harnik/Getty Images

While giving remarks at the National Medal of Honor Museum in Texas Thursday, President Trump complained to a room full of medal recipients that he can't have one.

"The thing I really want is I want for myself a Congressional Medal of Honor, and I've studied it and I will give it to myself. I have no problem, but I'm not allowed to. Can you believe it? The one thing I'm not allowed to do," Trump said to laughter from the audience, which included 15 of the 65 living recipients of the honor. "I would give myself, so it would make it instead of 15, we'd have 16."

After making jabs at the “fake news media” for always taking his sarcastic remarks and claiming that he actually wants a medal, Trump quipped “I’m only kidding” before adding, “Actually, I’m not kidding, I would like to.... I can think of no other thing.”

**Acyn**
@Acyn

Trump: We're privileged to have with us 15 of the 16 living recipients of the Congressional Medal of Honor. I want for myself a Congressional Medal of Honor, and I've studied it and I will give it to myself, I have no problem, but I'm not allowed to. Can you believe it? The one https://t.co/oVG3FcJLPP




Sep 10, 2026 · View on X

It’s a crass statement to make to recipients of the highest honor in the U.S. military, given to troops “who distinguish themselves through conspicuous gallantry and intrepidity at the risk of life above and beyond the call of duty.” Trump has never served in the military, dodging the Vietnam draft with a mysterious medical exemption for bone spurs. He later remarked that avoiding sexually transmitted diseases while dating around was like “being in Vietnam.”

But the president has never seen a trophy or award that he didn’t want, regardless of whether he deserved it. At a 2016 rally in Virginia, he accepted a (possibly fake) Purple Heart, given to soldiers wounded in combat, from a veteran. “I always wanted to get the Purple Heart,” he said while showing off the medal to the crowd. “This was much easier.”

Despite his desire for these kinds of awards, Trump has repeatedly disrespected wounded or deceased veterans and their families. He infamously insulted Khizer and Ghazala Khan, who lost their son in Iraq in 2004, and in 2015 attacked Senator John McCain, who was a prisoner of war during the Vietnam War, saying, "He's not a war hero. He's a war hero because he was captured. I like people that weren't captured."

In his first term as president, Trump referred to U.S. soldiers who died in World War I as "suckers" and "losers," and wanted soldiers who had lost limbs in their service hidden from public view during a proposed military parade. His recent treatment of soldiers serving in his war with Iran, with long deployments, supply disruptions, and other poor conditions only adds to the evidence that he doesn't really care about military service members, and wants their honors without any effort or sacrifice.

## Trump Admin Sued Over Plan to Send Armed ICE Agents to the Polls

### The city of Denver has teamed up with multiple civil rights organizations to try to protect the midterm elections.




Michael Ho Wai Lee/SOPA Images/LightRocket/Getty Images

The city of Denver—along with multiple Latino civil rights groups—on Thursday sued Homeland Security Secretary Markwayne Mullin and the Trump administration to stop them from allowing Immigration and Customs Enforcement agents to serve immigration warrants at polling sites.

While Mullin has denied that ICE would be monitoring voting booths this election, he was concrete about agents having the right to be there if there was a "threat to that polling place" or "we're serving a warrant." Denver argues that even that violates 18 U.S. Code § 592, a Civil War-era law which blocks armed forces from patrolling polling locations.

"The right to vote, and to do so without fear of intimidation, is fundamental to our democracy and to being an American," Denver Mayor Mike Johnston said in a press release. "Stationing ICE agents near polling places is only meant to scare people and suppress votes. We'll fight tooth and nail to prevent it."

Federal agents have already been reported at polling places in New York, California, and Texas, as Trump continues his attempt to use baseless claims of widespread voter fraud as a means of fully controlling—or postponing—the midterm elections.

"The presence of federal force at the polls interferes with the smooth administration of elections at the local level," the lawsuit reads. "It disrupts voting and makes it more difficult for state and local election officials and law enforcement to do their jobs by making polling places spaces of confrontation."

Other parties in the lawsuit noted that the presence of federal agents would have a chilling effect on Latino voters, potentially stopping many from showing up at all.

"Sending armed ICE officers to polling places is not immigration enforcement — it is voter suppression, plain and simple," UnidosUS President & CEO Janet Murguía said. "All Americans—including Latino voters—have a constitutional right to cast their ballot without fear of interrogation, detention, or family separation. This case is about protecting voters, preserving confidence in our elections, and ensuring that every eligible voter can participate free from intimidation."

## MAGA Official Barely Avoids Contempt Charge for Trying to Steal Seats

### Missouri State Secretary Denny Hoskins saved his own skin with his last-minute

**announcement that the state would use its original district maps from 2022.**



Missouri Secretary of State Denny Hoskins
Liz Rymarev/St. Louis Post-Dispatch/Getty Images

Missouri Secretary of State Denny Hoskins relented on the state's congressional maps Thursday, ending weeks of election season chaos sparked by a scheme to eke out another Republican seat in the House.

"Following the United States Supreme Court's stay, the only governing court order in effect is from the Missouri Supreme Court. In accordance with that order, my Office is directing local election authorities to use the 2022 congressional map," Hoskins said in a statement.

The order came hours after a contentious hearing before the Missouri Supreme Court that weighed whether Hoskins should be held in contempt of court. By Thursday afternoon, the court found that Hoskins "was in CONTEMPT" of their decision, but he would avoid punishment because his decision to use the 2022 map had purged the civil contempt.

Last week, the Missouri Supreme Court ruled that the state needed to use its original maps drawn up in 2022, and could not use maps that were created in 2025 at Donald Trump's behest (also known as the H1 B map)—even though state officials had used the new map during the August primary. The court held

that the 2022 map was the only legally viable legislative map, since the 2025 map was still pending due to a referendum petition filed in December.

Yet Hoskins did not comply with the court order. Instead, he sought emergency relief from the U.S. Supreme Court, though Justice Brett Kavanaugh chose to reject the request on Tuesday.

Then matters got even more complicated. That same day, U.S. District Judge Stephen Clark—a Trump appointee—issued a temporary restraining order in a separate federal case, directing Missouri to use the 2025 maps while prohibiting state officials from using the 2022 map.

The U.S. Supreme Court chimed in on the matter for a second time on Thursday, overriding Clark's decision by ordering the state to rely on Missouri's prior ruling.

Missouri Attorney General Catherine Hanaway issued her own statement Thursday afternoon in support of Hoskins's decision to walk back the 2025 map effort ahead of the midterms.

"We affirm the Secretary of State of Denny Hoskins's position and decision to advise local election authorities that the 2022 map is in effect," Hanaway said. "We respect and will continue to comply with all court decisions, including orders issued by the Supreme Court of Missouri. We appreciate Secretary Hoskins's continued commitment to upholding the law and working diligently to fulfill his duties on behalf of Missouri."

## Key Republican Delegates Have Decided on Trump's Successor

### The Republican midterm convention partially served as a JD Vance coronation.




Vice President JD Vance at the Republican midterm convention
Andrew Harnik/Getty Images

Republicans are reportedly leaning toward Vice President JD Vance as their pick for 2028.

While attending a closed-door breakfast at the Republican midterm convention Thursday, Vance was met with cheers of "forty-eight" from the crowd of delegates from key battleground states, four people who were in the room told Politico.

Ahead of Vance's scheduled address Thursday night, the breakfast served as reassurance that the vice president is favored by party members to eventually replace Donald Trump. Vance is currently leading the most recent Republican presidential primary polls, ahead of Secretary of State Marco Rubio.

Even Trump seems to have settled on Vance as his successor—though he still jokes about running for a third term.

Things weren’t always so peachy for Vance. Earlier this summer, the vice president was the target of online attacks from within the GOP after his involvement in a now-collapsed ceasefire agreement with Iran. Vance’s allies tried to spin the criticism, claiming that coordinated opposition from “establishment” and “neoconservative” Republicans could actually help him in 2028.

We’re still a long way from 2028, and Vance may get stuck in yet another fissure forming in the Republican Party: between the MAGA cultists and Charlie Kirk fans.

# WILKINSON EXHIBIT 66

Post

Log in Sign up

Brendan Carr
@BrendanCarrFCC

Ok, fine. I'll weigh in.

1. The Equal Time statute doesn't apply to GameDay for several reasons.

For one, when it passed the statute, Congress applied it to broadcast tv stations—not cable programs like GameDay.

For another, Congress stated that the statute only applies to legally qualified candidates. The Senator is not one.

2. The Equal Time statute does not prohibit anyone from interviewing anyone on broadcast tv. It is about more speech, not less. Congress wanted to ensure that voters would decide elections, not media gatekeepers picking winners and losers by providing preferential airtime to some candidates and not others.

Indeed, when the statute applies, it simply requires broadcast stations to offer comparable time and placement. And comparable does not necessarily mean an interview by the same person on the same program either.

3. This ties back to Talarico. He's just running the same hoax he did a few months ago on Colbert for the purpose of getting clicks and donations—he's banking on people not understanding the statute or operating as partisan lemmings.

4. More broadly, though, at least some people appear to take issue with a cable program choosing to interview one government official and not others. To the extent they're pushing for greater balance in media, that might be a good thing.

But to bring this back to the law, cable shows are different than broadcast programs.

Broadcasters are unique. The FCC gave them free licenses worth many billions of dollars to use a public resource (spectrum). They are given a government sanctioned monopoly on their broadcast frequencies, too. If anyone else wants to use that same public resource (spectrum) for the purpose of expressing their own views, the government will not let them—it will eject anyone else that tries to use a broadcaster's licensed spectrum.

This means that Americans are subsidizing the distribution of broadcast programs over a public resource to the tune of many billions of dollars. We don't do that with cable or anything else.

In exchange for that free and exclusive right to use spectrum, broadcasters made a deal with the American people. They agreed to operate, not in their own narrow

interests, but in the public interest. There are various rules and policies that they must follow. This sets them apart from newspapers and cable shows and podcasts.

But some broadcasters want to break their deal with the American people. They want to keep their free access to billions of dollars worth of spectrum, of course. They are less eager these days to abide by their public interest obligations.

Yet the Supreme Court has already ruled that holding broadcasters to their public interest obligations is not censorship or any sort of 1A violation.

And Congress has charged the FCC with ensuring that broadcasters meet those public interest obligations, as required by their licenses. The agency should do so.



UD **University Democrats** @UDems · Sep 12

So I can't watch Talarico on Kimmel but I have to watch Ted Cruz on GameDay?

9:07 PM · Sep 12, 2026 · **666.7K** Views

555 1K 4.9K 431



**Chef Joe Gera** 🏳️‍🌈 🏳️‍⚧️ IT @redhotnerd · Sep 13

Or, hear me out, you're lying because you're afraid of losing Texas & Jimmy Kimmel pisses you off, since the only candidate you've ever applied this to is James Talarico… yeah? Yeah. Good talk.

34 27 636 6.6K



**Chef Joe Gera** 🏳️‍🌈 🏳️‍⚧️ IT @redhotnerd · Sep 13

Now do The View… Ted Cruz was on there last week and THAT is a talk show under your bullshit here… so.. what the fuck dude?

97 7 452 23K



**Steph the Governerd** @MayJuneViolets · Sep 13

This was disturbingly partisan from someone who isn't supposed to be. And what kind of man, on the government dole, in a position such as yours, posts a meme? Shouldn't you be better than this?

35 4 443 11K