**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

AMERICAN BROADCASTING COMPANIES, INC.; THE WALT DISNEY COMPANY; KABC TELEVISION, LLC; KFSN TELEVISION, LLC; KGO TELEVISION, INC.; KTRK TELEVISION, INC.; WABC TELEVISION (NEW YORK), LLC; WLS TELEVISION, INC.; WPVI TELEVISION (PHILADELPHIA), LLC; and WTVD TELEVISION, LLC,

Plaintiffs,

v.

FEDERAL COMMUNICATIONS COMMISSION; and, in their official capacities, BRENDAN CARR; ANNA GOMEZ; OLIVIA TRUSTY; and JOHN DOES 1–2,

Defendants.

Case No. 1:26-cv-02902

**BRIEF OF PROPOSED *AMICUS CURIAE* REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Bruce D. Brown (D.C. Bar No. 457317)
REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS
1156 15th Street NW, Suite 1020
Washington, D.C. 20005
Telephone: (202) 795-9300
bruce.brown@rcfp.org

Donald B. Verrilli, Jr. (D.C. Bar No. 420434)
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Ave. NW, Suite 500E
Washington, D.C. 20001-5369
Telephone: (202) 220-1100
Fax: (202) 220-2300
Donald.Verrilli@mto.com

*Counsel for* Amicus Curiae

## CORPORATE DISCLOSURE STATEMENT

The Reporters Committee for Freedom of the Press is an unincorporated association of reporters and editors with no parent corporation and no stock.

## TABLE OF CONTENTS

**Page**

INTEREST OF *AMICUS CURIAE* AND INTRODUCTION ........ 1

ARGUMENT ........ 3

I. A Free Press Is the Cornerstone of Our Democracy ........ 8

II. The Climate of Fear Created by the Commission's Actions Endangers Our Nation's Democracy ........ 10

CONCLUSION ........ 12

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Abrams v. United States*,
250 U.S. 616 (1919) ... 11

*Associated Press v. United States*,
326 U.S. 1 (1945) ... 8

*Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963) ... 11

*Cox Broad. Corp. v. Cohn*,
420 U.S. 469 (1975) ... 8, 9

*Grosjean v. Am. Press Co.*,
297 U.S. 233 (1936) ... 8

*Jenner & Block, LLP v. U.S. Dep't of Just.*,
784 F. Supp. 3d 76 (D.D.C. 2025) ... 12

*Mills v. Alabama*,
384 U.S. 214 (1966) ... 8

*N.Y. Times Co. v. Sullivan*,
376 U.S. 254 (1964) ... 9

*N.Y. Times Co. v. United States*,
403 U.S. 713 (1971) ... 9

*Nat'l Rifle Ass'n of Am. v. Vullo*,
602 U.S. 175 (2024) ... 8

*Nebraska Press Ass'n v. Stuart*,
427 U.S. 539 (1976) ... 9

*Sheppard v. Maxwell*,
384 U.S. 333 (1966) ... 9

*Susman Godfrey, LLP v. Exec. Off. of the President*,
789 F. Supp. 3d 15 (D.D.C. 2025) ... 12

*Times, Inc. v. Hill*,
385 U.S. 374 (1967) ... 9

*United States v. Rumely*,
345 U.S. 41 (1953)....................11

*Whitney v. California*,
274 U.S. 357 (1927)....................4

**OTHER FEDERAL AUTHORITIES**

*Creation of Low Power Radio Serv.*, 15 FCC Rcd 2205 (2000) ....................3

Exec. Order No. 14290, 90 Fed. Reg. 19415, *Ending Taxpayer Subsidization of Biased Media* (May 1, 2025) ....................5

*Fairness Report*, 102 F.C.C.2d 142 (1985) ....................11

**FEDERAL STATUTES**

47 U.S.C. § 309(k)(1) ....................3

**OTHER AUTHORITIES**

Jem Bartholomew, *The Uses of 'Treason'*, Col. J. Rev. (July 20, 2026), https://www.cjr.org/the_media_today/the-uses-of-treason-donald-trump-press-traitors-air-force-one-qatar-sanger-subpoenas-maga-base-splinter.php ....................5

Vincent Blasi, *The Checking Value in First Amendment Theory*, 1977 Am. B. Found. Res. J. 521 (1977) ....................8

Les Brown, *Reported Political Use of Radio Fairness Doctrine Under Kennedy and Johnson Is Causing Concern*, N.Y. Times (Mar. 31, 1975), https://www.nytimes.com/1975/03/31/archives/reported-political-use-of-radio-fairness-doctrine-under-kennedy-and.html ....................11

Madison Colombo, *FCC boss signals major crackdown on TV networks pushing 'fake polls' ahead of the midterms*, Fox News (Sept. 7, 2026), https://www.foxnews.com/media/fcc-boss-signals-major-crackdown-tv-networks-pushing-fake-polls-ahead-midterms ....................7

Helen Coster, *Trump attacks new CBS owners over Marjorie Taylor Greene interview*, Reuters (Dec. 8, 2025), https://www.reuters.com/business/media-telecom/trump-attacks-new-cbs-owners-over-marjorie-taylor-greene-interview-2025-12-08/ ....................5

David Folkenflik, *Judge orders White House to allow AP access to news events,* NPR (Apr. 9, 2025), https://www.npr.org/2025/04/08/nx-s1-5342369/ap-white-house-court-ruling-oval-office-gulf-of-mexico-america ....................5

Fred W. Friendly, *What's Fair on the Air?*, N.Y. Times (Mar. 30, 1975), https://www.nytimes.com/1975/03/30/archives/whats-fair-on-the-air-the-red-lion-case-a-landmark-court.html ....................11

*"I Can't Do My Job as a Journalist": The Systematic Undermining of Media Freedom in Hungary*, Human Rights Watch (Feb. 13, 2024), https://www.hrw.org/report/2024/02/13/i-cant-do-my-job-journalist/systematic-undermining-media-freedom-hungary ....................10

Tom Jones & Angela Fu, *Donald Trump accuses The Washington Post of treason*, Poynter (Aug. 7, 2026), https://www.poynter.org/commentary/2026/donald-trump-accuses-the-washington-post-of-treason/ ....................5

Clark Kauffman, *Judge in Trump election-poll lawsuit cites potential 'chilling effect' on free speech,* Iowa Capital Dispatch (July 10, 2026), https://iowacapitaldispatch.com/2026/07/10/judge-in-trump-election-poll-lawsuit-cites-potential-chilling-effect-on-free-speech/ ....................7

Gene Maddaus, *FCC Chairman Threatens ABC Over Jimmy Kimmel's Remarks About Charlie Kirk's Killer*, Variety (Sept. 17, 2025), https://variety.com/2025/tv/news/brendan-carr-abc-fcc-jimmy-kimmel-charlie-kirk-1236522406/ ....................4

James Madison, *The Report of 1800* (Jan. 7, 1800), Founders Online, National Archives, available at https://founders.archives.gov/documents/Madison/01-17-02-0202 ....................9

Kaela Malig, *How Russia's Press Freedom has Deteriorated Over the Decades Since Putin Came to Power*, PBS (Sept. 26, 2023), https://www.pbs.org/wgbh/frontline/article/russia-putin-press-freedom-independent-news/ ....................10

Dominick Mastrangelo, *FCC chief targets Comcast-owned outlets over 'news distortion'*, The Hill (Apr. 17, 2025), https://thehill.com/homenews/media/5253421-fcc-brendan-carr-comcast-license-abrego-garcia-case/ ....................5

Memorandum from J.S. Magruder to H.R. Haldeman (Oct. 17, 1969) ....................11

J. Kim Murphy, *Brendan Carr Is 'Looking at a Lot of Actions' to Answer Trump's Call for FCC 'Punishment' of Kristen Welker*, TheWrap (Sept. 6, 2026), https://www.thewrap.com/media-platforms/politics/fcc-weighing-actions-trump-threatens-welker/ ....................7

Angelika Nußberger, *Report on Russia's Legal and Administrative Practice in Light of its OSCE Human Dimension Commitments*, Organization for Security and Co-operation in Europe (Sept. 16, 2022), available at https://odihr.osce.org/sites/default/files/f/documents/7/5/526720_0.pdf....................10

*Opinion: Potomac Watch*, The Wall Street Journal (Sept. 19, 2025), https://www.wsj.com/podcasts/opinion-potomac-watch/jimmy-kimmels-suspension-and-the-power-of-the-fcc/ ....................4

Jim Rutenberg & Maggie Haberman, *How Trump Is Wielding Power to Stifle Speech*, N.Y. Times (Sept. 12, 2026), https://www.nytimes.com/2026/09/12/us/politics/trump-free-speech.html ....................4, 6

Brian Stelter & Liam Reilly, *Trump Vows to Sue Rupert Murdoch as Epstein Report Opens New Rift in their Relationship*, CNN (July 18, 2025), https://www.cnn.com/2025/07/17/media/trump-rupert-murdoch-wsj-epstein-story-lawsuit-threat. ....................5

*Timeline: Press freedom in Hong Kong under the national security law*, Hong Kong Free Press (May 3, 2026), https://hongkongfp.com/2026/05/03/explainer-the-decline-of-hong-kongs-press-freedom-under-the-national-security-law/....................10

Donald J. Trump (@realDonaldTrump), Truth Social (Aug. 30, 2026, 8:46 a.m. ET), https://truthsocial.com/@realDonaldTrump/posts/117184527741564500....................7

Donald J. Trump (@realDonaldTrump), Truth Social (Aug. 30, 2026, 9:00 a.m. ET), https://truthsocial.com/@realDonaldTrump/posts/117184581053116309....................7

Jacob Wendler, *New York Times sues Pentagon—again—over restrictions on reporters*, Politico (May 18, 2026), https://www.politico.com/news/2026/05/18/new-york-times-sues-pentagon-00927408....................5

Thomas Whiteside, *Shaking the Tree*, The New Yorker (Mar. 10, 1975), https://www.newyorker.com/magazine/1975/03/17/shaking-the-tree....................11

Tim Zick, *Trump 2.0: Executive Power and the First Amendment*, First Amendment Watch (last updated Aug. 28, 2026), https://firstamendmentwatch.org/deep-dive/trump-2-0-executive-power-and-the-first-amendment/ ....................6

## INTEREST OF *AMICUS CURIAE* AND INTRODUCTION

*Amicus curiae* the Reporters Committee for Freedom of the Press (the "Reporters Committee") is an unincorporated nonprofit association founded by leading journalists and media lawyers in 1970.[1] Today, its attorneys provide *pro bono* legal representation, *amicus curiae* support, and other legal resources to protect First Amendment freedoms and, specifically, the freedom of the press. The Reporters Committee frequently serves as *amicus curiae*, including in this Court and in the U.S. Court of Appeals for the District of Columbia Circuit, in matters implicating the ability of the press to report freely, independently, and without government interference.

The Reporters Committee has a strong interest in ensuring a robust and free press. The work done by our nation's news and media organizations and their newsrooms and on-air journalists is vital to our democracy. Some focus on national and international news, covering topics such as Congressional politics, the war in Iran, and federal elections. Others report on news at the state and local level such as public corruption and accountability, housing, health care, and education, providing day-to-day reporting that informs individuals' decision-making. Others are topic-oriented, focusing on areas ranging from financial news to business reporting to analysis of government-issued data like employment figures and inflation rates. And many broadcast news organizations provide essential coverage of emergency alerts, natural disasters, and educational programming.

[1] No counsel for a party authored this brief in whole or in part, and no party or counsel for a party made a monetary contribution intended to fund the preparation or submission of this brief. No person other than amicus curiae or its counsel made a monetary contribution to the preparation or submission of this brief.

Since the founding of our nation, journalists have brought attention to news that otherwise might have remained hidden, allowing the public to hold governments and power to account for wrongdoing and corruption and to pursue the promise of freedom and equality. Journalists exposed the conditions in Chicago's meatpacking plants, the McCarthy witch hunts, the My Lai massacre, the Pentagon Papers, Watergate, and the cover-up of sexual abuse of children by the Catholic Church, to name just a few of the legion of stories in the public interest generated by an independent and resilient press. Many of these topics involve examination of government action—examination that often takes a critical view or is perceived as such by government officials. But just as important as the investigative journalism that makes national headlines is the day-to-day and breaking news coverage at the local level that people rely on in their communities to make informed decisions. At bottom, news organizations seek to expose the ways in which taxpayer dollars are spent and how the people's representatives wield power in countless areas, from deployment of troops overseas and disbursement (or withdrawal) of aid funding, to local events that directly affect a city's residents' daily lives. The Reporters Committee is therefore filing this brief because our commitment to accurate reporting in the public interest and our belief in the vital role a free press plays in maintaining our nation's democracy and the rule of law leaves us no choice.

Plaintiffs have cogently explained why the attack by the Federal Communications Commission (the "FCC" or the "Commission") on ABC should be immediately enjoined because it is a brazen violation of bedrock First Amendment guarantees. But something even more fundamental is at stake. The President and the Commission's Chair have directed a series of existential threats not just at ABC but at news organizations large and small based on the content of their publications and their editorial decision-making. Such threats show no sign of abating.

To the contrary, news organizations across the country increasingly operate under the shadow of the very real risk of punishing official retribution for publishing news and opinions that federal officials, from the President on down, do not want the public to hear, chilling their editorial decisions and their freedom to collect and disseminate the news.

Threats such as the one at issue here to end a broadcaster's ability to inform the public because of how and what that broadcaster chooses to report—triggered by a late-night host's on-air comments, Compl. ¶¶ 5–6—pose a grave danger not just to news organizations, but to our constitutional system of democratic governance and to the rule of law itself. The Commission's pretextually calling in ABC's licenses for early renewal in retaliation for what ABC chooses to broadcast is causing actual harm both directly to ABC and indirectly through its amplified chilling effect. This Court should act with resolve—now—to bring an end to the Commission's abuse of its licensing authority against ABC.

## ARGUMENT

The Commission's unprecedented order directing ABC's stations to submit renewal applications for their broadcast licenses *years* ahead of schedule—issued immediately after the President excoriated ABC commentators' on-air statements and ABC's editorial decisions and demanded that ABC's broadcast licenses be revoked—is an undisguised effort to intimidate not just ABC but every broadcast licensee in the country. Historically, in the overwhelming majority of instances, renewal applications have been granted—and certainly without being influenced by threats of retaliation from high government officials. 47 U.S.C. § 309(k)(1); *see also Creation of Low Power Radio Serv.*, 15 FCC Rcd 2205, 2267 (2000) (describing section 309(k)(1) as "renewal expectancy provisions" that "[p]rovid[e] incumbents with the likelihood of renewal"). But without an FCC license, broadcasters cannot continue to make use of public airwaves to reach their audiences. The threat of license non-renewal is thus existential for any broadcaster,

regardless of its size or financial resources. By issuing the order that ABC challenges in this case, the Commission's message could hardly be clearer: steer away from accurate reporting that displeases the incumbent administration lest you put your FCC licenses at risk.[2] It is, in the words of Justice Brandeis, an attempt to "coerce[]" "silence"—"the argument of force in its worst form." *Whitney v. California*, 274 U.S. 357, 375-76 (1927) (Brandeis, J., concurring).

Unfortunately, the Commission action at issue here is merely the latest in a disturbing pattern of escalating intimidation aimed at broadcast licensees and other news organizations that report critically on the actions of the President and his administration or merely in a manner the administration sees as unfavorable or adverse to its agenda. Since January 2025, the President, FCC Chairman Brendan Carr, and other senior administration officials have publicly and repeatedly taken umbrage at the editorial decisions and factual reporting of the nation's leading news organizations—and threatened retaliation ranging from restrictions on access to information to outright termination of licenses. Those threats have been directed at not just ABC

---

[2] Brendan Carr, the Commission's Chair, has been explicit about his intent to wield the power of the FCC to achieve President Trump's goal of "reshaping the media landscape." Jim Rutenberg & Maggie Haberman, *How Trump Is Wielding Power to Stifle Speech*, N.Y. Times (Sept. 12, 2026), https://www.nytimes.com/2026/09/12/us/politics/trump-free-speech.html. In a September 2025 interview on the Benny Johnson podcast, Chairman Carr said, "We can do this the easy way or the hard way. These companies can find ways to change conduct, to take action, frankly, on [Jimmy] Kimmel or there's going to be additional work for the FCC." He also said, "It's really past time that a lot of these licensed broadcasters themselves push back on Comcast and Disney and say, 'Listen, we are going to preempt. We are not going to run Kimmel anymore until you straighten this out because we . . . licensed broadcaster[s], are running the possibility of fines or license revocation from the FCC if we continue to run content that ends up being a pattern of news distortion.'" Gene Maddaus, *FCC Chairman Threatens ABC Over Jimmy Kimmel's Remarks About Charlie Kirk's Killer*, Variety (Sept. 17, 2025), https://variety.com/2025/tv/news/brendan-carr-abc-fcc-jimmy-kimmel-charlie-kirk-1236522406/; *Opinion: Potomac Watch*, The Wall Street Journal (Sept. 19, 2025), https://www.wsj.com/podcasts/opinion-potomac-watch/jimmy-kimmels-suspension-and-the-power-of-the-fcc/2ce076e8-aecc-4f7e-b34f-5300d826e33c.

but also at, among others, NBC,[3] CBS,[4] the Associated Press,[5] the New York Times,[6] the Wall Street Journal (including attacks on Rupert Murdoch personally),[7] the Washington Post,[8] and NPR and PBS, along with their numerous member stations.[9] The Court's decision in this case therefore impacts how the administration will treat news organizations going forward.

The attacks have been grave and widespread. They often go so far as to include claims by a wartime President that media reporting that displeases him constitutes "treason," a federal crime punishable by death.[10] The administration's methods include meritless libel, defamation, and other lawsuits against reporters and news groups, targeted Federal Trade Commission investigations of media watchdog organizations, subpoenas on journalists and their family

---

[3] *E.g.*, Dominick Mastrangelo, *FCC chief targets Comcast-owned outlets over 'news distortion'*, The Hill (Apr. 17, 2025), https://thehill.com/homenews/media/5253421-fcc-brendan-carr-comcast-license-abrego-garcia-case/.

[4] *E.g.*, Helen Coster, *Trump attacks new CBS owners over Marjorie Taylor Greene interview*, Reuters (Dec. 8, 2025), https://www.reuters.com/business/media-telecom/trump-attacks-new-cbs-owners-over-marjorie-taylor-greene-interview-2025-12-08/.

[5] *E.g.*, David Folkenflik, *Judge orders White House to allow AP access to news events*, NPR (Apr. 9, 2025), https://www.npr.org/2025/04/08/nx-s1-5342369/ap-white-house-court-ruling-oval-office-gulf-of-mexico-america.

[6] *E.g.*, Jacob Wendler, *New York Times sues Pentagon—again—over restrictions on reporters*, Politico (May 18, 2026), https://www.politico.com/news/2026/05/18/new-york-times-sues-pentagon-00927408.

[7] Brian Stelter & Liam Reilly, *Trump Vows to Sue Rupert Murdoch as Epstein Report Opens New Rift in their Relationship*, CNN (July 18, 2025), https://www.cnn.com/2025/07/17/media/trump-rupert-murdoch-wsj-epstein-story-lawsuit-threat.

[8] Tom Jones & Angela Fu, *Donald Trump accuses The Washington Post of treason*, Poynter (Aug. 7, 2026), https://www.poynter.org/commentary/2026/donald-trump-accuses-the-washington-post-of-treason/.

[9] *E.g.*, Exec. Order No. 14,290, 90 Fed. Reg. 19415, *Ending Taxpayer Subsidization of Biased Media* (May 1, 2025).

[10] Jem Bartholomew, *The Uses of 'Treason'*, Col. J. Rev. (July 20, 2026), https://www.cjr.org/the_media_today/the-uses-of-treason-donald-trump-press-traitors-air-force-one-qatar-sanger-subpoenas-maga-base-splinter.php.

members, the execution of a search warrant on a Washington Post reporter and seizure of her devices in a national security "leak" case (the first time such a step has been taken in our history as a country), the exclusion of certain reporters from the Oval Office and Air Force One because they would not accede to the President's demands, the removal of the press corps from the Pentagon—and now, a challenge to the licenses of every ABC-owned broadcast television station, coming after years of threats by President Trump.[11] Compl. ¶¶ 48–56.

As a result of the administration's broad efforts to suppress speech, news organizations now operate in precisely the climate that the Supreme Court found to be unconstitutional, where the administration seeks to punish not only accurate coverage, but potentially inadvertent mistakes as well. News organizations must now think long and hard about the risk that the full arsenal of the Executive branch—including threats to FCC licenses—will be deployed against them before they decide whether to publish or disseminate news that the administration might find unwelcome, or in a medium the administration does not prefer, or if they make an honest error in covering a story of local significance, even as the public needs such information to manage life in an increasingly complex world.

Indeed, in the weeks since Plaintiffs filed suit, the administration has doubled down, again publicly, on its threats of retaliation against news organizations that broadcast journalism that irks the President. After NBC's Kristen Welker accurately stated that "some" of President Trump's candidate endorsements had "mixed results" in the primaries, the President vowed that

---

[11] *See* Rutenberg & Haberman, *How Trump Is Wielding Power to Stifle Speech*, *supra* note 2; *see also* Tim Zick, *Trump 2.0: Executive Power and the First Amendment*, First Amendment Watch (last updated Aug. 28, 2026), https://firstamendmentwatch.org/deep-dive/trump-2-0-executive-power-and-the-first-amendment/ (cataloging threats to press in President Trump's second administration including the array of litigation brought against news organizations).

Welker "will be reported to the FCC for rebuke or punishment"[12]—and when asked about these threats, Commission Chair Carr confirmed that the Commission was "looking at a lot of actions."[13] At literally the same time—just fourteen minutes before threatening Welker and the network for which she works—the President had threatened wide-ranging FCC action against the news media for reporting about poll results that displeased the President.[14] And just a few days ago, the Commission Chair amplified this threat, suggesting that a failure to follow soon-to-be issued Commission guidance on what the Chair called "fake polls" could put a broadcaster's license at risk.[15] According to national media, Carr's statements "signal[] [a] major crackdown on TV networks pushing 'fake polls' ahead of the midterms."[16]

The present state of affairs is deeply threatening to our constitutional rights and democracy. Our republican form of government requires an informed electorate, and an informed electorate in turn requires that the nation's news organizations remain free from government restraint—and free from the fear of retaliation for pursuing their journalistic

---

[12] Donald J. Trump (@realDonaldTrump), Truth Social (Aug. 30, 2026, 9:00 a.m. ET), https://truthsocial.com/@realDonaldTrump/posts/117184581053116309.

[13] J. Kim Murphy, *Brendan Carr Is 'Looking at a Lot of Actions' to Answer Trump's Call for FCC 'Punishment' of Kristen Welker*, TheWrap (Sept. 6, 2026), https://www.thewrap.com/media-platforms/politics/fcc-weighing-actions-trump-threatens-welker/.

[14] Donald J. Trump (@realDonaldTrump), Truth Social (Aug. 30, 2026, 8:46 a.m. ET), https://truthsocial.com/@realDonaldTrump/posts/117184527741564500. The President has in fact already sued the Des Moines Register and a pollster claiming that a poll showing the then candidate trailing in the 2024 race constituted fraud. *See* Clark Kauffman, *Judge in Trump election-poll lawsuit cites potential 'chilling effect' on free speech*, Iowa Capital Dispatch (July 10, 2026), https://iowacapitaldispatch.com/2026/07/10/judge-in-trump-election-poll-lawsuit-cites-potential-chilling-effect-on-free-speech/.

[15] Madison Colombo, *FCC boss signals major crackdown on TV networks pushing 'fake polls' ahead of the midterms*, Fox News (Sept. 7, 2026), https://www.foxnews.com/media/fcc-boss-signals-major-crackdown-tv-networks-pushing-fake-polls-ahead-midterms.

[16] *Id.*

mission. As the Supreme Court has affirmed, "a free press is a condition of a free society." *Associated Press v. United States*, 326 U.S. 1, 20 (1945). It is for this reason above all that "the First Amendment prohibits government officials from relying on the threat of invoking legal sanctions and other means of coercion . . . to achieve the suppression of disfavored speech." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 189 (2024) (citation modified).

## I. A Free Press Is the Cornerstone of Our Democracy

The Supreme Court has emphasized over and over again that the First Amendment guarantees the freedom of the press to ensure that it can play the indispensable role of "inform[ing] citizens about the public business," an endeavor in which it must operate free of government interference. *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 496 (1975); *see also Mills v. Alabama*, 384 U.S. 214, 219 (1966) ("Suppression of the right of the press to praise or criticize governmental agents and to clamor and contend for or against change . . . muzzles one of the very agencies the Framers of our Constitution thoughtfully and deliberately selected to improve our society and keep it free."); *Grosjean v. Am. Press Co.*, 297 U.S. 233, 250 (1936) ("[S]ince informed public opinion is the most potent of all restraints upon misgovernment, the suppression or abridgement of the publicity afforded by a free press cannot be regarded otherwise than with grave concern."). Without a free press, the electorate cannot "vote intelligently or [] register opinions on the administration of government generally." *Cox Broad. Corp.*, 420 U.S. at 492.

The need to protect the indispensable democracy-enabling function of the press was front and center for the Framers. The "role free expression can play in guarding against breaches of trust by public officials" was likely "the single value that was uppermost in the minds of the persons who drafted and ratified the First Amendment." Vincent Blasi, *The Checking Value in First Amendment Theory*, 1977 Am. B. Found. Res. J. 521, 527 (1977). As no less an authority than James Madison observed, if any branch of the federal government "may not have duly

discharged its trust," "they should be brought into contempt or disrepute, and incur the hatred of the people." James Madison, *The Report of 1800* (Jan. 7, 1800), Founders Online, Nat'l Archives, available at https://founders.archives.gov/documents/Madison/01-17-02-0202. But holding power to account could occur, Madison stressed, only if the First Amendment guaranteed "free examination" and "free communication" regarding these "violation[s] of duty" by a vigorous and unfettered press. *Id.*; *see N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 276 (1964) (noting the "broad consensus" that the Sedition Act "was inconsistent with the First Amendment" "because of the restraint it imposed upon criticism of government and public officials"). After all, "[t]he Government's power to censor the press was abolished so that the press would remain forever free to censure the government," "serve the governed," and "expose deception in government." *N.Y. Times Co. v. United States*, 403 U.S. 713, 717 (1971) (Black, J., concurring). By laying bare all workings of government, the press "assures the maintenance of our political system and an open society." *Time, Inc. v. Hill*, 385 U.S. 374, 389 (1967).

A vigorous free press does more than protect our democratic system of government, as vital as that is—it protects the rule of law itself. The press ensures that the public is educated on the workings of its justice system. "[F]ree and robust reporting" facilitates "public understanding of the rule of law and . . . comprehension of the functioning of the entire criminal justice system." *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 587 (1976) (Brennan, J., concurring). The press helps "guarantee the fairness of trials" and "bring[s] to bear the beneficial effects of public scrutiny upon the administration of justice." *Cox Broad. Corp.*, 420 U.S. at 492. And it "guards against the miscarriage of justice" by ensuring that the judiciary, no less than any other branch of government, is subject to "extensive public scrutiny and criticism." *Sheppard v. Maxwell*, 384 U.S. 333, 350 (1966).

## II. The Climate of Fear Created by the Commission's Actions Endangers Our Nation's Democracy

Recent history is replete with cautionary examples of the risks to the survival of democracy posed by systematic efforts to intimidate and thereby silence an independent press. Such tactics were integral to Viktor Orbán's decades-long effort to subvert democracy in Hungary.[17] Similar actions were integral to Vladimir Putin's drive to consolidate authoritarian power in Russia, including criminalizing accurate reporting that contradicts the state's narrative.[18] And in the years since Beijing imposed a sweeping national security law on Hong Kong in 2020, authorities have jailed dozens of journalists and targeted the media sector with investigations, silencing the territory's pro-democracy movement.[19] Indeed, in too many countries and instances to name, regimes have silenced journalists and media outlets by enacting laws criminalizing independent coverage and have prosecuted and jailed journalists who dared report on government actions or inactions or their effects—with predictable results for an informed electorate, democratic legitimacy and the rule of law.

Unfortunately, our own history also provides ample reason for steadfast vigilance in safeguarding the freedom of the press. From the Alien and Sedition Acts (against which James

---

[17] *See, e.g.*, *"I Can't Do My Job as a Journalist": The Systematic Undermining of Media Freedom in Hungary*, Human Rights Watch (Feb. 13, 2024), https://www.hrw.org/report/2024/02/13/i-cant-do-my-job-journalist/systematic-undermining-media-freedom-hungary.

[18] *See, e.g.*, Kaela Malig, *How Russia's Press Freedom has Deteriorated Over the Decades Since Putin Came to Power*, PBS (Sept. 26, 2023), https://www.pbs.org/wgbh/frontline/article/russia-putin-press-freedom-independent-news/; Angelika Nußberger, *Report on Russia's Legal and Administrative Practice in Light of its OSCE Human Dimension Commitments*, Organization for Security and Co-operation in Europe (Sept. 16, 2022) 77-94, 117-19, available at https://odihr.osce.org/sites/default/files/f/documents/7/5/526720_0.pdf.

[19] *Timeline: Press freedom in Hong Kong under the national security law*, Hong Kong Free Press (May 3, 2026), https://hongkongfp.com/2026/05/03/explainer-the-decline-of-hong-kongs-press-freedom-under-the-national-security-law/.

Madison protested in the Report of 1800 cited above), to the Red Scare, *see Abrams v. United States*, 250 U.S. 616, 624-31 (1919) (Holmes, J., dissenting), to the McCarthy era, *see United States v. Rumely*, 345 U.S. 41, 56-58 (1953) (Douglas, J., concurring), American history provides object lessons in the way that the federal government's power can be abused to silence legitimate criticism of official conduct and public policy. And abuse of FCC authority has played a role in this unfortunate history through administrations of both parties, highlighting, starkly, how permitting the agency to police perceived "bias" in broadcast media poses bipartisan dangers to our political system. The Kennedy and Johnson administrations weaponized the fairness doctrine to thwart right-wing talk radio it deemed damaging.[20] The Nixon administration adopted a multi-front approach to neuter what it deemed "unfair coverage," one element of which was official monitoring by the FCC.[21] Even without direct government threats, the looming fear that robust criticism of government conduct could invite the FCC's watchful regulatory eye has had a chilling effect, as the Commission itself once acknowledged (and now, ironically, seeks to exploit). *See Fairness Report*, 102 F.C.C.2d 142, 171-74 (1985) (noting the "climate of timidity and fear . . . that is antithetical to journalistic freedom" created by the threat of overaggressive enforcement of the fairness doctrine and collecting examples). Such risks are precisely why courts recognize that "coercion, persuasion, and intimidation" can all constitute "informal censorship" that runs afoul of the Constitution. *Bantam Books, Inc. v. Sullivan*, 372

---

[20] Les Brown, *Reported Political Use of Radio Fairness Doctrine Under Kennedy and Johnson Is Causing Concern*, N.Y. Times (Mar. 31, 1975), https://www.nytimes.com/1975/03/31/archives/reported-political-use-of-radio-fairness-doctrine-under-kennedy-and.html; *see also* Fred W. Friendly, *What's Fair on the Air?*, N.Y. Times (Mar. 30, 1975), https://www.nytimes.com/1975/03/30/archives/whats-fair-on-the-air-the-red-lion-case-a-landmark-court.html.

[21] Memorandum from J.S. Magruder to H.R. Haldeman at 1-2 (Oct. 17, 1969); *see also* Thomas Whiteside, *Shaking the Tree*, The New Yorker (Mar. 10, 1975), https://www.newyorker.com/magazine/1975/03/17/shaking-the-tree.

U.S. 58, 67 (1963); *cf. Susman Godfrey LLP v. Exec. Off. of the President*, 789 F. Supp. 3d 15, 52 (D.D.C. 2025) (noting that an executive order "hang[ing] like the sword of Damocles" over a law firm that "advocat[ed] for clients whose interests are adverse to the government" chilled its exercise of First Amendment freedoms).

As unfortunate as those prior abuses of FCC authority were, they pale in comparison to the present threat. No Commission has ever been as systematically brazen as this one in using its regulatory power to try to silence critics of the President and the incumbent administration. Its bald maneuvering around these licenses has already created dangers to free expression far more serious than the under-the-radar efforts to suppress criticism that prior Commissions have attempted. If the Commission continues unchecked on its present course, its actions will pose threats no less severe in their democracy-threatening potential than the Alien and Sedition Acts, the Red Scare, and McCarthyism.

**CONCLUSION**

The precipitous Commission action subjecting ABC's broadcast licenses to renewal review years ahead of schedule is a naked attempt to punish a network the President disfavors. This continues a pattern of attempts "to extinguish speech [the President] dislikes." *Jenner & Block, LLP v. U.S. Dep't of Just.*, 784 F. Supp. 3d 76, 103 (D.D.C. 2025). The Court should put a stop to this unconstitutional use of executive authority by granting Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction.

Dated: September 17, 2026

*/s/ Donald B. Verrilli, Jr.*
Donald B. Verrilli, Jr. (D.C. Bar No. 420434)
Donald.Verrilli@mto.com
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW, Suite 500E
Washington, D.C. 20001
(202) 220-1100

Bruce D. Brown (D.C. Bar No. 457317)
Lisa Zycherman (D.C. Bar No. 495277)
Gabriel Rottman (D.C. Bar No. 992728)
Marietta Catsambas (D.C. Bar No. 1617526)
REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
1156 15th Street NW, Suite 1020
Washington, D.C. 20005
(202) 795-9300

*Attorneys for* Amicus Curiae

## CERTIFICATE OF COMPLIANCE

This *amicus curiae* brief complies with the type-volume limit of LCvR 7(o)(4) because it is fewer than 25 pages in length.

This *amicus curiae* brief complies with the typeface and type-style requirements of LCvR 5.1(d) because it has been prepared in a proportionally spaced typeface using Microsoft Word with Times New Roman in size 12 font.

Dated: September 17, 2026

*/s/ Donald B. Verrilli, Jr.*
Donald B. Verrilli, Jr. (D.C. Bar No. 420434)

*Attorneys for* Amicus Curiae