**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

AMERICAN BROADCASTING COMPANIES, INC., et al.,

*Plaintiffs*,

v.

FEDERAL COMMUNICATIONS COMMISSION, et al.,

*Defendants*.

Case No. 1:26-cv-02902-LLA

**BRIEF OF *AMICUS CURIAE* OF THE**
**FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION, CATO INSTITUTE, CLAY CALVERT, COMPETITIVE ENTERPRISE INSTITUTE, INSTITUTE FOR POLICY INNOVATION, THE MULTICULTURAL MEDIA, TELECOM AND INTERNET COUNCIL, NATIONAL COALITION AGAINST CENSORSHIP, PEN AMERICAN CENTER, INC., PUBLIC KNOWLEDGE, REPORTERS WITHOUT BORDERS, INC., THE RUTHERFORD INSTITUTE, AND SOCIETY FOR THE RULE OF LAW AND DEMOCRACY, INC.**
**IN SUPPORT OF PLAINTIFFS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..... ii

INTEREST OF *AMICUS CURIAE* ..... 1

INTRODUCTION ..... 1

BACKGROUND ..... 1

ARGUMENT ..... 7

I. The FCC's Claim of Enforcing its Employment Policies is Pretextual and Cannot Justify This Extraordinary Licensing Proceeding. ..... 7

A. The Commission's Pretextual Use of its EEO Rules Exceeds the Limits of its Jurisdiction. ..... 7

B. Contrary to the Commission's Assumption, DEI Does Not Equate to Illegal Discrimination. ..... 12

C. The FCC's Stated Rationale Highlights the First Amendment Tensions of the Renewal Proceeding. ..... 15

II. This License Renewal Proceeding is an Exercise in Political Retribution That This Court Must Enjoin. ..... 19

A. The Administration's Hostility to ABC is Open and Obvious. ..... 19

B. The FCC Cannot Use a Retaliatory License Renewal Proceeding to Indirectly Punish ABC For its Speech. ..... 20

C. The FCC's General Authority to Regulate in the Public Interest Cannot Shield it From Judicial Review. ..... 23

CONCLUSION ..... 25

## TABLE OF AUTHORITIES

**Cases**

*303 Creative LLC v. Elenis*, 600 U.S. 570 (2023) ....................17

*All. for Fair Bd. Recruitment v. Sec. & Exch. Comm'n*, 125 F.4th 159 (5th Cir. 2024) (en banc)....................7

*Am. Fed'n of Teachers v. Dep't of Educ.*, 796 F. Supp. 3d 66 (D. Md. 2025), appeal dismissed, No. 25-2228 (4th Cir. Jan. 22, 2026)....................13, 15

*Ark. Ed. Television Comm'n v. Forbes*, 523 U.S. 666 (1998) ....................4

*Axon Enter., Inc. v. FTC*, 598 U.S. 175 (2023) ....................11

*Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963)....................20, 21

*Beaumont Branch of the NAACP v. FCC*, 854 F.2d 501 (D.C. Cir. 1988)....................9

*Bilingual Bicultural Coal. on Mass Media, Inc. v. FCC*, 595 F.2d 621 (D.C. Cir. 1978) (en banc) ....................8, 9

*Boy Scouts of Am. v. Dale*, 530 U.S. 640 (2000) ....................17

*CBS, Inc. v. Democratic Nat'l Comm.*, 412 U.S. 94 (1973) ....................4, 16, 23

*Cinderella Career & Finishing Schs., Inc. v. FTC*, 425 F.2d 583 (D.C. Cir. 1970)....................23

*Claybrooks v. American Broadcasting Cos.*, 898 F. Supp. 2d 986 (M.D. Tenn. 2012) ....................17, 18

*Community-Service Broadcasting of Mid-America, Inc. v. FCC*, 593 F.2d 1102 (D.C. Cir. 1978) (en banc) ....................11, 21

*Council for Opportunity in Educ. v. Dep't of Educ.*, 2026 WL 120984 (D.D.C. Jan. 16, 2026) ....................13

*Endocrine Soc'y v. FTC*, 832 F. Supp. 3d 1 (D.D.C. 2026) ....................14

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) (Thomas, J., concurring) ....................24

*FCC v. League of Women Voters of Cal.*, 468 U.S. 364 (1984) ....................24

*Fed. Educ. Ass'n v. Trump*, 795 F. Supp. 3d 74 (D.D.C. 2025), stay pending appeal denied, 2025 WL 2738626 (D.C. Cir. Sept. 25, 2025)....................20

*Hartman v. Moore*, 547 U.S. 250 (2006)....................22

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171 (2012) ....................18

*Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468 (2022)...........................................................22

*Hurley v. Irish-Am. Gay, Lesbian, & Bisexual Grp. of Boston*, 515 U.S. 557 (1995).............17, 18

*In re Radio Television Digital News Ass'n*, No. 26-1099 (D.C. Cir. Sept. 9, 2026) (per curiam)...........................................................................................................................25

*Jenner & Block LLP v. DOJ*, 784 F. Supp. 3d 76 (D.D.C. 2025), appeal docketed, No. 25-5265 (D.C. Cir. July 22, 2025) ............................................................................13, 15

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) .........................................................7, 24

*Lutheran Church-Missouri Synod v. FCC*, 141 F.3d 344 (D.C. Cir. 1998) ..................9, 10, 18, 22

*McDermott v. Ampersand Publ'g LLC*, 593 F.3d 950 (9th Cir. 2010)..........................................16

*MD/DC/DE Broads. Ass'n v. FCC*, 236 F.3d 13 (D.C. Cir. 2001).............................10, 11, 18, 21

*Media Matters for Am. v. Bailey*, 2024 WL 3924573 (D.D.C. Aug. 23, 2024).......................20, 22

*Media Matters for Am. v. FTC*, No. 25-5302, 2025 WL 2988966 (D.C. Cir. Oct. 23, 2025) (per curiam) ......................................................................................................14

*Media Matters for Am. v. Paxton*, 138 F.4th 563 (D.C. Cir. 2025) .................................11, 20, 22

*Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241 (1974) ..................................................17

*Moody v. NetChoice, LLC*, 603 U.S. 707 (2024).........................................................................17

*Motion Picture Ass'n of Am., Inc. v. FCC*, 309 F.3d 796 (D.C. Cir. 2002)....................................7

*NAACP v. Dep't of Educ.*, 779 F. Supp. 3d 53 (D.D.C. 2025) .....................................................13

*NAACP v. Fed. Power Comm'n*, 425 U.S. 662 (1976)...................................................................8

*Nat'l Council of Nonprofits v. McMahon*, No. 25-cv-13242-MJJ, 2026 WL 1876366 (D. Mass. June 30, 2026) ..............................................................................................................13

*Nat'l Educ. Ass'n v. Dep't of Educ.*, 779 F. Supp. 3d 149 (D.N.H. 2025) ...................................13

*Nat'l Org. for Women v. FCC*, 555 F.2d 1002 (D.C. Cir. 1977) ....................................................9

*Nat'l Religious Broads. v. FCC*, 138 F.4th 282 (5th Cir. 2025)................................................7, 8

*Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175 (2024) ...........................................20, 21, 23

*Nieves v. Bartlett*, 587 U.S. 391 (2019) .........................................................................................22

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732 (2020) .......................................18

*Perkins Coie LLP v. DOJ*, 783 F. Supp. 3d 105 (D.D.C. 2025), appeal docketed, No. 25-5241 (D.C. Cir. July 2, 2025) ....................13, 15

*Pernell v. Fla. Bd. of Governors of the State Univ. Sys.*, 181 F.4th 1135 (11th Cir. 2026) ..........12

*Perry v. Sindermann*, 408 U.S. 593 (1972)....................22

*Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367 (1969) ....................24

*Reges v. Cauce*, 175 F.4th 1014 (9th Cir. 2026)....................12

*Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819 (1995) ....................22

*Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115 (1989) ....................24

*Schurz Communications, Inc. v. FCC*, 982 F.2d 1043 (7th Cir. 1992)....................15

*Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*, 600 U.S. 181 (2023)....................13

*Susman Godfrey LLP v. Exec. Off. of the President*, 789 F. Supp. 3d 15 (D.D.C. 2025), appeal docketed, No. 25-5310 (D.C. Cir. Aug. 26, 2025) ....................13, 15

*Telescope Media Grp. v. Lucero*, 936 F.3d 740 (8th Cir. 2019)....................18

*Trump v. Slaughter*, 146 S. Ct. 2283 (2026) (Gorsuch, J., concurring)....................25

*United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803 (2000) ....................24

*United States v. Stanchich*, 550 F.2d 1294 (2d Cir. 1977)....................15

*Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President*, 774 F. Supp. 3d 86 (D.D.C. 2025) ....................20

**Statutes**

47 U.S.C. § 151....................8

47 U.S.C. § 307(c)(3)....................11

47 U.S.C. § 315(a) ....................5

47 U.S.C. § 326....................23

Title VI of the Civil Rights Act of 1964 ....................13

Title VII of the Civil Rights Act of 1964....................8

**Constitutional Provisions**

U.S. Const. amend. I ....................1, 4, 7, 10, 15, 16, 17, 18, 19, 21, 22, 23, 24

**Regulations**

47 C.F.R. § 73.2080(a)....................6, 11

47 C.F.R. § 73.2080(b)–(c)....................10, 11

**Other Authorities**

Aaron Pellish, Trump calls for revocation of ABC, NBC licenses over speech snub, Politico (July 16, 2026) ....................3

Anthony Orrico, Jimmy Kimmel Nemesis Brendan Carr Has Ominous New Message For ABC, HuffPost (July 23, 2026) ....................4

Barry Cole & Mal Oettinger, Reluctant Regulators 213 (1978)....................11

Blair Guild, Trump refutes NBC Story, suggests challenging its broadcast license, CBS News (Oct. 11, 2017)....................2

Brian Stelter, How Brendan Carr, the attack-dog FCC chair, helped take down Jimmy Kimmel with words, not actions, CNN.com (Sept. 18, 2025)....................23

Christopher Rufo, The Wokest Place on Earth, City Journal (May 7, 2021) ....................16

Daniel Arkin & Kevin Collier, Jimmy Kimmel suspension puts spotlight on Brendan Carr, Trump's FCC chair, NBC News (Sept. 18, 2025)....................5

David L. Bazelon, FCC Regulation of the Telecommunications Press, 1975 Duke L.J. 213 (1975)....................21

Dominick Mastrangelo, Trump floats punishment for ABC after debate, The Hill (Sept. 11, 2024) ....................2

Exec. Order No. 14151, Ending Radical and Wasteful Government DEI Programs and Preferencing, 90 Fed. Reg. 8339 (Jan. 20, 2025)....................6, 12

Exec. Order No. 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity, 90 Fed. Reg. 8633 (Jan. 21, 2025)....................6

FCC's Media Bureau Establishes Pleading Cycle and Ex Parte Procedures for the Early Renewal Applications of the Walt Disney Company's ABC Licenses, Public Notice, DA 26-541 (MB May 29, 2026) ....................6

FCC's Media Bureau Seeks Comment on Petition by Disney's ABC Asking the FCC to Declare That The View Qualifies as a Bona Fide News Interview Program and Thus Is Exempt from the Statutory Equal Opportunities Requirements, Public Notice, DA 26-517 (MB May 22, 2026) ....5

Free Press Emergency Petition for Inquiry Into Broadcast of False Information on COVID-19, Letter, 35 FCC Rcd. 3032 (MB & OGC 2020) ....2

Glen O. Robinson, The FCC and the First Amendment: Observations on 40 Years of Radio and Television Regulation, 52 Minn. L. Rev. 67 (1967) ....21

Irie Sentner, Trump again threatens ABC's broadcast license, this time over Epstein questions, Politico (Nov. 18, 2025) ....3

Jaime Fuller, Why the major networks didn't give President Obama primetime real estate for his immigration speech, Washington Post (Nov. 21, 2014) ....4

Jon Brodkin, Six days later, FCC chair says Trump can't order FCC to revoke TV licenses, Ars Technica (Oct. 17, 2017) ....4

Jon Brodkin, Trump wants CBS license revoked; FCC chair explains that isn't going to happen, Ars Technica (Oct. 10, 2024) ....3

Jon Levine, 'Blatantly Unacceptable': Trump's Threat to NBC License Denounced by 2 Ex-FCC Commissioners, The Wrap (Oct. 11, 2017) ....2

Kaia Hubbard, Trump says broadcast licenses should be terminated if networks are "almost 100% Negative" about him, CBS News (Dec. 24, 2025) ....3

Kathryn Watson, Trump says TV networks covering him negatively should "maybe" have their licenses revoked, CBS News (Sept. 18, 2025) ....3

Letter from Brendan Carr to Robert A. Iger re: Investigation into Disney/ABC's DEI Programs (Mar. 27, 2025) ....5, 6, 12, 16, 17

Madison Columbo, FCC chair warns 'The View' faces 'uphill climb' in equal-time probe, Fox Business (Feb. 27, 2026) ....23

Matthew Keys, Trump suggests pulling broadcast licenses of NBC, ABC stations, TheDesk.net (Aug. 25, 2025) ....3

Paul Farhi, As Biden warned about democracy's collapse, TV networks aired reruns, Washington Post (Sept. 2, 2022) ....4

Petition for Rulemaking to Require Broadcast Licensees to Show Nondiscrimination in Their Employment Practices, 18 F.C.C.2d 240 (1969) ....10

Review of the Commission's Broadcast and Cable Equal Employment Opportunity Rules and Policies, 17 FCC Rcd. 24018 (2002) ....9

Review of the Commission's Broadcast and Cable Equal Opportunity Rules and Policies, 39 FCC Rcd. 1791, 1844 (2024) (dissenting statement of Commissioner Brendan Carr) ....16

The Walt Disney Co., American Broadcasting Co., et al., Order, DA 26-416 (MB Apr. 28, 2026) ....5

## INTEREST OF *AMICUS CURIAE*

As laid out in more detail in *Amici's* Motion, *Amici* are a collection of nonprofit organizations and scholars. Their advocacy and activities are varied and span the ideological spectrum, but *amici* unite here out of deep concern about the grave threat to freedom of expression posed by the Federal Communication Commission's aggression toward Plaintiff.

## INTRODUCTION

The FCC's initiation of early renewal for the ABC Television Network's licenses for its owned and operated stations is a serious escalation of this Administration's efforts to intimidate the media. These began with informal actions that crossed the line into unconstitutional jawboning and now have ripened into official actions designed to punish ABC for independent journalism and entertainment programs the current Administration finds offensive. The FCC claims the early renewal proceeding is a routine examination of the network's employment practices and that its administrative procedures should be allowed to run their normal course. But nothing about this is normal or routine. As former FCC Chairman Mark Fowler put it, "[n]ever in its history has the agency ever acted so corruptly and unlawfully to intrude on broadcasters' First Amendment rights."[1] This Court's immediate intervention is vital to halt this gross misuse of executive power.

## BACKGROUND

***In general***. The proceeding to examine whether the Commission should renew eight station licenses held by the Walt Disney Company, owner of the ABC Television Network (ABC), tops off an extraordinary nineteen-month period in which the FCC under Chairman Brendan Carr has transformed from an agency that proclaimed "the Commission does not—and cannot and will

[1] Declaration of Mark S. Fowler in Support of Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction, No. 1:26-cv-2902, ECF No. 2–6 at ¶ 7.

not—act as a self-appointed, free-roving arbiter of truth in journalism"[2] into a government body that routinely threatens broadcasters for programming choices. During this time, the FCC has jettisoned its original statutory design as a bipartisan, independent agency and become an extension of the presidency implementing political whims in the name of the "public interest."

Current FCC leadership operates under the assumption that the public interest standard permits it to focus on particular programs or personalities and to threaten regulatory consequences, including license revocation. Worse still, this mindset equates the public interest with what pleases—or displeases—the President. Beginning with his first term, President Trump has called for the revocation of network "licenses" with some regularity.[3] As early as 2017, the President called for challenges to NBC's licenses because of what he called "fake news."[4] The President was irritated about news coverage of increases in the country's nuclear arsenal, and he has since broadened his threat to include other networks as well.[5]

The President's calls to revoke broadcast licenses have increased in his second term. He called for revocation of ABC's TV licenses in 2024 because he objected to being fact-checked by the moderator of a presidential debate.[6] He called for revocation of CBS's licenses over the editing

[2] *Free Press Emergency Petition for Inquiry Into Broadcast of False Information on COVID-19*, Letter, 35 FCC Rcd. 3032, 3033 (MB & OGC 2020).

[3] Of course, networks are not the licensees, but the President's ire is generally directed toward networks and particular personalities who appear on them.

[4] *See*, *e.g.*, Jon Levine, *'Blatantly Unacceptable': Trump's Threat to NBC License Denounced by 2 Ex-FCC Commissioners*, THE WRAP (Oct. 11, 2017, 10:48 PM), https://www.thewrap.com/trump-fcc-licenses-nbc-news-commissioners-blatantly-unacceptable.

[5] *See*, *e.g.*, Blair Guild, *Trump refutes NBC Story, suggests challenging its broadcast license*, CBS NEWS (Oct. 11, 2017, 12:03 PM), https://www.cbsnews.com/news/trump-refutes-nbc-story-suggests-challenging-its-broadcasting-license.

[6] Dominick Mastrangelo, *Trump floats punishment for ABC after debate*, THE HILL (Sept. 11, 2024, 11:35 AM), https://thehill.com/homenews/media/4874106-trump-abc-debate-punishment/.

of an interview with then-Vice President Kamala Harris on *60 Minutes*.[7] In August 2025, the President said the Commission should revoke ABC's and NBC's licenses because they aired too many "bad stories" about him.[8] This was followed a month later by President Trump's statement that urging revocation of networks' licenses because "[t]hey give me only bad publicity or press."[9] And in November 2025, President Trump called for revoking ABC's licenses because a reporter asked him a question about the Epstein files.[10] A December 2025 social media post said that network licenses should be "terminated" because network newscasts and their "Late Night Shows" are "almost 100% Negative to President Donald J. Trump, MAGA, and the Republican Party."[11] In July, after this proceeding was initiated, the President asserted that ABC and NBC should lose their licenses because the networks had engaged in "fraud" for failing to carry live on-air the President's speech in which he asserted (yet again) that the 2020 election was stolen.[12]

Far from being a basis for any sanction (much less license revocation), a network decision not to air a presidential address is the exercise of independent editorial judgment, the very thing

---

[7] Jon Brodkin, *Trump wants CBS license revoked; FCC chair explains that isn't going to happen*, ARS TECHNICA (Oct. 10, 2024, 4:45 PM), https://arstechnica.com/tech-policy/2024/10/fcc-chair-slams-trumps-call-to-revoke-cbs-and-abc-broadcast-licenses/.

[8] Matthew Keys, *Trump suggests pulling broadcast licenses of NBC, ABC stations*, THEDESK.NET (Aug. 25, 2025), https://thedesk.net/2025/08/trump-threatens-abc-nbc-broadcast-licenses-fcc/.

[9] Kathryn Watson, *Trump says TV networks covering him negatively should "maybe" have their licenses revoked*, CBS NEWS (Sept. 18, 2025, 8:02 PM), https://www.cbsnews.com/news/trump-says-tv-networks-should-maybe-have-their-licenses-revoked/.

[10] Irie Sentner, *Trump again threatens ABC's broadcast license, this time over Epstein questions*, POLITICO (Nov. 18, 2025, 2:39 PM), https://www.politico.com/news/2025/11/18/trump-again-threatens-abcs-broadcast-license-this-time-over-epstein-questions-00657264?.

[11] Kaia Hubbard, *Trump says broadcast licenses should be terminated if networks are "almost 100% Negative" about him*, CBS NEWS (Dec. 24, 2025, 10:31 AM), https://www.cbsnews.com/amp/news/trump-broadcast-licenses-terminated-100-negative/.

[12] Aaron Pellish, *Trump calls for revocation of ABC, NBC licenses over speech snub*, POLITICO (July 16, 2026, 9:47 PM), https://www.politico.com/news/2026/07/16/trump-calls-for-revocation-of-abc-nbc-licenses-over-speech-snub-01002580.

the public interest standard expects of broadcast licensees. *See, e.g.*, *Ark. Ed. Television Comm'n v. Forbes*, 523 U.S. 666, 673 (1998) ("Public and private broadcasters alike are not only permitted, but indeed required, to exercise substantial editorial discretion in the selection and presentation of their programming."); *CBS, Inc. v. Democratic Nat'l Comm.,* 412 U.S. 94, 124–25 (1973). This was well understood by earlier administrations, such as when the networks declined the Biden Administration's request for airtime to address what the President called "threats on democracy," or when ABC, CBS, and NBC did not air President Obama's primetime speech on immigration.[13] Networks in those instances declined to air presidential speeches they determined to be political.

And in this regard, FCC Chairmen in more normal times understood the President could not simply call for license revocations whenever he was displeased with network decisions. Instead, they reaffirmed the Commission's commitment to follow "the terms of the Communications Act and . . . other applicable legal principles," especially the First Amendment.[14] But these are not normal times, and Chairman Carr no longer recognizes these constraints as he once claimed to do as a Commissioner. He has publicly indicated the decision not to air the President's July 16 speech will be considered as part of the review of the ABC license renewals.[15]

---

[13] *See* Paul Farhi, *As Biden warned about democracy's collapse, TV networks aired reruns*, WASHINGTON POST (Sept. 2, 2022), https://www.washingtonpost.com/media/2022/09/02/biden-speech-network-coverage-independence-hall/; Jaime Fuller, *Why the major networks didn't give President Obama primetime real estate for his immigration speech*, WASHINGTON POST (Nov. 21, 2014), https://www.washingtonpost.com/news/the-fix/wp/2014/11/20/why-the-networks-arent-giving-president-obama-primetime-real-estate-for-his-immigration-speech/.

[14] Jon Brodkin, *Six days later, FCC chair says Trump can't order FCC to revoke TV licenses*, ARS TECHNICA (Oct. 17, 2017, 1:49 PM), https://arstechnica.com/tech-policy/2017/10/ajit-pai-despite-what-trump-says-fcc-wont-revoke-broadcast-licenses.

[15] Anthony Orrico, *Jimmy Kimmel Nemesis Brendan Carr Has Ominous New Message For ABC*, HUFFPOST (July 23, 2026, 12:39 AM), https://www.huffpost.com/entry/brendan-carr-fcc-abc-trump-speech_n_6a61623be4b0c2f78d01a65c.

Of course, this is just the latest thing in the President's—and, by extension, Chairman Carr's—list of grievances against ABC. As is well known, Chairman Carr threatened ABC over a September 15, 2025 monologue on *Jimmy Kimmel Live!* that included a line about MAGA reactions to Charlie Kirk's assassination. Carr directed the network to "take action on Kimmel, or there is going to be additional work for the FCC ahead."[16] The Commission later issued a public notice seeking comment on whether ABC's *The View* qualified for a news exemption under the Section 315(a) equal opportunity rules.[17] And, most significantly, the FCC directed ABC to file years-early renewal applications for eight local station licenses slated to expire between 2028 and 2031.[18]

***ABC Early Renewal Proceeding***. The Commission's asserted justification for initiating the early renewal proceeding is to probe "possible violations of the Communications Act of 1934 and the FCC's rules, including the agency's prohibition on unlawful discrimination." *Early Renewal Order* at ¶ 1. This opaque, one-sentence justification was foreshadowed by a March 27, 2025 letter from Chairman Carr to Disney CEO Robert Iger informing him the Chairman had directed the Commission's Enforcement Bureau to investigate whether Disney and ABC had violated "FCC equal employment opportunity regulations by promoting invidious forms of DEI," *i.e.*, diversity, equity, and inclusion.[19] The letter purports to rely on "the FCC's longstanding … EEO

---

[16] *See* Daniel Arkin & Kevin Collier, *Jimmy Kimmel suspension puts spotlight on Brendan Carr, Trump's FCC chair*, NBC NEWS (Sept. 18, 2025), https://www.nbcnews.com/business/media/jimmy-kimmel-suspension-brendan-carr-trumps-fcc-chair-rcna232091.

[17] *FCC's Media Bureau Seeks Comment on Petition by Disney's ABC Asking the FCC to Declare That The View Qualifies as a* Bona Fide *News Interview Program and Thus Is Exempt from the Statutory Equal Opportunities Requirements,* Public Notice, DA 26-517 (MB May 22, 2026), https://docs.fcc.gov/public/attachments/DA-26-517A1.pdf.

[18] *The Walt Disney Co., American Broadcasting Co., et al.*, Order, DA 26-416 (MB Apr. 28, 2026), https://docs.fcc.gov/public/attachments/DA-26-416A1.pdf ("*Early Renewal Order*").

[19] *Letter from Brendan Carr to Robert A. Iger RE: Investigation into Disney/ABC's DEI Programs* (Mar. 27, 2025), https://www.fcc.gov/sites/default/files/Carr-Letter-to-Disney-DEI-03272025.pdf ("*Investigation into Disney/ABC's DEI Programs*").

rules [which] set forth specific requirements," but also refers to "invidious forms of DEI," as if those concepts were synonymous. *Investigation into Disney/ABC's DEI Programs* at 1. (Spoiler alert: They are not.)

In particular, Chairman Carr questioned Disney making DEI a "key priority" through such practices as requiring that "50 percent of regular and recurring characters" on ABC programs be drawn from "underrepresented groups." *Id.* at 2. But other than unadorned references to the FCC's EEO rules and the FCC general statutory mandate, the letter did not specify how Disney and ABC's practices might have violated any FCC rule, let alone provide a basis for non-renewal (or early renewal) of licenses. Instead, it drew on President Trump's January 20 Executive Order pledging to "end the radical and wasteful DEI programs that have spread across the federal government." *Id*. at 3.[20] The unstated premise of the FCC's investigation draws on the Executive Orders' assumption that DEI programs, however configured, necessarily conflict with federal civil rights statutes as well as the FCC's rules. *E.g*., 47 C.F.R. § 73.2080(a) (2026). After the Commission opened the early renewal proceeding and called for interested parties to file comments or petitions to deny the ABC licenses,[21] the FCC received over 150,000 submissions, including several petitions to deny targeting ABC's programming choices and not just the network's hiring practices.

---

[20] The letter did not specifically cite the Executive Order but apparently was referring to Exec. Order No. 14151, *Ending Radical and Wasteful Government DEI Programs and Preferencing*, 90 Fed. Reg. 8339 (Jan. 20, 2025). President Trump also issued Exec. Order No. 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, 90 Fed. Reg. 8633 (Jan. 21, 2025). Neither Executive Order offered a definition of DEI, or diversity, equity, and inclusion, but seemed to assume DEI, however defined, is a *per se* violation of existing civil rights laws.

[21] *FCC's Media Bureau Establishes Pleading Cycle and Ex Parte Procedures for the Early Renewal Applications of the Walt Disney Company's ABC Licenses,* Public Notice, DA 26-541 (MB May 29, 2026), https://docs.fcc.gov/public/attachments/DA-26-541A1.pdf.

## ARGUMENT

Coming as it does after years of demands by Donald Trump to revoke network "licenses," and in the wake of nineteen months of jawboning by the President and Chairman Carr targeting ABC programming and personalities, the unprecedented proceeding calling for early review of ABC's television station licenses reeks of political pretext and should be enjoined.

### I. The FCC's Claim of Enforcing its Employment Policies is Pretextual and Cannot Justify This Extraordinary Licensing Proceeding.

This proceeding is illegitimate even if the FCC could be taken at its word that the license review is based on station employment practices, as that justification is far from sufficient to justify early review, much less conducting hearings or nonrenewing ABC's licenses.

#### A. The Commission's Pretextual Use of its EEO Rules Exceeds the Limits of its Jurisdiction.

The Commission's repeated invocation of the "public interest" cannot supply authority the Communications Act and First Amendment withhold. The Commission asserts that adjudicating Plaintiffs' claim would require the Court to "delve deeply into the antidiscrimination investigation" and resolve questions implicating "the Commission's expertise." Defs.' Mem. at 19–20. This is incorrect. Whether the FCC may condition license renewal on a licensee's DEI policies is a question of statutory authority for the court to decide, and requires no factfinding or specialized judgments about broadcast regulation. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 392–93 (2024). Because the Commission lacks the authority it invokes, references to agency discretion or expertise cannot supply a legitimate basis for the renewal proceeding.

Instead, the "FCC's public-interest authority must be interpreted in light of the 'targets' of the Communications Act of 1934." *Nat'l Religious Broads. v. FCC*, 138 F.4th 282, 292 (5th Cir. 2025) (quoting_All. for Fair Bd. Recruitment v. Sec. & Exch. Comm'n, 125 F.4th 159, 178 (5th Cir. 2024) (en banc)); *see also Motion Picture Ass'n of Am., Inc. v. FCC*, 309 F.3d 796, 805–806

(D.C. Cir. 2002). Contrary to the Commission's claims, "use of the words 'public interest' in a regulatory statute "is not a broad license to promote the general public welfare," because those words "take meaning from the purposes of the regulatory legislation." *NAACP v. Fed. Power Comm'n*, 425 U.S. 662, 669 (1976). And *NAACP* is instructive on precisely the point the Commission presses: the "public interest" is not a directive to eliminate discrimination. *Id*. *Contra* Defs.' Mem. at 20–21 (asserting the Commission has a valid basis for "investigating questions of unlawful discrimination and other possible public interest violations").

Defendants nonetheless read the Communications Act's general mandate to "make available" communications services to all Americans "without discrimination on the basis of race, color, religion, national origin, or sex," 47 U.S.C. § 151, as establishing a duty "to guard against unlawful discrimination" among "the Commission's core functions." Defs.' Mem. at 4. But that language applies to the "provision of communications services to Americans" and is not a directive empowering the Commission to "eradicate *employment* discrimination." *Nat'l Religious Broads*., 138 F.4th at 293. Notably, the Commission neither cites nor distinguishes *National Religious Broadcasters*, even though it construes the very provision invoked for their theory of authority.

The D.C. Circuit reached the same conclusion decades ago in the licensing renewal context. The FCC is not charged, in considering license renewals, "with an undifferentiated mandate to enforce the antidiscrimination laws: the FCC is not the Equal Employment Opportunity Commission (EEOC), and a license renewal proceeding is not a Title VII suit." *Bilingual Bicultural Coal. on Mass Media, Inc. v. FCC*, 595 F.2d 621, 628 (D.C. Cir. 1978) (en banc). The D.C. Circuit thus rejected petitions to deny grounded in employment discrimination allegations, explaining that the FCC is "not charged directly with the enforcement of Title VII under its 'public interest' mandate," and that even a finding of probable cause by the EEOC "does not necessarily mean that the same

finding raises an issue under the Communications Act." *Nat'l Org. for Women v. FCC*, 555 F.2d 1002, 1017–18 (D.C. Cir. 1977).

Defendants' authorities do not bridge that gap. They rely principally on *Beaumont Branch of the NAACP v. FCC*, 854 F.2d 501, 506 (D.C. Cir. 1988), to argue "license renewal will not be deemed to be in the public interest if a licensee has engaged in intentional employment discrimination." Defs.' Mem. at 5. However, "engaged in intentional… discrimination" means adjudicated conduct, not a contested theory that diversity initiatives are unlawful *per se*.

The FCC invokes its own EEO order to the same end, quoting its statement that "a documented pattern of intentional discrimination would put seriously into question a licensee's character qualifications to remain a licensee." *Review of the Commission's Broadcast and Cable Equal Employment Opportunity Rules and Policies*, 17 FCC Rcd 24018, 24036 ¶ 46 (2002); Defs.' Mem. at 5. Again, the predicate is a *documented pattern of intentional* discrimination. Here, by the Commission's own account, allegations against Plaintiffs "do not represent FCC conclusions or determinations," and it is "reserving judgment on the issues." Defs.' Mem. at 11. Defendants turn also to *Bilingual Bicultural*, Defs.' Mem. at 5, but that decision both holds that it is a proven pattern of intentional discrimination that may bear on renewal *and* reiterates that the FCC lacks a general antidiscrimination charter. 595 F.2d at 628. Both are fatal here: the Commission has no finding of employment discrimination and no statutory mandate to go looking for one.

What authority the FCC does possess in this area is narrow. As the D.C. Circuit explained, it "can probably only regulate discrimination that affects 'communication service'—here, that means programming." *Lutheran Church-Missouri Synod v. FCC*, 141 F.3d 344, 354 (D.C. Cir. 1998). This presents the Commission with a dilemma in which both horns constrain its authority. On one, its EEO enforcement authority is limited to specific communications-related matters, and

on the other, it cannot enforce its policies in ways that threaten First Amendment injury. The Commission's own stated rationale impales it on the second horn. *See infra* Section I.C.

Because of the particular focus of its authority, the limited FCC jurisdiction to enforce EEO mandates has long been contested, and its view of the public interest in this regard has shifted significantly over time. The requirements date to 1969, when the Commission required broadcast licensees not only to refrain from discriminatory hiring but also to "establish, maintain, and carry out a positive continuing program of specific practices designed to ensure equal opportunity … in every aspect of station employment policy and practice."[22] The rules at that time required stations to seek out minority and female applicants, track referral sources of minority applicants, and record the race and sex of every applicant and hire. Where the data showed a station employed a lower percentage of minorities and women than the local workforce, the Commission "would take that into account in determining whether to renew the station's license." *MD/DC/DE Broads. Ass'n v. FCC*, 236 F.3d 13, 16 (D.C. Cir. 2001).

However, that authority to use EEO policies in licensing proceedings has since been cabined both by acknowledgement of jurisdictional limits on FCC public interest authority and by constitutional constraints. The D.C. Circuit held the asserted interest in promoting "diverse programming" could not justify the FCC EEO rules' affirmative action requirements, and that the resulting mandates violated the Equal Protection Clause. *Lutheran Church-Missouri Synod,* 141 F.3d at 356 ("[O]ur opinion has undermined the proposition that there is any link between broad employment regulation and the Commission's avowed interest in broadcast diversity."); *MD/DC/DE Broads. Ass'n*, 236 F.3d at 21 ("[I]t is far from clear that future employment in the

[22] 47 C.F.R. § 73.2080(b); *see Petition for Rulemaking to Require Broadcast Licensees to Show Nondiscrimination in Their Employment Practices*, 18 F.C.C.2d 240 (1969).

broadcast industry is a public benefit for which the Government is constitutionally responsible."). Importantly, the authorities on which the FCC now relies pre-date these D.C. Circuit decisions.

The courts have likewise made clear these constitutional limits apply not only to the formal exercise of FCC authority but also to informal, "raised eyebrow" intimidation. *Id.* at 19 (quoting *Community–Service Broadcasting of Mid–America, Inc. v. FCC*, 593 F.2d 1102, 1116 (D.C. Cir. 1978) (en banc)). The D.C. Circuit has recognized an "investigatory hearing before the FCC 'is considered by both key staff people and most commissioners almost as drastic as taking a license away.'" *Id.* (quoting BARRY COLE & MAL OETTINGER, RELUCTANT REGULATORS 213 (1978)). That recognition bears directly on Defendants' contention that Plaintiffs suffer nothing cognizable because 47 U.S.C. § 307(c)(3) allows them to continue operating throughout the renewal proceeding and any ensuing judicial review. Defs.' Mem. at 2, 6, 40, 45. In the licensing context, the process itself is the punishment. A regulated party facing a proceeding of this kind does not need to lose its license to be injured, and it cannot be made whole by a decision arriving years after editorial judgments made under the shadow of that proceeding. *See Media Matters for Am. v. Paxton*, 138 F.4th 563, 579 (D.C. Cir. 2025) (recognizing the "present, concrete, and objective harms (not merely 'chilling effects') resulting from retaliatory government actions"); *cf. Axon Enter., Inc. v. FTC*, 598 U.S. 175, 191 (2023) (the injury of "being subjected" to an unconstitutional proceeding is "impossible to remedy once the proceeding is over").

There is a further irony in the Commission's asserted rationale: It now threatens Plaintiffs' licenses for allegedly engaging in the very type of recruitment and hiring practices it once believed the public interest *required*. It does not matter whether the Commission grounds that theory in the antidiscrimination rule of 47 C.F.R. § 73.2080(a) or the former affirmative action requirements of 47 C.F.R. §§ 73.2080(b) and (c). Just as the FCC may not exercise EEO authority to ensure

programming is sufficiently "diverse," it may not read those same rules in reverse to reach programming decisions the Chairman regards as "woke." The issue is not whether Plaintiffs' hiring or editorial policies are wise, or politically acceptable to the current Administration (or the previous one). It is that the government has no legitimate interest wielding its authority to require any particular ideological commitments, *see Reges v. Cauce*, 175 F.4th 1014, 1023, 1036 (9th Cir. 2025), or to forbid them, *see Pernell v. Fla. Bd. of Governors of the State Univ. Sys.*, 181 F.4th 1135, 1144, 1158 (11th Cir. 2026). And for purposes of this license renewal proceeding, the FCC's attempt to invoke its EEO rules exceeds its authority under the Act.

### B. Contrary to the Commission's Assumption, DEI Does Not Equate to Illegal Discrimination.

The Commission launched its investigation into Plaintiffs' employment practices shortly after the President issued Executive Orders pledging to stamp out DEI initiatives, making explicit references to them. *Investigation into Disney/ABC's DEI Programs* at 3. Defendants embrace that chronology, explaining that the President "established combatting unlawful discrimination through policies purporting to promote 'diversity, equity, and inclusion'" as "a policy priority," and the Chairman "signaled his commitment to that priority from the outset of his leadership." Defs.' Mem. at 24 (citing Exec. Order No. 14151, 90 Fed. Reg. 8339 (Jan. 20, 2025)). However, the inquiry's premise was that DEI initiatives, without more, violate federal law. Even now, nineteen months later, Defendants tell this Court the allegations against Plaintiffs "do not represent FCC conclusions or determinations," and the Commission is "reserving judgment on the issues." Defs.' Mem. at 11. Defendants' unwarranted premise is all they have.

But that faulty premise underlies a range of actions purporting to implement the Administration's Executive Orders, many of which have been enjoined for reasons relevant here. Courts have rejected the assumption that DEI initiatives necessarily violate antidiscrimination laws. In

*Jenner & Block LLP v. DOJ*, a judge in this Court found the government "point[ed] to no case holding such diversity initiatives illegal" and had stretched "the Supreme Court's recent decision in *Students for Fair Admissions, Inc. v. President and Fellows of Harvard College* beyond its own bounds." 784 F. Supp. 3d 76, 107 (D.D.C. 2025), *appeal docketed*, No. 25-5265 (D.C. Cir. July 22, 2025).[23] Other courts agree "the Administration's belief that all [DEI] practices are illegal" is "not settled law, and many [such] practices remain legal across the country." *Nat'l Council of Nonprofits v. McMahon*, No. CV 25-13242-MJJ, 2026 WL 1876366, at *32 (D. Mass. June 30, 2026). And as the District of Maryland explained in rejecting a similar theory, "there is no basis in Title VI or *SFFA* for concluding that discussion of race … is ever, or especially always, discrimination." *Am. Fed'n of Teachers v. Dep't of Educ.*, 796 F. Supp. 3d 66, 110–11 (D. Md. 2025), *appeal dismissed*, No. 25-2228 (4th Cir. Jan. 22, 2026).[24]

Courts have also found the government's references to "DEI" are undefined to the point of being unintelligible and unadministrable. Judges of this Court have observed that the government "avoids trying to define the terms 'diversity, equity and inclusion' altogether," *Perkins Coie*, 783 F. Supp. 3d at 175; that challenged documents "fail to provide an actionable definition … or delineate between a lawful DEI practice and an unlawful one," *NAACP v. Dep't of Educ.*, 779 F. Supp. 3d 53, 66 (D.D.C. 2025); and that courts are "left to guess *how* the excerpted sentences conflict with the Administration's policies, priorities, or violate civil rights law," *Council for Opportunity in Educ. v. Dep't of Educ.*, 2026 WL 120984, at *14 (D.D.C. Jan. 16, 2026). A standard

[23] *See also Perkins Coie LLP v. DOJ*, 783 F. Supp. 3d 105, 176 n.38 (D.D.C. 2025), *appeal docketed*, No. 25-5241 (D.C. Cir. July 2, 2025); *Susman Godfrey LLP v. Exec. Off. of the President*, 789 F. Supp. 3d 15, 43 (D.D.C. 2025), *appeal docketed*, No. 25-5310 (D.C. Cir. Aug. 26, 2025).

[24] *See also Nat'l Educ. Ass'n v. Dep't of Educ.*, 779 F. Supp. 3d 149, 187 (D.N.H. 2025) (guidance "does not make clear … what the Department believes constitutes a DEI program, or the circumstances in which the Department believes DEI programs run afoul of Title VI").

no agency has been able to articulate cannot be applied neutrally, and an undefined category is a ready instrument for targeting disfavored speakers.

Defendants themselves recognize this distinction. Seeking to distinguish *Media Matters for Am. v. FTC*, No. 25-5302, 2025 WL 2988966 (D.C. Cir. 2026), and *Endocrine Soc'y v. FTC,* 832 F. Supp. 3d 1 (D.D.C. 2026), Defendants emphasize that, in those cases, the agency's asserted grounds were opaque, it was "unclear who the Commission hypothesize[d] [was] violating the FTC Act," and the agency "offer[ed] no answers." Defs.' Mem. at 26 (quoting *Endocrine Soc'y*, 832 F. Supp. 3d at 18). Whereas here, they say, "there is no dispute that the Enforcement Bureau's letters of inquiry made the grounds for … investigation clear." Defs.' Mem. at 25. But the grounds the Commission articulated were that Plaintiffs maintained DEI programs. *See id.* at 24–25. Precisely naming an undefined category does not make the agency's theory clear. The FCC has never identified which of Plaintiffs' practices it believes are unlawful, under what standard, or where the line between permissible and impermissible practices lie—the very deficiency the decisions above describe.

Most pertinent here are cases finding the Administration's invocation of its anti-DEI Executive Orders was a pretext for punishing disfavored speech. In the face of the President's repeated demands to revoke ABC's licenses, reinforced by Chairman Carr's numerous acts of jawboning, Defendants devote a section of their brief to arguing "[t]he Commission's Investigatory Interests Are Not Pretextual." Defs.' Mem. at 29. But courts are not bound to credit solemn FCC claims that it is merely carrying out its public interest responsibilities. As Judge Richard Posner wrote in reviewing (and rejecting) a previous FCC misadventure, the Commission's justification in this proceeding "consists of boilerplate … and self-congratulatory rhetoric about how careful and thoughtful and measured and balanced [it] has been in … carrying out its responsibilities."

*Schurz Communications, Inc. v. FCC*, 982 F.2d 1043, 1050 (7th Cir. 1992). But "[s]tripped of verbiage, the opinion, like a Persian cat with its fur shaved, is alarmingly pale and thin." *Id.* And as Judge Howell observed in the current environment: "Judges are not required to exhibit a naiveté from which ordinary citizens are free." *Perkins Coie*, 783 F. Supp. 3d at 168 (quoting *United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir. 1977) (Friendly, J.)).[25]

This Court need not break new ground to recognize the pattern that other courts and judges in this court have already identified: a vague, undefined anti-DEI theory advanced against a party the government has publicly singled out for its speech. If anything, the pattern is more pronounced here, where the instrument wielded by the government is not an executive order subject to immediate review, but a licensing proceeding that Defendants say no court may examine until the Commission itself elects to conclude it. *See* Defs.' Mem. at 14–22.

### C. The FCC's Stated Rationale Highlights the First Amendment Tensions of the Renewal Proceeding.

The Commission is seeking to use the early renewal proceeding as a hook to regulate programming, despite the inquiry being superficially organized around the EEO rules. Chairman Carr specifically cited ABC's stated commitment to hire "underrepresented groups" for "regular and recurring characters" as well as for "writers, directors, crew, and vendors." Defs.' Ex. 5,

[25] A growing number of courts are thus rejecting claims that this Administration is merely trying to enforce EEO mandates. The *Perkins Coie* court held that "fair reading of the record, and taking the government at its word, requires finding that the justification for EO 14230 stemming from plaintiff's purported 'racial discrimination' was motivated only by [its] First Amendment protected speech in support of diversity," and that "the true motivation lurking behind the façade of discrimination allegations" was "the administration's disapproval of plaintiff's speech." 783 F. Supp. 3d at 154–55. The *Jenner & Block* court noted the "remarkable … shared characteristic of the firms [] threatened with EEOC investigations: speech the President dislikes." 784 F. Supp. 3d at 110. And in *Susman Godfrey*, this court held "[i]n the absence of any plausible allegations of unlawful discrimination, Susman's statements … are speech plainly protected by the First Amendment." *Susman Godfrey LLP v. Exec. Off. of the President*, 789 F. Supp. 3d 15, 43 (D.D.C. 2025), *appeal docketed*, No. 25-5310 (D.C. Cir. Aug. 26, 2025); *see also Am. Fed'n of Teachers*, 796 F. Supp. 3d at 111 ("The letter is textbook viewpoint discrimination.") (cleaned up).

*Investigation into Disney/ABC's DEI Programs* at 2; *see also* Defs.' Mem. at 24-25 (describing the inquiry as directed at "racial and identity quotas" for the selection of "writers, directors, crew, and vendors"). The Chairman also cited the work of political activists who have criticized Disney for "wokeness," suggesting his inquiry is driven by culture war grievances, not FCC EEO policies.[26] But as Chairman Carr once said in his role as Commissioner, "[i]t is quite obvious that the FCC's stated rationales are nothing more than pretext."[27] Defendants respond that the Chairman has also stated "the FCC should not operate as a speech police." Defs.' Mem. at 28. But that hollow assurance changes nothing where the inquiry, by Defendants own account, is directed at who writes ABC's programs, who may appear in them, and which kinds of characters they can portray.

Broadcasters' decisions about what stories to tell, what their editorial positions will be, and who they should hire to convey those messages are all protected by the First Amendment. *See, e.g., CBS, Inc.*, 412 U.S. at 124 ("editing is what editors are for; and editing is selection and choice of material"). "To the extent the publisher's choice of writers affects the expressive content of its newspaper, the First Amendment protects that choice," *McDermott v. Ampersand Publ'g LLC*, 593 F.3d 950, 962 (9th Cir. 2010), and the same is no less true of broadcasters, including their choices of editors and writers, as well as their selection of on-air talent and guests. *Contra* Defs.' Mem. at 22 (contending broadcasters' editorial protections cannot "convert their employment conduct into protected speech").

---

[26] See Defs.' Ex. 5 *Investigation into Disney/ABC's DEI Programs* at 2 n.4 (citing Christopher Rufo, The Wokest Place on Earth, CITY JOURNAL (May 7, 2021)) (criticizing Disney policies in general and for putting content advisories on some of its classic films). It is hard to tell what bearing Disney's policies at its theme parks or its placing advisories on films have to do with the employment records at ABC's eight owned and operated television stations.

[27] *Review of the Commission's Broadcast and Cable Equal Opportunity Rules and Policies, 39 FCC Rcd. at 1844 (dissenting statement of Commissioner Brendan Carr).*

Even if the Commission's actions come disguised as "anti-discrimination" measures, the First Amendment bars regulating a licensee's hiring practices to foster the government's notion of political balance. In our constitutional scheme the government has no legitimate role to decide "what counts as the right balance of private expression—to 'un-bias' what it thinks [is] biased." *Moody v. NetChoice, LLC*, 603 U.S. 707, 719 (2024). The Supreme Court has long made clear that antidiscrimination laws, when applied to speech, cannot override the First Amendment and are not "immune from the demands of the Constitution." *303 Creative LLC v. Elenis*, 600 U.S. 570, 592 (2023); *see also Boy Scouts of Am. v. Dale*, 530 U.S. 640, 659 (2000) ("[T]he First Amendment prohibits … imposing [an inclusion] requirement through … its public accommodations law.").

In *Hurley v. Irish-Am. Gay, Lesbian, & Bisexual Grp. of Boston*, the Court unanimously held the First Amendment barred Massachusetts from applying its public accommodation law to require the private organizers of Boston's St. Patrick's Day parade to include a gay contingent, drawing on precedent upholding the rights of newspaper publishers. 515 U.S. 557, 570, 579 (1995) (citing *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 258 (1974)). The First Amendment protects such choices "regardless of whether the government considers [the] speech sensible and well intentioned or deeply 'misguided.'" *303 Creative LLC*, 600 U.S. at 586 (quoting *Hurley*, 515 U.S. at 574). *Contra* Defs.' Ex. 5, Investigation into Disney/ABC's DEI Programs at 1 ("Disney started out a century ago as an iconic American company ... But then something changed."). The Commission's evident purpose to combat DEI and what it perceives as "wokeness" conflicts with this constitutional imperative.

Even if Chairman Carr could be believed that the current inquiry focuses just on hiring involving performers, writers, and directors, the First Amendment problem is the same. Applying these constitutional principles, the court in *Claybrooks v. American Broadcasting Cos.*, 898 F.

Supp. 2d 986, 993–96 (M.D. Tenn. 2012), dismissed a civil rights claim alleging that casting decisions for the ABC programs The Bachelor and The Bachelorette were motivated by racial discrimination. The court held the claims were barred as a matter of law because, under *Hurley*, "antidiscrimination statutes of general applicability must yield to the First Amendment." *Id*. at 996. The court compared TV casting decisions with editorial and creative choices by newspaper editors, playwrights, or parade sponsors (as in *Hurley*) and held them to be constitutionally protected. *Id*. at 1000. It noted "defendants—not the plaintiffs—are entitled to control the casting of their own programs." *Id*. at 997 n.13.

This general principle means "the First Amendment can trump the application of antidiscrimination laws to protected speech." *Id*. at 993; *see also Telescope Media Grp. v. Lucero*, 936 F.3d 740, 755 (8th Cir. 2019) ("Even antidiscrimination laws, as critically important as they are, must yield to the Constitution. And as compelling as the interest in preventing discriminatory conduct may be, speech is treated differently under the First Amendment."); *cf. Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171 (2012) (First Amendment bars application of employment discrimination statutes to a religious institution's selection of minister); *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732 (2020) (same, with respect to religious schools' hiring of teachers).

Such considerations explain why courts have already limited the Commission's EEO rules as violations of the Equal Protection Clause. *Lutheran Church-Missouri Synod*, 141 F.3d at 356 ("The regulations could not pass the substantial relation prong of intermediate scrutiny, let alone the narrow tailoring prong of strict scrutiny."); *MD/DC/DE Broads. Ass'n*, 236 F.3d at 21–22. And what is true for the former affirmative action requirements of the EEO policy is equally true of the nondiscrimination mandate and the First Amendment where the FCC seeks to regulate a licensee's

casting and editorial choices. Its license renewal inquiry into ABC is irreconcilable with the First Amendment—and that is a conclusion that rests on the constitutional limits of the Commission's authority, not on any matter of agency expertise. *Contra* Defs.' Mem. at 20–22.

## II. This License Renewal Proceeding is an Exercise in Political Retribution That This Court Must Enjoin.

The FCC asks this Court to presume regularity and let the administrative process to follow its normal course. But nothing about this proceeding is "normal." While the FCC can cite boiler-plate propositions for its broad powers of investigation and licensing, those generic statements do not apply where an agency has allowed itself to become a nakedly partisan tool.

### A. The Administration's Hostility to ABC is Open and Obvious.

Since 2017 the President has repeatedly called for revocation of network broadcast licenses generally, and demanded ABC's license at least four times since returning to office: after being fact-checked by a moderator, after the network aired too many "bad stories" about him, after a reporter asked him about the Epstein files, and after ABC declined to carry his address live. *See supra* pp. 3-5. None of these demands rested on an alleged violation of the Act, only editorial decisions the President disliked. And Chairman Carr's repeated public statements always parroted Trump's: When the President said *The View* should be pulled off the air, called for Jimmy Kimmel's firing, and demanded ABC's licenses, any stated FCC concerns surfaced against the backdrop of the President having signaled his dissatisfaction. Since January 2025, the FCC has reinstated a dismissed news distortion complaint against ABC, threatened it with "additional work for the FCC" over a late-night monologue, reversed decades of agency practice on exemption from the equal-time rules, and now calls up eight ABC licenses for early renewal years before expiration. *See supra* pp. 5–8.

Courts look to the entire context—including officials' statements and actions—in evaluating illicit purpose. In *National Rifle Association of America v. Vullo*, the Court did not confine itself to the four corners of the guidance letters issued by regulators, but instead "viewed [them] in context" alongside inflammatory public commentary. 602 U.S. 175, 193 (2024). Context is especially necessary where, as here, the government asks the Court to accept its stated rationale at face value. *See, e.g.*, Defs.' Mem at 27–28. Courts in this district have routinely declined to indulge a presumption of good faith where, as here, the record reveals otherwise. *See Fed. Educ. Ass'n v. Trump*, 795 F. Supp. 3d 74, 88–92 (D.D.C. 2025) (collecting cases), *stay pending appeal denied*, 2025 WL 2738626 (D.C. Cir. Sept. 25, 2025); *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President*, 774 F. Supp. 3d 86, 88 (D.D.C. 2025) ("The retaliatory nature of the Executive Order at issue … is clear from its face."); *Media Matters for Am. v. Bailey*, 2024 WL 3924573, at *18 (D.D.C. Aug. 23, 2024). Taken in context, the Commission has not made a series of discrete regulatory judgments that happen to share a target, but instead sustained this Administration's campaign of indirect punishment against one broadcaster's disfavored speech.

### B. The FCC Cannot Use a Retaliatory License Renewal Proceeding to Indirectly Punish ABC For its Speech.

The Supreme Court recently reaffirmed unanimously that a government official "cannot do indirectly what he or she is barred from doing directly." *Vullo*, 602 U.S. at 190; *see also Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67–69 (1963). The Commission cannot deny license renewals because the President or Chairman dislikes ABC's programming decisions, nor can it accomplish the same end by re-packaging its grievances as an EEO inquiry. As the D.C. Circuit held in *Paxton*, such a retaliatory campaign against a media plaintiff inflicts irreparable injury and must be enjoined. 138 F.4th at 585.

The Court held in *Vullo* that the "threat of invoking legal sanctions and other means of coercion … to achieve the suppression' of disfavored speech violates the First Amendment." 602 U.S. at 180 (quoting *Bantam Books*, 372 U.S. at 67). In that case, where a state official lacking authority over the NRA's speech used her leverage with entities she *could* regulate (banks and insurers) to punish the NRA indirectly, the Court held that officials violate the First Amendment when they use their powers "to suppress the speech of organizations that they have no direct control over." 602 U.S. at 197–98. This is precisely the strategy of the Commission here in using licensing proceedings to reach a network's speech and it is not the first time this agency has governed by implication and indirect threat. Use of such indirect means of regulation is well known at the FCC, and reviewing courts have been alert to the problem, especially when the abuse of authority is as transparent as it is here. *See* Glen O. Robinson, *The FCC and the First Amendment: Observations on 40 Years of Radio and Television Regulation*, 52 MINN. L. REV. 67, 119 (1967); *see also Community-Service Broadcasting of Mid-America v. FCC*, 593 F.2d 1102 (D.C. Cir. 1978) (en banc).

The tactics are familiar enough to have picked up their own shorthand—regulation by "raised eyebrow."[28] As the D.C. has Circuit observed, the FCC "has a long history of employing … 'a variety of *sub silentio* pressures and "raised eyebrow" regulation of program content …. The practice of forwarding viewer or listener complaints to the broadcaster with a request for a formal response to the FCC, the prominent speech or statement by a Commissioner or Executive official, the issuance of notices of inquiry … all serve as means for communicating official pressures to the licensee.'" *MD/DC/DE Broadcasters Ass'n.,* 236 F.3d at 19 (quoting *Community-Service*

[28] *See e.g.*, David L. Bazelon, *FCC Regulation of the Telecommunications Press*, 1975 DUKE L. J. 213, 215 (1975); Glen O. Robinson, *The FCC and the First Amendment: Observations on 40 Years of Radio and Television Regulation*, 52 MINN. L. REV. 67, 119 (1967).

*Broadcasting of Mid-America*, 593 F.2d at 1116). Such an investigation "is a powerful threat, almost guaranteed to induce the desired conduct." *Id. See Lutheran Church-Missouri Synod*, 141 F.3d at 353 (same).

The prohibition against government retaliation for protected speech is essentially a *per se* rule, as such retaliation serves no legitimate governmental interest. *See Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995). "[T]he First Amendment prohibits government officials from subjecting an individual to retaliatory actions … for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006); *see also Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022) (quoting *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019)); *Perry v. Sindermann,* 408 U.S. 593, 597 (1972) (the government may not punish a person or deprive him of a benefit to limit "constitutionally protected speech"). And even more pointedly, the government may not restrict or regulate speech "when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger*, 515 U.S. at 829.

In *Paxton*, the D.C. Circuit affirmed preliminarily enjoining a Texas civil investigative demand to a media entity based on the finding that Media Matters was the "target of a government campaign of retaliation" and "arguably bad-faith investigation" that imposed "special burdens on their newsgathering activities and operation." 138 F.4th at 581. And in the case concerning a similar Missouri investigation, the district court held: "A reasonable factfinder is likely to interpret Defendants' words as targeting Media Matters not for legitimate law enforcement purposes but instead for its protected First Amendment activities." *Media Matters for Am. v. Bailey*, 2024 WL 3924573, at *15 (D.D.C. Aug. 23, 2024).

In such cases the answer is <u>not</u> to let the proceeding run its course. An agency's decision cannot stand where the process itself is restricting speech and its Chair has publicly prejudged the

matter. See *Cinderella Career & Finishing Schs., Inc. v. FTC*, 425 F.2d 583, 589–91 (D.C. Cir. 1970) (requiring FTC Chair's disqualification where his public remarks would lead "a disinterested observer [to] conclude that [the agency] has in some measure adjudged the facts as well as the law … in advance of hearing"). And here, Chairman Carr announced *The View* faced "an uphill climb" before any petition was filed, and has told broadcasters they can do this "the easy way or the hard way."[29] Where the outcome has been predetermined, completing the (retaliatory) proceeding cannot offer a remedy.

### C. The FCC's General Authority to Regulate in the Public Interest Cannot Shield it From Judicial Review.

The FCC asserts that this proceeding is just the normal exercise of its authority to regulate in the public interest. Nonsense. This is not a legitimate exercise of authority under the Communications Act or the Constitution. Even if the FCC were legitimately pursuing EEO violations, it could not use this proceeding as a way to threaten or pressure ABC over its editorial decisions. *Compare Vullo*, 602 U.S. at 196 ("[A]lthough Vullo can pursue violations of state insurance law, she cannot do so in order to punish or suppress … protected expression."). Nothing in the public interest mandate can be leveraged to justify FCC actions targeting disfavored speech.

The Communications Act expressly withholds the power to "interfere with the right of free speech by means of radio communication." 47 U.S.C. § 326. This denies the FCC "the power of censorship" as well as the ability to promulgate any "regulation or condition" that interferes with freedom of speech. *Id*. These policies "were drawn from the First Amendment itself [and] the 'public interest' standard necessarily invites reference to First Amendment principles." *CBS, Inc.,*

---

[29] *E.g.*, Madison Columbo, *FCC chair warns 'The View' faces 'uphill climb' in equal-time probe*, FOX BUSINESS (Feb. 27, 2026), https://www.foxbusiness.com/media/fcc-chair-warns-theview-faces-uphill-climb-equal-time-probe; Brian Stelter, *How Brendan Carr, the attack-dog FCC chair, helped take down Jimmy Kimmel with words, not actions*, CNN.COM (Sept. 18, 2025), https://www.cnn.com/2025/09/18/media/brendan-carr-jimmy-kimmel-fcc-first-amendment.

412 U.S. at 121. Consequently, the Supreme Court has stressed that "the First Amendment must inform and give shape to the manner in which Congress exercises its regulatory power in this area." *FCC v. League of Women Voters of Cal.,* 468 U.S. 364, 378 (1984). Although the Court historically interpreted the law to give some greater leeway to regulate broadcasting compared to traditional media, *e.g.*, *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367 (1969), the public interest standard has never permitted the use of the FCC for retaliation or to pursue partisan ends.[30]

Deference is not owed to the Commission where the First Amendment is at stake. *See Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 129 (1989) ("Deference to a legislative finding cannot limit judicial inquiry when First Amendment rights are at stake."); *accord United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 817–18 (2000). The Supreme Court has confirmed that courts owe no deference to agencies' statutory interpretations, which makes the Communications Act's unambiguous prohibitions, like Section 326, all the more binding on the Commission. *See Loper Bright Enters.*, 603 U.S. at 392–93. As the Court has interpreted the Communications Act in the decades following *Red Lion*, the unambiguous command of Congress that the FCC has no power of censorship must take precedence over any exercise of discretionary "public interest" authority by the agency.

To whatever extent this Court might have been inclined to defer to the FCC's interpretation of its authority, recent interpretations of precedent holding the FCC is not an independent agency, coupled with Chairman Carr's frank acknowledgement he serves merely to do the President's bidding, increase this Court's duty to oversee unchecked executive power. Justice Gorsuch recently

---

[30] The Court has since questioned *Red Lion*'s continued vitality, *see e.g., FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 532–35 (2009) (Thomas, J., concurring) ("the extant facts that drove this Court to subject broadcasters to unique disfavor under the First Amendment simply do not exist today"). Regardless, whatever latitude *Red Lion* may still afford, it never allowed retaliation.

called for greater judicial oversight of such power, specifically in the context of broadcast regulation. *Trump v. Slaughter*, 146 S.Ct. 2283 (2026) (Gorsuch, J., concurring). Specifically, he cited one of Chairman Carr's more notorious examples on jawboning—his demand that ABC "take action on Kimmel," and suggested it is time for reviewing courts exert their supervisory authority and "return, all the way, to the Constitution." *Id*. at 2319. The early renewal proceeding targeting ABC makes such intervention imperative.

Defendants answer is that mandamus remains available if the agency delays. Defs.' Mem. at 17, 22. But the Commission sat on a repeal petition from seven former Commissioners of both parties until mandamus became necessary, and that petition was rejected by the D.C. Circuit, given the extraordinary nature of mandamus relief. *In re Radio Television Digital News Ass'n*, No. 26-1099 (D.C. Cir., Sept. 9, 2026) (per curiam). The remedy Defendants offer is no substitute for review in this Court.

## CONCLUSION

This proceeding is a shameful chapter in the history of the FCC. This Court must intervene to halt the Commission's retaliatory proceeding and continued abuse of executive power.

Dated: September 17, 2026

/s/ *Robert Corn-Revere*

Robert Corn-Revere
(D.C. Bar No. 375415)
Ronald G. London
(D.C. Bar No. 456284)
FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
700 Pennsylvania Ave. SE, Ste. 340
Washington, DC 20003
bob.corn-revere@fire.org
ronnie.london@fire.org
(215) 717-3473

Counsel for *Amici Curiae*