**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN BROADCASTING COMPANIES, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>FEDERAL COMMUNICATIONS COMMISSION, et al.,<br><br>Defendants. | Civil Action No. 1:26-cv-2902 (LLA) |

**BRIEF OF NATIONAL REPUBLICAN SENATORIAL COMMITTEE AND NATIONAL REPUBLICAN CONGRESSIONAL COMMITTEE AS *AMICI CURIAE* IN SUPPORT OF DEFENDANTS**

## LCVR 7(O)(5) & FRAP 29(A)(4)(E) STATEMENT

Counsel for *amici curiae* certify that the National Republican Senatorial Committee has no parent corporation, and no publicly held corporation owns ten percent or more of its stock. Counsel for *amici curiae* further certify that the National Republican Congressional Committee has no parent corporation, and no publicly held corporation owns ten percent or more of its stock.

# TABLE OF CONTENTS


**LCVR 7(O)(5) & FRAP 29(A)(4)(E) STATEMENT .................... ii**

**TABLE OF AUTHORITIES .................... iv**

**INTEREST OF *AMICI CURIAE* .................... 1**

**INTRODUCTION .................... 2**

**ARGUMENT .................... 3**

**I. THE FCC'S EARLY RENEWAL PROCEEDING WAS JUSTIFIED BY THE PUBLIC INTEREST .................... 3**

**A. Preventing Partisan Exploitation of Limited Broadcast Resources Is an Important Component of the Public Interest .................... 5**

**B. Plaintiffs Have a Long Track Record of Partisan Abuse of a Public Resource. .................... 8**

**II. THE FCC'S ENFORCEMENT OF PUBLIC INTEREST OBLIGATIONS IS NOT FIRST AMENDMENT RETALIATION .................... 13**

**CONCLUSION .................... 20**

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Arkansas Educational Television Commission v. Forbes*,
523 U.S. 666 (1998) .......... 18

*Brandywine-Main Line Radio, Inc. v. FCC*,
473 F.2d 16 (D.C. Cir. 1972) .......... 6, 12, 17, 18

*CBS, Inc. v. FCC*,
453 U.S. 367 (1981) .......... 4, 5

*Chisholm v. FCC,*
538 F.2d 349 (D.C. Cir. 1976) .......... 8

*Columbia Broad. Sys., Inc. v. Democratic Nat. Comm.*,
412 U.S. 94 (1973) .......... 13, 14

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) .......... 3–4

*FCC v. League of Women Voters*,
468 U.S. 364 (1984) .......... 15

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*,
429 U.S. 274 (1977) .......... 19

*NBC v. United States*,
319 U.S. 190 (1943) .......... 4

*Nieves v. Bartlett*,
587 U.S. 391 (2019) .......... 19

*NRA v. Vullo*,
602 U.S. 175 (2024) .......... 19

*Red Lion Broad. Co. v. FCC*,
395 U.S. 367 (1969) .......... 15, 16, 17, 19

*Scott v. Rosenberg*,
702 F.2d 1263 (9th Cir. 1983) .......... 13

*Turner Broad. Sys., Inc. v. FCC*
512 U.S. 622 (1994) .......... 14, 15

**Statutes** **Page(s)**

47 U.S.C. § 151 .......... 4

47 U.S.C. § 301 .......... 4

47 U.S.C. § 307(c) .......... 19

47 U.S.C. § 309(a) .......... 3, 19

47 U.S.C. § 310(d) .......... 19

47 U.S.C. § 315 .......... 5, 6, 16

47 U.S.C. § 315(a) .......... 5

47 U.S.C. § 315(a)(1) .......... 5

47 U.S.C. § 315(a)(2) .......... 5

Pub. L. No. 86-274, § 1, 73 Stat. 557 (1959) .......... 6

**Administrative Materials** **Page(s)**

*Broadcast Actions*,
40 F.C.C. 314 (1960) .......... 7

*Complaint of Gillis*,
43 F.C.C.2d 584 (1973) .......... 7

*FCC's Media Bureau Provides Guidance on Political Equal Opportunities Requirement for Broadcast Television Stations*, Public Notice,
DA 26-68 (MB Jan. 21, 2026) .......... 6

*In re Davis*,
59 F.C.C.2d 351 (1976) .......... 7

*In re Request for "Equal Time" Under Section 315 of the Commc'ns Act of 1934*,
40 F.C.C. 313 (1960) .......... 7

*In re Request for Declaratory Ruling That Independently Produced Bona Fide News Interview Programs Qualify for the Equal Opportunities Exemption Provided in Section 315(a)(2) of the Communications Act*,
7 F.C.C. Rcd. 4681 (1992) .......... 6

*In Re Complaint of Socialist Workers Party Against NBC*,
65 F.C.C.2d 229 (1977) .......... 7

*Petitions of the Aspen Institute Program on Communications and Society and CBS, Inc., for Revision or Clarification of Commission Rulings Under Section 315(a)(2) and 315(a)(4)*, Declaratory Ord.
55 F.C.C.2d 697 (1975) .......... 7

**Other Authorities** **Page(s)**

Jacob Bernstein, *A Former Trump Aide Becomes a Liberal Favorite*, N.Y. Times
(Mar. 11, 2024) .......... 10

Eric Columbus, *Brendan Carr Has a Point About the Equal Time Rule*, Lawfare (Mar. 4, 2026) ........ 11

Brian Flood, ABC News' 'The View' Has Had 63 Liberal Guests in 2025 Without a Single Conservative, Fox News (Apr. 8, 2025) ........ 10

Nicholas Fondacaro, *The View Spoke to ZERO Conservative, Pro-Trump Guests in 2025 (So Far)*, NewsBusters (July 30, 2025) ........ 10–11

Nicholas Fondacaro, *The View: Conservatives Don't Live Up to Our 'Certain Caliber of Guest,'* MRC NewsBusters (Nov. 7, 2025) ........ 12

Nicholas Fondacaro, *The View Kicks Off Midterm Year With 27 Liberal Guests to 1 Republican*, MRC NewsBusters (Apr. 10, 2026) ........ 11

Tim Hanlon, *Local Broadcasting's Over-the-Air Blind Spot*, TVRev (Apr. 11, 2024) ........ 14

Justinian, Institutes 2.1.1 (J.B. Moyle trans., 5th ed. 1913) ........ 4

Colleen McClain and William Bishop, *What We Know About Smartphone Ownership and Digital Divides in the U.S.*, Pew Rsch. Ctr. (Jan. 8, 2026) ........ 15

Tia Mitchell, *Marjorie Taylor Greene's Populist Rise Continues With Debut on 'The View,'* Atlanta J.-Const. (Nov. 4, 2025) ........ 11

Sonia Rao, "*The View" Adds Alyssa Farah Griffin and Ana Navarro as New Co-Hosts*, Wash. Post (Aug. 4, 2022) ........ 9

Variety, *Top-Rated Television Networks: Ranking 2025's Winners and Losers* (Jan. 2, 2026) ........ 14–15

The View, *S29 E44: Marjorie Taylor Greene* (ABC television broadcast, aired Nov. 4, 2025) ........ 11

The View, *S29 E182: Vice President JD Vance* (ABC television broadcast, aired June 16, 2026) ........ 11–12

## INTEREST OF *AMICI CURIAE*[1]

The National Republican Senatorial Committee (NRSC) is the Capitol Hill-based committee of the Republican Party focused on defending and expanding the number of elected Republicans in the U.S. Senate. The National Republican Congressional Committee (NRCC) is the Capitol Hill-based committee of the Republican Party focused on defending and expanding the number of elected Republicans in the U.S. House of Representatives. Promoting Republican candidates for office is a core function of both committees.

Both the NRSC and NRCC field candidates and support campaigns in an ever-evolving media landscape, including through the use of broadcast communication channels. Absent equitable treatment by broadcasters, the candidates backed by the NRSC and NRCC will be unable to effectively communicate with the public at large, thereby compromising the NRSC and NRCC's mission. Accordingly, the NRSC and NRCC both have a strong interest in ensuring that the legal standards that govern this environment are administered fairly and faithfully. The NRSC and NRCC file this brief to defend the right of the Federal Communications Commission (the Commission) to enforce the longstanding, and statutory, public interest standard in contexts where—as here—that standard has been flagrantly transgressed for years.

---

[1] This brief was not written, in whole or in part, by counsel for either party. No entity other than *amici* made a financial contribution in support of the preparation and submission of this brief. Consistent with FRAP 29(a) and D.D.C. Rule LCvR7(o), this brief is filed at the same time as *amici*'s Motion for Leave to File. Counsel for Defendants do not object to the filing of this amicus brief. Counsel for Plaintiffs do not consent to the filing of this amicus brief, due to timing.

## INTRODUCTION

The story behind this lawsuit is simple. For decades, licensees like Plaintiffs have taken advantage of the Commission's presumptions of good faith, all while benefiting from their exclusive license to use a scarce public resource—broadcast spectrum. But no longer. In recent months, the FCC has taken steps to rectify Plaintiffs' longstanding license misuse.

The catalyst for the present lawsuit is the Commission's decision to require Plaintiffs to undertake early license renewal proceedings, against the backdrop of the Commission's investigation of discrimination allegations. But Plaintiffs accuse the Commission of much more than this, alleging that the Commission has a more nefarious agenda: to bludgeon Plaintiffs over their perceived politics, through pretextual oversight measures.

That theory fails as a matter of law. Enforcement of the public interest standard falls squarely within the Commission's lawful authority—and always has. As the Supreme Court has recognized for decades, there is no First Amendment right for a licensee to use public broadcast resources solely as they please, without regard for the public interest or statutory limitations. For instance: editorial discretion cannot cross the line into transparent partisan advocacy without violating the law. When licensees with exclusive rights to broadcast spectrum monopolize the airwaves in support of one position, they necessarily shut out other viewpoints. That undermines the *public's* interest in free speech.

For years, Plaintiffs have done precisely that. Most instructively, *The View*—the program Plaintiffs place at the heart of their pretext argument—has consistently displayed

an explicit partisan bent. By law, the equal opportunities rule requires equal airtime for opposing candidates when political candidates make appearances on broadcast stations, though the rule contains an exception for good faith news coverage that only incidentally involves appearances by candidates. For some time, the Commission—in tension with its own past practice—adopted a hands-off approach to the "good faith" requirement. This led *The View*—among other programming—to exploit the Commission's lenience.

No longer. The Commission has a statutory duty to ensure that licensees of a limited public resource operate in the public interest. And that may involve policing, if necessary, licensees' misuse of those limited spectrum resources for avowedly partisan purposes. As the Supreme Court and a host of lower courts have held, such enforcement does not amount to "retaliation," because Plaintiffs do not have an unlimited right to use public resources as they please. Plaintiffs' Complaint should be dismissed.

## ARGUMENT

### I. THE FCC'S EARLY RENEWAL PROCEEDING WAS JUSTIFIED BY THE PUBLIC INTEREST.

No one is entitled to a broadcast license. Nor is a broadcast license *carte blanche* to do whatever one pleases on the airwaves. Under federal law, licenses may be issued only when they serve "the public interest, convenience, and necessity." 47 U.S.C. § 309(a).

This public interest requirement is not mere boilerplate. It confers actual obligations. When a license is issued, "[a] licensed broadcaster is granted the free and exclusive use of a limited and valuable part of the public domain; when he accepts that franchise it is burdened by enforceable public obligations." *FCC v. Fox Television Stations, Inc.*, 556

U.S. 502, 506 (2009) (alteration in original) (quoting *CBS, Inc. v. FCC*, 453 U.S. 367, 395 (1981)); *see* 47 U.S.C. § 301 (prohibiting broadcasting "except under and in accordance with [the Communications Act] and with a license"); *NBC v. United States*, 319 U.S. 190, 217 (1943) (public interest standard is expansive by design). This public-interest requirement follows from the longstanding common-law principle that limited resources held in common—unlike private resources—should be administered for the public good. *Cf.* Justinian, Institutes 2.1.1 (J.B. Moyle trans., 5th ed. 1913).

This statutory authority authorized the Commission to require early license renewal applications. As the Commission has explained, that requirement was triggered by an ongoing investigation into whether Disney—Plaintiffs' parent entity—was complying with the Commission's antidiscrimination and thus public interest standards. Motion to Dismiss at 8–9; *see also* 47 U.S.C. § 151 (Commission's interest in nondiscrimination). Plaintiffs, however, argue otherwise, averring that the antidiscrimination investigation was pretextual and that the early renewal requirement was a response to perceived political skew. Opposition to Motion to Dismiss at 19–38. That's wrong for the reasons explained by the Commission. Motion to Dismiss at 22–36.

Even if credited, Plaintiffs' political-skew argument would not undermine the Commission's authority to act. While Plaintiffs breathlessly raise claims of censorship and content-based interference, those arguments ignore decades of Commission precedent and statutory authority, which recognize that partisan abuses of broadcast licenses—and the exclusive right to spectrum use that they confer—are inconsistent with the public interest. The Commission is statutorily required to police these. And investigating whether such

abuses have occurred, particularly where evidence of widespread abuse exists, is squarely within the Commission's responsibilities—and would constitute an appropriate basis for mandating early license renewal.

### A. Preventing Partisan Exploitation of Limited Broadcast Resources Is an Important Component of the Public Interest.

Since 1934, one of broadcasters' "enforceable public obligations," *CBS*, 453 U.S. at 395, has been an obligation not to exploit their exclusive license of the public spectrum for one-sided electoral advantage. The equal opportunities rule—located in the text of the Communications Act itself—encapsulates this principle. With limited exception, Section 315 of the Act requires that where a broadcast station permits a legally qualified candidate for public office to use its facilities, it must provide an equal opportunity to all other legally qualified candidates. 47 U.S.C. § 315(a) ("If any licensee shall permit any person who is a legally qualified candidate for any public office to use a broadcasting station, he shall afford equal opportunities to all other such candidates for that office in the use of such broadcasting station[.]"); *see id.* §315(a)(1)-(2) (providing exceptions for, among other things, "bona fide" news casts and interviews).

The logic of this policy is straightforward: Where the federal government confers on some broadcasters—but not others—an exclusive right to use a particular portion of the broadcast spectrum, a licensee cannot abuse that privilege by amplifying some candidates' voices over others. Else, a corrupted Commission might grant licenses *only* to those broadcasters inclined to support the extant administration's political party.

At bottom, the purpose of Section 315 is to ensure that no candidate for office "is unfairly given less access to the public airwaves than their opponent." *FCC's Media Bureau Provides Guidance on Political Equal Opportunities Requirement for Broadcast Television Stations*, Public Notice, DA 26-68 (MB Jan. 21, 2026), https://docs.fcc.gov/public/attachments/DA-26-68A1.pdf. Such unfairness would result in an underinformed, and potentially manipulated, citizenry —an outcome certainly not in the public interest. "[H]ow can the citizenry remain informed if broadcasters are permitted to espouse their own views only without attempting to fully inform the public? This is the issue of good faith which, unfortunately, a small number of broadcasters refuse to exercise." *Brandywine-Main Line Radio, Inc. v. FCC*, 473 F.2d 16, 60 (D.C. Cir. 1972).

To be sure, the equal-opportunities rule contains an exception for "bona fide" news coverage. Pub. L. No. 86-274, § 1, 73 Stat. 557 (1959) (codified as amended at 47 U.S.C. § 315(a)(1)–(4)). But again—"bona fide" is not an inkblot standard that can mean anything at all. Newsgathering and reporting activities that inform the American public about current events, and that involve appearances by political figures for such purposes, are distinguishable from deliberate efforts to advance a particular partisan agenda. Elsewise, the exception would swallow the rule.

This is why, when enforcing the bona fide exception, the Commission has sought to ensure "that the content, format and participants not be intended for the political advantage of candidates." *In re Request for Declaratory Ruling That Independently Produced Bona Fide News Interview Programs Qualify for the Equal Opportunities Exemption Provided in Section 315(a)(2) of the Communications Act*, 7 F.C.C. Rcd. 4681, 4685, para. 26 (1992).

In fact, the Commission has even observed that programs that would otherwise qualify for a bona fide exemption are ineligible if the program is "designed for the specific advantage of a candidate." *Petitions of the Aspen Institute Program on Communications and Society and CBS, Inc., for Revision or Clarification of Commission Rulings Under Section 315(a)(2) and 315(a)(4)*, Declaratory Ord., 55 F.C.C. 2d 697, 705 (1975).

Throughout its history, the Commission has not hesitated to police the boundaries of the bona fide exception. In 1960, the Commission held that because Jack Paar's *The Tonight Show* was a "variety program" rather than a "bona fide news" program, it "was not exempt from [the] equal opportunities requirement of Section 315." *In re Request for "Equal Time" Under Section 315 of the Commc'ns Act of 1934*, 40 F.C.C. 313 (1960); *Broadcast Actions*, 40 F.C.C. 314 (1960); *accord In re Davis*, 59 F.C.C.2d 351, 353–54 (1976). In 1973, Commission staff ruled that a program featuring—"a melange of news interviews along with comments by [the host] and interviews of entertainment personalities, authors and sports celebrities"—was ineligible for the exemption. *Complaint of Gillis*, 43 F.C.C.2d 584, 589 (1973). And in 1976, Commission staff concluded that a program was ineligible for the bona fide news exemption when it "appears to deal with newsworthy topics and individuals on an intermittent and not on a regularly scheduled basis, while at other times providing its audience with entertainment or a conventional talk show format." *In Re Complaint of Socialist Workers Party Against NBC*, 65 F.C.C.2d 229, 232-33 (1977).

In recent years, the Commission has taken a more hands-off approach to regulating the bona fide exception. But the statute forecloses an infinitely open-ended exception. At

a minimum, "good faith" can only exist in the absence of "evidence of broadcaster intent to advance a particular candidacy." *Chisholm v. FCC*, 538 F.2d 349, 359 (D.C. Cir. 1976). And the statute requires that licenses be issued and administered in the public interest—which has always prohibited blatant partisan abuse of the broadcast license. Congress recognized this nearly a century ago, and enshrined that recognition via the equal opportunities rule. In short, there is nothing novel or untoward about the Commission acting to ensure that the no-partisan-abuse principle is upheld.

### B. Plaintiffs Have a Long Track Record of Partisan Abuse of a Public Resource.

Take, for instance, *The View*—Plaintiffs' marquee talk show program, the debate over which underlies many of Plaintiffs' representations about the allegedly pretextual character of the early renewal mandate. *See* Compl. at ¶¶ 80–89, 107, 125, 138.

*The View* is a daytime talk show, presented by a rotating cast of women hosts, that has aired on ABC and its broadcast affiliates since 1997. Compl. ¶ 81. Plaintiffs tout the purported success of *The View*, declaring that the program has "won more than 30 Daytime Emmy Awards and the DuPont-Columbia Award for journalism, and boasts among its hosts political strategists, producers, news correspondents, and attorneys." *Id.*

None of that addresses the relevant legal question. By any commonsense standard, evidence of broadcaster intent to advance the candidacies of Democratic Party figures on *The View* is not merely present, but overwhelming. For years, *The View* has exploited the Commission's recent tendency to presume good faith—by maintaining a single token "conservative seat" among its large roster of progressive hosts, granting overwhelmingly

disproportionate airtime to Democratic Party-aligned political figures, and permitting only rare appearances by Republican-aligned figures, despite affirmative outreach efforts by Republicans. The facts speak for themselves: this is not "good faith" news coverage in the sense contemplated by the law or by past practice.

First, and most importantly, *The View*'s own producers have described the composition of the show in overtly ideological—and thus political—terms. In 2022, producer Brian Teta issued a news release describing host Alyssa Farah Griffin as occupying "the conservative seat" on the show. Sonia Rao, *"The View" Adds Alyssa Farah Griffin and Ana Navarro as New Co-Hosts*, Wash. Post (Aug. 4, 2022), https://www.washingtonpost.com/arts-entertainment/2022/08/04/view-ana-navarro-alyssa-farah-griffin/. Emphasis on the singular—"seat." Indeed, Teta himself corroborated that reading by reiterating this same language elsewhere, explaining that the show had anticipated "tak[ing] a little time to fill the seat" in advance of Farah Griffin's selection. *Id.*

Teta's statement was a crucial admission: hosts of *The View* are not selected for their journalistic talent or excellence in commentary, but for their partisan tilt. Unlike traditional news programs like *Crossfire*, which featured one liberal and one conservative journalist facing off over the news of the day, *The View* does not host liberal and conservative perspectives in equal measure. Currently, it has *five* liberal hosts and *one* former Republican. That imbalance is no accident. As Teta's own words confirm, it is by design.

And there is ample reason to doubt whether even this lopsided policy represents a good-faith attempt at political diversification. The show's sole self-described conservative—Farah Griffin—has gone so far as to describe President Donald Trump as "the most dangerous politician" in her lifetime, and has distanced herself from any Republican affiliation. Jacob Bernstein, *A Former Trump Aide Becomes a Liberal Favorite*, N.Y. Times (Mar. 11, 2024), https://www.nytimes.com/2024/03/09/style/alyssa-farah-griffin-trump-cnn.html. Such a characterization calls into question whether Farah Griffin's presence on the show represents political diversity in any meaningful sense—or is simply (a poor attempt at) tokenism.

Second, *The View*'s guest selections have, for years, been overwhelmingly partisan in character—a pattern which drew prior Commission scrutiny and undergirded the Commission's decision to require early license renewals. In the early months of 2025, the show hosted 63 left-leaning guests, including nine sitting Democratic Party politicians, without a single Republican. Brian Flood, *ABC News' 'The View' Has Had 63 Liberal Guests in 2025 Without a Single Conservative*, Fox News (Apr. 8, 2025), https://www.foxnews.com/media/abc-news-the-view-has-had-63-liberal-guests-2025-without-single-conservative-study.

When a Republican finally appeared, it was the exception that proved the rule. Rep. Marjorie Taylor Greene appeared on election day, November 4, 2025, *after* a *NewsBusters* report revealed that between roughly January and July 2025 the show had hosted 102 left-leaning guests—including 19 Democratic politicians—and zero conservatives. Nicholas Fondacaro, *The View Spoke to ZERO Conservative, Pro-Trump Guests in 2025 (So Far)*,

NewsBusters (July 30, 2025), https://newsbusters.org/blogs/nb/nicholasfondacaro/2025-/07/30/view-spoke-zero-conservative-pro-trump-guests-2025-so-far. The hosts praised Greene's evolution and highlighted her differences with President Trump and the Republican Party. The View, *S29 E44: Marjorie Taylor Greene* (ABC television broadcast, aired Nov. 4, 2025); *see also* Tia Mitchell, *Marjorie Taylor Greene's Populist Rise Continues With Debut on 'The View'*, Atlanta J.-Const. (Nov. 4, 2025), https://www.ajc.com/politics/2025/11/marjorie-taylor-greenes-populist-rise-continues-with-debut-on-the-view/. As of April 2026, 27 of the show's guests defended liberal views, while just one offered a conservative perspective. Nicholas Fondacaro, *The View Kicks Off Midterm Year With 27 Liberal Guests to 1 Republican*, MRC NewsBusters (Apr. 10, 2026), https://www.newsbusters.org/blogs/nb/nicholas-fondacaro/2026/04/10/view-kicks-midterm-year-27-liberal-guests-1-republican.

And often, even when conservative-aligned guests appear on *The View*, they are invited primarily because of their disagreement with the consensus of their party. As of March 2026, the only three Republicans who had been invited onto the show were Reps. Marjorie Taylor Greene and Thomas Massie, both vocal critics of the institutional Republican Party and the current administration, and ex-California Governor Arnold Schwarzenegger, a longtime critic of the sitting President who backed Kamala Harris in 2024. Eric Columbus, *Brendan Carr Has a Point About the Equal Time Rule*, Lawfare (Mar. 4, 2026), https://www.lawfaremedia.org/article/brendan-carr-has-a-point-about-the-equal-time-rule. Only after the FCC began its investigation did *The View* finally host a bona fide conservative—Vice President J.D. Vance—on the show, on June 16. The View,

*S29 E182: Vice President JD Vance* (ABC television broadcast, aired June 16, 2026). All of this, taken together, means that viewpoints differing from a left-wing partisan consensus are virtually never aired on *The View*.

This was not an accident of booking logistics. When publicly pressed in November 2025 regarding the show's ideological tilt, host Joy Behar went so far as to opine that conservatives were simply "afraid" of appearing on *The View*, and that many did not rise to the level of the "certain caliber of guest"—meaning, level of public prominence—demanded by the show. Nicholas Fondacaro, *The View: Conservatives Don't Live Up to Our 'Certain Caliber of Guest,'* MRC NewsBusters (Nov. 7, 2025), https://www.newsbusters.org/blogs/nb/nicholas-fondacaro/2025/11/07/view-conservatives-dont-live-our-certain-caliber-guest.

It beggars belief that the party that presently controls all three branches of the federal government lacks guests interesting enough for *The View*. By any commonsense understanding, Republican-aligned political figures are as "newsworthy" as ever. Yet *The View* has not hosted them, reserving the overwhelming majority of airtime on a limited public broadcast resource for their partisan opponents.

Viewed as a whole, this pattern is not consistent with either the bona fide exception to the equal opportunities rule—which presumes that "good faith" actually means *good faith* in a meaningful way—or, more importantly, with the underlying principle that public resources should not be used for partisan purposes. *Cf. Brandywine-Main Line Radio*, 473 F.2d at 60 (licensee's "deliberate and continuing disregard" of fairness obligations justified Commission sanctions). Plaintiffs' ongoing conduct is inconsistent with the purpose of the

licensing regime the Commission enforces, and would fully justify both the Commission's original investigation and—moreover—the early license renewal proceedings.

## II. THE FCC'S ENFORCEMENT OF PUBLIC INTEREST OBLIGATIONS IS NOT FIRST AMENDMENT RETALIATION.

The Commission does not violate the First Amendment when it enforces the public interest standard to prevent partisan abuses. Rather, the public interest standard simply prevents broadcast stations, which have been given access to a valuable public resource and have an obligation to operate in good faith, from unfairly putting their thumbs on the scale for political candidates. This follows from the government's natural role in stewarding a limited physical good—broadcast bandwidth. *See, e.g.*, *Columbia Broad. Sys., Inc. v. Democratic Nat. Comm.*, 412 U.S. 94, 101 (1973) (*CBS*); *see id.* at 173–74 (Brennan, J., dissenting) ("[B]oth radio and television broadcasting utilize a natural resource—the electromagnetic spectrum—that is part of the public domain. And, although broadcasters are granted the temporary use of this valuable resource for terminable three-year periods, 'ownership' and ultimate control remain vested in the people of the United States.").

Wherever broadcast allocation is at issue, "unique and special problems not present in the traditional free speech case" emerge. *CBS*, 412 U.S. at 101; *see also Scott v. Rosenberg*, 702 F.2d 1263, 1272 (9th Cir. 1983) ("A greater degree of conflict with traditional first amendment principles is tolerated with the broadcast media because of the limited number of available frequencies."). Unlike many other communication channels, broadcast frequencies are not an unlimited resource. While any person may share his views

through a social media post or in the public square without meaningfully limiting others' ability to speak, the same is not true in the broadcasting context. In any geographic area, there are a finite number of wavelengths suitable for use by broadcasters. "Unlike other media, broadcasting is subject to an inherent physical limitation. Broadcast frequencies are a scarce resource; they must be portioned out among applicants." *CBS*, 412 U.S. at 101.

Stewardship of this limited public resource is the reason why Congress created the Commission, and gave it the power to issue licenses to some and deny them to others. *See id.* (given physical limitations of broadcast spectrum, "[a]ll who possess the financial resources and the desire to communicate by television or radio cannot be satisfactorily accommodated"). And it is still true today that "there are more would-be broadcasters than frequencies available in the electromagnetic spectrum." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 637 (1994). Each of those licensing allocation decisions represents a *public* choice regarding the use of this limited resource—and, as previously emphasized, obligations attach to those allocations.

The public's interest in broadcast stewardship is not an old-fashioned concern. Millions of Americans still reliably watch over-the-air broadcasts, many exclusively. *See* Tim Hanlon, *Local Broadcasting's Over-the-Air Blind Spot*, TVRev (Apr. 11, 2024), https://www.tvrev.com/news/local-broadcastings-over-the-air-blind-spot. Indeed, as the continuing desire of companies like Plaintiffs to maintain a broadcast presence illustrates, broadcast media continues to command a significant mass audience—the NFL games on ABC, CBS, NBC, and Fox consistently rank among the most widely watched programs on any platform. Variety, *Top-Rated Television Networks: Ranking 2025's Winners and*

*Losers* (Jan. 2, 2026), https://variety.com/2025/tv/news/top-rated-channels-2025-tv-network-ratings-most-watched-1236613231/. And barely half of the lowest-income Americans subscribe to high-speed internet services, which are often necessary to access broadcast media alternatives. Colleen McClain and William Bishop, *What We Know About Smartphone Ownership and Digital Divides in the U.S.* (Jan. 8, 2026), https://www.pewresearch.org/short-reads/2026/01/08/internet-use-smartphone-ownership-digital-divides-in-u-s/#_Who_has_home.

The Supreme Court emphasized these stakes in 1969, reasoning that—without safeguards in place—"owners and a few networks would have unfettered power to make time available only to the highest bidders, to communicate only their own views on public issues, people and candidates, and to permit on the air only those with whom they agreed. There is no sanctuary in the First Amendment for unlimited private censorship operating *in a medium not open to all*." *Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 392 (1969) (emphasis added). Precisely so.

Plaintiffs may argue that *Red Lion*'s scarcity rationale has fallen out of favor. But the case has not been overruled. In fact, the Supreme Court has repeatedly declined invitations to revisit *Red Lion*. *See FCC v. League of Women Voters*, 468 U.S. 364, 376 n.11 (1984). And in declining to extend the broadcast rule to cable television, the Supreme Court relied on cable's lack of connection to physical scarcity, reaffirming the unique nature of the broadcast spectrum. *Turner Broad. Sys.*, 512 U.S. at 637–39. Academic critiques aside, *Red Lion* remains controlling precedent. And that case firmly

forecloses Plaintiffs' assumption that the First Amendment immunizes a licensee from congressional conditions attached to the use of a scarce public resource.

Here, though Plaintiffs do not attack *Red Lion* head-on, the upshot of their argument is clear. According to Plaintiffs, the First Amendment forbids enforcing the public interest standard if doing so would implicate the content of their broadcasts in any way. *See* Compl. ¶¶ 48, 69, 94, 99, 106, 117–18, 133, 138. Plaintiffs feign shock at the notion that partisan skew could ever be relevant to the Commission's public interest analysis. They fret that "the Chairman has in public comments declared that the public interest standard should account for the 'political ideology' of a broadcaster's programming," Compl. ¶ 99, and opine that the Chairman's warnings against "running a narrow, partisan circus" represent a "perversion" of the public interest standard, *id.* ¶ 118. This trip through the looking glass uses evidence of Plaintiffs' *own political bias* to avoid compliance with the equal opportunities rule.

The Chairman was simply stating the law: if a licensee is using a limited resource for overtly partisan purposes, that violates the public interest. *See* 47 U.S.C. § 315; *see also Red Lion*, 395 U.S. at 392. Plaintiffs seem to believe that "public interest" should mean something akin to prestige and popularity. *See, e.g.*, Compl. ¶ 43 ("award-winning original journalism"); ¶ 44 ("the Stations' local news broadcasts consistently earn market-best ratings"); ¶ 45 ("[n]umerous industry awards"); ¶ 104 ("thousands of comments" filed in support). That will not do. After all, highly partisan media can—and does—command very large audiences. But as Congress saw it, partisan abuse of limited spectrum was inconsistent with the public interest.

Plaintiffs' First Amendment concerns do not land because broadcast spectrums are unique. Other mediums are not comparable—they are not physically exclusionary and the government does not award free licenses for their use. As the Supreme Court has explained, in the broadcast context, "the First Amendment confers no right on licensees to prevent others from broadcasting on 'their' frequencies and no right to an unconditional monopoly of a scarce resource which the Government has denied others the right to use." *Red Lion*, 395 U.S. at 391.

Ensuring that a diversity of voices may speak via a limited public resource is not an infringement on free speech, but an important support for it. As the *Red Lion* Court explained, "[i]t does not violate the First Amendment to treat licensees given the privilege of using scarce radio frequencies as proxies for the entire community, obligated to give suitable time and attention to matters of great public concern." *Id.* at 394. Rather, "condition[ing] the granting or renewal of licenses on a willingness to present representative community views on controversial issues is consistent with the ends and purposes of those constitutional provisions forbidding the abridgment of freedom of speech and freedom of the press." *Id.*

This fact is just as true today as in 1969, when *Red Lion* came down. As the D.C. Circuit has recognized, by design "[t]he law places requirements on licensees as fiduciaries," and so logically, "[f]ailure to live up to the trust placed in the hands of the fiduciary requires that a more responsible trustee be found." *Brandywine-Main Line Radio*, 473 F.2d at 60. In the present matter, the public interest standard—the statutory guarantor of public trust—is once again being enforced after decades of underenforcement. That the

Commission recently has underenforced the bona fide news exemption does not change the fact that a recalcitrant licensee's "[a]ttempting to impose the blame on the Commission for its own shortcomings can only be likened to the spoiled child's tantrum at being refused a request by an otherwise overly-benevolent parent." *Id.* at 61. Broadcast licensees like ABC continue to receive valuable benefits from a federal licensing scheme that parcels out a limited public resource without charge. Congress acted fully within its constitutional prerogatives when, in establishing the framework for stewardship of a limited natural resource, it accounted for the public interest in a fair marketplace of ideas—and the Commission acts fully within its statutory prerogatives when it enforces that framework.

In an attempt to sidestep this consistent line of caselaw, Plaintiffs appeal to *Arkansas Educational Television Commission v. Forbes*, which held that broadcasters engage in speech activity when they exercise editorial discretion in the course of journalism. 523 U.S. 666, 674 (1998); *see* Compl. ¶ 138. But that case simultaneously disavowed any notion that "the First Amendment would bar the legislative imposition of neutral rules for access to public broadcasting." *Arkansas Educ. Television Comm'n*, 523 U.S. at 675. That is exactly right. Just such neutral rules—such as the public interest standard, and its expression in the equal opportunities rule and that rule's exception for bona fide news coverage—are at issue here.

Those neutral rules are not impermissible content-based restrictions on speech. They simply require ABC and its affiliates to pick a lane. If Plaintiffs wish to continue to enjoy the benefits of their state-conferred monopoly over a portion of a scarce public resource, they should abide by the substantive requirements of the public interest standard, including

the equal opportunities rule. Under that standard, if Plaintiffs engage in partisan advocacy, they must provide equal opportunities for other candidates to appear. In this specific context, ensuring access to a wide variety of speakers is consistent with the First Amendment. *Red Lion*, 395 U.S. at 389 (a licensee "has no constitutional right to . . . monopolize a radio frequency to the exclusion of his fellow citizens"); *see id.* at 390 ("It is the right of the viewers and listeners, not the right of the broadcasters, which is paramount.").

None of this is altered by Plaintiffs' retaliation framing. Putting to one side Plaintiffs' allegations of bad motive, their First Amendment claim fails because the Commission would have taken the same action for lawful reasons. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *cf. Nieves v. Bartlett*, 587 U.S. 391, 402–04 (2019). Congress expressly conditions broadcast spectrum licenses upon a finding that the public interest will be served. 47 U.S.C. §§ 307(c), 309(a), 310(d). That authority supplies an independent basis for each action Plaintiffs challenge.

As for *NRA v. Vullo*, 602 U.S. 175 (2024), that case is inapposite. *Vullo* concerned a regulator who leveraged her power over third parties to suppress speech. *Id.* at 180. Here, the Commission has exercised the lawful licensing authority conferred by Congress against licensees who have flouted the conditions of their licenses. The First Amendment does not prohibit the Commission's enforcement of congressionally imposed conditions.

When the Commission grants broadcasters the privilege of a license, it need not tolerate persistent abuses. That is why the Commission has enforcement powers—to

vindicate the public interest. It does not violate the First Amendment for the Commission to take that responsibility seriously.

## CONCLUSION

The Court should grant Defendants' motion and dismiss this case.

Respectfully submitted,

/s/ Erin Morrow Hawley

Erin Morrow Hawley
District of Columbia Bar 500782
John S. Ehrett
District of Columbia Bar 1657026
LEX POLITICA PLLC
700 Pennsylvania Avenue SE, Ste 440
Washington, D.C. 20003
(512) 354-1783
ehawley@lexpolitica.com
jehrett@lexpolitica.com

Dated: September 28, 2026

*Counsel for Amici Curiae NRSC and NRCC*