**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN BROADCASTING COMPANIES, INC., *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>FEDERAL COMMUNICATIONS COMMISSION, *et al.*,<br><br>*Defendants*. | Civil Action No. 26 - 2902 (LLA) |

## MEMORANDUM OPINION

Plaintiffs—American Broadcasting Companies, Inc. ("ABC"), its indirect parent, the Walt Disney Company, and eight television stations of which ABC is the indirect parent—bring this action against the Federal Communications Commission (the "Commission" or "FCC"), FCC Chairman Brendan Carr, FCC Commissioner Anna Gomez, FCC Commissioner Olivia Trusty, and two not-yet-appointed FCC commissioners John Doe 1 and John Doe 2 (collectively, "Defendants"). Plaintiffs assert that Defendants violated their First Amendment rights by designating their broadcast licenses for early renewal as retaliation for Plaintiffs' broadcasting unfavorable speech about President Donald J. Trump and the Republican Party. Plaintiffs seek preliminary and permanent injunctive relief preventing Defendants from taking any early action in relation to their license renewals or otherwise seeking to influence their exercise of editorial discretion. ECF Nos. 1, 2. Defendants oppose Plaintiffs' motion for preliminary relief and have moved to dismiss the case for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). ECF Nos. 23, 24. For the following reasons, the court will deny Defendants'

motion to dismiss and will grant in part Plaintiffs' motion for preliminary relief and issue a preliminary injunction.

## I. LEGAL BACKGROUND

Under the Communications Act of 1934, 47 U.S.C. § 151 *et seq.*, "[t]he Federal Communications Commission possesses broad statutory authority to regulate broadcast media 'as public convenience, interest, or necessity requires,'" *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 416 (2021) (quoting 47 U.S.C. § 303). Congress has tasked the agency with "mak[ing] available, so far as possible, to all the people of the United States, without discrimination on the basis of color, religion, national origin, or sex, a rapid, efficient, Nation-wide, and world-wide wire and radio communication service." 47 U.S.C. § 151.

Because broadcast media requires access to radio spectrum to operate, and because radio spectrum is a finite public resource, the FCC is responsible for granting and renewing broadcast licenses. *See id.* §§ 303, 307. A television or radio broadcast station must obtain a license from the agency to operate. *See id.* § 301; *see also Fed. Commc'ns Comm'n v. Nat'l Citizens Comm. for Broad.* ("*NCCB*"), 436 U.S. 775, 780 (1978). The FCC "shall grant" a station's application for a license if doing so will serve "public convenience, interest, or necessity." 47 U.S.C. § 307(a). When a licensee submits an application for renewal of an existing license, "the Commission shall grant the application if it finds" that "the station has served the public interest, convenience, and necessity, . . . there have been no serious violations by the licensee of" the Act or of the FCC's regulations, and "there have been no other violations" of the Act or of the FCC's regulations "which, taken together, would constitute a pattern of abuse." *Id.* § 309(k)(1); *see NCCB*, 436 U.S. at 807 (explaining that "the Commission's general practice has been to go with the 'proved product' and grant renewal if the incumbent has rendered meritorious service"). A licensee

seeking renewal need not "file any information which has previously been furnished to the Commission"; instead, the FCC may "require any new or additional facts" only as "it deems necessary to make its findings." 47 U.S.C. § 307(c)(2).

The FCC may grant an initial license or a license renewal for a term of no more than eight years, *id.* § 307(c), and it "ordinarily" grants licenses for eight-year terms, with term dates staggered by the geographic location of each station, 47 C.F.R. § 73.1020(a). "However, if the FCC finds that the public interest, convenience and necessity will be served thereby, it may issue either an initial license or a renewal thereof for a lesser term." 47 C.F.R. § 73.1020(a). "No renewal of an existing station license . . . shall be granted more than thirty days prior to the expiration of the original license." 47 U.S.C. § 307(d).

The Communications Act also endows the FCC with broad investigatory power, including:

> full authority and power at any time to institute an inquiry, on its own motion, in any case and as to any matter or thing concerning which complaint is authorized to be made, to or before the Commission by any provision of [the Act], or concerning which any question may arise under any provisions of [the Act], or relating to the enforcement of any of the provisions [of the Act].

*Id.* § 403. As relevant here, the FCC may call for a license application ahead of schedule if it is "essential to the proper conduct of a hearing or investigation." 47 C.F.R. § 73.3539(c). In exercising its powers under the Communications Act, the agency may not "censor[]" or otherwise "interfere with the right of free speech." 47 U.S.C. § 326.

If the Commission denies an applicant a station license (either in the first instance or upon review of a renewal application), the applicant may appeal directly to the U.S. Court of Appeals for the D.C. Circuit. *Id.* § 402(b); *see id.* § 402(b)(3) to (10) (setting forth other FCC "decisions and orders" that may be appealed to the D.C. Circuit). Otherwise, the Communications Act provides that "[a]ny proceeding to enjoin, set aside, annul, or suspend any order of the Commission

under [the Act]" shall be governed by the Hobbs Act, 28 U.S.C. § 158 *et seq.* 47 U.S.C. § 402(a). The Hobbs Act, in turn, vests the U.S. Courts of Appeals other than the Federal Circuit with "exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of . . . all final orders of the Federal Communication Commission made reviewable by [47 U.S.C. § 402(a)]." 28 U.S.C. § 2342(1).

## II. FACTUAL BACKGROUND

Each of ABC's stations—WABC-TV, in New York, NY; KABC-TV, in Los Angeles, CA; WLS-TV, in Chicago, IL; WPVI-TV, in Philadelphia, PA; KTRK-TV, in Houston, TX; KGO-TV, in San Francisco, CA; WTVD, in Durham, NC; and KFSN-TV, in Fresno, CA (collectively, "Plaintiff Stations")—has held its broadcast license without interruption for decades. ECF No. 2-5 ¶¶ 5-9. Seven of the eight stations rank first in viewership in their respective markets for local news, and the eighth is ranked second. *Id.* ¶ 7. None of their license renewal applications has ever been denied, and no station's license is slated for renewal until at least 2028. *Id.* ¶ 9.

Plaintiffs allege that President Trump and Chairman Carr have been making comments intended to chill their protected speech, and that these comments have escalated since the 2024 presidential election. ECF No. 1 ¶¶ 47-48, 50-52. On September 11, 2024, the day after the sole presidential debate between President Trump and then-Vice President Kamala Harris, President Trump phoned into a talk show and called the debate "a rigged deal," referred to ABC as "the most dishonest news organization[]," and stated that "[t]hey ought to take away [ABC's] license for the way" ABC News had moderated the debate. ECF No. 2-3, at 109-10.[1] The next

[1] When citing ECF Nos. 2-3, 2-4, 23-1, 23-4, 23-5, 23-8, 23-9, 23-24, 23-25, 23-27, 42-2, the court refers to the CM/ECF-generated numbers at the top of each page rather than any internal pagination.

day, President Trump posted on Truth Social that "Fake News ABC" has "proven NOT WORTHY, and hopefully an investigation will be done as to whether or not they gave the Debate questions to Comrade Kamala, whose best friend is a top ABC Executive. If she did give the questions to Kamala, ABC's license should be TERMINATED." *Id.* at 157.

On October 25, 2024, President Trump posted again on Truth Social, writing "CBS should lose its license, and it should be bid out to the Highest Bidder, as should all other Broadcast Licenses, because they are just as corrupt as CBS—and maybe even WORSE!" *Id.* at 166. That same day, at a campaign event in Michigan, President Trump stated, "CBS should lose its license. You know, the government, the government gives [those] license[s] to NBC fake news, ABC fake news, and CBS fake news. They have to pay. If they had to pay, they'd pay billions of dollars. They get them for nothing. They pay nothing." *Id.* at 207; *see* ECF No. 1 ¶ 52. At another campaign event in Nevada the following week, President Trump stated, "I think CBS should lose its license, but I think ABC should lose its license also because of what they've done. We'll see." ECF No. 2-3, at 252; *see* ECF No. 1 ¶ 52. He continued, "They should lose their license, which is worth billions of dollars." ECF No. 2-3, at 253.

After being inaugurated for a second term in January 2025, President Trump tapped then-Commissioner Carr to be the FCC's Chairman. ECF No. 2-2 ¶ 18; ECF No. 2-3, at 272. That same week, Chairman Carr told Fox News, "We need to keep every single remedy on the table. . . . One of the remedies the FCC has, ultimately, would be license revocation, if we find that it's egregious. And we'll see what they have to say about this. But it needs to deter this kind of conduct," referring to then-Vice President Harris's appearance on *Saturday Night Live*. ECF No. 2-3, at 269. The following week, Chairman Carr stated on Fox Business, "Step one for me is to make sure I continue to work with President Trump and his team over the coming weeks as the

transition is complete. . . . I want to make sure that I understand, 100%, President Trump's agenda, after all, when it comes to his administration." *Id.* at 272. He concluded, "The American people voted for him and voted for his agenda." *Id.*

Around the same time, Chairman Carr committed the FCC to "ending [its] promotion of DEI"—diversity, equity, and inclusion—in line with President Trump's "quick and decisive action [to] end the radical and wasteful DEI programs . . . across the government." ECF No. 23-8, at 2. On March 27, 2025, Chairman Carr sent a letter to Disney's Chief Executive Officer, explaining that he had "asked the FCC's Enforcement Bureau to open an investigation into Disney and ABC" to "ensure" that they had not been "violating FCC equal employment opportunity regulations by promoting invidious forms of DEI discrimination." ECF No. 23-5, at 2. Chairman Carr disclosed that "the Commission's Enforcement Bureau [would] be engaging with [the] company to obtain an accounting of Disney and ABC's DEI programs, policies, and practices" and would "follow up with more specifics." *Id.* at 4.

In June 2025, the Enforcement Bureau issued its first letter of inquiry to Disney, ordering the company to produce documents and information about its employment practices. ECF No. 2-5 ¶ 15; ECF No. 23-4, at 4. Disney responded to the letter of inquiry and a subsequent informal request for additional information. ECF No. 2-5 ¶ 15; ECF No. 23-4, at 5. In February 2026, the Enforcement Bureau issued a second letter of inquiry seeking even more materials. ECF No. 2-5 ¶ 15; ECF No. 23-4, at 5. Disney responded to that request on April 21, 2026, ECF No. 2-5 ¶ 15; ECF No. 23-4, at 5; ECF No. 23-27, at 2, and it has responded to all subsequent requests as recently as August 21, 2026, ECF No. 42-3 ¶¶ 2-4.

Meanwhile, on August 24, 2025, President Trump posted on Truth Social:

> Despite a very high popularity and, according to many, among the greatest 8 months in Presidential History, ABC & NBC FAKE NEWS, two of the worst and most biased networks in history, give me 97% BAD STORIES. IF THAT IS THE CASE, THEY ARE SIMPLY AN ARM OF THE DEMOCRAT PARTY AND SHOULD, ACCORDING TO MANY, HAVE THEIR LICENSES REVOKED BY THE FCC. I would be totally in favor of that because they are so biased and untruthful, an actual threat to our Democracy!!! MAGA.

ECF No. 2-3, at 303. An hour later, he continued in another post:

> Why is it that ABC and NBC FAKE NEWS, two of the absolute worst and most biased networks anywhere in the World, aren't paying Millions of Dollars a year in LICENSE FEES. They should lose their Licenses for their unfair coverage of Republicans and/or Conservatives, but at a minimum, they should pay up BIG for having the privilege of using the most valuable airwaves anywhere at anytime!!! Crooked "journalism" should not be rewarded, it should be terminated!!!

*Id.* at 306.

In September 2025, Jimmy Kimmel, who hosts ABC's late-night talk show *Jimmy Kimmel Live!*, made several on-air comments about President Trump and his supporters following the assassination of Charlie Kirk. ECF No. 1 ¶ 70. Two days later, Chairman Carr stated on Fox News, "Something's gone seriously awry [with late-night shows]. . . . They went from being court jesters that would make fun of everybody in power to being court clerics and enforcing a very narrow political ideology." ECF No. 1 ¶ 71; ECF No. 2-1, at 58; *see* ECF No. 2-3, at 310. That same day, Chairman Carr appeared on a podcast, where he stated, "We can do this the easy way or the hard way. These companies can find ways to take action on Kimmel, or there is going to be additional work for the FCC ahead." ECF No. 1 ¶ 72; *see* ECF No. 2-4, at 6, 69; ECF No. 23-25, at 4 (Chairman Carr's calling for Mr. Kimmel's suspension). President Trump expressed a similar sentiment to reporters: "When you have a network and you have evening shows, and all they do is hit Trump . . . . They're licensed. They're not allowed to do that. They're

an arm of the Democrat Party . . . . I think maybe their license should be taken away. It will be up to [Chairman] Carr." ECF No. 1 ¶ 75 (first and second alterations in original). When ABC suspended Mr. Kimmel's show, *id.* ¶ 73, President Trump posted: "Great News for America: The ratings challenged Jimmy Kimmel Show is CANCELLED. Congratulations to ABC for finally having the courage to do what had to be done," ECF No. 2-3, at 315. Following Mr. Kimmel's reinstatement in late September, ECF No. 1 ¶ 78, President Trump posted: "I can't believe ABC Fake News gave Jimmy Kimmel his job back. . . . I think we're going to test ABC out on this. Let's see how we do. Last time I went after them, they gave me $16 Million Dollars. This one sounds even more lucrative," ECF No. 2-3, at 318.

President Trump's comments about Plaintiffs and their broadcast licenses continued through the rest of the year. On October 5, 2025, President Trump posted:

> I knew Al Sharpton for many years, not that it matters, but he was a major "TRUMP" fan. . . . Then he got to know Brian Roberts, Chairman of Fake News NBC, who gave him what would become one of the Lowest Rated Shows in Television History. Roberts is afraid to take him off because it wouldn't be "Politically Correct." This is just one of the many reasons that the Federal Communications Commission should look into the license of NBC, which shows almost exclusively positive Democrat content. Likewise, ABC Fake News—About the same thing, 97% negative to Republicans!

*Id.* at 321. On November 18, 2025, when asked a question at a White House press conference by ABC News's Chief White House Press Correspondent, President Trump replied:

> I think the license should be taken away from ABC because your news is so fake and it's so wrong. And we have a great commissioner, the chairman, who should look at that because I think when you come in and when you're 97 percent negative to Trump. And then Trump wins the election in a landslide, that means obviously your news is not credible and you're not credible as a reporter.

*Id.* at 340; ECF No. 1 ¶ 69. The following day, the White House issued a press release titled "ABC 'News' Is Fake News." ECF No. 2-3, at 344. The press release stated, "ABC 'News' is not journalism—it's a Democrat spin operation masquerading as a broadcast network. The network's longstanding commitment to hoaxes, character assassinations, and outright fiction targeting only one side of the political aisle is a deliberate deception to wage war on President Trump and the millions of Americans who elected him to multiple terms." *Id.* Four days later, President Trump posted: "ABC & NBC, in particular, are a disaster - A VIRTUAL ARM OF THE DEMOCRAT PARTY. They should be viewed as an illegal campaign to the Radical Left. NO EXPANSION OF THE FAKE NEWS NETWORKS. If anything, make them SMALLER!" ECF No. 2-4, at 2. On December 24, 2025, President Trump posted: "Who has the worst Late Night host, CBS, ABC, or NBC??? They all have three things in common: High Salaries, No Talent, REALLY LOW RATINGS!" *Id.* at 10. Minutes later, he followed up: "If Network NEWSCASTS, and their Late Night Shows, are almost 100% Negative to President Donald J. Trump, MAGA, and the Republican Party, shouldn't their very valuable Broadcast Licenses be terminated? I say, YES!" *Id.* at 13.

In February 2026, the Commission's Media Bureau opened an investigation into ABC's daytime talk show, *The View*. ECF No. 1 ¶¶ 81, 83; ECF No. 2-5 ¶ 16; ECF No. 23-1, at 3. The Media Bureau sent a letter of inquiry to Plaintiff KTRK-TV, citing a potential violation of Section 315 of the Communications Act, 47 U.S.C. § 315, and FCC regulations based on a U.S. senatorial candidate's appearance on the show. ECF No. 2-5 ¶ 16. In 2002, the Commission had ruled that *The View* was exempt from these requirements, *see* ECF No. 2-3, at 2, which generally compel broadcasting stations to "afford equal opportunities to all [legally qualified political] candidates" when one such candidate makes an appearance on their programs, 47 U.S.C. § 315(a).

ECF No. 2-5 ¶ 17.[2] In its letter, the Media Bureau ordered KTRK-TV to file a new petition for declaratory ruling on *The View*'s exempt status. ECF No. 2-5 ¶ 17. ABC filed the petition. *Id.* The investigation came less than a year after a White House spokesperson had called one of the show's co-hosts "an irrelevant loser" and warned that she "should self-reflect on her own jealousy of President Trump's historic popularity before her show is the next to be pulled off-air." ECF No. 2-3, at 294. Almost immediately after the White House's spokesperson made her comment, Chairman Carr chimed in on Fox News: "[O]nce President Trump has exposed these media gatekeepers and smashed this facade, there's a lot of consequences. I think the consequences of that aren't quite finished. And look, 'The View's' got a lot of challenges there. . . . So I'm not surprised to hear people saying that their ratings are struggling." *Id.* at 301.[3]

On April 23, 2026, Mr. Kimmel, in a skit on his show, pretended to address First Lady Melania Trump at the White House Correspondents' Dinner and said, "Mrs. Trump, you have a glow like an expectant widow." ECF No. 2-4, at 52. Four days later, after a shooting at the White House Correspondents' Dinner, President Trump recalled the skit in a Truth Social post:

> Wow, Jimmy Kimmel, who is in no way funny as attested to by his terrible Television Ratings, made a statement on his Show that is

---

[2] Specifically, the FCC had declared that *The View* was "exempt from the equal opportunities requirements of Section 315(a) of the Communications Act" as a "*bona fide* news interview program." ECF No. 2-3, at 2; *see* 47 U.S.C. § 315(a)(2) (providing that an "[a]ppearance by a legally qualified [political] candidate on any bona fide news interview" is exempt). In the weeks leading up to the FCC's about-face, Chairman Carr publicly expressed a view that "[i]f you're fake news, you're not going to qualify [for] the bona fide news exception." ECF No. 2-4, at 28. He also voiced concern about a "potential misreading of [Section 315(a)] precedents on the broadcast TV side." *Id.* at 29.

[3] Three of *The View*'s co-hosts, as well as Mr. Kimmel and other ABC News reporters, have entries on the White House's "Media Offenders" webpage, which was launched in November 2025. ECF No. 2-4, at 16-24; *see* ECF No. 2-1, at A8. Their "offense[s]" range from "incendiary rhetoric when discussing President Trump and his supporters," ECF No. 2-4 at 17 (Joy Behar), to "claiming President Trump was overstepping his authority by constructing a White House ballroom," *id.* at 23 (Whoopi Goldberg); *see id.* at 24 (Ana Navarro).

> really shocking. He showed a fake video of the First Lady, Melania, and our son, Barron, like they were actually sitting in his studio, listening to him speak, which they weren't, and never would be. He then stated, "Our First Lady, Melania, is here. Look at Melania, so beautiful. Mrs. Trump, you have a glow like an expectant widow." A day later a lunatic tried entering the ballroom of the White House Correspondents Dinner, loaded up with a shotgun, handgun, and many knives. He was there for a very obvious and sinister reason. I appreciate that so many people are incensed by Kimmel's despicable call to violence, and normally would not be responsive to anything that he said but, this is something far beyond the pale. Jimmy Kimmel should be immediately fired by Disney and ABC. Thank you for your attention to this matter!

*Id.* at 49.

The next day, on April 28, 2026, the Media Bureau issued an order designating each Plaintiff Station's broadcast license for early renewal. *Id.* at 56-57. The order reads in full:

> 1. The FCC has been investigating The Walt Disney Company, its American Broadcasting Company, and its subsidiaries (collectively, "Disney's ABC") for compliance with its obligations as a licensed broadcaster. Specifically, the FCC has been investigating Disney's ABC stations for possible violations of the Communications Act of 1934 and the FCC's rules, including the agency's prohibition on unlawful discrimination. While Disney's ABC has purported to respond to two FCC Letters of Inquiry (LOIs) as part of this investigation, the FCC has determined that additional actions are appropriate at this time.
>
> 2. Specifically, FCC rules provide that whenever the FCC regards an application for a renewal of a license as essential to the proper conduct of an investigation, the FCC has the authority to call the broadcaster's licenses in for early renewal. Doing so both allows the FCC to conduct its ongoing investigation and enables the FCC to ensure that the broadcaster has been meeting its public interest obligations more broadly.
>
> 3. The FCC determines that calling in Disney's ABC licenses for early renewal, at this time, under the Communications Act's public interest standard is essential within the meaning of agency regulations. Therefore, Disney's ABC is hereby directed to file license renewals for all of their licensed TV stations within 30 days—in other words, by May 28, 2026.

*Id.* (footnotes omitted). A couple weeks later, Chairman Carr stated in an interview, "It's probably been 50, 60 years or longer since the FCC has used this tool. . . . If you didn't take us seriously, now you should." ECF No. 2-4, at 67; *see* ECF No. 2-6 ¶¶ 7-12 (Declaration of Former FCC Chairman Mark Fowler).

On May 15, 2026, the Enforcement Bureau indicated in an email to Disney that it had "considerable concerns about the completeness" of Disney's responses to its letters of inquiry regarding Disney's employment practices. ECF No. 23-27, at 2. In an attached letter, the Bureau explained that it disagreed with how Disney had construed the scope of its document requests and listed each of Disney's responses it believed to be deficient. *Id.* at 3-13. The Bureau concluded its email by "direct[ing]" Disney "to provide complete responses" within fourteen days. *Id.* at 2. Disney replied to the email, maintaining that it had responded to the Bureau's letters of inquiry "fully and in good faith" and "contest[ing] the Bureau's characterization of [its] response as 'improper' and 'disingenuous.'" ECF No. 42-2, at 16; *see id.* at 16-51. Disney asserted that "the Bureau's inaccurate list of alleged inadequacies and unsupported accusations of impropriety and disingenuousness, when viewed in the context of the Commission's other recent actions, calls into question the true purpose of its May 15 email." *Id.* at 16.

Around the same time, Chairman Carr restated the FCC's concerns about Disney's employment practices in a letter to U.S. Congresswoman Yvette Clarke. ECF No. 23-4. He wrote that the FCC had "ordered the early renewal of Disney's ABC TV stations based on the agency's ongoing investigation into allegations that the relevant corporate entities discriminated on the basis of race, gender, and/or other protected characteristics in violation of federal law." *Id.* at 3. Chairman Carr acknowledged that "Disney is submitting evidence," but he explained that the FCC had found Disney's previous responses to be "deficient, nonresponsive, and disingenuous." *Id.*

at 4-5. "Accordingly," he wrote, "after more than a year of investigative activity, multiple rounds of document requests, and ongoing engagement between FCC staff and Disney representatives, the FCC's Media Bureau issued an early renewal order," which "FCC leadership [had] signaled for months . . . was a distinct possibility." *Id.* at 5.

On May 28, 2026, Plaintiffs filed their renewal applications under protest, asserting that the Commission's order violated their First Amendment rights. ECF No. 1 ¶ 104; ECF No. 2-4, at 74; ECF No. 2-5 ¶ 22; ECF No. 23-1, at 3. The next day, the FCC's Media Bureau issued a public notice detailing the procedure governing its consideration of the renewal applications. ECF No. 2-4, at 74-78. The procedure permitted "[i]nterested persons" to file petitions to deny by June 29, oppositions by July 29, and replies by August 5. *Id.* at 76. The Media Bureau received six petitions to deny, which yielded oppositions from Plaintiffs and others. ECF No. 1 ¶ 106; ECF No. 23, at 11. It also received over 150,000 public comments, which were "overwhelmingly supportive" of the Plaintiff Stations. ECF No. 1 ¶ 106; *see* ECF No. 23, at 11. According to Defendants, review of the "voluminous record" is still underway. ECF No. 23, at 11.

In July 2026, while the early license renewal process was unfolding, the White House asked broadcast television networks, including Plaintiffs, to show President Trump's primetime address on "election interference" live on air. ECF No. 2-5 ¶ 23; *see* ECF No. 2-4, at 88. Instead of broadcasting the address on ABC's television network, ABC livestreamed the address on its web-based platform, ABC News LIVE. ECF No. 2-5 ¶ 23 (Declaration of Eric Lieberman, Chief Counsel of Disney Entertainment, Direct to Consumer, News, and Technology). Even livestreaming the address was not something ABC "ordinarily would . . . have done." *Id.* Specifically, despite there being "ample precedent for not broadcasting a President's speech during [past] [a]dministrations," Plaintiffs factored in "the fact that the [Trump] Administration wanted

the speech to be broadcast live and might take some adverse action against [them] if [they] did not." *Id.*

During the address, President Trump remarked:

> In a rare move, NBC and ABC fake news have both said that they would not cover this speech. They knew what it was about, because of the fact that they don't like the topic, because they know how corrupt our system is and they don't want to reveal it. They and others in the media are part of a plot.
>
> They want to continue this fraud for whatever reason. They want to keep it going. They want to protect the radical left. They can't have a great country and that's true; you can't have a great country without free and fair elections. Fraud like this should mean a revocation of their licenses. They use our public multibillion dollar in value airways for absolutely no money.
>
> They pay nothing. All we want is honesty in our elections and honesty in reporting. They pay nothing for multi-billion dollar assets. Great damage has been done to our country.

ECF No. 2-4, at 99. At a press conference the following week, Chairman Carr commented, "I think that when you have the [P]resident of the United States standing inside the White House delivering an important speech, I think that's something that broadcasters should be carrying." *Id.* at 110. He noted that he expected "Disney's decision there" to be among the "points raised in [the early license renewal] proceeding." ECF No. 2-1, at A11; *see* ECF No. 2-4, at 110. When later asked in an interview what he meant by this, Chairman Carr explained:

> Well, what we said is that the decision by broadcasters to carry or not carry the speech is something that is likely to be raised by petitioners that are seeking to have the FCC not renew the license for the Disney ABC stations that are before us. So that pleading has been filed. Uh, we'll take a look at it. We have also ourselves. We are looking into this question itself about the decision to air programming or not.

ECF No. 2-4, at 153.

Also in July 2026, the FCC's Media Bureau expanded its investigation into *The View* and some of ABC's other programs. On July 2, the Media Bureau issued a subsequent letter of inquiry directing KTRK-TV to produce all internal communications over a two-year period among *The View*'s booking staff, segment producers, executive producer, and on-air co-hosts discussing any political candidate. ECF No. 1 ¶ 85. The letter also ordered ABC to disclose its employees' and co-hosts' political donations and internal guidance on how its journalists book and conduct interviews. *Id.* Two weeks later, the Media Bureau issued another letter of inquiry directing ABC to disclose its standards and policies across all of its programs related to "journalistic integrity, newsworthiness, fairness, impartiality, objectivity, partisanship, [and] bias." *Id.* ¶ 86 (alteration in original). Like the last, this letter requested an itemized list of on-air talent and producers' political donations for *Good Morning America*, *This Week with George Stephanopoulos*, and *ABC World News Tonight with David Muir*. *Id.*

As a consequence of the FCC's actions, Plaintiffs have begun "evaluat[ing]" every "invitation to a political candidate . . . based on whether such an invitation would provide further pretextual justification for sanctions, including whether it might be cited by the Commission as a basis for non-renewal of the Stations' licenses in the impending proceedings." ECF No. 2-5 ¶ 31. Plaintiffs have also "changed" the "process for evaluating potential guests for *The View*." *Id.* ¶ 32. Rather than base "decisions about which candidates or public figures to invite as guests" solely "on newsworthiness, audience interest, and scheduling," Plaintiffs "now evaluate any invitation to a political candidate for its potential consequences, including whether it might later be cited by the Commission as a basis for non-renewal." *Id.* Since the start of the Media Bureau's February 2026 investigation into the show, "no candidate for public office has appeared on *The View*" and Plaintiffs have "pass[ed] on further consideration of booking several political candidates." *Id.*

¶ 33. Additionally, Plaintiffs "have chosen not to air clips that they otherwise would have aired during the Hot Topics segment of *The View* and also in the cold open of the program." *Id.* In a similar vein, in September 2026, Mr. Kimmel announced on his show that if viewers "want[ed] to learn about a candidate for the Senate"—the same candidate whose appearance on *The View* prompted the Media Bureau's February 2026 investigation—they would "have to go to the 'Jimmy Kimmel Live!' YouTube channel." ECF No. 42-2, at 64. Mr. Kimmel attributed the decision to President Trump's "threaten[ing] our show, threaten[ing] our network, ABC, our affiliates, our local stations" over "simple, traditional editorial decisions; guest bookings it would seem [President Trump and the Commission] don't like." *Id.*

## III. PROCEDURAL HISTORY

Plaintiffs commenced this action on August 18, 2026, alleging that "Defendants have violated, and continue to violate, [their] First Amendment rights by launching pretextual regulatory investigations and threatening the Stations' valuable broadcast licenses through early license renewal proceedings—all to punish Plaintiffs for content and viewpoints the Administration dislikes." ECF No. 1 ¶ 133. Plaintiffs moved for a temporary restraining order and a preliminary injunction the same day. ECF No. 2.[4] The court issued an order directing the parties to meet and confer and propose a joint briefing schedule and directing Defendants to notify the court if they issued a hearing designation order to any Plaintiff. Aug. 18, 2026 Minute Order. After the parties filed their joint status report, ECF No. 15, the court set a briefing schedule for Plaintiffs' motion for preliminary relief and Defendants' forthcoming motion to dismiss, Aug. 20,

---

[4] The court received three amicus briefs in support of Plaintiffs' motion for preliminary relief. *See* ECF Nos. 48 (former FCC officials), 49 (coalition of non-profits and scholars), 50 (Reporters Committee for Freedom of the Press).

2026 Minute Order. Defendants filed a consolidated motion to dismiss and opposition to Plaintiffs' motion for preliminary relief, ECF Nos. 23, 24.[5] Both the motion to dismiss and the motion for preliminary relief have been fully briefed. ECF Nos. 2, 23, 24, 42, 43, 52.[6]

The court held a hearing on the motions on October 6, 2026. *See* ECF No. 69. At the hearing, the court requested the parties to file supplemental briefs on a limited issue that had been addressed at the hearing. Oct. 6, 2026 Minute Entry. Defendants filed a supplemental brief on October 9, ECF No. 70, and Plaintiffs filed a response on October 12, ECF No. 71.

## IV. LEGAL STANDARDS

### A. Federal Rule of Civil Procedure 12(b)(1)

"Federal courts are courts of limited jurisdiction," and it is generally presumed that "a cause lies outside [of] this limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). Under Federal Rule of Civil Procedure 12(b)(1), the court must dismiss an action unless the plaintiff can establish, by a preponderance of the evidence, that the court possesses subject-matter jurisdiction. *Green v. Stuyvesant*, 505 F. Supp. 2d 176, 177-78 (D.D.C. 2007). In reviewing a Rule 12(b)(1) motion, the court "is not limited to the allegations set forth in the complaint" and "may consider materials outside the pleadings." *Morrow v. United States*, 723 F.

---

[5] The court received four amicus briefs in opposition to Plaintiffs' motion for preliminary relief or in support of Defendants. *See* ECF Nos. 32 (Center for American Rights), 47 (America First Legal Foundation), 65 (National Republican Senatorial Committee and National Republican Congressional Committee), 66 (private individual), 67 (private individual's supplemental brief).

[6] On September 24, 2026, Defendants moved to strike a declaration and exhibits attached to Plaintiffs' reply in support of their motion for preliminary relief. ECF No. 51. Plaintiffs opposed the motion and, in the alternative, sought leave to file the supplemental evidence under Local Civil Rule 65.1(c). ECF Nos. 53, 56. The court granted Plaintiffs leave to file the supplemental evidence pursuant to Rule 65.1(c) and consequently denied Defendants' motion to strike as moot. Oct. 5, 2026 Minute Order.

Supp. 2d 71, 76 (D.D.C. 2010) (quoting *Jerome Stevens Pharms. v. Food & Drug Admin.*, 402 F.3d 1249, 1253 (D.C. Cir. 2005)). Additionally, when reviewing a motion to dismiss pursuant to Rule 12(b)(1), the court is required to "assume the truth of all material factual allegations in the complaint and 'construe the complaint liberally, granting [the] plaintiff the benefit of all inferences that can be derived from the facts alleged.'" *Am. Nat'l Ins. Co. v. Fed. Deposit Ins. Corp.*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quoting *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005)).

### B. Preliminary Relief

"Temporary restraining orders and preliminary injunctions are 'extraordinary remed[ies] that should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion.'" *Lofton v. District of Columbia*, 7 F. Supp. 3d 117, 120 (D.D.C. 2013) (alteration in original) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)). To obtain a temporary restraining order or preliminary injunction, the moving party must show (1) "that [they are] likely to succeed on the merits," (2) "that [they are] likely to suffer irreparable harm in the absence of preliminary relief," (3) "that the balance of equities tips in [their] favor," and (4) "that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Where, as here, the government is the opposing party, the third and fourth factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## V. DISCUSSION

Defendants' primary argument is that the court lacks subject-matter jurisdiction, requiring dismissal of the case and denial of Plaintiffs' motion for preliminary relief as moot. ECF No. 23,

at 22.[7] In the alternative, Defendants argue that Plaintiffs have not established their entitlement to preliminary relief. *Id.* at 13-14. The court begins, as it must, with jurisdiction before turning to Plaintiffs' motion for preliminary relief. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93-94 (1998).

**A. Subject-Matter Jurisdiction**

Defendants contend that the court lacks jurisdiction over Plaintiffs' First Amendment claim because the Communications Act funnels judicial review of licensing-related claims to the D.C. Circuit and other challenges to the FCC's final orders to the federal courts of appeals consistent with the Hobbs Act. ECF No. 23, at 14-22. Plaintiffs respond that the Communications Act does not preclude this court's review because they do not challenge "any specific substantive decision by the Commission on the merits" of their license renewal applications but instead raise a collateral First Amendment challenge that falls outside the statutory review scheme. ECF No. 42, at 7. The court concludes that Plaintiffs have met their burden of establishing jurisdiction.

Although "[l]itigants generally may seek review of agency action in district court under any applicable jurisdictional grant," *Arch Coal, Inc. v. Acosta*, 888 F.3d 493, 498 (D.C. Cir. 2018) (internal quotation marks and citation omitted), a statutory review scheme that provides for "review in a court of appeals following the agency's own review process" often "divests district courts of their ordinary jurisdiction over the covered cases," *Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175, 185 (2023). "But a statutory review scheme of that kind does not

[7] Defendants do not seek dismissal on other grounds. *See* ECF No. 23, at 13 n.4 (clarifying that Defendants are "not mov[ing] to dismiss for failure to state a claim pursuant to Rule 12(b)(6)" because they "rely[] in part on evidence outside the Complaint").

necessarily extend to every claim concerning agency action." *Axon*, 598 U.S. at 185. Rather, a court must decide "whether the particular claim[] brought [is] 'of the type' Congress intended to be reviewed within this statutory structure." *Id.* (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 208, 212 (1994)). This inquiry generally involves three factors: (1) whether "precluding district court jurisdiction [could] 'foreclose all meaningful judicial review' of the claim," (2) whether the claim is "'wholly collateral' to the statute's review provisions," and (3) whether the claim falls "outside the agency's expertise." *Id.* (quoting *Thunder Basin*, 510 U.S. at 212-13). A court may conclude that it has jurisdiction even "if the factors point in different directions." *Id.* Here, each of the three factors confirms that Plaintiffs' claim is not "of the type" that Congress intended to be reviewed under the Communications Act's provisions challenging review either to the D.C. Circuit, 47 U.S.C. § 402(b), or consistent with the Hobbs Act, *id.* § 402(a).

**1. Meaningful review**

As to the first *Thunder Basin* factor, Defendants principally contend that precluding district-court jurisdiction would not foreclose meaningful judicial review because, "[i]f the Commission should ultimately deny the renewal applications or revoke the licenses," Plaintiffs "can challenge any such order in the D.C. Circuit" consistent with 47 U.S.C. § 402(b). ECF No. 23, at 19. This argument fails for two reasons. First, if the FCC ultimately renews Plaintiffs' licenses, Plaintiffs will have no avenue to pursue their claim of constitutional injury arising from the fact that they are being illegally subjected to early license renewal proceedings because of the content of their protected speech. Defendants respond that "[p]rocess is not punishment, it is simply process." ECF No. 52, at 7. But Plaintiffs' "allegation[s] that they are targets of a retaliatory government investigation is a claim regarding concrete harm" protectable under the First Amendment, even "distinct from any resulting chilling effects." *Media Matters for Am. v.*

*Paxton*, 138 F.4th 563, 580 (D.C. Cir. 2025); *see Endocrine Soc'y v. Fed. Trade Comm'n*, 832 F. Supp. 3d 1, 11 (D.D.C. 2026) (describing an agency's use of "investigative demands as a cudgel, 'inflict[ing] concrete and ongoing injuries that suppress speech,' regardless of any later enforcement action" (alteration in original) (quoting *Media Matters for Am. v. Fed. Trade Comm'n*, No. 25-5302, 2025 WL 2988966, at *4 (D.C. Cir. Oct. 23, 2025)). Put simply, if Plaintiffs are correct that Defendants initiated the early license renewal proceedings because of the content of their speech and editorial choices, then the imposition of that process is a distinct harm apart from any ultimate result concerning the licenses. *See Media Matters*, 2025 WL 2988966, at *4 ("Allowing the party that has issued a demand that is causing concrete and ongoing First Amendment injury to dictate when, if ever, judicial review can commence could deprive parties of all meaningful judicial review of constitutional claims."). "The Court thinks it unlikely that Congress could grant an agency license to run roughshod over a party's First Amendment rights 'while simultaneously closing the courthouse doors to relief as long as the agency chooses not to take additional enforcement steps.'" *Endocrine Soc'y*, 832 F. Supp. 3d at 11 (quoting *Media Matters*, 2025 WL 2988966, at *4).[8]

Second, even if the FCC ultimately declines to renew Plaintiffs' licenses in an appealable final order subject to review in the D.C. Circuit under 47 U.S.C. § 402(b), any such decision would come too late for Plaintiffs to vindicate their right to be free from a retaliatory proceeding. *See Axon*, 598 U.S. at 191. In *Axon*, the plaintiffs raised a constitutional separation-of-powers claim

---

[8] In this way, a First Amendment retaliation claim is similar to a selective prosecution claim, which is "entirely independent of the ultimate issue of whether the defendant actually committed the crimes for which she was charged" and instead turns on whether the government "singled" the plaintiff out for enforcement based on an improper motivation. *United States v. Washington*, 705 F.2d 489, 494-95 (D.C. Cir. 1983).

based on the "harm" of "being subjected to unconstitutional agency authority." 598 U.S. at 191 (internal quotation marks and citation omitted). The Supreme Court explained that this injury would exist regardless of whether the plaintiffs ultimately won or lost before the agency because the claim was "about subjection to an illegitimate proceeding." *Id.* And because "[a] proceeding that has already happened cannot be undone[,] [j]udicial review of [the plaintiffs'] structural constitutional claims" during an appeal of any final agency action "would come too late to be meaningful." *Id.* The same is true here. Plaintiffs allege that Defendants are subjecting them to early license renewal proceedings as punishment for the content of their protected speech and to chill their future speech. To be sure, Plaintiffs would face even greater injury if the FCC ultimately denied their renewal applications. But that does not mean that they are not currently being injured by allegedly being singled out for differential treatment—that is, from facing early license renewal proceedings years in advance of the standard expiration dates as a cudgel to stamp out unfavorable content about President Trump.

Defendants' remaining arguments on the first *Thunder Basin* factor also fail to persuade the court. Defendants first rely on *Telecommunications Research & Action Center v. Federal Communications Commission* ("*TRAC*"), 750 F.2d 70 (D.C. Cir. 1984), for its proposition that "where a statute commits review of agency action to the Court of Appeals, any suit seeking relief that might affect the Circuit Court's future jurisdiction is subject to the exclusive review of the Court of Appeals." ECF No. 52, at 4 (quoting *TRAC*, 750 F.2d at 78-79); *see* ECF No. 23, at 14-17. According to Defendants, it follows from *TRAC* that the very existence of the Communications Act's review scheme requires Plaintiffs to channel their claim to the D.C. Circuit. ECF No. 52, at 5. But that is non-responsive to the ultimate question that *Thunder Basin* requires courts to answer: whether the plaintiff's claim is "of the type" that Congress

intended to be reviewed under the statutory review scheme. 510 U.S. at 212. When the answer is "yes," *TRAC* clarifies that appellate courts retain protective jurisdiction. But when the answer is "no," *TRAC* does not impede the district court's jurisdiction. *See* 750 F.2d at 78 (explaining that the district court may retain jurisdiction in cases where "the underlying claim is not subject to the jurisdiction of the Courts of Appeals," meaning that "adjudication of the claim in the District Court will not affect any future statutory review authority of the Circuit Court").

Defendants next argue that Plaintiffs may obtain meaningful judicial review through mandamus relief if the Commission's action on their early license renewal applications is "unreasonably delayed." ECF No. 23, at 17; *see TRAC*, 750 F.2d at 79-80. This argument makes little sense since the Communications Act *precludes* the Commission from granting a license renewal more than thirty days before the license is set to expire. *See* 47 U.S.C. § 307(d); *see also* ECF No. 69, at 39:12-13 (defense counsel's acknowledgment that "license renewal . . . is not permitted" outside this timeframe). More importantly, and in any event, a mandamus action to force an ultimate determination on the license renewal applications does nothing to address the injury Plaintiffs are claiming from being subjected to an unconstitutional retaliatory process. *See supra* pp. 20-21.[9]

For the first time in their reply brief, Defendants advance that Plaintiffs had—but forwent—another avenue for meaningful review. ECF No. 52, at 6. Specifically, they argue that Plaintiffs could have requested that the full Commission review the April 2026 order establishing the early license renewal proceedings under 47 C.F.R. § 1.115(a), and then either sought

---

[9] The court further questions how a mandamus action can secure *meaningful* judicial review when mandamus relief "is a 'drastic' remedy, only available in 'extraordinary situations,' [which] 'is hardly ever granted.'" *Illinois v. Ferriero*, 60 F.4th 704, 714 (D.C. Cir. 2023) (quoting *In re Cheney*, 406 F.3d 723, 729 (D.C. Cir. 2005))

mandamus relief in the event of an "unreasonabl[e] delay" in the full Commission's review or appeal the full Commission's decision under 47 U.S.C. § 155(c)(4). ECF No. 52, at 6. But, as with Defendants' other arguments, this fails to reckon with Plaintiffs' contention that they should not be subject to an unconstitutional process *at all*. *See Axon*, 598 U.S. at 191; *see also Media Matters*, 2025 WL 2988966, at *4-5.[10]

Finally, Defendants assert that because Plaintiffs' licenses remain in effect while the renewal proceedings are pending, "whatever editorial changes [Plaintiffs] may adopt in the interim are not properly attributable to the early renewal proceeding, but are instead the result of their own independent choices." ECF No. 52, at 7. But this is an argument that Plaintiffs' claim of chilling under the First Amendment fails on the merits, not an argument that the court lacks jurisdiction over the chilling claim.

**2. Wholly collateral**

As to the second *Thunder Basin* factor, Plaintiffs contend that their retaliation claim is "wholly collateral" to the Communications Act's review provisions because the retaliation claim concerns "whether the Commission initiated the early license renewal proceeding to punish Plaintiffs for engaging in protected speech," not whether the Plaintiff Stations "satisfy the statutory criteria for renewing broadcast licenses." ECF No. 42, at 11. Defendants maintain that Plaintiffs' claim "calls into question the validity of the Commission's justifications for" initiating the early license renewal proceedings and thus "'relate[s] to the subject of the [investigatory] actions' and

[10] Defendants frame this as a claim about exhaustion of administrative remedies, *see* ECF No. 52, at 4, 6, but they do not argue that this provides an independent bar to the court's exercise of subject-matter jurisdiction.

the legitimacy of the agency's underlying concerns." ECF No. 23, at 20 (alterations in original) (quoting *Axon*, 598 U.S. at 193). Plaintiffs again have the better argument.

Defendants are mistaken that Plaintiffs' claim of pretext is inherently intertwined with the merits of the underlying proceedings. Plaintiffs' success turns on Defendants' motive for initiating the early license renewal proceedings. If Defendants initiated the proceedings to punish Plaintiffs for their protected speech, then Plaintiffs may bring a successful First Amendment claim regardless of whether they are entitled to renewal of their licenses in the ordinary course. A retaliation claim "turns on the Commission's motive in taking any investigative action against the [plaintiff]" and is thus "antecedent to and independent of" the question whether the underlying procedure complied with statutory and regulatory requirements. *Endocrine Soc'y*, 832 F. Supp. 3d at 11-12. As Plaintiffs contend, the proceedings are "merely the tool giving effect to the [Commission]'s alleged retaliation." *Id.*; *see* ECF No. 42, at 11. "The collateralism factor [thus] favors [Plaintiffs] . . . because they are challenging the Commission['s] power to proceed at all, rather than actions taken in the agency proceedings." *Axon*, 598 U.S. at 192; *see Abramowitz v. Lake*, No. 25-5314, 2026 WL 3398685, at *6 (D.C. Cir. Nov. 10, 2026) (explaining that a claim is "collateral" when it does not "call on the [agency] to 'address the sorts of procedural [and] evidentiary matters [the] agency often resolves on the way to a merits decision'" (second and third alterations in original) (quoting *Axon*, 598 U.S. at 193)).

### 3. Agency expertise

As to the third *Thunder Basin* factor, Defendants contend that Plaintiffs' retaliation claim implicates the Commission's subject-matter expertise because the success of their claim is "bound up with the validity of the Commission's basis for investigating" Plaintiffs' employment practices and "other possible public interest violations." ECF No. 23, at 20-21. Defendants' argument fails

for the same reason as their argument on the second *Thunder Basin* factor. *See supra* pp. 24-25. As explained, if Defendants initiated the early license renewal proceedings to punish Plaintiffs for their protected expression, then it is irrelevant whether Defendants could conjure up an adequate basis to investigate Plaintiffs or subsequently deny their licenses. As Plaintiffs put it, they "do not ask whether there was any violation of FCC rules," but instead bring a textbook retaliation claim that is well suited for judicial resolution. ECF No. 42, at 13. The court agrees that the Commission "has no 'expertise' in adjudicating First Amendment retaliation claims that parties bring against the Commission itself." *Endocrine Soc'y*, 832 F. Supp. 3d at 12 (quoting *Axon*, 598 U.S. at 186); *see Media Matters*, 2025 WL 2988966, at *5 (concluding that there was "no agency-expertise benefit to waiting" for judicial review where the agency "was already afforded an opportunity to consider the constitutional harms caused by its demand").

Defendants protest that Plaintiffs' proposed reading of *Axon* is too broad. ECF No. 52, at 8-10. Specifically, they caution against repurposing *Axon*'s holding into a bright-line rule that First Amendment retaliation claims fall outside of statutory review schemes. *See id.*; *see* ECF No. 23, at 7-10. But the Court in *Axon* engaged in a standard application of the *Thunder Basin* factors to conclude that the plaintiffs' constitutional claim was reviewable in district court. *See Axon*, 598 U.S. at 186-96. Here, the *Thunder Basin* factors similarly confirm that Plaintiffs' retaliation claim is not "of the type" that Congress intended to be reviewable only in the Court of Appeals under the Communications Act. *See supra* pp. 20-26. Although it may be true that constitutional claims of the kind alleged here may often fall outside of a claim-channeling provision, the court does not fashion a bright-line rule. The governing inquiry makes clear that the court retains jurisdiction over Plaintiffs' specific retaliation claim.

* * *

In sum, Plaintiffs do not claim that Defendants' early renewal orders are procedurally improper, violate governing regulations, or anything of the like. Rather, they argue that Defendants are using the early license renewal process as a tool to unconstitutionally retaliate against Plaintiffs for their protected expression. Because this claim falls far outside the Communications Act's review scheme, the court concludes that Plaintiffs have established jurisdiction over their claim.

### B. Preliminary Relief

#### 1. Likelihood of Success on the Merits

"'[I]f there is any fixed star in our constitutional constellation,'" it is that the First Amendment's Free Speech Clause "protect[s] the 'freedom to think as you will and to speak as you think.'" *303 Creative LLC v. Elenis*, 600 U.S. 570, 584 (2023) (first quoting *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943); then quoting *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 660-61 (2000)). The protection applies "regardless of whether the government considers [a person's] speech sensible and well intentioned or deeply 'misguided.'" *Id.* at 586 (quoting *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos., Inc.*, 515 U.S. 557, 574 (1995)). That is because "[a]t the heart of the First Amendment's Free Speech Clause is the recognition that viewpoint discrimination is uniquely harmful to a free and democratic society." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 187 (2024). Thus, the First Amendment prohibits the government from both "impos[ing] prior restraints on speech" and "from subjecting individuals to 'retaliatory actions' after the fact for having engaged in protected speech" that the government does not favor. *Hou. Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022).

To prevail on a retaliation claim, a plaintiff must show that (1) it "engaged in conduct protected under the First Amendment"; (2) "the defendant took some retaliatory action sufficient to deter a person of ordinary firmness in [the] plaintiff's position from speaking again"; and (3) "a causal link [exists] between the exercise of a constitutional right and the adverse action taken against [the plaintiff]." *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016) (internal quotation marks and citation omitted). The court concludes that Plaintiffs are likely to succeed on their retaliation claim.

*a. Protected conduct*

Plaintiffs "are obviously engaged in conduct protected under the First Amendment." *Paxton*, 138 F.4th at 584; *see Red Lion Broad. Co. v. Fed. Commc'ns Comm'n*, 381 F.2d 908, 923 (D.C. Cir. 1967), *aff'd*, 395 U.S. 367 (1969) (clarifying that the First Amendment "extends . . . to broadcasting, as well as other media of expression"). It is well established that "[w]hen a public broadcaster exercises editorial discretion in the selection and presentation of its programming, it engages in speech activity." *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 674 (1998); *see Moody v. NetChoice, LLC*, 603 U.S. 707, 731 (2024) ("[T]he editorial function itself is an aspect of speech." (alteration in original) (quoting *Denver Area Ed. Telecomms. Consortium, Inc. v. Fed. Commc'ns Comm'n*, 518 U.S. 727, 737 (1996) (plurality opinion)). "When the government interferes with such editorial choices—say, by ordering the excluded to be included—it alters the [programming]," and "in so doing—in overriding a private party's expressive choices—the government confronts the First Amendment." *Moody*, 603 U.S. at 731-32. Moreover, "reporting on public issues are quintessential First Amendment activities," *Paxton*, 138 F.4th at 584, and "[p]olitical speech, of course, is 'at the core of what the First Amendment is designed to protect,'"

*Morse v. Frederick*, 551 U.S. 393, 403 (2007) (quoting *Virginia v. Black*, 538 U.S. 343, 365 (2003) (plurality opinion)).

Here, Plaintiffs have demonstrated that they engaged in protected activity through: "ABC News's hosting of the 2024 presidential debate; *The View*'s editorial decisions about which guests to invite on the program . . . ; on-air comments about political figures by ABC late-night host Jimmy Kimmel; ABC News's general coverage of political events; and ABC News's decision not to broadcast the President's July [2026] address." ECF No. 2-1, at 23. Defendants do not seriously dispute this element, recognizing that "broadcasters make editorial decisions that may receive First Amendment protection." ECF No. 23, at 22. Instead, Defendants argue that Plaintiffs' expressive conduct "does not convert their employment conduct into protected speech, nor does it insulate them from the Commission's regulation and oversight." *Id.* That argument misses the point. Plaintiffs do not characterize their employment practices as protected expression. To the extent that Defendants frame Plaintiffs' suit as an overreaction to the Enforcement Bureau's investigation into Disney's employment practices, that argument goes to causation, not the existence of protected conduct.

*b. Retaliatory act*

Plaintiffs are also likely to show that Defendants took adverse action sufficient to "deter [a broadcaster] of ordinary firmness in [Plaintiffs'] position from speaking again." *Aref*, 833 F.3d at 258. Plaintiffs contend that the early license renewal proceedings are an adverse action "threaten[ing] drastic sanctions, including elimination of the Stations' broadcast licenses." ECF

No. 2-1, at 24.[11] Defendants make little argument to the contrary, suggesting only that because Plaintiffs "have corporate owners with immense financial and other resources," it is "far from clear" that a broadcaster in Plaintiffs' position "would be deterred from speaking based on the early renewal order or the possibility of a hearing designation order." ECF No. 23, at 23. Given the extreme, indeed existential, nature of the possible penalty Plaintiffs face—loss of their broadcast licenses—the court concludes that early license renewal proceedings create a risk sufficient to chill a broadcaster of ordinary firmness.

As Plaintiffs correctly point out, there is no support in the caselaw for factoring in the wealth of the plaintiff; rather, the inquiry centers on "th[e] threat's gravity." ECF No. 42, at 21; *see Vullo*, 602 U.S. at 191-92 ("[T]he greater and more direct the government official's authority, the less likely a person will feel free to disregard a directive from the official."). Even if the court were to account for Plaintiffs' collective wealth, it is hard to imagine that any broadcaster would be undeterred by Defendants' tangible steps toward enforcing President Trump and Commissioner Carr's repeated threats to strip the Plaintiff Stations of their licenses. Such "'threat[s] of invoking legal sanctions' [are] sufficient to deter protected speech," particularly when considering their magnitude here. *Media Matters for Am. v. Paxton*, 732 F. Supp. 3d 1, 28 (D.D.C. 2024), *aff'd*, 138 F.4th 563 (D.C. Cir. 2025). Plaintiffs project that they will lose "substantial revenue" if the Commission revokes their broadcast licenses and that upward of

---

[11] In their motion, Plaintiffs identify the Commission's "pretextual" investigations into Disney and *The View* as separate adverse actions. ECF No. 2-1, at 24. At the motions hearing, Plaintiffs clarified that they are only seeking preliminary relief as to the early license renewal proceedings. *See* ECF No. 69, at 23:24-26:4. The court will therefore tether any relief it orders to those proceedings and not the two investigations.

1,500 employees will face job insecurity. ECF No. 2-5 ¶¶ 37-38.[12] Any broadcaster of ordinary firmness—wealthy or not—would not hesitate to think twice if faced with such an existential threat to its business. *See Paxton*, 732 F. Supp. 3d at 28 (finding that the possibility of "civil penalties of up to $10,000 per violation" and contempt proceedings were "sufficient to deter [a media organization's] protected speech").

Plaintiffs' actual response thus far brings this chilling effect into clearer view. *See Hartley v. Wilfert*, 918 F. Supp. 2d 45, 54 (D.D.C. 2013) ("[W]hile a plaintiff's actual response to a defendant's conduct is not dispositive, it provides some evidence of the tendency of that conduct to chill First Amendment activity." (internal quotation marks omitted)). Plaintiffs represent that they have "changed" how they handle guest appearances for two of their shows singled out by President Trump and Defendants. ECF No. 2-5 ¶ 32 (*The View*); *see* ECF No. 42-2, at 64 (*Jimmy Kimmel Live!*). As a result of these changes, "no candidate for public office has appeared on *The View*" for several months, ECF No. 2-5 ¶ 33, and Plaintiffs opted to upload a senatorial candidate's appearance to the *Jimmy Kimmel Live!* YouTube channel instead of broadcasting it, ECF No. 42-2, at 64; *see* ECF No. 69, at 71:8-14 (explaining that that "editorial decision[]" was made in part "[b]ecause the FCC has no control over You[T]ube"). The prospect of license non-renewal has also factored into Plaintiffs' calculus of when and how they cover President Trump and political topics. *See* ECF No. 2-5 ¶ 23 (indicating that "ABC decided to livestream [President Trump's July 2026] speech on ABC News LIVE" because "the Administration . . . might take some adverse action against ABC if it did not"); *id.* ¶ 33 ("Plaintiffs

[12] Of note, both President Trump and Chairman Carr value Plaintiffs' broadcast licenses at "billions of dollars." ECF No. 2-3, at 185, 207, 253 (President Trump); ECF No. 2-4, at 33, ECF No. 42-2, at 80 (Chairman Carr).

have chosen not to air clips that they otherwise would have aired during the Hot Topics segment of *The View* and also in the cold open."). These alterations to Plaintiffs' editorial decisionmaking showcase how the Commission's early license renewal proceedings have already curtailed Plaintiffs' protected activity. That an objectively reasonable broadcaster faced with the same existential threat would follow suit is beyond debate. Thus, Plaintiffs have sufficiently cast the early license renewal proceedings as a retaliatory act.

*c. Causation*

Defendants channel most of their energy into disputing Plaintiffs' showing that any "adverse action against [them] would not have been taken absent the retaliatory motive." *Nieves v. Bartlett*, 587 U.S. 391, 399 (2019); *see* ECF No. 23, at 23-36. "It is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—the motive must *cause* the injury." *Nieves*, 587 U.S. at 398. "Courts have recognized that [] circumstantial evidence, including proximity in time between the protected speech and government's adverse actions, the defendant's expression of hostility to the protected speech, and the absence of a proffered legitimate alternative explanation for the action[,] can support a finding that protected speech caused the agency's response." *Media Matters*, 2025 WL 2988966, at *8 (collecting cases). Here, robust circumstantial evidence strongly supports Plaintiffs' theory of causation. Although Defendants proffer a legitimate alternative explanation, the court does not find that explanation to be credible on the record before the court.

Starting with expressions of hostility, President Trump has set his sights on Plaintiff ABC for several years now. What started in 2020 as questions about how ABC "can keep getting a license" if it "report[s] fake news," ECF No. 2-3, at 14, has crescendoed into repeated calls for the Commission to strip ABC's broadcast licenses for their editorial decisions. The court counts

eleven such calls made by President Trump over the past two years—the most recent being in July 2026. *See* ECF No. 1 ¶ 75 ("When you have a network and you have evening shows, and all they do is hit Trump[,] . . . I think maybe their license should be taken away. It will be up to [Chairman] Carr."); ECF No. 2-3, at 109-10 ("[T]hey ought to take away [ABC's] license."); *id.* at 157 ("ABC's license should be TERMINATED."); *id.* at 166 ("CBS should lose its license, and it should be bid out to the Highest Bidder, as should all other Broadcast Licenses, because they are just as corrupt as CBS—and maybe even WORSE!"); *id.* at 252 ("I think ABC should lose its license."); *id.* at 303 ("ABC & NBC FAKE NEWS . . . SHOULD, ACCORDING TO MANY, HAVE THEIR LICENSES REVOKED BY THE FCC."); *id.* at 306 ("ABC and NBC FAKE NEWS . . . should lose their Licenses."); *id.* at 321 ("[T]he Federal Communications Commission should look into the license of . . . ABC Fake News."); *id.* at 340 ("I think the license should be taken away from ABC because your news is so fake and it's so wrong. And we have a great commissioner, the chairman, who should look at that."); ECF No. 2-4, at 13 ("If Network NEWSCASTS, and their Late Night Shows, are almost 100% Negative to President Donald J. Trump, MAGA, and the Republican Party, shouldn't their very valuable Broadcast Licenses be terminated? I say, YES!"); *id.* at 99 ("ABC fake news ha[s] [] said that [it] would not cover this speech. . . . Fraud like this should mean a revocation of their licenses."). To be sure, President Trump is within his rights "to persuade Americans, including by speaking forcefully or critically, in ways that [he] believes would advance the public interest." *Trump v. United States*, 603 U.S. 593, 629 (2024). Here, however, the President's persistent "rhetoric demonstrates that [he] harbored animosity" toward Plaintiffs because of their protected speech, *N.Y. Times Co. v. Dep't of Def.*, 837 F. Supp. 3d 1, 17 (D.D.C. 2026); specifically—to quote the President—their "negative" and "unfair coverage" of him and the Republican Party, ECF No. 2-3, at 306, 340; *see*

*Vullo*, 602 U.S. at 188 ("A government official . . . [cannot] use the power of the State to punish or suppress disfavored expression.").

What is more, Chairman Carr has taken President Trump's rhetoric as his marching orders. The same week he was tapped to be President Trump's FCC chair, following months of President Trump's calling for "ABC [to] lose its license" for how it covered the presidential campaign, ECF No. 2-3, at 252, then-Commissioner Carr lauded "license revocation" as a "remedy" to "deter this kind of conduct," *id.* at 269. Then, early in his tenure as chairman and after committing himself to President Trump's agenda, ECF No. 2-3, at 272, Chairman Carr ordered the Enforcement Bureau to investigate Disney's employment practices, ECF No. 23-5, at 2, and soon ordered another investigation into *The View*, ECF No. 2-5 ¶ 16. When President Trump first called for Mr. Kimmel to be fired—as well as for ABC's license to be "taken away," ECF No. 1 ¶ 75—Chairman Carr vowed to intervene if Plaintiffs did not "take action on Kimmel," *id.* ¶ 72. Months later, when President Trump decried Mr. Kimmel's skit about the First Lady, ECF No. 2-4, at 49, the Commission, at Chairman Carr's behest, initiated early license renewal proceedings the next day, *id.* at 56-57; *see* ECF No. 23-4, at 5. Chairman Carr said of the move, "If you didn't take us seriously, now you should." ECF No. 2-4, at 67. Most recently, when President Trump touted that Plaintiffs' not broadcasting his address justifies "revocation of their licenses," ECF No. 2-4, at 99, Chairman Carr announced that the Commission was "looking into" Plaintiffs' decision, *id.* at 153, and that he expected it to come up during the early license renewal proceedings, *id.* at 63, 110. This conduct and rhetoric are "powerful evidence of [Defendants'] retaliatory motive." *N.Y. Times*, 837 F. Supp. 3d at 17. In response, Defendants point to Chairman Carr's assurances that the Commission "has not singled out any one company for special treatment," ECF No. 23, at 35 (quoting ECF No. 23-4, at 5), and will remain "open-minded"

throughout the early license renewal proceedings, *id.* at 2 (quoting ECF No. 23-1, at 3). But these assurances fall flat when Chairman Carr is simultaneously making comments that the Commission is "looking into" Plaintiffs' "decision [not] to air" a presidential address as part of the proceedings, ECF No. 2-4, at 153, especially given that Chairman Carr has said that this specific presidential address is "something that broadcasters should be carrying," *id.* at 110.

Turning to temporal proximity, against the backdrop of President Trump and Chairman Carr's call-and-response, it is no coincidence that President Trump criticized Mr. Kimmel's skit on social media and the very next day Defendants initiated the early license renewal proceedings. *See* ECF No. 2-4, at 49, 56-57. Indeed, in the wake of Mr. Kimmel's September 2025 comments about President Trump and his supporters, Chairman Carr stated, "We can do this the easy way or the hard way. These companies can find ways to take action on Kimmel, or there is going to be additional work for the FCC ahead." ECF No. 1 ¶ 72; *see* ECF No. 2-4, at 6, 69. Chairman Carr made this promise at the same time that President Trump said of the situation: "When you have a network and you have evening shows, and all they do is hit Trump[,] . . . I think maybe their license should be taken away. It will be up to [Chairman] Carr." ECF No. 1 ¶ 75. Chairman Carr's "fast-moving" inquest into Plaintiffs' business operations and editorial decisions from the moment he was appointed as chairman and seemingly at the President's direction further "indicates [Defendants'] retaliatory animus." *Media Matters for Am. v. Fed. Trade Comm'n*, 805 F. Supp. 3d 105, 136 (D.D.C. 2025).

For their part, Defendants maintain that the Media Bureau's early license renewal proceedings are merely "in aid" of the Enforcement Bureau's investigation into Disney's employment practices and would have occurred absent Plaintiffs' protected activity. ECF No. 23, at 27. The court, of course, starts from the "presumption [] that agency actions are taken in good

faith." *Media Matters*, 2025 WL 2988966, at *6. But that inference does not override the ample evidence that Defendants' "proffered nonretaliatory explanation" for the early license renewal proceedings is "pretext." *Media Matters*, 805 F. Supp. 3d at 136 (quoting *Media Matters for Am. v. Bailey*, No. 24-CV-147, 2024 WL 3924573, at *15 (D.D.C. Aug. 23, 2024)).

To begin, the early license renewal proceedings came over a year into Defendants' enforcement push against Plaintiffs. The Enforcement Bureau's investigation into Disney's employment practices began in March 2025, ECF No. 23-5, at 2; then came the Media Bureau's investigation into *The View* in February 2026, ECF No. 2-5 ¶ 16; and most recently, the Media Bureau's early licenses renewal proceedings in April 2026, ECF No. 2-4, at 56-57. As part of their push, Defendants have made hundreds of information demands and retrieved tens of thousands of documents from Plaintiffs, *see* ECF No. 2-5 ¶¶ 14-17; ECF No. 42-3 ¶¶ 2-4, some of which go directly to Plaintiffs' editorial decisionmaking, ECF No. 2-5 ¶ 17. The D.C. Circuit has "credited a 'pattern of litigation and information demands' targeted at a disfavored speaker over the course of some months" as proof of pretext. *Endocrine Soc'y*, 832 F. Supp. 3d. at 20 (quoting *Media Matters*, 2025 WL 2988966, at *6-8). And courts in this district have flagged pretext "concerns" where an information demand "seeks substantive content that itself would be protected by the First Amendment." *Id.* at 19; *see Media Matters*, 2025 WL 2988966, at *7 (holding that a district court may treat an "effort to probe into editorial decisionmaking . . . as relevant evidence of pretext"). This court follows suit, particularly because even the first investigation into Disney's employment practices came on the heels of Chairman Carr's appointment and unqualified endorsement of President Trump's agenda, ECF No. 2-3, at 269, 272, which at that time prominently included the threat of the Commission's revoking Plaintiffs' broadcast licenses for

Plaintiffs' "unfair coverage" of President Trump and the Republican Party, *id.* at 306; *see id.* at 109-10, 157, 203, 252-53.

Next, Defendants claim that the relevant sequence of events is the week between Disney's "woefully deficient" response to the Enforcement Bureau's second letter of inquiry on April 21, 2026 and the Media Bureau's order on April 28, 2026. ECF No. 23, at 26. To be sure, the Media Bureau's order mentions Disney's "purported" responses to "two FCC Letters of Inquiry" in the same sentence that it announces that the Commission had "determined that additional actions are appropriate at this time." ECF No. 2-4, at 56-57. But the order does not explain what rendered Disney's responses "woefully deficient," let alone use those words. *See generally id.* That explanation did not come until May 15, 2026, over two weeks *after* the Media Bureau initiated the early license renewal proceedings. *See* ECF No. 23-27.[13] "The late-breaking nature of this explanation cuts in favor of finding pretext." *Media Matters*, 805 F. Supp. 3d at 137.

More to the point, Defendants offer two reasons for their unprecedented decision to have the Media Bureau use early license renewal proceedings as opposed to the Enforcement Bureau's using existing tools to resolve the discovery dispute. Defendants explain, "Disney's unwillingness

---

[13] Chairman Carr spoke with reporters on May 4, 2026 about the early license renewal proceedings, indicating that "there's a view that Disney was not forthcoming with the agency in terms of its document production last week." ECF No. 23-9, at 8. He continued, "And we don't need to hash out exactly why that is, but there is a concern that they weren't." *Id.*; *see id.* at 12 ("[T]his action is driven by an investigation into DEI conduct."); *id.* at 14 ("[T]his was a decision that we made inside this building based on where we were in the enforcement matter. There was no pressure from the outside."). This vague answer, which came almost a week after the Media Bureau's order, says nothing about why Disney's responses fell short. Indeed, on May 29, 2026, Chairman Carr suggested in an interview that May 15, 2026 was the first time Disney received official notice from the Commission that its responses were "incomplete." ECF No. 23-24, at 5 ("We have been signaling for a long time that we want Disney to take seriously our investigation. And it was only after we felt like, again, *and we provided them notice now*, that we thought their responses were disingenuous, . . . that we . . . [took] this next step." (emphasis added)).

to provide complete responses to the Enforcement Bureau's investigative requests and the availability . . . of *public input* and *an evidentiary hearing*" in early license renewal proceedings led "the Media Bureau [to] reasonably conclude[] that calling for early renewal . . . was 'essential within the meaning of agency regulations' [governing] the antidiscrimination investigation." ECF No. 23, at 35 (emphases added) (quoting ECF No. 2-4, at 57). Yet this explanation is noticeably absent from the Media Bureau's order, *see generally* ECF No. 2-4, at 56-57, another lapse tending to show pretext, *see Media Matters*, 805 F. Supp. 3d at 136-37.

Notably, Defendants admit in their supplemental brief that there were other ways for the Enforcement Bureau to order an evidentiary hearing accompanied by public input, including by invoking the Commission's "general investigative authority under 47 U.S.C. § 403." ECF No. 70, at 3 (citing *Fed. Commc'ns Comm'n v. Schreiber*, 381 U.S. 279, 281-83 (1965)). Although Defendants "doubt" that they would have "generated the broad public input" they did here, *id.*, their decision to reach for the "harshest" tool—one posing an existential threat to Plaintiffs' business, *see supra* pp. 30-32, and one they had not used in over half a century, ECF No. 2-4, at 68—"bolster[s] the [court]'s finding of pretext," *Ozburn-Hessey Logistics, LLC v. Nat'l Lab. Rels. Bd.*, 833 F.3d 210, 224 (D.C. Cir. 2016) (concluding that a defendant's deviation from "its general disciplinary norm of starting out with the least severe penalty that might accomplish the disciplinary objective" was evidence of pretext when the defendant "chose immediately to impose the harshest form of discipline").

Defendants have also not given any indication as to when these proceedings will end. As noted, the FCC cannot renew a broadcast license "more than thirty days prior to the expiration of the original license." 47 U.S.C. § 307(d). As a result, Plaintiffs could very well have to cower under the cloud of the existential threat of non-renewal—and whatever fresh demands and

resulting chill may ensue, *see, e.g.*, ECF No. 2-4, at 99, 110, 153; ECF No. 2-5 ¶¶ 23, 31-33—for the next two to five years, *see* ECF No. 1 ¶ 7. The most Defendants offer as reassurance is that "the Communications Act allows licensees to continue operating under their existing licenses for the duration of a renewal proceeding," so "Plaintiffs cannot credibly link [their recent editorial changes] . . . to the early renewal proceeding." ECF No. 23, at 40. But this rebuttal says nothing about when the proceedings may end or whether Defendants will refrain from further chilling Plaintiffs' editorial decisionmaking in the interim. The court therefore credits Plaintiffs' concern that the Commission will "let that threat loom as long as possible," ECF No. 2-1, at 36, especially because Defendants have already exhibited their willingness to use the specter of non-renewal to influence Plaintiffs' editorial decisions, *see, e.g.*, ECF No. 2-4, at 99, 110, 153; ECF No. 2-5 ¶ 23. The existence of other mechanisms to solicit public input, coupled with the untenable timeline, casts serious doubt on the argument that Defendants are using the early license renewal proceedings to enhance public participation.

All told, the "significant mismatch" between Defendants' decision to order the proceedings when they did and their stated rationale for doing so presents an air of pretext the court will not ignore. *Dep't of Com. v. New York*, 588 U.S. 752, 783-85 (2019) ("[Courts] are not required to exhibit a naiveté from which ordinary citizens are free." (internal quotation marks omitted)). Accordingly, the court determines that Plaintiffs have met their burden of showing causation at this stage. They are thus likely to succeed on their First Amendment claim.

### 2. Irreparable Harm

Without question, "[t]he loss of First Amendment freedoms, for even minimal periods of time, [] constitutes irreparable injury." *Paxton*, 138 F.4th at 585 (quoting *Pursuing Am.'s Greatness v. Fed. Election Comm'n* ("*PAG*"), 831 F.3d 500, 511 (D.C. Cir. 2016)). "Still, to

obtain a preliminary injunction, a party must show that their 'First Amendment interests are either threatened or in fact being impaired at the time relief is sought.'" *Id.* (quoting *Nat'l Treasury Emps. Union v. United States*, 927 F.2d 1253, 1254-55 (D.C. Cir. 1991)).

Plaintiffs have readily done so here. They have detailed "a campaign of retaliation against them in response to their exercise of their First Amendment rights," which on its own is an "irreparable injury." *Id.*; *see supra* pp. 28-39. They have further shown how the early license renewal proceedings have "result[ed] in [their] self-censorship and the chilling of [their] First Amendment expression," either of which constitutes irreparable harm. *Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333, 385 (D.D.C. 2020); *see supra* pp. 32-38. Since the early license renewal proceedings began in April 2026, Plaintiffs have decided to, among other things, livestream a presidential address that they otherwise would not have shown at all, ECF No. 2-5 ¶ 23, and upload a political candidate's appearance on YouTube instead of broadcasting it, ECF No. 42-2, at 64; ECF No. 69, at 71:8-14. Plaintiffs have made these and other editorial decisions fearing "the potential loss of [their] licenses." ECF No. 2-5 ¶ 34. Additionally, Plaintiffs have affirmatively "changed" how they "evaluat[e] potential guests for *The View*," now factoring in how "any invitation to a political candidate . . . might later be cited by the Commission as a basis for non-renewal in the . . . [early] license renewal proceedings." *Id.* ¶ 32.

Contrary to Defendants' telling, these harms are not "speculative," nor are they any less acute because Plaintiffs can "continue operating under their existing licenses for the duration of [the] renewal proceeding[s]." ECF No. 23, at 39-40. That fact is underscored by Chairman Carr's recent statements signaling that Plaintiffs' editorial "decision[s]" about what Plaintiffs broadcast will be "raised," ECF No. 2-1, at A11, and "look[ed] into" by the Commission as part of the early license renewal proceedings, ECF No. 2-4, at 153; *see Paxton*, 732 F. Supp. 3d at 28 (observing

that "the 'threat of administrative and judicial intrusion into newsgathering and editorial process'" is "sufficient to deter protected speech" (quoting *United States v. LaRouche Campaign*, 841 F.2d 1176, 1182 (1st Cir. 1988)). Plaintiffs' ongoing and anticipated self-censorship and augmentation of their constitutionally protected editorial discretion are the sort of "adverse effects" that constitute irreparable injury under the First Amendment. *Paxton*, 138 F.4th at 585; *see Turner*, 502 F. Supp. 3d at 385.

**3. The Balance of Equities and the Public Interest**

Finally, Plaintiffs have established that the balance of equities and the public interest weigh in their favor. As noted, these factors "'merge when,' as here, 'the Government is the opposing party.'" *Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020) (quoting *Nken*, 556 U.S. at 435). Thus, "[w]hen a private party seeks injunctive relief against the government," the court must "weigh[] the benefits to the private party from obtaining an injunction against the harms and the public from being enjoined." *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 734 (D.C. Cir. 2022) (quoting *Doe v. Mattis*, 928 F.3d 1, 23 (D.C. Cir. 2019)).

This is not a close case. Plaintiffs have a weighty interest in "vindicating the[ir] right to be free of retaliation for [their] protected speech." *Endocrine Soc'y*, 832 F. Supp. 3d at 21. And "'there is always a strong public interest in the exercise of free speech rights otherwise abridged by an unconstitutional' government action," *Paxton*, 138 F.4th at 585 (quoting *PAG*, 831 F.3d at 511), which favors Plaintiffs here because they have "shown a likelihood of success on the merits of [their] First Amendment retaliation claim," *Media Matters*, 805 F. Supp. 3d at 138. While Defendants certainly have a strong interest in enforcing the law, they may not "act unlawfully even in pursuit of desirable ends." *Huisha-Huisha*, 27 F.4th at 734 (internal quotation marks and citation omitted); *see Karem*, 960 F.3d at 668 ("[E]nforcement of an unconstitutional

law is always contrary to the public interest" (internal quotation marks and citation omitted)); *see also* 47 U.S.C. § 326 ("[N]o regulation or condition shall be promulgated or fixed by the Commission which shall interfere with the right of free speech."). Nor will granting preliminary relief "insulate[] [Plaintiffs'] broadcast stations from the regulatory requirements and processes that Congress has prescribed," ECF No. 23, at 45, as the "relief is not permanent" and Defendants "remain[] free to deploy other investigative tools," *World Pro. Ass'n for Transgender Health v. Fed. Trade Comm'n*, No. 26-CV-532, 2026 WL 1257321, at *5 (D.D.C. May 7, 2026).[14] No one doubts that the Commission may enforce the law in the manner it sees fit. But in doing so, Defendants may not retaliate against or punish Plaintiffs and other broadcast license holders for disfavored speech.

### 4. Scope of Relief

Having determined that Plaintiffs are entitled to preliminary relief, the court will issue a preliminary injunction and deny Plaintiffs' concurrent request for a temporary restraining order as moot. *See AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, 803 F. Supp. 3d 164, 193-94 (D.D.C. 2025), *appeal dismissed*, No. 25-5317, 2026 WL 476138 (D.C. Cir. Feb. 18, 2026). As to the contents of the preliminary injunction, Plaintiffs seek to enjoin Defendants from taking two sets of actions: (1) "any continuing or further action against Plaintiffs in relation to the early license renewal proceedings before the Federal Communications Commission, including issuing a

---

[14] Defendants list administrative subpoenas, 47 U.S.C. §§ 403, 409, forfeiture orders, *id.* § 503(b)(1)(B), (b)(4), standalone evidentiary hearings, *see id.* § 403, and license revocation proceedings, *id.* § 312, as alternative tools to ensure Plaintiffs' compliance with the Enforcement Bureau's investigation. ECF No. 70, at 1-4. Plaintiffs have also identified cease-and-desist orders, 47 U.S.C. § 312(b), formal admonishment, 47 C.F.R. § 0.111(a)(18), informal warning letters, or negotiated consent decrees as other options. ECF No. 71, at 3-4

Hearing Designation Order," and (2) "any actions, formal or informal, to coerce or threaten Plaintiffs with sanctions in an effort to alter their exercise of editorial discretion." ECF No. 2-8, at 1; *see* ECF No. 2, at 1. The court declines to enjoin the second set of actions. Beyond the early license renewal proceedings, Plaintiffs have not specified what these future "actions, formal or informal, to coerce or threaten Plaintiffs with sanctions," ECF No. 2-8, at 1, are or might be.[15] But injunctive relief requires "adequate proof of a threatened injury," *Taylor v. Resol. Tr. Corp.*, 56 F.3d 1497, 1508 (D.C. Cir. 1995), and the court cannot issue an injunction "to prevent injuries neither extant nor presently threatened, but only merely feared," *KalshiEX LLC v. Commodity Futures Trading Comm'n*, 119 F.4th 58, 65 (D.C. Cir. 2024) (internal quotation marks and citation omitted). Accordingly, the court will limit the preliminary injunction to acts pertaining to the early license renewal proceedings.

**5. Bond**

Federal Rule of Civil Procedure 65(c) provides that the court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Plaintiffs ask the court to waive this requirement, ECF No. 2-1, at 43, while Defendants request "an appropriate bond commensurate with the scope of any injunction," ECF No. 23, at 45. The court will exercise its "broad discretion" to order Plaintiffs to post a nominal bond of $1.00. *P.J.E.S. ex rel. Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492, 520 (D.D.C. 2020)

---

[15] When asked at the motions hearing whether the second set of actions is limited to acts taken as part of the early license renewal proceedings, Plaintiffs stated, "We don't want them to make those type of threats, which they have been making for a long time about losing your license, because of your speech." ECF No. 69, at 25:12-26:4.

(quoting *Simms v. District of Columbia*, 872 F. Supp. 2d 90, 107 (D.D.C. 2012)); *see Cable News Network, Inc. v. Trump*, No. 26-CV-3287, 2026 WL 3063460, at *12 (D.D.C. Oct. 13, 2026) (finding that a nominal bond was "appropriate . . . given the lack of representation that Defendants will sustain any monetary injury from an injunction and the importance of the rights Plaintiffs s[ought] to vindicate); *N.Y. Times*, 837 F. Supp. 3d at 23 (similar). Defendants have not attempted to explain how they will "suffer any 'material monetary injury' from the proposed injunction." *N.Y. Times*, 837 F. Supp. 3d at 23 (quoting *Am. Oversight v. Hegseth*, 788 F. Supp. 3d 14, 32 (D.D.C. 2025)); *see generally* ECF No. 23, at 45. And a nominal bond is particularly appropriate here because anything beyond that "would risk deterring other litigants from pursuing their right to judicial review of unlawful executive action." *League of United Latin Am. Citizens v. Exec. Off. of the President* ("*LULAC*"), 780 F. Supp. 3d 135, 225 (D.D.C. 2025), *aff'd*, No. 25-5476, 2026 WL 1991571 (D.C. Cir. July 2, 2026).[16]

---

[16] Indeed, courts in this district have routinely "declined to require plaintiffs to post any bond as a condition of obtaining an injunction against agencies or officers of the federal government," concerned that doing so "would 'contravene the interests of justice.'" *LULAC*, 780 F. Supp. 3d at 224-25 (D.D.C. 2025) (quoting *Aviel v. Gor*, 780 F. Supp. 3d 1, 16 n.7 (D.D.C. 2025)).

## VI. CONCLUSION

For the foregoing reasons, the court will deny Defendants' Motion to Dismiss, ECF No. 23, grant in part and deny in part Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction, ECF No. 2, and enter a preliminary injunction. A contemporaneous order will issue.

**SO ORDERED.**

LOREN L. ALIKHAN
United States District Judge

Date: November 25, 2026